**EXHIBIT A-4**

# LEASE

Landlord: **Southlands Colorado, LLC**
Tenant: **Colorado Cinema Group, LLC**
Date: August ~~July~~ 2, 2004
Location: Aurora, Colorado

## INDEX

| Article | Page No. |
|---|---|
| ARTICLE I Demise and Term | 1 |
| ARTICLE II Common Area; Parking and Access | 2 |
| ARTICLE III Construction of Improvements | 4 |
| ARTICLE IV Tenant's Furnishings, Fixtures and Equipment | 5 |
| ARTICLE V Rent | 5 |
| ARTICLE VI Maintenance and Repairs; Common Area Costs; Real Estate Taxes; Utility Charges | 7 |
| ARTICLE VII Alterations and Improvements | 11 |
| ARTICLE VIII Trade Name | 11 |
| ARTICLE IX Encumbrances | 11 |
| ARTICLE X Use of Premises | 12 |
| ARTICLE XI Noises and Odors | 13 |
| ARTICLE XII Signs | 14 |
| ARTICLE XIII Insurance; Destruction | 15 |
| ARTICLE XIV Eminent Domain | 17 |
| ARTICLE XV Default | 18 |
| ARTICLE XVI Surrender of Premises Upon Termination of Lease; Holdover | 20 |
| ARTICLE XVII Quiet Enjoyment and Marketable Title; Zoning, Environmental and Other Laws | 21 |
| ARTICLE XVIII Notice | 23 |
| ARTICLE XIX Taxes on Personalty | 23 |
| ARTICLE XX Title Policy | 24 |
| ARTICLE XXI Options to Extend | 24 |
| ARTICLE XXII Use of Lifestyle/Entertainment District | 25 |
| ARTICLE XXIII Memorandum of Lease; Commencement Date Memorandum | 25 |
| ARTICLE XXIV Force Majeure | 25 |
| ARTICLE XXV Assignment and Subletting | 26 |
| ARTICLE XXVI Ticket Kiosk; Antennas | 26 |
| ARTICLE XXVII Trash Area | 27 |
| ARTICLE XXVIII Leasehold Financing | 27 |
| ARTICLE XXIX Arbitration Clause | 30 |
| ARTICLE XXX Miscellaneous | 30 |

EXHIBIT A-1   Site Plan
EXHIBIT A-2   No-Build Area
EXHIBIT A-3   Monument Sign
EXHIBIT A-4   Tenant's Trash Area
EXHIBIT A-5   Queuing Area
EXHIBIT A-6   Tenant's Staging Area
EXHIBIT B   Legal Description of Lifestyle/Entertainment District
EXHIBIT C   Tenant Work Letter
EXHIBIT D   Form Assignment and Assumption Agreement
EXHIBIT E   Monument Sign Criteria
EXHIBIT F   Schematic Plan
EXHIBIT G-1   Parking Plan; No Build Area; Horizontal Control Plan
EXHIBIT G-2   No Popcorn/No Liquor Area
EXHIBIT H   Signage Guidelines
EXHIBIT I   Tenants and Occupants with Exclusives
EXHIBIT J   Approved Form of Memorandum of Lease

LEASE

THIS LEASE (the "Lease") is made and entered into as of the 2nd day of August 2004, by and between **Southlands Colorado, LLC**, a Delaware Limited Liability Company ("Landlord"), and **Colorado Cinema Group, LLC**, a Delaware Limited Liability Company ("Tenant"), with reference to the following facts:

