# EXHIBIT 5

# PART 1

# LEASE

Landlord:    **Southlands Colorado, LLC**
Tenant:      **Colorado Cinema Group, LLC**
Date:        ~~July~~ August 2, 2004
Location:   **Aurora, Colorado**

## INDEX

| Article | Page No. |
|---|---|
| ARTICLE I   Demise and Term | 1 |
| ARTICLE II   Common Area; Parking and Access | 2 |
| ARTICLE III   Construction of Improvements | 4 |
| ARTICLE IV   Tenant's Furnishings, Fixtures and Equipment | 5 |
| ARTICLE V   Rent | 5 |
| ARTICLE VI   Maintenance and Repairs;  Common Area Costs; Real Estate Taxes; Utility Charges | 7 |
| ARTICLE VII   Alterations and Improvements | 11 |
| ARTICLE VIII   Trade Name | 11 |
| ARTICLE IX   Encumbrances | 11 |
| ARTICLE X   Use of Premises | 12 |
| ARTICLE XI   Noises and Odors | 13 |
| ARTICLE XII   Signs | 14 |
| ARTICLE XIII   Insurance; Destruction | 15 |
| ARTICLE XIV   Eminent Domain | 17 |
| ARTICLE XV   Default | 18 |
| ARTICLE XVI   Surrender of Premises Upon Termination of Lease; Holdover | 20 |
| ARTICLE XVII   Quiet Enjoyment and Marketable Title; Zoning, Environmental and Other Laws | 21 |
| ARTICLE XVIII   Notice | 23 |
| ARTICLE XIX   Taxes on Personalty | 23 |
| ARTICLE XX   Title Policy | 24 |
| ARTICLE XXI   Options to Extend | 24 |
| ARTICLE XXII   Use of Lifestyle/Entertainment District | 25 |
| ARTICLE XXIII   Memorandum of Lease; Commencement Date Memorandum | 25 |
| ARTICLE XXIV   Force Majeure | 25 |
| ARTICLE XXV   Assignment and Subletting | 26 |
| ARTICLE XXVI   Ticket Kiosk; Antennas | 26 |
| ARTICLE XXVII   Trash Area | 27 |
| ARTICLE XXVIII   Leasehold Financing | 27 |
| ARTICLE XXIX   Arbitration Clause | 30 |
| ARTICLE XXX   Miscellaneous | 30 |

EXHIBIT A-1   Site Plan
EXHIBIT A-2   No-Build Area
EXHIBIT A-3   Monument Sign
EXHIBIT A-4   Tenant's Trash Area
EXHIBIT A-5   Queuing Area
EXHIBIT A-6   Tenant's Staging Area
EXHIBIT B   Legal Description of Lifestyle/Entertainment District
EXHIBIT C   Tenant Work Letter
EXHIBIT D   Form Assignment and Assumption Agreement
EXHIBIT E   Monument Sign Criteria
EXHIBIT F   Schematic Plan
EXHIBIT G-1   Parking Plan; No Build Area; Horizontal Control Plan
EXHIBIT G-2   No Popcorn/No Liquor Area
EXHIBIT H   Signage Guidelines
EXHIBIT I   Tenants and Occupants with Exclusives
EXHIBIT J   Approved Form of Memorandum of Lease

## LEASE

THIS LEASE (the "Lease") is made and entered into as of the 2nd day of ~~July~~ August 2004, by and between **Southlands Colorado, LLC**, a Delaware Limited Liability Company ("Landlord"), and **Colorado Cinema Group, LLC**, a Delaware Limited Liability Company ("Tenant"), with reference to the following facts:

Landlord, in consideration of the rents to be paid and the covenants and agreements to be performed and observed by Tenant, does hereby lease unto Tenant, and Tenant does hereby lease and take from Landlord, all of a freestanding building to be constructed by Tenant and located within the Lifestyle/Entertainment District of a project commonly known as the Southlands, located at the northeast corner of E-470 and Smoky Hill Road, City of Aurora, County of Arapahoe, State of Colorado (the "Project"). The Lifestyle/Entertainment District of the Project is more particularly described on **Exhibit B** attached hereto and is referred to herein as the "Shopping Center". The Project consists of four districts, the Value Retail District, the High Visibility District, the Large Format District, and the Lifestyle/Entertainment District (within which the Demised Premises will be situated and which is shown on **Exhibit A-1** attached hereto). The buildings and the common area which are proposed to be constructed within the Lifestyle/Entertainment District (the Shopping Center) are shown on **Exhibit A-1** attached hereto and incorporated herein. This Lease and the Demised Premises shall be subject to, among other things, (a) that certain Easements with Covenants and Restrictions Affecting Land (the "ECRs"), which ECRs have been previously delivered to Tenant and which are recorded in Arapahoe County, Colorado, on December 12, 2003, as Reception #83265873, (b) the Master Declaration of Easements, Covenants, Conditions and Restrictions (the "Master Declaration"), which Master Declaration has been previously delivered to Tenant and which was recorded in Arapahoe County, Colorado, on June 22, 2004, as Reception #84112093, (c) that certain Design Development Package: Site Signage and Retail Sign Design Criteria and Framework Development Plan Revised Submission Revised Issue: May 15, 2003, prepared by Communication Arts Incorporated, which may be amended from time to time from the initial form thereof, and which is attached hereto as **Exhibit H** (the "Signage Guidelines"), and (d) the Southlands Framework Development Plan (the "FDP"), which FDP has been previously delivered to Tenant. Tenant acknowledges that the work to be conducted hereunder by Tenant will be subject to the review of and approval by the Southlands Architectural Control Committee and the City of Aurora, both of which will be applying the design themes established in the FDP and the Signage Guidelines.

## ARTICLE I

### Demise and Term

1.      Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the freestanding building to be built by Tenant on that portion of the Shopping Center outlined on **Exhibit A-1** attached hereto (the "Theatre Area" or the "Demised Premises"), together with the "Theatre Improvements" to be constructed by Tenant pursuant to (and as defined in) the "Tenant Work Letter" (attached as **Exhibit C** to this Lease and incorporated herein by this reference) and any other improvements now or hereafter located on the Theatre Area. (The Theatre Area and the Theatre Improvements, together with any other improvements now or hereafter located in the Theatre Area, are hereinafter sometimes referred to as the "Theatre".). The Landlord and Tenant anticipate that, upon completion, the Demised Premises will contain approximately 72,000 square feet. Following completion of construction of the Theatre Improvements, the actual square footage of the Demised Premises shall be determined based on a calculation of the area extending to the outer surface of the exterior walls of the first floor of the Demised Premises (and once determined shall be referred to in this Lease as the "Gross Leasable Area"). Once the Gross Leasable Area of the Demised Premises has been established, Landlord and Tenant shall execute a memorandum or letter agreement (a) confirming the actual Gross Leasable Area, and (b) amending those provisions of the Lease (i.e., minimum rent, Tenant's Proportionate Share, etc.) that directly relate to the revised Gross Leasable Area.

2.      The initial term of this Lease shall be for twenty (20) years. If the last day of the initial term falls on a day other than the last day of a calendar month, then the initial term shall be extended so that the last day of the initial term shall be the last day of the calendar month in which the initial term would otherwise end.

3.      The term of this Lease shall commence on the earlier of (i) the date on which Tenant opens the Theatre to the public for business, or (ii) three hundred sixty five (365) days following Landlord's delivery of a "buildable pad" (as such term is defined in Article III hereinbelow) to Tenant ("Commencement Date"); provided, however, Landlord and Tenant agree that Landlord shall not deliver the buildable pad to Tenant prior to May 1, 2005, unless Tenant notifies Landlord in writing that Tenant will agree to accept the buildable pad prior to May 1, 2005.

4.      Tenant shall open the Theatre to the public for business forthwith upon issuance of the Certificate of Occupancy (or temporary Certificate of Occupancy, as applicable) for the Theatre. Landlord and Tenant shall cooperate so that that the applicable Certificate of Occupancy is issued at the earliest possible date.

5.   In the event that Landlord has not delivered a buildable pad to Tenant on or prior to August 1, 2005 (the "Outside Pad Delivery Date"), then, as Tenant's sole remedy for the delay, Tenant shall be entitled to two (2) days of free rent for each day after the Outside Pad Delivery Date until the Landlord delivers to Tenant the buildable pad; provided, however, that if the delay is due to force majeure as described in Article XXIV or the acts or omissions of Tenant or its contractors, subcontractors, agents, representatives, employees, or others acting on behalf of Tenant ("Tenant Delays"), the Outside Pad Delivery Date shall be delayed for the number of days of the force majeure and/or number of days of the Tenant Delays (as applicable).  In addition, in the event that Landlord has not delivered a buildable pad to Tenant on or prior to November 1, 2005 (the "Pad Delivery Termination Date"), then, as Tenant's sole remedy for the delay, Tenant shall have the right to terminate this Lease (by providing Landlord with written notice of the same) at any time after the Pad Delivery Termination Date, but prior to the date the Landlord delivers the buildable pad to Tenant; provided, however, that if the delay is due to force majeure or Tenant Delays, the Pad Delivery Termination Date shall be delayed for the number of days of the force majeure and/or number of days of the Tenant Delays (as applicable).

ARTICLE II

Common Area; Parking and Access

1.   As used in this Lease, the term "Common Area" shall mean all of the Lifestyle/Entertainment District, excepting only (i) the areas upon which buildings are constructed, are under construction, or may thereafter be constructed (whether or not then leased to other tenants of the Lifestyle/Entertainment District), (ii) the areas of the Lifestyle/Entertainment District shown on the Site Plan as building pads, unless such areas are used for parking available for the common use of all tenants of the Lifestyle/Entertainment District, provided that any temporary use for parking shall not affect Landlord's right to build on the building pads in the future, and (iii) exclusive drive through areas, if any.  Notwithstanding anything to the contrary contained herein, in no event shall any of the exclusive drive through areas materially and adversely affect access to, visibility of or Tenant's use of the Demised Premises (as a Theatre) or reduce the number of parking spaces in the Lifestyle/Entertainment District to below that required by applicable law.  The Common Area shall include parking areas, common driveways, shared access curb cuts, sidewalks, landscaping, curbs, loading areas, lighting facilities, and other improvements provided for the common use of all tenants of the Lifestyle/Entertainment District and their respective employees, agents, invitees and clientele.  All of the Common Area shall be subject to Landlord's sole management and control, except as otherwise expressly provided herein and except that (a) Landlord shall not build any permanent structures in the No-Build Area (as hereinafter defined) without the prior written approval of Tenant, (b) once paved and striped, Landlord shall not materially decrease the number of parking spaces in the area noted on Exhibit A-1 as the "Tenant Parking No Change Area" unless required to do so by governmental authorities or as a result of a casualty or condemnation (provided, however, that (x) Tenant acknowledges that the Tenant Parking No Change Area is located in the Value Retail District of the Project, and (y) in the event the portion of the Project which includes the Tenant Parking No Change Area is sold by the Landlord and the buyer violates the Landlord's covenant regarding the Tenant Parking No Change Area set forth herein, such violation shall not be a Landlord default under this Lease so long as Landlord reasonably cooperates with Tenant in enforcing Tenant's rights hereunder), and (c) Landlord shall not make any material change to the remainder of the Lifestyle/Entertainment District which would materially, adversely impact access to the Lifestyle/Entertainment District's parking areas or the Theatre without the prior approval of Tenant, which approval shall not be unreasonably withheld or delayed.

Any portion of the Lifestyle/Entertainment District so included within Common Areas, (except the No-Build Area) shall be excluded therefrom when designated by Landlord for a non-common use, and any portion thereof not so included within Common Areas shall be included when so designated and improved for common use.  Landlord reserves the unrestricted right to change the building perimeters, driveways, parking areas, store sizes, and identity and type of other stores or tenancies and add buildings and/or other structures within the Common Areas, provided only that the size of the Demised Premises and minimum parking facilities as required by governmental authorities having jurisdiction, shall not be substantially or materially impaired.  Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary to prevent the public from obtaining prescriptive rights or to make repairs or alterations.

Landlord shall maintain and operate the Common Area in a first class manner, consistent with similarly situated projects.  Tenant and its employees, agents, contractors and clientele shall have, and Landlord hereby grants to Tenant, the nonexclusive right, in common with Landlord and other tenants of the Shopping Center and their respective employees, agents, contractors and clientele, to use the Common Area as constituted from time to time for all purposes reasonably related to the conduct of Tenant's business on the Demised Premises (including, without limitation, but subject to the provisions of the Master Declaration and the ECR, the right to have Tenant's clientele wait in lines on such Common Area in the areas specified therefor on Exhibit A-5 as the "Queuing Area" for the purchasing of tickets and the beginning of performances in the Theatre, and the right to use temporary barricades or similar devices to control clientele lines; provided that the appearance of such temporary barricades or similar devices shall be similar in appearance to the temporary barricades and similar devices used at other first class theatres operated by Tenant

in Colorado). Said right shall also include the right for Tenant and its agents, employees and contractors to install and connect to the Theatre, Tenant's signs and (if Tenant exercises the option in Article XXVI hereof) the Kiosk Area. Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary to prevent the public from obtaining prescriptive rights or to make repairs or alterations; provided, however, that any such closure shall not unreasonably interfere with the conduct of Tenant's business, and that Tenant shall receive at least 30 days advance written notice of any such closure, except in the event that emergency repairs are required, Landlord shall only be required to provide notice which is reasonable under the circumstances.

Tenant shall have the right to install two automated ticket teller machines (the "ATTMs") for use solely to (a) distribute Theatre tickets (for which Tenant shall have the exclusive right in the Shopping Center), and (b) disburse cash (for which Tenant shall have a non-exclusive right), at locations to be mutually determined by Landlord and Tenant (each acting reasonably) on an exterior wall of the Theatre or within a designated portion of the Common Area. Landlord and Tenant agree that Tenant shall be solely responsible for all costs incurred in constructing, installing and removing the ATTMs, including all costs of repairing the Common Area or any other improvements in the Lifestyle/Entertainment District required as a result of the construction, installation or removal of the ATTMs in order to restore such Common Area or other improvements to substantially the same condition as immediately prior to the construction, installation or removal of the ATTMs. Landlord further agrees that Landlord shall have no right to receive any proceeds or receipts derived from the operation of the ATTM except to the extent such proceeds or receipts are included within Gross Box Office Receipts under Article V.

As used in this Lease, the term "No-Build Area" shall mean the area outlined as the "No-Build Area" on Exhibit A-2.

2.    Without limiting the generality of the provisions of Section 1 of this Article II, Tenant and its employees, agents, invitees and clientele shall have the nonexclusive right, in common with Landlord and other tenants of the Lifestyle/Entertainment District and their respective employees, agents, contractors, invitees and clientele, to use without charge all exits, entrances, driveways and parking areas on the Shopping Center, and to the extent of Landlord's right, to use without charge all public or private streets or roads bounding or serving the Shopping Center, for ingress to and egress from the Theatre and for the accommodation and parking of vehicles while patronizing, servicing or working at the Shopping Center. Except as otherwise provided in Section 1 of this Article II, Landlord shall have the right to designate from time to time the portions of the Shopping Center which shall be used as parking areas, approaches, exits, entrances, roadways, and the like; provided, however, that at all times during the term of this Lease (i) there shall be on the Shopping Center and in the immediate vicinity of the Theatre accessible but nonexclusive, free customer and employee parking areas for such number of cars as may now or hereafter be required by law in connection with the operation of the Theatre as well as all other facilities of Landlord or other tenants located on the Shopping Center; and (ii) Landlord shall not violate its agreement set forth in Article II, Section 1 above not to materially decrease the number of parking spaces in the Tenant Parking No Change Area. Should security be needed in the future and as and when requested by Tenant after one hour after the Theatre shows its last film, at Tenant's sole cost and expense, Landlord shall light and provide security for the parking areas within the No-Build Area in a manner consistent with that of a first class shopping center in Arapahoe County, Colorado containing a movie theatre that operates with customary movie theatre hours. All of the parking areas and other Common Area on the Lifestyle/Entertainment District shall be maintained by Landlord in a neat, clean and safe condition. Except as otherwise provided above, the entire cost of maintenance and of providing said lighting and security for the parking areas and other Common Areas on the Lifestyle/Entertainment District shall be paid by Landlord as a Common Area charge (subject to Landlord's right to pass through to Tenant Common Area charges pursuant to Article VI hereof).

3.    Landlord covenants that neither Tenant nor Tenant's clientele shall at any time during the term of this Lease be denied parking rights (except those who violate any rules and regulations or laws) in any parking areas on the Lifestyle/Entertainment District or within the No-Build Area, nor shall any charge or time restrictions (except that the parking areas shall not be used for long-term parking, selling vehicles or storage of vehicles) be imposed for utilizing such parking areas provided that any grocery or general merchandise operation within the Lifestyle/Entertainment District shall be entitled to maintain a seasonal sales area and cart corrals within the Common Areas, as well as kiosks and sales carts shall be permitted within the Common Areas, from time to time, which is not in violation of this Article II. Breach of this covenant shall be considered a default under the terms of the Lease by Landlord, and Tenant, as its sole and exclusive remedy therefor, shall have the right to specifically enforce this covenant. Without in any way limiting the generality of the foregoing, Landlord shall not have the right to use any portion of the No-Build Area for the purpose of holding a carnival, flea market or other temporary event which will reduce the number of spaces available for vehicle parking or which will impair access to such parking spaces or the Theatre, and shall not have the right to use any other part of the No-Build Area for the purpose of holding a carnival, flea market or other temporary event which will materially and adversely affect access to or visibility of the Theatre or materially and adversely affects parking at the Theatre.

ARTICLE III

Construction of Improvements

1.      Promptly following Landlord's delivery of the buildable pad to Tenant, Tenant shall construct on the Theatre Area a multi-screen theatre containing sixteen (16) auditoriums and approximately 3,400 seats (such multi-screen theatre and all improvements related thereto are hereinafter referred to as the "Theatre Improvements").  Said Theatre Improvements shall be constructed by Tenant in accordance with the provisions of the Tenant Work Letter (attached as **Exhibit C** to this Lease).  The location, placement and design of all Theatre Improvements shall be determined in accordance with the provisions of the Tenant Work Letter.  Tenant hereby confirms, agrees and acknowledges, that, notwithstanding anything to the contrary contained in this Lease or in the Tenant Work Letter, all Theatre Improvements shall comply with and be consistent with the provisions and requirements of the Master Declaration, the ECRs, the FDP and the Signage Guidelines, as well as all applicable laws, codes and ordinances.

2.      Attached hereto as **Exhibit E** is a copy of the schematic floor plan and elevations (the "Schematic Plan") for the Theatre Improvements, which have been prepared, at Landlord's expense, by Landlord's architect, and approved by Tenant. Tenant will prepare its proposed construction plans and specifications pursuant to the Tenant Work Letter based on and in compliance with the Schematic Plan, and will submit the construction plans and specifications to Landlord in accordance with the provisions of the Tenant Work Letter.

3.      **Exhibit G-1** attached to this Lease outlines (a) the approved parking plan for a portion of the Lifestyle/Entertainment District (including the Tenant Parking No Change Area), (b) the No-Build Area, and (c) a horizontal control plan showing the plotted location of the Theatre Area, the other proposed tenant buildings in the Lifestyle/Entertainment District, and all proposed sidewalks, curb areas, parking areas and any other improvements to be located within the immediate vicinity of the Theatre Area

4.      Prior to delivering the "buildable pad" to Tenant, Landlord shall have completed all of the following (and Landlord shall not have been deemed to have delivered a buildable pad to Tenant until Landlord has completed all of the following): the Theatre Area shall be rough graded and utilities shall be installed, separately metered and stubbed to within five (5) feet of the Theatre Area.  All costs related to the same (including, without limitation, utility connection fees [other than specific sewer and other connection fees directly to the Demised Premises, which shall be at Tenant's cost and expense]) shall be at Landlord's sole cost and expense.

5.      Prior to the Commencement Date, Landlord shall complete the following "Site Work" (and, notwithstanding anything to the contrary contained in Article I, Section III, if the following Site Work has not been completed on or prior to the date that is 365 days after Landlord delivers the buildable pad to Tenant, and Tenant is not open for business to the public at such time, the Commencement Date shall not occur until the earlier to occur of the date the Tenant opens the Premises for business to the public or the date the Site Work has been substantially completed): Landlord shall have completed the roadways, driveways, parkways, curb cuts and parking areas in those portions of the Common Areas and those portions of the common areas of the Project illustrated on **Exhibit A-1**. Notwithstanding anything herein to the contrary, if any new ordinances or laws are enacted following the execution of this Lease, and compliance therewith actually causes Landlord to be unable to timely complete any of the Site Work, but such failure to complete such Site Work would not have a material adverse impact on Tenant's ability to conduct business operations at the Premises, then, so long as Landlord uses diligent efforts to subsequently comply with the new ordinance or law (as applicable), Landlord shall be deemed (for purposes of satisfying the timing requirements set forth in this Lease regarding the Site Work) to have substantially completed the Site Work, notwithstanding such inability.

