# EXHIBIT 5

# PART 2

**C O M M . A R T S**
Communication Arts Incorporated
1112 Pearl Street
Boulder, Colorado 80302
303 447 8202

This drawing was for the sole purpose of presenting related design intent information and may not be used, reproduced, or copied without prior written consent and responsibility for materials, dimensions, fabrication and installation.

DATE  23 APR 2004

REVISIONS

DRAWN BY  JEH

CHECKED BY

SUBMITTALS:

**Table of Contents**

**GR 0.1.1**

## PROGRAMMING

History & Quantities — GR 0.2.1
Fabricator Performance & Material Requirements — GR 0.3.1
Project Materials & Finish Schedule — GR 0.4.1
Phased Project Signage Location Plan — GR 0.5.1
Phased Project Signage Message Schedule — GR 0.6.1

## EXTERIOR SIGNAGE

SIGN TYPE PE  Primary Entry Monument — GR 1.1.1
SIGN TYPE SE  Secondary Entry Monument — GR 1.2.1
SIGN TYPE E   E-470 Tenant Signage Pylon — GR 1.3.1
SIGN TYPE AP  Aurora Parkway Tenant Signage Pylon — GR 1.4.1
SIGN TYPE VD  Vehicular Directional Signage — GR 1.5.1
SIGN TYPE SI  Street Identification Signage — GR 1.6.1
Light Fixtures & Custom Masonry Unit Conditions — GR 1.7.1

# HISTORY & QUANTITIES

| Page No. | Page Title | Phase 1 Qty. | Phase 2 Qty. | Total Qty. | Original Issue | Last Delta | Date |
|---|---|---|---|---|---|---|---|
| **PROGRAMMING** | | | | | | | |
| GR 0.1.1 | Table of Contents | - | - | - | 29 APR 2004 | - | |
| GR 0.2.1 | History & Quantities | - | - | - | 29 APR 2004 | - | 21 MAY 2004 |
| GR 0.3.1 | Fabricator Performance & Material Requirements | - | - | - | 29 APR 2004 | 1 | |
| GR 0.3.2 | Fabricator Performance & Material Requirements | - | - | - | 29 APR 2004 | 1 | |
| GR 0.3.3 | Fabricator Performance & Material Requirements | - | - | - | 29 APR 2004 | - | |
| GR 0.3.4 | Fabricator Performance & Material Requirements | - | - | - | 29 APR 2004 | - | |
| GR 0.3.5 | Fabricator Performance & Material Requirements | - | - | - | 29 APR 2004 | - | |
| GR 0.4.1 | Project Materials & Finish Schedule | - | - | - | 29 APR 2004 | 1 | 21 MAY 2004 |
| GR 0.5.1 | Phased Project Signage Location Plan | - | - | - | 29 APR 2004 | 1 | 21 MAY 2004 |
| GR 0.6.1 | Phased Project Signage Message Schedule | - | - | - | 29 APR 2004 | 1 | 21 MAY 2004 |
| GR 0.6.2 | Phased Project Signage Message Schedule | - | - | - | 29 APR 2004 | 1 | 21 MAY 2004 |
| **EXTERIOR SIGNAGE** | | | | | | | |
| GR 1.1.1 | SIGN TYPE PE - Primary Entry Monument | 1 | 1 | 2 | 29 APR 2004 | - | |
| GR 1.2.1 | SIGN TYPE SE - Secondary Entry Monument | 2 | - | 2 | 29 APR 2004 | - | |
| GR 1.3.1 | SIGN TYPE E - E-470 Tenant Signage Pylon | 2 | 1 | 3 | 29 APR 2004 | - | |
| GR 1.4.1 | SIGN TYPE AP - Aurora Parkway Tenant Signage Pylon | 3 | - | 3 | 29 APR 2004 | 1 | 21 MAY 2004 |
| GR 1.5.1 | SIGN TYPE VD - Vehicular Directional Signage | 4 | 13 | 17 | 29 APR 2004 | 1 | 21 MAY 2004 |
| GR 1.6.1 | SIGN TYPE SI - Street Identification Signage | 5 | 7 | 12 | 29 APR 2004 | 1 | 21 MAY 2004 |
| GR 1.7.1 | Light Fixtures | - | - | - | 29 APR 2004 | - | |
| GR 1.7.2 | Custom Masonry Unit Conditions | - | - | - | 29 APR 2004 | - | |

C O M M . A R T S
Communication Arts Incorporated
1112 Pearl Street
Boulder Colorado 80302
303 443 9002

This drawing may be for sale purposes of preparing actual design which may or may not be intended for actual fabrication purposes. Common arts copyrights and responsibility for materials selection, fabrication and installation.

REVISIONS

28 APR 2004
△ DATE
△ 21 MAY 2004

DRAWN BY
JSM

CHECKED BY

SUBMITTALS:

History &
Quantities

GR 0.2.1

# FABRICATOR PERFORMANCE & MATERIAL REQUIREMENTS

I. These Fabricator Performance and Material Requirements are an integral part of the Design Intent documents. The fabricator, subcontractor and the general contractor are responsible for all aspects of fabrication identified in this document. Any exclusions or substitutions to this document or to the Design Intent Drawings must be stated in writing to the Owner and to Communication Arts, Inc. at the time of bid.

II. PROPRIETARY INFORMATION NON-DISCLOSURE AGREEMENT

All ideas, designs, arrangements and plans indicated or presented by these drawings are owned by and are the property of the Owner, and were created, evolved and developed for use on and in connection with the specified project. None of such ideas, designs, arrangements or plans shall be used by or disclosed to any person, firm, or corporation for any purpose whatsoever without the written permission of Communication Arts, Inc. and the Owner. Any and all inquiries in this regard by outside parties should be referred to Communication Arts, Inc. In addition, The Fabricator must request and receive written approvals to use images of any completed element described in these documents in print or promotional materials of any kind including video, from both Communication Arts, Inc and the Owner in order to proceed with publication. Permission to use images of the work for promotional or editorial purposes requires that the Fabricator be responsible for ensuring that credit indicating Communication Arts, Inc. as the designer be adjacent to those images. If an article in a publication accompanies the images, Communication Arts, Inc. must be identified as the designer in that article as well. The Owner may have additional requirements or restrictions for which the Fabricator is also responsible.

All original artwork (including electronic files) furnished by Communication Arts, Inc. must be returned upon completion of this project.

The acceptance of these drawings by vendors, bidders, fabricators, or contractors and their agents constitutes agreement to the following conditions:

III. DESIGN INTENT DRAWINGS

A. Design intent drawings are for the sole purpose of design intent only and not intended for construction purposes.

B. Detailing working drawings, shop drawings and contract documents including permit documents are the sole responsibility of the contractor in every respect.

C. Communication Arts, Inc. shall review the shop drawings only for

conformance with general design intent, and will in no way be responsible or liable for any results of construction from working drawings, material selection, shop drawings, contract documents or any other agreements other than agreement with the Owner authorizing these documents.

D. Any Owner requested changes after this document has been completed will be considered additional services.

IV. QUALITY ASSURANCE

A. Quality of Workmanship
The contractor shall be responsible for the quality and delivery of all materials and workmanship required for the execution of the contract including the materials and workmanship of any firms or individuals who act as his or her subcontractors. Contractors shall be responsible for providing subcontractors with complete and up-to-date drawings, performance and material requirements, graphic schedule and other information issued by Communication Arts, Inc.

B. Performance
The contractor shall base his or her proposal on the performance of all services, including all items of labor, materials and equipment required for the complete fabrication and installation of the specified work within the timeframe agreed to by contractor, Owner and Communication Arts, Inc.

C. Dimensions
Written dimensions on the drawings shall take precedence over scaled dimensions. Contractor shall verify and be responsible for all dimensions and conditions shown by these drawings.

D. Sign Package Message Schedule
Copy, quantities and references shown on the Message Schedule shall take precedence over drawings. The large scale details shall take precedence over the smaller scale drawings.

E. Execution
Contractor shall notify the Owner and Communication Arts, Inc. of any discrepancies in the drawings or Message Schedule, in field dimensions or conditions, and/or changes required in construction details. Problems such as messages being too long to fit into the required formats, difficulty accurately reproducing logo or logotype components, etc., must be brought to the attention of the Owner and Communication Arts, Inc. prior to execution. It is required that the contractor not resolve

any discrepancies without consulting the Owner and Communication Arts, Inc.

F. Contractor Recommendations
The contractor shall carefully study the detailed drawings and make specific recommendations for changes if those changes will improve the quality of any fabrication. Such recommendations and changes including any changes in contract amount shall be approved in writing by the Owner and Communication Arts, Inc. prior to preparation of shop drawings of fabrication.

G. Artwork
Macintosh Zip 100mb cartridge with electronic artwork as required by the sign contractor for symbols or custom designed graphic components (i.e. logos, logo types, arrows, or patterns) will be provided in Macintosh Macromedia FreeHand 7.0 or Adobe Illustrator 8 format at a scaled percentage of the final size. The appropriate Adobe Photoshop pss scan will also be provided when necessary. All required copy layouts and text for project signage system is the responsibility of the sign contractor. All lettering and reducing is the responsibility of the sign contractor. Contractor shall submit an itemized list of all required artwork at time of bid. Note: Any artwork required beyond electronic computer artwork noted above (i.e. additional custom copy layouts, formatting for other platform(s), output, or copying to other media, etc.) will be billed to the contractor on a time and materials basis by Communication Arts, Inc. Communication Arts cannot provide copies of licensed fonts.

Stock Photo Images: Communication Arts will provide placed electronic files for stock photo images indicated on the drawings as digital output on solid vinyl, scrim, mesh or other materials. These files are for composition and layout purposes only. High resolution final images and any other associated fees or other costs are the responsibility of the fabricator and should be obtained from the specified stock photo vendor by the fabricator and registered in the Owner's name. Scans or negatives as well as any additional computer file manipulation time required are the responsibility of the fabricator.

H. UL Compliance
Complete UL, or approved nationally recognized testing agency, compliance, as required, is the responsibility of the contractor. Contractor shall provide lighting fixtures and electrical components that meet all UL testing lab requirements for safety, operation, and construction. Fixtures and components must be UL-labeled and listed and shall indicate locations and electrical service required



C O M M, A R T S
Communication Arts Incorporated
1112 Pearl Street
Boulder, Colorado 80302
303 442 9222

The drawings are for design intent purposes only and shall not be relied upon for and are not intended to be used for construction purposes. Contractor assumes all responsibility for materials selection, fabrication and installation.

REVISIONS

DATE
29 APR 2004

DRAWN BY
JBH

CHECKED BY

SUBMITTALS

Fabricator
Performance
& Material
Requirements

GR 0.3.1

# FABRICATOR PERFORMANCE & MATERIAL REQUIREMENTS

for review by the Owner and Communication Arts, Inc. unless noted otherwise. Contractor is responsible for all final electrical connections.

**I. Lamp Emission**
All lighting fixtures/sources shall emit a color balanced, consistent and uniform light with no browning, flickering, haloing, or other uneven effect.

**J. Electrical Hardware**
All transformers and electrical hardware shall be concealed, non-audible and non-visible to pedestrian and vehicular traffic. Provide disconnect switch if required by governing agencies. Disconnect switch location and type must be clearly shown in shop drawings.

**K. Labeling**
There shall be no visible labels, manufacturer's or otherwise, code permitting, on the completed signs or other objects. If labels are required, a sample label and intended location along with an explanation of the requirement must be submitted for Communication Arts, Inc. and Owner review, prior to application and/or installation.

**L. Stock**
All materials, hardware, electrical components, finishes, etc. used to fabricate any and all components shall be "NEW" (not previously used or operated in any other application) and from the most recent original manufacturer's production run/supply and appropriately matched to the service conditions required of the site.

**M. Testing**
An independent testing lab will be hired by the Owner to do inspection and material testing as required. Do not proceed with the work until unsatisfactory conditions have been corrected by the contractor in a manner acceptable to the Owner.

## V. SUBMITTALS

**A. Shop drawings**
The contractor shall submit three sets of detailed shop drawings of sign or object plans. These drawings are to show/indicate all materials, finishes, construction details, lighting requirements, installation details, artwork and structure, including locations of all material seams (finished and unfinished). Shop drawings and data shall

be reviewed by the Owner and Communication Arts, Inc. with such promptness as to cause no delay in the work. The contractor shall make all corrections required and resubmit for final review. Final reviewed shop drawings noted "No Exceptions Taken" or "Exceptions as Noted" must be received from the Owner before production starts.

Shop drawings will be reviewed for compliance with design intent only. The contractor is responsible for engineering each object to meet all load and wind requirements with sealed drawings and calculations by certified engineers. The contractor is responsible for all other aspects of fabrication including engineering, procedure, installation techniques and performance as well as coordination with site conditions and related trades.

**B. Product Data**
The contractor shall submit manufacturer's technical data and installation instructions for each fixture provided within the completed, installed unit. Contractor shall provide identification of all materials used, including manufacturer's descriptive literature, control number, name, code number, batch and formula (when available).

