# EXHIBIT 3

**1**

```
 1             IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 09-cv-00799-ZLW-KLM
 3
     GRANITE SOUTHLANDS TOWN CENTER, LLC,
 4
     Plaintiff,
 5
     v.
 6
     ALBERTA TOWN CENTER, LLC,
 7   LAND TITLE GUARANTEE COMPANY,
     DONALD G. PROVOST, ALLAN G. PROVOST,
 8   and PETER M. CUDLIP,
 9   Defendants.
     _____
10
          VIDEOTAPE DEPOSITION OF:  DONALD G. PROVOST
11                       January 8, 2010
     _____
12
                PURSUANT TO NOTICE, the videotape
13   deposition of DONALD G. PROVOST was taken on behalf of
     the Plaintiff at 600 17th Street, Suite 1800, Denver,
14   Colorado 80202, on January 8, 2010, at 9:13 a.m.,
     before Marchelle Hartwig, Certified Shorthand Reporter
15   and Notary Public within Colorado.
16              A P P E A R A N C E S
17   For the Plaintiff:    PAUL TRAHAN, ESQ.
                           Fulbright & Jaworski L.L.P.
18                         600 Congress Avenue, Suite 2400
                           Austin, Texas 78701
19
     For the Defendants:   STUART N. BENNETT, ESQ.
20   Alberta Town Center,  Lindquist & Vennum, PLLP
     LLC, Donald G.        600 17th Street
21   Provost, and Peter    Suite 1800 South
     M. Cudlip             Denver, Colorado 80202
22
     Also Present:         Barb Horn, Videographer
23                         Jeff Dykes
24
25
```

**2**

```
 1                         I N D E X
 2   EXAMINATION OF DONALD G. PROVOST:               PAGE
     January 8, 2010
 3
     By Mr. Trahan                                  5, 118
 4
     By Mr. Bennett                                   116
 5
                                                   INITIAL
 6   DEPOSITION EXHIBITS:                          REFERENCE
 7   54  Eighth Amendment To Amendment And            45
         Agreement And Termination Agreement,
 8       2/28/08
 9   55  Letter to Piekarski from Noack,              73
         1/28/09, RE:  Form of Estoppel
10       Certificate, DCC Architects, LLC,
         Lease of premises Suite 235
11
     56  Letter to Piekarski from Noack,              73
12       1/28/09, RE:  DCC Architects, LLC,
         Lease of premises Suite 235, damage
13       to property/requested repairs and
         requested revisions to the Form of
14       Estoppel Certificate
15   57  Form of Estoppel Certificate                 73
16   58  Letter to Inclan from Bow-Richardson,        74
         6/28/08
17
     59  Release And Termination Agreement,           98
18       12/12/08
19   60  Letter to Callison Architecture,            107
         Magnussen Klemencic Associates,
20       HC Beck, and Ground Engineering
         Consultants from McFarland, 3/5/09,
21       RE:  Southlands Town Center, Aurora,
         Colorado (the "Project")
22
23   EXHIBIT DISPOSITION:
24   Original Exhibits:  Ongoing notebook(s)
25
```

**3**

```
 1   DEPOSITION EXHIBITS:  (Previously Marked)
 2   1   Exhibit H Form of Estoppel Certificate       90
 3   2   Estoppel Certificate, 5/12/08                88
 4   3   Estoppel Certificate, 1/13/09                88
 5   26  Letter to Inclan from Policicchio,           77
         9/16/08, RE:  Colorado Cinema
 6
     28  Letter to Policicchio, Silleck, Wilde        77
 7       from Kahn, 10/24/08, RE:  Colorado
         Cinema
 8
     37  Fifteenth Amendment To Amendment And        100
 9       Agreement And Termination Agreement,
         12/8/08
10
     39  E-mail to Don Provost from Cudlip,          101
11       2/24/09, Subject:  Re:  Sorry I missed
         you, with attached e-mails
12
     47  Alberta Town Center, LLC, Revised            11
13       Project Cash Flow Report, March 2008
14   48  Alberta Town Center, LLC, Revised            11
         Project Cash Flow Report, July 31, 2008
15
     49  Alberta Town Center, LLC, Revised            11
16       Project Cash Flow Report, August 31, 2008
17   50  Alberta Town Center, LLC Year-to-date        11
         Ledger - Accrual 10/21/08
18
     51  Paid Pre Closing                             11
19
     52  Lease                                        29
20
21
22
23
24
25
```

