# EXHIBIT A-8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

In the Matter of:

**Granite Southlands Town Center, LLC v. Alberta Town Center, LLC, et al.**

09-CV-00799-SLW-KLM

DEPOSITION OF:

## ANGELA KRALOVEC

DATE TAKEN: January 15, 2010

PAGES: 1-157

REPORTED BY: Tami L. Le, CSR

**H+G**

Hunter + Geist, Inc.

(303) 832-5966

- www.huntergeist.com
- depo@huntergeist.com

1900 Grant Street, Suite 800
Denver, Colorado 80203
Fax: (303) 832-9525
Toll Free: 1-800-525-8490

Your Partner in Making the Record    Court Reporting & Videoconferencing

Granite Southlands v. Alberta Town Center    ANGELA KRALOVEC    1/15/2010

## Page 1

```
       IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLORADO

Civil Action No. 09-CV-00799-SLW-KLM

GRANITE SOUTHLANDS TOWN CENTER   )
LLC,                             )
                                 )
           Plaintiff,            )
                                 )
vs.                              ) 09-CV-00799-SLW-KLM
                                 )
ALBERTA TOWN CENTER, LLC and LAND)
TITLE GUARANTEE COMPANY,         )
                                 )
           Defendants.           )
_____)


          Deposition of ANGELA KRALOVEC,
       taken on behalf of the Defendants, at
       1900 Main Street, 5th Floor, Irvine,
       California, commencing at 12:40 p.m.,
       on Friday, January 15, 2010, before
       Tami L. Le, CSR No. 8716, RPR.
```

## Page 2

APPEARANCES OF COUNSEL:

For the Plaintiff:

    FULBRIGHT & JAWORSKI, L.L.P.
    BY:  PAUL TRAHAN, ESQ.
    600 Congress Avenue
    Suite 2400
    Austin, Texas  78701-2978
    (512) 536-5288
    ptrahan@fulbright.com

For Defendants:

    LINDQUIST & VENNUM PLLP
    BY:  STUART N. BENNETT, ESQ.
    600 17th Street
    Suite 1800 South
    Denver, Colorado  80202
    (303) 573-5900
    sbennett@lindquist.com

## Page 3

I N D E X

| Deponent | Examined By | Page |
|---|---|---|
| Angela Kralovec | Mr. Bennett | 6, 151 |
|  | Mr. Trahan | 145 |

DEFENDANTS' EXHIBITS FOR IDENTIFICATION:

| | | Page |
|---|---|---|
| 69 - | Affidavit of Angela Kralovec dated the 22nd day of December, 2009, 5 pages | 8 |
| 70 - | March 24, 2009 e-mail string between Steve Zezulak and Angela Kralovec, with attachment, 4 pages | 60 |
| 71 - | E-mail string between Steve Zezulak and Angela Kralovec, the latest of which is dated March 27, 2009, 2 pages | 62 |
| 72 - | E-mail string between Steve Zezulak and Angela Kralovec, the latest of which is dated March 27, 2009, 3 pages | 63 |
| 73 - | April 16, 2009 e-mail from Steve Zezulak to Angela Kralovec, with attachment, 33 pages | 65 |
| 74 - | April 15, 2009 e-mail from Steve Zezulak to Angela Kralovec, with attachment, 3 pages | 66 |
| 75 - | June 1, 2009 e-mail string between Michael Krier and Peter Cudlip, 3 pages | 67 |
| 76 - | E-mail string between Angela Kralovec and Peter Cudlip, the latest of which is dated October 7, 2009, 3 pages | 70 |
| 77 - | E-mail string among Angela Kralovec, Peter Cudlip, Robin Boileau and Steve Zezulak, 2 pages | 72 |
| 78 - | Document entitled "Post Purchase A/P," 2 pages | 91 |

## Page 4

I N D E X  (Continued)

DEFENDANTS' EXHIBITS FOR IDENTIFICATION: (Continued)

| | | Page |
|---|---|---|
| 79 - | E-mail string among Angela Kralovec, Peter Cudlip, Elizabeth Hyatt and Steve Zezulak, the latest of which is dated June 17, 2009, 2 pages | 93 |
| 80 - | E-mail string among Peter Cudlip, Angela Kralovec and Michael Krier, the latest of which is dated August 31, 2009, 2 pages | 95 |
| 81 - | April 29, 2009 letter from Elizabeth A. Starrs to BlackRock Realty Advisors, Inc., with attachments, 13 pages | 95 |
| 82 - | March 5, 2009 letter from Erica H. Weber to Granite Southlands Town Center LLC, 2 pages | 142 |

