IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-CV-00799-ZLW-KLM

GRANITE SOUTHLANDS TOWN CENTER LLC,

        Plaintiff,

v.

ALBERTA TOWN CENTER, LLC,
and LAND TITLE GUARANTEE COMPANY,

        Defendants.

---

**PLAINTIFF'S SUR-REPLY TO DEFENDANT ALBERTA TOWN CENTER, LLC'S RESPONSE RE: MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiff Granite Southlands Town Center LLC ("Buyer") files this sur-reply to address new arguments raised in Defendant Alberta Town Center, LLC's ("Seller") Reply to Motion for Partial Summary Judgment (Docket #86) ("Reply"), as follows:

**A.**    **"As Is" Clause in FPSA[1] is Unrelated to Estoppel Requirements and Does Not Prevent Buyer from Objecting to Estoppels Complaining of Property's Condition.**

      1.    One of Seller's new arguments is that the "as is" provision at section 5.1 of the FPSA undercuts Buyer's ability to object to the Cinema Estoppel based on the certificate's reference to a "cracked foundation" because a cracked foundation relates to the Property's condition. To suggest Seller had no obligations and Buyer had no rights regarding the condition of the Property is incorrect. There is an entire section of the FPSA, Article VII (5 pages of the 39-page document), relating to the condition and construction of the Property and setting out

---

[1] For consistency, Buyer will continue to use the defined terms it used in Plaintiffs' Response to Defendant Alberta Town Center, LLC's Motion for Partial Summary Judgment (Docket #84).

85460636.4

what Seller was required to deliver at closing.  (Conf. Ex. 2, Docket #62).  Section 5.1 of the FPSA states, "the Property is being sold to Buyer on the Closing Date in its 'AS IS, WHERE IS' condition."  (Conf. Ex. 2, §5.1(a)) (emphasis added).  The "as is" provision only limits Buyer's ability to make claims against Seller, after closing, for defects at the Property.  The dispute over the $650,000 Estoppel Holdback is not a defect claim by Buyer against Seller, and the "as is" provision is, therefore, not relevant to this dispute.  The provisions relating to the Estoppel Holdback are separate and unrelated, as evidenced by the existence of a separate Escrow Agreement and the terms of the FPSA.

2. This reading is reinforced by the fact that the "as is" provision subjects itself to the rest of the FPSA.  For example, Section 5.1(a), which is the provision upon which Seller chiefly relies, is prefaced with the following statement, "*except as expressly set forth herein and except for those warranties expressly set forth, or implied by law, in the Deed or other documents delivered at the Closing*, the Property is being sold to Buyer on the Closing Date in its then 'AS IS, WHERE IS' condition, with all faults."  (Conf. Ex. 2) (emphasis added).  Sections 5.1(b), 5.1(c), and 5.1(d) are similarly qualified with the phrases "*except as otherwise specifically provided herein*," "*other than as set forth herein*," and "*the foregoing shall in no way limit any of the express representations or warranties made by Seller in this Agreement*."  (Conf. Ex. 2) (emphasis added).  To suggest the "as is" provision overrides the rest of the FPSA is not consistent with the terms of the agreement.  Seller has chosen to remain silent as to the effect of these qualifying provisions, presumably because they undercut Seller's argument as to the effect of the "as is" provision.  Seller just cannot ignore these express carve outs.

3. Another provision of the FPSA that sheds light on the inaccuracy of Seller's "as is" argument is Seller's covenant regarding changes in the condition of the Property.[2] Section 7.2(f) of the FPSA required Seller to "promptly notify Buyer of any change in any condition with respect to the Property." (Conf. Ex. 2). Seller's compliance with this covenant was an express condition precedent to Buyer's obligation to close under the FPSA. (Conf. Ex. 2, §8.1(c)). The condition of the Property and Seller's representations as to the condition of the Property were key components of the underlying transaction. To suggest otherwise by placing undue and inappropriate emphasis on the "as is" provision is inaccurate and misleading. What Seller ignores and the Court must appreciate is that the "as is" provision only protects Seller against property defect claims. It does not absolve Seller of its remaining obligations under the FPSA, like the duty to inform Buyer of changes in the condition of the Property <u>and</u> the duty to deliver "clean" estoppel certificates.[3]

