IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-CV-00799-ZLW-KLM

GRANITE SOUTHLANDS TOWN CENTER LLC,

        Plaintiff,

v.

ALBERTA TOWN CENTER, LLC,
LAND TITLE GUARANTEE COMPANY,
DONALD G. PROVOST,
and PETER M. CUDLIP,

        Defendants.

---

## PLAINTIFF'S SECOND AMENDED COMPLAINT

---

Plaintiff/counter-defendant Granite Southlands Town Center LLC ("Granite") complains of and against defendants Alberta Town Center, LLC ("Alberta"), Donald G. Provost and Peter M. Cudlip (collectively, the "Principals," and, together with Alberta, being referred to herein as the "Alberta Defendants"), and Land Title Guarantee Company ("Land Title") (the Alberta Defendants and Land Title are sometimes collectively referred to herein as the "Defendants").

### PARTIES

1.    Plaintiff Granite Southlands Town Center LLC is a Delaware limited liability company with its principal place of business in New Jersey.

2.    Defendant Alberta Town Center, LLC is a Colorado limited liability company with its principal place of business in Denver, Colorado. Defendant Alberta has appeared in this

85498050.2

lawsuit and can be served through its counsel of record.  On information and belief, Alberta is a limited liability company that has three members (such members being the Principals and one other individual who is not a party to this lawsuit), two managers (such managers being the Principals), no employees, and whose sole asset, prior to the Closing, was the Property.

3.      Defendant Land Title Guarantee Company is a Colorado corporation with its principal place of business in Denver, Colorado.  Land Title has appeared in this lawsuit and can be served through its counsel of record.

4.      Defendant Donald G. Provost is an individual residing in Colorado who has appeared in this lawsuit and can be served through his counsel of record.

5.      Defendant Peter M. Cudlip is an individual residing in Colorado who has appeared in this lawsuit and can be served through his counsel of record.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1332 by virtue of the diversity of citizenship of the parties.  The amount in controversy in this case, exclusive of interest and costs, exceeds $75,000.00.

7.      This Court has personal jurisdiction over each of the Defendants because each is a resident of this state and has conducted business in this state.

8.      Pursuant to 28 U.S.C. § 1391, venue for this case is proper in this District because the claims affect property located in this District and all Defendants are subject to personal jurisdiction in this District.

**FACTS**

9.    Granite closed on a purchase of the Southlands Town Center ("Property") from Alberta on December 12, 2008 ("Closing").   Alberta developed the Property and began construction following execution of a Forward Purchase and Sale Agreement ("FPSA") in September 2005.[1]  Alberta needed the FPSA in order to secure financing for construction of the Property in that the FPSA provided assurance to the lender that there would be a buyer to pay off the loan upon completion of the Property, provided certain conditions were met.[2]  The FPSA also outlined Alberta's and Granite's rights and obligations with respect to the Property.

10.    The price Granite agreed to pay for the Property was based on the actual construction costs Alberta incurred in constructing "the Buildings, the parking, access and lighting facilities on the Land and all other improvements" necessary to develop the Property ("Improvements").  FPSA § 4.1.  Throughout construction of the Improvements, the Alberta Defendants certified in sworn construction draw affidavits that requested loan disbursements were being used to pay their cost of constructing the Improvements.  On March 26, 2008, Granite was informed by Alberta's construction lender that the construction loan in the amount of $158,807,879 had been fully disbursed to Alberta.  The loan was fully disbursed based on a sworn representation from the Alberta Defendants that their actual costs of constructing the

---

[1]  The FPSA is dated September 29, 2005; however, the parties amended the FPSA numerous times, with the final amendment dated December 8, 2008.

[2]  Unbeknownst to Granite, as a result of Alberta's and the Principals' fraud, these conditions had not been met at Closing and would have allowed Granite to refuse to close.

