Page 1

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3            CIVIL ACTION NO. 09-CV-00799-ZLW-KLM

4    GRANITE SOUTHLANDS TOWN             :

5    CENTER, LLC,                        :

6                    Plaintiff,    : CIVIL ACTION

7              vs.                       :

8    ALBERTA TOWN CENTER, LLC, LAND      :

9    TITLE GUARANTEE COMPANY,            :

10   DONALD G. PROVOST, ALLAN G.         :

11   PROVOST, and PETER M. CUDLIP,       :

12                    Defendants.   :

13

14        DEPOSITION UPON ORAL EXAMINATION OF:

15                  ANDREW PIEKARSKI

16                   April 7, 2010

17

18   *******CONFIDENTIAL, ATTORNEYS' EYES ONLY*******

19

20

21              HUNTER & GEIST, INC.

22            1900 Grant Street, Suite 800

23               Denver, Colorado 80203

24      (303) 832-5966 - (800) 525-8490 (Toll Free)

25                www.huntergeist.com

Page 34

```
 1    A.   Correct.
 2    Q.   Now paragraph 8(k), romanette double
 3  i provides certain circumstances under which the
 4  buyer may object to a tenant's estoppel
 5  certificate, correct?
 6    A.   Yes.
 7    Q.   The first is it's not in the form
 8  required under paragraph 7.2, which refers us
 9  back to Exhibit H, or has been materially and
10  adversely modified from that form.
11     Do you have experience in dealing with
12  similar clauses in other transactions that
13  provided for objections to tenant estoppels that
14  have been materially or adversely modified?
15        MR. TRAHAN:  Object to form.
16    A.   Nothing -- none that precluded a
17  transaction ultimately from closing.
18    Q.   Have you been called upon in other
19  transactions to make judgments about what
20  constitutes a material and adverse modification
21  of the required form?
22    A.   No.
23    Q.   Do you know or is there any standard
24  by which one judges what is a material and
25  adverse modification of the form?
```

Page 35

```
 1        MR. TRAHAN:  Object to form.
 2    A.   When it's material you know it.
 3    Q.   Kind of like pornography, you know
 4  it when you see it?
 5    A.   I'll let you be the judge of that,
 6  but when it's material, you know it, which is why
 7  I think we're here.
 8     There were two significant provisions that
 9  were changed in the tenant estoppel that we're
10  referring to.  One was the reference to the
11  structural and foundation defects, and the other
12  was the deletion of a bankruptcy paragraph.
13    Q.   All right.  So how have you judged
14  that those two items that you've mentioned were
15  material?
16    A.   A structural defect is material and
17  warrants further investigation.
18    Q.   And how do you define the term
19  material?  How do you judge that that's material?
20    A.   From sound business judgment and
21  anybody who looked at a building with a
22  structural defect when you have other tenants and
23  other estoppels giving other information with
24  respect to structural defects, leases that were
25  -- or estoppels that were kicked out, it becomes
```

Page 36

```
 1  material.
 2    Q.   So are you suggesting that by itself
 3  the cinema disclosure of cracked foundation would
 4  not be material, not necessarily material but in
 5  conjunction with other certificates?
 6    A.   No, it would be material.  It's your
 7  largest tenant and they have an issue with the
 8  property and their occupancy of the property.
 9    Q.   And what about the question of
10  adverse?  How is the disclosure of a cracked
11  foundation adverse?  What is your basis for
12  deciding it's adverse?
13    A.   There's obviously a dispute with
14  your largest tenant, and potentially or certainly
15  likely can compromise the value of the asset or
16  the ability to sell the asset.
17    Q.   In making that decision, do you have
18  to look at who has the financial responsibility
19  for the cracked foundation if there is one?
20    A.   I -- no, I don't think -- the
21  ability to sell the asset, I don't think it
22  matters who has the obligation, because if you
23  have an asset that has a structural issue, it's
24  not sellable until that structural issue is
25  resolved.
```