Landlord, in consideration of the rents to be paid and the covenants and agreements to be performed and observed by Tenant, does hereby lease unto Tenant, and Tenant does hereby lease and take from Landlord, all of a freestanding building to be constructed by Tenant and located within the Lifestyle/Entertainment District of a project commonly known as the Southlands, located at the northeast corner of E-470 and Smoky Hill Road, City of Aurora, County of Arapahoe, State of Colorado (the "Project"). The Lifestyle/Entertainment District of the Project is more particularly described on **Exhibit B** attached hereto and is referred to herein as the "Shopping Center". The Project consists of four districts, the Value Retail District, the High Visibility District, the Large Format District, and the Lifestyle/Entertainment District (within which the Demised Premises will be situated and which is shown on **Exhibit A-1** attached hereto). The buildings and the common area which are proposed to be constructed within the Lifestyle/Entertainment District (the Shopping Center) are shown on **Exhibit A-1** attached hereto and incorporated herein. This Lease and the Demised Premises shall be subject to, among other things, (a) that certain Easements with Covenants and Restrictions Affecting Land (the "ECRs"), which ECRs have been previously delivered to Tenant and which are recorded in Arapahoe County, Colorado, on December 12, 2003, as Reception #83265873, (b) the Master Declaration of Easements, Covenants, Conditions and Restrictions (the "Master Declaration"), which Master Declaration has been previously delivered to Tenant and which was recorded in Arapahoe County, Colorado, on June 22, 2004, as Reception #84112093, (c) that certain Design Development Package: Site Signage and Retail Sign Design Criteria and Framework Development Plan Revised Submission Revised Issue: May 15, 2003, prepared by Communication Arts Incorporated, which may be amended from time to time from the initial form thereof, and which is attached hereto as **Exhibit H** (the "Signage Guidelines"), and (d) the Southlands Framework Development Plan (the "FDP"), which FDP has been previously delivered to Tenant. Tenant acknowledges that the work to be conducted hereunder by Tenant will be subject to the review of and approval by the Southlands Architectural Control Committee and the City of Aurora, both of which will be applying the design themes established in the FDP and the Signage Guidelines.

## ARTICLE I

### Demise and Term

1.  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the freestanding building to be built by Tenant on that portion of the Shopping Center outlined on **Exhibit A-1** attached hereto (the "Theatre Area" or the "Demised Premises"), together with the "Theatre Improvements" to be constructed by Tenant pursuant to (and as defined in) the "Tenant Work Letter" (attached as **Exhibit C** to this Lease and incorporated herein by this reference) and any other improvements now or hereafter located on the Theatre Area. (The Theatre Area and the Theatre Improvements, together with any other improvements now or hereafter located in the Theatre Area, are hereinafter sometimes referred to as the "Theatre".). The Landlord and Tenant anticipate that, upon completion, the Demised Premises will contain approximately 72,000 square feet. Following completion of construction of the Theatre Improvements, the actual square footage of the Demised Premises shall be determined based on a calculation of the area extending to the outer surface of the exterior walls of the first floor of the Demised Premises (and once determined shall be referred to in this Lease as the "Gross Leasable Area"). Once the Gross Leasable Area of the Demised Premises has been established, Landlord and Tenant shall execute a memorandum or letter agreement (a) confirming the actual Gross Leasable Area, and (b) amending those provisions of the Lease (i.e., minimum rent, Tenant's Proportionate Share, etc.) that directly relate to the revised Gross Leasable Area.

2.  The initial term of this Lease shall be for twenty (20) years. If the last day of the initial term falls on a day other than the last day of a calendar month, then the initial term shall be extended so that the last day of the initial term shall be the last day of the calendar month in which the initial term would otherwise end.

3.  The term of this Lease shall commence on the earlier of (i) the date on which Tenant opens the Theatre to the public for business, or (ii) three hundred sixty five (365) days following Landlord's delivery of a "buildable pad" (as such term is defined in Article III hereinbelow) to Tenant ("Commencement Date"); provided, however, Landlord and Tenant agree that Landlord shall not deliver the buildable pad to Tenant prior to May 1, 2005, unless Tenant notifies Landlord in writing that Tenant will agree to accept the buildable pad prior to May 1, 2005.

4.  Tenant shall open the Theatre to the public for business forthwith upon issuance of the Certificate of Occupancy (or temporary Certificate of Occupancy, as applicable) for the Theatre. Landlord and Tenant shall cooperate so that that the applicable Certificate of Occupancy is issued at the earliest possible date.

PAGES 3-17 REMOVED FOR BREVITY

Theatre would be excessive, then this Lease shall terminate as to the entire Theatre as of the date of such appropriation or taking. Notwithstanding any provision in this Article XIV to the contrary, in all events the provisions of this Lease relating to restoration or rebuilding following an appropriation or taking shall be subject to and governed by the provisions of any first mortgage or first deed of trust given by Landlord and encumbering the Demised Premises.