6.      At all times during the term of this Lease, the improvements to be undertaken by Landlord and Tenant, respectively, with respect to the Theatre shall be free from, and each party shall fully indemnify the other party against, liens of materialmen, contractors, subcontractors and laborers or any other liens or claims arising in connection with the construction of such improvements by the indemnifying party.  The party undertaking the improvements ("First Party") shall post and keep posted until completion of construction, alterations or repairs in a conspicuous place upon the Theatre building, and shall personally serve upon such contractors or subcontractors performing any such work, a notice in the form required by Colorado statute, stating that the other party's interest in the Theater Improvements shall not be subject to any lien for said work.

First Party shall have the right to contest the correctness or the validity of any such lien if, immediately on demand by the other party, First Party procures and records a lien release bond issued by a corporation authorized to issue surety bonds in the state in which the Lifestyle/Entertainment District is located in an amount equal to one and one-half times the amount of the claim of the lien. The bond shall meet the requirements of any applicable law, and shall provide for the payment of any sum that the claimant may recover on the claim (together with costs of suit, if recovered in the action).

7.      Each party hereto represents and warrants to the other party that all construction and other

work which it is to perform or cause to be performed under this Lease shall be constructed and undertaken in a good and workmanlike manner, in accordance with the laws of the United States of America, the State of Colorado and the City of Aurora and with the FDP, the ECRs, the Signage Guidelines and the Master Declarations, if and to the extent applicable, and will be and remain free from defects in materials and workmanship for one year following substantial completion of the work or such longer period as may be specified in any applicable third party warranty.

8.    During construction of the Theatre Improvements, Tenant shall have the right to place trash dumpsters and receptacles, construction equipment, construction shacks and trailers and other normal incidents of construction work in the Tenant Staging Area (as shown on **Exhibit A-6**).

<center>ARTICLE IV</center>

<center>Tenant's Furnishings, Fixtures and Equipment</center>

Tenant, at its sole cost and expense, shall cause to be constructed and installed in the Theatre operating equipment consisting mainly of seats, floor carpets, draperies, auditorium acoustical wall treatments, screens, sound reproducing equipment, projection equipment, furniture for office and lobby, and any other miscellaneous furnishings and equipment which Tenant may, from time to time, deem advisable in the operation of a motion picture theatre, including all additions, replacements and substitutions thereto (collectively, "Tenant's FF&E" or "Tenant's Work"), as further detailed in the Tenant Work Letter. Tenant's FF&E shall be and remain the property of Tenant



Tenant's licensors or lessors; and Tenant, or its licensors or lessors, from time to time and at any time, at its or their discretion, may remove, change or exchange Tenant's FF&E, and make additions, replacements and substitutions thereto. Items defined as "trade fixtures" shall become the property of Landlord upon termination of this Lease unless Landlord requires Tenants to remove them from the Theatre Improvements. Without limiting the aforesaid, items specifically to remain the property of Tenant are concession equipment, seats, projection and sound equipment, screens, poster cases, display cases, point of sale equipment, telephone systems, security systems, LED signs, interior signage, and all personal property, provided that Tenant, at its sole cost and expense, shall promptly repair any damage to the Demised Premises caused by such removal.

<center>ARTICLE V</center>

<center>Rent</center>

1.    Tenant shall pay to Landlord, during the term of this Lease, fixed "minimum rent" for the Gross Leasable Area as follows:

| Time Period | Total Annual Minimum Rent | Total Monthly Minimum Rent | Annual Minimum Rent per Square Foot of Demised Premises |
|---|---|---|---|
| Years 1-5 | $1,296,000.00 | $108,000.00 | $18.00 |
| Years 6-10 | $1,425,600.00 | $118,800.00 | $19.80 |
| Years 11-15 | $1,568,160.00 | $130,680.00 | $21.78 |
| Years 16-20 | $1,725,120.00 | $143,760.00 | $23.96 |

Said minimum rent shall be paid in equal monthly installments in an amount equal to one-twelfth of the annual rate, each of which shall be payable in advance on the first day of every calendar month during the term hereof, except that the minimum rent for the first month of the term hereof shall be paid in advance on or prior to the date Landlord delivers the buildable part to Tenant. Minimum rent payable for any partial calendar month shall be prorated based on the actual number of days in such calendar month. Minimum rent and all other sums due and payable hereunder shall be paid to Landlord at its address provided in Article XVIII, without deduction, offset, or counterclaim.

2.    In addition to the minimum rent, Tenant shall pay to Landlord (as set forth in paragraph 7 hereinbelow), as additional rent, "percentage rent" for each year during the term of this Lease. Tenant's percentage rent obligation shall be the amount by which (a) nine percent (9%) of the Gross Box Office Receipts plus nine percent (9%) of the Gross Candy Concession Receipts exceeds (b) the amount of minimum rent payable by Tenant for such period.

3.    Tenant shall also pay, as additional rent, $0.15 per square foot per year to be applied towards advertising and sales promotions for the Shopping Center (the "Marketing Fund"). Tenant shall make payments to the Marketing Fund in equal monthly installments on or before the first day of each calendar month, together with its regular payments of minimum rent and additional rent.

4.    Except as otherwise provided in Section 6 of this Article V, the term "Gross Box Office Receipts" shall mean the total charges for admission to the auditoriums in the Theatre and all other gross revenues and receipts derived from the use and/or operation of the Theatre and the business conducted thereon, whether paid in cash, by credit card, or otherwise, other than Gross Candy Concession Receipts which are defined and accounted for below, less any and all admission taxes, sales taxes and film use tax required to be paid to any governmental authority, local, county, city, state, federal or otherwise, less amounts credited or refunded to customers not to exceed ½% of Gross Box Office Receipts, and less any amounts paid to banks or other credit card issuers or facilitators in connection with credit card sales to the extent that such amounts do not, in the aggregate for the applicable year, exceed 3% of the aggregate amount of such credit card sales in such applicable year.

For the purposes of calculating the percentage rent provided for in this Article V, any film rental to be paid for any period by Tenant pursuant to a contract with a film distributor in excess of 50 percent of Gross Box Office Receipts for such period shall be deducted from the Gross Box Office Receipts for the year in which said period is included. By way of an example only, if a contract with a film distributor provides for film rental for any period of 55 percent of the Gross Box Office Receipts for said period and if the Gross Box Office Receipts pertaining to said contract for said period amount to $1,000.00, then Tenant shall be entitled to deduct 5 percent of $1,000.00 – i.e., $50.00 – from the Gross Box Office Receipts for said period for the purpose of computing the percentage rent payable pursuant to Sections 2 and 3 of this Article V for the year in which said period is included. Deductions of the same type and to the same extent shall be made if the Theatre is used for other attractions, including, without limitation, closed circuit television programs.

5.    Except as otherwise provided in Section 6 of this Article V, the term "Gross Candy Concession Receipts" shall mean the total charges, whether paid in cash, by credit card or otherwise, for all sales in the Theatre of candy, drinks, popcorn, hot dogs, t-shirts, posters and any and all other food or merchandise items, whether made by Tenant, or any licensee, concessionaire, or subtenant of Tenant, less (i) any and all sales taxes or other amounts or charges computed as a percentage of the total sales price which are required to be paid to any governmental authority, local, county, city, state, federal or otherwise; (ii) any and all occupational taxes, use taxes and other taxes which must be paid or collected by Tenant (by whatever names known or assessed, and regardless of whether or not they are imposed under any existing or future order, regulation, law, ordinance or assessment); (iii) amounts credited or refunded to customers; and (iv) any amounts paid to financial institutions or other credit card issuers or facilitators in connection with credit card sales to the extent that such amounts do not, in the aggregate for the applicable year, exceed 3% of the aggregate amount of such credit card sales in such applicable year.

6.    Notwithstanding anything to the contrary contained in Sections 4 and 5 of this Article V, none of the following items shall be included within Gross Box Office Receipts or Gross Candy Concession Receipts: (i) receipts from the sale of gift certificates (provided that the price of a gift certificate that is redeemed at the Theatre for an admission ticket or merchandise shall be included); (ii) receipts from the sale of senior citizen, student and other similar discount cards (provided that the actual admission charges received at the Theatre from such discount cardholders shall be included); (iii) service charges imposed in connection with the sale of advance tickets; (iv) receipts from the sale of admission tickets (which receipts do not accrue to Tenant) with respect to programs or performances controlled or presented under a short-term license or "four wall" deal arrangement (provided that any amounts paid by any such licensee to Tenant in connection with any such arrangement shall be included after deducting therefrom any applicable sales, occupational and use taxes, and excluding therefrom all receipts allocable to such licensee's reimbursement to Tenant of Tenant's Proportionate Share of Common Area costs, insurance and real estate taxes); (v) receipts from the sale of lottery tickets; (vi) receipts from any refreshment or other vending machines, automatic teller machines or any electronic or other game machines, which are not owned by Tenant (provided that the net proceeds (as commission, rental or otherwise) received by Tenant with respect to any such machines located in the Theatre shall be included); (vii) receipts arising from the transfer of merchandise or Tenant's FF&E not in the ordinary course of Tenant's business; (viii) receipts derived from the sale of merchandise which is donated to charitable organizations; (ix) insurance proceeds received in respect of damage to food or merchandise; (x) receipts derived from the transfer of food or merchandise located at the Theatre to another theatre or warehouse operated by Tenant; (xi) receipts derived in connection with the return of merchandise to shippers, suppliers or manufacturers; (xii) discount sales of merchandise to employees of Tenant and its affiliates up to 1% of Gross Candy Concession Receipts; (xiii) tips and gratuities; and (xiv) receipts derived from licensed movie product sales made by third party vendors other than Tenant or any of its affiliates, provided that any proceeds, revenues or other sums (as commission, rental or otherwise) paid to Tenant by such vendors with respect to such sales shall be included in Gross Box Office Receipts and Gross Candy Concession Receipts.

7.    The calculation of Gross Box Office Receipts and Gross Candy Concession Receipts from the Demised Premises shall be made by Tenant and delivered to Landlord at the end of each calendar month; provided, however, that until the end of the first calendar year for which Tenant first becomes obligated to pay percentage rent (based on annual minimum rent), Tenant shall have no obligation to pay percentage rent on a monthly basis (however, Tenant shall be required to report Gross Box Office Receipts and Gross Candy Concession Receipts on a monthly basis from and after the first month in which Tenant operates the Theatre at the Demised Premises). From and after the first calendar year in which Tenant is obligated to pay percentage rent

(based on annual receipts), Tenant shall pay percentage rent (estimated on a monthly basis), without demand, no later than 30 days after the end of each calendar month. A written statement of Gross Box Office Receipts and Gross Candy Concession Receipts, certified to be correct by a financial officer of Tenant, shall be delivered by Tenant to Landlord within sixty (60) days following the end of each calendar year, whether or not any percentage rent is then payable. If the monthly payments made by Tenant during such period total less than the amount shown by said statement to be owed, Tenant shall accompany said statement with payment of the deficiency. If the monthly payments made by Tenant during such period total more than the amount shown by said statement to be owed, the excess shall be credited against the next rent amounts owing by Tenant pursuant to this Lease. .

Tenant shall keep an accurate set of books and records of all Gross Box Office Receipts and Gross Candy Concession Receipts, and shall cause the same to be retained and preserved for at least three (3) years after the end of the period to which they relate. Such books and records shall be kept in the Denver, Colorado metropolitan area and shall be open to the inspection by Landlord and its agents at all reasonable times. In addition to such inspection right, no more often than once per year Landlord may have such books and records audited by a certified public accountant. Landlord shall provide Tenant with not less than 15 days prior written notice of such audit and such audit shall be conducted exclusively during Tenant's regular business hours at the location where such books and records are regularly maintained. All costs of any such audit shall be paid by Landlord; provided, however, that in the event any such audit shall disclose an understatement of the total of Gross Box Office Receipts plus Gross Candy Concession Receipts reported for any year in excess of 3 percent of the actual amount thereof and such amount would have resulted in overage rent being due, Tenant shall promptly pay to Landlord the reasonable costs of said audit in addition to the deficiency in percentage rent, which deficiency shall be payable in any event. Any information obtained by Landlord as a result of such audit shall be held in strict confidence by Landlord and its accountants and lawyers except in litigation or arbitration between parties.

8.      Landlord and Tenant agree that, solely for the purpose of computing the percentage rent payable for each year pursuant to Section 2 of Article V, Tenant shall use a calendar year which begins on the Thursday which is the closest to December 31st (and which may occur prior to or after December 31st) and end on the Thursday (approximately one year later) which is closest to the next December 31st (and which may occur prior to or after December 31st).

Tenant's Gross Box Office Receipts and Gross Candy Concession Receipts for the initial partial calendar year and final partial calendar year of the Lease shall be determined and be payable prorated as to the number of days in said initial or final year. Such percentage rent shall be payable in full within 90 days after end of such initial or final year, as applicable, after taking into account any monthly installments of percentage rent already paid for such period.

9.      In the event that prior to its scheduled expiration date (as the same may be extended by Tenant's exercise of any renewal options) this Lease is terminated for any reason (excluding an Event of Default but including but not limited to a termination in connection with damage or destruction or a taking under power of eminent domain) as to all or any portion of the Theatre, the fixed minimum rent, percentage rent and all other amounts payable hereunder shall be apportioned as of the date of such termination, and any rent or other amounts paid for any period beyond such termination date shall be repaid to Tenant.

## ARTICLE VI

### Maintenance and Repairs;
### Common Area Costs; Real Estate Taxes; Utility Charges

1.      Tenant, at its cost and expense, shall maintain and repair the Theatre and all mechanical systems therein or exclusively serving the Theatre, including (a) the plumbing, heating, roof repair, air conditioning, and electrical lines and equipment located within and servicing only the Theatre, and including repainting the exterior of the Theatre, and (b) the sewer lines within the Theatre Area. Tenant shall also maintain, at its expense, all signs used exclusively by Tenant. Tenant shall be solely responsible for the structural integrity of the walls unless required due to the acts or omissions of Landlord, its agents, employees, contractors or invitees, in which case Landlord shall be responsible therefor. Landlord shall be assigned any and all Warranties from the builder and/or Tenant for those items which are Landlord's responsibility. Notwithstanding the foregoing, if the cost of a particular roof repair is in excess of thirty percent (30%) of the cost of a total roof replacement and is not caused by (i) the acts or omissions of Tenant, its agents, employees or contractors, or (ii) a casualty, peril or other event partially covered by insurance, Tenant shall notify Landlord prior to commencing the repair and Landlord shall decide whether the roof will be repaired or replaced, and, in either case, Landlord shall pay the cost thereof.

Notwithstanding anything to the contrary contained in said first paragraph of this Section 1 or in Section 2 of this Article VI, unless caused by the wrongful act or omission or gross negligence of Landlord, its employees, agents or contractors, Tenant shall be responsible for all costs and expenses incurred in making any changes to the Theatre which are required by any governmental entity or agency and are required as a

result of or because of Tenant's use or occupancy of the Demised Premises. Landlord shall be responsible for all costs and expenses incurred in making changes to the Theatre which are required by any governmental entity or agency after the issuance of a Certificate of Occupancy with respect thereto and are required for a reason other than Tenant's use or occupancy of the Demised Premises. Subject to the waiver of subrogation provisions set forth in Section 3 of Article XIII hereof, Landlord shall be responsible for any losses or damages (as impact Tenant) from any hazardous materials (as defined below) which are leaked or discharged from any area outside the Theatre Area, including, without limitation, the Common Area, by Landlord, any other tenant of the Shopping Center or any of their respective employees, agents or contractors. Subject to the waiver of subrogation provisions set forth in Section 3 of Article XIII hereof, Tenant shall be responsible for any losses or damages resulting to the Theatre or any other property from any hazardous materials which are leaked or discharged from any area whether inside or outside the Theatre, including, without limitation, the Common Area, by Tenant or any of its employees, agents, contractors or others claiming by, through or under Tenant.

2.      Subject to the obligations imposed on Landlord pursuant to this Lease, Tenant, at its cost and expense, shall keep and maintain the Theatre and the Demised Premises in a first class condition, in good order and repair, and in a clean and sanitary condition in accordance with the laws of the state in which the Shopping Center is located and in accordance with all directions, rules, and regulations of the health officer, building inspector or other proper officials of the governmental agencies having jurisdiction thereover, the Master Declaration, the ECRs, the FDP, and the Signage Guidelines.

3.      Landlord may enter the Theatre at any reasonable time during hours in which movies are not being shown or other performances are not being given for the purpose of inspecting the same, or of making repairs to the Theatre which Landlord has the right to make hereunder, or of showing the Theatre to prospective purchasers or lenders; provided, however, that except in the event of emergency repairs, no such entry shall unreasonably interfere with the conduct of Tenant's business or be made without at least one day prior notice to Tenant.

4.      Landlord, at its cost and expense (but with the right to pass through a portion of Common Area costs to Tenant as provided in Section 5 of this Article VI), shall keep and maintain in first class condition (consistent with other neighborhood shopping centers of similar age in the Aurora area), good order and repair, in accordance with the laws of the state in which the Shopping Center is located and in accordance with all directions, rules and regulations of the health officer, building inspector or other proper officials of the governmental agencies having jurisdiction therein, the Lifestyle/Entertainment District, and every part thereof (other than the portions of the Theatre required to be maintained by Tenant pursuant to Section 1 of this Article VI), including but not limited to the entire Common Area and all water, sewer, and electrical systems (specifically including all systems servicing the Theatre and Tenant's signs, excluding only the lines and ducts thereof located within and servicing only the Theatre). The foregoing maintenance obligation shall include all signs located on the Lifestyle/Entertainment District specifically including any Monument Signs, as defined in Article XII hereof).

5.      Tenant shall pay to Landlord each year Tenant's Proportionate Share (as defined below) of the actual costs of maintaining, repairing and operating the Common Area, including, without limitation, the actual costs of insuring, lighting, striping, cleaning, and providing security (if provided at all or as requested by Tenant, in which case, the entire cost of such security shall be paid by Tenant) for the Common Area; provided, however, that Common Area costs shall not include (i) any management or administrative fees or charges, legal fees or accounting charges or supervisory payroll costs in excess of 10 percent of the total Common Area costs for the applicable year (exclusive of the costs of Landlord's insurance otherwise included in Common Area costs for such year), provided that legal fees incurred for the purpose of attempting to reduce Common Area costs and other legal fees which are incurred for the benefit of all Lifestyle/Entertainment District tenants shall not be counted against said 10 percent limitation provided that Tenant's Proportionate Share of such legal fees shall not exceed $2000.00 in any year; (ii) any capital expenditures (as determined in accordance with generally accepted accounting principles, consistently applied ("GAAP")), except that capital expenditures may be included provided that such costs are (a) amortized over the reasonable useful life of the improvements (as determined in accordance with GAAP) and only the annual portion thereof shall be so expensed in any year, and (b) generally benefit the majority of the tenants in the Lifestyle/Entertainment District; (iii) any costs incurred for any environmental clean up of the Lifestyle/Entertainment District caused by Landlord or another tenant or occupant of the Shopping Center; (iv) any real estate taxes or assessments (only to the extent the same are to be handled pursuant to Section 7 of this Article VI); (v) any costs incurred in connection with the purchase or rental of any equipment (including but not limited to signs) which is not used exclusively for maintaining, repairing and operating the Common Area; (vii) any costs for which Landlord is reimbursed by Tenant or other parties other than pursuant to proportionate Common Area cost allocation provisions similar to the foregoing; (viii) costs of special work done by Landlord for the exclusive benefit of another tenant; (ix) principal, interest, fees and points payable in connection with Landlord's mortgage on the Lifestyle/Entertainment District; (x) all costs related to the solicitation, negotiation or execution of leases for space in the Lifestyle/Entertainment District; (xi) wages, salaries, fees, and fringe benefits paid to Landlord's personnel off-site (i.e., if Landlord locates it corporate offices on-site, Landlord shall not seek reimbursement for its costs related to the same); (xii) costs incurred which are covered by the

insurance required to be maintained by Landlord under this Lease (except for the deductibles payable thereunder); (xiii) costs incurred due to Landlord's gross negligence; (xiv) any revenue, income or franchise tax payable by Landlord; (xv) costs incurred by Landlord due to the violation by Landlord or any tenant (other than Tenant) of the terms of any lease in the Shopping Center; (xvi) Landlord's general overhead expenses; and (xvii) advertising and promotional expenditures of Landlord in connection with the Lifestyle/Entertainment District except as otherwise provided herein.  In addition to paying Tenant's Proportionate Share of maintaining, operating and repairing the Common Areas, during the Lease Term, Tenant shall also pay Tenant's Proportionate Share of all amounts owed by Landlord (as the owner of the Lifestyle/Entertainment District) under the Master Declaration (in connection with the maintenance, repair and operation of the common areas of the Project).

As used in this Lease, "Proportionate Share" shall be a fraction, the numerator of which shall be the Gross Leasable Area of the Demised Premises (i.e, approximately 72,000 square feet) as established pursuant to Section 1 of Article I hereof or as determined after measurement pursuant to said Article III, and the denominator of which shall be the total number of gross leasable square feet (including the Gross Leasable Area of the Theatre Improvements as measured and all leasable space of other tenants), contained in all rentable areas of completed buildings available in the Lifestyle/Entertainment District for exclusive use and occupancy by tenants of the Lifestyle/Entertainment District, whether or not actually leased, occupied and open for business.  Notwithstanding the preceding, in no event shall Tenant's Proportionate Share be greater than Eighteen percent (18%).