**C. Specific Samples**
The contractor shall submit a minimum of three (3) samples (minimum size 6" x 6" or as requested by Communication Arts, Inc.) of each color and finish on the specified materials. Samples must be submitted in a timeframe allowable for review, multiple adjustments, and approval without delay to the project. Communication Arts, Inc. review of samples will be for color, texture, and aesthetic compatibility with existing or adjacent materials. Compliance with any other requirement is the exclusive responsibility of the contractors. When specified, furnish full-size samples of objects, partial objects, and/or materials. Required samples if requested until required steel, color, texture, and compliance with Fabricator Performance and Material Requirements is accepted.

**D. Structure**
Design of installation, internal structure, mounting assemblies and foundations are by contractor. Contractor shall submit three sets of prints and one reproducible set of comprehensive engineering drawings to Communication Arts, Inc. incorporating an adequate foundation and/or mounting structure for all sign components to meet all load and wind requirements and given site conditions. The contractor shall, at his or

her expense, submit for Owner's review calculations, sealed by certified engineers registered in the state of final installation, for all structural members including foundations.

**E. Custom Fabricated Items**
The contractor is to submit shop drawings of all custom fabricated items and specifications on all standard pre-manufactured items.

**F. Electrical Requirements**
Contractor shall, within twenty one (21) days of contract execution, provide the owner and general contractor with a list of electrical requirements and support/blocking requirements for each element (including approximate weight).

**G. Lamp Service**
The contractor shall, at the time of close-out, provide the Owner with complete lamp replacement information, brand, type, wattage, color, etc., for all lighted components. This information shall be in a typewritten format (8-1/2" x 11") and shall indicate at least one local (site) supplier.

**H. Maintenance**
The contractor shall, at the time of close-out, provide the Owner with complete finish/component care instructions as specified by the manufacturer for on-going cosmetic cleaning and maintenance. Three sets are to be submitted in an 8-1/2" x 11" 3-ring binder. Turn over to Owner one (1) unopened gallon of each color/finish used on the project clearly marked with complete specification and "P" color reference.

**I. Copy/Text Layouts**
The contractor shall provide full size copy layouts for all signs. Layouts must be submitted in a time frame allowable for review, multiple adjustments and approval without delay to the project.

**J. Large Format Digital Output**
A 12"x 24" portion of the final full size computer output of each image is required to be submitted to Communication Arts, Inc. for approval prior to final production.



C O M . A R T S
Communication Arts Incorporated
1112 Pearl Street
Boulder, Colorado 80302
303 447 8202

*These drawings are for the sole purpose of preparing actual design drawings and are not intended for actual fabrication purposes. Contractor assumes total responsibility for warranties, colors, quantities and conditions.*

R E V I S I O N S

D A T E

D R A W N   B Y
dH

C H E C K E D   B Y

S U B M I T T A L S :

Fabricator Performance & Material Requirements

GR 0.3.2

# FABRICATOR PERFORMANCE & MATERIAL REQUIREMENTS

## VI. FINISHES

### A. Colors and Surface Textures
All colors shall match exactly the color and finish requirements provided by Communication Arts, Inc. For exposed signage, materials with applied colors or other characteristics related to appearance, contractor shall provide color matches indicated, or if not indicated, as selected and reviewed by Communication Arts, Inc.

### B. Surface Preparation
All surfaces shall be thoroughly cleaned and free from dust, dirt, rust, scale, mill scale, oil, greasy materials or residue from cleaning. All coatings shall be applied in strict accordance with the manufacturer's recommendations. All paint products shall conform to local codes. All finishes shall present a uniform opaque color appearance unless specifically indicated otherwise by Communication Arts, Inc.

### C. Painted Finish

1. Ferrous Surfaces
Using Matthews paint products, finish with 1 coat 74734 & 74735 Metal Pretreat @ .25 mils DFT, 1 coat Matthews Acrylic Polyurethane 1 mil DFT (min.). Observe designer's specification regarding specularity (matte to gloss).

2. Aluminum
Using Matthews paint products finish, with 1 coat 74-734 & 74-735 Metal Pretreat @ .25 mils DFT of 1 coat 74-795 Spray Bond @ .15 to .25 mil DFT and 1 coat Matthews Acrylic Polyurethane 1 mil DFT (min.).

3. Bright Metals
Match finish (polished, satin, brushed, etc.) detailed on drawing, if specified, finish with a polyurethane clear coat warranted against yellowing for seven years.

4. Plastic Surfaces
All plastic to be paint finished according to paint manufacturer's specifications.

### D. Application
All applications of color/coatings are to be equal and of consistent cover with no streaking, spotting, gradation, or other variations within and from each similar application.

### E. Ultra-Violet/Fading Protection
Contractor shall utilize materials, coatings and processes to minimize as much as possible any noticeable fading of pigmented coatings.

### F. Neon Returns
All exposed neon returns and double backs are to be opaque with a top coat to match the field area immediately behind that neon.

## VII. MATERIALS

### A. Acrylic Color Translucent Sheet
Where sheet material is indicated as a "color" provide color translucent sheet of density required to produce uniform brightness without halo-like effect. Material provided shall be appropriately matched to the intended permanent field conditions.

### B. Acrylic/Transparent Sheet
Where sheet material is indicated as "clear" provide colorless sheet in gloss finish, with light transmittance of 92%, where tested in accordance with the requirements of ASTM D-1003.

### C. Aluminum Sheet
Provide aluminum sheet of alloy and temper recommended by the aluminum producer or finisher for the type of use and finish indicated and with not less than the strength and durability properties specified in ASTM B109 for 5005-H15.

### D. Aluminum Extrusions
Provide aluminum extrusions of alloy and temper recommended by the aluminum producer or finisher for the type of use and finish indicated and with not less than the strength and durability properties specified in ASTM B221 for 6063-T5.

### E. Structural Steel
Provide internal structural steel as required to meet the requirements of the permanent installation.

### F. Fasteners
Unless otherwise indicated, provide concealed fasteners fabricated from metals that are non-corrosive to either the signage materials or the mounting surface.

### G. Electrical/Lamps
Provide new electrical components and respective lamps, so as to be easily repaired or replaced from local available stock (24 hr. max. turn-around).

### H. Vinyl Machine-Cut Copy
Vinyl machine-cut copy shall be of 3M Scotchcal brand film or approved equal.

### I. Paint
Paint shall be contractor's highest grade for best ultraviolet light resistance, weatherability, and overall longevity of finish and color. Where possible, use water-based, 100% solids, high performance acrylic instead of solvent-based paints. If solvent-based paints must be used, use products that are low-VOC (<500 g/l) and <5% aromatic hydrocarbons by weight. Paint shall have a written warranty against premature fading and be approved by Communication Arts, Inc. prior to construction. Prior to close-out, contractor shall turn over to Owner 3 copies of complete paint schedule indicating all colors used.

## VIII. FABRICATION

### A. Copy Application
Provide copy to comply with the requirements indicated for size, style, spacing, content, position, material, finish and color of letters, numbers, symbols and other graphic devices.

### B. Illumination
Illuminate units in the manner indicated using the manufacturer's standard lighting components including: fluorescent, incandescent and/or neon, fixtures, transformers, insulators and other components. Make provisions for servicing and for concealed connection to the building system. Coordinate all electrical components with those of the power supply provided.

### C. Signage/Cabinet
Details shown on the drawing shall be followed for exterior appearance. Structural design shall utilize unitized, self-supportive framing. Fabricate cabinet, exposed faces and graphic devices to size and style indicated and produce surfaces free from all canting, warping, distortion or any irregularities or inconsistencies. Include internal bracing for stability and attachment of mounting accessories as required. Contractor may change interior construction shown on these details to conform with his shop practices. However, these changes must be submitted as part of the shop drawings and be reviewed and accepted by Communication Arts, Inc. prior to fabrication.

### D. Fasteners
1. Fasteners on all visible surfaces shall not be exposed, except where noted.
2. Surfaces shall not be penetrated during fabrication or installation, except where noted.



COMM. ARTS
Communication Arts Incorporated
1112 Pearl Street
Boulder, Colorado 80302
303 447 0202

These drawings are for sample or specify typical details which may or may not be used on this project. No drawings may be reproduced for any purpose. Commence unwritten and responsibility for material and installation.

29 APR 2004
DATE

REVISIONS

DRAWN BY
JRN

CHECKED BY

SUBMITTALS:

Fabricator Performance & Material Requirements

GR 0.3.3

# FABRICATOR PERFORMANCE & MATERIAL REQUIREMENTS

3. Surfaces shall not be deformed, distorted, or discolored by attachment of concealed fasteners.

4. All fasteners shall be resistant to oxidation or other corrosive action completely through their cross sections.

5. Work shall be secured with fasteners of the same metal, color and finish as the components they secure where they are exposed to view.

6. Fasteners shall be utilized in strict accordance with their manufacturer's specifications, directions, recommendations and as indicated on Design Intent Drawings.

E. Neon/Lamps

All exposed neon shall be installed in such a manner as to minimize double backs, exposed wires, etc. All exposed neon shall appear as a continuous line (470" min. seamless runs) of light with no irregularities from section to section. Contractor shall coordinate with Communication Arts, Inc. to select exact color of neon and/or lamps. Contractor is responsible for referencing and following code constraints.

F. Aluminum Sheet

Not less than 0.125" thick unless noted otherwise. Fabricate by the HELIARC or MIG welding process with all visible seams continuously welded, filled and ground smooth, unless the seam occurs along a color break. Then a clean butt joint with concealed backing channel and plug weld is finished to match surrounding material finish. All blinds, curves, and folds to be geometrically correct and produced by a consistent mechanical method unless approved otherwise by Communication Arts, Inc.

G. Jointing and Brake Forming

All sheet metal shall have brake formed edges with radii not greater than sheet thickness unless otherwise specified. Adjacent stock shall have edges with similar radii.

H. Welding

All exposed welds are to be ground smooth and filled to match surface of adjacent material.

## IX. INSTALLATION

A. Contractor shall be responsible for determining the erection and dismantling of all barricades or protective coverings necessary to safeguard the public and property during the performance and duration of his or her work.

B. Contractor shall attach objects to substrates in accordance with the project structural engineer's and the manufacturer's instructions unless otherwise shown. Install level, plumb, and at proper height. Repair or replace damaged units as directed by the Owner or Communication Arts, Inc. Visible abrasion to finished surfaces must be repaired so that damage is not visible.

C. Installation of all items shall be by the Contractor. Installation includes provision of any required footings, all anchor bolts, fastenings, attachment metals, and other miscellaneous metal items embedded in concrete or building wall material as required, and security of units in place with no visible fasteners.

D. The contractor will be responsible for any damage caused to building, site, and adjacent objects or elements during installation. The contractor shall be responsible for cleaning up all work areas upon the completion of their work, on a daily basis.

E. The contractor shall provide required electrical equipment and connection to the building. The point of connection is to be provided by the General Contractor. All electrical connections shall be made by a licensed electrician employed by the contractor for this purpose. All connections shall be made in accordance with the requirements of the National Electrical Code (N.E.C.) in addition to all applicable local codes. Electrical contractor shall provide and install all wiring, conduit, junction boxes and electrical devices necessary to provide electrical power to required connections unless otherwise noted. Contractor shall provide concealed neon transformers and all electrical connections beyond rough-in connections by electrical contractor, according to N.E.C. approved methods.

F. Contractor shall be responsible for matching electrical service available on site to the requirements of the object, including transformers.

G. All necessary electrical components as well as the entire assembly are to be UL listed, or by approved nationally recognized testing lab.

H. Contractor is responsible for compliance with all applicable environmental regulations.

I. Contractor is responsible for compliance with an OSHA regulations.

J. Contractor shall be responsible for coordination of all elements with the general contractor, other sub-contractors and trades people relative to this work. These coordination efforts will include, but not limited to: deliveries, work schedules, and installation. Storage space at the job site is limited and will also require coordination and/or approval. Materials or finished work

stored at the job site without prior permission may be relocated at contractor's expense.

## X. CLEANING/PROTECTION AND WARRANTIES

A. All items to be installed by the contractor shall be left in a clean and serene condition. Upon completion of the installation, clean all soiled surfaces and touch up all finishes in accordance with the manufacturer's instructions. All dents and packing material shall be removed and disposed of in a legal manner. The protective masking of the plastic surfaces shall be removed by the contractor upon completion of installation. All excavation and site work shall be returned to its original grade configuration after contract items are installed.

B. Finish Surfaces

All units shall be warranted in writing by the contractor for a period of no less than one year from the date of Owner acceptance. All finishes (except large format computer output) are to be warranted for 3 years from the date of Owner acceptance. There shall be:

1. No delamination of any portion of the object including vinyl graphics and copy.

2. No cupping, warping or dishing.

3. No bubbling, crazing, chalking, rusting or other disintegration of surfaces, messages or edge finishes.

4. No corrosion developing beneath the paint surface of the support systems, except as the result of obvious vandalism.

5. No corrosion of the fasteners.

6. No movement of objects from their foundations. The objects must remain true and plumb on their foundations, except when obvious post-installation external damage has occurred.

7. No fading of the colors when matched against a sample of the original color and material.

8. No variation of any other performance stated by Communication Arts, Inc. on the drawings or in the Fabricator Performance and Material Requirements.