**4**

```
 1              WHEREUPON, the following proceedings were
 2   taken pursuant to the Federal Rules of Civil
 3   Procedure.
 4                  *    *    *    *    *
08:41:34  5              THE VIDEOGRAPHER:  We are on the record
09:12:45  6   at 9:13 on January 8, 2010, at 600 17th Street, Suite
09:12:52  7   1800 South, Denver, Colorado.  We are here for the
09:12:56  8   videotape deposition of Donald Provost in the matter
09:12:59  9   of Granite Southlands Town Center, LLC, versus Alberta
09:13:02 10   Town Center, LLC, et al., in the U.S. District Court
09:13:06 11   for the District of Colorado, Civil Action No.
09:13:09 12   09-cv-00799-ZLW-KLM.
09:13:15 13              The videographer is Barb Horn.  The court
09:13:20 14   reporter is Marchelle Hartwig from Hunter + Geist.
09:13:23 15              Will counsel please state their
09:13:25 16   appearances, beginning with plaintiff's counsel.
09:13:26 17              MR. TRAHAN:  Paul Trahan for plaintiff
09:13:28 18   Granite Southlands Town Center, LLC.
09:13:31 19              MR. BENNETT:  Stu Bennett for defendant
09:13:35 20   Alberta Town Center, LLC.
09:13:37 21              THE VIDEOGRAPHER:  Will the court
09:13:38 22   reporter please swear in the witness.
09:13:40 23              DONALD G. PROVOST,
08:54:59 24   having been first duly sworn to state the whole truth,
08:54:59 25   testified as follows:
```

**69**

```
11:26:13   1   site.  So was there a specific Town Center tour?
11:26:16   2   Don't recall.  Was there meetings on site during the
11:26:24   3   negotiations of the FPSA prior to the execution of the
11:26:26   4   FPSA?  I'm sure there was.
11:26:30   5        I mean, Granite was making a large
11:26:31   6   investment and committing $160 million on their
11:26:33   7   balance sheet, so I would imagine, you know, Steve
11:26:37   8   Corrigan and Michael Krier -- Corrigan being the
11:26:39   9   acquisition guy -- was involved in those negotiations,
11:26:41  10   and Chris and Andrew later on were involved post FPSA
11:26:48  11   execution, so I would imagine there was meetings on
11:26:54  12   site to review the Town Center site specifically.
11:27:05  13        Q.  Do you remember any occasions when you
11:27:09  14   were out at the Southlands Town Center after its grand
11:27:15  15   opening when members or representatives of Granite
11:27:18  16   were present?
11:27:20  17        A.  Yes.
11:27:24  18        Q.  How many times?
11:27:26  19        A.  I don't know.  A couple times.  I know
11:27:28  20   Chris came out and saw the asset post grand opening.
11:27:31  21   I don't think he even got involved with the property
11:27:33  22   until post grand opening.  And like I said, I don't
11:27:37  23   recall if Andrew came out or didn't come out.
11:27:41  24        Q.  Was there ever an occasion where --
11:27:45  25        A.  One real quick -- one other -- I know Jay
```