WITNESS INSTRUCTED NOT TO ANSWER

| Page | Line |
|---|---|
| 107 | 2 |
| 120 | 14 |
| 138 | 21 |

EXHIBIT DISPOSITION:

Original Exhibits: Ongoing notebooks

depo@huntergeist.com          HUNTER + GEIST, INC.          303.832.5966 / 800.525.8490

**5**

1    IRVINE, CALIFORNIA; FRIDAY, JANUARY 15, 2010
2            12:40 P.M.
3
4         ANGELA KRALOVEC,
5    having been first duly sworn, was
6    examined and testified as follows:
7
8              EXAMINATION
9    BY MR. BENNETT:
10   Q   Would you please state your name for the
11   record.
12   A   Angela Kralovec.
13   Q   By whom are you employed, Ms. Kralovec?
14   A   BlackRock.
15   Q   Do you know what entity of BlackRock?
16   A   BlackRock Realty.
17   Q   Realty Advisors?
18   A   BlackRock Realty Advisors, yes.
19   Q   What are your job responsibilities with
20   BlackRock Realty Advisors?
21   A   I am an asset manager of multiple commercial
22   real estate assets on behalf of multiple clients.
23   Q   And as you use the term "clients," who do you
24   refer to?
25   A   Funds.  There are a variety of funds that

**6**

1    are -- I refer to as clients.
2    Q   So the investments funds that are advised and
3    managed by BlackRock are the people you refer to as
4    clients?
5    A   There are clients within those funds, so yes.
6    Q   Do you refer to the investors in those funds as
7    your clients or only the funds themselves?
8    A   I would say both.
9    Q   Okay.
10   A   I mean...
11   Q   All right.  Do you have any reporting
12   responsibilities to the investors in the funds that
13   BlackRock manages?
14   A   I report through the portfolio management.  I
15   report to portfolio management, who reports to the
16   fund -- the clients.
17   Q   Okay.  Do you know if the information you
18   provide to portfolio management is put together or
19   accumulated and then into reports that are given to
20   investors?
21   A   I don't know every time if it's given to
22   investors, if that's what you're asking.
23   Q   But on occasion the information you provide to
24   portfolio management is incorporated into some sort of
25   report --

**7**

1    A   Yes.
2    Q   -- to your fund investors?
3    A   That's correct.
4    Q   Do you know if any information you have
5    prepared relating to the Southlands shopping center has
6    been accumulated in a report to investors of your funds?
7    A   I'm not aware.
8        (Defendants' Exhibit 69 was marked for
9    identification.)
10       (Document handed to counsel and the deponent.)
11   Q   BY MR. BENNETT:  Have you ever given sworn
12   testimony in a deposition before?
13   A   No.
14   Q   Have you met with counsel for BlackRock and
15   discussed the procedures we're going to follow today?
16   A   Yes.
17   Q   So you understand that you are under oath?
18   A   Yes.
19   Q   And that you understand the meaning of an oath?
20   A   Yes.
21   Q   And you understand that this deposition has the
22   same solemnity as if given at trial?
23   A   Yes.
24   Q   And it also bears the same potential sanctions
25   or penalties if you should be found to have

**8**

1    intentionally lied or misled us in this deposition.
2    A   I understand.
3    Q   You also understand that we need oral responses
4    to my questions, and that if at any time you do not
5    understand a question, I'll be happy to rephrase it.
6        Agreed?
7    A   I agree.
8    Q   Okay.  Wonderful.
9        I have handed to you what the court reporter
10   has marked as Exhibit 69.  This is an affidavit of
11   Angela Kralovec filed in the United States District
12   Court for the District of Colorado on or about
13   December 23, 2009.
14       Do you recognize it?
15   A   Yes.
16   Q   Did you prepare it?
17   A   No.
18   Q   Who prepared your affidavit?
19   A   Fulbright, on my behalf.
20   Q   Did you review your affidavit before you signed
21   it?
22   A   Yes.
23   Q   Is it true and accurate, to the best of your
24   ability?
25   A   Yes.