**B.     Reference to a "Cracked Foundation" in the Cinema Estoppel is Not Immaterial.**

4. Another new argument posited by Seller is that the cracked foundation at the Cinema is not "material." This untenable assertion is related to the Seller's "as is" argument, founded on Seller's erroneous presumption that nothing relating to the condition of the property matters and, therefore, possibly could be material. For the reasons discussed above, this argument is misguided. In further response and as evidence that the condition of the property was, in fact, material, the Buyer could have refused to close on the purchase as a result of the Property's condition. Again, 5 pages of the FPSA are devoted to construction and the condition

---

[2] This provision serves as the basis for a breach of contract claim which Buyer has sought leave from the Court to assert.

[3] It is worthy to note that Buyer exercised its right to inspect the Property prior to closing, but there were no visible signs of problems because, Buyer believes, Seller and its Principals had concealed them.

of the Property, and as noted, Section 7.2(f) required an affirmative disclosure of "any change in condition with respect to the Property." Further, Section 8.1(c) establishes the following as a condition precedent to Buyer's obligation to proceed with closing: "Seller shall have materially complied with each and every covenant or condition of this Agreement to be kept or complied with by Seller prior to the Closing." We now know that Seller failed to disclose changes in the condition of the Property prior to closing, in violation of the terms of the FPSA. Had Seller disclosed these changes, Buyer could have refused to extend the deadline for delivery of the tenant estoppel certificates until after closing and, consequently, chosen not to close on the purchase of the Property. Delivery of the estoppels was a condition precedent to Buyer's obligation to close.

5.  In support of its materiality argument, Seller relies heavily on Section 5.3(c) of the FPSA, which limits Buyer's right to terminate the FPSA and refuse to close as a result of the Property's condition. What Seller fails to point out is that Section 5.3(c), as with the "as is" provision at Section 5.1(a), subjects itself to the rest of the agreement. The relevant portion of Section 5.3(c) reads, "*[E]xcept as specifically set forth in this Agreement*, Buyer has no right to terminate this Agreement as a result of any matter relating to the condition of the Property, its entitlements status or its marketability."  (Conf. Ex. 2) (emphasis added)). Section 5.3(c) essentially says that Buyer could not disapprove of the Property and terminate the FPSA prior to closing except where the FPSA otherwise gave Buyer a right to terminate the agreement. But the FPSA expressly gave Buyer a right to terminate the FPSA if one or more preconditions were not satisfied, and some of those preconditions were tied to the state of the Property, like the duty of

Seller to disclose changed circumstances "in any condition with respect to the Property." (Conf. Ex. 2, § 7.2(f)).

6. It also is important to point out that the *Fifteenth Amendment to Amendment and Agreement and Termination Agreement* ("Closing Agreement") merely changed the deadline for delivering the estoppels and Buyer's remedy for Seller's failure to deliver the estoppels. It did not alter the bases on which Buyer could object set out in Section 8.1(k)(ii) – a provision that remained unchanged by the Closing Agreement. (*Compare* Section 8.1(k)(ii) in Conf. Exh. 2 to Conf. Ex. 3, Docket #62). As a result of the Closing Agreement, Seller was given an extension to March 1, 2009, to deliver the required Estoppels, and if Seller failed to deliver clean estoppels, Buyer's remedy was the right to collect the escrowed funds, pursuant to the Closing and Escrow Agreements. Nothing changed the reasons for which Buyer could object to an estoppel under Section 8.1(k)(ii), and nothing rendered the condition of the property immaterial for purposes of the required tenant estoppels.