Improvements was $158,807,879.  Likewise, Granite's approval of the purchase price amount was based upon these representations.[3]

11.     The Improvements at the Property included certain improvements to be dedicated to the Southlands Metropolitan District No. 1 ("District") (streets, sidewalks, curb cuts, sewers, and certain site amenities of the Property such as the plaza fountains and fire pit ["District Improvements"]).   Unbeknownst to Granite, Alberta previously had been reimbursed $10,134,279 by the District for construction of District Improvements that were included in the Alberta Defendants' $158,807,879 sworn statement of costs.  As a result, the District used its bond proceeds to pay Alberta for the District Improvements while, at the same time, Alberta presented a sworn statement of costs to secure loan advances for the same improvements. Alberta was paid twice for the same work, and Granite paid a price for the Property that was calculated based upon construction costs for which Alberta separately had been reimbursed. Granite consequently overpaid $10,134,279 as a result of the Alberta Defendants' misrepresentations.  Despite multiple inquiries by Granite to the Alberta Defendants regarding the total actual construction cost of the Property, the Alberta Defendants failed to disclose to Granite the fact that Alberta already had been reimbursed for the cost of constructing the District Improvements.

---

[3]  As noted, under the FPSA, Granite was obligated to pay the actual costs incurred by Alberta in constructing the Improvements up to a cap of $160,000,000.  FPSA § 4.1.  By virtue of the Alberta Defendants' representations that the actual costs had already exceeded the maximum (when in fact they had not), Granite was induced into executing an amendment to Section 4.1 of the FPSA that dropped the actual-cost formula and instead fixed the purchase price at the maximum amount of $160,000,000.  This fixed-amount agreement was memorialized in the Fourteenth Amendment to Amendment and Agreement and Termination Agreement ("Fourteenth Amendment").

12.     As a result of the Alberta Defendants' misrepresentations regarding Alberta's actual cost of constructing the Improvements, as well as omissions of material fact regarding the District's reimbursement, Granite was fraudulently induced to pay a purchase price for the Property that was $10,134,279 more than what Granite otherwise would have been obligated to pay.  If Granite had known that Alberta had been previously reimbursed for these District Improvements, Granite would never have agreed to pay this amount.  The Alberta Defendants' fraud and fraudulent concealment of these facts essentially allowed the Alberta Defendants to be paid for the District Improvements twice; once by the District in 2007 and a second time by Granite as part of the Closing.

12.13. Further, Section 7.2(f) of the FPSA required prompt notification to Granite of "any change in any condition with respect to the Property or any portion thereof . . . ."  The purpose of this provision was to obligate Alberta to share material information with Granite.

13.14. Prior to Closing, Alberta learned that there were serious structural defects in the Property.  Over the course of eight months, it received letters and complaints from tenants of the Property identifying the defects at the Property and requiring Alberta to make repairs.  Rather than disclose these letters to Granite, Alberta and its Principals engaged structural and soils engineers to determine the cause of the defects and ordered cosmetic repairs be made to portions of the Property, the management office and other areas, that the Alberta Defendants knew Granite representatives would be visiting to conceal the existence of the defects.  In fact, Alberta never notified Granite of any changed circumstances under § 7.2(f) – much less any structural defects – prior to Closing.  Further, Alberta Defendants misrepresented to Granite on numerous occasions that Alberta, as landlord, was not in default under any of the leases with tenants of the

Property, though the undisclosed tenant letters and complaints revealed otherwise. Alberta and the Principals had a powerful motive to conceal the defects and to misrepresent the condition of the Property – namely so that Alberta could avoid an imminent default on its nine-figure construction loan and the Principals could avoid the lender calling their personal guarantees on that nine-figure construction loan.

14.15. These defects were not open and obvious, but in fact were latent due in part to the Alberta Defendants' acts to conceal the defects, as evidenced by the fact that only ten days before the Closing, three real estate professionals from New Market Real Estate Group inspected the Property on Granite's behalf and provided a detailed, 200-page report that did not reveal anything that would have shown that the soil's load-bearing capacity was insufficient to support the existing structure or that there were other defects in construction ("Inspection Report"). Instead, the appraiser reported that "the buildings are in above average physical and functional condition" and that "[o]verall, the property is in excellent condition." Alberta Defendants had ordered repairs just days before this inspection.

15.16. The FPSA and an accompanying Escrow Agreement also required Alberta to obtain estoppel certificates from the tenants of the Property, in one of several prescribed forms that addressed Granite's specific areas of concern ("Approved Tenant Estoppel Certificates"). The general purpose of the certificates was to confirm that the tenant relationships were as they were reported to be and that there were no outstanding issues between the tenant and the landlord Alberta.