Page 37

```
 1    Q.   Are you aware that cinema
 2  constructed its own building?
 3    A.   My understanding is they had -- I
 4  don't know if they physically constructed it
 5  themselves, or if they had some involvement in
 6  it, I don't know the specifications as to who
 7  built exactly what.
 8    Q.   Have you ever reviewed the cinema
 9  lease to determine who was responsible for
10  constructing the cinema building?
11    A.   No, I have not.
12    Q.   No material to your decision of
13  materiality?
14    A.   Materiality with respect to the
15  largest tenant is does the largest tenant have an
16  issue with respect to their occupancy at the
17  asset.
18     If there's a discrepancy between a developer
19  and this tenant, the developer probably ought to
20  take it up with the tenant.  It's not our fight.
21        (Off the record discussion.)
22    Q.   Under the original FPSA as we looked
23  at a moment ago, your rights if the seller
24  breached its obligation to give the tenant
25  estoppels was to terminate the contract.
```

Granite Southlands Town Center v. Alberta Town Center     ANDREW PIEKARSKI                                    4/7/2010

Page 38

1    Under -- with that remedy, do you believe
2    that the cinema estoppel was sufficiently
3    material and adverse to have justified BlackRock
4    in terminating the contract, not proceeding with
5    closing?
6        A.   We didn't, we closed.
7        Q.   I'm talking about under the original
8    agreement. The only right if you objected to a
9    tenant estoppel that was required?
10       A.   Absolutely.
11       Q.   You would have felt comfortable
12   terminating this contract on the basis of the
13   cinema estoppel?
14       A.   Absolutely.
15       Q.   And you recognize now that not only
16   did -- was you or BlackRock obligated to Alberta
17   under this forward purchase agreement, it also
18   had the standing as collateral to the banks, and
19   the banks had the right to enforce the agreement,
20   and you would have no problem terminating it as
21   to either party?
22       A.   No problem whatsoever.
23       Q.   Now as you know, this provision
24   relating to the right to terminate was modified
25   in the Fifteenth Amendment to provide for an

Page 39

1    estoppel holdback of $650,000 dollars, right?
2        A.   Right.
3        Q.   So you no longer had the right to
4    terminate, and you have the right if you're
5    correct to receive $650,000 dollars, right?
6        A.   Right.
7        Q.   How did that provision come about,
8    $650,000 dollar holdback, were you involved in
9    those negotiations?
10       A.   Yes.
11       Q.   Tell me how the concept of putting
12   up $650,000 in a holdback was arrived at.
13       A.   We recognized at the time of the
14   revised structure, effectively the buyout, I'll
15   call it a buyout of Alberta's interest for the $2
16   plus million dollars.
17       We recognized there would be insufficient
18   time to obtain fresh estoppels from the tenants,
19   so in order to provide for obtaining them, we had
20   decided to holdback -- mutually agreed upon a
21   holdback of $650,000 -- we being Alberta and
22   Granite while Alberta went out to procure the
23   estoppels as required under the forward
24   agreement.
25       Q.   How was the number $650 arrived at?

Page 40

1        A.   Just a negotiated number.
2        Q.   Was there a proposal from Granite
3    for a higher number and a smaller number from
4    Alberta, or was it just $650 and that's okay?
5        A.   I think it was -- we proposed $650
6    and they accepted. I don't think it was much
7    back and forth, they being Alberta.
8        Q.   Was there any basis that you
9    proposed $650? Was it tied to anything or just a
10   number?
11       A.   It was a -- we wanted it to be
12   sufficient to motivate them to go out and obtain
13   the estoppels.
14       Q.   All right. Now you probably recall
15   that for a period of time during the Summer of
16   2008 there was an effort to structure a deal that
17   would involve refinancing the project rather than
18   actually buying it?
19       A.   Right.
20       Q.   And there was a proposal drafted by
21   you and Mr. Silva that was presented to the
22   investment committee. Do you recall that?
23       A.   I guess it did make it to the
24   investment committee. I don't recall presenting
25   it to the investment committee. I'm not saying I

Page 41

1    didn't, I don't recall.
2        Q.   Well, there was one drafted and I
3    guess my question is was it ever presented? So
4    let me show you the document, and we'll see if it
5    refreshes your memory here.
6            (Whereupon Exhibit No. 122, Memo
7    dated 11/17/2008, was received and marked for
8    identification.)
9        A.   Okay.
10       Q.   This is a memorandum dated
11   November 17th, 2008 to the investment committee
12   from you and Mr. Silva?
13       A.   Correct.
14       Q.   Do you know if this proposal was
15   actually submitted to the committee?
16       A.   I really don't recall if we actually
17   formally submitted it.
18       Q.   I gather then that you don't recall
19   if they took any action on it?
20       A.   No, I don't.
21       Q.   The parties worked on trying to
22   document this transaction up until about December
23   of 2008; do you recall that?
24       A.   That sounds about right.
25       Q.   And at some point in time in early