3. If (i) a portion of the Lifestyle/Entertainment District other than the Theatre comprising at least 10 percent of the No-Build Area and/or at least 10 percent of the parking spaces within the No-Build Area shall be appropriated or taken under power of eminent domain, or any similar power, and (ii) Tenant's Gross Box Office Receipts and Gross Candy Concession Receipts from the Theatre in the ninety day period commencing on the effective date of such appropriation or taking is less than 95% of Tenant's average Gross Box Office Receipts and Gross Candy Concession Receipts from the Theatre for the same ninety day calendar period in each of the immediately preceding three calendar years (or such shorter period if the appropriation or taking occurs during the first three years of the term hereof), and (iii) in Tenant's reasonable judgment, the Theatre cannot be effectively, legally and profitable used by Tenant for the operation of its business, Tenant shall have the right to terminate this Lease within 60 days following the taking/appropriation. However, if, in Tenant's reasonable judgment, the Theatre can still be effectively, legally and profitably used by Tenant in the operation of its business notwithstanding the taking/appropriation, then Tenant shall so use the Theatre and there shall be an abatement of fixed minimum rent based upon the extent by which Gross Box Office Receipts and Gross Candy Concession Receipts was so affected. Additionally, Tenant's Proportionate Share shall be recomputed based on the number of gross leasable square feet remaining in the Lifestyle/Entertainment District. In such event, Landlord shall, at its cost and expense, take all action necessary to restore the Lifestyle/Entertainment District provided that in no event shall Landlord be obligated to expend more than the net condemnation proceeds available to Landlord for such purpose. All such restorations shall be promptly commenced, diligently prosecuted to completion, and of good quality and workmanship, and shall be undertaken in a manner which will minimize the inconvenience to Tenant, including but not limited to construction and maintenance of adequate barricades and aesthetic screening around all construction areas. If, on the other hand, the occurrences described in subclauses (i) and (ii) of this Section 3 shall have occurred and in Tenant's reasonable judgment the Theatre thereafter cannot be effectively, legally and profitably used by Tenant in the operation of its business, then this Lease shall terminate as of the date of such appropriation or taking.

4. Subject to the provisions of Section 2 of this Article XIV concerning the costs of restoring the Theatre, if all or a portion of the Theatre or the Lifestyle/Entertainment District is taken or appropriated as contemplated in Section 2 of this Article XIV, only Landlord shall have the right to claim the award made by the condemning authority.

5. Without in any way limiting the generality of the provisions of this Article XIV, it is specifically agreed that if, as a result of a taking or appropriation, either (a) the number of parking spaces in the Tenant Parking No Change Area is materially reduced and adequate alternative parking is unavailable, or (b) the nonexclusive parking facilities on the remainder of the Shopping Center are reduced below such number as may now or hereafter be required by any law for the operation of the Theatre and all other facilities then located on the Shopping Center, as a result of taking or appropriation, Tenant may terminate this Lease as of the date of such taking by giving notice to Landlord.

6. A voluntary sale to any public body or agency having the power of eminent domain, either under threat of condemnation or while proceedings are pending, shall be deemed to be a taking under the power of eminent domain for the purposes of this Lease.

## ARTICLE XV

### Default

1. The following events shall be deemed to be "Events of Default" by Tenant under this Lease:

(a) Tenant shall have failed to pay any installment of fixed minimum rent, additional rent, percentage rent or any portion thereof or any other amount due hereunder when the same shall be due and payable, and shall not cure such failure within 10 days after Landlord has given written notice to Tenant of such failure; or

(b) Tenant shall have failed to comply with any other provision of this Lease to be complied with by Tenant and shall not cure such failure within 30 days after Landlord has given written notice to Tenant of such noncompliance (provided, however, that in the case of a failure which cannot with due diligence be cured within a period of 30 days, Tenant shall have such additional time to cure the same as may be reasonably necessary, as long as Tenant commences to cure such failure within said 30 day period and at all times thereafter proceeds with due diligence to cure such failure after receipt of said notice).