6.

    (a)    Tenant shall pay to Landlord, in advance, on the first day of each calendar month during the term of this Lease, one-twelfth of the total of Tenant's Proportionate Share of Landlord's reasonable estimate of Tenant's Proportionate Share of Common Area costs for the current year, as may be reasonably adjusted from time to time during any calendar year.  All amounts paid by Tenant pursuant to the immediately preceding sentence shall be credited to the amounts owing by Tenant pursuant to Section 5 of this Article VI, and Landlord shall include in the annual statements required by said Section 5 a summary of the amounts paid by Tenant during the preceding calendar year pursuant to this Section 6.  In the event the amounts so prepaid by Tenant during any calendar year exceed the actual amount owing by Tenant for such year pursuant to Section 5 of this Article VI, Landlord shall credit against future payments the difference to Tenant concurrently with Landlord's delivery of the annual statement required by said Section 5.  In the event the amounts so prepaid by Tenant during any calendar year are less than the actual amount owing for such year, Tenant shall pay the balance to Landlord within 30 days after Tenant's receipt of the annual certified statement and any requested back-up documentation.  Additionally, if Landlord's Lender or any other lender hereafter providing financing for the Lifestyle/Entertainment District requires a monthly escrow payment to cover taxes and/or insurance premiums for the Lifestyle/Entertainment District consistent with standard practice in the industry, Landlord may require that Tenant pay in advance and in equal monthly installments an estimated sum to cover Tenant's obligations hereunder with respect to taxes and insurance coverage.

    (b)    Common Area costs that cover a period not within the term of this Lease shall be prorated.  Within 90 days after the end of each calendar year, Landlord shall furnish to Tenant a statement covering the calendar year just expired, certified as correct by an officer of Landlord or Landlord's property manager, showing the number of gross leasable square feet contained in the Lifestyle/Entertainment District and all out-of-pocket costs as described above incurred by Landlord in maintaining, repairing and operating the Common Area, and Tenant's Proportionate Share of such costs shall be due 30 days after Tenant's receipt of said statement and certificate.  At Tenant's request, Landlord shall also furnish to Tenant copies of all bills, receipts and other back-up documentation for Common Area costs.

7.    Tenant shall pay to Landlord Tenant's Proportionate Share of (i) all real estate taxes and assessments (exclusive of any penalty, late charge or interest unless caused by Tenant's failure to make the payments required of it hereunder) levied and/or assessed upon the Lifestyle/Entertainment District during the term of this Lease, (ii) any fee levied in lieu of any ad valorem tax or assessment on the Lifestyle/Entertainment District, (iii) all amounts levied and/or assessed against the Lifestyle/Entertainment District by and/or in connection with the Southlands Metropolitan District #1, and (iv) all amounts owed by Landlord (as the owner of the Lifestyle/Entertainment District) under the Master Declaration (in connection with taxes paid on the common areas of the Project).  For any partial tax year during the term hereof, such amount shall be prorated on a time basis.  With respect to any assessment which may be levied against or upon the Lifestyle/Entertainment District or the Theatre, or which under the laws then in force may be evidenced by improvement or other bonds, or which may be paid in annual installments, only the amount of such annual installment (with appropriate proration for any partial year) shall be included within the computation of the annual taxes and assessments.  Real estate tax payments to be made to Landlord pursuant to this Section 7 shall be paid in the following manner:  on the fifth day of each calendar month during the term of this Lease, Tenant shall pay to Landlord an amount estimated by Landlord to be the monthly sum payable hereunder by Tenant.  Landlord may adjust the monthly estimated sum at the end of any calendar month on the basis of Landlord's experience and reasonably anticipated assessments.  Within ninety (90) days following the end of each calendar year, or at Landlord's option, each tax year, Landlord shall furnish Tenant a statement covering

the year just expired showing the total of such Real Estate Taxes payable by Tenant for such year and the payments made by Tenant with respect to such period as set forth above. If the sums payable for such Real Estate Taxes exceed Tenant's payments so made, Tenant shall pay Landlord the deficiency within thirty (30) days after receipt of such statement. If said payments exceed the sums payable for such Real Estate Taxes, Tenant shall be entitled to offset the excess against Real Estate Tax payments next thereafter to become due Landlord as set forth above.

If the Demised Premises are subdivided into a separate tax parcel, in Landlord's sole and absolute discretion, Tenant shall pay all taxes and assessments levied against the Demised Premises, which shall be deemed to equal Tenant's Proportionate Share of the taxes and assessments levied against the entire Lifestyle/Entertainment District.

8.      Landlord shall keep at the Lifestyle/Entertainment District or at Landlord's principal executive offices accurate and complete books and records that show all Common Area costs and real estate taxes and that include, without limitation, invoices, receipts, canceled checks and like matters. Such books and records shall be retained by Landlord for at least three (3) years after the expiration of the calendar year to which they relate. Tenant shall have the right, once during each year and once after expiration or termination of this Lease, during regular business hours and at Landlord's office to audit or to cause to be audited by an auditor reasonably acceptable to Landlord such books and records, which audit right shall include the right to inspect all receipts and other documents relating to Common Area costs and real estate taxes. Tenant shall give Landlord at least ten (10) days prior written notice of Tenant's desire to conduct the audit. If the audit shows an overstatement of any Common Area costs or real estate taxes, Landlord shall immediately credit against future costs or refund (if the Lease has previously been terminated) to Tenant Tenant's Proportionate Share of the amount of the overstatement. Costs of the audit shall be paid by Tenant unless the audit shows that Landlord overstated Common Area costs or real estate taxes for any year by more than 3 percent, in which case Landlord shall pay all Tenant's reasonable costs of said audit. If the audit reveals that Landlord understated Common Area costs or real estate taxes, Tenant shall forthwith pay Landlord Tenant's Proportionate Share of the amount of the understatement. Tenant shall keep any information gained from any such audit confidential other than in litigation or arbitration between the parties.

9.      If Tenant refuses or neglects to promptly and adequately commence and complete the maintenance or repairs which it is required to undertake pursuant to this Lease, or if Tenant otherwise fails to perform any of its obligations under this Lease, Landlord, after not less than 10 days' prior written notice to Tenant (provided, however, that if such failure by Tenant is having a material and adverse affect on the operation of the Lifestyle/Entertainment District, Landlord shall only be required to give Tenant 24 hours' prior oral notice, or such lesser notice, if any, as may be reasonable under the circumstances), may, but shall not be obligated to, undertake such repairs or maintenance, or render such other performance, and Tenant shall promptly pay Landlord as additional rent due hereunder the reasonable costs incurred by Landlord in connection therewith (collectively, the "Tenant Maintenance Reimbursement Costs"), together with interest thereon, from the date expended by Landlord until paid in full by Tenant, at the Interest Rate. In the event Tenant disputes its obligation to pay all or any part of the Tenant Maintenance Reimbursement Costs, Tenant shall provide Landlord with written notice thereof within 5 days after Landlord's request for reimbursement of the Tenant Maintenance Reimbursement Costs and Landlord shall then be entitled to cause such dispute to be arbitrated in accordance with Section 13 of Article XXVIII.

10.      If Landlord refuses or neglects to promptly and adequately commence and complete the maintenance or repairs which it is required to undertake pursuant to this Lease, or if Landlord otherwise fails to perform any of its obligations under this Lease, Tenant, after not less than 30 days' prior written notice to Landlord (provided, however, that if such failure by Landlord is having a material and adverse affect on Tenant's business, Tenant shall only be required to give Landlord 24 hours' prior oral notice, or such lesser notice, if any, as may be reasonable under the circumstances), may, but shall not be obligated to, undertake such repairs or maintenance, or render such other performance, and Landlord shall promptly pay Tenant the reasonable costs incurred by Tenant in connection therewith (collectively, the "Landlord Maintenance Reimbursement Costs"), together with interest thereon, from the date expended by Tenant until paid in full by Landlord, at the Interest Rate; provided the foregoing self-help remedy shall only apply to the No-Build Area. In the event Landlord disputes its obligation to pay all or any part of the Landlord Maintenance Reimbursement Costs, Landlord shall provide Tenant with written notice thereof within 10 days after Tenant's request for reimbursement of the Landlord Maintenance Reimbursement Costs and Tenant shall then be entitled to cause such dispute to be arbitrated in accordance with Section 13 of Article XXIX.

11.      Tenant shall not solicit business or display merchandise within the Common Area or any other portion of the Project, or distribute handbills therein, or take any action which would interfere with the rights of other persons to use the Common Area or any portion of the Project without the prior written consent of the Landlord. Landlord shall use its best efforts, but shall not be required to bring legal action, at Tenant's request, to halt others from doing the same. Notwithstanding the preceding, Landlord and Tenant both desire that kiosks be constructed in various portions of the Lifestyle/Entertainment District in which Tenant may be permitted to place movie posters advertising the movies showing or to be shown at the Demises Premises. Following the delivery of the buildable pad, Landlord and Tenant shall use good faith efforts to work together

to (a) obtain approval for the construction of the poster kiosks, (b) agree on the location(s) of the poster kiosks, and (c) approve an acceptable cost sharing arrangement for the construction and maintenance of the poster kiosks. Subject to the terms of Article II hereof and provided that access to, visibility of or Tenant's use of the Demised Premises are not adversely affected, Landlord reserves the unrestricted right to change the building perimeters, driveways, parking areas (subject to the restrictions regarding the Tenant Parking No Change Area outlined in Article II hereinabove), store sizes, and identity and type of other stores or tenancies and add buildings and/or other structures within the Shopping Center, provided only that the size of the Demised Premises and minimum parking facilities as required by governmental authorities having jurisdiction, shall not be substantially or materially impaired.

12. Landlord shall cause all necessary utilities to be separately metered to the Theatre at standard public rates. Tenant shall during the term of this Lease pay for, as and when due, any and all water, sewer, telephone, gas, electric power, and other utilities used in the Theatre. Landlord shall not voluntarily interrupt any utility services to the Demised Premises unless such interruption is necessitated by the need to make emergency repairs. Such repairs shall, to the extent possible, be made only during hours when Tenant is not open for business to the public. If Landlord is notified of an impending interruption of any utility services to the Demised Premises by the utility company or any other party, Landlord shall use best efforts to immediately give notice of same to Tenant. Landlord shall use its best efforts to minimize and promptly cure all utility interruptions that are caused by Landlord or subject to Landlord's control. If, as a result of Landlord's negligence or Landlord's deliberate acts, utility service is interrupted to the Demised Premises to the extent that Tenant cannot and does not operate its business at the Demised Premises, then Tenant shall receive a rent abatement until such utility service is restored and Tenant is able to operate its business at the Demised Premises.

All payments by Tenant to Landlord pursuant to this Article VI shall be considered "additional rent."

## ARTICLE VII

### Alterations and Improvements

Tenant, during the term of this Lease, at its cost and expense, and consistent with all applicable laws, codes, regulations and ordinances, the Master Declarations, the Signage Guidelines, the FDP and the ECRs, may make such alterations, improvements or other changes to the Theatre or the signs permitted by this Lease as Tenant shall deem necessary or beneficial in the operation and conduct of its business; provided, however, that Tenant shall submit to Landlord and the Southlands Architectural Control Committee plans and specifications relating to any structural or exterior aesthetic change prior to commencing the same and shall obtain Landlord's and the Southlands Architectural Control Committee's approval of the same (which approval shall not be unreasonably withheld). Landlord shall review and approve or comment upon Tenant's plans and specifications within 10 business days of Landlord's receipt thereof. In the event Landlord fails to respond to Tenant's request for approval of any submission within such 10 business day period, Landlord shall be deemed to have given its approval thereto. The approval of the Southland's Architectural Control Committee shall be subject to the Master Declaration. In the event Landlord disapproves of Tenant's plans and specifications as submitted, Landlord shall set forth its comments thereto in reasonable detail. Tenant shall then have the right (but not the obligation) to submit revised plans and specifications until such plans and specifications are approved (using the plan and specification approval procedure described above). Tenant shall fully indemnify Landlord against any mechanics' or other liens or claims in connection with Tenant's Work or the making of any such alterations, improvements or other changes, and shall post the Demised Premises in accordance with C.R.S. 38-22-105. If a mechanics' lien is filed in conjunction with Tenant's Work or such alterations, improvements or other changes, Landlord may require that Tenant obtain a release of the lien by substituting a bond therefor in accordance with Colorado law.

## ARTICLE VIII

### Trade Name

Any trade name at any time placed on the Theatre or Tenant's signs, or used by Tenant in connection with the business of Tenant conducted in the Theatre, with the exceptions of a name similar to the name of the Shopping Center itself, shall be the exclusive property of Tenant, and such name shall not be deemed to be the name of the Shopping Center, and Landlord shall not have the right to use such name.

## ARTICLE IX

### Encumbrances

1. Tenant agrees that this Lease is and shall be at all times subordinate to any first mortgage or deed of trust now encumbering or hereafter placed upon the Lifestyle/Entertainment District by Landlord and, if requested to do so by Landlord, Tenant shall execute a subordination agreement(s) evidencing such subordination; provided, however, that such subordination shall be upon the express condition that this Lease

shall be recognized in writing by the mortgagee, trustee, beneficiary or holder of such encumbrance ("First Mortgagee"), and that any such writing shall acknowledge that the rights hereunder of Tenant shall remain in full force and effect during the term of this Lease so long as Tenant shall continue to pay all sums required to be paid by Tenant pursuant to the provisions of this Lease and shall otherwise perform in accordance with the terms of this Lease.  Within 15 working days of receiving written demand from Landlord and proposed subordination instruments which satisfy the foregoing, Tenant shall execute and send to Landlord such subordination instruments as the First Mortgagee may reasonably require.

2.  Landlord represents and warrants that as of the date Landlord delivers the buildable pad to Tenant and records the Memorandum of Lease referenced in Article XXIII hereinbelow (which Landlord shall have no obligation to do prior to the date it delivers the buildable pad to Tenant), no portion of the Lifestyle/Entertainment District shall be subject to any mortgage, deed of trust or other lien except for encumbrances held by mortgagees or beneficiaries which have agreed, in a recorded instrument in a form reasonably acceptable to Tenant and Landlord's mortgagee (if any), that they will recognize this Lease, and all of the rights of Tenant hereunder, so long as Tenant shall continue to pay all sums and perform all obligations required by Tenant pursuant to the provisions of this Lease ("Non-Disturbance Protection").

3.  Tenant and Landlord each agree at any time and from time to time during the term of this Lease and within ten (10) days after demand therefor by the other party to execute and deliver to the other party or to any proposed mortgagee, trustee, beneficiary, or purchaser a certificate in recordable form certifying (a) that this Lease constitutes the only agreement between Landlord and Tenant with respect to the Demised Premises; (b) that this Lease is in full force and effect and has not been assigned, modified, supplemented, or amended (or stating such assignment, modification, supplement or amendment); (c) that there are no claims, defenses, or offsets to the enforcement of this Lease (or stating such claims, defenses, or offsets); (d) that there are no defaults under this Lease by Landlord or by Tenant (or stating such defaults as are claimed); (e) the dates to which all rentals have been paid; (f) the remaining renewal terms provided herein, if any; and (g) such other matters as may reasonably be requested.

## ARTICLE X

### Use of Premises

1.  Tenant may use the Theatre during the term hereof only for a motion picture, "legitimate" theatrical, dramatic, operatic, vaudeville and other performances and exhibitions which are customarily performed at a Colorado Cinema, including those broadcast or televised to or from the Theatre, for general auditorium purposes, corporate events, church use (provided that such church use can only be incidental to the general cinema business conducted in the Theatre and can only be held during non-theatre hours), and civic functions, for the sale of confections, soft drinks, and other concession stand food items, and for such activities and the sale of such merchandise and refreshments as are customary and usual in connection with any of the foregoing or with the general cinema business ("Tenant's Use").  Notwithstanding anything to the contrary contained herein or elsewhere in this Lease, Tenant hereby acknowledges and agrees that Tenant may not use the Premises for (a) any of the prohibited uses set forth in the Master Declaration, or (b) for the sale of any item or service which would violate the exclusive uses granted to any of the Project tenants and/or occupants set forth on **Exhibit I** to this Lease.  Subject to the limitations set forth in this paragraph, if Tenant adds any new type or item of merchandise or refreshment (which do not violate any then-existing exclusive that has been granted to any tenant or occupant of the Project) after the Theatre opens for business which is then sold by Tenant in substantially all of Tenant's theatres in the Denver metropolitan area, sales of said merchandise or refreshment shall be a permitted Tenant's Use.  Tenant, without Landlord's prior consent, shall not keep, store or maintain anything within the Theatre for any purpose which invalidates, or increases the premium for, any insurance policy carried on the Lifestyle/Entertainment District.  All property kept, stored or maintained within the Theatre by Tenant shall be at Tenant's sole risk.  Tenant shall not exhibit films which are not of a type generally consistent with films being shown at other theatres operated by Tenant and Tenant shall not operate the Demised Premises as an "adult" motion picture theatre, i.e., a motion picture theatre which, as a general policy, exhibits "X-rated" films nor shall Tenant operate the Demised Premises, in whole or in part, for the sale or display of pornographic materials (provided, however, that Landlord hereby agrees and confirms that showing "R" rate movies in the Demised Premises and/or displaying posters advertising such "R" rated movies does not violate this section).  Tenant shall not violate any exclusive use covenant between Landlord (and any successor and/or assignee of Landlord) and any current or future tenant or occupant of the Lifestyle/Entertainment District and the Project, provided that Landlord hereby agrees that neither the sale at any time by Tenant of any type or item of merchandise or refreshment which relate to the movie industry which was also sold by Tenant when Tenant initially opened the Theatre for business nor Tenant's sale of any new type or item of merchandise or refreshment which relate to the movie industry within Tenant's existing concession area, or from another area or areas of the Theatre not to exceed 250 square feet in the aggregate, shall be deemed to violate any exclusive use covenant running in favor of any other current or future tenant of the Lifestyle/Entertainment District.

2.  Tenant covenants and agrees that it will, following delivery of the buildable pad, diligently proceed to construct the Theatre Improvements pursuant to the provisions of and the timeframes required in

the Tenant Work Letter and open the Demised Premises for business under the trade name "Southlands Cinema" (unless Tenant has previously assigned this Lease or sublet the Demised Premises to a third party in accordance with the provisions of Article XXV or unless Tenant changes the trade name of substantially all of its theatres in Colorado along with that of its operations at the Demised Premises). Landlord and Tenant hereby agree that if Tenant (i) fails to open for business within 30 days after the issuance of a certificate of occupancy for the Demised Premises (subject to events of force majeure and Landlord caused delays), or (ii) ceases business operations within the Demised Premises for one hundred eighty (180) or more consecutive days (for a reason other than the repair and reconstruction from casualty, remodeling, condemnation or other reason permitted in this Lease), then at Landlord's option at any time after either of said events, as applicable, in addition to any other remedies Landlord may be entitled to exercise hereunder, pursuant to the provisions set forth in the Tenant Work Letter, at law or in equity, Landlord may either (1) collect the fixed minimum rent, additional rent and all other sums due hereunder as the same become due under the terms of this Lease, or (2) terminate this Lease upon thirty (30) days prior written notice to Tenant, in which event the parties shall be released from all liabilities or obligations under this Lease thereafter arising.  If Tenant shall fail to open for business or Tenant closes and cease to operate the Theatre in the Demised Premises for a period in excess of 180 days for any reason other than Landlord's default, casualty or condemnation, then Tenant (and any entity which is an "Affiliate" of Tenant) shall be prohibited from constructing, opening and/or operating (to the extent Tenant or an Affiliate is not then operating) a theatre within four (4) miles from any portion of the Project for a period of five (5) years after failing to open the Theatre or closing the Theatre, as applicable. Upon the stated expiration date for the term of this Lease (i.e., twenty (20) years or as otherwise extended), the provision in the immediately preceding sentence shall be of no further force and effect.  As used herein, the term "Affiliate" shall mean an entity controlled by Tenant, controlling Tenant or under common control with Tenant.

3.      Tenant agrees that from and after the day that Tenant initially opens the Theatre at the Demised Premises to the public and through the last day of the fifth (5th) full calendar year thereafter (the "Operating Covenant Period"), Tenant shall continuously operate the Demised Premises as a theatre in a good and business-like manner during such hours as are commercially reasonable to Tenant but for at least 30 hours per week.  Notwithstanding the foregoing, Tenant shall not be obligated to operate the Demised Premises during any period in which the Demised Premises are untenantable by reason of fire or other casualty, and, in addition, such obligation shall be subject to Tenant's termination rights specified in this Lease.  In addition, temporary cessation (not to exceed 60 days) due to causes such as lockouts, strikes, inability to obtain films, major alterations to the Demised Premises, or other reasons beyond the reasonable control of Tenant shall not deemed to be a violation of this Lease.  Notwithstanding the foregoing, Tenant shall have the right during the Operating Covenant Period, if fifty percent (50%) or more of the rentable area of the Shopping Center is vacant or otherwise not being operated for a period of six (6) months, to cease operations within the Demised Premises, provided that Tenant has otherwise complied with all other terms and conditions of the Lease, including the timely payment of minimum rent and additional rent (excluding percentage rent), with sixty (60) days' prior written notice to Landlord.  At any time following the Operating Covenant Period, Tenant shall have the right to close its operations within the Demised Premises, provided that Tenant has otherwise complied with all other terms and conditions of the Lease, including the timely payment of minimum rent and additional rent (excluding percentage rent), by giving Landlord 120 days' prior written notice ("Close Notice") in which event Landlord shall have the right, at any time following the closing of Tenant's operation within the Demised Premises, to cancel and terminate this Lease on 30 days' prior written notice to Tenant.  Furthermore, if after the Operating Covenant Period Tenant desires to change the use to be conducted by Tenant or any assignee or subtenant within the Demised Premises, which use is not in violation of Landlord's consent rights set forth in this Lease, nor in violation of any exclusive uses granted to other Shopping Center tenants in an executed lease at the time of the Change Notice, then Tenant shall give Landlord 120 days' prior written notice of such fact ("Change Notice") within which Change Notice, Tenant shall notify Landlord of the new use to be conducted within the Demised Premises. Landlord shall have the right at any time within such 120-day period to cancel and terminate this Lease by giving Tenant thirty (30) days prior written notice.   Landlord acknowledges that such rights of termination specified above shall be its exclusive remedy for such events, and that upon any such termination, the parties shall be released from all further obligations under this Lease.