C. Structure/Components

Contractor shall provide Owner with 3 copies of the written warranty prior to installation guaranteeing to correct, to Owner's satisfaction, at contractor's sole expense, all defects in fabrication and installation of work for a period of three years after Owner's acceptance of



C O M . A R T S
Communication Arts Incorporated
1112 Pearl Street
Boulder, Colorado 80302
303 447 8202

These drawings are for use and purpose of Communication Arts Incorporated design and may not be used or reproduced without written authorization. These drawings are not intended for construction purposes. Contractor assumes any and all responsibility for materials, fabrication and installation.

REVISIONS

DRAWN BY          JSH

CHECKED BY

SUBMITTALS:

DATE             29 APR 2004

Fabricator
Performance
& Material
Requirements

GR 0.3.4

# FABRICATOR PERFORMANCE & MATERIAL REQUIREMENTS

completed installation.

**D. External Lamps**

All lamps shall be warranted against failure for 90 days, at least three years, and all ballast one year. Lamps are to be replaced within 48 hours of failure by Owner and/or General Contractor. In the event of failure within specified times these items are to be replaced by contractor at contractor's sole expense.

**E.** The contractor shall have total and complete responsibility for the security of all equipment, materials, and sign components until reviewed and accepted by the Owner.

**F. Lamp Service**

The contractor shall provide Owner with 3 copies of complete lamp replacement information, brand, type, wattage, color, etc., for all lighted components. This information shall be in a typewritten format ($8\frac{1}{2}$" x 11") and shall indicate at least one local (city) supplier. Lamps must comply with all local, state, and federal regulations.

**G. Maintenance**

The contractor shall provide to Owner 3 copies each of complete finish/component care instructions as specified by the manufacturer for ongoing cosmetic cleaning and maintenance. These are to be submitted in an $8\frac{1}{2}$" x 11" 3-ring binder. Contractor to ensure signage, neon, lamps, and electrical components etc. are easily accessible for maintenance.

## XI. PERMITS

**A.** Securing and paying for all permits required by governmental agencies is the responsibility of the contractor. Inspections and tests necessary for the construction and placement of all work required by the applicable governing agencies to by the contractor.

**B.** Contractor shall secure and pay for all insurance required by law including: Liability, Worker's Compensation, Comprehensive, Constructural Liability, Personal Injury, Comprehensive Auto and Property on- and off-site.

**C.** Contractor shall not reveal or disseminate any information to any person(s), private or public, other than Communication Arts, Inc., Owner or contractor's personnel necessary to execute the contract without first contacting the Owner for permission.

## XII. LARGE FORMAT COMPUTER OUTPUT

All high resolution large format computer output indicated in the

Design Intent Document must comply with the following:

1. Minimum resolution 400 dpi, or as noted on the drawings.
2. Process: 3M SCOTCHPRINT for approved equal.
3. Substrate: Opaque or Translucent Scotchcal film for approved equal.
4. Finish: 2 mil Matte overlaminate.
5. Input: Electronic art as specified.

**6. Warranty**

Product must be warranted against color fading, UV change, delamination, shrinkage or peeling for a minimum of five (5) years from date of installation. Product must be installed by a certified 3M installer to guarantee warranty.

## XIII. THE AMERICANS WITH DISABILITIES ACT REQUIREMENTS

ALL SIGNS MUST COMPLY WITH ADA GUIDELINES AND/OR CODE REQUIREMENTS.

**A. Permanent Room Identification**

This information is being provided as a courtesy of CommArts. It is the fabricator's responsibility to verify compliance with all ADA state and federal regulations and addendums and retain an ADA consultant if necessary.

1. All sides and edges to be finished and painted.
2. Sign must meet ADA requirements for clearance, character proportion and height, sign finish and contrast.
3. Sign MUST be mounted 60" on center AFF and 6" from the door or in the case of obstruction, on the wall surface nearest to the latch side of the door and located to avoid door swing and protruding objects.
4. Type must have a minimum 5/8" cap height.
5. Characters and background must be eggshell, matte, or other non-glare finish. Characters must have a minimum of 70% reflectance contrast with their background.
6. Where permanent room identification is provided for rooms and spaces, copy shall be a 5/8" minimum cap height, all caps, tactile lettering together with Grade 2 Braille.

**B. Overhead Hanging or 'Flag' Mounted Signs**

1. There must be a minimum of 80" clearance from the bottom of the sign AFF.
2. No objects, including signs shall protrude more than 4" from the wall surfaces or 12" from post or pylons in a horizontal zone between 27" AFF to 80" AFF.

**3. NOTES**

Blocking and reinforcement by G.C. will be required at all flag mounted and suspended sign locations. ALL conditions must be field verified.

Information was obtained from the Americans with Disabilities Act White Paper Second Edition, Courtesy SEGD.

ALL CARTS, KIOSKS, BOOTHS, FURNITURE AND ANY OTHER OBJECT OR FABRICATION DESCRIBED IN THE DESIGN INTENT DOCUMENTS MUST COMPLY WITH ADA GUIDELINES AND ALL APPLICABLE CODE REQUIREMENTS.

## XIV. BID NOTES

Original fabrication quotes shall be sent directly to the Owner with copies of all pricing information to be sent simultaneously to Communication Arts, Inc. and General Contractor.

Pricing shall be submitted in accordance with the bid documents.

Bidders are required to clearly indicate in writing within their bid the method of construction anticipated, the materials to be used, and any exclusions or exceptions to the bid documents.



C O M M . A R T S
Communication Arts Incorporated
1112 Pearl Street
Boulder, Colorado 80302
303 447 8202

This drawing are for the sole purpose of preparing total design intent only and are not intended for actual fabrication purposes. Commarts assumes and responsibility for materials selection, fabrication and installation.

29 APR 2004

DATE

R E V I S I O N S

JSH
D R A W N   B Y

C H E C K E D   B Y

S U B M I T T A L S :

Fabricator
Performance
& Material
Requirements

GR.3.5

# PROJECT MATERIALS & FINISHES

| No. | Material | Specification | Size | Notes |
|---|---|---|---|---|
| MU-1A | Masonry Units | Arizcraft, Renaissance "Papillos," Rocked Finish | 12 x 24 x 4 | |
| MU-1B | Masonry Units | Arizcraft, Renaissance "Papillos," Rocked Finish | 8 x 24 x 4 | |
| MU-2 | Masonry Units | Arizcraft, Renaissance "Papillos," Dressed Finish | 4 x 24 x 4 | |
| MU-3A | Masonry Units | Arizcraft, Renaissance "Cazenal," Rocked Finish | 12 x 24 x 4 | |
| MU-3B | Masonry Units | Arizcraft, Renaissance "Cazenal," Rocked Finish | 8 x 24 x 4 | |
| MU-3C | Masonry Units | Arizcraft, Renaissance "Cazenal," Rocked Finish | 4 x 24 x 4 | |
| MU-4 | Masonry Units | Arizcraft, Renaissance "Cazenal," Dressed Finish | 4 x 24 x 4 | |
| MU-5A | Masonry Units | Arizcraft, Adair Limestone base course, "Sepia" | 12 x 24 x 4 | |
| MU-5B | Masonry Units | Arizcraft, Adair Limestone base course, "Sepia" | 8 x 24 x 4 | |
| CS-1 | Custom Stone | Edwards Cast Stone to match Pineapple Grove "Coastal Ivory" | | 3/8" V-groove tops, picked with gold leaf. |
| CS-2 | Custom Stone | Design Materials "Swedish Brown" granite (or similar) | 1 1/2" thick | Sandblasted first surface |
| AC-1 | Acrylic | "Natural Horn" acrylic, vertical grain | 3/16" thick | |
| P-1 | Powder Coat | Perxy Gold U-5428 | | |
| P-2 | Paint | Mathews matt in MP2019A, satin finish | | |
| P-3 | Paint | ICI 1595, "Black Poly," satin finish | | |
| P-4 | Paint | ICI 424, "Sconce Sheen," satin finish | | |
| VH-1 | Vinyl | 3M Scotchlite 480-10, reflective "White," exterior grade | | (dark) |
| VH-2 | Vinyl | 3M Scotchcal 3650-33, "Deep Red," exterior grade | | (light) |
| WS-1 | Wood Stain | Olympic Stain 713 | | |
| WS-2 | Wood Stain | Olympic Stain 708 | | |





C O M M . A R T S
Communication Arts Incorporated
1112 Pearl Street
Boulder, Colorado  80302
303 447 8202

This drawing are for the sole
purpose of expressing visual
design concepts only and are not
intended for actual fabrication
purposes. Consumer assumes
total responsibility for materials
selection, fabrication and
installation.

D A T E
29 APR 2004
⚠ 01 MAY 2004

R E V I S I O N S

D R A W N   B Y
JIM

C H E C K E D   B Y

S U B M I T T A L S :

Project Materials
& Finish Schedule

GR 0.4.1



# PHASED PROJECT SIGNAGE MESSAGE SCHEDULE

| Location | Sign Type | Side | Arrow | Message | Notes |
|---|---|---|---|---|---|
| 01 | PE | - | . | (Project Logo) | Phase 2 Location |
| 02 | SE | A / B | . | (Project Logo) | |
| 03 | PE | . | . | (Project Logo) | |
| 04 | VD | A | | Wal-Mart / (Town Center) / Barnes & Noble / Whole Foods | Phase 2 Location |
| 05 | VD | A | ← / → / → / ↑ | Michael's / Walgreens / Chick-Fil-A / To Aurora Pkwy | Phase 2 Listing / Phase 2 Listing / Phase 2 Listing |
| 06 | SI | A & B / C & D | | Southlands Pkwy / Central Street | |
| 07 | SI | A & B / C & D | ↑ / ↑ | Southlands Pkwy / Central Street | |
| 08 | VD | A | ↑ / → / → / ↑ | Kohl's / Sam's Club / Wal-Mart / (Town Center) | Phase 2 Listing |
| 10 | VD | A | ← / → / → / → | To Aurora Pkwy / Barnes & Noble / Sports Authority / To Smoky Hill Rd | Phase 2 Location |
| 11 | AP | . | | (Tenant logos by others) | |
| 12 | AP | . | | (Tenant logos by others) | |
| 13 | SI | A & B / C & D | | Commons Avenue / Central Street | |
| 14 | SI | A & B / C & D | . | Commons Avenue / Central Street | |

| Location | Sign Type | Side | Arrow | Message | Notes |
|---|---|---|---|---|---|
| 15 | VD | A | ← / ↑ / ← / ← | (Town Center) / To Ashier Pkwy / Babies R Us / Ross | Phase 2 Listing / Phase 2 Listing / Phase 2 Listing |
| 16 | VD | A | ← / ↑ / ↑ / ← | Michael's / To Smoky Hill Rd / Ross / (Town Center) | Phase 2 Listing / Phase 2 Listing |
| 18 | VD | A | ← / ← / ↓ / ↑ | Colorado Cinema / Off Broadway Shoes / Southlands / To Aurora Pkwy | Phase 2 Location |
| 19 | SI | A & B / C & D | . | Orchard Road / Central Street | Phase 2 Location |
| 20 | SI | A & B / C & D | . | Orchard Road / Central Street | |
| 21 | AP | . | . | (Tenant logos by others) | |
| 22 | VD | A | ← / ↓ / ← / ← | (Town Center) / Kohl's / To Smoky Hill Rd / Southlands | Phase 2 Location |
| 23 | SE | A / B | . | (Project Logo) / (Project Logo) | Phase 2 Location |
| 24 | E | . | . | (Tenant logos by others) | |
| 25 | E | . | . | (Tenant logos by others) | |
| 26 | E | . | . | (Tenant logos by others) | Phase 2 Location |
| 27 | SI | A & B / C & D | . | Southlands Pkwy / Main Street | Phase 2 Location |
| 28 | SI | A & B / C & D | . | Southlands Pkwy / Main Street | Phase 2 Location |
| 28 | VD | . | . | TBD | Phase 2 Location |



COMARTS
Communication Arts Incorporated
1112 Pearl Street
Boulder, Colorado 80302
303 447 8202

These drawings are for use as indicated, is property of Communication Arts Incorporated and may not be reproduced nor used for any use, intended, for any and fabrication purposes. Contractor accepts and responsibility for omissions, dimensions, fabrication and installation.

DATE
29 APR 2004
△ 01 MAY 2004

REVISIONS

DRAWN BY
JBM

CHECKED BY

SUBMITTALS:

Phased
Project Signage
Message Schedule

GR 0.6.1



C O M M . A R T S
Communication Arts Incorporated
1112 Pearl Street
Boulder, Colorado 80302
303 447 8202

These drawings are for the sole
purpose of expressing visual
design intent and are not
intended for actual fabrication
purposes. Contractor assumes
total responsibility for materials
selection, fabrication and
installation.