**70**

```
11:27:48   1   Alexander was also out at the site.  I don't think he
11:27:52   2   was out post grand opening of the Town Center, but I
11:28:00   3   know he was out to the site prior to that.
11:28:11   4        Q.  During any of these occasions when you
11:28:18   5   were out at the Southlands Town Center after the grand
11:28:24   6   opening and Granite representatives were present, did
11:28:28   7   you ever talk to them about any of the structural
11:28:31   8   issues at Colorado Cinema or the remainder of the
11:28:37   9   property?
11:28:37  10        A.  No.  I don't recall.
11:28:39  11        Q.  Do you remember during any of these site
11:28:41  12   visits where the structural problems or the other
11:28:46  13   problems with Colorado Cinema or the other buildings
11:28:50  14   at the Southlands Town Center were apparent?
11:28:54  15        A.  I don't recall.
11:29:09  16        Q.  Have you had any discussions with anyone
11:29:11  17   at Colorado Cinema about the structural issues that
11:29:15  18   the Cinema is experiencing?
11:29:18  19        A.  Have I directly had any conversations
11:29:20  20   with them?
11:29:22  21        Q.  Yes.
11:29:22  22        A.  No.
11:29:22  23        Q.  Have you had any indirect communications
11:29:24  24   with them?
11:29:24  25        A.  No.  Just the paperwork that I've seen.
```

**71**

```
11:29:28   1        Q.  Through legal counsel?
11:29:28   2        A.  Legal counsel.
11:29:30   3        Q.  The letters and such?
11:29:30   4        A.  Letters, yeah.
11:29:33   5        Q.  Have you gone out to survey the problems
11:29:37   6   at the Colorado Cinema?
11:29:39   7        A.  I have not.
11:29:39   8        Q.  So you don't know how it looks today?
11:29:43   9        A.  No.
11:29:43  10        Q.  When is the last time you looked -- you
11:29:45  11   were at the Colorado Cinema?
11:29:46  12        A.  I can't recall.  A few years.
11:29:50  13        Q.  Are you aware that there are settling
11:30:13  14   issues and other structural issues with the remaining
11:30:16  15   buildings at the Southlands Town Center?  By
11:30:18  16   "remaining," I mean the buildings other than the
11:30:20  17   Colorado Cinema.
11:30:22  18            MR. BENNETT:  Object to the form.
11:30:22  19        A.  I'm aware that there is an issue with one
11:30:28  20   of the other buildings.
11:30:30  21        Q.  (BY MR. TRAHAN)  Which building?
11:30:30  22        A.  I forget which building it is.  Is it
11:30:31  23   Building H or Building G?
11:30:35  24            MR. BENNETT:  E.
11:30:35  25        A.  Building E.
```

**72**

```
11:30:37   1        Q.  (BY MR. TRAHAN)  And what is your
11:30:37   2   understanding as to the issues with that building?
11:30:39   3        A.  There was some settlement of the
11:30:41   4   foundation, foundation and walls, and it caused some
11:30:45   5   drywall cracking and separation.
11:30:48   6        Q.  Do you have an understanding or opinion
11:30:50   7   as to the cause of those problems?
11:30:52   8        A.  No.  I don't think it was ever resolved.
11:31:00   9        Q.  When did you first learn of those
11:31:01  10   problems?
11:31:01  11        A.  I think I probably first learned of any
11:31:11  12   issues associated with that when we got an estoppel
11:31:20  13   from -- DCC Architects, I believe, claimed a bunch of
11:31:24  14   issues associated with their -- condition of their
11:31:28  15   space that I wasn't even aware of.
11:31:31  16            (Deposition Exhibits 55, 56, and 57 were
11:31:31  17   marked.)
11:33:26  18        Q.  I will hand you what I've marked as
11:33:28  19   Exhibits 55, 56, and 57.  If you could please take a
11:33:33  20   moment to review those and let me know when you're
11:33:37  21   done.
11:34:35  22        A.  Yes.
11:34:37  23        Q.  I'm going to hand you Exhibit 58 as well.
11:34:39  24   If you would please review this.  It's also
11:34:43  25   referenced.
```