**93**

1  referencing that has come -- started to come current. I
2  believe actually has come current as of January.
3    Q   Is there an issue as to the allocation of
4  McCabe's payments vis-a-vis whether you apply it to the
5  last due amount or the first due amount?
6    A   Not to -- that I understand. The agreement
7  does provide, though, for a reduced amount of payments.
8  We had to settle with them in order to get them current.
9  But it's even throughout that term, so I can -- I can
10 just forward a schedule showing exactly how they've paid
11 based on what.
12   Q   I don't know if Mr. Cudlip is aware of that
13 agreement. I'll check and, if we need it, we can
14 communicate it with Mr. Trahan.
15   A   Okay.
16   Q   And then what is the last item on the -- in the
17 last paragraph on the first page of 79 about the
18 different amounts for deposit? Do you know what that
19 is?
20   A   I don't know.
21   Q   Do you know what account is referenced there,
22 TF262 No. 140800?
23   A   I don't know what account it's referring to off
24 the top of my head. It's a receivables account, I
25 believe, but I don't know.

**94**

1    Q   Okay.
2        (Defendants' Exhibit 80 was marked for
3    identification.)
4        (Document handed to counsel and the deponent.)
5    Q   BY MR. BENNETT: Exhibit 80 is a follow-on to
6  Exhibit 79 where it looks like you forwarded the Fat
7  Burger and McCabe settlements to Mr. Cudlip. But in his
8  follow-on e-mail at the top of the page, it indicates
9  that he never got the attachment, which perhaps
10 indicates Mr. McCabe has not received the two -- as of
11 August 31, 2009, had not received the settlement papers.
12 So looks like we need to look into that.
13   A   Yeah, I would imagine if we didn't e-mail it,
14 we would have given it to him in one of our meetings.
15 But we can send it again. That's not a problem.
16   Q   Okay.
17       (Defendants' Exhibit 81 was marked for
18   identification.)
19       (Document handed to counsel and the deponent.)
20   Q   BY MR. BENNETT: Exhibit 81 is a letter from
21 Elizabeth Starrs to BlackRock Realty Advisors relating
22 to an extension of time to complete this resolution of
23 property expenses under the FPSA as amended. She
24 recites that it was originally March 31st, then extended
25 to April 15th and later to April 30th.

**95**

1    Are you aware of those extensions of time?
2    A   I've seen this letter.
3    Q   Okay. Are you aware of any extension of time
4  agreed to by the parties after April 30th, 2009 to
5  complete this analysis of the property expenses and
6  proration?
7    A   I'm not aware.
8    Q   Do you know what position the parties have
9  taken about their ongoing efforts to try to get this
10 resolved?
11   A   I do not.
12   Q   As far as you know, there have been no further
13 agreements between the parties to extend the deadline?
14   A   I do not know of any.
15   Q   Have you ever been offered to provide expert
16 testimony in any proceeding in which Alberta or Granite
17 was involved?
18   A   No.
19   Q   It's not part of your job duties or
20 responsibilities to provide testimony in litigation
21 which Granite or BlackRock is involved?
22   A   No.
23   Q   Okay. Have you prepared any memoranda to your
24 supervisors regarding the facts in this case?
25   A   I have prepared memoranda that updates

**96**

1  portfolio management as well as my boss on the status of
2  the Town Center, but not particular to this case.
3    Q   Okay. So as part of the ongoing business
4  reporting responsibilities?
5    A   Yes.
6    Q   And in -- in the preparation of those reports
7  to your boss and to portfolio management, have you
8  included comments about this litigation?
9    A   No.
10   Q   Your immediate is supervisor, Mr. Krier?
11   A   Yes.
12   Q   And portfolio management is Mr. Piekarski,
13 Mr. Silva?
14   A   It is Mr. Piekarski. Mr. Silva is no longer on
15 Granite, he's on a different fund.
16   Q   Okay. When did his position with respect to
17 Granite change?
18   A   It was late spring 2009. I don't know the
19 exact date.
20       MR. TRAHAN: What year did you say?
21       THE DEPONENT: 2009.
22       MR. TRAHAN: 2009.
23   Q   BY MR. BENNETT: Was the first time that you
24 physically visited the Southlands center was
25 September 2008?