**C.   Modifications to Paragraph 6 of the 2009 Cinema Estoppel Constituted a Material and Adverse Modification to the Required Form.**

7. Seller also argues, for the first time in its Reply, that Exhibit H to the FPSA is not the standard against which the sufficiency of the 2009 Cinema Estoppel should be gauged. Relying on language in the Closing Agreement, Seller contends the estoppel that the Cinema submitted in May 2008 establishes a new standard. This is not correct. The language in the Closing Agreement did not establish a new standard; it merely provided a limitation on Buyer's right to object to the new estoppels. In essence, if Buyer had not objected to a 2008 Tenant Estoppel Certificate, Buyer could not object to a 2009 certificate that was substantially similar. The language on which Seller relies reads, in relevant part:

> Buyer shall be entitled to object to any Tenant Estoppel Certificate if such Tenant Estoppel Certificate (i) is not in the form required under paragraph 7.2(i) or has been materially modified from that form, or (ii) indicates the continuing existence of an actual material default of the landlord under the applicable Lease . . . ; provided, however, Buyer may not object to . . . any Tenant Estoppel Certificate . . . that is substantially similar to the Tenant Estoppel Certificate for that tenant executed in or about May 2008 and previously delivered to Buyer.

(Conf. Ex. 3, §8.1(k)(ii)).

8.  This provision relating to the May 2008 Estoppels means that Buyer could not object to a new estoppel, even if it deviated from the specimen Exhibit H, provided the new estoppel was substantially similar to that submitted by a tenant in May 2008.  By the same token, if the new estoppel was not substantially similar to the estoppel submitted in May 2008, the sufficiency of the new estoppel was to be measured against Exhibit H (as set forth above in Section 8.1(k)(ii)(i)).  This is what happened with the Cinema Estoppel because it is not substantially similar to the estoppel submitted by the Cinema in May 2008 ("2008 Estoppel") (Exhibit A-5 (Exhibit B) to Seller's Reply, Docket #86).  The 2008 Estoppel does not reference a cracked foundation or raise a dispute about the responsibility for repairs; as a result, the required comparison is against Exhibit H, and for the reasons explained in Buyer's Response, the Cinema Estoppel delivered in 2009 falls far short of what the FPSA specimen estoppel required.

9.  In addition to the "cracked foundation" referenced in paragraph 5, paragraph 6 of the Cinema Estoppel constitutes a material and adverse modification to the prescribed language.  The language used in the Cinema Estoppel is a "watered down" version of the default language set forth in Exhibit H.  Compare the language in paragraph 6 of the Cinema Estoppel and 2008 Estoppel to that in Exhibit H:

<u>Language from Exhibit H</u>

There is no default now existing on the part of the undersigned or of the Landlord under the Lease, and there is no event with which notice or the passage of time or both would constitute a default of the undersigned or of the Landlord under the lease.

<u>Language from paragraph 6 of the Cinema's estoppels</u>

To Tenant's actual knowledge and belief (without any duty to investigate), there are no defaults now existing on the part of the Tenant or of the Landlord under the Lease.

The language from Exhibit H not only estops the tenant from making claims relating to existing defaults, it also covers events that with notice or the passage of time would constitute a default. The language in the Cinema Estoppel is narrower and, consequently, provides less protection for Buyer than the language in Exhibit H. There is a material difference in the protection offered by these two provisions.

10. True, Buyer did not object to paragraph 6 when it was included as part of the 2008 Estoppel. Buyer was willing to accept the watered down language as part of an otherwise clean estoppel certificate. Buyer was not willing, however, to accept a watered down default provision as part of an estoppel that complained of a cracked foundation and raised a dispute about the responsibility for repairs. Given the Cinema Estoppel was not substantially similar to the 2008 Estoppel, the standard against which the Cinema Estoppel was measured was Exhibit H to the FPSA; and, the Cinema Estoppel represents a material and adverse modification to Exhibit H in multiple respects. There can be no credible argument that the Cinema Estoppel's reference to a cracked foundation and a dispute over the responsibility for repairs is anything but a material and adverse modification to the 2008 Estoppel, indicating the existence of a material landlord default.

11. Even if the 2008 Estoppel established a new standard against which the sufficiency of the Cinema Estoppel should be gauged – which is not the case – the Cinema Estoppel constitutes a material and adverse modification to the 2008 Estoppel. The 2008 Estoppel makes no reference to a cracked foundation. The Cinema Estoppel at issue here does make reference to a cracked foundation (Exhibit A-3 to Seller's Motion, Docket #75), which is material and adverse. (Kralovec Affidavit ¶5, Exhibit 3 to Buyer's Response, Docket #84).