16.17. The failure of Alberta to obtain the certificates required under the FPSA gave Granite the right to invoke the termination process under the FPSA, in which case it would have

had no obligation to go forward with the Closing and attendant purchase.  FPSA §§ 7.2(i), 8.1(k).

Moreover, even if Alberta had delivered the certificates they ultimately procured, they would

have demonstrated that Alberta was in default or breach of material terms of its tenant leases,

thus providing Granite with an additional second ground for termination and refusal to go

forward with the Closing.  *Id.* §§ 8.1(a), 11.2(d).

~~17.~~18.  The FPSA and Escrow Agreement established a minimum threshold for Alberta

to clear with respect to the estoppels ("Required Estoppels").  The FPSA reads, in relevant part:

> Each tenant occupying more than 10% of the rentable square feet in the Buildings shall have executed a Tenant Estoppel Certificate ("Large Tenants"), and, subject to Seller's right to provide landlord estoppel certificates as set forth below, tenants who together occupy at least 75% of the total number of rentable square feet subject to Qualifying Leases at the Closing shall have executed Approved Tenant Estoppel Certificates, as defined below (collectively, the "<u>Required Estoppels</u>").[4]

Consequently, Alberta was required to deliver, to Granite,

- Approved Tenant Estoppel Certificates for tenants making up at least 75% of the total leased square footage for the Property, <u>and</u>

- An Approved Tenant Estoppel Certificate for each tenant whose leased space made up 10% or more of the total leased square footage.

Section 8.1(k)(ii) of the FPSA also provided Granite with the right to reject a tenant estoppel

certificate delivered by Alberta under several circumstances:

> Buyer shall be entitled to object to any Tenant Estoppel Certificate if such Tenant Estoppel Certificate is (i) not in the form required under paragraph 7.2(i) or has been materially and adversely modified from that form, or (ii) indicates the continuing existence of an actual material default of landlord under the applicable Lease, or (iii) correctly indicates that the Lease includes terms and provisions which are inconsistent with the Approved Leasing Guidelines or terms and provisions that are inconsistent with the applicable lease.

---

[4]  Please note that Alberta, as "Seller," did not submit any landlord estoppel certificates.

18.19.  When it became apparent Alberta would not be able to deliver the Required Estoppels by Closing, Granite agreed, as an accommodation to Alberta based in part on the written representations and the delivery of the May 2008 Estoppels in the November 21, 2008 letter from Drew Flowers of Gibson Dunn, that the sale still could close in December 2008 if Alberta agreed to deliver the Required Estoppels by a fixed deadline after Closing.  Because Alberta had been able to secure the May 2008 Estoppels and these estoppels did not disclose the existence of defects at the Property, Granite had no reason to believe that Alberta would not be able to obtain acceptable tenant estoppel certificates in the ordinary course.  Alberta and Principals, knowing of the defects, the numerous tenant complaints concerning the condition of the Property, and the fact that the May 2008 Estoppels no longer were an accurate representation of the landlord's relationship with the tenants of the Property, compounded their fraudulent conduct by delivering the May 2008 Estoppels without making Granite aware of these issues. Alberta's and Principals' concealment of this information, coupled with the delivery of the May 2008 Estoppels, fraudulently induced Granite into agreeing to allow Alberta to deliver these estoppels post-closing.  Nonetheless, to protect Granite, the parties agreed that $650,000 of the closing funds would be withheld and placed in escrow with Land Title ("Estoppel Holdback").

19.20.  Alberta would only receive the Estoppel Holdback if it delivered the Required Estoppels by 5:00 PM (EDT) on March 1, 2009.  The parties agreed that if Alberta failed to deliver the Required Estoppels by this deadline then Land Title would be required to deliver the Estoppel Holdback to Granite.  Time was expressly made of the essence for Alberta's delivery of the Required Estoppels to Granite.[5]  The relevant portion of the FPSA reads as follows:[6]

---

[5]  Section 14.9 of the FPSA expressly provides that "[t]ime is of the essence of this Agreement."