11 (Pages 38 to 41)

Page 106

 1   A.   There are actual meetings because
 2   this was -- I believe this one was a physical
 3   meeting as well, sometimes smaller amounts are
 4   done electronically, but I think I'm pretty sure
 5   this one was a physical meeting next door.
 6   Q.   And did you attend that meeting?
 7   A.   Yes.
 8   Q.   You're not a member of the
 9   investment committee, were you?
10   A.   No, no.
11   Q.   Mr. Alexander was at the time?
12   A.   Yes.
13   Q.   Have you seen the accounting entries
14   of how this transaction was booked on Granite
15   Property Fund's books?
16   A.   The accounting entries, no.
17   Q.   Right, okay.  There isn't any
18   allocation of the purchase price among the $2.15
19   million paid to Alberta and the $3.2 or the
20   balance thereof refunded?
21   A.   I don't know.
22   Q.   As far as you know, it's whatever
23   the net cost was recorded on the books?
24   A.   Yeah, I don't -- beyond that I have
25   no idea.

Page 107

 1   Q.   All right.  It's not something you
 2   would have handled in making sure you got it
 3   done?
 4   A.   It's not something I would have
 5   handled, it's not something in my role -- is
 6   specific to my role.
 7   Q.   You have accountants that do that
 8   kind of thing?
 9   A.   That's why we have them.
10       MR. BENNETT:  All right.  I think I
11   can let you go with that.  Thank you for your
12   time.  I appreciate it.
13   EXAMINATION BY MR. TRAHAN:
14   ==Q.   Just a quick couple questions.  With==
15   ==respect to the estoppel certificates Mr.==
16   ==Piekarski, did Granite as a buyer have any==
17   ==obligation to investigate the issues set out, in==
18   ==particular, estoppel certificates?==
19   ==     MR. BENNETT:  Object to the form,==
20   ==lack of foundation.==
21   ==A.   No.  It's the seller's==
22   ==responsibility==.
23       MR. TRAHAN:  No further questions.
24       (Deposition concluded at 5:35 p.m.)
25

Page 108

 1              C E R T I F I C A T E
 2       I, NICOLE LYNN KISH, a Certified Court
 3   Reporter and Notary Public of the State of New
 4   Jersey, do hereby certify that prior to the
 5   commencement of the examination, ANDREW
 6   PIEKARSKI, was duly sworn by me to testify the
 7   truth, the whole truth and nothing but the truth.
 8       I DO FURTHER CERTIFY that the foregoing
 9   is a true and accurate transcript of the
10   testimony as taken stenographically by and before
11   me at the time, place and on the date set forth,
12   to the best of my ability.
13       I DO FURTHER CERTIFY that I am neither a
14   relative nor employee nor attorney nor counsel of
15   any of the parties to this action, and that I am
16   neither a relative nor employee of such attorney
17   or counsel, and that I am not financially
18   interested in the action.
19
20
21   ------------------------------------------------
22          NICOLE LYNN KISH
23       Notary Public of the State of New Jersey
24       My Commission expires September 10, 2011
25   Dated:  April 12, 2010

 1       I, ANDREW PIEKARSKI, do hereby certify that
 2   I have read the above and foregoing deposition and
 3   that the same is a true and accurate transcription of
 4   my testimony, except for attached amendments, if any.
 5       Amendments attached   ( ) Yes   ( ) No
 6
 7
 8
 9       _____
         ANDREW PIEKARSKI
10
11
12
13       The signature above of ANDREW PIEKARSKI was
14   subscribed and sworn to before me in the county of
15   _____, state of Colorado, this _____ day of
16   _____, 2010.
17
18
19
         _____
20       Notary Public
         My commission expires
21
22
23
24
25   Granite Southlands Town Center, LLC 4/07/10 (nlk)