2. Upon an Event of Default, Landlord may:

h:s/l/d/w/doc/Southlands-Co Cinema Lease(fnl)

Page 18

(a) terminate this Lease, in which event Tenant shall immediately surrender the Demised Premises to Landlord. In such event, Landlord shall be entitled to recover from Tenant (i) the unpaid rent which had been earned at the time of the termination, (ii) the worth at the time of the award of the amount by which the unpaid rent which would have been earned after termination until the time of the award exceeds the amount of such rental loss that the Tenant proves could have been reasonably avoided, (iii) the worth at the time of the award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Tenant proves could have been reasonably avoided, and (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including, without limitation, the cost of recovering possession of the Demised Premises, expenses of reletting, including necessary renovation and alteration of the Demised Premises, reasonable attorneys fees, and that portion or any leasing commission paid by Landlord in connection with this Lease applicable to the unexpired term of this Lease. Landlord's efforts to mitigate its damages shall not waive Landlord's right to recover all or any portion thereof in a separate suit.

(b) continue this Lease and Tenant's right to possession and recover rent (and all additional rent) a the same becomes due, in which event Tenant may sublet or assign (in accordance with the provisions of this Lease relating thereto). In connection therewith, acts of maintenance, efforts to relet and/or the appointment of a receiver to protect Landlord's interests, shall not constitute a termination of the Lease.

(c) pursue any other remedy or remedies now or hereafter available in the State of Colorado, provided, however that the termination of the Lease shall not relieve Tenant from liability under any indemnity provisions of the Lease as to matters occurring and/or accruing during the term of the Lease.

(d). Notwithstanding anything to the contrary contained herein, Landlord shall use reasonable efforts to mitigate its damages in the event this Lease or Tenant's right to possession of the Demised Premises is terminated due to Tenant's default.

(e) Tenant agrees that any reentry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings or without the necessity for any legal proceedings, as Landlord may elect, and Landlord shall not be liable in trespass or otherwise.

(f) In case of any Event of Default or breach by Tenant, Tenant shall also be liable for and shall pay to Landlord, at the address specified for notice to Landlord herein in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises, the costs of removing and storing Tenant's Property, the costs of repairing, altering, remodeling or otherwise putting the Premises in a "white-box" condition, and all reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies including reasonable attorneys' fees.

(g) Landlord and Landlord's agents and employees shall not be liable to Tenant or any other person or entity whomsoever for any injury to person or damage to property caused by the Premises or other portions of the Shopping Center arising out of repair or by defect in or failure of equipment, pipes or wiring, or broken glass, or by the backing up of drains, or by gas, water, steam, electricity or oil leaking, escaping or flowing into the Premises, nor shall Landlord be liable to Tenant or any other person or entity whomsoever for any loss or damage that may be occasioned by or through the acts or omissions of other tenants or occupants of the Shopping Center or of the Project or of any other persons or entities whomsoever, excepting only duly authorized employees and agents of Landlord.

(h) No receipt of money by Landlord from Tenant after the termination of this Lease as herein provided shall reinstate, continue or extend the Lease Term or operate as a waiver of the right of Landlord to enforce the payment of Minimum Rent or additional rent when due from Tenant, or operate as a waiver of the right of Landlord to recover possession of the Premises.

3. In the event Tenant fails to pay Landlord within ten days after written notice from Landlord that any installment of fixed minimum rent or additional rent has become due hereunder, Landlord will incur additional expenses in an amount not readily ascertainable and which has not been elsewhere provided for between Landlord and Tenant. Subject to any prior notice requirements, if Tenant should fail to pay to Landlord any installment of fixed minimum rent or additional rent within ten days after Landlord's notice that such installment is due, Tenant will pay Landlord on demand a late charge of 2% thereof, provided that such notice and cure period shall be available to Tenant only two times in any lease year and if Tenant thereafter fails in said lease year to pay to Landlord any installment of fixed minimum rent or additional rent when due, said late charge shall become immediately due and payable. Failure to pay such late charge upon demand therefor shall be an event of default hereunder. Tenant shall have an additional ten (10) days to cure the default, as long as Tenant pays Landlord on demand a late charge of 8% thereof. Said late charge shall become immediately due and payable. Provision for such late charge shall be in addition to all other rights and remedies available to Landlord hereunder or at law or in equity and shall not be construed as liquidated damages or limiting Landlord's remedies in any manner.