## ARTICLE XI

### Noises and Odors

1.      Landlord shall not use or voluntarily permit to be used any part of the Lifestyle/Entertainment District in any manner that will unreasonably disturb the operation of the Theatre by noxious odors, noises, sound, vibrations or anything constituting a nuisance, and any and all leases by Landlord of all or any portion of the Lifestyle/Entertainment District or such adjacent property shall contain appropriate provisions against such uses by lessees thereof.  Without limiting the generality of the foregoing, Landlord shall not use or permit to be used any part of the Lifestyle/Entertainment District for (i) a discotheque (excluding dance floors within a restaurant), or (ii) any use involving live or recorded music which can be heard in the auditoriums of the Theatre.  Tenant recognizes that construction of additional buildings and improvements and typical restaurant and shopping center uses may be undertaken on the Shopping Center and agrees that such activities will not constitute a violation of this Article XI.

2.       Tenant shall not allow any noxious odor, noise, sound, vibration or anything constituting a nuisance to emanate from the Demised Premises.

## ARTICLE XII

### Signs

1.       Tenant, at its sole cost and expense, and subject to the other provisions of this Article XII, shall have the exclusive right (but not the obligation) to place, construct, erect, maintain, repair and replace on the exterior of the Theatre, one or more signs, including but not limited to a lighted marquee or "readerboard". All signs erected pursuant to this Section 1 shall be constructed in accordance with the applicable sign ordinances, the Signage Guidelines and the provisions of the Tenant Work Letter.  If Landlord approves Tenant's signs, Landlord's approval shall not be deemed to be in conformance with the Signage Guidelines or in compliance with applicable laws, and Tenant acknowledges, that it will require the consent of the Southlands Architectural Control Committee and the City of Aurora as well.

2.       Tenant shall also have the right to place, construct, erect, maintain, repair and replace on or about the exterior of the Theatre, and on the windows or doors thereof, such additional signs and other materials as are customary to motion picture theatres, subject to the Signage Guidelines and any applicable sign ordinances and subject to the approval of the Southlands Architectural Control Committee and the City of Aurora.

3.       In conjunction with the site work to be performed by Landlord pursuant to Article III hereof, Landlord will construct a monument sign and the panel to be used by Tenant thereon shall be designated by Landlord and shall be at least as large and prominent as the space to be used by any other tenant of the Lifestyle/Entertainment District of the Project.  As used herein, the term "Monument Sign" shall mean the sign depicted on **Exhibit A-3** to be used by Tenant, together with other space to be used to identify the name of the Project, certain other lessees and occupants of the Lifestyle/Entertainment District and other portions of the Project, or both.  The Monument Sign shall be designed and constructed, at Landlord's expense, pursuant to plans and specifications to be prepared by Landlord in accordance with the Signage Guidelines.  The Monument Sign shall be constructed and operational prior to the date on which the Theatre opens for business.

Tenant shall use its portion of the Monument Sign for the purpose of maintaining, repairing and replacing Tenant's panel of the Monument Sign.  Landlord shall construct the Monument Sign.  Tenant shall be responsible for providing and maintaining in good order and repair, at Tenant's expense, the panel or other materials to be placed in Tenant's portion of the Monument Sign, and for paying Tenant's "Monument Sign Proportionate Share" (as defined below) of the cost of construction of the Monument Sign. At the request of Tenant, Landlord shall provide reasonable supporting documentation regarding the cost of the construction of the Monument Sign.  Landlord shall cause the balance of the Monument Sign, including but not limited to the structure thereof, to be properly maintained in good condition and repair.  Tenant shall have no responsibility for any portion of the costs incurred in maintaining the spaces available on the Monument Sign for use by other lessees, however, a portion of the reasonable costs of maintaining the structure of the Monument Sign and lighting the Monument Sign may be passed through to Tenant as Common Area charges, to the extent permitted by Article VI hereof.  Landlord shall cause the Monument Sign to be fully lighted from dusk until 30 minutes after the conclusion of the final performance in the Theatre, unless Tenant requests that they be turned off earlier.  For the purposes of this paragraph, Tenant's "Monument Sign Proportionate Share" shall be a fraction, the numerator of which shall be the total number of square feet of Tenant's sign panel on the Monument Sign and the denominator of which shall be the total number of square feet of available signage on the Monument Sign (including the total number of square feet of the name of the Shopping Center as it appears on the Monument Sign).

Landlord represents, warrants, covenants and agrees that the Monument Sign, together with all other signs identifying the Lifestyle/Entertainment District, shall at all times during the term of this Lease, be owned exclusively by Landlord and shall remain free and clear of any and all Uniform Commercial Code or other liens or security interests (other than the real property mortgages or encumbrances referred to in Article IX hereof).  In the event Landlord breaches the foregoing, Tenant shall have the right, but not the obligation, to satisfy any such lien or security interest, in which event Landlord shall, within five days after demand therefor, reimburse Tenant for the full amount paid by Tenant to so satisfy such lien or security interest together with interest thereon, from the date advanced, at the Interest Rate.

4.       Landlord expressly agrees that except as shown on **Exhibit A-2**, no permanent buildings, structures, signs or elevated parking areas shall be constructed or maintained in the No-Build Area that will in any way obstruct the view of the Theatre, and of Tenant's signs or the Monument Sign from the adjacent public streets.

5.       Landlord shall use its commercially reasonable efforts to assist Tenant in getting approvals for Tenant's signage.

ARTICLE XIII

Insurance; Destruction

1.     Upon taking possession of the buildable pad, Tenant shall carry, maintain and pay the premium for the following types of insurance in the amounts specified, with such deductibles as Tenant may reasonably determine (but not to exceed $50,000.00 per policy):

(a)     Fire Insurance:  Fire insurance (Cause of loss-special form) with an extended All Risk coverage endorsement insuring the structure of the Theatre in an amount which is not less than 100 percent of the replacement costs of said structure, with loss payable thereunder to Landlord, any First Mortgagee and Tenant in accordance with their respective interests as they may appear.  Tenant's fire insurance policy shall be written on a "per location" basis.

(b)     Commercial General Liability Insurance:   Liability insurance of not less than $5,000,000.00 combined single limit, insuring against property damage and bodily injury liability of the insured with respect to the Theatre or arising out of the maintenance, use or occupancy thereof, with a contractual liability endorsement deleting the exclusion from contractual liability coverage for personal injury.

(c)     Plate Glass Insurance:  Tenant shall be responsible for the maintenance of any plate glass in the Theatre, but may either insure such risk or self-insure therefor.  Any and all glass breakage shall be replaced with glass of the same quality.

(d)     Business Interruption Insurance:  Business interruption insurance covering Tenant's operations at the Theatre for not less than 12 months.

(e)     Builder's Risk Insurance:      Builder's risk insurance shall be maintained in an amount not less than 100 percent of the amount of Tenant's contract with its general contractor for its FF&E as defined in Article IV.  Landlord shall name Tenant as additional insured in its Builder's risk insurance policy for construction of the Theatre Improvements.

(f)     Worker's Compensation and Employer's Liability Insurance: Worker's Compensation and Employer's Liability Insurance, each with waivers of subrogation in favor of Landlord.

2.     From and after the Commencement Date, and thereafter during the term of this Lease, Landlord shall carry and maintain insurance against perils customarily included within all-risk and fire and extended coverage, which may include earthquake, war, terrorism, vandalism, malicious mischief and sprinkler leakage, flood and hurricane on the entire Lifestyle/Entertainment District, and any insurable improvements thereon, in an amount equal to the full replacement value thereof at the time of loss, and there shall be annual adjustments of value under the policy.  Landlord shall also carry and maintain commercial general liability and property damage insurance, with minimum limits of not less than $5,000,000 with respect to injury or death to any one person, $10,000,000 with respect to any one occurrence, and $1,000,000 with respect to property damage arising out of any one occurrence.  Tenant shall pay Tenant's Proportionate Share of the cost of the Landlord's insurance described herein as additional rent.

3.     All policies of insurance to be provided pursuant to Sections 1 and 2 of this Article XIII shall be issued by responsible insurance companies with a Best's rating of "A-" or better and that are qualified to do business in the state where the Shopping Center is situated.  All policies maintained by Tenant hereunder shall be issued in the name of Tenant, with Landlord and Landlord's mortgagees listed as an additional insured; all policies maintained by Landlord hereunder shall be issued in the name of Landlord, with Tenant listed as an additional insured on all liability insurance policies.   Notwithstanding the foregoing, except for general liability insurance of the type referred to in Section 1(b) of this Article XIII, Landlord shall have no interest in any insurance coverage which Tenant may elect to maintain in excess of that required by Section 1 of this Article XIII (whether or not such excess coverage is included within any policy of insurance containing such required coverage), provided, however, that any such excess shall not reduce the benefits payable under the required policies nor trigger coinsurance provisions.  Any and all proceeds from such excess coverage shall be paid to, and be the sole property of, Tenant.  Executed copies of such policies of insurance or certificates thereof shall be delivered to Landlord and Tenant prior to the date on which Tenant takes possession of the Theatre Area.  New certificates shall be delivered promptly whenever policies are renewed or new policies are written.  As often as any such policy shall expire or be terminated, a renewal or additional policy shall be procured and maintained by Landlord or Tenant in like manner and to like extent.  All policies of insurance maintained by Landlord or Tenant pursuant hereto shall contain a provision that the company writing said policy will give to the other party hereto not less than 30 days' notice in writing in advance of any cancellation or lapse of the effective date or any reduction in the amounts of insurance or other material modification of such policy.  Tenant may be required from time to time to increase the insurance or add additional coverage to that shown in Section 1 of this Article XIII upon the demand of Landlord's lender (provided, that any such increased and/or additional coverage is typically required by tenants similar to the Tenant in shopping centers

typical to the Project in the general geographic location in which the Project is located). All insurance policies carried by either party may contain such party's standard deductibles and other provisions and may be in one or more blanket, umbrella or excess liability policies covering other locations of such party.

Each general liability policy maintained by Tenant pursuant to Section 1 of this Article XIII shall contain a provision that Landlord, although named as an additional insured, shall nevertheless be entitled to recover under said policy for any covered loss occasioned to Landlord, its servants, agents and employees by reason of the negligence of Tenant. Each general liability policy maintained by Landlord pursuant to Section 2 of this Article XIII shall contain a provision that Tenant, although named as an additional insured, shall nevertheless be entitled to recover under said policy for any covered loss occasioned to Tenant, its servants, agents and employees by reason of the negligence of Landlord.

Landlord and Tenant each shall cause all casualty insurance policies which they are required to carry pursuant to this Lease to provide that the insurance company issuing such policy waives all rights of recovery by way of subrogation against the other party in connection with any damage covered by such policy. If any such insurance coverage cannot be obtained with such a waiver of subrogation, or is obtainable only by the payment of an additional premium charge, the party undertaking to obtain the insurance shall promptly notify the other party of this fact. If such waiver is obtainable only by the payment of an additional premium, the other party shall have the option to reimburse the insuring party for the additional premium and to require such party to obtain such waiver. If the insurance cannot be obtained or the party in whose favor a waiver of subrogation is desired does not agree to reimburse the insuring party for the additional premium charged, the insuring party is relieved of the obligation to obtain a waiver of subrogation rights with respect to the particular insurance involved.

4.    Tenant's obligations to carry the insurance provided for in Section 1 of this Article XIII may be brought within the coverage of a so-called "blanket" policy or policies of insurance carried and maintained by Tenant; provided, however, that Landlord shall be named as an additional insured thereunder as Landlord's interest may appear, that the coverage afforded Landlord or Tenant shall not be reduced or diminished by reason of the use of such blanket policy of insurance, and that the requirements set forth herein are otherwise satisfied. If Tenant carries any so-called "blanket" policy, each shall be written on a "per location" basis.

5.    If all or any portion of the Theatre is damaged or destroyed during the term hereof, (i) Tenant at its cost and expense shall restore the damaged or destroyed areas of the Theatre which constitute Tenant's FF&E and Landlord shall restore the Theatre Improvements to substantially the same or better condition as they were in immediately before the damage or destruction, and each party shall cooperate with the other party to make available, on mutually acceptable terms, any insurance proceeds payable in connection with such loss by the insurance coverage required to be carried by this Article XIII, provided that Tenant may elect that instead of restoring the damaged areas of Tenant's FF&E to substantially the same or better condition as existed prior to the damage, Tenant may reconstruct such areas so that they are the equivalent of comparable areas in state of the art motion picture theatres as of the date of such reconstruction; and (ii) Landlord at its cost and expense shall restore the other Theatre Improvements.

6.

(a)    Notwithstanding the provisions of Section 5 of this Article XIII, if the Theatre is "substantially damaged or destroyed" (as hereinafter defined) as a result of a risk not covered by the insurance required to be carried pursuant to Sections 1 or 2 of this Article XIII, or Landlord's blanket coverage pursuant to Section 5 of Article VI, Landlord may terminate this Lease by giving notice to Tenant within 60 days after the damage or destruction. In the event Landlord elects not to terminate this Lease pursuant to this Section, Landlord shall restore, at Landlord's cost and expense, damaged or destroyed portions of the Theatre and all damaged parking and other Common Areas except that Tenant shall restore, at Tenant's cost and expense, damaged or destroyed portions of Tenant's FF&E, and Landlord shall remove and landscape or restore all other damaged or destroyed portions of the Lifestyle/Entertainment District.

(b)    Notwithstanding the provisions of Section 5 of this Article XIII, if the Theatre is substantially damaged or destroyed during the last two years of the initial term or any extended term of this Lease by a risk covered by the insurance required to be carried pursuant to Sections 1 or 2 of this Article XIII, or Landlord's blanket coverage pursuant to Section 5 of Article VI, either Landlord or Tenant may terminate this Lease by giving notice to the other party within 30 days after the damage or destruction; provided, however, that if Landlord so elects to terminate this Lease prior to the exercise or expiration of Tenant's last option to extend the term hereof, Tenant may elect, by notice given to Landlord within 30 days after receiving Landlord's notice of termination, to exercise one or more of the then remaining options, in which event Landlord's termination of this Lease shall not be effective and the provisions of Section 5 of this Article XIII shall apply.

(c)    In all events, the provisions of this Lease relating to repair or rebuilding following casualty or other damage shall be subject to and governed by the provisions of any first mortgage or first deed of trust given by Landlord and encumbering the Demised Premises.

7.     Any notice of termination given by either party pursuant to the provisions of Section 6 of this Article XIII shall specify the date of termination, which date shall not be less than 30 nor more than 60 days after the date the notice is given.

8.     As used in this Article XIII, the Theatre shall be deemed to have been "substantially damaged or destroyed" if either (a) 25 percent or more of the Gross Leasable Area of the Theatre is destroyed and cannot reasonably be repaired in 365 days, (b) three (3) or more auditoriums are not able to show movies for at least 365 days, (c) the majority of the restroom facilities or the majority of the concession areas in the Demised Premises are not operable and cannot be repaired within 365 days, (d) 25 percent or more of the parking area within the No-Build Area is destroyed, and/or (e) the Theatre is so damaged that the cost of repairing the same will exceed 25 percent of its replacement value immediately prior to the occurrence of such damage and such damage cannot be repaired in 365 days.

9.     All restorations made by Landlord or Tenant, as applicable, pursuant to this Article XIII shall be of good quality and workmanship, shall be promptly commenced and diligently prosecuted to completion, and in the event the same are not substantially completed within 365 days after the date of the damage or destruction, the party not responsible for the work shall have the right to terminate this Lease by giving notice to the party responsible for the work at any time prior to such completion.  All such restorations made by Landlord during periods when the Theatre is open to the public for business shall be undertaken in a manner which will minimize the inconvenience to Tenant and Tenant's clientele, agents and employees, including but not limited to construction and maintenance of adequate barricades and aesthetic screening around all construction areas.

10.     In case of damage to or destruction of the Theatre or the Lifestyle/Entertainment District, except in the event such damage or destruction is due to the negligence or wrongful acts or omissions of Tenant, its employees, agents or contractors, there shall be an abatement or reduction of rent (including minimum rent, percentage rent and additional rent) and all other amounts payable by Tenant under this Lease for the period between the date of the damage or destruction and the date on which the same is completely repaired or restored and Tenant re-opens for business, based on the extent, if any, to which the damage or destruction interferes with the business being conducted in the Theatre (as measured by Tenant's ability to generate both Gross Box Office Receipts and Gross Candy Concession Receipts).

11.     If all or any portion of Tenant's FF&E located in the Theatre shall be damaged or destroyed, this Lease shall remain in full force and effect, except that Tenant may elect to terminate this Lease as of the date of such damage or destruction if the extent of such damage or destruction equals or exceeds 50 percent of the total insurable value of Tenant's FF&E and such damage or destruction occurs during the last two years of the initial term or of any extended term hereof.  If Tenant so elects to terminate this Lease, Tenant must exercise its right to terminate by giving notice to Landlord within 120 days after such damage or destruction.

ARTICLE XIV

Eminent Domain

1.     If the entire Theatre shall be appropriated or taken under the power of eminent domain, or under any similar power, this Lease shall terminate as of the date of such appropriation or taking.

2.     If a portion of the Theatre shall be appropriated or taken under power of eminent domain, or under any similar power, and if in Tenant's reasonable judgment the remaining portion of the Theatre can be effectively, legally and profitably used by Tenant in the operation of its business and the costs of making any necessary restorations thereto would not be excessive, then this Lease shall terminate as to the portion of the Theatre so taken as of the date of such appropriation or taking, Tenant shall continue to use the remaining portion of the Theatre, and there shall be an abatement of fixed minimum rent based upon the extent to which the taking or appropriation interferes with the business being conducted on the Theatre (as measured by Tenant's ability to generate both Gross Box Office Receipts and Gross Candy Concession Receipts); provided, however, that in no event shall the rent abatement be less than a pro rata abatement based on the number of gross leasable square feet taken and the Gross Leasable Area originally contained in the Theatre.  Additionally, Tenant's Proportionate Share (as defined in Section 5 of Article VI of this Lease) shall be recomputed based on the Gross Leasable Area remaining in the Theatre and the Lifestyle/Entertainment District.  In such event, Tenant shall take all action necessary to restore the Theatre, which restorations shall be made in accordance with the provisions of Article VII hereof.  The costs and expenses of such restorations to the fullest extent possible shall be paid from condemnation proceeds, and Landlord shall cooperate fully with Tenant in making such restorations and in making said condemnation proceeds available for Tenant's use in connection therewith.  If such condemnation proceeds are not adequate to complete the restorations, the excess costs shall be equitably apportioned between Tenant and Landlord (and, if the parties are unable to agree upon such apportionment, the matter shall be resolved through arbitration pursuant to the provisions of Article XXIX hereinbelow).  If on the other hand, in Tenant's reasonable judgment the remaining portion of the Theatre cannot be effectively and profitably used by Tenant in the operation of its business or the costs of restoring the

Theatre would be excessive, then this Lease shall terminate as to the entire Theatre as of the date of such appropriation or taking. Notwithstanding any provision in this Article XIV to the contrary, in all events the provisions of this Lease relating to restoration or rebuilding following an appropriation or taking shall be subject to and governed by the provisions of any first mortgage or first deed of trust given by Landlord and encumbering the Demised Premises.