DATE
23 APR 2004
13 MAR 2004

REVISIONS

DRAWN BY
JSM

CHECKED BY

SUBMITTALS:

Phased
Project Signage
Message Schedule

GR 0.6.2

# PHASED PROJECT SIGNAGE MESSAGE SCHEDULE

| Location | Sign Type | Side | Arrow | Message | Notes |
|---|---|---|---|---|---|
| 30 | VD | | | TBD | Phase 2 Location |
| 31 | VD | | | TBD | Phase 2 Location |
| 32 | VD | | | TBD | Phase 2 Location |
| 33 | SI | A & B C & D | | Commons Avenue Southlands Pkwy | Phase 2 Location |
| 34 | SI | A & B C & D | | Commons Avenue Southlands Pkwy | Phase 2 Location |
| 35 | VD | | | TBD | Phase 2 Location |
| 36 | VD | | | TBD | Phase 2 Location |
| 37 | VD | | | TBD | Phase 2 Location |
| 38 | SI | A & B C & D | | Orchard Road Southlands Pkwy | Phase 2 Location |
| 39 | SI | A & B C & D | | Orchard Road Southlands Pkwy | Phase 2 Location |
| 40 | VD | | | TBD | Phase 2 Location |
| 41 | VD | | | TBD | Phase 2 Location |

| Location | Sign Type | Arrow | Message | Notes |
|---|---|---|---|---|
| | | | | |







COMARTS
Communication Arts Incorporated
1112 Pearl Street
Boulder, Colorado 80302
303 447 8202

This drawing is for the sole
purpose of expressing a visual
design intent only and are not
intended for actual fabrication
purposes. Customer accepts
total responsibility for materials
safety, fabrication and
installation.

REVISIONS
DATE
29 APR 2004
△ 13 MAY 2004

DRAWN BY
JSM

CHECKED BY

SUBMITTALS:

E-470 Tenant
Signage Pylon

SIGN TYPE E

GR 1.3.1



Cast stone caps and sill, CS-1

Renaissance masonry units, MU-3C

EIFS tenant sign panel, P-4

NOTE: Tenant sign by others, available power for tenant sign to be provided by sign contractor

Renaissance masonry units, MU-5B

Renaissance masonry base cornice, MU-5B

1 Light Sconce 9
TOWARD ROAD △

Renaissance masonry units, MU-2
Renaissance masonry units, MU-1A
Renaissance masonry units, MU-1A
Custom Stone Cornice 4
Renaissance masonry units, MU-4
Renaissance masonry units, MU-3B
Renaissance masonry units, MU-3A

1 E-Point Elevation
Scale: 3/16" = 1'-0"



TOWARD ROAD △

2 E-Point Plan
Scale: 3/16" = 1'-0"











C O M M · A R T S
Communication Arts Incorporated
1112 Pearl Street
Boulder, Colorado 80302
303 447 8202

These drawings are for the sole purpose of the project and shall not be used or reused for any purpose. Communications shall not be responsible for materials, labor, fabrication and installation.

DATE
29 APR 2004

REVISIONS

DRAWN BY    JBH

CHECKED BY

SUBMITTALS:

Vehicular
Directional
Signage

SIGN TYPE VD

GR 1.5.1

Kohl's
WalMart
Office Depot
Sam's Club

Spun aluminum dome top, painted finish, P-1
Fluted structure (non visible) fastenerss painted finish, P-2
Renaissance masonry units, MU-4
Renaissance masonry units, MU-2A
Cast stone caps and sill, CS-1
Renaissance masonry units, MU-2
Renaissance masonry units, MU-1A
Adel limestone base course, MU-5B

Painted .125" aluminum sign panel, P-3
Applied vinyl copy, VM-1
Applied vinyl border, VM-2
1 1/2"x 2" cabinet aluminum sign panel frame, P-2

1  Elevation
   Scale: 3/8" = 1'-0"

2  Plan
   Scale: 3/8" = 1'-0"







EXHIBIT "F"

(Schematic Plan)

*EXHIBIT "G-1"*

**(Parking Plan; No-Build Area; Horizontal Control Plan)**



CURB

ORCHARD ROAD

EE 2401 THEATRE

PLAZA AVENUE

PARKING STRUCTURE

MAIN STREET

COMMONS AVENUE

TENANT'S PARKING
NO BUILD AREA

NORTH     KEY PLAN

Date: 7/6/04



ALBERTA
DEVELOPMENT
PARTNERS, LLC



SOUTHLANDS

EXHIBIT G-1

**EXHIBIT "G-2"**

(No Popcorn/No Liquor Area)

EXHIBIT "H"

(Signage Guidelines)







EXHIBIT G-2

SIGNAGE GUIDELINES



SOUTHLANDS

Value Retail and Large Format Residual Tenant Signage Criteria

ALBERTA
DEVELOPMENT
PARTNERS, LLC

COMMERCE · ARTS

# TENANT SIGN DESIGN CRITERIA

## GENERAL

### I. GOALS

The intent of this criteria is to ensure that Tenant signage within the Southlands development will contribute to the intent of the project architecture as well as create a lively and provocative atmosphere, establishing the identities of tenants, and providing clear, functional information.

Signing at Southlands was designed by CommArts working closely with the Southlands Design Review Committee and Alberta Development Partners. Special considerations were taken to ensure signing becomes an extension of the architecture and the landscape. The Southlands sign program was submitted as a "Comprehensive Sign Plan" in order to allow for flexibility in site and number of signs. The criteria for tenant signage is divided into three sections which align with the proposed districts: Vista, Scene/Walk and Choice/Park. The following descriptions outline design goals and functionality for each of the three proposed districts within the development.

### VISTA:

High visibility tenants with a broad variety of building types and sizes which will include single pad users such as banks, gas stations, restaurants, hotels, medium sized office buildings and other service buildings. A combination of monument signage and wall mounted building signage will occur.

### SCENE/WALK:

Marks the core design character for the project. Emphasizing traditional characteristics of a downtown "Main Street" environment. Key design features include a timeless sensibility with an eclectic mix of storefronts and signage alternatives that will express the individual character of each tenant.

### CHOICE/PARK:

Large format and value oriented retail tenants which require a high level of nationwide brand recognition.





# TENANT SIGN DESIGN CRITERIA



## II. General Sign Criteria

A. Tenant signing is expected to enhance and extend the spirit of the architecture for the retail facility, expressing clearly the retail name and function, while also serving as an expression of the high quality of merchandise and services within.

B. Graphic Design shall be imaginative, simple and clean. Signage shall be limited to the logo and/or name of the tenant. Additional icons/imagery for tenants will be considered (at the sole discretion of the Landlord) as long as it contributes to the overall identity of the store. Tenants are expected to retain the services of a professionally trained graphic designer to create their identity and sign program.

## III. Tenant Submission and Approval Process

The developers of Southlands encourage tenants within all districts to submit their individual, imaginative schemes for signage. Allowances for approvals will be made for professionally designed, high quality programs that are appropriately distinctive. In these cases, the sign types listed in the following criteria may not apply; however, tenant sign programs that exceed the given total allowable square footage will not be granted a variance.

Graphic Design, materials, construction and installation of all tenant signs will be subject to Landlord's approval and will be done solely at tenant's expense (including approval process). The design submission must be completed as outlined. Each application is considered on its individual merit. No design will be approved until all documents are received. Proposed signs shall be shown in all tenant submissions. Fabricator shop drawings shall be submitted for final approval. (refer to section V)

### A. Tenant Submission Requirements:

The tenant shall submit for review and written approval four (4) complete sets of Sign drawings to the Landlord prior to any submission to the City of Aurora for a Sign Permit or sign fabrication. The tenant shall submit all drawings and details required for City of Aurora Sign Permit and shall include:

1. Elevation of storefront showing design, location, size and layout of sign drawn to scale indicating dimensions, attachment devices, construction details including electrical connections and conduits.

2. Plan view of sign on the building drawn to scale indicating dimensions.

3. Section through letter and/or sign panel showing the dimensioned projection of the face of the letter and/or sign panel and the method of illumination as well as attachment devices and construction details including electrical connections and conduits.

4. Sample board showing actual materials and Matthews Paint Specification or PMS identified color(s).

### B. Landlord's Approval:

Landlord shall stamp approved for submission to the City of Aurora on three (3) Sign Sets. If the City requests a modification to the Landlord approved Sign Set, Landlord shall have the opportunity to review and approve any modification to Landlord approved Sign Set prior to City of Aurora issuance of Sign Permit.

Make all submissions to:
Alberta Development Partners, LLC
5460 South Quebec Street
Suite 210
Englewood, Colorado 80111
p: 303.774.9090
f: 303.771.4066
email: aal@aldev.com

Contact: Allen Lampert, Director of Real Estate





# TENANT SIGN DESIGN CRITERIA

## GENERAL

### IV. Sign Fabrication Performance Requirements

**General:**

Tenant shall have its signs fabricated in accordance with the Landlord and City of Aurora approved Sign Set. Signs shall be constructed in accordance with the following requirements:

A. Tenant shall have its sign contractor submit Landlord's required insurance certificate prior to commencement of any work on the property.

B. Tenant shall have its sign contractor meet with the Landlord for a pre-construction meeting prior to the placement of Tenant's sign.

C. Tenant shall be responsible to have sign contractor immediately repair any damage caused by its work on the property.

D. All signs shall be fabricated and installed in compliance with all applicable building and electrical codes and bear a U.L. label concealed from public view.

E. All conduit, raceways, crossovers, wiring, ballast boxes, transformers, and other equipment necessary for sign connection shall be concealed.

F. All bolts, fastenings and clips shall consist of enameling iron with porcelain enamel finish; stainless steel, anodized aluminum, brass or bronzed; or carbon-bearing steel with painted finish.

G. Separate all ferrous and non-ferrous materials with non-conductive gaskets to prevent electrolysis. In addition to gaskets, provide stainless steel fasteners to secure ferrous to non-ferrous metals.

H. Landlord shall not be responsible for the cost of signs fabricated or installed which do not conform to the Southlands Retail Sign Criteria and do not have City of Aurora sign permit.

I. Sign fabricator's labels shall not be visible.

### V. Sign Fabricator Submittal Requirements

A. Four (4) blue line print sets of shop/fabrication drawings to include the following:

   1. Elevation of storefront with proposed sign(s).

   2. Larger scale detail elevation of proposed storefront sign(s) with size, color indications, fabrication and attachment details.

   3. Detail(s) showing method of illumination (if appropriate) with ballast or transformer location.

B. Elevations, details, and layouts of additional sign types, including storefront window identification and hours of operation.

C. Color copy of current logotype used in proposed sign.

D. Suitable Materials: Letter Forms

   1. Fabricated letter form: With finished back faces.

      a. Aluminum

      b. Sheet Metal

E. Non-suitable Materials: Letter Forms

   1. Expanded and/or extruded PVC sheet (Komacel and Sintra)

   2. Wood

   3. Sign Foam





**SOUTHLANDS**

# TENANT SIGN DESIGN CRITERIA

## CHOICE PARK

## A.1a Maximum Allowable Pad Site Tenant Sign Area Matrices

| SIGN TYPES & LOCATIONS | INDIVIDUAL SIGN AREA ALLOWANCES & QUANTITIES BY TENANT LEASE AREAS | | | |
|---|---|---|---|---|
| | **TENANTS OF 5,000 SF OR LESS** | | **TENANTS GREATER THAN 5,000** | |
| | Max. Allowable Area (SF) | Letter Ht. | Max. Allowable Area (SF) | Letter Ht. |
| **1. Primary Identity Sign:** Building mounted and located on Tenant's facade with greatest exposure. Sign types include: | One (1) sign per Tenant only. | | One (1) sign per Tenant only. | |
| Wall Fascia Sign | 120 | 3'-0" | 200 | 4'-0" |
| Canopy Sign | 80 | 1'-6" | 120 | 2'-0" |
| Grand Projecting Sign | 120 | 2'-0" | 200 | 2'-6" |
| Awning Sign | 100 | 2'-0" | 150 | 2'-6" |
| **2. Secondary Identity Sign:** Building mounted or located on Tenant's secondary facade(s) facing parking fields or along internal walkways. Sign types include: | One (1) double-sided monument sign plus one (1) sign per Secondary facade up to a maximum of three (3) signs. | | One (1) double-sided monument sign plus one (1) sign per Secondary facade up to a maximum of four (4) signs. | |
| Wall Fascia Sign | 60 | 1'-6" | 120 | 2'-6" |
| Canopy Sign | 60 | 1'-6" | 80 | 1'-9" |
| Awning Sign | 40 | 1'-6" | 80 | 1'-6" |
| Monument Sign | 40 | 1'-6" | 40 | 1'-6" |
| **3. Auxiliary Signs:** Building mounted and located on any of Tenant's facades. Sign types include: | See table A.2a for quantities. | | See table A.2a for quantities. | |
| Window Sign | 10 (per panel)** | 8" | 10 (per panel)** | 8" |
| Awning Valance Sign | 16 (per awning) | 8" | 16 (per awning) | 8" |
| Menu / Poster Case | 6 | N/A | 6 | N/A |
| Plaque Sign | 4 | 6" | 4 | 6" |
| **TOTAL MAXIMUM ALLOWABLE SIGN AREA:** | The total maximum allowable sign area shall be the greater of 80 sf or 1.5 sf per linear foot of primary frontage for the first 100 lineal feet plus 0.75 sf per linear foot thereafter; plus 1 sf per lineal foot or the secondary frontages. The total allowable sign area shall not exceed 400 sf. | | The total maximum allowable sign area shall not be exceed 1.5 sf per linear foot of primary frontage for the first 100 feet plus 0.75 sf per lineal foot thereafter; plus 1 sf per lineal foot of the secondary frontages to allow for Secondary ID Signage. The total allowable sign area shall not exceed 600 sf. | |

\* Tenants of greater than 15,000 sf with frontage on at least two internal streets may be permitted to have two (2) double-sided monument signs. The total quantity of signs allowed will not be increased.