**Page 73**

```
11:34:45   1         A.  Sure.  Okay.
11:35:03   2              (Deposition Exhibit 58 was marked.)
11:35:09   3         Q.  Exhibit 55 is a January 28 letter to
11:35:13   4    Andrew Piekarski from Kara Noack at Anest & Brown,
11:35:16   5    correct?
11:35:18   6         A.  Correct.
11:35:20   7         Q.  And the Re line is "Form of Estoppel
11:35:22   8    Certificate, DCC Architects, LLC, Lease of premises
11:35:26   9    Suite 235," correct?
11:35:30  10         A.  Correct.
11:35:33  11         Q.  And there is a cc to Southlands Shopping
11:35:35  12    Center Management, LLC, correct?
11:35:39  13         A.  Correct.
11:35:39  14         Q.  And then Exhibit 56 is a letter to the
11:35:41  15    same -- also to Mr. Piekarski from Ms. Noack also
11:35:48  16    dated January 28, 2009, correct?
11:35:50  17         A.  Correct.
11:35:50  18         Q.  And that letter references a June 25 --
11:35:52  19    references and encloses a June 25, 2008, letter
11:36:01  20    relating to DCC Architects, correct?
11:36:07  21         A.  Correct.
11:36:07  22         Q.  And Exhibit 57 is a Form of Estoppel
11:36:11  23    Certificate for DCC Architects dated January 28, 2009,
11:36:18  24    correct?
11:36:18  25         A.  Correct.
```

**Page 74**

```
11:36:22   1         Q.  And then the June 25, 2008, letter to
11:36:26   2    Jose Inclan identified as a general manager for
11:36:30   3    Alberta Town Center, LLC, from DCC Architects is
11:36:37   4    Exhibit 58, correct?
11:36:39   5         A.  Correct.
11:36:39   6         Q.  Is the June 25, 2008, letter from DCC
11:36:43   7    Architects the letter you were referring to in your
11:36:45   8    prior testimony?
11:36:48   9         A.  No.  What are you referring to?
11:36:50  10         Q.  I understood your prior testimony to
11:36:52  11    be -- when I asked you when you first became aware of
11:37:01  12    issues or problems with Building E at the Southlands
11:37:05  13    Town Center, you said it was when you received
11:37:09  14    correspondence or a letter relating to the issues.  Is
11:37:13  15    this the letter?
11:37:13  16         A.  No.  I never saw this letter until now.
11:37:18  17         Q.  What letter are you referring to?
11:37:20  18         A.  This June 25 letter.
11:37:24  19         Q.  Well, which letter are you referring to
11:37:26  20    when you referred to the letter you saw that advised
11:37:30  21    you of the problems with Building E?
11:37:31  22         A.  I don't know that I said "letter."  You
11:37:33  23    know, I was made aware that there were some issues,
11:37:37  24    and I don't know if it was in June or August or
11:37:39  25    September or whenever, but it was -- my being made
```

**Page 75**

```
11:37:43   1    aware of it was very much at a high level and that it
11:37:46   2    wasn't even an issue.  There was no major issue and it
11:37:50   3    was just, you know, some drywall cracking and other
11:38:00   4    building settlement that would be considered normal or
11:38:05   5    customary in Colorado, so . . .
11:38:07   6         Q.  Is this June 25 letter that is
11:38:11   7    Exhibit 58, is this the sort of thing that you would
11:38:15   8    expect to have been brought to your attention, given
11:38:16   9    your responsibilities in connection with the
11:38:18  10    Southlands Town Center?
11:38:20  11         A.  Not necessarily.  I mean, Peter was
11:38:24  12    directly managing the asset from our perspective with
11:38:28  13    Jose as the on-site general manager, and Joe Bellio,
11:38:31  14    who worked for me, was also in charge of -- you know,
11:38:37  15    a direct employee who was in charge of property
11:38:41  16    management at a corporate level, so it would have gone
11:38:45  17    from Jose to Joe to Peter and a long ways to get to me
11:38:48  18    when it was a property management issue, whether it
11:38:50  19    was drywall cracking or, you know, trash cans that
11:38:54  20    were overflowing and nobody was taking the trash cans
11:39:00  21    out or things like that.
11:39:01  22         Q.  You would put this in the same category
11:39:05  23    as emptying trash cans?
11:39:07  24         A.  I don't know if I would put it in the
11:39:09  25    same category.  I would just -- you know, I haven't
```