**Page 97**

1   A   It's the first time I set foot on site. We
2   drove through the parking lot in June 2008, I believe it
3   was June 25th, but it was just a drive-by.
4   Q   Didn't see much driving by, did you?
5   A   No. It was there.
6   Q   Okay. Tell me about your first physical visit
7   where you actually got out of the car in September 2008.
8   MR. TRAHAN: Objection; calls for a narrative.
9   THE DEPONENT: September 11, 2008, we got to
10  the site. It was relatively early in the morning, I
11  want to say around 9:30. We met with Peter and Jos, and
12  Joe Bellio. Mike Krier was with me and Justin Loiacono
13  was with me.
14  Q   BY MR. BENNETT: I think we had his name
15  spelled.
16  A   L-O-I -- wait. L-O-I-A-C-O-N-O.
17  Q   How many of those vowels do you pronounce?
18  A   Only the ones you remember.
19  Q   Loiacono, is that how it's pronounced?
20  A   Loiacono.
21  MR. TRAHAN: Please wait for a question. I
22  don't know if there's a question on the table.
23  Q   BY MR. BENNETT: You went to the site at about
24  9:30 in the morning, met with Peter, Jos,, Joe Bellio.
25  Mr. Loiacono was with you and Mr. Krier was with you --

**Page 98**

1   A   Correct.
2   Q   -- is that correct?
3   I think Mr. Krier testified that he had about a
4   three-hour conference call.
5   Do you recall that?
6   A   That's correct.
7   Q   So he did not participate in any meetings while
8   he was on his conference call; is that right?
9   A   No, no.
10  Q   Did he take that call in a conference room at
11  the -- Southlands' management's offices?
12  A   It was in an office.
13  Q   In the management office?
14  A   In the management office.
15  Q   All right. And what did you do while Mr. Krier
16  was on his telephone call?
17  A   Met with Peter, Jos, and Joe, got an overview
18  of the Southlands project from development. Peter gave
19  us the background of how it was developed, what pieces
20  were done first, how the road was relocated. And then
21  also gave us an overview of the Metro District and how
22  that works.
23  And then we -- after he gave us this overview
24  and we just talked in general about the project, we
25  discussed Power Center operational issues, because that

**Page 99**

1   was the piece that we actually fully owned at the time.
2   And in particular, there were discussions about payment
3   on VR2 and 3, went over the details regarding that.
4   We talked generally about leasing, office and
5   retail. And then I -- I know I ducked out at a couple
6   points to go join in Mike's conference call, but that
7   was for no more than 30 minutes.
8   About 11:30, I want to say, we broke for lunch
9   and went to Ted's Montana Grill. Chris Silva joined us
10  for lunch. I think he arrived some point later on in
11  the morning. I don't remember what point. He had
12  another meeting off site before that.
13  And then after lunch we walked back towards the
14  Power Center to go walk by the sites, see all the
15  tenants back there. And in particular, there was a
16  dental tenant that had just been built out so we walked
17  through that space. We walked back towards the
18  management office.
19  Chris left and went to the airport. Mike -- I
20  believe Mike went to go on another call for some reason.
21  And Justin and I went in Joe Bellio's car and went for a
22  drive over towards the multi-family site and toward the
23  rest of the Metro District 2 that's on the other side.
24  Got back, went back up to the management office
25  and said goodbye to everybody and drove to -- to 24 Hour

**Page 100**

1   Fitness. There was another site that Alberta had
2   developed and they had opened up a 24 Hour Fitness, who
3   was a potential tenant for the Town Center -- the Power
4   Center, actually, so we wanted to go see them, that
5   build-out. We got there about 4:00 p.m., toured the
6   site, went to our hotel, and that was it.
7   Q   During the course of either going to or from
8   lunch, did you walk by the Cinema building? Did you see
9   the Cinema building in any fashion?
10  A   We -- we passed it. We didn't stop.
11  Q   So you didn't look at anything at the Cinema
12  building at that time?
13  A   No.
14  Q   I assume you went in the building that houses
15  the management offices through the lobby?
16  A   It -- at the beginning of the day we entered
17  there, yes.
18  Q   Entered the lobby.
19  Did you observe any cracks in the lobby?
20  A   Nothing noticeable.
21  Q   Did you see any cracking in the drywall in the
22  management offices themselves?
23  A   No.
24  Q   Did you exit the management offices through the
25  back stairwell?