### D. Seller's Assertion that the Cracked Foundation is Tenant's Fault Does Not Prove, As a Matter of Law, that there is No Indication of a Default.

12. Seller goes on to argue, again for the first time, that Buyer was not justified in objecting to the Cinema Estoppel because, if the Cinema's foundation was cracked, the Cinema was responsible for it. Who was responsible for the cracked foundation is of no moment for purposes of assessing the adequacy of the Cinema Estoppel. Either the estoppel was "clean" or it was not; and, it clearly was not. The parties' agreement does not place a burden on the Buyer to determine whether there are merits to material and adverse modifications to a form of estoppel. The mere fact that there are material and adverse modifications is enough to justify an objection.

13. Even so, as noted in paragraph 19 of Buyer's Response to Seller's Motion for Partial Summary Judgment, the Cinema expressly disputed that it had responsibility to repair the cracked foundation. In Seller's Reply, Seller ignores this fact and states the Cinema Estoppel "does not contain any facts from which the Court could infer the existence of an actual material default" (Seller's Reply at 9, Docket #86) and categorically states that "the Cinema is responsible for repairs to its building." (Seller's Reply at 7). Seller's assertion is not consistent with the facts, and Seller's legal conclusion on the effect of provisions in the Cinema's lease is

not dispositive of this issue. The Cinema's lease clearly provides that the landlord may be liable for repairs to the building. The lease reads, in relevant part:

> Tenant shall be solely responsible for the structural integrity of the walls *unless required due to the acts or omissions of Landlord, its agents, employees, contractors or invitees, in which case Landlord shall be responsible therefor.*

(Ex. 5 to Buyer's Response, Art. VI, ¶ 1, p. 7, Docket #84) (emphasis added). Indeed, the fact that the Cinema has at all times maintained that the foundation problems were the landlord's responsibility has at the very least created a fact issue as to whether Seller was in material breach of the lease. Seller would have the Court look to the 108-page Cinema Lease to support its argument while insisting that the Court disregard the letter from the Cinema blaming the cracked foundation on Seller. (Ex. 6 to Buyer's Response, Docket #84). The Court should not, as Seller suggests, look to the Cinema Lease but disregard the letter from the Cinema.

**E.     Buyer Has Not Waived the Right to Claim that the 2009 Cinema Estoppel was Materially and Adversely Modified.**

14.     Seller's claim that Buyer's First Amended Complaint does not allege the 2009 Cinema Estoppel was "materially and adversely modified" from the required form is without merit. Buyer's First Amended Complaint expressly states in Paragraph 19 that the reasons for Buyer's objections to the rejected estoppels "are covered by Section 8.1(k)(ii) of the FPSA." (First Amended Complaint, ¶19, Docket No. #34). In addition, Buyer expressly sets forth the text of Section 8.1(k)(ii) of the FPSA in paragraph 11 of Buyer's First Amended Complaint. (First Amended Complaint, ¶11). This section of the FPSA contains all three bases upon which Buyer is entitled to object to a tenant estoppel certificate delivered by Seller as the bases for Buyer's objection to the Cinema Estoppel. Contrary to the statements in Seller's Reply, Buyer

specifically referenced these provisions in Buyer's First Amended Complaint. Seller was, and is, undoubtedly on notice of Buyer's claims in this regard. Seller's claim that Buyer has waived the "material and adverse modification" objection to the tenant estoppel certificates therefore is without merit.

### F. Buyer Does Not Need to Satisfy Seller's Proposed Eight-Part Test to Show the Cinema Estoppel "Indicates the Continuing Existence of An Actual Material Default of the Landlord."