> If, prior to the Closing Date, Seller fails to deliver the Required Estoppels, (x) Seller shall be obligated to continue to use commercially reasonable efforts to obtain the Required Estoppels after the Closing, and (y) Escrow Holder shall retain Six Hundred Fifty Thousand and No/100 Dollars ($650,000.00) of the Excess Funds at Closing ("Estoppel Holdback") . . . .  [S]hould Seller fail to deliver the Required Estoppels to Buyer on or before 5:00 P.M. (EDT) on March 1, 2009, Buyer and Seller agree Escrow Holder shall deliver the entire Estoppel Holdback to Buyer upon written notice to Escrow Holder from Buyer, and the amount of the Estoppel Holdback shall be deemed to have been forfeited by Seller.  The provisions of this Section 8.1(k)(ii) shall survive Closing.

The Escrow Agreement reinforced Land Title's obligation to deliver the Estoppel Holdback to Granite in the event Alberta failed to deliver the Required Estoppels to Granite by March 1, 2009.  The relevant portion of the Escrow Agreement reads:

> If Alberta fails to deliver the Required Estoppels to Granite on or before 5:00 P.M. (EDT) on March 1, 2009, Granite and Alberta agree Escrow Holder shall deliver the Cash Funds to Granite upon written notice to Escrow Holder from Granite and the Cash Funds shall be deemed to have been forfeited by Alberta.

~~20.~~21.  As noted, December 12, 2008, was the date of Closing.  In order to consummate the purchase, Granite entered into an agreement, entitled *Fifteenth Amendment to Amendment and Agreement and Termination Agreement* ("Closing Agreement") that bound both Granite and Alberta, as well as a number of additional parties, to certain actions that were necessary to effect the Closing.  This Closing Agreement, among other things:  (i) amended the FPSA to permit Alberta to deliver the Required Estoppels after Closing; (ii) bound Alberta, as well as the Principals in their individual capacities, and Alberta's construction lender, to execute a separate agreement releasing possible claims against one another ("Release"); and (iii) obligated Granite to pay an additional $2,150,000 above the purchase price previously provided for in the FPSA,

---

[6]  This excerpt is from paragraph 4.1(c) of the final amendment to the FPSA, which amends Section 8.1(k)(ii) of the FPSA.  The final amendment is entitled "Fifteenth Amendment to Amendment and Agreement and Termination Agreement."

which was the consideration for the Release and which Principal Donald Provost acknowledged in writing (produced as a part of recent discovery).  Peter Cudlip and Donald Provost also confirmed in their recent (January 7 and 8, 2010) depositions that the additional $2,150,000 was consideration for release of disputed claims between the parties, in particular claims relating to a purported joint venture.  By allowing Alberta to deliver the Required Estoppels after the Closing, Granite gave up a right to terminate the FPSA and extract itself from the Closing under §§ 7.2(i) and 8.1(k).[7]  A copy of the Closing Agreement (without attachments) is attached as <u>Exhibit A</u>.

21.22.  The Release was also necessary to effect the Closing because the parties, including the Principals, had discussed the possibility of a joint venture that the parties contemplated would be memorialized in a limited liability company agreement ("LLC Agreement").  The parties never achieved a meeting of the minds as to a joint venture, never entered into the LLC Agreement, and, up until Closing, were in disagreement as to the purported existence of a joint venture.  These circumstances, in part, necessitated the Release and also provide valuable context regarding the nature of the parties' relationships, dealings, understandings, and expectations prior to Closing.  The Principals, Alberta's construction lender, and Granite were parties to the Release.  A true and correct copy of the Release is attached hereto as <u>Exhibit B</u>.  By signing the Release, the Principals directly participated in inducing Granite not only to sign the Release but to close on the purchase of the Property.  Granite paid

---

[7] Although § 8.1(k) contains an alternative method for satisfying this condition precedent, invoking the alternative method—which would have given Alberta an additional short period of time to obtain the estoppels—would have delayed the Closing.  If the Closing had been deferred to allow for the estoppels to be obtained Alberta would have been in default under its construction loan, and, concomitantly the Principals' liability under their personal guarantees would have been triggered.  Moreover, discovery has revealed that Colorado Cinema, a key tenant, would not have delivered an acceptable tenant estoppel during the additional time provided to deliver tenant estoppels.