4.  Landlord shall not be deemed to have committed an event of default under this Lease unless Landlord shall have failed to comply with any material provision of this Lease to be complied with by Landlord and shall not cure such failure within 30 days after Tenant has given written notice to Landlord of such noncompliance (provided, however, that in the case of a failure which cannot with due diligence be cured within a period of 30 days, Landlord shall have such additional time to cure the same as may be reasonably necessary, as long as Landlord proceeds promptly and with due diligence to cure such failure after receipt of said notice). If Landlord fails to cure a Landlord default within the timeframes set forth hereinabove (and Landlord does not dispute the same), Tenant may, as Tenant's sole remedy therefore, cure such default at Landlord's expense, in which case, following completion of such cure, Tenant shall submit paid invoices and/or other reasonable documentation evidencing the Tenant's completion of and payment for the work to Landlord for reimbursement. If Landlord fails to reimburse Tenant for the costs of curing the Landlord default within thirty (30) days after receiving documentary evidence of the work completed and the costs incurred by Tenant therefore, Tenant may offset the costs thereof against the payments of minimum rent next becoming due and payable. In no event shall Tenant have the right to terminate the Lease as a result of Landlord's default hereunder unless such Landlord default would constitute a "constructive eviction" of Tenant.

5.  Tenant agrees to send the holder of any mortgage or deed of trust on the Shopping Center (a "Mortgagee"), by certified mail, a copy of any notice of default given to Landlord at such address of Landlord's Mortgagee of which Tenant has been notified. If Landlord fails to cure any default of Landlord within the time period provided for in this Lease, then Landlord's Mortgagee shall have an additional thirty (30) days within which to cure such default (or such additional period of time as may be reasonably necessary if such Mortgagee is diligently pursuing cure of same) before Tenant shall be entitled to exercise its rights to seek recovery of its actual damages or obtain equitable relief, which shall be Tenant's sole and exclusive remedies hereunder.

6.  Notwithstanding any other provision hereof, neither Landlord, Landlord's managing agent, Landlord's mortgagees or their respective partners, members, managers, shareholders, principals, officers, directors or agents shall have any personal liability hereunder. In the event of any breach or default by Landlord in any term or provision of this Lease, Tenant agrees to look solely to the equity or interest (including for this purpose any and all rents, profits, insurance proceeds and condemnation proceeds) then owned by Landlord in the land and improvements which constitute the Lifestyle/Entertainment District, however, in no event shall any deficiency judgment of any kind be sought or obtained against Landlord, Landlord's managing agent, Landlord's mortgagees or their respective partners, members, managers, shareholders, principals, officers, directors or agents.

7.  Except if caused by the intentional wrongful act or gross negligence of Landlord, its agents or employees and except as expressly provided to the contrary in this Lease, Landlord shall not be liable to Tenant or any other person or entity whomsoever for any injury to person, property damage or damage to the Theatre or other portions of the Lifestyle/Entertainment District. Tenant shall indemnify and hold Landlord harmless from any loss, cost, expense or claims arising out of such injury or damage referred to in this Section.

## ARTICLE XVI

### Surrender of Premises Upon Termination of Lease; Holdover

1.  Tenant, within 30 days after the expiration or earlier termination of this Lease, shall remove from the Theatre all items of Tenant's personal property and shall surrender the Theatre in broom-clean condition, subject to the effects of wear and tear arising from use or lapse of time and of damage by fire or other casualty. Tenant shall continue to pay rent and all other sums due hereunder during the 30-day move out period and shall otherwise comply with the terms of this Lease during such period, but shall not operate the Theatre during such period. If Tenant surrenders the Theatre as above provided during the 30-day move out period, such rent and other sums shall be prorated as of the surrender date.