3.      If (i) a portion of the Lifestyle/Entertainment District other than the Theatre comprising at least 10 percent of the No-Build Area and/or at least 10 percent of the parking spaces within the No-Build Area shall be appropriated or taken under power of eminent domain, or any similar power, and (ii) Tenant's Gross Box Office Receipts and Gross Candy Concession Receipts from the Theatre in the ninety day period commencing on the effective date of such appropriation or taking is less than 95% of Tenant's average Gross Box Office Receipts and Gross Candy Concession Receipts from the Theatre in the ninety day calendar period in each of the immediately preceding three calendar years (or such shorter period if the appropriation or taking occurs during the first three years of the term hereof), and (iii) in Tenant's reasonable judgment, the Theatre cannot be effectively, legally and profitable used by Tenant for the operation of its business, Tenant shall have the right to terminate this Lease within 60 days following the taking/appropriation. However, if, in Tenant's reasonable judgment, the Theatre can still be effectively, legally and profitably used by Tenant in the operation of its business notwithstanding the taking/appropriation, then Tenant shall so use the Theatre and there shall be an abatement of fixed minimum rent based upon the extent by which Gross Box Office Receipts and Gross Candy Concession Receipts was so affected. Additionally, Tenant's Proportionate Share shall be recomputed based on the number of gross leasable square feet remaining in the Lifestyle/Entertainment District.  In such event, Landlord shall, at its cost and expense, take all action necessary to restore the Lifestyle/Entertainment District provided that in no event shall Landlord be obligated to expend more than the net condemnation proceeds available to Landlord for such purpose. All such restorations shall be promptly commenced, diligently prosecuted to completion, and of good quality and workmanship, and shall be undertaken in a manner which will minimize the inconvenience to Tenant, including but not limited to construction and maintenance of adequate barricades and aesthetic screening around all construction areas. If, on the other hand, the occurrences described in subclauses (i) and (ii) of this Section 3 shall have occurred and in Tenant's reasonable judgment the Theatre thereafter cannot be effectively, legally and profitably used by Tenant in the operation of its business, then this Lease shall terminate as of the date of such appropriation or taking.

4.      Subject to the provisions of Section 2 of this Article XIV concerning the costs of restoring the Theatre, if all or a portion of the Theatre or the Lifestyle/Entertainment District is taken or appropriated as contemplated in Section 2 of this Article XIV, only Landlord shall have the right to claim the award made by the condemning authority.

5.      Without in any way limiting the generality of the provisions of this Article XIV, it is specifically agreed that if, as a result of a taking or appropriation, either (a) the number of parking spaces in the Tenant Parking No Change Area is materially reduced and adequate alternative parking is unavailable, or (b) the nonexclusive parking facilities on the remainder of the Shopping Center are reduced below such number as may now or hereafter be required by any law for the operation of the Theatre and all other facilities then located on the Shopping Center, as a result of taking or appropriation, Tenant may terminate this Lease as of the date of such taking by giving notice to Landlord.

6.      A voluntary sale to any public body or agency having the power of eminent domain, either under threat of condemnation or while proceedings are pending, shall be deemed to be a taking under the power of eminent domain for the purposes of this Lease.

ARTICLE XV

Default

1.      The following events shall be deemed to be "Events of Default" by Tenant under this Lease:

(a)      Tenant shall have failed to pay any installment of fixed minimum rent, additional rent, percentage rent or any portion thereof or any other amount due hereunder when the same shall be due and payable, and shall not cure such failure within 10 days after Landlord has given written notice to Tenant of such failure; or

(b)      Tenant shall have failed to comply with any other provision of this Lease to be complied with by Tenant and shall not cure such failure within 30 days after Landlord has given written notice to Tenant of such noncompliance (provided, however, that in the case of a failure which cannot with due diligence be cured within a period of 30 days, Tenant shall have such additional time to cure the same as may be reasonably necessary, as long as Tenant commences to cure such failure within said 30 day period and at all times thereafter proceeds with due diligence to cure such failure after receipt of said notice).

2.      Upon an Event of Default, Landlord may:

h:s/l/d/w/doc/Southlands-Co Cinema Lease(fsl)

(a)     terminate this Lease, in which event Tenant shall immediately surrender the Demised Premises to Landlord.  In such event, Landlord shall be entitled to recover from Tenant (i) the unpaid rent which had been earned at the time of the termination, (ii) the worth at the time of the award of the amount by which the unpaid rent which would have been earned after termination until the time of the award exceeds the amount of such rental loss that the Tenant proves could have been reasonably avoided, (iii) the worth at the time of the award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Tenant proves could have been reasonably avoided, and (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including, without limitation, the cost of recovering possession of the Demised Premises, expenses of reletting, including necessary renovation and alteration of the Demised Premises, reasonable attorneys fees, and that portion or any leasing commission paid by Landlord in connection with this Lease applicable to the unexpired term of this Lease.  Landlord's efforts to mitigate its damages shall not waive Landlord's right to recover all or any portion thereof in a separate suit.

(b)     continue this Lease and Tenant's right to possession and recover rent (and all additional rent) a the same becomes due, in which event Tenant may sublet or assign (in accordance with the provisions of this Lease relating thereto).  In connection therewith, acts of maintenance, efforts to relet and/or the appointment of a receiver to protect Landlord's interests, shall not constitute a termination of the Lease.

(c)     pursue any other remedy or remedies now or hereafter available in the State of Colorado, provided, however that the termination of the Lease shall not relieve Tenant from liability under any indemnity provisions of the Lease as to matters occurring and/or accruing during the term of the Lease.

(d).     Notwithstanding anything to the contrary contained herein, Landlord shall use reasonable efforts to mitigate its damages in the event this Lease or Tenant's right to possession of the Demised Premises is terminated due to Tenant's default.

(e)     Tenant agrees that any reentry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings or without the necessity for any legal proceedings, as Landlord may elect, and Landlord shall not be liable in trespass or otherwise.

(f)     In case of any Event of Default or breach by Tenant, Tenant shall also be liable for and shall pay to Landlord, at the address specified for notice to Landlord herein in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises, the costs of removing and storing Tenant's Property, the costs of repairing, altering, remodeling or otherwise putting the Premises in a "white-box" condition, and all reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies including reasonable attorneys' fees.

(g)     Landlord and Landlord's agents and employees shall not be liable to Tenant or any other person or entity whomsoever for any injury to person or damage to property caused by the Premises or other portions of the Shopping Center arising out of repair or by defect in or failure of equipment, pipes or wiring, or broken glass, or by the backing up of drains, or by gas, water, steam, electricity or oil leaking, escaping or flowing into the Premises, nor shall Landlord be liable to Tenant or any other person or entity whomsoever for any loss or damage that may be occasioned by or through the acts or omissions of other tenants or occupants of the Shopping Center or of the Project or of any other persons or entities whomsoever, excepting only duly authorized employees and agents of Landlord.

(h)     No receipt of money by Landlord from Tenant after the termination of this Lease as herein provided shall reinstate, continue or extend the Lease Term or operate as a waiver of the right of Landlord to enforce the payment of Minimum Rent or additional rent when due from Tenant, or operate as a waiver of the right of Landlord to recover possession of the Premises.

3.     In the event Tenant fails to pay Landlord within ten days after written notice from Landlord that any installment of fixed minimum rent or additional rent has become due hereunder, Landlord will incur additional expenses in an amount not readily ascertainable and which has not been elsewhere provided for between Landlord and Tenant.  Subject to any prior notice requirements, if Tenant should fail to pay to Landlord any installment of fixed minimum rent or additional rent within ten days after Landlord's notice that such installment is due, Tenant will pay Landlord on demand a late charge of 2% thereof, provided that such notice and cure period shall be available to Tenant only two times in any lease year and if Tenant thereafter fails in said lease year to pay to Landlord any installment of fixed minimum rent or additional rent when due, said late charge shall become immediately due and payable.  Failure to pay such late charge upon demand therefor shall be an event of default hereunder.  Tenant shall have an additional ten (10) days to cure the default, as long as Tenant pays Landlord on demand a late charge of 8% thereof.  Said late charge shall become immediately due and payable.  Provision for such late charge shall be in addition to all other rights and remedies available to Landlord hereunder or at law or in equity and shall not be construed as liquidated damages or limiting Landlord's remedies in any manner.

4.      Landlord shall not be deemed to have committed an event of default under this Lease unless Landlord shall have failed to comply with any material provision of this Lease to be complied with by Landlord and shall not cure such failure within 30 days after Tenant has given written notice to Landlord of such noncompliance (provided, however, that in the case of a failure which cannot with due diligence be cured within a period of 30 days, Landlord shall have such additional time to cure the same as may be reasonably necessary, as long as Landlord proceeds promptly and with due diligence to cure such failure after receipt of said notice. If Landlord fails to cure a Landlord default within the timeframes set forth hereinabove (and Landlord does not dispute the same), Tenant may, as Tenant's sole remedy therefore, cure such default at Landlord's expense, in which case, following completion of such cure, Tenant shall submit paid invoices and/or other reasonable documentation evidencing the Tenant's completion of and payment for the work to Landlord for reimbursement. If Landlord fails to reimburse Tenant for the costs of curing the Landlord default within thirty (30) days after receiving documentary evidence of the work completed and the costs incurred by Tenant therefore, Tenant may offset the costs thereof against the payments of minimum rent next becoming due and payable. In no event shall Tenant have the right to terminate the Lease as a result of Landlord's default hereunder unless such Landlord default would constitute a "constructive eviction" of Tenant.

5.      Tenant agrees to send the holder of any mortgage or deed of trust on the Shopping Center (a "Mortgagee"), by certified mail, a copy of any notice of default given to Landlord at such address of Landlord's Mortgagee of which Tenant has been notified. If Landlord fails to cure any default of Landlord within the time period provided for in this Lease, then Landlord's Mortgagee shall have an additional thirty (30) days within which to cure such default (or such additional period of time as may be reasonably necessary if such Mortgagee is diligently pursuing cure of same) before Tenant shall be entitled to exercise its rights to seek recovery of its actual damages or obtain equitable relief, which shall be Tenant's sole and exclusive remedies hereunder.

6.      Notwithstanding any other provision hereof, neither Landlord, Landlord's managing agent, Landlord's mortgagees or their respective partners, members, managers, shareholders, principals, officers, directors or agents shall have any personal liability hereunder. In the event of any breach or default by Landlord in any term or provision of this Lease, Tenant agrees to look solely to the equity or interest (including for this purpose any and all rents, profits, insurance proceeds and condemnation proceeds) then owned by Landlord in the land and improvements which constitute the Lifestyle/Entertainment District, however, in no event shall any deficiency judgment of any kind be sought or obtained against Landlord, Landlord's managing agent, Landlord's mortgagees or their respective partners, members, managers, shareholders, principals, officers, directors or agents.

7.      Except if caused by the intentional wrongful act or gross negligence of Landlord, its agents or employees and except as expressly provided to the contrary in this Lease, Landlord shall not be liable to Tenant or any other person or entity whomsoever for any injury to person, property damage or damage to the Theatre or other portions of the Lifestyle/Entertainment District. Tenant shall indemnify and hold Landlord harmless from any loss, cost, expense or claims arising out of such injury or damage referred to in this Section.

### ARTICLE XVI

#### Surrender of Premises Upon Termination of Lease; Holdover

1.      Tenant, within 30 days after the expiration or earlier termination of this Lease, shall remove from the Theatre all items of Tenant's personal property and shall surrender the Theatre in broom-clean condition, subject to the effects of wear and tear arising from use or lapse of time and of damage by fire or other casualty. Tenant shall continue to pay rent and all other sums due hereunder during the 30-day move out period and shall otherwise comply with the terms of this Lease during such period, but shall not operate the Theatre during such period. If Tenant surrenders the Theatre as above provided during the 30-day move out period, such rent and other sums shall be prorated as of the surrender date.

2.      The holding over and/or continuation of any activities by Tenant on the Demised Premises after the expiration of the term hereof and the move out period provided in Paragraph I immediately above shall not be considered to be a renewal or extension of this Lease unless Landlord approves such holding over in writing and a definite extension agreement defining the length of such additional term is executed by Landlord. Any holding over beyond the 30-day move out period without the written consent of Landlord shall be considered to be a month-to-month tenant at sufferance at a rental equal to one and one-half (1½) times the minimum rent paid by Tenant in the prior Lease year as provided herein and otherwise subject to all the terms and provisions of this Lease.

ARTICLE XVII

Quiet Enjoyment and Marketable Title; Zoning, Environmental and Other Laws

1.      Landlord covenants that Tenant, on paying the rents reserved herein and performing the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the Demised Premises, and all rights, easements, appurtenances and privileges thereunto belonging or in anywise appertaining, during the full term of this Lease, including any extensions or renewals hereof, without hindrance from Landlord or any other person or entity claiming by, through or under Landlord.

2.      Landlord represents and warrants, and shall indemnify Tenant for any breach hereof, that:

(i)      It is the fee title holder and owner of the Lifestyle/Entertainment District.

(ii)     It has good and lawful right and authority to make this Lease.

(iii)     To the best of Landlord's knowledge, there are no leases, agreements, restrictive covenants, easements or other restrictions (including but not limited to "zoning" restrictions) that will prevent or restrict Tenant from conducting in the Theatre the business permitted by this Lease (including but not limited to Tenant's ability to (i) to exhibit films in all auditoriums on all days of the year, (ii) to exhibit films on any day, including no restrictions on matinee or evening performances, and (iii) to use all available seats in each auditorium during all hours of operation).

(iv)     To the best of Landlord's knowledge, neither the entering into of this Lease, nor the construction, maintenance and operation of the Theatre or the balance of the Lifestyle/Entertainment District, will violate any existing subdivision or zoning ordinance or other law, statute, ordinance or regulation applicable to this Lease, the Theatre or the Lifestyle/Entertainment District, or will require any governmental consents or approvals (other than a normal building permit and certificate of occupancy).

Except to the extent such representations and warranties relate to the content of so-called zoning ordinances, these representations and warranties shall be deemed to be made again on the first day of the initial term of this Lease.

3.      Landlord represents, warrants and covenants with and to Tenant that (i) to the best of Landlord's knowledge, there has not been in the past any use, treatment, storage, disposal, spill, leakage, discharge or release of any hazardous substance (including, without limitation, any substance listed in 49 U.S.C. s 1801 et seq. Or 40 C.F.R. 302.4 (1986)) or pollutant on the Lifestyle/Entertainment District, or any portion thereof in violation of applicable law; (ii) no portion of the Lifestyle/Entertainment District constructed by Landlord contains any asbestos or other hazardous substance in violation of applicable law; and (iii) Landlord has complied, and will in the future use its best efforts to comply, fully with all laws, ordinances, regulations and orders, including, without limitation, all safety and environmental laws, ordinances, regulations and orders, applicable to the Lifestyle/Entertainment District.

4.      If any representation and warranty contained in this Article XVII shall prove to be untrue, if Landlord shall breach any covenant contained in this Article XVII, if Landlord shall fail to promptly complete any legally required environmental clean-up of the Shopping Center (other than one caused by any act of Tenant or Tenant's agents, contractors, employees or others claiming by, through or under Tenant), or if, as a result of Landlord's acts or omissions, the zoning of the Theatre or the Shopping Center should be altered or changed so as to materially interfere with or materially prohibit, either, in whole or in part, the construction, maintenance or operation of a motion picture theatre or the Shopping Center as herein contemplated, including, without limitation, any material interference with respect to or prohibition on Tenant's ability to operate matinee performances in the Theatre for more than 360 consecutive days, then in that event Tenant, in addition to whatever other rights it may have, shall have the option of terminating this Lease, thereby being released from all of the covenants and obligations herein contained.  Additionally, if the zoning of the Theatre or the Shopping Center should be altered or changed in any manner or any other law or regulation applicable to this Lease, the Theatre or the Shopping Center should be enacted by any governmental authority so as to materially prohibit the construction, maintenance or operation of a motion picture theatre, whether or not as a result of Landlord's acts or omissions, Tenant shall be permitted to change Tenant's Use in its sole discretion to any use (i) permitted by applicable law, (ii) which does not violate any covenants, conditions or restrictions or reciprocal easement agreement then affecting the Theatre or the Shopping Center or other use restrictions set forth in this Lease, and (iii) which does not violate any then existing exclusive use covenant between Landlord and any other tenant of the Shopping Center.  In the event that Tenant changes Tenant's Use as provided in this Section 4, the terms of this Lease shall remain effective and enforceable.  The powers conferred on Tenant hereunder are solely to protect its interest in the Theatre and shall not impose any duty upon it to exercise any such powers.  Except for the exercise of reasonable care in connection with the exercise of its rights hereunder and except as expressly provided to the contrary in this Lease, Tenant shall have no duty as to the maintenance or operation of the Shopping Center or the Theatre.

5.    Landlord's representations, warranties, covenants, agreements and indemnities contained in this Article XVII shall survive the expiration or earlier termination of this Lease.

6.    Landlord represents that prior to its execution of this Lease, Landlord has delivered to Tenant all environmental site assessment reports (the "Reports") within the possession or control of Landlord respecting the Shopping Center, including the Demised Premises. Tenant, at its sole cost and expense may have the Reports recertified to it by the parties preparing such Reports, but Landlord shall have no responsibility or liability for the inability of Tenant to obtain such recertification, and such is not a condition of this Lease. Tenant agrees that neither Tenant nor any person claiming, by, through or under Tenant shall have any claim against Landlord in connection with the Reports or the matters contained therein.

7.    Except in strict compliance with all environmental laws and except in small amounts customarily used in the operation and maintenance of theatres, all of which shall be used and stored in accordance with applicable law, Tenant shall not cause, permit or suffer any hazardous material to be brought upon, treated, kept, stored, disposed of, discharged, released, produced, manufactured, generated, refined or used upon, about or beneath the Demised Premises or any portion thereof by Tenant, its agents, employees, contractors or tenants without the prior written consent of Landlord. Any request by Tenant for such consent by Landlord shall be in writing and shall demonstrate to the reasonable satisfaction of Landlord that such hazardous material is necessary to the business of Tenant and will be stored, used and disposed of in a manner that complies with all environmental laws applicable to such hazardous material. Such consent shall not be unreasonably withheld, but Landlord shall in no case be obligated to consent to the presence of any hazardous material which will increase the likelihood or magnitude of liability for environmental damages or to any treatment, storage or disposal upon the Demised Premises of any hazardous material the treatment, storage or disposal of which requires a permit or variance under the Federal Resource Conservation and Recovery Act (42 U.S.C. section 6901 et seq.) or state analogues thereto, and Landlord shall in no case be obligated to execute any application for such a permit or variance.

Except in strict compliance with all environmental laws and except in small amounts customarily used in the operation and maintenance of first class regional shopping centers, Landlord shall not cause, voluntarily permit or voluntarily suffer any hazardous material to be brought upon, treated, kept, stored, disposed of, discharged, released, produced, manufactured, refined or used upon, about or beneath the Common Areas or any portion thereof by Landlord, its agents, employees, contractors or tenants.

8.    Tenant shall not cause, voluntarily permit or voluntarily suffer the existence or the commission by Tenant, its agents, employees or contractors or by any other person of a violation of any environmental laws upon, about or beneath the Demised Premises, the Common Area or the Shopping Center or any portion thereof. Landlord shall not cause, voluntarily permit or voluntarily suffer the existence or the commission by Landlord, its agents, employees or contractors or by any other person of a violation of any environmental laws upon, about or beneath the Demised Premises, the Common Area or the Shopping Center or any portion thereof.

9.    Tenant shall not create or suffer to exist with respect to the Demised Premises, or permit any of its agents to create or suffer to exist any lien, security interest or other charge or encumbrance of any kind relating to environmental matters, including, without limitation, any lien imposed pursuant to section 107(f) of the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C. section 9607(1)) or any similar state statute.

10.    If Tenant violates the obligations stated in this Article, or if the presence of hazardous materials on the Shopping Center and/or the Project caused or permitted by Tenant results in contamination of any portion of the Shopping Center and/or the Project or if contamination by hazardous material otherwise occurs for which Tenant is liable to Landlord for damage resulting therefrom, then Tenant shall indemnify, defend and hold Landlord, its agents, employees, officers, directors, members, managers and partners harmless from any and all claims judgments, damages, penalties, fines, liabilities or losses (including, without limitation, diminution in the value of the Shopping Center and/or the Project, damages for loss or restriction of use of rentable or useable space or of any amenity of the Shopping Center and/or the Project, damages arising from any adverse impact on marketing of space, and sums paid in settlement of claims, reasonable attorneys' fees, consultant fees and expert fees which arise during or after the Lease term as a result of such contamination). This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation of the site conditions or any clean-up, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of hazardous material present in the air, soil or groundwater on, within or under the Shopping Center and/or the Project. The provisions of this Paragraph shall survive the expiration or earlier termination of this Lease.

If Landlord violates the obligations stated in this Article, or if the presence of hazardous materials on the Shopping Center and/or the Project caused or permitted by Landlord results in contamination of any portion of the Shopping Center and/or the Project or if contamination by hazardous material otherwise occurs for which Landlord is liable to Tenant for damage resulting therefrom, then Landlord shall indemnify, defend and hold Tenant, its agents, employees, officers, directors and partners harmless from any and all claims,

judgments, damages, penalties, fines, liabilities or losses (including, without limitation, damages for loss or restriction of use of rentable or useable space, or of any amenity of the Shopping Center or the Demised Premises and sums paid in settlement of claims, reasonable attorneys' fees, consultant fees and expert fees which arise during or after the Lease term as a result of such contamination). This indemnification of Tenant by Landlord includes, without limitation, costs incurred in connection with any investigation of the site conditions or any clean-up, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of hazardous material present in the air, soil or groundwater on, within or under the Shopping Center and/or the Project. The provisions of this Paragraph shall survive the expiration or earlier termination of this Lease. Landlord and Tenant acknowledge that Landlord's liability under this Paragraph is limited by the provisions of Section 5 of Article XV hereof.