\*\* Not to exceed 20% of the clear window glass area.

## A.2a Auxiliary Sign Allowable Quantities Matrix

| AUXILIARY SIGN TYPES | ALLOWABLE QUANTITIES |
|---|---|
| Window Sign | One (1) per window panel and glazed entry door of not less than 10 sf of glass area |
| Awning Valance Sign | One (1) per window bay and / or entry door bay |
| Menu / Poster Case | One (1) per primary public entry |
| Plaque Sign | One (1) per primary public entry |

### TOTAL MAXIMUM SIGN QUANTITIES

The maximum number of signs allowed per tenant shall be as follows: 15,000 sf or less – (4) ID signs plus two auxiliary sign types with quantities as listed in table A.2a. Greater than 15,000 sf – (5) ID signs plus two auxiliary sign types with quantities as listed in table A.2a.



# TENANT SIGN DESIGN CRITERIA

## CHOICE · PARK



## A.2b Maximum Allowable Tenant Sign Area Matrices

### SIGN TYPES & LOCATIONS | INDIVIDUAL SIGN AREA ALLOWANCES & QUANTITIES BY TENANT LEASE AREAS

| SIGN TYPES & LOCATIONS | IN-LINE TENANTS OF 25,000 SF OR LESS | | IN-LINE TENANTS GREATER THAN 25,000 SF AND UP TO 100,000 SF | |
| --- | --- | --- | --- | --- |
| | Max. Allowable Area (SF) | Letter Ht. | Max. Allowable Area (SF) | Letter Ht. |
| **1. Primary Identity Sign:** Building mounted and located at tenant's primary entry. Sign types include: | One (1) sign per tenant only. | | One (1) sign per tenant only. | |
| Wall Fascia Sign | 120 | 3'-6" | 200 | 4'-6" |
| Canopy Sign | 75 | 1'-9" | 90 | 2'-6" |
| Grand Projecting Sign | 90 | 2'-6" | 120 | 3'-6" |
| Awning Sign | 90 | 2'-6" | 120 | 3'-6" |
| **2. Secondary Identity Sign:** Building mounted and located on tenant's secondary facade(s), except as noted for roadway. Sign types include: | One (1) sign per Secondary facade up to a maximum of three (3) signs. | | One (1) sign per Secondary facade plus one (1) additional sign on the primary facade up to a maximum of four (4) signs. | |
| | Max. Allowable Area (SF) | Letter Ht. | Max. Allowable Area (SF) | Letter Ht. |
| Wall Fascia Sign | 60 | 1'-6" | 100 | 2'-6" |
| Canopy Sign | 40 | 1'-4" | 80 | 1'-9" |
| Awning Sign | 40 | 1'-4" | 80 | 1'-9" |
| **3. Auxiliary Signs:** Building mounted and located on any of tenant's facades. Sign types include: | See table A.2b for quantities. | | See table A.2b for quantities. | |
| | Max. Allowable Area (SF) | Letter Ht. | Max. Allowable Area (SF) | Letter Ht. |
| Window Sign | 20 (per panel)* | 8" | 20 (per panel)* | 8" |
| Awning Valance Sign | 16 (per awning) | 8" | 16 (per awning) | 8" |
| Menu / Poster Case | 6 | N/A | 6 | N/A |
| Plaque Sign | 4 | 6" | 4 | 6" |
| **TOTAL MAXIMUM ALLOWABLE SIGN AREA:** | This total maximum allowable sign area is not to exceed 1.5 sf per lineal foot of primary frontage for the first two (2) floors plus 0.75 sf per lineal foot thereafter, plus 1 sf per lineal foot of two secondary frontages to allow for Secondary ID signage. The total allowable sign area shall not exceed 600 sf. | | This total maximum allowable sign area is not to exceed 1.5 sf per lineal foot of primary frontage for the first two (2) floors plus 0.75 sf per lineal foot thereafter, plus 1 sf per lineal foot of two secondary frontages to allow for Secondary ID signage. The total allowable sign area shall not exceed 600 sf. | |

*Not to exceed 20% of the clear window glass area.

## A.2b Auxiliary Sign Allowable Quantities Matrix

### AUXILIARY SIGN TYPES | ALLOWABLE QUANTITIES

| AUXILIARY SIGN TYPES | ALLOWABLE QUANTITIES |
| --- | --- |
| Window Sign | One (1) per window panel and glazed entry door of not less than 10 sf glass area |
| Awning Valance Sign | One (1) per window bay and / or entry door bay |
| Menu / Poster Case | One (1) per primary public entry |
| Plaque Sign | One (1) per primary public entry |

### TOTAL MAXIMUM SIGN QUANTITIES

The maximum number of signs allowed per tenant shall be as follows: 25,000 sf or less — (4) in-line signs plus two auxiliary sign types with quantities as listed in table A.2b. 25,000 sf to 100,000 sf — (5) in-line signs plus two auxiliary sign types with quantities as listed in table A.2b.





# TENANT SIGN DESIGN CRITERIA

## CHOICE PART

### A.1c Maximum Allowable Tenant Sign Area Matrices

**LARGE FORMAT RETAIL TENANTS GREATER THAN 100,000 sf**

| SIGN TYPES & LOCATIONS | INDIVIDUAL SIGN AREA ALLOWANCES & QUANTITIES | |
|---|---|---|
| | Max. Allowable Area (SF) | Letter Ht. |
| **1. Primary Identity Sign:** Building mounted and located on Tenant's primary facade. Sign types include: | Two (2) signs per Tenant. | |
| Wall Fascia Sign | 250 | 4'-6" |
| Canopy Sign | 200 | 4'-6" |
| Grand Projecting Sign | 150 | 3'-0" |
| Awning Sign | 150 | 3'-0" |
| **2. Secondary Identity Sign:** Building mounted and located on Tenant's secondary facade(s) or smaller service/ product listing signs on the primary facade. | Two (2) signs per Secondary facade plus (x) service related signs up to a maximum of fourteen (14) signs. | |
| Wall Fascia Sign | 200 | 2'-6" |
| Canopy Sign | 100 | 2'-0" |
| Awning Sign | 100 | 2'-0" |
| **3. Auxillary Signs:** Building mounted and located on any part of Tenant's facades. Sign types include: | See table A.2c for quantities. | |
| Window Sign | 10 (per panel)* | 8" |
| Awning Valance Sign | 16 (per awning) | |
| **4. Pylon Signs:** Freestanding multi-tenant listing signs located along E-470 or the Aurora Parkway. | One (1) listing per face are up to a maximum of four (4) listings.** | |
| Aurora Parkway | 30 (per listing) | 2'-0" |
| E-470 Pylon | 16 (per listing) | 1'-0" |
| Aurora Parkway Pylon | | |
| **TOTAL MAXIMUM ALLOWABLE SIGN AREA:** | The total allowable sign area shall not exceed (xxx) sf, excluding pylon signage. | |

*Not to exceed 50% of the clear window glass area.
**The number of listings available to a Tenant shall be negotiated with Landlord. Total quantity of listings shown is a not-to-exceed number.

**MOVIE THEATER**

| SIGN TYPES & LOCATIONS | INDIVIDUAL SIGN AREA ALLOWANCES & QUANTITIES | |
|---|---|---|
| | Max. Allowable Area (SF) | Letter Ht. |
| **1. Primary Identity Sign:** Building mounted and located at Tenant's primary entry. Sign types include: | Two (2) signs per Tenant. | |
| Wall Fascia Sign | 200 | 4'-6" |
| Canopy Sign | 200 | 4'-6" |
| Grand Projecting Sign | 200 | 3'-0" |
| Changeable Marquee Sign | 200 | 1'-6" |
| **2. Secondary Identity Sign:** Building mounted and located on Tenant's secondary facade(s) facing parking fields or outer roadways. Sign types include: | Two (2) signs per Secondary facade up to a maximum of four (4) signs. | |
| Wall Fascia Sign | 120 | 2'-6" |
| Canopy Sign | 80 | 1'-9" |
| Changeable Marquee Sign | 150 | 1'-6" |
| **3. Auxillary Signs:** Building mounted and located on any of Tenant's facades, except as noted below. Sign types include: | See table A.2c for window sign quantities. Tenant shall be limited to a maximum of two (2) movie poster cases and one (1) movie listing sign per box office. | |
| Window Sign | 10 (per panel)* | 8" |
| Movie Poster Case | 20 (per case) | N/A |
| Movie Listing Sign at Box Office | | 6" |
| **TOTAL MAXIMUM ALLOWABLE SIGN AREA:** | The total allowable sign area shall not exceed (xxx) sf. | |
| | 100 | |

### A.2c Auxillary Sign Allowable Quantities Matrix

| AUXILLARY SIGN TYPES | ALLOWABLE QUANTITIES |
|---|---|
| Window Sign | One (1) per window panel and glazed entry door of not less than 10 sf of glass area |
| Awning Valance Sign | One (1) per window bay and / or entry door bay |

| TOTAL MAXIMUM SIGN QUANTITIES |
|---|
| The maximum number of signs allowed per tenant shall be as follows: Greater than two-out of four (4) of both poster screens and one (1) pylon listing plus one auxillary sign types as listed in table A.2c. Movie Theater - (4) (x) signs plus two (2) poster cases plus (1) movie listing sign at box office plus (1) window sign per window bay and entry areas. |




# TENANT SIGN DESIGN CRITERIA

## CHOICE PARK

### B. Recommended Sign Types

#### 1. Wall Mounted/Fascia Mounted Signs

The following construction methods are encouraged:
- Halo illuminated channel letters
- Open pan channel with exposed neon (with color restrictions)
- Internally illuminated channel letters with acrylic faces

a. Wall mounted letter form total projection shall not exceed 10"

b. Signs shall not overlap or cover features of the building, such as cornices, eaves, windows, door frames, columns and other decorative elements. Parapet wall signs, mansard roof signs, backlit awnings, and false front wall signs are prohibited.

c. Wall signs may be placed on buildings in two locations: (1) The space between the top of storefronts and the second level finish floor (12' to 16' above finished grade) and (2) the cap space above the top row of windows and below the parapet edge or the leading edge of the building roof form.

*Examples below and right apply to inline Choice/Park Tenants*









 

TENANT SIGN DESIGN CRITERIA

CHOICE PARK

B. Recommended Sign Types (continued)

1. Wall Mounted/Fascia Mounted Signs

The examples on this page apply to large format retail tenants



















# TENANT SIGN DESIGN CRITERIA

CHOICE MARK

## C. Additional Sign Types

### 1. Vehicular/Pedestrian Directional Signs
*See examples below and right*

The Landlord will provide vehicular directional signs along major roadways within the development with directional information that guides visitors to each major tenant. Specific locations will be determined by the Landlord. Major tenants may be listed on a maximum of (2) sign locations. A maximum of four major tenants may be listed on the vehicular directional signs. It is at the discretion of the Landlord as to the selection of major tenants that are listed on the directional signage.

### 2a. E-470/Aurora Parkway Identification Pylon
*See examples below and right*

Specific tenants will be eligible for an additional identification monument sign along the E-470 Corridor as well as Aurora Parkway. This sign will be installed at the tenant's expense and shall conform to the Southlands Comprehensive Sign Plan boundary design. Only tenant logotype will be permitted (no graphics or symbols). Maximum sq. footage and linear site boundaries for tenant signage are as follows: On the E-470 pylons tenant signage is not to exceed a) 1'-9" high or b) 11'-0" wide or c) 18.5sf (whichever boundary is met first). On the AP pylons tenant signage is not to exceed a) 1'-3" high or b) 7'-4" wide or c) 9sf (whichever boundary is met first). No signage element shall extend beyond 8" (on AP) or 10" (on E) from the Pylon panel surface (including but not limited to pan-channel, pin-mounted, and halo-illuminated lettering). A maximum of four tenants may be listed per pylon face.

### 2b. E-470/Aurora Parkway Identification Pylon
*See examples below and right*

Tenants with frontage along Aurora Parkway and with primary or secondary signage on that frontage may be permitted to have listings on the multi-tenant pylons along E-470 but not on the pylons along Aurora Parkway. Similarly, tenants with frontage on E-470 and with primary or secondary signage on that frontage may be permitted to have listings on the pylons along Aurora Parkway but not on the pylons along E-470.



Southlands Vehicular Directional
Scale 1/4"=1'-0"

Southlands Pedestrian Directional
Scale 1/4"=1'-0"



E-470 Tenant Pylon
Scale 1/4"=1'-0"

Aurora Parkway Tenant Pylon
Scale 1/4"=1'-0"




# TENANT SIGN DESIGN CRITERIA

## C. Additional Sign Types (continued)

### 3. Display Window
The tenant may apply a logo to second surface of storefront glazing with traditional storefront graphic material. The logo/tenant ID should be aligned with the hours of operation on the door and centered within the window. All vinyl graphics are to be applied to the storefront glazing by professional installers.