**Page 76**

```
11:39:09   1    seen this letter until now.  I, you know, was made
11:39:13   2    aware that there were some issues of building
11:39:15   3    settlement out there, but nothing that was material.
11:39:20   4         Q.  Who made you aware of the building
11:39:22   5    settlement issues?
11:39:24   6         A.  I don't know.  I think Peter may have
11:39:28   7    told me.
11:39:31   8         Q.  Do you remember when he told you?
11:39:35   9         A.  Don't.
11:39:35  10         Q.  Would it have been before the closing on
11:39:37  11    the sale of the property on December 12, 2008?
11:39:41  12         A.  Probably.
11:39:43  13         Q.  And you don't remember what he told you
11:39:45  14    about the settling issues?
11:39:45  15         A.  No.
11:39:50  16         Q.  Would that have been just in a
11:39:50  17    conversation or would he have sent you an e-mail?
11:39:54  18         A.  I don't recall.
11:39:54  19         Q.  Did you typically communicate with Peter
11:40:00  20    Cudlip by e-mail?
11:40:01  21         A.  Yes.
11:41:09  22         Q.  Mr. Provost, earlier you testified about
11:41:13  23    indirect communications with Colorado Cinema relating
11:41:15  24    to the issues with the foundation and walls, correct?
11:41:30  25         A.  Correct.
```

**77**

| Time | # | |
|---|---|---|
| 11:41:48 | 1 | Q. I'm handing you Deposition Exhibits 26 |
| 11:41:50 | 2 | and 28. Please take a moment to review them and let |
| 11:41:54 | 3 | me know when you're done. |
| 11:43:43 | 4 | A. Okay. |
| 11:43:45 | 5 | Q. Are these letters among the indirect |
| 11:43:46 | 6 | communications that you saw relating to the problems |
| 11:43:50 | 7 | with the Colorado Cinema? |
| 11:43:52 | 8 | A. I don't recall ever seeing either of |
| 11:43:54 | 9 | these letters specifically. |
| 11:44:01 | 10 | Q. Are these the sorts of letters that you |
| 11:44:03 | 11 | would have expected to see in the course of your |
| 11:44:07 | 12 | responsibilities at the Southlands Town Center? |
| 11:44:09 | 13 | ==A. My understanding of the theater issue was== |
| 11:44:13 | 14 | ==they were making unfounded claims of the landlord== |
| 11:44:16 | 15 | ==responsibility for their structural issues and that we== |
| 11:44:24 | 16 | ==were, you know, writing them letters telling them that== |
| 11:44:30 | 17 | ==they are responsible, and that was my understanding of== |
| 11:44:31 | 18 | ==it.== |
| 11:44:31 | 19 | ==Q. What's the basis of your understanding?== |
| 11:44:37 | 20 | ==A. Discussions with Peter, discussions with== |
| 11:44:37 | 21 | ==the Brownstein law firm.== |
| 11:44:45 | 22 | Q. Anybody else that you can recall? |
| 11:44:46 | 23 | A. I'm sure I talked to Bryan as well about |
| 11:44:48 | 24 | it. |
| 11:44:50 | 25 | Q. Bryan -- |

**78**

| Time | # | |
|---|---|---|
| 11:44:50 | 1 | A. Bryan McFarland. |
| 11:44:52 | 2 | Q. What was Bryan McFarland's responsibility |
| 11:44:54 | 3 | with respect to the Southlands Town Center? |
| 11:45:00 | 4 | A. He was the -- is a development partner, |
| 11:45:01 | 5 | development project manager for the entire 300 acres. |
| 11:45:09 | 6 | Q. And who is his employer? |
| 11:45:11 | 7 | A. Alberta Development Partners. |
| 11:45:13 | 8 | Q. What is the relationship with Alberta |
| 11:45:15 | 9 | Development Partners and Alberta Town Center, LLC? |
| 11:45:26 | 10 | A. Alberta Development Partners was the |
| 11:45:33 | 11 | construction development manager of the Town Center |
| 11:45:39 | 12 | project just like all of the other construction on the |
| 11:45:43 | 13 | project. |
| 11:45:45 | 14 | Q. So Alberta Town Center, LLC, retained |
| 11:45:48 | 15 | Alberta Development Partners to serve in that role in |
| 11:45:52 | 16 | connection with the Southlands Town Center? |
| 11:45:54 | 17 | A. Yes. |
| 11:45:54 | 18 | Q. Is there -- are there any written |
| 11:46:00 | 19 | agreements between Alberta Town Center and Alberta |
| 11:46:01 | 20 | Development Partners? |
| 11:46:03 | 21 | A. I don't know. |
| 11:46:03 | 22 | Q. Who would know? |
| 11:46:07 | 23 | A. Either myself or Peter, I'm sure. |
| 11:46:11 | 24 | Q. But you don't know? |
| 11:46:13 | 25 | A. I don't. |