### 133

1  random basis, checking in tenant spaces to see if I
2  could see evidence of movement further up the street.
3     Q  When did you do that?
4     A  That was on the 9th, that Friday morning.
5     Q  What did you discover?
6     A  That the best evidence was in Building E, that
7  there appeared to be minor issues at Building F, and you
8  could see some threshold issues at Building G. Further
9  up the street there didn't seem to be much evidence.
10 There were minor cracks in the wall in Building D. The
11 Gap suite specifically I remember seeing.
12    Q  Gap?
13    A  Yes.
14    Q  The tenant is Gap?
15    A  The tenant is Gap.
16    Q  Have any of the issues you observed on
17 January 9, 2009 in Buildings F, G or D worsened over the
18 12 months or so that Granite has owned the property?
19      MR. TRAHAN: Object to relevance.
20      THE DEPONENT: It appears Building D --
21      MR. TRAHAN: D?
22      THE DEPONENT: I'm sorry. F, G, E, Building E,
23 the conditions have worsened in certain suites.
24    Q  BY MR. BENNETT: My question specifically was
25 to those issues you discovered in F, G and D.

### 134

1     A  Oh. Have they worsened since -- at all?
2     Q  Yes, since your first observation of them in
3  January 2009.
4     A  Yes, they have.
5     Q  In what respects?
6     A  Building G, there's been some further threshold
7  movement. Building F, the revolving door at Ted's
8  Montana Grill has required adjustment due to movement --
9  or we believe it's due to movement. And then
10 Building D, the cracking has worsened and has become
11 more visible in not only the Gap space, but also Gap
12 Kids and Banana Republic.
13    Q  Were you aware that prior to closing, that
14 Granite retained the services of New Market Real Estate
15 Group, Inc.?
16    A  Yes.
17    Q  Did you retain them to do the work?
18    A  I did not.
19    Q  Do you know who did?
20    A  That would have been done through valuations,
21 Michael Yurinich.
22    Q  Did you receive -- strike that.
23      New Market Real Estate Group is an appraisal
24 company?
25    A  Yes, national appraisal firm.

### 135

1     Q  Do you know what office was used? Do they have
2  several?
3     A  They do have several. The two lead appraisers
4  on it, one lives in Southern California here and I
5  believe the other lives in -- I can't recall. It's
6  either Delaware or Connecticut, somewhere on the East
7  Coast.
8     Q  And which office do they work out of?
9     A  I honestly don't know. You'd have to look at
10 the report.
11    Q  Did you receive a copy of the report?
12    A  Yes.
13    Q  And it assesses the market value of the
14 Southlands Town Center?
15    A  Yes.
16    Q  And the value that this report came up with was
17 used to book the asset for the mutual -- or the
18 investment fund that is your client?
19    A  Yes.
20    Q  And from time to time that market value has
21 been revised downward?
22    A  Yes.
23    Q  And in the last 12 months by approximately 20
24 to 25 percent; is that correct?
25    A  That sounds about right.

### 136

1     Q  And has any of the conditions of the buildings
2  at the Southlands Town Center had anything to do with
3  the markdown in the market value of the real estate?
4     A  The conditions were not contemplated in the
5  report, but they would have an impact.
6     Q  But they have not to date?
7     A  But they have not to date.
8     Q  And so nothing in the adjustment of the market
9  value as of this date is reflective of the condition of
10 the real estate?
11      MR. TRAHAN: Object to form; asked and
12 answered.
13      THE DEPONENT: Correct.
14      MR. BENNETT: Okay. This New Mark Real Estate
15 Group report, Paul, is -- figures prominently in your
16 motion to amend the Complaint.
17      MR. TRAHAN: Do we need to be on the record?
18      MR. BENNETT: Yeah, I just want to put this on
19 the record. We sent an e-mail to Jeff Dykes, your
20 partner, asking him to produce a copy of that right
21 away. We haven't gotten a response. Do you know what
22 your position would be on giving us a copy of that?
23      MR. TRAHAN: I need to look at the report and
24 see.
25      MR. BENNETT: If you'd get back to us on that