15. While not an entirely new argument, Seller makes another run at the "default" argument in its Reply. Seller argues, again, that in order for Buyer to object to the Cinema estoppel on "default" grounds, Buyer must demonstrate:

> 1) the 2009 Cinema Estoppel itself; 2) showed; 3) that as of the date of the Cinema Estoppel certificate, 4) in fact, as opposed to possibly or potentially; 5) Alberta had failed to comply with a provision of the Cinema Lease; 6) that the provision with which Alberta failed to comply went to the essence of the Cinema Lease and rendered substantial performance under the Cinema Lease impossible; 7) that the Cinema had given Alberta notice of such failure to comply; and 8) that Alberta had failed to cure such failure.

Seller does not cite any provision of the FPSA but, rather, makes general reference to the default provision in the Cinema lease. Buyer refers the Court to its prior briefing on this point which relies on the terms of the FPSA. (Buyer's Response ¶¶22-30, Docket #84). The FPSA allows Buyer to object to an estoppel if it "indicates the continuing existence of an actual material default of the landlord under the applicable Lease." The Cinema sent the Seller, as its landlord, a letter alleging that Seller was responsible for the cracked foundation (Ex. 6 to Buyer's Response) and unequivocally protested that same cracked foundation in its Estoppel. (Ex. A-3 to Buyer's Motion, Docket # 75). These circumstances create, at the very least, a fact issue about whether

the 2009 Cinema Estoppel contains an "indication" of a material default of the landlord. That is all the FPSA requires.

### G. Buyer Has Previously Addressed Seller's Arguments Relating to the Admission of Parole Evidence.

16. Buyer believes that Buyer has, in Buyer's Response, adequately addressed, Seller's plea to disregard parole evidence. (Buyer's Response ¶¶17 & 18). Where there is ambiguity or a question of ambiguity as to the term of a contract parole evidence is allowed. "Extrinsic evidence may be admitted conditionally in order to determine whether a term of a contract is ambiguous." *Denver Center for the Performing Arts v. Briggs*, 696 P.2d 299, 306 (Colo. 1985). Again, if the Court considers the Cinema Lease in its assessment of the Cinema Estoppel, the Court should also consider the Cinema's letter blaming Seller for the cracked foundation as well as affidavit testimony regarding the materiality of the modifications to the required estoppel.

## CONCLUSION

For the foregoing reasons and the reasons set forth in Buyer's First Amended Complaint and Buyer's Response to Seller's Motion for Partial Summary Judgment, Seller's Motion for Partial Summary Judgment should be denied.

Dated January 29, 2010

>Respectfully submitted,
>
>*/s/  Paul Trahan*
>OSBORNE J. DYKES, III
>BENJAMIN M. VETTER
>FULBRIGHT & JAWORSKI L.L.P.
>370 Seventeenth Street, Suite 2150
>Denver, CO  80202
>(303) 801-2700 – Telephone
>(303) 801-2777 – Facsimile
>jdykes@fulbright.com
>bvetter@fulbright.com
>
>PAUL TRAHAN
>FULBRIGHT & JAWORSKI L.L.P.
>600 Congress Avenue, Suite 2400
>Austin, TX  78701
>(512) 474-5201 – Telephone
>(512) 536-4598 – Facsimile
>ptrahan@fulbright.com
>
>**COUNSEL FOR PLAINTIFF/COUNTER-DEFENDANT**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on January 29, 2010, I electronically filed the foregoing **PLAINTIFF'S SUR-REPLY TO DEFENDANT ALBERTA TOWN CENTER, LLC'S RESPONSE RE: MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to attorneys for the remaining parties at the following e-mail addresses:

>Stephen L. Waters            swaters@rwolaw.com
>Kimberly A. Bruetsch         kbruetsch@rwolaw.com
>ROBINSON WATERS & O'DORISIO, P.C.
>1099 18th Street, Suite 2600
>Denver, CO 80202
>*Attorneys for Land Title Guarantee*

>Stuart N. Bennett            sbennett@lindquist.com
>Lindquist & Vennum, P.L.L.P.
>600 – 17th Street, Suite 1800 – South
>Denver, CO 80202
>*Attorneys for Defendant Alberta Town Center, LLC*

>>*/s/  Paul Trahan*

85460636.4

- 13 -