$1,500,000 of the $2,150,000 upon execution of the Release.  The remaining $650,000 was paid into escrow and became the Estoppel Holdback pending timely delivery of the Required Estoppels.

22.23.  Shortly after the Closing, a tenant provided Granite with Granite's first notice of what Granite would come to realize were material defects at the Property – defects that the Principals had known about for months before the Closing.  On January 28, 2009, Granite received a letter from legal counsel for DCC Architects, one of the tenants at the Property.  A true and correct copy of the letter from DCC Architects' attorneys is attached hereto as Exhibit C.  The correspondence enclosed a copy of a June 25, 2008 letter (the "DCC Letter") to Alberta whereby DCC Architects informed Alberta of defects at the Property, enclosing "photographs and verbal descriptions of damage due to building movement that is by no fault of the tenant or its occupants."  A true and correct copy of the DCC Letter is attached as a part of Exhibit C.  The defects were so severe that Alberta had previously sought proposals from five different engineering firms to investigate the defects and obtained reports from three different structural and soils engineers on  the source of the defects – all prior to Closing and without notifying Granite.  One of the proposals, the November 2008 proposal from Wiss, Janney, Elstner Associates, Inc., was "to provide engineering services related to the evaluation and remediation of slab and foundation movements affecting the buildings at the Southlands Mall located in Aurora, Colorado."  Also prior to Closing, Alberta's attorneys, Brownstein Hyatt Farber Schreck, LLP, communicated with attorneys for the Colorado Cinema, a tenant at the Property, regarding "foundation system movement."  These communications and events made it shockingly apparent to Granite that Alberta and the Principals were aware of the defects eight

months before Closing and were communicating with tenants about the defects just four (4) days before Closing.  Further, the Principals took affirmative steps to conceal the existence of these defects and made affirmative misrepresentations that no such defects existed in order to induce Granite to enter into the Closing Agreement, the Release, the Escrow Agreement and the other closing documents, and to close on the purchase of the Property.

23.24.  The Principals had a duty to disclose these defects to Granite prior to Closing. Not only are the defects of the kind that Alberta and the Principals, in equity and good conscience, should have disclosed to Granite, but the FPSA clearly created a duty for them to disclose these sorts of defects, including sections 7.2, 8.2(c), and 11.2.  In any event, the objective circumstances, including the nature of the relationship and dealings between the parties,[8] the latency and severity of the defects, and the Alberta Defendants' knowledge that Granite was unaware of the actual state of the Property, individually and collectively gave rise to a reasonable expectation of disclosure of the defects prior to Closing.

24.25.  Alberta and the Principals were aware of the defects prior to Closing.  When confronted with these issues in February 2009, Donald Provost acknowledged to Granite's representatives that he had been working to address the defects prior to Closing.  Donald Provost again acknowledged in his recent deposition taken January 8, 2010, that he was aware, through discussions with Peter Cudlip and discussions with Brownstein Hyatt Farber Schreck, LLP, of "drywall cracking and other building settlement" at the Property sometime in "June, or August or September" of 2008 which was prior to Alberta's delivery of the May Estoppels in November 2008, prior to the parties entering into the Closing Agreement, and prior to the Closing.  Donald

---

[8]  Alberta, Granite, and the Principals had discussed entering into a joint venture.

Provost further acknowledged in his deposition testimony that he had not personally made Granite aware of his knowledge concerning the changed condition of the Property prior to delivery of the May Estoppels in November 2008, prior to the parties entering into the Closing Agreement, or prior to the Closing.  Peter Cudlip, in his deposition testimony from January 7, 2010, confirmed that he was on-site regularly throughout construction of the Property and up through Closing and was involved in the decisions to engage engineers and to make repairs to the Property which concealed the defects from Granite.