2.  The holding over and/or continuation of any activities by Tenant on the Demised Premises after the expiration of the term hereof and the move out period provided in Paragraph 1 immediately above shall not be considered to be a renewal or extension of this Lease unless Landlord approves such holding over in writing and a definite extension agreement defining the length of such additional term is executed by Landlord. Any holding over beyond the 30-day move out period without the written consent of Landlord shall be considered to be a month-to-month tenant at sufferance at a rental equal to one and one-half (1½) times the minimum rent paid by Tenant in the prior Lease year as provided herein and otherwise subject to all the terms and provisions of this Lease.

PAGES 21-30 REMOVED FOR BREVITY

10.  As used in this Lease, a "business" or a "working day" means a week day which is not a federal holiday or a legal holiday in the State in which the Shopping Center is located.

11.  To the extent not prohibited by applicable law which may not be waived, Landlord and Tenant hereby irrevocably waive any and all right to trial by jury in any judicial proceeding arising out of or related to this Lease and the transactions contemplated hereby, whether sounding in tort, in contract or otherwise.

12.  The payment of any and all commissions due to Lampert Properties, Inc. and David Hicks Brokerage, Inc. shall be the responsibility of Landlord pursuant to a separate agreement. Landlord and Tenant represent and warrant to each other, and shall indemnify each other for any breach hereof, that, other than Lampert Properties, Inc. and David Hicks Brokerage, Inc., there are no other brokers, finders or other persons who might, by any reason of their contact with Landlord or Tenant, be entitled or claim to be entitled to a commission, finder's fee or other compensation in connection with this transaction.

13.  In no event shall Landlord be liable to Tenant for any failure of any other tenant in the Lifestyle/Entertainment District to operate its business.

14.  Subject to the prohibition on the operation a Liquor store in the No Popcorn/No Liquor Area, Tenant agrees not to protest any application for a liquor license for use by any business operating within the Shopping Center and/or on other property adjacent to the Shopping Center and/or the Project.

15.  Subject to the terms of this Lease (including, without limitation, Article II hereof), Landlord reserves the right from time to time to enlarge the Shopping Center by constructing other buildings on portions of the Shopping Center with or without any new Common Areas, and by including within the existing Shopping Center other properties now or hereafter owned by Landlord adjacent to or near the Shopping Center, and constructing on such additional property buildings and Common Areas, provided, however, that in no event shall access to the Demised Premises be adversely affected. In this event, such new buildings, properties and Common Areas shall be treated as though they were originally a part of the Shopping Center and, at the election of Landlord, all Common Area costs shall be applicable to such enlarged area and all improvements now or hereafter constructed thereon; provided, however, that in such event Tenant's Proportionate Share shall be appropriately adjusted to include any additional square footage contained in such new buildings or comprising additional properties added to the Shopping Center. Until Landlord makes such election, Common Area costs shall continue as though such enlargement had not occurred.

16.  As used herein, "Interest Rate" shall mean the rate of interest per annum announced or published by *The Wall Street Journal* as the "prime rate" plus two percent (2%), adjusted with each change in the prime rate.

17.  Tenant shall maintain all display windows in a neat, attractive condition, and shall keep all display windows and exterior electric signs in front of the Premises lighted during reasonable hours every day, including Sundays and holidays.

18.  "To Landlord's knowledge" as used in this Lease (a) shall mean and apply to the actual current knowledge of Don Provost or Bryan McFarland (the "Involved Parties"), and not to any other parties (provided, however, that if either Don Provost or Bryan McFarland should no longer be an Involved Party, Landlord shall substitute another person who shall have knowledge of the applicable matters and issues), (b) without any investigation or inquiry of any kind; (c) shall not mean such Involved Parties are charged with knowledge of the acts, omissions and/or knowledge of the predecessors in title to the Property; and (d) shall not apply to or be construed to apply to information which is not actually known to the Involved Parties.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

**LANDLORD:**

SOUTHLANDS COLORADO, LLC,
a Delaware limited liability company

By:   Southlands Management, LLC,
      a Colorado limited liability company

      By: _____
      Name:  Don Provost
      Title: Manager

**TENANT:**

COLORADO CINEMA GROUP, LLC,
a Delaware limited liability company

By: _____
Name:  Haydn Silleck
Title: Manager