## ARTICLE XVIII

### Notice

1. Any notice, demand, request, consent, approval or other communication that either party is required or desires to give to the other party hereunder shall be in writing and shall be either delivered personally, or sent by reputable overnight air courier (e.g., Federal Express, DHL), with shipping charges prepaid, addressed to Landlord as follows:

> Southlands Colorado, LLC
> Attn: Don Provost
> 5460 South Quebec Street, Suite 100
> Greenwood Village, CO 80111

With a copy to:

> Alberta Development Partners
> Attn: Southlands Property Management
> 5460 South Quebec Street, Suite 100
> Greenwood Village , CO 80111

Or addressed to Tenant as follows:

> Colorado Cinema Group, LLC
> Attn: Haydn Silleck
> 6696 S. Parker Road
> Aurora, CO 80016

With a copy to:

> Providence Equity Partners, Inc.
> Attn: Peter O. Wilde
> 50 Kennedy Plaza
> Providence, RI 02903

2. Each party may, from time to time, designate a different address by notice given in conformity with this Article XVIII. All notices and other communications so given shall be deemed given or delivered (i) on the date of delivery, if delivered personally, or (ii) if sent by overnight delivery service, on the date of delivery, whichever is applicable, as indicated on the delivery receipt.

3. Landlord acknowledges and agrees that no agent or employee of Tenant shall have authority to accept personal delivery of any notice or other communication delivered pursuant to this Article XVIII at the Theatre or any other location except for Tenant's address as set forth in Section 1 of this Article XVIII and except as otherwise permitted by applicable law.

## ARTICLE XIX

### Taxes on Personalty

Tenant shall be liable for all taxes levied against Tenant's FF&E and Tenant's other personal property in the Theatre or on the Demised Premises. If any such taxes are levied against Landlord or Landlord's property and if Landlord elects to pay the same, or if the assessed value of Landlord's property is increased by inclusion of Tenant's FF&E and other personal property in the Theatre and Landlord elects to pay the taxes based on such increase, Tenant shall pay to Landlord, upon demand, the part of such taxes for which Tenant is primarily liable hereunder. Tenant, at its sole cost, shall have the right, at any time, to seek a reduction in the taxes that are to be paid by Tenant pursuant to this Article XIX. If Tenant seeks a reduction or contests such taxes, the failure on Tenant's part to pay such taxes shall not constitute a default as long as Tenant complies

with the provisions of this Article XIX; however, Tenant shall deposit the amount of the assessed taxes with the Landlord during the period that Tenant contests such taxes and Tenant agrees to pay any penalties and interest that may be accrued because of such delay to pay such taxes. Landlord reserves the right to pay such taxes in the event Landlord believes in its reasonable judgment that its interests are being jeopardized by failure to pay the taxes, and in such event Tenant agrees to reimburse Landlord. Landlord shall not be required to join in any proceeding or contest brought by Tenant unless the provisions of any law require that the proceeding or contest be brought by or in the name of Landlord or any owner of the Demised Premises. In that case, Landlord shall join in the proceeding or contest or permit it to be brought in Landlord's name as long as Landlord is not required to bear any cost. Tenant, on final determination of the proceeding or contest, shall immediately pay or discharge any decision or judgment rendered, together with all costs, charges, interest, and penalties incidental to the decision or judgment.

## ARTICLE XX

### Title Policy

Tenant shall have the right, at Tenant's cost and expense, to obtain an ALTA, extended coverage, leasehold policy of title insurance, all in form and substance acceptable to Tenant and issued by the title company who recently issued Landlord's title policy in connection with Landlord's acquisition of, among other property, the Project, with liability limits to be determined by Tenant in its sole discretion, and insuring Tenant's interest under this Lease subject only to such exceptions as may be approved by Tenant. Landlord shall reasonably cooperate with Tenant in connection therewith. Promptly following the execution of this Lease, Landlord shall (if Landlord has not already delivered the same) deliver to Tenant a copy of Landlord's current title policy. Tenant shall have until the date that is thirty (30) calendar days following the Landlord's delivery of a copy of the Landlord's title policy to Tenant to review title in order to identify any title matters specifically related to the Demised Premises which would materially and adversely effect Tenant's ability to construct the Theatre Improvements and/or operate the theatre at the Demised Premises. If, during such thirty (30) calendar day period, Tenant identifies any title matters which Tenant would materially and adversely effect Tenant's ability to construct the Theatre Improvements and/or operate the theatre at the Demised Premises, Tenant shall notify Landlord in writing of the same ("Title Notice"). Following receipt of such Title Notice, Landlord and Tenant shall work together with the title company, the architects and the contractors to attempt to either (a) remove such title matter or exception, (b) cause the title company to insure around such title matter or exception, or (c) provide other assurances to Tenant that such title matter will not materially and adversely effect Tenant's ability to construct the Theatre Improvements and/or operate the theatre at the Demised Premises. If Landlord and Tenant are unable to accomplish either (a), (b) or (c) above within thirty (30) days after Landlord's receipt of the Title Notice, Tenant shall have the right to terminate this Lease within ten (10) business days after the end of such additional thirty (30) day period. If Tenant fails to (i) deliver the Title Notice within thirty (30) calendar days following receipt of a copy of Landlord's title policy, or (ii) timely terminate this Lease pursuant to the previous sentence, Tenant's right to terminate this Lease pursuant to this Article XX shall terminate an be of no further force and/or effect.

## ARTICLE XXI

### Options to Extend

Tenant shall be entitled to three (3) separate options to extend the term hereof for a period of five (5) years each, all of them upon the same terms and conditions as herein set forth, except that the fixed "minimum rent" for the first option extension shall be $26.35 per square foot, the fixed "minimum rent" for the second option extension shall be $28.98 per square foot and the fixed "minimum rent" for the third option extension shall be $31.87 per square foot. Tenant may exercise any such option, if Tenant is not then in default hereunder beyond all applicable notice and cure periods and provided that Tenant is then operating the Theatre for general cinema purposes, by giving notice to Landlord of the exercise thereof not less than six months prior to the expiration of the initial term or any extended term hereof. In the event Tenant fails to timely exercise an option to extend as set forth herein, the applicable option shall not lapse if Tenant exercises such option by giving notice to Landlord within ten (10) days after Landlord has given Tenant notice of the upcoming expiration of the option right, but in any event, not later than thirty (30) days prior to the expiration of the then-current term. The word "term" as used in this Lease includes the initial term and any extended or renewed term.

It shall be a condition of Tenant's right to exercise its renewal options herein that Tenant is in compliance with all the terms and conditions of this Lease both at the time of Tenant's exercise of any of its options and at the time that the particular Extension is scheduled to commence, provided that Landlord may waive this condition at its sole discretion, and this condition may not be used by Tenant to negate the effectiveness of Tenant's exercise of any of its renewal options. Further, if Tenant fails to exercise its right to extend this Lease for any Extension as provided herein, that and all further rights to extend this Lease shall be void and of no further effect, and this Lease shall expire at the end of the then applicable Term.

ARTICLE XXII

Use of Lifestyle/Entertainment District

1.     Landlord acknowledges that the business of Tenant will be materially and adversely affected if another motion picture theatre operates on the Property and accordingly agrees that it will not lease nor sell land in the Shopping Center or the Project, for another motion picture theatre while this Lease is in effect provided that Tenant has not been in default hereunder beyond all applicable notice and cure periods at any time during the term of this Lease.  The foregoing restriction shall not prohibit other tenants in the Shopping Center and the Project from operating televisions or video screens in their premises as an incidental part of their operations, including without limitation, showing videotaped movies therein.

2.     Except as otherwise specifically set forth in this paragraph, so long as the Tenant is operating the Theatre in the Demised Premises, Landlord shall not lease space in (or voluntarily permit a tenant who leases space in) the area depicted on **Exhibit G-2** to this Lease as the "No Popcorn/No Liquor Area" to (a) a retailer whose primary business is the sale of liquor, or (b) a retailer (including a kiosk) whose primary business includes the sale of fresh-popped popcorn intended for off-site consumption.  Notwithstanding the preceding, the liquor restriction does not apply to a retailer who sells beer and/or wine and related items (but no "hard" liquor) in the No Popcorn/No Liquor Area.  In addition, Tenant hereby acknowledges that Landlord plans to hold special events (i.e., weekend farmers markets, parades, concerts, etc.) during which popcorn will be sold in the No Popcorn/No Liquor Area.  In connection therewith, Tenant confirms that such popcorn sales shall not violate the restrictions set forth in this paragraph with respect to popcorn sales in the No Popcorn/No Liquor Area so long as Landlord notifies Tenant (at the Demised Premises and not under the notice provisions of this Lease) in advance of such special events and first offers the popcorn concession to Tenant for such special event(s).

3.     Notwithstanding anything to the contrary contained in this Article XXII, the following occupants and their uses shall not be considered to violate the foregoing exclusive rights:

Non-conflicting Retailers: Bed Bath and Beyond, Linens and Things, Designer Shoe Warehouse, TJ Maxx, Marshalls, Gart Sports, Galyans, Sportsmans Warehouse, Office Max, Office Depot, Staples, Ross Dress for Less, Party City, Paper Warehouse, Petco, PetsMart, , Wild Oats, Whole Foods, Gap, Banana Republic, Old Navy, Limited, Tower Records, Sam Goody, Media Play, Pier One, Blockbuster Video, Hollywood Video, Home Depot Expo, Sears, The Great Indoors, the Container Store, Crate and Barrel, Nordstrom Rack, Restoration Hardware, Ulta, Lifeway Christian Bookstores, Radio Shack, Suncoast Motion Pictures, CompUSA, Apple Computers, Gateway Computers, Virgin Records, Car Toys, Jillian's, Dave and Buster's, Wal-Mart, Sam's, Kohl's, Toys 'R Us, Babies 'R Us and Kids 'R Us.

ARTICLE XXIII

Memorandum of Lease; Commencement Date Memorandum

On or prior to the date Landlord delivers the Buildable Pad to Tenant, the parties hereto shall execute and acknowledge a Memorandum of Lease in the form attached as **Exhibit J** to this Lease.  Within ten (10) business days after the Commencement Date, the parties hereto shall further execute a Commencement Date Memorandum in a form satisfactory to Landlord and Tenant which shall set forth the actual Commencement Date, the actual square footage of the Demised Premises determined in accordance with Section 1 of Article III hereof, and the termination date of the initial term of this Lease.  Landlord shall cause the original Memorandum of Lease to be promptly recorded at Landlord's cost and expense.  Upon termination of this Lease, Tenant shall execute and acknowledge a confirmation of the termination in a form reasonably acceptable to Landlord.

ARTICLE XXIV

Force Majeure

Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, extreme weather conditions, acts of God, inability to obtain labor or materials, or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, judicial orders, enemy or hostile governmental action, civil commotion, fire or other casualty and other causes beyond the reasonable control of Tenant or Landlord shall excuse the performance by Tenant or Landlord, as applicable, for a period equal to any such prevention, delay or stoppage, except that such events shall not be cause for Tenant to withhold or delay payments of any amounts due hereunder as rent or otherwise after the commencement of the term hereof.

## ARTICLE XXV

### Assignment and Subletting

1.       Tenant and any successor and/or assign shall have the right to assign or encumber its interest in this Lease or to sublease all or any part of the Demised Premises only with the prior consent of Landlord, which consent shall not be unreasonably withheld or delayed, subject to the following requirements: (i) at the time thereof, Tenant is not in default under this Lease beyond the expiration of all applicable notice and cure periods; (ii) Landlord, in its reasonable discretion, determines that the proposed use of the Demised Premises would not violate the terms of this Lease, (iii) Landlord, in its reasonable discretion, determines that the business experience of the proposed assignee or sublessee is adequate to perform all of Tenant's obligations under this Lease for the term hereof; (iv) any assignee or sublessee shall expressly assume all the obligations of this Lease on Tenant's part to be performed; (v) Tenant submits current financial statements for such sublessee or assignee which are reasonably acceptable to Landlord; and (vi) Landlord, in its reasonable discretion, shall have the right to condition any change in use on negotiation of a percentage rent provision appropriate to such use.  Tenant shall provide Landlord with such information concerning the proposed transferee as may be reasonably required to ascertain whether the conditions upon Landlord's approval to such proposed assignment or subletting have been met.  Any denial of consent by Landlord shall be in writing and shall state the reasons for such denial in reasonable detail.  Any proposed use to be made of the Demised Premises by any permitted assignee or sublessee must be consistent with the uses permitted within the Lifestyle/Entertainment District, under this Lease and with Tenant's Use.  Except as otherwise provided in Section 5 below, any assignment or sublease shall not release Tenant from liability under this Lease.  Any sums payable by the assignee (in the event of a partial assignment) or subtenant over and above the rent and other sums payable under this Lease shall be paid over to Landlord as additional rent.

2.       Landlord's consent to the assignment or sublease shall not waive the requirement of obtaining Landlord's consent to any subsequent assignment or sublease.

3.       Landlord hereby preapproves the form Assignment and Assumption Agreement attached hereto as **Exhibit D** and agrees to execute the same, subject to such reasonable modifications as Landlord and Tenant may request, in connection with any approved assignment of this Lease.

4.       Notwithstanding the provisions of Section 1 of this Article XXV, and provided that such assignee or sublessee shall assume and agree to perform all of Tenant's obligations under this Lease which arise from and after the effective date of the assignment or sublease, as applicable, Tenant shall have the right (without being required to obtain Landlord's consent, but upon prior written notice to Landlord) to assign Tenant's interest in this Lease or to sublet all or any portion of the Demised Premises (i) to any "Affiliate" (as that term is defined in Article X, Section 2 hereinabove) of Tenant, (ii) in connection with a sale or other transfer of all or substantially all of the motion picture theatres then operated by Tenant in the Denver metropolitan area, (iii) in connection with a sale or other transfer of all of the assets of Tenant, (iv) in connection with a sale or other transfer of all of the then outstanding ownership interests (e.g., stock or partnership interests) in Tenant, (v) in connection with a merger, consolidation or other corporate reorganization of Tenant, or (vi) in connection with any "four wall" or similar sublease transaction in which Tenant temporarily (i.e., for not more than 120 days per transaction) subleases one or more auditoriums.  Landlord's consent shall be necessary and mandatory if the assignee or sublessee does not meet any of the minimum provisions stated in ARTICLE XXV, Paragraph 4.

5.       No sublease shall release Tenant from liability under this Lease.  No assignment under Paragraph 1 above shall release Tenant from liability hereunder.  No assignment under Paragraph 4 above shall release Tenant from liability hereunder unless the assignee has a net worth in excess of Fifty Million Dollars ($50,000,000.00).

## ARTICLE XXVI

### Ticket Kiosk; Antennas

1.       Landlord hereby grants Tenant the right, subject to the provisions of the Master Declaration, the FDP and the ECRs, to also lease an approximately 3 by 5 foot space as the "Kiosk Area."  The location of the Kiosk Area shall be mutually determined in good faith by Landlord and Tenant, provided that in no event shall the Kiosk Area be a "drive up" or "drive through" area and in no event shall the establishment of the Kiosk Area require the use of any parking spaces within the Lifestyle/Entertainment District. The Demised Premises shall include the Kiosk Area and minimum rent shall be increased by the product of (i) the number of square feet contained in the Kiosk Area, multiplied by (ii) the per square foot rental rate then being charged for the Theatre Area, with the rental rate to be adjusted to coincide with each rental rate adjustment for the Theatre.

2.       Tenant may construct and install on the Kiosk Area one or two (but not more than two) ATTMs and a sheltering kiosk, and may thereafter during the term of this Lease maintain and operate said

ATTMs and kiosk solely for the purpose of selling tickets to performances at the Demised Premises.  In addition, and following receipt of written approval from Landlord and any other entities to whom Landlord has granted the right to distribute cash, Tenant may distribute cash from the ATTMs.  Tenant shall be responsible for all costs incurred in constructing, installing, maintaining and removing any ATTMs and the ticket kiosk, including all costs of repairing the Common Area or any other improvements in the Lifestyle/Entertainment District required as a result of the construction, installation or removal of any ATTMs and/or ticket kiosk in order to restore such Common Area or other improvements to substantially the same condition as immediately prior to the construction, installation or removal of the same.  Tenant shall obtain, at its sole expense, all governmental permits, approvals and consents necessary in connection with the construction, installation or use of such ATTMs and/or ticket kiosk and Landlord shall fully cooperate with Tenant in seeking to obtain all such governmental permits, approvals and consents.

3.       Landlord hereby grants Tenant the right and option, subject to the provisions of the Master Declaration, the ECRs and the FDP, exercisable by written notice to Landlord at any time during the initial term or any extended term of this Lease, to place and maintain on the roof of the Theatre at a location or locations reasonably acceptable to Tenant and Landlord (the "Roof Top Antenna Areas"), at no charge to Tenant, one or more antennas, satellite dishes, or similar devices subject to Landlord's prior written approval of the size and screening thereof (such approval not to be unreasonably withheld or delayed) to enable Tenant to send or receive broadcast transmissions (collectively, the "Antennas").  Landlord further grants Tenant the right and option to run wiring from the Roof Top Antenna Areas into the Theatre.  If Tenant exercises the foregoing options, Tenant shall maintain and operate said Antennas and wiring, provided that none of the foregoing authorities shall cause a violation of or void any roof or other warranty applicable to or covering the Demised Premises.  Tenant shall obtain, at its sole expense, all governmental permits, approvals and consents necessary in connection with the construction, installation or use of such antennas, satellite dishes or similar devices and Landlord shall cooperate with Tenant (at no cost to Landlord) in seeking to obtain all such governmental permits, approvals and consents.  Tenant shall remove the Antennas and make any necessary repairs created or required by said removal at the termination of its tenancy.  Tenant shall submit plans and specifications with the preliminary plans and specifications for the Demised Premises detailing the equipment to be installed and the proposed method of installation to the roof or the wall to the Landlord prior to commencing installation thereof and prior to any replacement or relocation thereof and shall obtain Landlord's consent therefore prior to commencing any work.  At no time shall the equipment installed by Tenant for transmission of any signals interrupt, disturb or interfere with the operation of the Shopping Center, the Project or any other tenant or occupant of the Shopping Center and/or the Project, including but not limited of the receipt of satellite signals by any other tenant, occupant or Landlord.  At all times that satellite dish equipment is installed on or attached to the Premises, Tenant shall maintain adequate insurance expressly covering any claim that may arise, for liability or hazards, resulting directly from the existence of the satellite dish and related equipment.  Tenant, at its own expense, will comply and conform with any all federal and state laws and regulations and local ordinances and obtain all necessary permits.

4.       Tenant shall be responsible for all costs incurred in installing the Antennas and the related wiring, and shall do so in such a manner as to not damage the roof membrane materially damage the Theatre or any other building and which will not void any roof membrane warranty.

### ARTICLE XXVII

#### Trash Area

1.       All of Tenant's garbage and refuse shall be kept in the kind of containers specified by Landlord and shall be placed outside the Demised Premises and prepared for collection in the manner and at the times and places specified by Landlord. Tenant, at its expense, shall provide for the removal of such garbage and refuse. Tenant shall not allow garbage or refuse to be placed or stored anywhere within the Demised Premises or the Common Areas except within those outdoor receptacles specified by Landlord. Landlord acknowledges that Tenant shall maintain a trash compactor and related trash storage immediately adjacent to the Building.

2.       Landlord, at its expense and in accordance with the final plans, shall cause "Tenant's Trash Area" as outlined in **Exhibit A-4** to be improved with concrete trash pads, walls and gates.

### ARTICLE XXVIII

#### Leasehold Financing

1.       For the purposes of this Lease, the terms "mortgage" and "leasehold mortgage" shall include whatever security instruments are used in the locale of the Demised Premises, such as, without limitation, mortgages, deeds of trust, mortgage deeds, security deeds and conditional deeds, as well as financing statements, security agreements and other documentation which any lender may require, and the terms "holder of a mortgage" and "mortgagee" or "holder of a leasehold mortgage" and "leasehold mortgagee" shall mean

the secured party in any of the foregoing instruments or the prospective secured party if the instruments have not been delivered.

2.       Tenant and every successor and assignee of Tenant (including, without limitation, any sublessee of Tenant, but only with Tenant's prior consent) is hereby given the right by Landlord in addition to any other rights herein granted, without any requirement to obtain Landlord's consent, to mortgage or grant a security interest in Tenant's interest in the Lease and any sublease(s), under one or more leasehold mortgage(s) and/or under one or more purchase money leasehold mortgage(s) in connection with any sale(s) of such interest and assign Tenant's interest in the Lease and any sublease(s), as collateral security for such leasehold mortgage(s), upon the condition that all rights acquired under such leasehold mortgage(s) shall be subject to each and all of the covenants, conditions and restrictions set forth in this Lease, and to all rights and interests of Landlord herein, none of which covenants, conditions or restrictions is or shall be waived by Landlord by reason of the right given so to mortgage or grant a security interest in Tenant's interest in the Lease, except as expressly provided herein.