### 4. Address/Hours Of Operation
Tenant shall post hours of operation and address at primary entrance door. Tenant may also repeat store logo/name above hours. Sign to be traditional storefront graphic material applied to inside surface of storefront glazing. "Hours" Cap height to be 3/4." Tenant logo/name shall not exceed 3" cap height. Maximum line length shall not exceed 1'-6". Overall signage area should not exceed 10% of the glass.

## D. Prohibited Sign Types
- Signs with exposed raceway
- Internally illuminated awnings
- Signs with animated components or flashing lights
- Vacuum formed plastic faces

## E. Logotype
1. If tenant has no usable logo or if logo is deemed unsuitable for application, tenant shall use one (1) of the following typeface(s):
- Sans Serif: Stone Sans
- Serif: Stone Serif

2. All caps are recommended. Lower case descenders and ascenders are discouraged.

3. For long logotype lengths, stacking of words is recommended.

## F. Color
Tenant logotype colors must be approved by the owner prior to fabrication. Tenant colors shall contrast 75% with applicable background.

## G. Illumination:
1. Lighting of signage is encouraged and electrical service to Tenant's signs shall be from Tenant's electrical service and on a 24-hour time clock. Operating times to be determined by Landlord.

2. All proposed lighting schemes shall be included in tenants submission to Landlord for approval prior to construction or installation.

## H. Temporary Signs
The tenant may utilize temporary signage when approved by the landlord. All such proposals shall be submitted to the landlord for review according to procedures outlined in Section III. Temporary signs are intended to be displayed for a limited time only and do not incorporate a permanent armature or structural attachment to a building, sidewalk or similar architectural feature. These signs are allowed in building storefronts and windows, the Amenity and Expansion Zones and paneled parking areas used temporarily for valet parking. Temporary signs must be professionally designed and fabricated using appropriate materials and finishes, including paper, vinyl, mylar or acrylic. Allowable temporary signs shall include but are not limited to:
- Valet Parking Signs
- Coming Soon Signs
- Space Available, For Rent or For Lease Signs
- Sale Signs
- Special Promotions
- Seasonal Displays
- Sandwich Boards





_EXHIBIT "I"_

**(Tenants and Occupants with Exclusives)**

# EXCLUSIVE USE EXHIBIT I

**WAL-MART/SAM'S CLUB:** Except as set forth below, Developer covenants that as long as either Wal-Mart, or any affiliate of Wal-Mart, or Sam's, or an affiliate of Sam's, is the user of the Wal-Mart Tract or the Sam's Tract, either as owner or lessee, no space in or portion of the Developer Tract (the portion of the shopping center owned by Wal-Mart and Sam's), the High Visibility Parcel, the Town Center or the Additional Developer Tract (or any Real Property adjacent to the same which is subsequently acquired by Developer) shall be leased or occupied by or conveyed to any other party for use as a membership warehouse club, a facility dispensing gasoline or fuel from pumps, a discount department store or other discount store selling a wide variety of merchandise. Notwithstanding the above, nothing in this Section 3 shall prohibit the operation of a category retailer (as such term is commonly known in the industry) selling primarily a single category of goods on the Developer Tract, provided however, in no even shall any person or entity that operates a facility dispending gasoline or fuel from pumps or a membership warehouse store be deemed to be a category retailer. This ECR shall not prohibit the operation of a Bed, Bath and Beyond, Home Depot Expo, a Kohl's Department Store, Linen's and Things, The Limited Store/Bach & Body Works, Michael's Nordstrom Rack, Old Navy, Gap, Banana Republic, Ross Dress for Less, Steinmart, TJ Maxx or Marshalls on the Developer Tract. In the event of a breach of this covenant, Wal-Mart shall have the right to terminate this Agreement and to seek any and all remedies afforded by either law or equity.

No pharmacy or grocery store (including without limitation any natural, whole or gourmet grocery stores) of any kind shall occupy any portion of the Developer Tract or the Additional Developer Tract (or any Real Property adjacent to the same which is subsequently acquired by Developer). In the event of a breach of this covenant, Wal-Mart shall have the right to terminate this Agreement and to seek any and all remedies afforded by either law or equity.

No grocery store of any kind shall occupy any portion of the Town Center or the High Visibility Parcel, provided however, it shall be permissible for not more than one whole or natural foods grocery store operating out of not more than 35,000 square feet of space to be operated on the Town Center or the High Visibility Parcel, provided further however, it shall be permissible for not more than one gourmet foods grocery store operating out of not more than 35,000 square feet of space to be operated on the Town center or the High Visibility Parcel. In the event of a breach of this covenant, Wal-Mart shall have the right to terminate this Agreement and to seek any and all remedies afforded by either law or equity.

It shall be permissible to locate only one pharmacy in total on one of (but not both) of the High Visibility Parcel or Town Center. In the event of this covenant, Wal-Mart shall have the right to terminate this Agreement and to seek any and all remedies afforded by either law or equity.

**ULTIMATE ELECTRONICS:** Landlord shall not convey or lease any interest in the Value Retail District, or any current or future phases to the Shopping Center, to a large format category retailer whose primary business is consumer electronics. Tenant hereby

Page 2 of 9

agrees that the following retailers, their successors and similar retailers, represent retailers that are not category retailers whose primary business is consumer electronics:

<u>Non-conflicting Retailers</u>:  Bed Bath and Beyond, Linens and Things, Designer Shoe Warehouse, TJ Maxx, Marshall, Gart Sports, Galyans, Sportsmans Warehouse, Office Max, Office Depot, Staples, Michaels Arts and Crafts, Ross Dress for Less, Party City, Paper Warehouse, Petco, PetsMart, Colorado Cinema, Regal Cinema, Century Theatres, Cinemark, Wild Oats, Whole Foods, Gap, Banana Republic, Old Navy, Limited, Tower Records, Sam Goody, Media Play, Pier One, Blockbuster Video, Hollywood Video, Home Depot Expo, Sears The Great Indoors, the Container Store, Crate and Barrel, Nordstrom Rack, Restoration Hardware, Ulta, Lifeway Christian Bookstores, Radio Shack, Suncoast Motion Pictures, CompUSA (as long as their total consumer audio, video, and mobile electronics sales area does not exceed 3,000 sq. ft.), Apple Computers, Gateway Computers (as long as their total consumer audio, video, and mobile electronics sales area does not exceed 3,000 sq. ft.), Apple Computers, Gateway Computers (as long as their total consumer audio, video, and mobile electronics sales area does not exceed 3,000 sq. ft.), Virgin Records, Car Toys, Jillian's, Dave and Buster's, Wal-Mart, Sam's, Kohl's, Toys 'R Us, Babies 'R Us and Kids 'R Us.

Additionally, Tenant hereby agrees that the following categories of retailers, subject to the following square footage allowances, are not category retailers whose primary business is consumer electronics.

**<u>Non-conflicting Category Retailers</u>:**  Except as identified below as "Conflicting Retailers;" office supply retailer of not more than 35,000 square feet; recorded music retailer of not more than 15,000 square feet; computer hardware/software retailer of not more than 35,000 square feet; video retailer/renter of not more than 8,000 square feet; newspaper, magazine and periodical retailer of not more than 10,000 square feet; computer software retailer of not more than 10,000 square feet; video game retailer of not more than 10,000 square feet; Christian book retailer of not more than 6,000 square feet; mobile electronics retailers of not more than 8,000 square feet and mobile and home audio/video retailers of not more than 5,000 square feet.

**Conflicting Retailers:**  Landlord shall not convey or lease any interest in the shopping center to: Best Buy, Fry's Electronics, Tweeters, The Good Guys, Circuit City, or any similar retailer, or any retailer, including general merchandise Department stores, which would use more than 10% of their floor area, or a total area in excess of 5,000 square feet, for consumer electronics, whichever is smaller, or more than the aggregate of 25,000 square feet for the entire Shopping Center, excluding Wal-Mart, Sam's and Kohl's

**<u>FAMOUS FOOTWEAR</u>:**  Landlord covenants and agrees that so long as Tenant operates the Premises as an open stock branded shoe store, Landlord shall not lease space in the Shopping Center to (i) Rack Room Shoes (provided, however, that Tenant understands, acknowledges and hereby confirms that Landlord's lease of space at the Shopping Center to Off Broadway Shoes, an affiliate of Rack Room Shoes, shall not constitute a violation of this paragraph 9(a)), (ii) Shoe Carnival, or (iii) Shoe Pavilion

(collectively, the "Excluded Tenants"). In addition, Landlord shall not voluntarily permit (to the extent Landlord or its affiliates then own or control the portion of the Shopping Center at issue and have the right to prohibit such use) any other tenant or occupant of the Shopping Center to operate its premises as one of the Excluded Tenants.

**PETCO:**  Subject to the rights of Wal-Mart, Sam's Club, Kohl's and Babies R Us, Landlord covenants and agrees that Landlord and its affiliates shall not lease or sell any space in the Project (entire Southlands Shopping Center) to any tenant or occupant which shall have the right to sell pet food, pet supplies, live animals, pet grooming, pet training, and veterinary services (the "Exclusive Items and Services") in the Project except for "incidental sales". Incidental sales shall mean the sale or display of the Exclusive Items and Services not as the primary use of the competing tenant and taking up no more than five hundred (500) square feet of floor area. The foregoing exclusive use of Tenant shall remain in effect for so long as Tenant occupies and actually conducts its business from the Premises in accordance with the terms of this Lease for the Exclusive Items and Services. Accordingly, if, at any time, Tenant's use of the Premises is not for the Exclusive Items and Services, Tenant's exclusive right to sell the Exclusive Items and Services shall be terminated and of no further force and/or effect, and Landlord shall no longer be limited by this paragraph.

**PIER 1:**  Landlord shall not operate or lease or permit to be leased or operated any other store located within the Shopping Center (Value Retail District), for the use or purpose of selling or displaying for sale wicker or rattan furniture or decorative household furnishings that is of an imported nature and is intended to be used in sunrooms, living, dining and kitchen areas and on patios, or housewares imported from the Far East or Europe customarily sold in Pier 1 Imports retail stores unless such use or purpose is incidental, as defined below, to such business. For purposes hereof, the incidental sale of such items in connection with the overall business of another operator or tenant shall not be deemed a violation hereof. As used herein, incidental use or purpose shall mean the sale of such exclusive items which for any one (1) such product line does not exceed ten percent (10%) of the Leasable Square Footage for such business. The above exclusive shall not apply to Cost Plus, Ross, Bed Bath and Beyond, Babies R Us, Simply Artrageous and a traditional Furniture Store, such as but not limited to Ethan Allen.

**OFF BROADWAY:**  Subject to the uses permitted by other tenants' leases in the Value Retail District executed prior hereto and the Non-Conflicting Uses and other exemptions described below attached hereto and incorporated herein, Tenant shall have the exclusive right within the Value Retail District to operate a shoe and footwear retail store. The foregoing exclusive is personal to Tenant, and shall not be valid with respect to any sublessee or assignee of Tenant, unless such sublessee or assignee is an affiliate of Tenant. Notwithstanding the preceding, Landlord shall have the right to enter into a lease with one (but not more than one) of (i) Famous Footwear, (ii) Rack Room Shoes, (iii) Payless Shoesource, (iv) Athlete's Foot, (v) Shoe Carnival, and/or (vi) Just For Feet, for space in the Value Retail District, so long as the front door of the space occupied by such retailer is at least three hundred (300) feet from any outside wall of the Premises. With respect to the remainder of the Shopping Center (i.e., all portions of the Shopping

Center other than the Value Retail District), Landlord shall retain the right to lease space (A) to any and all other "full price" shoe retailers who (x) are typically found in enclosed malls or specialty retail centers, and (y) each occupy 5,000 square feet of space or less, and (B) in the Large Format District, up to 4,000 square feet of space to Payless or another similar off-price shoe retailer.

<u>Non-conflicting Retailers</u>: Bed Bath and Beyond, Linens and Things, Barnes & Noble Booksellers, Off Broadway Shoes, TJ Maxx, Marshalls, Gart Sports/Sports Authority Warehouse, REI, Galyans, Sportsmans Warehouse, Office Max, Office Depot, Staples, Michaels Arts and Crafts, Ross Dress for Less, Party City, Paper Warehouse, Petco, PetsMart, Colorado Cinema, Regal Cinema, Century Theatres, Cinemark, Wild Oats, Whole Foods, Gap, Banana Republic, Old Navy, Limited, Tower Records, Sam Goody, Media Play, Pier One, Blockbuster Video, Hollywood Video, Home Depot Expo, Sears The Great Indoors, the Container Store, Crate and Barrel, Nordstrom Rack, Restoration Hardware, Ulta, Lifeway Christian Bookstores, Radio Shack, Suncoast Motion Pictures, CompUSA, Apple Computers, Gateway Computers, Virgin Records, Car Toys, Jillian's,

Dave and Buster's, Wal-Mart, Sam's Wholesale Club, Kohl's, Toys 'R Us, Babies 'R Us and Kids 'R Us.