**79**

| Time | # | |
|---|---|---|
| 11:46:13 | 1 | Q. So Peter would know if anybody knows? |
| 11:46:15 | 2 | A. Yeah, I would imagine. |
| 11:46:16 | 3 | Q. Are you aware of any agreements |
| 11:46:18 | 4 | between -- |
| 11:46:18 | 5 | A. I'm not. |
| 11:46:18 | 6 | Q. -- Alberta Development Partners and |
| 11:46:22 | 7 | Alberta Town Center? |
| 11:46:22 | 8 | A. I'm not. |
| 11:46:28 | 9 | Q. Did Alberta Town Center pay expenses or |
| 11:46:35 | 10 | make payments to Alberta Development Partners in |
| 11:46:39 | 11 | connection with the Southlands Town Center? |
| 11:46:43 | 12 | A. I believe so. |
| 11:46:46 | 13 | Q. What would the form of those payments be? |
| 11:46:48 | 14 | A. Development fees. |
| 11:46:50 | 15 | Q. And would they -- did you see any |
| 11:46:54 | 16 | reference to that in the expense reports that we |
| 11:47:01 | 17 | looked at earlier? |
| 11:47:01 | 18 | A. No. |
| 11:47:03 | 19 | Q. And those payments would be to Alberta |
| 11:47:05 | 20 | Development Partners directly. It wouldn't be to the |
| 11:47:09 | 21 | employees of Alberta Development Partners? |
| 11:47:11 | 22 | A. To the employees? |
| 11:47:13 | 23 | Q. Well, I understood your testimony to be |
| 11:47:15 | 24 | that Bryan McFarland worked for Alberta Development |
| 11:47:16 | 25 | Partners. |

**80**

| Time | # | |
|---|---|---|
| 11:47:18 | 1 | A. Right. There wouldn't have been direct |
| 11:47:20 | 2 | payments from Alberta Town Center to any employees. |
| 11:47:30 | 3 | Q. So to the extent Alberta Town Center, |
| 11:47:30 | 4 | LLC, covered those expenses, those payments would have |
| 11:47:33 | 5 | been paid to Alberta Development Partners? |
| 11:47:39 | 6 | A. I don't understand the question. |
| 11:47:43 | 7 | Q. Well, I guess my question is: One of the |
| 11:47:45 | 8 | issues in the lawsuit is the true-up dispute and who's |
| 11:47:48 | 9 | responsible for which expenses. And I understand from |
| 11:47:50 | 10 | your testimony that Granite and Alberta had agreed to |
| 11:47:54 | 11 | share in the operating deficits from the property |
| 11:48:03 | 12 | after some period of time -- after some point, I |
| 11:48:05 | 13 | think, in December of 2007? |
| 11:48:09 | 14 | A. Yeah, whatever the document said, sure. |
| 11:48:11 | 15 | Q. So I guess my question is: Would |
| 11:48:13 | 16 | payments to Alberta Development Partners be among the |
| 11:48:16 | 17 | operating expenses that -- |
| 11:48:20 | 18 | A. I didn't see any in what you gave me. |
| 11:48:28 | 19 | Q. So aside from the documents, would those |
| 11:48:31 | 20 | expenses or payments to Alberta Development Partners, |
| 11:48:31 | 21 | based upon your understanding of Alberta's agreement |
| 11:48:37 | 22 | with Granite to share expenses, would those payments |
| 11:48:39 | 23 | be something that you would hold Granite responsible |
| 11:48:43 | 24 | for? |
| 11:48:43 | 25 | A. They are not operating expenses. They |