25.26.  Not only did Alberta and the Principals fail to disclose the defects to Granite, they actively sought to conceal them.  In November 2008, in an effort to mislead Granite, the Principals tried to persuade Granite to accept estoppel certificates that had been executed in May 2008 and were thus out of date and did not reflect the condition of the Property at the time of the Closing.  In contrast to the May 2008 certificates, the estoppel certificates delivered to Granite in 2009 after the Closing reflect numerous and serious defects at the Property which Alberta and the Principals knew existed prior to Closing.  By offering these May 2008 certificates at or near the time of Closing and by asserting that Alberta had materially complied with all of Alberta's covenants under the FPSA – including the covenant to give notice to Granite of any change in condition of the Property – Alberta and the Principals actively misrepresented the condition of the Property.

26.27.  In addition, one or more of the Principals ordered that repairs of apparent defects be made at the Property for the purpose of concealing the defects and inducing Granite to enter into the Closing Agreement, the Release, the Escrow Agreement, and the other closing documents and close on the purchase of the Property.  Alberta's meeting agendas for the

Property – recently obtained in discovery – reflect that such repairs were made shortly before closing.  Specifically, Peter Cudlip, in his deposition testimony from January 7, 2010, stated he was aware of the fact that repairs were made by Construction Logic LLC to the premises occupied by DCC Architects "to repair the cracking in the drywall within the DCC Architects' space" even though the invoice itself only references "Misc. repairs @ DCC's space – Building E."  The invoice showing these repairs were completed – also recently obtained in discovery – was dated November 26, 2008, which was approximately three weeks before the scheduled Closing and approximately one week prior to New Market Real Estate Group's inspection of the Property on Granite's behalf.  Mr. Cudlip's detailed knowledge of the scope of the repairs made by Construction Logic shows that Mr. Cudlip was intimately aware of the problems at the Property as well as the steps taken by Alberta and the Principals to conceal the existence of these problems from Granite.  In addition to the repairs made to the DCC space, these meeting agendas also document that "cosmetic repairs due to building movement" to the "lobby, PacSun [a tenant at the Property], [and] the management conference room" were "completed" on November 19, 2008.  Importantly, at the same time that Alberta and the Principals were busy making repairs, these same meeting agendas also reflect that Alberta was in communications with New Market and providing information to New Market in anticipation of New Market's upcoming physical inspection of the Property.  Alberta never mentioned the defects to New Market during these communications in November 2008.  Finally, the agendas disclose that Jose Inclan, an agent of Alberta and the Principals, walked the Property with the New Market representatives during their physical inspection of the Property on December 2, 2008.  It is apparent from New Market's report that the defects were not brought to the attention of New Market by Mr. Inclan, as New

Market's report did not note any of these problems.  Instead of using the New Market inspection as the perfect opportunity for Alberta and the Principals to come clean about the defects, Alberta and the Principals chose to focus their attention on covering up the problems.

27.28.  Granite relied on Alberta's and Principals' misrepresentations and silence concerning known defects in the Property, as well as the assumptions as to the structural integrity of the Property engendered by their acts of concealment.  Granite would never have entered into the Closing Agreement, the Release, the Escrow Agreement, or the other closing documents, paid the additional $2,150,000, or closed on the purchase of the Property if Granite had known of the structural defects with the Property.   By withholding this information from Granite, the Alberta Defendants induced Granite to enter into the Closing Agreement, pay the additional $2,150,000, and execute the Release, the Escrow Agreement, and the other closing documents and to close.  Given Alberta's and the Principals' duty to disclose any change in the condition, and even more importantly any defects, Granite was justified in relying on their silence and the assumption that the Property continued to be in an acceptable condition when the concealed facts showed otherwise.

28.29.  Granite also relied on the affirmative representations made regarding the condition of the Property such as offering the May 2008 estoppel certificates three weeks before Closing.   Offering the May 2008 certificates three weeks before Closing amounted to an affirmative representation that the condition of the Property had not changed since May 2008, and Granite relied on this and other misrepresentations.   To summarize, Alberta and the Principals engaged in the following fraudulent acts or omissions:

- failing to comply with an express obligation under the FPSA to notify Granite of the changed condition of the Property prior to the Closing;

- concealing the existence of complaints and letters from tenants of the Property identifying the defects at the Property and requiring Alberta to make repairs;

- ordering cosmetic repairs be made to public portions of the Property as well as tenant premises to conceal the existence of the defects;

- concealing the fact that the Alberta Defendants were investigating the defects and had engaged structural and soils engineers to determine the cause of the defects and to monitor shifting;

- misrepresenting to Granite on numerous occasions that Alberta, as landlord, was not in default under any of the leases with tenants of the Property; and

- sending Granite false information in the form of tenant estoppel certificates which the Alberta Defendants knew to be inaccurate at the time they sent them.