3.       If Tenant and/or Tenant's successors and assignees (including, without limitation, any sublessee of Tenant, but only with Tenant's prior consent) shall mortgage or grant a security interest in Tenant's interest in the Lease, and if the leasehold mortgagee shall send to Landlord a true copy of its leasehold mortgage, together with written notice specifying the name and address of the leasehold mortgagee, so long as such leasehold mortgage shall remain unsatisfied of record or until written notice of satisfaction is given by the holder to Landlord, notwithstanding anything to the contrary, the following provisions shall apply (in respect of such leasehold mortgage and of any other leasehold mortgages which also comply with the above):

(a) There shall be no amendment, alteration or modification of the Lease without the prior consent in writing of the leasehold mortgagee, which consent shall not be unreasonably withheld, delayed or conditioned.  If the leasehold mortgagee fails to respond to a given request for its consent within ten (10) business days after the leasehold mortgagee receives the written request, the leasehold mortgagee shall be deemed to have consented to the item for which its consent was requested.  Nor shall any merger result from the acquisition by, or devolution upon, any one entity of the fee and the leasehold estates in the Demised Premises.

(b) Landlord, upon serving Tenant with any notice or other communication of default or any event which, with the giving of notice and/or the passage of time would constitute a default, shall forward a copy of such notice to the leasehold mortgagee before proceeding with any remedies under this Lease arising by virtue of such default.  The leasehold mortgagee's address is General Electric Capital Corporation, Commercial Finance, 2325 Lakeview Parkway, Suite 700, Alpharetta, Georgia 30004-1976, Attention: Thomas Waters / Richard Varalla (with a copy to General Electric Capital Corporation, 201 High Ridge Road, Stamford, Connecticut 06927-5100, Attention: Corporate Counsel-Commercial Finance).  Any such notice to the leasehold mortgagee shall be given in the manner provided in the Lease for the giving of notices.

(c) In the event of any Default by Tenant under the Lease, the leasehold mortgagee shall have the same period (which may run concurrently with Tenant's cure period), after receipt of notice of such default, to remedy or cause to be remedied the default complained of as Tenant has hereunder for such default, and Landlord shall accept such performance by or at the instigation of such leasehold mortgagee as if same has been done by Tenant.  Each notice of a monetary default given by Landlord will state the amounts of whatever rent and other payments herein provided for are then claimed to be in default.

(d) In the event of termination of the Lease by reason of the rejection of the Lease by the Tenant in a bankruptcy, Landlord will promptly notify the leasehold mortgagee of such termination and the amount of the sums then due to Landlord under the Lease, and the leasehold mortgagee shall have the right to have Landlord enter a new lease of the Demised Premises (on exactly the same terms and conditions as this Lease unless Landlord, in its sole discretion, agrees to different terms) with the leasehold mortgagee or, subject to the provisions of Article XXV of this Lease, its nominee or designee in accordance with the following provisions:

(i)       The leasehold mortgagee or its nominee or designee shall be entitled to such new lease if the leasehold mortgagee shall make written request upon Landlord for such new lease on or before the date which is 15 business days after the date on which the leasehold mortgagee shall have received the notice from Landlord of such termination and if such written request is accompanied by the leasehold mortgagee's agreement to pay to Landlord within ten (10) calendar days after the 15 business day notice period provided above in this subsection (i) all sums then due to Landlord under the Lease.

(ii)       Said new lease shall be for what would have been the remainder of the term if the Lease had not been terminated, effective as of the date of such termination, at the rent and upon the terms, provisions, covenants and agreements as herein contained, including all rights and options herein contained. Possession under the new lease shall be subject to Tenant having vacated the Demised Premises.

(iii)     Such new lease shall be subject to any mortgage or other lien, charge or encumbrance on the fee of the Shopping Center and the Demised Premises. However, Landlord shall deliver to the leasehold mortgagee a nondisturbance agreement from Landlord's lender(s) in a form reasonably satisfactory to the leasehold mortgagee and the Landlord's lender.

(iv)     In said new lease, Landlord shall not warrant possession of the Demised Premises to the leasehold mortgagee or its nominee or designee.

(v)     The leasehold mortgagee or its nominee or designee as tenant under the new lease shall have the same right, title and interest in and to the buildings and improvements (if any) erected on the Demised Premises as Tenant had under the Lease.

(vi)     If more than one leasehold mortgagee make written request upon Landlord in accordance with the provisions hereof for a new lease, the new lease shall be delivered pursuant to the request of the leasehold mortgagee whose leasehold mortgage is prior in lien among those who made the request, and the written request of any leasehold mortgagee whose leasehold mortgage is subordinate in lien and shall be void and of no force or effect.

(vii)     The conveyance by the leasehold mortgagee or its nominee or designee of its interest as tenant under the new lease and the Demised Premises shall be subject to the provisions of Article XXV (Assignment and Subletting) of this Lease.

(e)     Any and all insurance proceeds which are payable solely to Tenant in respect of the Tenant's FF&E shall be paid to the leasehold mortgagee to be applied in the manner specified in the leasehold mortgage, provided that any damaged part of the building and all foundations and footings shall, at the request of Landlord, be removed from the Property, and the land will be paved in a first-class manner and will be striped for parking.

(f)     No fire or casualty loss claims made by Tenant with respect to insurance carried by Tenant and with loss payable to Tenant shall be settled.

(g)     Except where the leasehold mortgagee has become the Tenant, no liability for the payment of rent or the performance of any of Tenant's covenants and agreements under the Lease shall attach to or be imposed upon the leasehold mortgagee, all such liability being hereby expressly waived by Landlord.

(h)     Landlord, within 10 calendar days after a request in writing by Tenant or the leasehold mortgagee, shall furnish a written statement, duly acknowledged, that the Lease is in full force and effect and that there are no defaults thereunder by Tenant, or if there are any defaults, such statement shall specify the defaults Landlord claims exist.

(i)     If Tenant fails to timely exercise any extension or renewal in the Lease, Landlord shall send the leasehold mortgagee written notice thereof, and the leasehold mortgagee, within 15 business days after receipt of such notice, may exercise any such option on behalf of Tenant. Tenant hereby appoints the leasehold mortgagee as Tenant's attorney-in-fact for the purpose of exercising such extension or renewal, which power is coupled with an interest and is irrevocable.

(j)     No payment made to Landlord by the leasehold mortgagee shall constitute agreement that such payment was, in fact, due under the terms of the Lease and the leasehold mortgagee having made any payment to Landlord pursuant to Landlord's wrongful, improper or mistaken notice or demand shall be entitled to the return of any such payment or portion thereof provided it shall have made demand therefor not later than one hundred eighty (180) calendar days after the date of its payment.

(k)     Notwithstanding any provision to the contrary, foreclosure of a leasehold mortgage or any sale of Tenant's interest in the Lease in connection with a foreclosure, whether by judicial proceedings or by virtue of any power of sale contained in the leasehold mortgage, or any conveyance of Tenant's interest in the Lease from Tenant to the leasehold mortgagee or its nominee or designee by virtue of or in lieu of foreclosure or other appropriate proceedings, or any conveyance of Tenant's interest in the Lease by the leasehold mortgagee or its nominee or designee, shall not require the consent or approval of Landlord or constitute a breach of any provision of or a default under the Lease, provided, however, that none of the foregoing events shall release Tenant from liability under this Lease or excuse any Tenant breach of or default under the Lease.

(l)     As used herein, a "business day" is Monday through Friday of each week excluding holidays on which national banks are closed for business.

(m)     In no event will Landlord subordinate its fee interest in the Theatre to any such leasehold mortgage.

h:s/l/d/w/doc/Southlands-Co Cinema Lease(fnl)

## ARTICLE XXIX

### Arbitration Clause

All claims, disputes and other matters in question between the parties to this Lease shall be decided by mandatory and binding arbitration in Denver, Colorado, by the Judicial Arbiter Group ("JAG"), in accordance with the rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise. The following procedures shall apply: (a) demand for arbitration shall be filed in writing with the other party to this Lease and with JAG within a reasonable time after the claim, dispute or other matter in question has arisen (and, in no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations), (b) no arbitration arising out of or relating to this Lease shall include, by consolidation, joinder or any other manner, an additional person or entity not a party to this Lease, except by written consent containing a specific reference to this Lease signed by the parties hereto and any other person or entity sought to be joined, (c) consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein, (d) the agreement to arbitrate as set forth herein and as consented to by the parties to this Lease shall be specifically enforceable in accordance with applicable law and any court having jurisdiction thereof, (e) the award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof, (f) all filing fees and costs associated with the arbitration itself shall be paid for by the party who files the notice of arbitration; provided, however, that all such expenses shall be recovered by the filing party in the event said party prevails, (g) any issues regarding who is the prevailing party shall be determined by the arbitration panel, (h) the prevailing party also shall recover from the non-prevailing party all attorneys' fees and costs, including fees and costs for legal assistants and expert witnesses, and including all fees and costs incurred relative to any challenge or appeal of the arbitration award, or confirmation by a court of law.

## ARTICLE XXX

### Miscellaneous

1.     The captions of the Articles of this Lease are for convenience and reference only and shall not in any way limit or be deemed to construe or interpret the terms and provisions thereof.

2.     Time is of the essence of this Lease and of all provisions hereof.  Whenever it is provided in this Lease that an approval or consent shall not be unreasonably withheld, such approval or consent also shall not be unreasonably delayed.

3.     In this Lease the neuter gender includes the masculine and feminine, the singular number includes the plural, and the word "person" or "entity" includes corporations, partnerships, limited liability companies, trusts, firms or associations whenever the context so requires.

4.     This Lease may be amended or otherwise modified or supplemented only by a writing signed by both parties hereto.

5.     This Lease contains the entire agreement of the parties with respect to the matters covered by this Lease, and no other agreement, statement or promise made by any party or by any officer, employee or agent of any party, which is not contained in this Lease shall be binding or valid.

6.     All the covenants, agreements and conditions in this Lease shall extend to, and be binding upon, the successors and permitted assigns of the respective parties hereto, the same as if they were in every case named and expressed.

7.     This Lease shall be interpreted in a fair and equitable manner, in accordance with its terms, neither for nor against either party hereto, and in accordance with the law of the state in which the Lifestyle/Entertainment District is located.  The inclusion in this Lease of provisions not included in, or the deletion of provisions previously included in, prior drafts of this Lease shall not be considered in interpreting the provisions of the final executed version of this Lease.

8.     Each individual executing this Lease on behalf of each party represents and warrants that such execution is duly authorized by such party and that as a result of such execution this Lease will become the valid and binding obligation of that party.

9.     In the event any action or suit is brought by Landlord or Tenant under or in connection with this Lease, the prevailing party shall be entitled to recover from the other party, as part of its judgment, reasonable attorneys' fees and expenses and its costs of suit.

10. As used in this Lease, a "business" or a "working day" means a week day which is not a federal holiday or a legal holiday in the State in which the Shopping Center is located.

11. To the extent not prohibited by applicable law which may not be waived, Landlord and Tenant hereby irrevocably waive any and all right to trial by jury in any judicial proceeding arising out of or related to this Lease and the transactions contemplated hereby, whether sounding in tort, in contract or otherwise.

12. The payment of any and all commissions due to Lampert Properties, Inc. and David Hicks Brokerage, Inc. shall be the responsibility of Landlord pursuant to a separate agreement. Landlord and Tenant represent and warrant to each other, and shall indemnify each other for any breach hereof, that, other than Lampert Properties, Inc. and David Hicks Brokerage, Inc., there are no other brokers, finders or other persons who might, by any reason of their contact with Landlord or Tenant, be entitled or claim to be entitled to a commission, finder's fee or other compensation in connection with this transaction.

13. In no event shall Landlord be liable to Tenant for any failure of any other tenant in the Lifestyle/Entertainment District to operate its business.

14. Subject to the prohibition on the operation a Liquor store in the No Popcorn/No Liquor Area, Tenant agrees not to protest any application for a liquor license for use by any business operating within the Shopping Center and/or on other property adjacent to the Shopping Center and/or the Project.

15. Subject to the terms of this Lease (including, without limitation, Article II hereof), Landlord reserves the right from time to time to enlarge the Shopping Center by constructing other buildings on portions of the Shopping Center with or without any new Common Areas, and by including within the existing Shopping Center other properties now or hereafter owned by Landlord adjacent to or near the Shopping Center, and constructing on such additional property buildings and Common Areas, provided, however, that in no event shall access to the Demised Premises be adversely affected. In this event, such new buildings, properties and Common Areas shall be treated as though they were originally a part of the Shopping Center and, at the election of Landlord, all Common Area costs shall be applicable to such enlarged area and all improvements now or hereafter constructed thereon; provided, however, that in such event Tenant's Proportionate Share shall be appropriately adjusted to include any additional square footage contained in such new buildings or comprising additional properties added to the Shopping Center. Until Landlord makes such election, Common Area costs shall continue as though such enlargement had not occurred.

16. As used herein, "Interest Rate" shall mean the rate of interest per annum announced or published by *The Wall Street Journal* as the "prime rate" plus two percent (2%), adjusted with each change in the prime rate.

17. Tenant shall maintain all display windows in a neat, attractive condition, and shall keep all display windows and exterior electric signs in front of the Premises lighted during reasonable hours every day, including Sundays and holidays.

18. "To Landlord's knowledge" as used in this Lease (a) shall mean and apply to the actual current knowledge of Don Provost or Bryan McFarland (the "Involved Parties"), and not to any other parties (provided, however, that if either Don Provost or Bryan McFarland should no longer be an Involved Party, Landlord shall substitute another person who shall have knowledge of the applicable matters and issues), (b) without any investigation or inquiry of any kind; (c) shall not mean such Involved Parties are charged with knowledge of the acts, omissions and/or knowledge of the predecessors in title to the Property; and (d) shall not apply to or be construed to apply to information which is not actually known to the Involved Parties.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:                                            TENANT:

SOUTHLANDS COLORADO, LLC,                 COLORADO CINEMA GROUP, LLC,
a Delaware limited liability company              a Delaware limited liability company

By:   Southlands Management, LLC,            By:   /s/ Haydn Silleck
       a Colorado limited liability company      Name: Haydn Silleck
                                Title:  Manager
       By:   /s/
       Name: Don Provost
       Title:  Manager

_EXHIBIT "A-1"_

(Site Plan)

EXHIBIT "A-2"

(No-Build Area)



EXHIBIT A-1



CURB

ORCHARD ROAD

PLAZA AVENUE

PARKING STRUCTURE

COMMONS AVENUE

NO BUILD AREA

NORTH   KEY PLAN

NOT INTENDED TO NOT PERMIT PARKING STRUCTURE IN DESIGNATED AREA.

Date: 7/22/04





SOUTHLANDS

EXHIBIT A-2

*EXHIBIT "A-3"*

(Monument Sign)

## EXHIBIT "A-4"

### (Tenant's Trash Area)



*EXHIBIT "A-5"*

**(Queuing Area)**



CURB

ORCHARD ROAD

PLAZA AVENUE

MAIN STREET

COMMONS AVENUE

TENANT TRASH AREA

NORTH   KEY PLAN

Date: 7/6/04





EXHIBIT A-4

EXHIBIT *"A-6"*

(Tenant's Staging Area)







EXHIBIT A-5

***EXHIBIT "B"***

**(Legal Description of Lifestyle/Entertainment District)**

EXHIBIT A-6
SOUTHLANDS
Date: 7/6/04
NORTH
KEY PLAN
COMMONS AVENUE
MAIN STREET
PLAZA AVENUE
THEATRE
TENANT'S STAGING AREA
ORCHARD ROAD
CURB

### EXHIBIT "C"

#### (Tenant Work Letter)

This Tenant Work Letter ("Work Letter") is attached to and incorporated by reference into the "Lease" executed concurrently herewith, between **SOUTHLANDS COLORADO, LLC** (as "Landlord"), and **COLORADO CINEMA GROUP, LLC** (as "Tenant").  Terms which are capitalized herein, but not defined herein, shall have the meanings ascribed to them in the Lease.

1.     **CONSTRUCTION PLANS AND PROCEDURES**

---

A PARCEL OF LAND LOCATED IN SECTION 19, TOWNSHIP 5 SOUTH, RANGE 65 WEST OF THE 6TH P.M., CITY OF AURORA, COUNTY OF ARAPAHOE, STATE FO COLORADO, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SOUTHLANDS SUBDIVISION FILING NO. 1 RECORDED AT RECEPTION NO. B3265867 IN THE OFFICE OF THE CLERK AND RECORDER FOR ARAPAHOE COUNTY AND CONSIDERING THE WEST LINE OF SAID SUBDIVISION TO BEAR SOUTH 00 DEGREES 43 MINUTES 48 SECONDS EAST WITH ALL BEARINGS HEREIN RELATIVE THERETO; THENCE SOUTH 00 DEGREES 43 MINUTES 48 SECONDS EAST ALONG SAID WEST LINE, A DISTANCE OF 682.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID WEST LINE SOUTH 00 DEGREES 43 MINUTES 48 SECONDS EAST, A DISTANCE OF 1,908.77 FEET TO THE SOUTHWEST CORNER OF SAID SOUTHLANDS SUBDIVISION FILING NO. 1; THENCE SOUTH 00 DEGREES 43 MINUTES 48 SECONDS EAST, A DISTANCE OF 816.47 FEET; THENCE SOUTH 89 DEGREES 16 MINUTES 12 SECONDS WEST, A DISTANCE OF 1.24 FEET; THENCE ALONG THE ARC OF A 317.00 FOOT RADIUS CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 33 DEGREES 44 MINUTES 57 SECONDS, A DISTANCE OF 186.72 FEET AND HAVING A CHORD WHICH BEARS NORTH 73 DEGREES 51 MINUTES 20 SECONDS WEST, A DISTANCE OF 184.04 FEET; THENCE NORTH 56 DEGREES 58 MINUTES 51 SECONDS WEST, A DISTANCE OF 1,049.65 FEET; THENCE ALONG THE ARC OF A 243.00 FOOT RADIUS CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 88 DEGREES 22 MINUTES 52 SECONDS, A DISTANCE OF 374.84 FEET AND HAVING A CHORD WHICH BEARS NORTH 12 DEGREES 47 MINUTES 25 SECONDS WEST, A DISTANCE OF 338.76 FEET; THENCE NORTH 31 DEGREES 24 MINUTES 01 SECONDS EAST, A DISTANCE OF 136.48 FEET; THENCE ALONG THE ARC OF A 557.00 FOOT RADIUS CURVE TO THE LEFT THROUGH A CENTRAL ANGLE OF 32 DEGREES 07 MINUTES 49 SECONDS, A DISTANCE OF 312.35 FEET AND HAVING A CHORD WHICH BEARS NORTH 15 DEGREES 20 MINUTES 07 SECONDS EAST, A DISTANCE OF 308.28 FEET; THENCE NORTH 00 DEGREES 43 MINUTES 48 SECONDS WEST, A DISTANCE OF 663.57 FEET; THENCE NORTH 89 DEGREES 16 MINUTES 12 SECONDS EAST, A DISTANCE OF 963.00 FEET TO THE POINT OF BEGINNING.

CONTAINING 1,797,793 SQUARE FEET OR 41.2715 ACRES, MORE OR LESS.

DATE:

STEVE M. OLSON, REGISTERED LAND SURVEYOR
COLORADO REGISTRATION NUMBER 24670
FOR AND ON BEHALF OF CLC ASSOCIATES, INC.

| PROJ #: 02.0225 | LIFESTYLE/ENTERTAINMENT DISTRICT LEGAL DESCRIPTION | CLC ASSOCIATES |
| DATE: 02/27/04 | **THE SOUTHLANDS** | 8480 E. ORCHARD RD. SUITE 5000 GREENWOOD VILLAGE COLORADO 80111 P 303 770 5600 F 303 770 3349 CLCASSOC.COM |
| REV #: 1 | E-470 AND SMOKY HILL RD | ARCHITECTURE ENGINEERING PLANNING LANDSCAPE ARCHITECTURE LAND SURVEYING |
| ASI #: 1 | AURORA, COLORADO | |
| SHEET 1 | LEGAL DESCRIPTION | |

final working drawings and specifications for the Theatre Improvements, based upon and conforming in all respects to the approved Preliminary Plans and the Schematic Design (the "**Final Plans**"). Within ten (10) business days following Landlord's receipt of the proposed Final Plans, Landlord shall approve or reasonably disapprove of the same; provided, however, Landlord shall have no right to disapprove the proposed Final Plans to the extent they are consistent with the Schematic Design and the Preliminary Plans previously approved by Landlord. Landlord, however, retains the right to require revisions to the proposed Final Plans to the extent that such revisions cause the proposed Theatre Improvements to conform to the architectural character and integrity of the Schematic Design.

D.      <u>Submittal of Final Plans</u>. Promptly following Landlord's written approval of the Final Plans, Tenant, with the cooperation of Landlord, shall (i) submit the Final Plans to the Authority and all other appropriate governmental agencies, and prepare and submit to the same any applications, documents, studies, reports or other items necessary to obtain all approvals and permits required by law for the construction of the Theatre Improvements (the "**Tenant's Permits**"), (ii) in all other respects diligently pursue the obtaining of Tenant's Permits, (iii) pay all necessary fees incidental to the Theatre Improvements and obtaining the Tenant's Permits, and (iv) furnish Landlord such evidence thereof as is reasonably satisfactory to Landlord. Tenant agrees to diligently and in good faith process any and all applications required from the City of Aurora, the Authority, and all other governmental agencies necessary to obtain Tenant's Permits.