Additionally, Tenant hereby agrees that the following categories of retailers, subject to the following square footage allowances, are not category retailers whose primary business is office supply and hence, are allowed in the Shopping Center under the Off Broadway Shoe Warehouse exclusive:

<u>Non-conflicting Category Retailers</u>: Except as identified below as "Conflicting Retailers"; Apparel Retailers of any size, Sporting Goods Retailers of any size, and Department Stores in excess of 60,000 square feet.

<u>Conflicting Retailers</u>: Designer Shoe Warehouse ("DSW"), or any other off-price/discount shoe retailer in excess of 12,000 square feet.

*NOTE: These provisions are still in negotiation and are subject to change.*

**BABIES "R" US:** Landlord shall not operate, lease or permit any other store located in the Shopping Center (entire Southlands project), or on any other property owned or leased by Landlord or any affiliate of Landlord which is within or adjacent to the perimeter of the Shopping Center, to be used for the sale, rental or distribution of items customarily carried by a modern toy specialty store or specialty store for pre-natals, infants and children, including, without limitation, toys; children's, family and adult games; indoor and/or outdoor play and recreational equipment; layettes; prenatal items and equipment; newborn, infant, juvenile and children's clothing, apparel, footwear, accessories, furnishings, furniture, and bedding; candy; children's, infant and juvenile sporting goods, wheel goods, food or health and beauty aids; newborn, infant, juvenile, and children's books, records, audio and video tapes, cassette tapes, compact discs, CD-

Page 5 of 9

ROMS; cribs, cradles, and bedding; booster seats, car seats, carriages, strollers, playpens or other equipment and accessories; computers and related hardware, software and peripherals used primarily for game purposes (as distinguished from computers used primarily for business applications)] and video, electronic, and computer games and equipment, CD-ROMs, DVDs, and video and audio technological evolutions thereof, including, without limitation, game cartridges and consoles or other mechanical equipment necessary to play such games (collectively "Video Games"); or as a hair-cutting salon or photo studio for infants, juveniles or children.

**BED BATH & BEYOND:** Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center (entire Southlands project) or on any Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) house wares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet.] The restrictions set forth in this Section 13.2 shall be null and void with respect to any category of Exclusive Items (e.g., frames and wall art) in the event Tenant, after the initial opening of the Premises to the public for business (or, if earlier, the date which is one (1) year after the date upon which the Premises was required to be so open under this Lease), has ceased to sell, rent and distribute such category of Exclusive Items at the Premises for a continuous period of one (1) year (other than during Excused Periods); provided, however, that such restrictions with respect to such category of Exclusive Items shall not be null and void unless (x) Landlord has notified Tenant that Landlord intends to render such restrictions null and void by notice delivered to Tenant at any time after the end of such one (1) year period (which notice shall set forth which category of Exclusive Items such restrictions are intended by Landlord to be null and void), and (y) Tenant fails to sell, rent or distribute such category of Exclusive Items at the Premises prior to the end of such one (1) year period and, thereafter, such failure continues through the date which is sixty (60) days following the delivery of such notice to Tenant.

**MICHAEL'S:** Neither Landlord nor any entity controlled by Landlord will use, lease (or permit the use, leasing or subleasing of) or sell any space in or portion of the

Page 6 of 9

Shopping Center (entire shopping center) to any "craft store", store selling arts and crafts, art supplies, craft supplies, picture frames or picture framing services, framed art, artificial flowers and/or plants, artificial floral and/or plant arrangements, wedding or party goods (except apparel), scrapbooking/memory book store, or a store selling scrapbooking/memory book supplies, accessories, and/or decorations or other papercrafting (e.g. making greeting cards, gift bags, tags, and other related or similar items) supplies, accessories and/or decorations associated with the foregoing, or providing classes on any of the foregoing or any combination of the foregoing categories. This Section 16.4.1 shall not apply (i) to any lessee whose lease was fully executed on the prior to the effective date, or (b) Landlord agrees to an expansion of the premises for any such permitted use which violates Tenant's exclusive, or (b) Landlord permits or agrees to the change of a permitted use by any such lessee or its successors or assigns, or (c) Landlord permits or agrees to an assignment or sublease of such existing lease if Landlord may avoid the granting of such permission, or (d) Landlord has the right, by virtue of the provisions of the existing lease, to cause said lessee to honor the exclusive granted to Tenant by giving said existing lessee notice of this exclusive or otherwise, or (ii) to any lessee for which the sale of a product or service covered by the exclusive granted to Tenant hereunder is merely incidental to such lessee's primary use, unless the total space which such lessee devotes to the products or services which violate the exclusive contained in this Section 16.4.1 exceeds the lesser of ten percent (10%) of such lessee's Leasable Square Feet or one thousand (1,000) Leasable Square Feet (inclusive of allocable aisle space and linear shelf space); and further provided, in no event shall this exception for incidental use apply to picture framing services, it being the intention that no other lessee or occupant of the Shopping Center shall be permitted to offer picture framing services (but the incidental sale of picture frames shall be permitted as provided above), or (iii) to the typical operation of a card or gift shop such as a Hallmark store as such stores are typically operated as of the Effective Date.

**OFFICE DEPOT:**   Landlord shall not permit any other tenant or occupant of the Landlord's Parcel (the portion of the Large Format District not owed by Landlord) or the High Visibility District or the Value Retail District, other than Tenant, to: (i) use more than the lesser of five percent (5%) of its floor area, or one thousand (1,000) square feet of floor area (in the aggregate), for the sale, leasing, distribution or display of office or school supplies, office furniture, office machines and other office or school related equipment, computers, computer hardware, software and related equipment; or "copy/print services" (as hereinafter defined) or (ii) be primarily engaged in the sale, leasing, distribution or display of any of the items set forth in (i) above. No portion of any real property adjacent to or within one (1) mile of the Shopping Center which is now or may subsequently be acquired or leased by Landlord (or a related entity or affiliate of Landlord), shall be leased or occupied by or conveyed to any other party for a use in violation of this paragraph. "Copy/print services" is herein defined as a facility or center (whether in-store or free standing) providing any one or more of the following products and/or services: photocopying and facsimile and printing services, such as reproduction and printing services including full, self, coin and color copying, graphic design, desktop publishing, scanning, faxing and imaging services and binding, collating and finishing of documents. In addition, Landlord will not lease or allow any space in the Landlord's

Parcel to be used to provide mail services, including mailbox rent or mailing, or shipping, labeling and packaging services (such as a UPS Store) or a store specializing in the sale of cellular telephones or related equipment and devices (such as personal digital assistants and the like). Landlord shall not permit any tenant or occupant of the Lifestyle/Entertainment District (town Center) to be primarily engaged in the sale, leasing, distribution or display of the items set forth in (i) above.

**CHILI'S:**    So long as Tenant is using and occupying the Premises as a Chili's Restaurant, Landlord shall not allow to operate on either the Landlord's Property(entire shopping center) or any other portion of the High Visibility District of the Center any of the following specifically named restaurants: Applebee's, Amarillo Grill, Bennigan's, BJ's Restaurant & Brewery, Buffalo Cafe, Houlihan's, Logan's Roadhouse, Lone Star Cafe, Max & Irma's, O'Charley's, Red Robin, Roadhouse Grill, Ruby Tuesday's, Texas Roadhouse, T.G.I. Friday's and Tony Roma's.

**ON THE BORDER:**    Except for Tenant, Landlord shall not allow to operate in the Center (entire Shopping Center), to another Tenant offering alcoholic beverages, (excluding Beer and Wine) and a menu featuring primarily Mexican cuisine, "Tex-Mex" and/or Southwestern cuisine as the primary entrees. Without limiting the foregoing, Landlord shall not allow another restaurant to operate in the Center under the following trade names: Abuelo's, Blue Mesa, Cantina Laredo, Canyon Café, Chevy's, Chi-Chi's, Chuy's, Don Pablo's, El Chico, El Fenix, Mi Cocina, Pappasito's, Rio Bravo, Rio Grande Café or Uncle Julio's.

**BARNES & NOBLE:**    Landlord, and its successors and assigns, shall not (a) operate or permit under any circumstances to be operated within the Shopping Center any other store selling or displaying for sale or rental any of those items described in clauses (i), (ii) and/or (iii) of the first (1st) sentence of Paragraph 7.1 above (collectively, the "Exclusive Items"), (b) operate or permit under any circumstances to be operated within the Shopping Center any separately demised newsstand or magazine rack, regardless of size, or (c) operate or permit under any circumstances to be operated within the Shopping Center any other Coffee Shop, except that Landlord may permit the operation within the Shopping Center of one (1) other Coffee Shop not to exceed 1,700 Leasable Square Feet in addition to Tenant's operation in the Premises, provided such additional Coffee Shop is not within two hundred fifty feet (250') of any demising wall of the Premises. The Incidental Sale (as hereinafter defined) of one, all or any combination of the Exclusive Items in connection with the overall business of another operator or tenant, or the sale of coffee, tea or other beverages by a non-Coffee Shop restaurant operator or tenant as an incidental part of its general restaurant operation, shall not be deemed a violation of this Paragraph 7.5. As used herein, "Incidental Sale" shall mean the lesser of (x) five percent (5%) of such operator's or tenant's gross sales from their or its demised premises and (y) six hundred (600) square feet in the aggregate of such operator's or tenant's display area (inclusive of allocable aisle space).

**DEL TACO:**    As a drive thru restaurant whose sales from Mexican food equal fifteen percent (15%) or more of gross sales.

Page 8 of 9

**FITZSIMONS CREDIT UNION:** As a full service credit union.

**GOOD TIMES:** As a fast-food hamburger and/or frozen custard restaurant.

**BUFFALO WILD WINGS:** As a restaurant or bar which features chicken wings or as a "Sports Bar". A "Sports Bar" is defined as a restaurant or bar, which has five (5) or more televisions for viewing sporting events and markets itself to the public for viewing of sporting events. This "Sports Bar" restriction shall not apply to any restaurant or bar occupying 6,000 square feet or more.

**SHASTEEN:** As: (A) a gas station with a convenience store; or (B) a full service car wash.

**WELLS FARGO:** As a full service bank, a full service savings & loan organization, or a full service credit union.

**GENERAL EXCLUSIVES:**

So long as the following tenants have executed leases within two years after the date of this Lease for premises in excess of six thousand (6,000) square feet, Tenant agrees to be bound by the exclusive use provisions related to any such tenant's primary use, provided however, that such exclusive does not prohibit operation of the premises as a typical Colorado Cinemas.

Hobby Lobby
Linens N Things
Designer Shoe Warehouse, Rack Room Shoe, Payless Shoesource, Athlete's Foot, Shoe Carnival, Just For Feet
TJ Maxx
Marshalls
Gart Sports, Sports Authority
Dicks Sporting Goods
Galyans
Sportsmans Warehouse
Best Buy, Circuit City, Radio Shack or other consumer electronics retailer(s) of not more than 45,000 square feet
Office Depot, Staples or other office supply retailer(s) of not more than 35,000 square feet
Ross Dress for Less
Party City, Party America
Paper Warehouse
Wild Oats, Whole Foods or other gourmet/natural foods grocer(s) of not more than 40,000 square feet
Gap
Banana Republic
Old Navy

Limited

Tower Records, Sam Goody, Media Play, Virgin Records or other record music retailer(s) of not more than 15,000 square feet or video game retailer of not more than 10,000 square feet.

Blockbuster Video, Hollywood Video or other recorded video retailer/renter of not more than 8,000 square feet

Home Depot Expo

Sears Great Indoors

The Container Store

Organized Living

Crate and Barrel

Nordstrom Rack

Restoration Hardware

Cost Plus

Z-Gallerie

Lifeway Christian Bookstores or other Christian book retailer(s) of not more than 6,000 square feet

Comp USA, Apple Computers, Gateway Computers or other computer hardware/software retailer(s) of not more than 35,000 square feet or a computer software retailer(s) of not more than 10,000 square feet

Jillian's

Dave and Busters

Newspaper, magazine and/or periodical retailer(s) of not more than 10,000 square feet

*EXHIBIT "J"*

**(Approved Form of Memorandum of Lease)**

<u>MEMORANDUM OF LEASE</u>

THIS Memorandum of Lease ("Memorandum") is executed to be effective the ___ day of _____, 2004, by and between **SOUTHLANDS COLORADO, LLC**, a Delaware limited liability company, ("Landlord"), and **COLORADO CINEMA GROUP, LLC**, a Delaware limited liability company ("Tenant").

WITNESSETH:

1.      Pursuant to a "Lease", dated on or about July __, 2004 (the "Lease"), Landlord leased to Tenant, and Tenant leased from Landlord, certain real property (the "Premises") located in the Lifestyle Entertainment District (the "Property") of the Southlands Project (the "Project"), which is located in the City of Aurora, Arapahoe County, Colorado. The Property is legally described in <u>Exhibit A</u> to this Memorandum. The Project is legally described in <u>Exhibit B</u> to this Memorandum. The terms, provisions, covenants, conditions and agreements set forth in the Lease are incorporated herein.