**97**

```
12:13:33   1   repairing the cracked foundation.  Would you agree
12:13:39   2   that Colorado Cinema is stating in this estoppel
12:13:41   3   certificate that is Exhibit 3 --
12:13:43   4       A.  It says what it says.
12:13:45   5       Q.  Please let me finish -- that there is a
12:13:45   6   cracked foundation?  Would you agree with me that
12:13:46   7   that's at least Colorado Cinema's position?
12:13:50   8           MR. BENNETT:  I object to the form; calls
12:13:50   9   for speculation.
12:13:54  10       A.  Here like I said, they say whatever they
12:14:00  11   want to say.
12:14:00  12       Q.  (BY MR. TRAHAN)  Would you agree that
12:14:01  13   they are saying in Exhibit 3 that there is a cracked
12:14:03  14   foundation?
12:14:03  15       A.  Yeah.
12:14:05  16       Q.  And if you were buying the property, you
12:14:09  17   would not be concerned that the estoppel certificate
12:14:11  18   for the property's largest tenant, that the tenant was
12:14:15  19   stating that there was a cracked foundation?
12:14:16  20       A.  No.
12:14:35  21       Q.  Are you aware of any instance where
12:14:37  22   Colorado Cinema took the position that the landlord
12:14:41  23   was in default under the Colorado Cinema lease?
12:14:45  24       A.  No.
12:15:24  25           MR. TRAHAN:  It's 12:15.  I am going to
```

**98**

```
12:15:26   1   suggest we take a -- can we go off the record?
12:15:28   2           THE VIDEOGRAPHER:  Going off the record
12:15:30   3   at 12:16.
13:06:24   4           (Noon recess, 12:15 p.m. to 1:09 p.m.)
13:08:01   5           (Deposition Exhibit 59 was marked.)
13:08:39   6           THE VIDEOGRAPHER:  We are back on the
13:08:44   7   record at 1:09.
13:08:47   8       Q.  (BY MR. TRAHAN)  Mr. Provost, earlier we
13:08:50   9   testified about the Eighth Amendment to the Forward
13:08:53  10   Purchase and Sale Agreement.  Do you recall that
13:08:55  11   testimony?
13:08:55  12       A.  Yes.
13:08:57  13       Q.  And I asked you if that the execution of
13:09:00  14   that agreement marked a culmination of the parties'
13:09:05  15   discussion and disagreement regarding the joint
13:09:07  16   venture that had been discussed.  Do you recall that?
13:09:08  17       A.  Yes.
13:09:09  18       Q.  And then I asked you about a particular
13:09:13  19   release, and I understood your testimony to be that
13:09:15  20   you needed to see the document?
13:09:17  21       A.  Correct.
13:09:17  22       Q.  Well, I'm handing you what I've marked as
13:09:19  23   Exhibit 59.  If you could please take a moment to
13:09:24  24   review Exhibit 59 and let me know when you're done.
13:11:02  25       A.  Okay.
```