29.30.  These same defects and deficiencies that existed prior to Closing contributed to Alberta's inability to deliver the Required Estoppels after Closing.  Alberta delivered eighty-five (85) tenant estoppel certificates to Granite prior to the March 1, 2009, deadline; however, Granite rejected nine (9) of the estoppels because they were insufficient ("Rejected Estoppels"). The reasons Granite rejected the estoppels, which were numerous and substantive, are covered by section 8.1(k)(ii) of the FPSA.  The reasons included alleged landlord defaults, monetary disputes, drainage problems, serious cracks in the walls, and defects with the HVAC.  Perhaps the most serious issues relate to the cracked foundations, walls, and structural defects raised in the tenant estoppel certificates delivered by Colorado Cinema, DCC Architects, LLC, and American Fidelity Assurance Company.   Alberta's failure to deliver an Approved Tenant Estoppel Certificate for Colorado Cinema Group, LLC – whose lease makes up approximately 16.5% of the total leased square footage of the Property – means Alberta failed to deliver an Approved Tenant Estoppel Certificate for all tenants whose leased space comprises 10% or more of the total leased square footage of the Property.

30.31.  Given this failure, the Escrow Agreement required Land Title to release the Estoppel Holdback to Granite.  Land Title, however, has refused to release the Estoppel Holdback to Granite.  On March 4, 2009, Granite notified Land Title of Alberta's failure to deliver the Required Estoppels and requested that Land Title release the Estoppel Holdback to Granite.  Land Title responded on March 6, 2009, by advising Granite that it would not deliver the Estoppel Holdback.  According to the Escrow Agreement, Land Title can only refuse to comply with Granite's demand for the Estoppel Holdback if the parties are in disagreement and Land Title has a good faith basis for doubting what action should be taken.  There is no good faith basis for Land Title to doubt what action should be taken here.  The indisputable facts establish that Alberta has failed to deliver the Required Estoppels and the Estoppel Holdback should be delivered to Granite.  Instead of delivering the Estoppel Holdback to Granite, Land Title provided the parties with notice on March 11, 2009, of its intent to file an action in interpleader.  As of January 11, 2010, the Estoppel Holdback remains in escrow with Land Title.  Granite is entitled to the Estoppel Holdback plus accrued interest, as provided for by the parties' agreement.

31.32.  The defects at the Property, though latent and concealed at Closing as shown by the Inspection Report, are serious.  Certain slabs at the Property are sinking into the ground, and the exterior walls, interior walls, and other components of some of the buildings at the Property are failing as a result.  Although the cause of and responsibility for the defects has not been completely revealed, though construction errors now are apparent, there is no question these defects existed prior to Closing and Alberta and the Principals were aware of the defects at Closing.  Despite having knowledge of the defects, Alberta and the Principals failed to inform

Granite of these defects prior to the December 12, 2008, Closing, and, in fact, took actions to conceal the defects from Granite which culminated in a flurry of repairs made to the Property in November 2008 to conceal the defects immediately prior to Granite's inspection of the Property on December 2, 2008.

## CAUSES OF ACTION

### BREACH OF CONTRACT
**(against Alberta)**

~~32.~~33.   Under § 7.2(f) of the FPSA, Alberta was contractually obligated to provide prompt notification to Granite of changes in condition of the Property.  The defects in the Property that were known to Alberta by the time of the Closing were material and further Alberta made untrue and/or misleading representations and warranties to Granite under the FPSA.  Had Alberta disclosed these defects to Granite prior to Closing, Granite would not have executed the Closing Agreement, the Release, the Escrow Agreement, or the other closing documents and would not have gone forward with the Closing.  Granite was damaged as a result.  These damages are in an amount which Granite believes is tens of millions of dollars, as well as other damages naturally and proximately caused by the breach, including the loss of tenants and attendant revenues and repair costs.