E.      <u>Plan Approval; Final Budget</u>. If (i) Landlord objects to the proposed Preliminary Plans and/or the proposed Final Plans, or to any aspect thereof, or (ii) Tenant objects to the proposed CSP, or to any aspect thereof, Landlord's construction representative (who shall be Bryan McFarland) and Tenant's construction representative (who shall be Haydn Silleck) shall, promptly after Tenant's receipt of Landlord's notice of objections or Landlord's receipt of Tenant's objections (as applicable), meet and attempt in good faith to resolve the objections. If the parties are unable to resolve the objections to the proposed Preliminary Plans, the proposed Final Plans or the proposed CSP within sixty (60) calendar days after a party has received notice of the other party's objections, Landlord and Tenant shall submit the dispute to binding arbitration pursuant to the provisions of Article XXIX of the Lease. Landlord may provide Tenant with Landlord's approvals through Landlord's architect or designated construction representative. Tenant shall provide Landlord with Tenant's approvals through Tenant's designated construction representative. Tenant shall provide Landlord with a proposed final budget for Landlord's approval (not to be unreasonably withheld) for the Theatre Improvements (the "**Final Budget**") within thirty (30) business days after receiving all Tenant's Permits and Final Plan approval. In any event, Tenant shall provide Landlord with a proposed Final Budget at least thirty (30) business days prior to the commencement of construction of the Theatre Improvements.

2.      **CONSTRUCTION OF THEATRE IMPROVEMENTS**

A.      <u>General</u>. Tenant shall cause the Theatre Improvements to be completed in accordance with the Final Plans and the Final Budget. Tenant agrees to use its best efforts to cause construction of the Theatre Improvements to (i) commence promptly following the Landlord's approval of the Final Budget and the issuance of Tenant's Permits, (ii) adhere to the "**Construction Schedule**" (which shall be submitted by Tenant to Landlord for review and approval [which approval shall not be unreasonably withheld] at least forty-five (45) business days prior to the date Tenant plans to commence construction of the Theatre Improvements) and the "Milestone Schedule" set forth on Schedule 1 to this Work Letter, and (iii) cause the completion of the Theatre Improvements to occur on or prior to that date which is three hundred sixty five (365) days after the delivery of the "**buildable pad**" (as that phrase is defined in Article III, Paragraph 4 of the Lease) to Tenant. At all times during the course of the construction of the Theatre Improvements, Landlord shall have the right (without being required to provide Tenant with notice) to enter upon the Theatre Area to inspect Tenant's construction activities.

B.      <u>Contractor</u>. Landlord and Tenant have agreed that the contractor who will construct the Theatre Improvements shall be Murray and Stafford (the "**Contractor**"). Prior to entering into a contract with the Contractor for the construction of the Theatre Improvements, Tenant shall provide Landlord with a copy of the proposed contract, which shall be subject to Landlord's prior written approval (which approval shall not be unreasonably withheld). Among other things, the construction contract shall provide for progress payments and retainage, and Tenant shall pay for the entire cost of the Theater Improvements in excess of the Construction Allowance (as defined in Article III below) specified in Article III. Concurrently with the construction of the other Theatre Improvements, Tenant shall cause the Demised Premises to be fully equipped with Tenant's FF&E in accordance with the Final Plans. The construction contract shall contain a provision whereby Landlord shall have the right to replace Tenant as the "owner" in the event that (pursuant to the provisions of Section 4 hereinbelow) Tenant fails to comply with and/or meet the Construction Schedule and/or the Milestone Schedule.

C.      <u>Miscellaneous Construction Covenants</u>. Landlord and Tenant agree that during the course of construction of the Theatre Improvements, the following shall apply:

(i) Prior to the commencement of construction of any of the Theatre Improvements, Tenant shall provide Landlord, for approval in writing, a schedule setting forth any actions to be taken by Tenant during the construction. Subject to the other provisions of this Work Letter, Tenant will

h:s/l/d/w/doc/Southlands-Co Cinema Lease(fil)

promptly, diligently and continuously pursue construction of the Theatre Improvements to successful completion in full compliance with the Final Plans, the Final Budget and this Work Letter.

(ii)   Tenant will cause the Theatre Improvements to be constructed in a safe and lawful manner.   Tenant shall, at its sole cost and expense, comply with all applicable laws and all regulations and requirements of, and all licenses and permits issued by, the Authority, as well as all other municipal or other governmental bodies with jurisdiction. Copies of all field documents and all permits and licenses (including, without limitation, the Tenant's Permits) shall be provided to Landlord.   Tenant shall notify Landlord in writing not less than ten (10) days prior to the commencement of the construction of any portion of the Theatre Improvements as to name, telephone number and responsible party for each and every contractor and/or subcontractor who is about to commence work at the Theatre Area.

(iii)   Landlord and Tenant agree that their respective indemnities set forth in the Lease shall also apply with respect to any acts or omissions of such parties and/or their respective contractors, subcontractors, laborers, materialmen and suppliers during the construction of the Theatre Improvements.

(iv)   Construction of the Theatre Improvements shall not proceed without Tenant (and/or the Contractor, as applicable) first acquiring workers' compensation insurance (in amounts required by Colorado law), comprehensive general liability insurance and property damage insurance as well as "All Risks" builders' risk insurance, with minimum coverages of $5,000,000.00 per occurrence issued by an insurance company meeting the requirements of the Lease.  In addition, the Architect and the Contractor must maintain errors and omissions insurance in amounts reasonable satisfactory to Landlord (and standard in the industry).  Not less than thirty (30) days before commencing the construction of the Theatre Improvements, certificates of such insurance shall be furnished to Landlord or, if requested, the original policies thereof shall be submitted for Landlord's approval. All such policies shall provide that thirty (30) days prior notice must be given to Landlord before modification, termination or cancellation.  All insurance policies maintained by Tenant and/or the Contractor pursuant to this Work Letter (other than workers' compensation and errors and omissions insurance) shall name Landlord and any lender with an interest in the Theatre Area as additional insureds, and shall comply with all of the applicable terms and provisions of the Lease relating to insurance.

(v)   The Contractor and all subcontractors, employees, servants and agents thereof shall work in harmony with and shall not interfere with any labor retained and/or employed by the Landlord (and/or its contractors) in connection with the construction of other portions of the Project. The Contractor shall provide a proposed staging plan to Landlord for review and approval prior to the Contractor's commencement of any construction work.  Tenant hereby acknowledges that it is likely that Contractor will be required to relocate it's staging area at least one time during the construction of the Theatre Improvement, and, in connection therewith, Contractor shall assume full responsibility for securing it's staging area, including but not limited to fencing, security forces, etc.

(vi)   Nothing contained in this Work Letter shall be construed as (i) constituting Tenant as Landlord's agent for any purpose whatsoever, or (ii) a waiver by Landlord of any of the terms or provisions of the Lease.  In the event of any inconsistencies or contradictions between this Work Letter and the Lease, the terms and conditions of the Lease shall control and prevail.  Any default by Tenant or Landlord with respect to any portion of this Work Letter shall be deemed a breach of the Lease for which the non-defaulting party shall have all the rights and remedies as in the case of a breach of the Lease.

(vii)   Landlord shall have no obligation to check the Schematic Design, the Preliminary Plans and/or the Final Plans for building code compliance.  Approval of the Schematic Design, the Preliminary Plans and/or the Final Plans by Landlord is not a representation that the same are in compliance with the requirements of the Authority or any other governing authorities, and it shall be Tenant's responsibility to meet and comply with all federal, state, and local code requirements. Approval of the Final Plans does not constitute assumption of responsibility by Landlord or its architect for their accuracy, sufficiency or efficiency, and Tenant shall be totally responsible for such matters.

(viii)   The Contractor and all subcontractors engaged/retained for performance of any portion of the Theatre Improvements shall be bondable, licensed contractors, possessing good labor relations, capable of performing quality workmanship and working in harmony with Landlord (and any contractors and subcontractors retained by Landlord for other work at the Project).

(ix)   Tenant shall provide and pay for all temporary utility facilities and the removal of debris, as necessary and required in connection with the performance of the Theatre Improvements. Storage of Tenant's construction materials, tools, equipment and debris shall be confined to the Theatre Area and any other areas which may be reasonably designated for such purposes by Landlord.

(x)  During the construction of the Theatre Improvements, Tenant shall use its best efforts (and shall cause its contractors to use their best efforts) not to disturb any then-current tenants and/or occupants of the Project.  Tenant acknowledges and hereby confirms its understanding that buildings immediately adjacent to the Theatre Parcel will be occupied and open for business during Tenant's construction of the Theatre Improvements, and Tenant hereby agrees that it will (i) use best efforts to minimize noise during the construction process, and (ii) use best efforts not to interfere with or disrupt the businesses operated by such tenants and/or occupants during the construction of the Theatre Improvements.  In the event that Tenant breaches its obligation to use its best efforts not to disturb the other tenants, Landlord shall provide Tenant with written notice of the same, outlining with reasonable specificity those actions that are causing such breach.  Following receipt of such notice, Tenant shall use best and diligent efforts to promptly cure (or cause to be cured) such breach.  If Tenant fails to promptly cure such breach, Landlord will provide Tenant with a second notice regarding the same, and if Tenant does not immediately cure such breach, then, in addition to all other remedies available to Landlord (at law and in equity) as a result of such breach, Tenant shall pay to Landlord liquidated damages in the amount of Five Thousand Dollars ($5,000.00) per day for each day that Tenant interferes with the businesses of any other tenants and/or occupants of the Project during Tenant's construction of the Theatre Improvements.

(xi)  Tenant acknowledges and confirms its understanding that during Tenant's construction of the Theatre Improvements, Landlord will likely be constructing Buildings G-1 and G-2 (immediately adjacent to, and including common walls with, the Demised Premises/Theatre Area, in the approximate locations outlined on the Site Plan attached to the Lease).  In connection therewith, Landlord and Tenant shall cooperate with one another and shall coordinate their construction efforts in order to assist the other party (to the extent practical and commercially reasonable) in obtaining any time savings and cost savings that would otherwise be obtained if one party were constructing both the Theatre Improvements and Buildings G-1 and G-2.

3.  **PAYMENT OF THE COST OF THE THEATRE IMPROVEMENTS**

A.  <u>Construction Allowance</u>.  Landlord hereby grants to Tenant a construction allowance (to be used solely to contribute to the cost of the Theatre Improvements) up to a maximum amount of One Hundred Five Dollars ($105.00) multiplied by the total number of first floor leasable square feet (as such square footage may be revised in accordance with the provisions of the Lease) to be contained in the Demised Premises (the "**Construction Allowance**").

B.  <u>Excess Cost</u>.  In the event that the actual cost of the Theatre Improvements shall exceed the Construction Allowance, Tenant shall pay such excess and Landlord shall have no responsibility therefor.  Such excess shall be paid in accordance with Section 3D hereinbelow (Tenant's Portion).  If the cost of Theatre Improvements exceeds the Construction Allowance, Tenant shall not be entitled to any payment, rent reduction or credit therefor.

C.  <u>Changes</u>.   In the event that changes to the Final Plans are requested by the Tenant or required by the Authority and/or any governmental agency subsequent to Landlord's approval thereof, such changes (and the costs therefore) shall be forwarded to Landlord for approval (which approval shall not be unreasonably withheld) prior to incorporation into the Theatre Improvements.  After the Landlord's approval of the changes and the costs thereof, the changes shall be incorporated into the Theatre Improvements by means of a change order, and, if necessary, the Final Budget shall be revised accordingly.

D.  <u>Payment of the Construction Allowance and the Cost of the Theatre Improvements</u>.  The cost incurred by Tenant in completing the Theatre Improvements and the Construction Allowance shall be paid as follows:

(i)  On or prior to the fifteenth (15th) day of each calendar month, Tenant (or the Contractor) shall provide Landlord (and Tenant, if provided by the Contractor) with a pay application prepared by the Contractor (or the Architect with respect to design costs) setting forth the costs of the Theatre Improvements payable since the last such pay application.  Each pay application shall be accompanied by (a) a certificate from Tenant's architect certifying that the cost outlined in the pay application is accurate and that all of the Theatre Improvement work set forth in prior pay applications have been (subject to the approved retainage) paid in full (or if not paid in full, detailing what was not paid in full), (b) copies of pay applications from all subcontractors setting forth the cost of the Theatre Improvement work attributable to such subcontractor as noted on the Contractor's pay application, (c) receipts from all subcontractors acknowledging payment of the work previously performed and billed by such subcontractor as set forth in prior pay applications, and (d) copies of unconditional lien releases and waivers for the prior month's pay application, and conditional lien releases and waivers for the current month's pay application, as the case may be, in both Landlord's and Tenant's favor, from the Contractor and all subcontractors (such releases and waivers shall be conditional with respect to the Theatre Improvement work cost set forth in the pay application which they are accompanying and final with respect to the Theatre Improvement work cost for which they were paid pursuant to the prior pay application).  Landlord's approval of all pay applications shall not

h:s/l/d/w/doc/Southlands-Co Cinema Lease(fnl)

be unreasonably withheld or delayed. Landlord and Tenant shall each pay "Landlord's Portion" and "Tenant's Portion", respectively, of the pay application amounts to the Contractor or to the Architect (with respect to design costs) within thirty (30) calendar days of receipt of all of the foregoing, minus ten percent (10%) for retention. For the purposes of this Work Letter, **"Landlord's Portion"** shall equal a fraction (v) whose numerator is the amount of the Construction Allowance, and (w) whose denominator is equal to the Final Budget (but which fraction shall in no event be greater than 1), multiplied by the amount of the pay application. For the purposes of this Work Letter, **"Tenant's Portion"** shall equal a fraction (x) whose numerator is the amount by which the Final Budget exceeds the Construction Allowance, and (y) whose denominator is equal to the Final Budget, multiplied by the amount of the pay application.

(ii)  Upon completion of all of the Theatre Improvements, including the installation of all of the Tenant's FF&E (which completion shall be certified by the Tenant and the Architect), Tenant shall execute and deliver to Landlord a written acknowledgment (the "Completion Notice") that the Theatre Improvements have been completed and approved by Tenant. To be effective, the Completion Notice must be accompanied by (a) a written certificate setting forth the amount and nature of all costs and expenses billed to Tenant in connection with the Theatre Improvements, and (b) copies of all related bills, pay applications, receipts and final conditional lien releases and conditional waivers of all lien rights, in recordable form, from the Contractor and all subcontractors, and (c) all warranties and operations and maintenance manuals. Within thirty (30) days after Landlord's receipt of the effective Completion Notice (accompanied by the materials, documents and information set forth above), Landlord and Tenant shall pay to the Contractor the remaining amount of the Landlord's Portion and the Tenant's Portion of the Theatre Improvements (provided, however, that Landlord's Portion shall never exceed the Construction Allowance).

4.  **CONSTRUCTION SCHEDULE: MILESTONES.**

As set forth in Section 2A hereinabove, Tenant shall commence construction of the Theatre Improvements within thirty (30) business days following the later to occur of (i) the date that Tenant obtains the Tenant's Permits and Landlord approves the Final Budget, and (ii) the date that Landlord delivers possession of the "buildable pad" to Tenant, but in no event shall Tenant commence construction of the Theatre Improvements prior to February 1, 2005, or later than September 1, 2005 (unless Landlord fails to deliver the buildable pad to Tenant on or prior to August 1, 2005, in which case Tenant shall commence construction of the Theatre Improvements on or prior to the date which is thirty (30) business days following the date that Landlord actually delivers the buildable pad). Thereafter, Tenant shall use best efforts to cause the Theatre Improvements to be constructed and completed in accordance with the construction schedule approved by Landlord pursuant to Section 2A hereinabove. Further, in connection with the construction of the Theatre Improvements, Tenant shall use best efforts to comply with the milestones and milestone schedule set forth in Schedule 1 to this Work Letter (the "Milestone Schedule"). In the event that at any time or times during the course of the construction of the Theatre Improvements, Tenant fails (subject to events of Force Majeure or delays caused by Landlord) to either (a) meet the timeframes set forth in the approved Construction Schedule, or (b) comply with the Milestone Schedule, Landlord shall provide Tenant with written notice thereof (the "Schedule Failure Notice"). If Tenant does not achieve compliance with both the Construction Schedule and the Milestone Schedule within ten (10) business days following receipt of the Schedule Failure Notice, Landlord shall have the right to (x) replace Tenant (either with an affiliate of Landlord or with a non-affiliated third party) as the manager and administrator of the Theatre Improvements, and (y) the right to terminate any and all existing contracts at its sole and absolute discretion. In such instance, Landlord shall be entitled to receive a fee ("Landlord's Administrative Fee") equal to eight percent (8%) of the unexpended portion of the Final Budget, which Landlord's Administrative Fee shall be added to the Final Budget (but shall not increase the Construction Allowance).

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Work Letter Agreement as of the day and year first above written.

LANDLORD:                                              TENANT:

SOUTHLANDS COLORADO, LLC,                COLORADO CINEMA GROUP, LLC,
a Delaware limited liability company            a Delaware limited liability company

By:    Southlands Management, LLC,              By: _____
       a Colorado limited liability company        Name:  Haydn Silleck
                                                       Title:    Manager
       By: _____
       Name:  Don Provost
       Title:    Manager

**SCHEDULE 1 TO WORK LETTER**

(Theatre Improvements Milestone Schedule)

*EXHIBIT "D"*

**(Form Assignment and Assumption Agreement)**

ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment") is made as of the __ day         of ___, 20__, by and between Colorado Cinema Group, LLC, a Delaware limited liability company ("Assignor") and _____, a _____, ("Assignee"), with reference to the following facts:

A.       Assignor and Assignee are parties to a certain _____ Agreement   dated    as     of     _____ _____ (the "Agreement").

B.       Assignor is the current "Tenant" under that certain "Lease" dated July __ 2004, between Southlands Colorado, LLC (as "Landlord"), and Colorado Cinema Group, LLC (as tenant), covering certain premises located in the Lifestyle/Entertainment District of the Southlands Project, located in Aurora, Colorado (as previously amended and assigned, collectively, the "Lease").

C.       In connection with the transactions contemplated by the Agreement, Assignor desires to transfer to Assignee all of Assignor's right, title and interest as the tenant in and to the Lease and Assignee desires to assume all of Assignor's responsibilities and obligations as the tenant under the Lease.

NOW, THEREFORE, incorporating and in consideration of the foregoing recitals, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.       Assignment of Rights.  Assignor hereby assigns, transfers and sets over unto Assignee, all of the right, title and interest of Assignor as tenant in, to and under the Lease, and any security deposit given pursuant to said Lease, to have and to hold the same unto Assignee, its successors and assigns, from and after the date hereof, for the rest and remainder of the term and renewal terms, if any, thereof, subject to the rents, covenants, conditions and other provisions contained therein.  Assignor shall indemnify and hold Assignee harmless from all obligations on the part of the tenant arising under the Lease prior to the date hereof and from all liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred in connection therewith.

2.       Assumption of Duties by Assignee.  Assignee hereby accepts and assumes and agrees to pay, perform, observe and discharge all of the covenants, conditions, agreements, terms and obligations on the part of the tenant to be performed under the Lease accruing or arising from and after the date hereof.  Assignee further agrees that the security deposit, if any, shall continue to stand as security for the performance by Assignee of each and every term, covenant and condition of the Lease.  Assignee shall indemnify and hold Assignor harmless from all obligations on the part of the tenant arising under the Lease from and after the date hereof and from all liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred in connection therewith.

3.       Attorneys' Fees.  In the event suit is brought to enforce or interpret any part of this Assignment or the rights or obligations of any party to this Assignment, the prevailing party shall be entitled to recover as an element of such party's cost of suit, and not as damages, reasonable attorneys' fees to be fixed by the court.

4.       Binding Effect.  This Assignment and all provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

5.       Headings.  The headings contained in this Assignment are for reference purposes only and shall not affect in any way the meaning or interpretation of this Assignment.

6.       Governing Law.  This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Colorado (regardless of the laws that might otherwise govern under applicable principles of conflicts of law of such state).

7.       Counterparts.  This Assignment may be executed in counterparts, each of which shall be deemed and original, but all of which shall constitute the same instrument.

8.       Conflict.  Nothing herein contained shall itself change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Lease or the Agreement in any manner whatsoever.  In the event of any conflict or other difference between (a) the Lease and this Assignment, the provisions of the Lease shall prevail, and/or (b) the Agreement and this Assignment, the provisions of the Agreement shall control.

9.    No Release of Assignor.   Under no circumstances shall this Assignment release Assignor as the primary obligee for the responsibilities of the Tenant under the Lease, and Assignee shall remain primary liable to the Landlord for all obligations of the tenant under the Lease.

10.    Landlord as Third Party Beneficiary.   The Landlord is a direct third party beneficiary of the obligations of the Assignor and the Assignee under this Assignment.

IN WITNESS WHEREOF, the Assignor and Assignee have executed this Assignment as of the day first written above.

ASSIGNOR:

**COLORADO CINEMA GROUP, LLC**, a Delaware limited liability company

By: _____

ASSIGNEE:

_____, a _____

By: _____

*EXHIBIT "E"*

(Monument Sign Criteria)



SOUTHLANDS

Project Signage · Revised Design Intent Document

ALBERTA DEVELOPMENT PARTNERS, LLC

DATE OF ORIGINAL ISSUE:   29 APR 2004

1   21 MAR 2004

C O M M   A R T S