2.      Pursuant to the provisions set forth in Article I of the Lease, the Term of the Lease is twenty (20) years, commencing on the earlier to occur of (a) the date which Tenant opens the Premises for business to the public, and (b) 365 days following the date that Landlord delivers a "buildable pad" to Tenant.

3.      The provisions regarding Tenant's permitted use of the Premises are outlined in Article X of the Lease.

4.      Pursuant to Article XXI of the Lease, Tenant has three (3) options to extend the Term of the Lease for a period of five (5) years each.

5.      Pursuant to Article XXII of the Lease, Landlord has agreed that during the term of this Lease, and so long as Tenant is operating a motion picture theatre at the Premises, (a) Landlord will not lease or sell land at the Project to any tenant/occupant for use as a motion picture theatre, and (b) Landlord shall not lease space in (or voluntarily permit a tenant who leases space in) the area noted in Exhibit G-2 of the Lease to any retailer (i) whose primary business is the sale of hard liquor, or (ii) whose primary business includes the sale of fresh-popped popcorn intended for off-site consumption.

This Memorandum is executed solely to provide notice of the existence of the Lease.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Memorandum to be effective as of the day and year first above written.

LANDLORD:                                      TENANT:

**SOUTHLANDS COLORADO, LLC,**          **COLORADO CINEMA GROUP, LLC,**
a Delaware limited liability company            a Delaware limited liability company

By:   **Southlands Management, LLC**          By:   _____
      a Colorado limited liability company            Haydn Silleck
                                                Title:   Manager
      By:   _____
            Don Provost
      Title:   Manager

Date:   _____          Date:   _____

STATE OF COLORADO          )
                           ) ss.
COUNTY OF _____  )

The foregoing instrument was acknowledged before me on this _____ day of _____, 2004, by Don Provost, as manager of Southlands Management, LLC, a Colorado limited liability company, on behalf of Southlands Colorado, LLC, a Delaware limited liability company.

Witness my hand and official seal.
My commission expires: _____

_____
Notary Public

STATE OF COLORADO          )
                           ) ss.
COUNTY OF _____  )

The foregoing instrument was acknowledged before me on this _____ day of _____, 2004, by R. Haydn Silleck as manager of Colorado Cinema Group, LLC, a Delaware limited liability company.

Witness my hand and official seal.
My commission expires: _____

_____
Notary Public

## FIRST AMENDMENT TO LEASE

This FIRST AMENDMENT TO LEASE ("Amendment") is made and entered into as of this 21st day of July, 2005, by and between **Colorado Cinema Group, LLC**, a Delaware limited liability company ("**Tenant**") and **Southlands Colorado, LLC**, a Delaware limited liability company ("**Landlord**").

## R E C I T A L S

A. On or about August 2, 2004, Landlord and Tenant entered into that certain Lease ("**Lease**") pursuant to which Landlord agreed to lease to Tenant, and Tenant agreed to lease from Landlord, an approximately 72,000 square foot space ("**Demised Premises**") to be constructed in the Lifestyle/Entertainment District ("**Shopping Center**") of the Southlands project ("**Project**") currently under development in Aurora, Colorado.

B. Landlord and Tenant now desire to modify and amend the Lease in order to, among other things, provide Tenant with certain "minimum rent" relief during the period of time between the date Tenant opens the Demised Premises for business to the public and the grand opening date of the Shopping Center. All terms which are capitalized, but not defined, in this Amendment, shall have the meanings ascribed to them in the Lease.

## A G R E E M E N T

NOW THEREFORE, incorporating and in consideration of the foregoing recitals, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1. **Minimum Rent and Percentage Rent Modifications.** Landlord and Tenant hereby confirm and agree that, notwithstanding anything to the contrary contained in the Lease, commencing on the date that Tenant first opens the Demised Premises for business to the public, and continuing until the "grand opening" of the Shopping Center ("**Minimum Rent Reduction Period**"), Tenant's "minimum rent" and "percentage rent" obligations under the Lease shall be revised as follows:

    (a) Tenant's minimum rent obligation during the Minimum Rent Reduction Period shall be $54,000 per month (prorated for any partial months during the Minimum Rent Reduction Period); and

    (b) Tenant's percentage rent obligation for each month during the Minimum Rent Reduction Period (prorated for any partial months during the Minimum Rent Reduction Period) shall be the amount by which (i) the Gross Box Office Receipts plus the Gross Candy Concession Receipts for each such month exceeds (ii) five hundred thousand dollars ($500,000.00), multiplied by nine percent (9%).

2. **Tenant's Proportionate Share of CAM, Taxes and Insurance.** During the Minimum Rent Reduction Period, Tenant shall pay 100% of its Proportionate Share of Common Area costs, real estate taxes and assessments and insurance costs

3. **No Further Modification.** Except as specifically set forth in this Amendment, the Lease shall remain unmodified and in full force and effect.

## (ALL SIGNATURES ARE ON THE NEXT PAGE)

F:\goosenberg/Southlands/LED-Colorado Cinema Lease Amnd1(v1)

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Amendment as of the date hereinabove set forth.

LANDLORD:

SOUTHLANDS COLORADO, LLC,
a Delaware limited liability company

By: **Southlands Management, LLC**
    a Colorado limited liability company
Its: Administrative Member

    By: _____
        Donald G. Provost
    Its: Manager

TENANT:

COLORADO CINEMA GROUP, LLC,
a Delaware limited liability company

By: _____
Name: Haydn Silleck
Title: Manager

F:goosenberg/Southlands/LED-Colorado Cinema Lease Amnd1(v1)

## SECOND AMENDMENT TO LEASE

This SECOND AMENDMENT TO LEASE ("**Second Amendment**") is made and entered into as of this _10th_ day of January, 2006, by and between **Colorado Cinema Group, LLC**, a Delaware limited liability company ("**Tenant**") and **Alberta Town Center, LLC**, a Colorado limited liability company ("**Landlord**").

## R E C I T A L S

A.      On or about August 2, 2004, Southlands Colorado, LLC (Landlord's predecessor-in-interest) and Tenant entered into that certain Lease ("**Original Lease**") pursuant to which Tenant agreed to lease an approximately 72,000 square foot space ("**Demised Premises**") to be constructed in the Lifestyle/Entertainment District ("**Shopping Center**") of the Southlands project ("**Project**") currently under development in Aurora, Colorado. In July, 2005, Southlands Colorado, LLC and Tenant entered into a First Amendment to Lease ("**First Amendment**") pursuant to which, among other things, Tenant was granted certain "minimum rent" relief during the period of time between the date Tenant opens the Demised Premises for business to the public and the grand opening date of the Shopping Center.  The Original Lease and the First Amendment are referred to herein collectively as the "**Lease**".

B.      Landlord and Tenant now desire to further modify and amend the Lease in order to (i) increase the Tenant's Construction Allowance by One Hundred Sixty Thousand Dollars ($160,000) in order to reimburse Tenant for certain costs incurred (or to be incurred) by Tenant, and (ii) provide for Tenant's reimbursement to Landlord of a portion of the cost of a shared water service line to be installed by Landlord, which shared water service line will benefit the Demised Premises, all in accordance with the provisions of this Second Amendment. All terms which are capitalized, but not defined, in this Second Amendment, shall have the meanings ascribed to them in the Lease (as previously amended).

## A G R E E M E N T

NOW THEREFORE, incorporating and in consideration of the foregoing recitals, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      **Increase in Tenant's Construction Allowance**.    Pursuant to Section 3(a) of **Exhibit C** (Tenant Work Letter) to the Lease, Landlord granted Tenant a Construction Allowance equal to $105 multiplied by the number of leasable square feet on the first floor of the Demised Premises.  Landlord and Tenant now agree that the Construction Allowance shall be (and is hereby) increased by exactly One Hundred Sixty Thousand Dollars ($160,000) to reimburse Tenant for the following costs (in accordance with the provisions of Section 3(d) of Lease **Exhibit C**): (a) Sixty Thousand Dollars ($60,000) towards the cost of Tenant's towers, (b) Sixty Five Thousand Dollars ($65,000) towards the cost of Tenant's marquee, and (c) Thirty Five Thousand Dollars ($35,000) towards the cost of the redesign of the Demised Premises.

2.      **Shared Water Service Line Reimbursement**.     Following the date hereof, Landlord shall install a shared 3" water service line which will benefit the Demised Premises and certain other premises at the Shopping Center.  The total cost of the shared water service line is approximately $383,887.00.  Tenant has agreed to pay exactly $254,280.00 toward the cost of the shared water service line ("**Tenant's Portion**").  Tenant shall pay the Tenant's Portion to Landlord within ten (10) business days of receipt of an invoice therefore.

3.      **No Further Modification**.    Except as specifically set forth in this Second Amendment, the Lease (as previously amended) shall remain unmodified and in full force and effect.

## (ALL SIGNATURES ARE ON THE NEXT PAGE)

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Second Amendment as of the date hereinabove set forth.

**LANDLORD**:

**ALBERTA TOWN CENTER, LLC,**
a Colorado limited liability company

By:
Name:  Donald G. Provost
Its:     Authorized Signatory

**TENANT**:

**COLORADO CINEMA GROUP, LLC,**
a Delaware limited liability company

By:
Name:  Haydn Silleck
Title:   Manager

JUL 17 2006

## THIRD AMENDMENT TO LEASE

This FIRST AMENDMENT TO SHOPPING CENTER LEASE ("First Amendment") is made and entered into as of this __ day of June, 2006, by and between **Colorado Cinema Group, LLC a Delaware limited liability company** ("Tenant") and **Alberta Town Center, LLC**, a Colorado limited liability company ("Landlord").

## R E C I T A L S

A.    On or about August 2, 2004, Southlands Colorado, LLC (Landlord's predecessor-in-interest) and Tenant entered into that certain Lease ("**Original Lease**") pursuant to which Tenant agreed to lease an approximately 72,000 square foot space ("**Demised Premises**") to be constructed in the Lifestyle/Entertainment District ("**Shopping Center**") of the Southlands project ("**Project**") currently under development in Aurora, Colorado. In July, 2005, Southlands Colorado, LLC and Tenant entered into a First Amendment to Lease ("**First Amendment**") pursuant to which, among other things, Tenant was granted certain "minimum rent" relief during the period of time between the date Tenant opens the Demised Premises for business to the public and the grand opening date of the Shopping Center. On or about January 10, 2006, Alberta Town Center, LLC, and Tenant entered into a Second Amendment to Lease ("**Second Amendment**") pursuant to which, among other things, Tenant was granted an additional Tenant Construction Allowance by One Hundred Sixty Thousand Dollars ($160,000) in order to reimburse Tenant for certain costs incurred (or to be incurred) by Tenant, and to provide for Tenant's reimbursement to Landlord of a portion of the cost of a shared water service line to be installed by Landlord, which shared water service line will benefit the Demised Premises. The Original Lease, the First Amendment, the Second Amendment and this Third Amendment are referred to herein collectively as the "**Lease**".

B.    Landlord and Tenant now desire to further amend the Lease in order to, among other things confirm the Certified Area of the Premises, in accordance with the provisions of this Third Amendment. All terms which are capitalized, but not defined, in this Third Amendment, shall have the meanings ascribed to them in the Lease (as previously amended).

## A G R E E M E N T

NOW THEREFORE, incorporating and in consideration of the foregoing recitals, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.    **Certified Area; Minimum Rent; Additional Rent**.  Landlord and Tenant hereby agree, acknowledge and confirm that the Certified Area of the Premises is 72,347 square feet.  Accordingly, the Tenant's Annual and Monthly Minimum Rents are as follows:

|  | YEARS | RATE/S.F. | ANNUAL RENT | MONTHLY RENT |
|---|---|---|---|---|
| Lease Years | 1-5 | $18.00 | $1,302,246.00 | $108,520.50 |
| Lease Years | 6-10 | $19.80 | $1,432,470.60 | $119,372.55 |
| Lease Years | 11-15 | $21.78 | $1,575,717.66 | $131,309.80 |
| Lease Years | 16-20 | $23.96 | $1,733,434.12 | $144,452.84 |

Further, all of Landlord's and Tenant's Lease obligations that are based on Premises square footage (i.e., CAM Costs, Real Property Taxes, etc.) shall be computed based on the Premises Certified Area of 72,347 square feet. In addition, Tenant's Construction Allowance will be adjusted accordingly based on the Premises Certified Area of 72,347, equating to an additional amount due to Tenant for Tenant's Construction Allowance of $36,435.00, which such Construction Allowance shall be payable upon the full execution of this Third Amendment to Lease.

2.    <u>**No Further Modification**</u>.  Except as specifically set forth in this Third Amendment, the Lease shall remain unmodified and in full force and effect.


IN WITNESS WHEREOF, Landlord and Tenant have entered into this Third Amendment as of the date hereinabove set forth.

<u>**LANDLORD**</u>:                                            <u>**TENANT**</u>:

**ALBERTA TOWN CENTER, LLC,**              **Colorado Cinema Group, LLC,**
a Colorado limited liability company              a Delaware limited liability company

By: _____              By: _____
Name: Peter M. Cudlip                             Name: CLIFFORD E. COOFE
Title: Manager                                        Title: PRESIDENT / MANAGER