**99**

```
13:11:05   1       Q.  Let me ask you again:  Is the release
13:11:08   2   that is Exhibit --
13:11:13   3           MR. BENNETT:  59.
13:11:13   4       Q.  (BY MR. TRAHAN) -- 59, does this
13:11:16   5   document represent the culmination of the parties'
13:11:21   6   discussions and the parties' agreement relating to the
13:11:26   7   disagreement of the existence of a joint venture?
13:11:40   8       A.  This document and, I believe -- I don't
13:11:43   9   know if it's in here or not.  I didn't see it -- the
13:11:47  10   $2,150,000 additional purchase price.
13:11:58  11       Q.  This agreement and that amount?
13:12:01  12       A.  Well, isn't there a separate agreement
13:12:05  13   that addresses that, or is that in the Fifteenth
13:12:07  14   Amendment?  I just don't want to say -- you are asking
13:12:10  15   if this is the culmination and the only document
13:12:13  16   relating to the conclusion of our dispute regarding
13:12:21  17   the joint venture, and I would say no, because I think
13:12:24  18   there is language in the Fifteenth Amendment that also
13:12:27  19   would be considered part of that discussion.
13:12:31  20       Q.  So it's your understanding that this
13:12:33  21   agreement, Exhibit 59, which is the release, language
13:12:37  22   in the Fifteenth Amendment and the additional
13:12:42  23   consideration of $2,150,000 would have resolved the
13:12:48  24   parties' disagreement or dispute regarding the joint
13:12:52  25   venture issue?
```

**100**

```
13:12:54   1       A.  Yes.
13:12:55   2       Q.  Let me show you a copy of the Fifteenth
13:12:58   3   Amendment.  It's Deposition Exhibit No. 37.  Please
13:13:05   4   take a moment to review it and let me know when you're
13:13:08   5   done.  In particular, if you could please review it
13:13:10   6   for the provision --
13:13:19   7       A.  There is a lot of exhibits.
13:13:21   8       Q.  Pardon me?
13:13:22   9       A.  I think there is a lot of exhibits here.
13:13:30  10   Okay.  What do you want me to review it specifically
13:13:32  11   for?
13:13:33  12       Q.  Well, I understood your testimony to be
13:13:35  13   that it was your impression that there was language in
13:13:38  14   the Fifteenth Amendment that also addressed the
13:13:41  15   parties' dispute and helped to resolve the parties'
13:13:43  16   dispute regarding the existence or not of a joint
13:13:47  17   venture, correct?
13:13:48  18       A.  Correct.
13:13:49  19       Q.  And my question is:  If you could please
13:13:52  20   refer to the Fifteenth Amendment, which is Deposition
13:13:54  21   Exhibit No. 37, and direct me to the language you
13:13:56  22   are -- to which you are referring.
13:14:04  23       A.  Paragraph 2, page 3.
13:14:24  24       Q.  And that Section is -- 4.1 is an
13:14:28  25   amendment of Section 4.1 of the Forward Purchase and
```

**121**

REPORTER'S CERTIFICATE

STATE OF COLORADO       )
                        ) ss.
CITY AND COUNTY OF DENVER )

    I, MARCHELLE HARTWIG, Certified Shorthand Reporter and Notary Public, State of Colorado, do hereby certify that previous to the commencement of the examination, the said DONALD G. PROVOST was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

    I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

    IN WITNESS WHEREOF, I have affixed my signature this 12th day of January, 2010.

    My commission expires April 19, 2013.

__X__ Reading and Signing was requested.
_____ Reading and Signing was waived.
_____ Reading and Signing is not required.

---

January 12, 2010

Stuart N. Bennett, Esq.
Lindquist & Vennum, PLLP
600 17th Street
Suite 1800 South
Denver, Colorado 80202

Re: Granite Southlands Town Center, LLC, v. Alberta
    Town Center, LLC., et al.
Deposition of: Donald G. Provost

Dear Mr. Bennett:

Enclosed are the original signature pages(s) of the above-named deposition(s). It was agreed that you would arrange for signature of same by means of your copy transcript(s) and the enclosed signature page(s). Also enclosed are amendment sheets for changes if necessary. Please return the signed and notarized signature page(s) and amendment sheet(s), if any, to our office within 30 days from the date of this letter to comply with the statute.
We will mail the original pages to the appropriate attorney to be placed with the original sealed transcript and copies to all other counsel.
If circumstances change and a copy transcript is not available from your office for the witness to review, then please notify the witness that he/she should contact our office to make an appointment to read, sign, and make corrections to a copy that we will make available at our office.
Thank you for your attention to this matter.
Sincerely,


Marchelle Hartwig, CSR
HUNTER + GEIST, INC.
Registered Professional Reporters

c: Paul Trahan, Esq.