### FRAUDULENT INDUCEMENT
**(against Alberta, Donald Provost and Peter Cudlip)**

~~33.~~34.   As alleged herein, Alberta and the Principals, in their individual capacities, withheld material information from, and made material misrepresentations to, Granite so as to induce Granite to purchase the Property for $10,134,278 in excess of what it otherwise would have paid, execute the Closing Agreement, the Release, the Escrow Agreement and the other

closing documents, pay the additional $2,150,000, and move forward with the Closing – none of which Granite would have done but for the Principals' fraudulent concealment, omissions of material fact and/or affirmative misrepresentations.  Granite reasonably and justifiably relied on the Principals' silence and affirmative misrepresentations, failure to disclose material facts, and concealment of the true facts, and Granite has suffered damages as a result of this e Principals' fraudulent conduct.  These damages include the $10,134,279 Granite was fraudulently induced to overpay for the Property, the $2,150,000 Granite was fraudulently induced to pay for the Release, as well as the difference between what Granite paid for the Property at Closing and the amount the Property was worth at Closing, which Granite believes is tens of millions of dollars, together with the as well as other damages naturally and proximately caused by the fraud, including the loss of tenants and attendant revenues and repair costs.

## DECLARATORY JUDGMENT REGARDING ESCROW
### (against Alberta and Land Title)

34.35.  Based upon the facts alleged and documents referenced herein, an actual and justiciable controversy exists between the parties to this lawsuit as to their respective rights and obligations regarding the Estoppel Holdback.  To resolve this controversy, Granite seeks judicial declarations that:

- Alberta failed to timely deliver the Required Estoppels;

- Granite is entitled to receive the Estoppel Holdback; and

- Land Title is entitled and obligated to deliver the Estoppel Holdback to Granite.

Granite requests this relief pursuant to 28 U.S.C. §2201, Rule 57 of the Federal Rules of Civil Procedure, the parties' agreements, and as otherwise provided by law.

## ACTUAL AND EXEMPLARY DAMAGES FOR FRAUD
### (against Alberta and the Principals)

35.36.  Granite seeks the actual damages it has suffered as a result of the Principals' fraudulently inducing Granite to enter into the agreements described above and ultimately to close on the purchase of the Property, in particular the difference between what Granite paid for the Property and its value at Closing, which Granite estimates is in the tens of millions of dollars, as explained above.  Granite also seeks exemplary damages against Alberta and the Principals for the fraud they committed to induce Granite to enter into the agreements described above and ultimately to close on the purchase of the Property because the injury complained of by Granite is attended by circumstances of fraud, malice, or willful and wanton conduct on the part of Alberta and the Principals, as set out above.

## ATTORNEYS' FEES AND COSTS UNDER THE ESCROW AGREEMENT
### (against Alberta)

36.37.  Granite seeks its attorneys' fees and costs against Alberta under the Forward Purchase and Sale Agreement and Escrow Agreement pursuant to its breach of contract and declaratory judgment actions.  Granite has been required to retain legal counsel to assist in resolving these disputes – disputes which arise under the Forward Purchase and Sale Agreement and Escrow Agreement.  These agreements provide that the prevailing party in any dispute arising from them is entitled to recover its reasonable and actual attorneys' fees and expenses, including those incurred in connection with any appeal.  Granite seeks to recover those attorneys' fees and expenses incurred in connection with the breach of contract and dispute over the Estoppel Holdback.

WHEREFORE Plaintiff Granite Southlands Town Center LLC respectfully requests that the Court enter a declaratory judgment against Defendants Alberta Town Center, LLC and Land Title Guarantee Company as requested herein, order Land Title to deliver the Estoppel Holdback to Granite along with accrued interest, and award Granite its attorneys' fees and expenses. Granite further requests that the Court enter a judgment against Alberta holding Alberta liable for the damages suffered by Granite as a result of Alberta's breach of Alberta's contractual obligations under the FPSA.  Granite also requests that the Court enter a judgment against Alberta and the Principals holding them jointly and severally liable for actual and exemplary damages, as determined by the Court or a jury, along with prejudgment and post-judgment interest and all other and further relief to which Granite is entitled.

Plaintiff renews its demand for a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.