# EXHIBIT A.

Granite Southlands Town Center v. Alberta Town Center     ANDREW PIEKARSKI                    4/7/2010

**1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

CIVIL ACTION NO. 09-CV-00799-ZLW-KLM

GRANITE SOUTHLANDS TOWN          :

CENTER, LLC,                     :

    Plaintiff,   : CIVIL ACTION

    vs.          :

ALBERTA TOWN CENTER, LLC, LAND   :

TITLE GUARANTEE COMPANY,         :

DONALD G. PROVOST, ALLAN G.      :

PROVOST, and PETER M. CUDLIP,    :

    Defendants.  :

DEPOSITION UPON ORAL EXAMINATION OF:

ANDREW PIEKARSKI

April 7, 2010

*******CONFIDENTIAL, ATTORNEYS' EYES ONLY*******

HUNTER & GEIST, INC.

1900 Grant Street, Suite 800

Denver, Colorado 80203

(303) 832-5966 - (800) 525-8490 (Toll Free)

www.huntergeist.com

**2**

1    Computer-aided transcript of the deposition

2  testimony of ANDREW PIEKARSKI, taken

3  stenographically in the above-entitled matter

4  before NICOLE L. KISH, a Certified Court Reporter

5  and Notary Public of the State of New Jersey, at

6  the offices of BLACKROCK REALTY, 300 Campus

7  Drive, Suite 300, Florham Park, New Jersey 07932,

8  on Wednesday, April 7, 2010, commencing at 2:39

9  p.m.

**3**

A P P E A R A N C E S :

FULBRIGHT & JAWORSKI, LLP.

BY:  PAUL TRAHAN, ESQ.

  600 Congress Avenue

  Suite 2400

  Austin, Texas 78701

  (512) 474-5201

  ptrahan@fulbright.com

For the Plaintiff, Granite Southlands

Town Center.

LINDQUIST & VENNUM, PLLP.

BY:  STUART N. BENNETT, ESQ.

  600 17th Street

  Suite 1800 South

  Denver, Colorado 80202

  (303) 573-5900

  sbennett@linquist.com

For the Defendant, Alberta Town

Center, LLC.

**4**

I N D E X

WITNESS                          PAGE

ANDREW PIEKARSKI

Examination By Mr. Bennett          5

Examination By Mr. Trahan         108

E X H I B I T S

ID    DESCRIPTION                PAGE

122   Memo dated 11/17/2008        41

123   Letter dated 04/03/2008      83

124   Fourteenth Amendment         85

125   Email dated 09/10/2008       94

126   Email dated 09/17/2008       95

127   Email dated 11/28/2008       97

128   Email dated 12/03/2008       99

129   Email dated 12/8/2008       102

(EXHIBITS ANNEXED HERETO)

**5**

1 A N D R E W   P I E K A R S K I, having been first
2 duly sworn, testified as follows:
3 EXAMINATION BY MR. BENNETT:
4 Q. Would you please state your full
5 name for the record.
6 A. Andrew Piekarski.
7 Q. You have met with Mr. Trahan I
8 assume before this deposition?
9 A. I have.
10 Q. And you've had an opportunity to
11 discuss with him the procedure?
12 A. Yes.
13 Q. So I don't need to go over with you
14 the rules of deposition taking at this point; is
15 that understood?
16 A. I am fine with that.
17 Q. Okay, good. All right. How long
18 have you been employed by BlackRock?
19 A. Since 1999. I left for about a
20 two-year period, a little less than two years
21 from 2001 to about 2003.
22 I should clarify, at predecessor firms. I
23 was with SSR, so it wasn't BlackRock originally.
24 BlackRock bought State Street Research and
25 Management in 2005, and I joined BlackRock as

**6**

1 part of that transaction.
2 Q. So SSR is State Street and Research?
3 A. State Street Research and
4 Management.
5 Q. And what job positions have you held
6 with BlackRock?
7 A. I was an acquisitions director from
8 '99 through 2006, and then in 2007 I transitioned
9 over to the portfolio management side on
10 BlackRock Granite Fund.
11 Q. And you've held that position since?
12 A. Correct.
13 Q. I understand that BlackRock has its
14 acquisition -- real estate acquisition department
15 divided into regions?
16 A. That's correct.
17 Q. Were you assigned a particular
18 region as acquisitions director?
19 A. I was on the East Coast.
20 Q. So you had no direct involvement I
21 gather then in the acquisition of, or the
22 entering into the agreement to acquire the
23 Southlands Shopping Center back in 2005?
24 A. That's correct.
25 Q. That would have been one of your

**7**

1 counterparts who had the Rocky Mountain area as a
2 territory?
3 A. Correct.
4 Q. And I understand that to be a Mr.
5 Corrigan; is that right?
6 A. Steve Corrigan, yes.
7 Q. Is there a strategy at BlackRock to
8 acquire at least some percentage of its real
9 estate investments pursuant to forward commitment
10 contracts?
11 A. It has been a strategy and continues
12 to be a strategy.
13 Q. And how would you describe that
14 strategy?
15 A. As it relates to the Granite Fund,
16 it typically was -- the target was about a third
17 -- 30/35 percent of the annual acquisition
18 volume.
19 It's since been ratcheted back and we
20 probably will do no more than 10 percent of the
21 gross asset value of the fund.
22 Q. And that's a reflection of market
23 conditions?
24 A. Correct.
25 Q. Now as I understand the idea behind

**8**

1 a forward commitment contract, it is that if you
2 purchase in advance of construction or early in
3 construction, you have an opportunity to
4 establish a price that hopefully will be less
5 than the market value at the time you actually
6 acquire the property. Is that kind of the
7 concept?
8 A. Essentially, yes.
9 Q. All right. And the risk of course
10 is if the market does not increase that you can
11 be committed to buy something for more than the
12 market value at the time you buy it?
13 A. That's one of the risks, yes.
14 Q. Okay. And in particular with the
15 Southlands Shopping Center, it turned out that
16 the market value of the property at the time of
17 acquisition was less than the actual contract
18 price?
19 A. That's correct.
20 Q. And it has continued to decline
21 somewhat since acquisition; is that right?
22 A. That's correct.
23 Q. So at present time the Granite
24 Property Fund has an acquisition cost which
25 exceeds the market value of the property?

**9**

1   A.   Correct.

2   Q.   Does any of the difference between
3   market price and the acquisition price for the
4   Southlands Shopping Center have anything to do
5   with the condition of the property, or is it all
6   based on market rents and market --
7        MR. TRAHAN: Object to the form of
8   the question.
9   A.   I would say it's probably a
10  combination. I can't specify, I don't know the
11  property is sellable now because of the condition
12  of the property. So I don't know if I can
13  completely answer your question.
14  Q.   Okay. Has BlackRock taken any
15  write-down on its financial statements due to
16  some lack of salability of the property?
17  A.   The property is appraised --
18       MR. TRAHAN: Object to form. Go
19  ahead.
20  A.   The property is appraised by a third
21  party appraiser who evaluates the -- part of it
22  would be the condition of the property. So we
23  value it based on what a third party appraiser
24  tells us it's worth.
25  Q.   Has there been an appraisal that

**10**

1   does take into account the condition of the
2   property?
3   A.   There was an appraisal done in
4   December and a subsequent one done during the
5   first quarter. The specifics regarding the
6   appraisal I don't know.
7   Q.   When you say December, December '08
8   or '09?
9   A.   I'm sorry, December of 2008. It was
10  -- they were done quarterly.
11  Q.   Okay. Now I've in other depositions
12  have had the December '08 appraisal described as
13  one which assumed the condition of the property
14  to be good, and so that the appraisal was not
15  based upon any assessment of the condition of the
16  property at the time.
17  A.   It was based on the appraiser's
18  visible apparent assessment of the property.
19  Q.   Are you aware of any appraiser that
20  has commented on the condition of the property as
21  a reason for lowering its market value?
22  A.   No, it's -- we don't -- we, the
23  portfolio management team does not get involved
24  in the appraisal process. It's separate and
25  distinct from the portfolio management function.

**11**

1   Q.   Okay. Now are you aware of work
2   done by Granite since its acquisition of the
3   property to assess the condition of the property?
4   A.   We have engaged studies to assess
5   the condition of the property.
6   Q.   Are those studies provided to you?
7   A.   They are largely -- it's largely
8   overseen by an engineering team that we have
9   in-house, and I will consult with the engineering
10  team, but I do not review the studies. I don't
11  have the professional expertise to review a
12  study.
13  Q.   So is the engineering staff headed
14  up by a man named Philip Yee?
15  A.   Yes, that's correct.
16  Q.   So he would be familiar at this
17  point in time with the current condition of the
18  property more so than you?
19  A.   When you say -- you mean the
20  physical condition of the property, or the status
21  of the review or both?
22  Q.   Probably both.
23  A.   Both, yes.
24  Q.   Are you aware that recently Granite
25  sent a letter to various construction

**12**

1   professionals who worked on the property advising
2   them of potential claims?
3   A.   Not specifically, no.
4   Q.   Are you aware that there's some
5   proposal I understand to drill one or more wells
6   on the property, and to pump water from the
7   structure beneath the property?
8   A.   My general understanding is that
9   they are reviewing alternatives as to how to
10  address the movement issue, but I'm -- I don't
11  know enough about it to comment on specifics.
12  Q.   So you don't know any specifics
13  about how many wells are proposed to be drilled
14  and when --
15  A.   No.
16  Q.   -- and how deep?
17  A.   No.
18  Q.   Okay. You did not have, I gather,
19  any role in negotiating the original Forward
20  Purchase and Sale Agreement for this property?
21  A.   I did not.
22  Q.   Is a forward purchase and sale
23  agreement one with which you're familiar?
24  A.   Generally, yes.
25  Q.   Is there a standard sort of template

**13**

1    that BlackRock uses, or are they all sort of
2    individually negotiated?
3        A.    I don't know.
4        Q.    Have you seen similar provisions in
5    multiple forward purchase and sale agreements?
6            MR. TRAHAN:  Object to form.
7        A.    No, because I personally -- I don't
8    recall -- I don't know if I've ever personally
9    negotiated a forward purchase and sale agreement,
10   so I -- I don't know if I have enough -- when you
11   say -- let me back up a second.  When you say
12   provisions, what provisions?
13       Q.    Any typical provisions.  I'm asking
14   if there are kind of general provisions that show
15   up, and all ones that you're familiar with.
16       A.    I don't know.
17       Q.    And when you were director of
18   acquisitions, you were not personally involved in
19   any forward commitment contracts?
20       A.    I don't think I've done -- I've
21   negotiated a forward commitment.
22       Q.    Have you had occasion to review the
23   Forward Purchase and Sale Agreement involved in
24   the Southlands project?
25       A.    I'm sure I reviewed sections of it.

**14**

1        Q.    Any particular ones that you know of
2    that you reviewed?
3        A.    I don't recall.
4        Q.    In front of you are a bunch of
5    exhibits that we marked earlier.  I don't know
6    what order they're in.
7        A.    They're not.
8        Q.    They may not be in any order.
9        A.    Maybe they're in reverse, I think
10   they're in reverse older.
11       Q.    Well then, at the very bottom should
12   be the Forward Purchase and Sale Agreement if
13   they're in reverse order.
14       A.    Probably the thickest one I'm going
15   to guess.  There we go.  101 if it matters.
16       Q.    We will refer to the various
17   documents by exhibit number.  Exhibit 101, in
18   looking at this document, are there any
19   particular sections that you recall having
20   reviewed and become familiar with?
21       A.    Not without spending a good deal of
22   time reviewing it, so no, not immediately.
23       Q.    Okay.  There's a provision on page
24   seven, which is section 5.1 as is, where is.  Do
25   you see that section?

**15**

1        A.    Yes, mm-hmm.
2        Q.    Without going into detail about what
3    each of these photographs provide, essentially
4    the contract is an as is, where is, seller makes
5    no representations or warranties with respect to
6    the condition of the property?
7        A.    Correct.
8            MR. TRAHAN:  Object to form.
9        Q.    Is this a type of provision that you
10   are familiar with in your experience in dealing
11   in acquisitions for BlackRock?
12       A.    Yes.
13       Q.    Is it a common provision in
14   acquisition agreements with BlackRock where the
15   seller makes no representations or warranties as
16   to condition?
17       A.    Yes.
18           MR. TRAHAN:  Object to form.
19       A.    Yes.
20       Q.    In accepting a property on an as is,
21   where is -- under an as is, where is contract,
22   what does BlackRock typically do to make sure
23   that it is not buying a property that has
24   defects?
25           MR. TRAHAN:  Object to form.

**16**

1        A.    A due diligence process, which
2    includes financial review, legal review, physical
3    review and environmental review.
4        Q.    And do you know if in closing on the
5    Forward Purchase and Sale Agreement with
6    Southlands whether there was a physical review of
7    the property done by Granite?
8        A.    Ever?
9        Q.    Yes.
10       A.    We had construction oversight I
11   believe by Marx Okubo during the development
12   process.  I think that was -- that predated me a
13   little bit, so I'm not positive on that.
14       Q.    What's the name of the firm?
15       A.    Marx Okubo.
16       Q.    How do you spell that?
17       A.    M-A-R-X -- can I ask my counsel?
18           MR. TRAHAN:  Slash O-K-U-B-O.
19       Q.    Okay.  So during the construction
20   phase there was a company called Marx/Okubo?
21       A.    Yes, something like that.
22       Q.    Something close to that, that was
23   overseeing the construction on behalf of Granite?
24       A.    Yes, I believe that was the name of
25   the firm.

Granite Southlands Town Center v. Alberta Town Center        ANDREW PIEKARSKI        4/7/2010

**17**

1    Q.    All right.  Do you know how often
2  this construction company --
3    A.    I don't.
4    Q.    -- reviewed the site?
5    A.    I don't.
6    Q.    Under whose jurisdiction was the
7  project during that -- for that work?
8    A.    I don't know.
9    Q.    Is that overseen by Granite's
10  engineering department?
11    A.    It would have been -- that's not
12  Granite's engineering department, it would have
13  been the -- BlackRock's engineering department.
14  It's not Granite specific.
15    Q.    Okay.  So during the construction
16  phase, BlackRock's engineering department
17  oversees the construction and uses outside
18  professionals to help it?
19    A.    That's generally the case.  Again, I
20  can't speak specifically of this asset, I was not
21  working on this asset during the construction
22  phase.
23    Q.    But if normal BlackRock procedures
24  were followed, that's what would have been done?
25    A.    I believe those were the procedures

**18**

1  back in 2005 as well.
2    Q.    When did you take on any
3  responsibility for the Southlands Shopping
4  Center?
5    A.    It grew gradually as I became more
6  involved and had a greater understanding of the
7  fund and the assets in the fund, so I can't point
8  to a specific day saying I'm taking
9  responsibility, but just being involved with the
10  rest of the portfolio management team and
11  learning what was going on, and you start to try
12  to help and apply your experience too.
13    So I can't point to a specific day, but it
14  was during 2007 and certainly into 2008.
15    Q.    Okay.  So you -- I think you told me
16  you became a portfolio manager for the BlackRock
17  Granite Fund in 2006 sometime?
18    A.    No, in January of 2007.
19    Q.    Oh, sorry, I wrote 2006.
20    A.    I don't think I misspoke, but
21  January 2007.  A perfect time to start the
22  portfolio management function to build a track
23  record, I might add.
24    Q.    And as you became more familiar with
25  the properties that were either in the portfolio

**19**

1  or were going to be in the portfolio, you became
2  more familiar with this project?
3    A.    Correct.
4    Q.    During 2007 and 2008, did the
5  Granite Property Fund acquire additional
6  commercial retail and office real estate?
7    A.    Yes.
8    Q.    Do you know approximately how many
9  acquisitions were made during 2007 and 8 by the
10  Granite Property Fund?
11    A.    I don't know.  It would be merely a
12  guess.  I don't want to guess.
13    Q.    Well, I took a little statement off
14  of BlackRock's web site that says in 2008 the
15  transaction group executed 43 acquisitions
16  totaling $1.5 billion, and 17 dispositions
17  totaling $850 million.
18    Some of those I assume -- some of the
19  acquisitions were for the property fund, I
20  assume?
21    A.    I'm sure they are.
22    Q.    And you can't or don't have a good
23  estimate for me of how many of the 43
24  acquisitions in 2008 were for the Granite
25  Property Fund?

**20**

1    A.    I would just be guessing and I don't
2  want to guess.  I'm not sure.
3    Q.    If you don't know and you can't give
4  me an estimate, that's fine.
5    A.    I'm not sure.
6    Q.    Do you know how many transactions
7  during 2008 were pursuant to forward commitment
8  contracts?
9    A.    I don't.
10    Q.    I assume one of those 43
11  acquisitions in 2008 would have been the
12  Southlands Shopping Center?
13    A.    Assuming that is accurate, yes, I'm
14  sure.
15    Q.    Now --
16    A.    I hope we're not going to go through
17  this one page at a time, otherwise we're going to
18  be here a while.
19    Q.    No, no, we will not go through every
20  page, nor one page at a time, but there are some
21  pages in this document in particular that are
22  kind of important.
23    There is a provision under -- on page 11 of
24  Exhibit 101, which is under paragraph 5.3(c)
25  called No Disapproval Right.

Granite Southlands Town Center v. Alberta Town Center     ANDREW PIEKARSKI     4/7/2010

---

**21**

1    Were you aware that under the terms of this
2    provision that Buyer, i.e. Granite has no right
3    to terminate the agreement as a result of any
4    matter relating to the condition of the property,
5    its entitlements, status or marketability?
6        MR. TRAHAN:  Object to form.
7        A.    I would look to my counsel to advise
8    me on how that paragraph is to be applied.  I'm
9    not an attorney, so I would look to my counsel
10   and let them tell us what we could or could not
11   do.
12       Q.    Okay.  So you have no knowledge or
13   based on your experience of any meaning to that
14   provision other than what it says?
15       A.    I'm not sure I follow.
16       Q.    You don't have any special knowledge
17   to interpret what this provision means other than
18   the language itself?
19       MR. TRAHAN:  Object to form.
20       A.    I don't have -- not having a legal
21   background, I would look to counsel to tell me
22   what the provisions of this paragraph meant.
23       Q.    And do you have any experience in
24   dealing with similar provisions in your
25   experience?

---

**22**

1        MR. TRAHAN:  Object to form.
2        A.    I -- no, I've never had to refer to
3    this -- a paragraph such as this in prior deals.
4        Q.    Okay.  Have you ever been involved
5    in a proposed acquisition -- well, I think you've
6    already answered that.  You have never done an
7    acquisition pursuant to a forward purchase
8    contract other than the Southlands?
9        A.    I never negotiated a forward
10   purchase agreement.  Granite Fund has had other
11   forwards close during my time on the fund, I have
12   never negotiated a forward purchase agreement.
13       Q.    All right.  Let me ask the question
14   then, perhaps you haven't answered it.  Have you
15   ever had a forward commitment contract terminated
16   because of a condition of the property?
17       A.    No.
18       Q.    Have you ever had issues relating to
19   the furnishing of tenant estoppels in connection
20   with the closing of any forward commitment
21   contract for the property fund?
22       MR. TRAHAN:  Could you read back the
23   question.
24       (Thereupon, question is read back by
25   the reporter as follows:

---

**23**

1        "QUESTION:  Have you ever had issues
2    relating to the furnishing of tenant estoppels in
3    connection with the closing of any forward
4    commitment contract for the property fund?"
5        MR. TRAHAN:  Object to form.
6        A.    Not that I'm aware of.
7        Q.    Other than the one that we're
8    currently --
9        A.    I presume you meant that.
10       Q.    Yes.  All right.  So no other
11   contract where you've had issues relating to
12   tenant estoppels
13       A.    No, not that I'm aware of.
14       Q.    Okay.  And are you familiar with any
15   of the Southside transactions entered into by the
16   Granite Property Fund?
17       A.    Yes.
18       Q.    Have there been any of those where
19   Granite Property Fund had to provide tenant
20   estoppels in connection with the closing of a
21   sale?
22       A.    I would think pretty much every
23   commercial asset -- you know, is going to be some
24   provision regarding tenant estoppels, so -- but I
25   don't know if there have ever been issues on a

---

**24**

1    sale.
2        Q.    So you're not aware of any if there
3    were?
4        A.    I don't know.
5        Q.    Are you aware that the Forward
6    Purchase and Sale Agreement was part of the
7    collateral for the financing secured by Alberta
8    for this project?
9        A.    Yes.
10       Q.    And you're aware that the agreement
11   was pledged to and assigned to the consortium of
12   banks that provided the funds?
13       A.    Whatever the legal mechanics behind
14   it, the agreement for Granite to buy the property
15   was part of the -- provided a lot of the ability
16   to procure the construction financing.
17       Q.    And as a result of that, the banks
18   had the ability to enforce the terms of the
19   Forward Purchase and Sale Agreement pursuant to a
20   tri-party agreement between Granite, Alberta and
21   the banks?
22       A.    Correct.
23       MR. TRAHAN:  Object to form.
24       Q.    There is a provision on page 16 of
25   the Forward Purchase and Sale Agreement in

---

Granite Southlands Town Center v. Alberta Town Center    ANDREW PIEKARSKI    4/7/2010

---

25

1   paragraph F on that page dealing with Change in
2   Condition.  Review that paragraph for me.
3        A.    Okay.
4        Q.    Have you ever been involved in a
5   situation where you've had to review this type of
6   a provision in another transaction?
7        A.    Excluding this transaction?
8        Q.    Excluding this one.
9        A.    No, not that I recall.
10        Q.    Now in this particular transaction
11   with Southlands Shopping Center, are you aware of
12   any condition in the property that pursuant to
13   this paragraph would be required to be disclosed?
14            MR. TRAHAN:  Object to form.
15        A.    In my view, knowledge of foundation
16   movement and structural defects should have been
17   disclosed.
18        Q.    Pursuant to this paragraph or some
19   other concept?
20            MR. TRAHAN:  Object to form.
21        A.    Pursuant to this paragraph, pursuant
22   to just what I would consider fair business
23   dealings.
24        Q.    Well, let's focus for a minute on
25   this paragraph.  What about -- what aspect of the

---

26

1   knowledge of foundation and structural defects
2   would be required to be disclosed under this
3   paragraph --
4            MR. TRAHAN:  Object to form.
5        Q.    -- in your view?
6        A.    The first part, "Seller shall
7   promptly notify Buyer of any change and any
8   condition with respect to the property or any
9   portion thereof."
10        Q.    Okay.  It has to disclose those
11   things which do one of two things; A, makes any
12   reputation or warranty of seller to buyer under
13   this agreement untrue or misleading, or B, makes
14   any covenant or agreement of seller under this
15   agreement incapable of being performed.
16        A.    Well, I would --
17        Q.    Which of those two would be
18   implicated?
19            MR. TRAHAN:  Object to form.
20        A.    I would say A.
21        Q.    And what representation or warranty
22   of seller to buyer under the agreement is untrue
23   or misleading if the seller knows of foundation
24   or structural defects?
25            MR. TRAHAN:  Object to form.

---

27

1        A.    There was in my view, a completed
2   project with a seller who has knowledge of
3   structural damage, and is issued a certificate of
4   substantial completion when they know that it
5   probably isn't really complete even though you
6   can argue that yes, we did A, B and C, but we
7   know A, B and C didn't work.  My argument is you
8   haven't fulfilled the obligations to complete the
9   project.
10        Q.    So one of the undertakings of the
11   owner or Alberta in this case was to develop the
12   -- use commercially reasonable efforts consistent
13   with the standard of care and diligence
14   applicable to first rate developers to cause a
15   construction of the buildings and improvements in
16   a timely manner using commercially reasonable
17   efforts to be completed on or before December 31,
18   2006.
19        It's your view that having knowledge of
20   foundation and structural defects is knowledge
21   that it has not been substantially complete?
22            MR. TRAHAN:  Object to form.
23        A.    I would say certainly not in a
24   commercially reasonable manner.
25        Q.    Now I'm on page 12 if you want to

---

28

1   look at the provisions relating to substantial
2   completion.  Under 7.1(c) on page 12 there is a
3   definition of substantial completion, see that?
4        A.    Okay, mm-hmm.
5        Q.    And it occurs at such time as all
6   the improvements have been constructed in
7   accordance with the plans and specifications and
8   in compliance with all requirements in capital
9   define term.
10        The estimate of cost to complete the punch
11   list items equals or is less than $500,000
12   dollars, and seller has received certificates of
13   occupancy, correct?
14            MR. TRAHAN:  Object to form.
15        A.    Correct.
16        Q.    All right.  Which of those three
17   items has not been accomplished if the seller has
18   knowledge of foundation and structural defects?
19        A.    If you have active knowledge that
20   the plans and the specifications are insufficient
21   or inadequate for the project, regardless of
22   whether it was built to those plans and
23   specifications, if you know that they were
24   inappropriate, you have an obligation to disclose
25   that.

---

Granite Southlands Town Center v. Alberta Town Center        ANDREW PIEKARSKI                                    4/7/2010

---

29

1      Q.      What knowledge do you have of
2  Alberta's knowledge that the plans and
3  specifications were inadequate to construct the
4  project?
5      A.      We've seen correspondence from
6  Alberta and other engineers, and correspondence
7  from tenants to Alberta indicating that there was
8  structural damage with respect to the foundations
9  -- or structural issues with respect to the
10  foundations.
11     Q.      Specifically indicating cracks in
12  their walls?
13     A.      Cracks or settlement or multiple
14  issues.
15     Q.      And from that do you conclude that
16  there is some knowledge that the plans and
17  specifications are inadequate to complete the
18  project?
19     A.      The project is -- you could say it
20  was technically complete, but you can certainly
21  call into question whether or not the plans or
22  specifications were appropriate.
23         If you're a ship builder and you're charged
24  with building a ship, and you finish the ship and
25  as soon as you put it in the water it sinks, you

---

30

1  probably ought to tell your client that the ship
2  doesn't float.
3      Q.      Well, not so sure that the project
4  sank in that context.
5      A.      I'm using it as an example of -- an
6  analogy.
7      Q.      I understand.  Of the -- how many
8  buildings did BlackRock acquire when it bought
9  the Southlands Shopping Center?
10     A.      I don't remember how many buildings
11  were on the site.
12     Q.      How many buildings were implicated
13  in these structural defects or foundation issues?
14     A.      I'm not sure.  I don't remember.
15     Q.      Certainly not all of them?
16     A.      I don't believe they were all of
17  them.
18     Q.      Okay.
19     A.      More than one.
20     Q.      More than one and less than all?
21     A.      Right, somewhere in the middle.
22     Q.      In paragraph (g) on page 16 there is
23  a provision for seller to cause the warranties
24  and guarantees of its contractor and its
25  architects and others to be assigned to the buyer

---

31

1  at closing without the consent -- without the
2  payment of any additional consideration, correct?
3         MR. TRAHAN:  Object to form.
4      A.      Appears so, I haven't read the
5  entire paragraph.
6      Q.      Well, I'm just talking about general
7  subject matter.
8         THE WITNESS:  Can we stipulate to
9  that, Paul?
10         MR. TRAHAN:  Document speaks for
11  itself.
12     A.      It appears that way.
13     Q.      So the concept is is that the
14  warranties and guarantees by the construction
15  professionals will be assigned to or made
16  available to the buyer?
17     A.      Yes.
18     Q.      And that took place in this case,
19  correct?
20     A.      Yes.
21     Q.      And by giving notice to construction
22  professionals, Granite has sought to execute or
23  to effectuate those assignment of warranties and
24  guarantees, correct?
25     A.      Correct.

---

32

1      Q.      And it contemplates at least
2  pursuing claims against the contractors and
3  responsible parties for any construction defects
4  that exist at the property?
5      A.      Yes.
6      Q.      At least it's preserving its right
7  to do so whether it does or not?
8      A.      Correct.
9      Q.      All right.  On the bottom of page
10  16, there is a provision relating to estoppels,
11  right?
12     A.      Yes.
13     Q.      In subparagraph (i) of paragraph
14  7.2, and in this paragraph the seller, i.e.
15  Alberta is required to deliver to tenants
16  tentative estoppel certificates and the form
17  attached, and then to use commercially reasonable
18  efforts to cause those tenants to sign those
19  tenant estoppels, correct?
20     A.      Yes.  I thought you were about to
21  ask me something else.  I'll be happy to read the
22  paragraph.
23     Q.      Well, if you need to to answer my
24  question feel free to.  My question is is if the
25  seller fails to obtain the required estoppels as

---

33

1  defined, then the sole consequences provided in
2  this paragraph is the purchaser or buyer's right
3  to terminate the agreement?
4        MR. TRAHAN:  Object to form.
5     A.    Yes.
6     Q.    Now let's look at page 18, which
7  deals with what tenant estoppel must contain, and
8  it's on page 18, paragraph 8(k), romanette i and
9  romanette double ii.
10       Two requirements for tenant estoppels; one
11 is for tenants with more than 10 percent of their
12 rentable square feet, the other is a total from
13 tenants who occupy at least 75 percent of the
14 rentable square footage subject to qualifying
15 leases, correct?
16    A.    Correct.
17    Q.    Do you have any knowledge whether
18 Alberta has met the -- providing the 75 percent
19 of the total number of rentable square feet
20 subject to qualifying leases at the center?
21    A.    I believe they reached 76 percent.
22    Q.    And so the dispute we have is from
23 the cinema, which is the only tenant at the
24 center that occupies more than 10 percent of the
25 rentable square feet?

34

1     A.    Correct.
2     Q.    Now paragraph 8(k), romanette double
3  i provides certain circumstances under which the
4  buyer may object to a tenant's estoppel
5  certificate, correct?
6     A.    Yes.
7     Q.    The first is it's not in the form
8  required under paragraph 7.2, which refers us
9  back to Exhibit H, or has been materially and
10 adversely modified from that form.
11       Do you have experience in dealing with
12 similar clauses in other transactions that
13 provided for objections to tenant estoppels that
14 have been materially or adversely modified?
15       MR. TRAHAN:  Object to form.
16    A.    Nothing -- none that precluded a
17 transaction ultimately from closing.
18    Q.    Have you been called upon in other
19 transactions to make judgments about what
20 constitutes a material and adverse modification
21 of the required form?
22    A.    No.
23    Q.    Do you know or is there any standard
24 by which one judges what is a material and
25 adverse modification of the form?

35

1        MR. TRAHAN:  Object to form.
2     A.    When it's material you know it.
3     Q.    Kind of like pornography, you know
4  it when you see it?
5     A.    I'll let you be the judge of that,
6  but when it's material, you know it, which is why
7  I think we're here.
8        There were two significant provisions that
9  were changed in the tenant estoppel that we're
10 referring to.  One was the reference to the
11 structural and foundation defects, and the other
12 was the deletion of a bankruptcy paragraph.
13    Q.    All right.  So how have you judged
14 that those two items that you've mentioned were
15 material?
16    A.    A structural defect is material and
17 warrants further investigation.
18    Q.    And how do you define the term
19 material?  How do you judge that that's material?
20    A.    From sound business judgment and
21 anybody who looked at a building with a
22 structural defect when you have other tenants and
23 other estoppels giving other information with
24 respect to structural defects, leases that were
25 -- or estoppels that were kicked out, it becomes

36

1  material.
2     Q.    So are you suggesting that by itself
3  the cinema disclosure of cracked foundation would
4  not be material, not necessarily material but in
5  conjunction with other certificates?
6     A.    No, it would be material.  It's your
7  largest tenant and they have an issue with the
8  property and their occupancy of the property.
9     Q.    And what about the question of
10 adverse?  How is the disclosure of a cracked
11 foundation adverse?  What is your basis for
12 deciding it's adverse?
13    A.    There's obviously a dispute with
14 your largest tenant, and potentially or certainly
15 likely can compromise the value of the asset or
16 the ability to sell the asset.
17    Q.    In making that decision, do you have
18 to look at who has the financial responsibility
19 for the cracked foundation if there is one?
20    A.    I -- no, I don't think -- the
21 ability to sell the asset, I don't think it
22 matters who has the obligation, because if you
23 have an asset that has a structural issue, it's
24 not sellable until that structural issue is
25 resolved.

37

1    Q.    Are you aware that cinema
2 constructed its own building?
3    A.    My understanding is they had -- I
4 don't know if they physically constructed it
5 themselves, or if they had some involvement in
6 it, I don't know the specifications as to who
7 built exactly what.
8    Q.    Have you ever reviewed the cinema
9 lease to determine who was responsible for
10 constructing the cinema building?
11    A.    No, I have not.
12    Q.    No material to your decision of
13 materiality?
14    A.    Materiality with respect to the
15 largest tenant is does the largest tenant have an
16 issue with respect to their occupancy at the
17 asset.
18    If there's a discrepancy between a developer
19 and this tenant, the developer probably ought to
20 take it up with the tenant.  It's not our fight.
21    (Off the record discussion.)
22    Q.    Under the original FPSA as we looked
23 at a moment ago, your rights if the seller
24 breached its obligation to give the tenant
25 estoppels was to terminate the contract.

38

1    Under -- with that remedy, do you believe
2 that the cinema estoppel was insufficiently
3 material and adverse to have justified BlackRock
4 in terminating the contract, not proceeding with
5 closing?
6    A.    We didn't, we closed.
7    Q.    I'm talking about under the original
8 agreement.  The only right if you objected to a
9 tenant estoppel that was required?
10    A.    Absolutely.
11    Q.    You would have felt comfortable
12 terminating this contract on the basis of the
13 cinema estoppel?
14    A.    Absolutely.
15    Q.    And you recognize now that not only
16 did -- was you or BlackRock obligated to Alberta
17 under this forward purchase agreement, it also
18 had the standing as collateral to the banks, and
19 the banks had the right to enforce the agreement,
20 and you would have no problem terminating it as
21 to either party?
22    A.    No problem whatsoever.
23    Q.    Now as you know, this provision
24 relating to the right to terminate was modified
25 in the Fifteenth Amendment to provide for an

39

1 estoppel holdback of $650,000 dollars, right?
2    A.    Right.
3    Q.    So you no longer had the right to
4 terminate, and you have the right if you're
5 correct to receive $650,000 dollars, right?
6    A.    Right.
7    Q.    How did that provision come about,
8 $650,000 dollar holdback, were you involved in
9 those negotiations?
10    A.    Yes.
11    Q.    Tell me how the concept of putting
12 up $650,000 in a holdback was arrived at.
13    A.    We recognized at the time of the
14 revised structure, effectively the buyout, I'll
15 call it a buyout of Alberta's interest for the $2
16 plus million dollars.
17    We recognized there would be insufficient
18 time to obtain fresh estoppels from the tenants,
19 so in order to provide for obtaining them, we had
20 decided to holdback -- mutually agreed upon a
21 holdback of $650,000 -- we being Alberta and
22 Granite while Alberta went out to procure the
23 estoppels as required under the forward
24 agreement.
25    Q.    How was the number $650 arrived at?

40

1    A.    Just a negotiated number.
2    Q.    Was there a proposal from Granite
3 for a higher number and a smaller number from
4 Alberta, or was it just $650 and that's okay?
5    A.    I think it was -- we proposed $650
6 and they accepted.  I don't think it was much
7 back and forth, they being Alberta.
8    Q.    Was there any basis that you
9 proposed $650?  Was it tied to anything or just a
10 number?
11    A.    It was a -- we wanted it to be
12 sufficient to motivate them to go out and obtain
13 the estoppels.
14    Q.    All right.  Now you probably recall
15 that for a period of time during the Summer of
16 2008 there was an effort to structure a deal that
17 would involve refinancing the project rather than
18 actually buying it?
19    A.    Right.
20    Q.    And there was a proposal drafted by
21 you and Mr. Silva that was presented to the
22 investment committee.  Do you recall that?
23    A.    I guess it did make it to the
24 investment committee.  I don't recall presenting
25 it to the investment committee.  I'm not saying I

**41**

1  didn't, I don't recall.
2      Q.    Well, there was one drafted and I
3  guess my question is was it ever presented?  So
4  let me show you the document, and we'll see if it
5  refreshes your memory here.
6          (Whereupon Exhibit No. 122, Memo
7  dated 11/17/2008, was received and marked for
8  identification.)
9      A.    Okay.
10     Q.    This is a memorandum dated
11 November 17th, 2008 to the investment committee
12 from you and Mr. Silva?
13     A.    Correct.
14     Q.    Do you know if this proposal was
15 actually submitted to the committee?
16     A.    I really don't recall if we actually
17 formally submitted it.
18     Q.    I gather then that you don't recall
19 if they took any action on it?
20     A.    No, I don't.
21     Q.    The parties worked on trying to
22 document this transaction up until about December
23 of 2008; do you recall that?
24     A.    That sounds about right.
25     Q.    And at some point in time in early

**42**

1  December, you had a conversation with Mr. Provost
2  about changing it from a refinance to an
3  acquisition by Granite?
4      A.    That's correct.
5      Q.    Do you recall why the nature of the
6  transaction changed at that point in time?
7      A.    It became apparent that we were not
8  going to be able to -- we and Alberta -- Granite
9  and Alberta would not be able to completely agree
10 on the loan terms, certainly within the time
11 frame that remained with the maturity of the
12 construction loan.  So in light of that, we
13 decided to pursue a different alternative.
14     Q.    And you were convinced by the group
15 of banks that they weren't going to extend the
16 loan maturity any further?
17     A.    It was made very clear that the
18 banks were not going to extend the loan maturity
19 any further.
20     Q.    So was it your judgment that one
21 could come to terms on the closing documents for
22 a purchase more easily and quickly than finishing
23 the negotiations of a loan transaction or the
24 refinance transaction?
25     A.    We had -- regardless of whether it

**43**

1  was a refinancing transaction or a purchase, we
2  would have needed closing documents.  So this
3  would have overlaid restructuring loan documents
4  on top of closing documents, so yes.
5      Q.    And was that the motivation from
6  your standpoint was simply unable to come to
7  terms within the amount of time remaining under
8  the loan material?
9      A.    It was unable to come to terms with
10 the recognition that we would be lending $100 to
11 $160 million dollars, roughly to a party with
12 which we've continually had difficult
13 negotiations.
14     Q.    Describe that for me.  What was
15 difficult about the negotiations with Alberta?
16     A.    It was just a long-term transaction
17 beginning of 2005 through 2008.  There were
18 issues with respect -- which somewhat predated
19 me, but with respect to forming a joint venture.
20      We were in many instances just unable to
21 reach agreement on different things with respect
22 to Alberta.  So in our view in evaluating the
23 circumstances at the time, we thought it better
24 not to lend $160 million, and rather just to
25 pursue an outright purchase and to buy out

**44**

1  Alberta's interest.
2      Q.    In terms of the financial commitment
3  by BlackRock, there was not a substantial
4  difference between loaning Alberta $160 million
5  and buying the property for $160 million, was
6  there?
7      A.    It's Granite and that's correct, not
8  BlackRock.
9      Q.    Did I misspeak Granite?
10     A.    It's Granite.
11     Q.    Okay, sorry.  So between Granite
12 paying $160 million and Granite loaning $160
13 million, the financial outlay is about the same?
14     A.    Correct.
15     Q.    One difference I see from the two
16 scenarios is there is a waterfall of payments in
17 the event of a sale of the property subject to
18 the mortgages, and of course obviously you have
19 to pay off the mortgages first.
20     A.    Right.
21     Q.    And then there was some
22 distributions to Alberta for money it had
23 advanced, and Alberta for its equity
24 contribution, and finally a split of 70 percent
25 to Alberta and 30 percent to Granite.

45

1      Was a consideration in changing the initial
2 purchase that there would be no final split of
3 the proceeds with Alberta in the event that
4 Granite owned the property outright?
5      A.    I'm not sure I understand your
6 question.
7      Q.    Let me ask it again.  Obviously if
8 Granite purchases the property for $160 million
9 dollars, it owns a hundred percent of whatever
10 profit or losses incurred goes to Granite?
11     A.    Correct.
12     Q.    There's no split with Alberta?
13     A.    That's right.
14     Q.    Under the refinancing scenario,
15 Granite's still out $160 million dollars, that
16 money gets repaid with interest, and then there's
17 a split of the profit, if there is any, between
18 Alberta and Granite, and was an unwillingness to
19 split the profit on resale one of the factors in
20 determining just to buy the property outright?
21     A.    No, it was not.
22     Q.    There had been produced to us and
23 they're in the file a number of what I'll call
24 financial analyses of these various proposed loan
25 structures, and there were variations in amount,

46

1 rates and so forth over time.
2      Do you recall there being a series of
3 calculations done by your staff to evaluate
4 those?
5      A.    Multiple -- myriad of calculations
6 being done to evaluate potential loan structures.
7      Q.    Was there a reason why there were a
8 myriad of structures looked at, or is that kind
9 of commonplace?
10     A.    Commonplace and also it was -- it
11 was subject to any third party financing that was
12 available at the time.
13     Originally the thought would be that there
14 would be a third party lender for a piece of the
15 capital stack, and then Granite would take a
16 subordinate position to that first mortgage
17 lender.
18     When it became apparent that wasn't going to
19 happen, we were evaluating a possibility where
20 Granite would fund the entire debt capital stack,
21 so -- and then it was a matter of moving around
22 the pieces to determine an appropriate cost of
23 debt, a fair cost of debt, something that we
24 deemed fair that would be acceptable to Alberta.
25     So there were -- as with any underwriting

47

1 and potential investment, there is multiple
2 analyses that are done.
3      Q.    Were you satisfied that this -- that
4 the structure that's outlined in this
5 November 17th memo was a fair investment for the
6 Granite Property Fund?
7      A.    Define fair.
8      Q.    Within your investing guidelines?
9      A.    I think it was a potentially
10 reasonable alternative considering the
11 circumstances that existed in the market, but
12 then one that we determined was not the best
13 alternative.
14     Q.    And you determined the best
15 alternative was the outright purchase?
16     A.    Correct.
17     Q.    Even though the outright purchase
18 resulted in an immediate write-down from purchase
19 price to market value in the fund?
20     A.    We would have recognized it whether
21 a lender or an owner, that immediate write-down.
22     Q.    Is that right?
23     A.    That's right.  You can't have a loan
24 carry a loan worth more than the value of the
25 underlying collateral.

48

1      Q.    Would you -- if you had made these
2 three loans, would you have taken an impairment
3 to those loan recoveries immediately?
4      A.    It would have, yes.  It was tranched
5 but yes, the equity would have bled into the
6 capital stack.
7      Q.    The reason I raised the question
8 about it is one of the things that you cite in
9 the first page of Exhibit 122 in the last
10 paragraph, "With the loan coming due, Granite and
11 Alberta have worked out a structure that allows
12 Granite to preserve its capital."
13     Do you know what you meant by that?  That's
14 in the first sentence of the last paragraph on
15 the first page.
16     A.    Where is it, I don't see it.
17     Q.    First sentence, last paragraph.
18     A.    Oh, I'm looking at the last
19 sentence, first paragraph, I'm sorry.
20     Q.    Sorry about that.  I may have
21 misspoke.
22     A.    I'm not sure what that was referring
23 to.
24     Q.    I kind of read that as perhaps
25 meaning if you made the loan, you wouldn't have

Granite Southlands Town Center v. Alberta Town Center       ANDREW PIEKARSKI                    4/7/2010

---

49

1   to take a write-down of market value, but that's
2   a misinterpretation?
3       A.    That's a misinterpretation.  My --
4   I'm not sure this was ever presented, and if
5   there was an $80 million dollar first mortgage
6   lender, that would have been $80 million that
7   Granite wouldn't have had to have fund, allowing
8   us to preserve our capital.  So I'm wondering if
9   it was a carryover from a prior draft, but I'm
10  not positive.
11      Q.    In this total returns swap that you
12  proposed putting the mezzanine loan in, was
13  Granite going to fund the entity that provided
14  the swap as well?
15      A.    What do you mean by swap?
16      Q.    It's indicated under the mezzanine
17  loan that this loan will be put into a TRS, which
18  I understand to be a Total Return Swap.
19      A.    No, it is a Taxable REIT Subsidiary.
20      Q.    Okay.  Well, that makes more sense
21  to me.  I didn't understand how you'd be putting
22  this into a TRS, okay.
23      And it does indicate that Granite would lend
24  the capital to the Taxable REIT Subsidiary, and
25  then I gather that subsidiary would make the

---

50

1   loan; is that how that would work?
2       A.    That's correct.
3       Q.    Okay.  So you rather than making the
4   loan directly, you'd loan the money to the REIT,
5   and the REIT would then put it into the capital
6   pool?
7       A.    Correct.
8       Q.    That makes more sense.
9       A.    That got us through about ten pages.
10      Q.    And the decision to purchase the
11  property was not as a result of any action by the
12  investment committee turning down this proposal
13  as far as you recall?
14      A.    No.  Again, I don't recall this
15  being specifically presented to investment
16  committee.
17      Q.    Now I went through with Mr. Silva
18  the various tenant estoppels that Alberta
19  provided.  Have you reviewed the tenant estoppels
20  that were rejected by Granite as part of this
21  transaction?
22      A.    Only the very relevant ones
23  recently.
24      Q.    Okay.  And the relevant ones are in
25  your mind?

---

51

1       A.    The cinema, DCC Architects, the one
2   that indicated -- any estoppels that indicated a
3   structural issue.
4       Q.    Okay.  So as to the other tenant
5   estoppels that were rejected, you have no
6   knowledge about why they were rejected if they
7   were rejected?
8       A.    I don't recall.
9       Q.    Let me just -- I want to try to
10  shortstop some of this so we don't repeat
11  ourselves.
12      A.    Sure, I appreciate that.
13      Q.    There's no reason asking both of you
14  the same questions, particularly if you have
15  nothing to add.  There is an Exhibit 114 in your
16  stack there.
17      A.    We done with 122?
18      Q.    I think so.  This is a letter,
19  again, 114 is a letter from Jane Snoddy Smith to
20  Alberta and others dated February 24th, 2009.  In
21  this letter, Ms. Smith rejects nine tenant
22  estoppels tendered by Alberta, correct?
23      A.    Correct.
24      Q.    And of these nine, you've looked at
25  and reviewed the DCC Architects and the Colorado

---

52

1   Cinema Group Estoppels?
2       A.    Specifically, yes.
3       Q.    Do you have any knowledge about the
4   reason for rejecting the Chico's Estoppel?
5       A.    Not without an additional review.
6       Q.    How about American Family Insurance?
7       A.    Not without an additional review.
8       Q.    Noodles & Company?
9       A.    Again, I'd have to review them.  The
10  only ones that I can recollect specific issues
11  are DCC Architects and Colorado Cinema.
12      Q.    Before Ms. Smith sent out her letter
13  rejecting these estoppels, do you recall having
14  any conversations with Mr. Silva about the tenant
15  estoppels, and whether they should or should not
16  be rejected?
17      A.    I am sure we did but I don't recall
18  specific conversations.
19      Q.    Was there a discussion with Ms.
20  Smith about her recommendation to reject these
21  nine, whether you agreed or disagreed with that?
22      A.    I don't recall a specific
23  conversation.
24      Q.    Now if I presented each of these
25  tenant estoppel certificates to you, would it

---

53

1   assist you in telling me why any of these were
2   rejected, or do you just not have any
3   recollection of these?
4        A.    I don't know without --
5        Q.    Without looking?  Well, I tried to
6   help you here, I guess we'll look at them.
7             THE WITNESS:  Can we take a bathroom
8   break?
9             MR. BENNETT:  Sure.
10            (Whereupon a break was taken.)
11       Q.    Exhibit 103 in your stack.
12       A.    We're done with 114?
13       Q.    We are.  Exhibit 103 is a tenant
14   estoppel from a tenant called Diversified
15   Properties Management Group, d/b/a Sweet & Sassy.
16       A.    Okay.
17       Q.    Has some modifications on the first
18   page to the representation whether the tenant has
19   received all of its tenant improvement
20   allowances, correct?
21       A.    Yes.
22       Q.    Do you know whether Granite objected
23   to this tenant estoppel?
24       A.    I don't know.  I don't recall.
25       Q.    Do you know if it did not why it

54

1   didn't?
2        A.    Well, if I -- I don't know if it did
3   or did not, so --
4        Q.    It's not on Ms. Snoddy Smith's
5   September -- excuse me, February 24th letter, is
6   it?
7        A.    What exhibit was that?
8        Q.    Exhibit 114.
9        A.    It's not on there.
10       Q.    So there is a change in the form on
11   the Sweet & Sassy Tenant Estoppel Certificate
12   that Granite did not object, at least in Ms.
13   Submit's February 24th letter, correct?
14       A.    That's correct.  If you would
15   prefer, we could object and bring the other down
16   below 75 percent.
17       Q.    Well, I don't know if you would or
18   you wouldn't, but the real question isn't it a
19   fact that purchasers seldom in your experience
20   object to tenant estoppels as long as the tenant
21   is current, claims no default by the landlord?
22       A.    It's not -- it doesn't happen
23   frequently.  Generally they resolve before
24   closing.  If there's a material issue or if there
25   is an issue with a tenant estoppel that would

55

1   hold up a closing, it's usually resolved before
2   closing.
3             These circumstances were different because
4   the estoppels came in after closing.  So instead
5   of holding up closing, there's an escrow dispute.
6        Q.    Right.  And there's a difference
7   between an all or none go forward with the
8   closing or terminate the contract, or simply
9   argue about $650,000 dollars?
10       A.    There is a difference, although
11   under the prior set of circumstances, you might
12   be arguing over a deposit, and there was money
13   deposited that was being held in escrow.
14       Q.    And I think you've testified earlier
15   but you have never seen a deal where the deal did
16   not close because of a dispute over tenant
17   estoppels?
18       A.    I don't recall having a deal -- one
19   of my deals not closing because of a dispute over a
20   tenant estoppel.
21       Q.    And you surely will acknowledge that
22   not every tenant estoppel that you got in all of
23   the deals you've done were exactly in the form
24   required by whatever contract governed the
25   transaction?

56

1        A.    I would venture to say that they
2   were not exact, no.
3        Q.    All right.  Exhibit 104 is the next
4   one.  This is the American Fidelity Assurance
5   Company Tenant Estoppel.  On page two it has a
6   handwritten note that American Fidelity Assurance
7   Company has cracks in the walls of two rooms
8   caused by settling that have not been repaired.
9   This tenant estoppel is not on Ms. Smith's letter
10   either, is it?
11       A.    Okay.
12       Q.    Agreed?
13       A.    Agreed.
14       Q.    So for whatever reason, Granite
15   chose not to object to this one, even though it
16   discloses essentially the same problem that
17   Colorado Cinema discloses?
18            MR. TRAHAN:  Object to form.
19       A.    Yeah -- yes.
20       Q.    Exhibit 105 is the next one.  This
21   is Chipotle Mexican Grill.  It has substantial
22   inserts from the form inserted by the tenant,
23   correct?
24       A.    I will let somebody else define what
25   substantial means.

Granite Southlands Town Center v. Alberta Town Center    ANDREW PIEKARSKI    4/7/2010

57

1    Q.    All right.  It has inserts?
2    A.    It has inserts.
3    Q.    Any of these inserts material in
4  your mind?
5    A.    I would have to consult with
6  counsel.  I'm not prepared to perform a very
7  cursory review here.
8    Q.    Well, for example in several
9  paragraphs the tenant inserts something to the
10  effect that it is not currently asserting any
11  claim or defense to the rent, or it's not
12  currently asserting any offset lien or
13  counterclaim.
14    Are those material alterations in your view
15  -- from a business standpoint, not a legal.
16    A.    For a 2,600-square foot tenant,
17  probably not material.
18    Q.    Okay.  So one of the factors that
19  goes into your materiality analysis is the size
20  and significance of the tenant?
21    A.    Certainly.
22    Q.    Next is Exhibit 106.  This is for
23  the Hallmark retail store.  This is in a form
24  that's different from the form attached to the
25  Forward Purchase and Sale Agreement, correct?

58

1    A.    It appears to be.
2    Q.    Okay.  Has some provisions that are
3  not included in the standard form including
4  paragraph 12 on page two of this exhibit?
5    A.    I'm sorry, repeat that.
6    Q.    Sure, paragraph 12 is not part of
7  the standard form attached to the Forward
8  Purchase and Sale Agreement?  It's Exhibit H if
9  you need to look at it.
10    THE WITNESS:  Can I stipulate to
11  that, Paul?
12    MR. TRAHAN:  Well, listen to his
13  question.  I'd rather not stipulate to anything.
14  I think the documents speak for themselves.
15    A.    What page is it on the forward?
16    Q.    It's Exhibit H.  I don't think it
17  has a separate page.  There it is.
18    A.    Okay.  So your question is?
19    Q.    It's not part of the standard form?
20    A.    It appears that it isn't.
21    Q.    And is this a material modification
22  of the form in your view?
23    A.    I would have to consult with counsel
24  to determine if we deemed it material.
25    Q.    Do you deem it material from a

59

1  business standpoint as opposed to the legal
2  ramifications of it?
3    MR. TRAHAN:  Object to form.
4    A.    I would have to consult with
5  counsel.
6    Q.    All right.  Exhibit 107 is in front
7  of you.  This is a tenant estoppel certificate
8  for The Finish Line, Inc.  It's on a different
9  form than the Exhibit H to the FPSA, correct?
10    A.    Correct.
11    Q.    Doesn't have many of the provisions
12  contained in the standard form on the FPSA,
13  right?
14    A.    It appears not.
15    Q.    And is not objected to by Granite?
16    A.    Apparently it was not.
17    Q.    Do you know why it wasn't objected
18  to?
19    A.    I'm not sure.  I'd have to consult
20  with counsel.  I'm also not certain that this
21  February 24th letter was every -- included every
22  lease at this point because I did have more time
23  to procure estoppels.
24    Q.    Do you know if there was ever a
25  subsequent objection letter to the February 24th

60

1  letter?
2    A.    I don't.  I'm not sure it was
3  meaningful because of the cinema lease.  So I'm
4  not sure this letter was meant to be all
5  inclusive or maybe it was inclusive to the point,
6  I'm not sure.
7    Q.    Now let's see here, let's look at --
8  in the white notebooks, there are some exhibits
9  that have been previously marked.  If you look at
10  the booklet 49 to 82 and turn to Exhibit 61.
11    A.    We done with 114?
12    Q.    No.  Leave that out because we may
13  need to refer to it again.
14    A.    I'm sorry, 61?
15    Q.    61.  61 is the American Family
16  Insurance Estoppel Certificate, and it is on Ms.
17  Smith's letter.  Take a look at that and tell me
18  why it was objected to.
19    MR. TRAHAN:  Just again for the
20  record, just want to make it clear that Mr.
21  Piekarski's testifying as a fact witness today
22  and not as a corporate representative, and that
23  he has only been allotted the time during this
24  deposition to review these estoppel certificates.
25    A.    I would have to consult with

Granite Southlands Town Center v. Alberta Town Center    ANDREW PIEKARSKI    4/7/2010

---

61

1    counsel.  I cannot just make a cursory judgment.
2       Q.    Do you see anything in this estoppel
3    certificate that indicates that it's not in the
4    prescribed form or has any material alteration?
5       A.    I'm sorry, your question, why?
6       Q.    Why is this Exhibit 61 included in
7    Ms. Snoddy Smith's letter?
8       A.    I would have to consult with
9    counsel.  I'm not sure.
10       Q.    You don't see anything in the form
11    of estoppel certificate --
12       MR. TRAHAN:  Object to form.
13       A.    Not with a cursory review of it.
14    There are specifications in here referring to the
15    lease that generally compare against the lease,
16    so I --
17       Q.    Assuming the description of their
18    lease is correct?
19       A.    Well, I don't want to assume that.
20       Q.    No, assuming that that's correct,
21    there does not seem to be anything wrong?
22       A.    Nothing -- nothing jumps out at me,
23    but again, I would need to consult with counsel.
24    There are business points and there are legal
25    points, and before something was picked out we

---

62

1    would consult with counsel.
2       Q.    All right.  Look at Exhibit 62.
3    This is the Family Life Counseling Certificate.
4    It's also rejected by Ms. Smith.  Do you know why
5    this certificate was rejected?
6       A.    I don't know specifically.
7       Q.    There's a note by the tenant,
8    continued issues with HVAC system?
9       A.    Yes.
10       Q.    Is that in your view a material
11    alteration to reject a tenant estoppel
12    certificate?
13       A.    Possibly.
14       Q.    How would you determine whether it
15    is or it isn't?
16       A.    We would have to investigate what
17    the issues with the HVAC system were and what the
18    tenant complaint is.
19       Q.    So the mere fact that the tenant
20    places something on the certificate is not by
21    itself sufficient?
22       MR. TRAHAN:  Object to form.
23       A.    No, it could be.
24       Q.    Depending on what the underlying
25    facts are, right?

---

63

1       A.    That's correct.
2       Q.    63 is the Main Street Dental
3    Certificate.  It is also rejected by Ms. Smith.
4    Do you know why?
5       A.    Various markups, a paragraph is
6    deleted with respect to paragraph eight with
7    respect to renewal or extension options.
8       Q.    Well, the tenant has deleted
9    paragraph eight regarding that there are no
10    renewal or extension options, and inserted that
11    there are two five-year options.
12       If the tenant is correct that it has two
13    five-year options, that's not a basis for
14    rejecting an estoppel, is it?
15       MR. TRAHAN:  Object to form.
16       A.    I don't know.  I don't know.
17       Q.    Similarly the tenant has changed the
18    date when its lease expires to 2017 from 2011.
19    If the tenant is correct, that's not a basis for
20    rejecting an estoppel certificate, is it?
21       A.    If the tenant is correct.  Again, I
22    would have to consult with counsel to see what
23    the specific reasons for this -- for declining
24    this estoppel, for rejecting this estoppel.
25       Q.    Right.  And you'd have no

---

64

1    recollection of discussing this with Mr. Silva or
2    counsel about why it was rejected?
3       A.    Not, not specifically.
4       Q.    Exhibit 64 is the QualDent Tenant
5    Estoppel.  It's also on Ms. Smith's list.  Do you
6    know why this tenant estoppel was rejected?
7       A.    I would have to consult with
8    counsel.
9       Q.    65 is Chico's.  Chico's FAS, Inc.
10    It was the first listed on Ms. Smith's letter.
11    Do you know why it was rejected?
12       A.    There's a paragraph in here
13    regarding a cotenancy requirement, so that much
14    is not consistent with the form, but I'm not sure
15    if that was the only reason why it was rejected.
16       Q.    And do you know what an operating
17    cotenancy requirement is?
18       A.    It's a provision where there are --
19    it's a provision in a lease that -- how can I
20    explain this, that requires certain other facts
21    to exist within a center, other specific tenants
22    or occupancy thresholds that impact a particular
23    lease or might impact a particular lease.
24       Q.    Do you know whether there was any
25    substance to the tenant's statement regarding the

---

65

1  operating cotenancy requirement?
2      A.   I don't.
3      Q.   And wouldn't it be an ordinary
4  course that such a provision of that would be --
5  result simply in an inquiry to the landlord
6  whether there's a problem with the operating
7  cotenancy requirement?
8          MR. TRAHAN:  Object to form.
9      A.   I think each circumstance is
10 different, so I wouldn't want to generalize
11 anything.
12     Q.   This is a matter that would be
13 subject to -- in the usual course some discussion
14 with the selling landlord about whether there's a
15 problem with this particular requirement; would
16 it not?
17     A.   I would think so, yes.
18     Q.   Aren't normally buyers and sellers
19 in a position to discuss and resolve these kinds
20 of discrepancies before rejecting a tenant
21 estoppel?
22         MR. TRAHAN:  Object to form.
23     A.   No.  I think you would reject the
24 estoppel, and if they can go and correct it, then
25 -- in the time frame allotted, then you would

66

1  accept the estoppel.
2      Q.   No discussion at all between the
3  buyer and seller in your experience?
4      A.   I don't recall if there was any
5  discussion with respect to this lease -- this
6  estoppel.
7      Q.   To your knowledge when was the first
8  time that BlackRock and/or Granite knew that
9  there were potential cracks in the buildings at
10 the shopping center?
11     A.   It was sometime in January of 2009.
12     Q.   Are you aware that at least
13 according to an email from Mr. Silva that the
14 management group was aware of it the day after
15 closing?
16     A.   No, I don't recall that.  That the
17 management group meaning who?
18     Q.   Mr. Krier and Ms. Kralovec.
19     A.   I don't recall that.
20     Q.   Exhibit 110 is an email.
21     A.   We done with the book?
22     Q.   I think so for the time being.
23 Exhibit 110 is an email chain that includes you,
24 Mr. Krier, Mr. Corrigan and Mr. Silva.
25     A.   Okay.

67

1      Q.   The very top of the page, Mr. Silva
2  wrote on January 28th, 2009, said, "We found
3  out the day after we closed" referring to cracks
4  in the walls.
5      A.   Okay.
6      Q.   Do you recall that some
7  representative of BlackRock or Granite found out
8  the day after closing that there were cracks in
9  the walls?
10     A.   I think the document speaks for
11 itself, so --
12     Q.   Do you have any recollection of this
13 having reviewed the document?
14     A.   Vaguely, yes.
15     Q.   Can you add anything other than what
16 the document says?
17     A.   No.
18     Q.   As a result of having received this
19 email from Mr. Silva, did you make any inquiry of
20 Mr. Krier or Ms. Kralovec about the extent of
21 their knowledge?
22     A.   I don't recall.
23     Q.   Mr. Krier wrote that we have Leland
24 involved.  Do you know who Leland is?
25     A.   Leland -- I believe the

68

1  pronunciation of his last name is Nakaoka, don't
2  ask me to spell it, I'm sorry, we'll get that for
3  you.
4      He is on our engineering team unless there's
5  another Leland, which I guess -- I suppose there
6  could be.
7      Q.   In Exhibit 116 which is in front of
8  you, it's a letter from Ms. Smith to Alberta and
9  others dated March 3, 2009.
10     In the last sentence of the next to last
11 paragraph there's a statement that Granite will
12 agree to forbear until April 1 from exercising
13 its rights to require the estoppel holdback to be
14 disbursed to Granite.
15     Do you know what happened to that offer to
16 forbear from seeking the estoppel holdback?
17     A.   It was part of a -- to work together
18 with Alberta to investigate the defects.
19     Q.   And is there some way in which
20 Alberta did not agree to work together?
21     A.   I think they were just -- a general
22 dismissal of the offer.
23     Q.   You're aware, aren't you, that in
24 January of 2009 Alberta forwarded to Granite all
25 of the engineering reports that it had secured

Granite Southlands Town Center v. Alberta Town Center       ANDREW PIEKARSKI                                    4/7/2010

69

1   relating to the property?
2      A.   I'm not sure that we might have
3   known or knew certainly that it was all of the
4   engineering reports, so no, I'm not aware that it
5   was all of the engineering reports.
6      Q.   Well, you knew you got some
7   engineering reports?
8      A.   I don't know what was received in
9   January of 2009.
10     Q.   Okay.  Did you ever review
11  engineering reports in this time frame relating
12  to the investigation --
13     A.   Me specifically?
14     Q.   -- conducted by Alberta?
15     A.   Me specifically, no.
16     Q.   Are you aware of any refusal by
17  Alberta in the March 2009 time frame to provide
18  information that they had on the situation?
19     A.   As I recall there were discussions
20  where we were hoping to work more closely or
21  directly or together with Alberta, and as I
22  recall, they didn't seem to progress.
23     Q.   Any specifics to that?
24     A.   No, just a general recollection.
25     Q.   Were you involved at all in the

70

1   negotiation of the Eighth Amendment to the
2   Forward Purchase and Sale Agreement whereby
3   Granite and Alberta agreed to share in either
4   operating deficits or operating profits during
5   the year 2008?
6      A.   Probably indirect involvement.
7      Q.   And what was your involvement?
8      A.   I was -- as I recall, that was later
9   in 2007, so I was probably just working with Mr.
10  Silva.
11     Q.   Did you have any discussions
12  relating to the contract language that was
13  entered into?
14     A.   I don't recall specific discussions.
15     Q.   Look at Exhibit 54, which should be
16  in this book 49 to 82.  See if that refreshes
17  your recollection at all.
18     Tab 54 is the Eighth Amendment, and
19  specifically paragraph five, which deals with the
20  sharing of operating deficits or operating
21  revenue.
22     A.   Okay.
23     Q.   Looking at this particular
24  provision, do you have any recollection of
25  negotiating its terms?

71

1      A.   The general agreement was a split of
2   the operating revenues and expenses.
3      Q.   Were income and expenses to be
4   accounted for for purposes of the split on a cash
5   basis or an accrual basis?
6      A.   Accrual.
7      Q.   And do you believe that this
8   provision specifies that?
9      A.   Well, it says accrued under
10  generally accepted accounting principles, so I
11  would think it does.
12     Q.   Well, what it says is is "Any income
13  or expenses that are properly accrued under
14  generally accepted accounting principles and
15  relate to a period prior to the Period," period
16  being a defined term, "shall not be included in
17  the report."
18     A.   Right.
19     Q.   Does that indicate to you that all
20  expenses that are accrued during the period
21  should be included?
22     A.   Well, I guess if you're going to --
23  how are you defining accrued?
24     Q.   Well, it's your agreement.  I'm
25  asking you what does it mean?

72

1      A.   Accrued has a very standard -- it's
2   relevant to a specific period, so --
3      Q.   So it's your understanding --
4      A.   I'm asking you if you're using
5   accrued in the sense that it's understood, or if
6   you're assigning it -- trying to assign something
7   else to it.
8      Q.   I don't understand the paragraph, so
9   that's why I'm asking you what accrued means.
10     A.   No, I think you understand the
11  paragraph.
12     Q.   I don't understand.  Anyways, so
13  it's your understanding based on your discussions
14  that the income and expense that are to be
15  reported are on an accrual basis under this
16  paragraph?
17     A.   That's correct.
18     Q.   Did you have any understanding that
19  at the end of the period, which ends with the
20  closing of the sale, that there would be some
21  reconciliation of the amounts that had been
22  reported?
23     A.   Yes.
24     Q.   And where does that understanding
25  come from?

Granite Southlands Town Center v. Alberta Town Center       ANDREW PIEKARSKI                                    4/7/2010

73

1    A.    Just -- without reviewing specific
2  documents, I know it was in different areas of
3  the documents, it was in discussions, it was in
4  emails, it was in many different aspects of the
5  transaction.  It would be a true-up.
6    Q.    Is there any signed written
7  agreement that there's going to be a true-up of
8  these operating deficits that are billed under
9  this paragraph?
10   A.    I'm sure there is.
11   Q.    Well, if there is, I would
12  appreciate your pointing it out.  I cannot find
13  an agreement that deals with this question of
14  truing-up these operating deficits, so if you're
15  aware of one and you can point me to it, it would
16  be great.
17        Let me start with -- let me help you here.
18  It doesn't appear that in the Eighth Amendment
19  there's any provision that relates to reconciling
20  and truing-up the amounts that are billed under
21  this paragraph five for operating deficits.  You
22  can confirm that or not if you like, but I can't
23  find it.
24   A.    Okay.
25   Q.    And so my question is is outside of

74

1  this Eighth Amendment, is there some signed
2  written agreement between the parties that says
3  we will reconcile the amounts billed for these
4  operating deficits?
5    A.    I believe it's the Fifteenth
6  Amendment.
7    Q.    Okay.  Well, we have that.  That is
8  tab 37.
9    A.    Okay.
10   Q.    There is a provision in paragraph or
11  in Exhibit 37 that talks about reconciling
12  property expense prorations done at closing,
13  paragraph 11.
14        Is that a provision that you think relates
15  to reconciling the amounts paid under the deficit
16  sharing arrangement?
17   A.    Certainly, yes.
18   Q.    And where in section 11 does it say
19  something about reconciling the amounts
20  previously billed under the operating deficit
21  provisions of section 11?
22   A.    It was understood.  It was
23  understood that for the year 2008, all amounts
24  would be trued-up.  I believe Peter Cudlip even
25  had an email suggesting that or stating that.

75

1    Q.    Paragraph 11 says its Property
2  Expense Prorations, right, that's the titling?
3    A.    Yes.
4    Q.    And it says that, "Alberta and
5  Granite shall reconcile the proration of property
6  expenses including common area expenses made at
7  closing for the property on or before March 31,
8  2009."  Doesn't say anything about reconciling
9  previously billed operating deficits, does it?
10   A.    The agreement and the understanding
11  of the agreement was there would be a true-up at
12  closing.
13   Q.    Okay.  Are you suggesting that
14  that's the understanding of this paragraph?
15   A.    I think the general understanding of
16  the agreement would be that there's a true-up at
17  closing.
18   Q.    True-up of what?
19   A.    Of the operations of the property at
20  closing.
21   Q.    All operations?
22   A.    To reflect the operating deficits or
23  whatever the operations were.
24   Q.    And starting with what period of
25  time?

76

1    A.    Beginning of the year because there
2  was a 50/50 funding agreement.
3    Q.    Would you agree with me that section
4  11 doesn't say that --
5        MR. TRAHAN:  Object to form.
6    Q.    -- whether there was an oral
7  understanding or otherwise that section 11 does
8  not provide that?
9    A.    I'll leave that up to your
10  interpretation.
11   Q.    Do you have some other
12  interpretation?
13   A.    I think the general agreement
14  between the parties was that there would be a
15  true-up at closing or post closing.
16   Q.    And I don't mean to be
17  argumentative, but I'm not finding where that's
18  ever reduced to writing.  I'm not saying --
19        MR. TRAHAN:  Wait for a question,
20  please.
21   Q.    I'm not saying that you didn't have
22  this understanding.  What I'm trying to find out
23  is whether the parties ever reduced the
24  understanding you're talking about to a writing,
25  and it doesn't appear to me that this does that.

77

1          MR. TRAHAN:  Object to form.  If
2    there's a question, please wait for a question,
3    Mr. Piekarski.
4          Q.     Do you believe that paragraph 11
5    provides that the parties will reconcile the
6    previously billed amounts for operating deficits?
7          A.     In my view the interpretation of 11
8    is that it was going to be reconciled.
9          Q.     The previously billed operating
10   deficit?
11         A.     That was my understanding.
12         Q.     All right.  Okay.  This document the
13   way I read it says we'll reconcile the proration
14   of property expenses made at closing.
15         A.     I suppose that's why --
16         MR. TRAHAN:  Wait for the question,
17   please.  No question.
18         Q.     Do you know what property expense
19   prorations were made at closing?
20         A.     Real estate taxes.
21         Q.     Any others?
22         A.     For sure.  I don't -- I'm not sure
23   specifically.
24         Q.     Okay.  We've marked the settlement
25   statements there -- let's see, Exhibits 118 and

78

1    119 in your stack.  And 118 is the Sellers
2    Settlement Statement, 119 is the Purchasers; is
3    that right?
4          A.     That's correct.
5          Q.     And the only expenses that are
6    prorated on the settlement statements between the
7    parties are property taxes as you indicated,
8    correct?
9          A.     Correct.
10         Q.     There is also a revenue proration
11   relating to rents, correct?
12         A.     Correct.
13         Q.     And there does not appear, at least
14   in section 11 of the Fifteenth Amendment any
15   undertaking by the parties to reconcile the
16   prorations of revenue made at closing, does it?
17         A.     Well, there is a rent proration.
18         Q.     There's a rent proration at closing,
19   but the Fifteenth Amendment does not seem to
20   require a reconciliation of that proration
21   subsequent to closing having referred only to
22   expenses, not revenues.
23         MR. TRAHAN:  Please wait for a
24   question.
25         Q.     Do you agree?  Does the Fifteenth

79

1    Amendment, section 11 have anything to do with
2    reconciling a proration of revenue?
3          A.     It doesn't specifically reference
4    revenue.
5          Q.     Now other than the Fifteenth
6    Amendment, are you aware of any other writing
7    signed by the parties that deals with the
8    question of reconciling prorations or reconciling
9    expenses and revenues?
10         A.     I'm not -- I don't know.
11         Q.     Now also the Fifteenth Amendment has
12   a provision, section four on page five that
13   provides section five of the Eighth Amendment to
14   Amendment and Agreement, section -- paragraph
15   four on page five.
16         Section five of the Eighth Amendment to
17   Amendment and Agreement and Termination Agreement
18   is hereby amended by deleting it in its entirety.
19         A.     Okay.
20         Q.     Were you involved in the discussions
21   that resulted in that provision?
22         A.     Not specifically, no.
23         Q.     Do you know why -- well, strike
24   that.  Section five of the Eighth Amendment,
25   which is referred to, is the provision relating

80

1    to the sharing of operating deficits, right?
2          A.     Where is the Eighth Amendment?  Do
3    you remember what tab?
4          Q.     It is tab 54.
5          A.     Paragraph five refers to operating
6    deficits.
7          Q.     All right.  So in the Fifteenth
8    Amendment, section four, this section five of the
9    Eighth Amendment is deleted in its entirety.  Do
10   you know why that was done?
11         A.     I'm not sure because I think there
12   was something else in the Fifteenth Amendment
13   which still referenced the operating deficits.
14         Q.     Okay.  Well, if you can find that,
15   point that out to me because I don't see it.
16         MR. TRAHAN:  You're just asking to
17   look at the different agreements?
18         MR. BENNETT:  He says that there's
19   something in the Fifteenth Amendment that deals
20   with operating deficits, so take a look.  See if
21   you can point that out to me.
22         A.     Maybe it was the release.  I think
23   it was in the release.
24         Q.     Okay.  Well, the Release and
25   Termination -- an unsigned copy of the Release

81

1　and Termination Agreement is attached to the
2　Fifteenth Amendment, or if you want, we have the
3　signed one marked if you want to look at the
4　signed one.
5　　A.　Which -- where is the signed one?
6　　Q.　The signed one?
7　　A.　Yeah.
8　　Q.　It is -- hang on a second, I'll have
9　to find it for you.
10　　THE WITNESS:  Might we take five
11　minutes while we look?
12　　MR. BENNETT:  Sure.
13　　(Whereupon a break was taken.)
14　　Q.　We were looking at the --
15　　A.　Release.
16　　Q.　The Release is tab 59, okay?
17　　A.　Yes.
18　　Q.　Do you find a provision that relates
19　to this question of reconciling operating
20　deficits in the release?
21　　A.　Five -- paragraph five, little i.
22　　Q.　Okay.  On page five?
23　　A.　Yes.
24　　Q.　Provides that nothing in the release
25　is cancelled or waived relating to the terms or

82

1　provisions of the FPSA, which are expressly
2　stated to survive the closing, including without
3　limitation any obligation of true-up proration
4　items?
5　　A.　Correct.
6　　Q.　Well, that again incorporates the
7　idea of truing-up something that's been prorated,
8　proration items.  Do you think that refers to
9　operating deficits under section 11 of the fifth
10　amendment?
11　　A.　I think it was intended to include
12　operating deficits.
13　　Q.　Any other provision of the Release
14　and Termination Agreement that you're aware of
15　that relates to this truing-up of operating
16　deficits?
17　　A.　No.
18　　Q.　When Alberta billed Granite for its
19　share of the operating deficits, did you have any
20　role in reviewing the billings?
21　　A.　No, I don't.
22　　Q.　And so you don't know whether
23　Granite made any attempt to analyze or review the
24　billings it received?
25　　A.　I would have to defer to the asset

83

1　management team.
2　　Q.　Okay.  Being Ms. Kralovec and Mr.
3　Krier?
4　　A.　Correct.
5　　Q.　Was there a time when Granite had a
6　payment obligation to Alberta of $2.6 million
7　dollars?
8　　A.　I -- it's possible.  I don't recall
9　specifically.
10　　Q.　I see references to this and I'm not
11　sure what it is.
12　　(Whereupon Exhibit No. 123, Letter
13　dated 04/03/2008, was received and marked for
14　identification.)
15　　Q.　123 is a memo you wrote in April of
16　2008 to Mr. Lieblich, Mr. Zuzack and Mr.
17　Alexander, right?
18　　A.　Yes.
19　　Q.　I assume you sent this to them?
20　　A.　Yes.
21　　Q.　It discusses extending the loan and
22　the bank's request for a $32 million dollar
23　letter of credit, but my specific question
24　relates to item two in the bottom half of the
25　page on page two.

84

1　　A.　Okay.
2　　Q.　It refers to a security interest in
3　a $2.6 million dollar receivable Granite owes for
4　operating deficits under our agreement with
5　Alberta.
6　　Do you know if you meant that at that point
7　in time Granite owed Alberta $2.6 million on this
8　agreement to share in operating deficits?
9　　A.　I'm sorry, repeat the question.
10　　Q.　Do you know if at the time you wrote
11　this memorandum, Exhibit 123, that Granite owed
12　Alberta $2.6 million dollars on its agreement to
13　share in operating deficits?
14　　A.　That looks to be the case.
15　　Q.　Do you know when that money was
16　paid, if it was paid?
17　　A.　I think it was -- I think it was
18　resolved as part of the closing transaction.
19　　Q.　So it remained outstanding up until
20　the closing?
21　　A.　I believe so.  I am not positive
22　though.
23　　Q.　How do you think it was resolved at
24　closing?
25　　A.　I think it was netted against other

Granite Southlands Town Center v. Alberta Town Center       ANDREW PIEKARSKI       4/7/2010

---

**85**

1 matters or other issues that were open at
2 closing.  The purchase price, the unfunded tenant
3 improvements and this.
4        Q.    So you think it all got netted out
5 in the wash?
6        A.    I believe so.
7        Q.    Now you -- were you involved in the
8 Fourteenth Amendment to the FPSA?
9        A.    I'm certain I had some involvement,
10 yes.
11        Q.    Do you recall that the Fourteenth
12 Amendment was one by which the closing date was
13 extended to 12/15 or the maturity date on the
14 construction loan was extended to 12/15/2008?
15        A.    Okay.
16        Q.    Do you recall that?
17        A.    I -- without reviewing the
18 amendment --
19        Q.    All right.  Well, I can give it to
20 you here.
21              (Whereupon Exhibit No. 124,
22 Fourteenth Amendment, was received and marked for
23 identification.)
24        A.    Okay.
25        Q.    So the Fourteenth Amendment is

---

**86**

1        entered into by the parties I think May 14th,
2        2008 if I recall right, May 8th by some of the
3        parties, and I think the bank signs off on it
4        May 14th essentially.  Yeah, Land Title finally
5        signs it on May 14th.
6              In this document the parties agree to extend
7        the loan maturity date to December 15th, and
8        for that they agree to split a fee that the bank
9        charged.  Do you recall that?  It's in paragraph
10        three if you need to reference.
11        A.    Okay.
12        Q.    You remember that the bank charged a
13        $397,000 dollar loan extension fee?
14        A.    I don't remember specifically but
15        it's apparent from the document.
16        Q.    Okay.  And apparently at one point
17        they had been wanting a $32 million dollar letter
18        of credit in order to extend the loan, and I
19        assume that never happened?
20        A.    That never happened.
21        Q.    Okay.  Instead the Fourteenth
22        Amendment reflects that there's a $7 million
23        dollar letter of credit posted by Granite,
24        correct?
25              MR. TRAHAN:  Where are you referring

---

**87**

1 to?
2              MR. BENNETT:  It's on paragraph
3 4.1(b), and then there's a new subsection (a) on
4 page three.  Buyer shall deposit $1 million
5 dollars and an unconditional letter of credit,
6 buyer being Granite.
7        A.    Yes.
8        Q.    Okay.  So there's a positive of $7
9 million dollar letter of credit.  Also as part of
10 the Fourteenth Amendment, Alberta put up a
11 $3.6 million tenant improvement escrow, correct?
12        A.    Correct.
13        Q.    And the other feature of this
14 Fourteenth Amendment is that previously Granite
15 had the right under the FPSA to withhold amount
16 of money for unfunded tenant finish or
17 uncompleted tenant finish; do you recall that?
18        A.    Vaguely.
19        Q.    And at or about this time that
20 amounted to about $8 million dollars.  Do you
21 recall that?
22        A.    That sounds familiar.
23        Q.    All right.  And by this amendment,
24 the provisions of the FPSA relating to the --
25 what I'll call the tenant improvement holdback

---

**88**

1        were deleted, and Granite became obligated to pay
2        a set price of $160 million dollars without
3        offset.  Do you recall that that's what this
4        Fourteenth Amendment did?
5        A.    I -- no, I don't specifically.
6        Q.    Okay.  So you don't recall any
7        discussions about why that happened?
8        A.    I just -- I don't.
9        Q.    All right.  Now when it came time to
10        close in December of 2008, there were I assume a
11        portion of the $3.6 million dollars that Alberta
12        deposited for the tenant improvement had been
13        expended?
14        A.    I think that's the case.
15        Q.    And there was some balance remaining
16        in that tenant improvement escrow, correct?
17        A.    I think so, yes.
18        Q.    All right.  And so between the
19        amount of money needed to finish the tenant
20        improvements, the amount of money that Granite
21        owed Alberta for operating deficits, all of that
22        gets netted out in the closing?
23        A.    I believe that's how it worked.
24        Q.    And the net of all that is that
25        Granite paid the amount of the construction loan

---

Granite Southlands Town Center v. Alberta Town Center     ANDREW PIEKARSKI     4/7/2010

---

89

1    -- the amount necessary to pay off the
2    construction loan plus $2.15 million dollars?
3        A.    Correct.
4        Q.    And were you the -- kind of the
5    final say from the Granite side of the table
6    about the deal terms that netted all those
7    figures out?
8        A.    It was -- I was part of the
9    discussions, as was myself, Chris Silva and Jay
10   Alexander.
11       Q.    So all three of you kind of had a
12   voice in those deal terms?
13       A.    We would have had discussions as to
14   how this was going to be settled, yes.
15       Q.    Also as part of this Fourteenth
16   Amendment, there were modifications of the loan
17   agreement and the tri-party agreement between the
18   parties to reflect these agreements and changes
19   in the terms of the purchase price and so forth.
20   Do you recall that?
21       A.    I don't specifically, no.
22       Q.    Would you have had any involvement
23   in the discussions relating to the amendments to
24   the tri-party agreement?
25       A.    If there were business points that

---

90

1    would have needed my input, then possibly, yes.
2        Q.    Do you have any recollection of
3    that?
4        A.    Not specifically, no.
5        Q.    Now from the beginning of this
6    project, you were aware that part of the public
7    improvements, the streets, the roads, the access
8    roads were going to be -- well, first of all,
9    they were defined as off site improvements.  You
10   recall they were separated out as under the term
11   off site improvements?
12       A.    I don't, I wasn't involved in the
13   beginning of the project.
14       Q.    Did you become aware at some point
15   that a special district had been formed in order
16   to fund a portion of the off site improvements?
17       A.    I'm aware of the special district,
18   I'm not sure of the mechanics of how that worked.
19       Q.    Is the formation of a
20   quasi-governmental special district something
21   you're familiar with in acquisition agreements
22   that you've dealt with previously?
23       A.    No, I -- no.
24       Q.    When you closed on the property in
25   December 2008, you were aware that the public

---

91

1    streets had been deeded to the special district
2    pursuant to agreements with the special district?
3        MR. TRAHAN:  I'm going to object to
4    form and ask you to explain how this relates to
5    the escrow dispute or the true-up dispute.
6        This relates to issues that we've attempted
7    to raise in this lawsuit but have been
8    unsuccessful in doing so.  It's my understanding
9    that they're no longer an issue in the ongoing
10   lawsuit.
11       If I'm wrong about that, please tell me, but
12   I don't see how this even tangentially relates to
13   anything that's currently at issue in the
14   lawsuits.
15       MR. BENNETT:  Well, as long -- right
16   now I have this -- what I will call vague for
17   lack of a better word understanding between the
18   parties about truing-up something.
19       I don't know if in the course of this quote,
20   true-up claim that someone's going to try to
21   argue that we get to go back and review all of
22   the costs and expenses incurred in the real
23   estate construction.
24       I don't see any limitation on what the
25   parties seem to have agreed to about -- or at

---

92

1    least one side thinks they agreed to in this
2    true-up.
3        As long as this issue about what the special
4    district paid or didn't pay, and how much money
5    Alberta may have received or didn't receive from
6    the special district, it's not part of the
7    true-up claim, then -- or the true-up issue, then
8    I want to go into it.
9        MR. TRAHAN:  I appreciate the
10   explanation.  Proceed.
11   BY MR. BENNETT:
12       Q.    So did you understand that by the
13   time of closing that the property had been
14   replatted, and that the property that the special
15   district had paid for had been deeded to it?
16       A.    I was not aware.
17       Q.    You didn't expect that you were
18   buying the property that the special district had
19   paid for, did you?
20       A.    I just beyond -- no, I was not
21   aware.
22       Q.    So it's outside your expectation one
23   way or the other?
24       A.    Exactly.
25       Q.    All right.  Did you ever attend a

---

Granite Southlands Town Center v. Alberta Town Center      ANDREW PIEKARSKI                                    4/7/2010

93

1  meeting at the property prior to closing?
2       A.     A meeting at the property?
3       Q.     Mm-hmm.
4       A.     I went to the property before
5  closing.  I never attended a meeting at the
6  property before closing.
7       Q.     When did you go to the property
8  before closing?
9       A.     It was May of 2008.
10       Q.     What was the occasion of your going
11  to the property?
12       A.     I was in town for a client meeting,
13  and while I was there I had never seen the asset,
14  so I went by the asset, walked around with Jeff
15  Brown, who was in the acquisition team.
16       Q.     Did you meet with any of the Alberta
17  folks?
18       A.     No.
19       Q.     Did you meet with any of the
20  property managers at all?
21       A.     No.
22       Q.     Just you and Mr. Brown?
23       A.     Yes.
24       Q.     How long did you spend there?
25       A.     We had lunch there, walked around a

94

1  bit, I'm not sure.  I mean we had lunch there and
2  walked around a little bit just to kind of -- I
3  had never seen the asset before.
4       Q.     And you didn't stop into the
5  management office to say hello, let them know you
6  were there?
7       A.     I don't think so.
8       Q.     Were you aware that in late August
9  or September Mr. Silva went to the property?
10       A.     Yes.
11       Q.     Did he report back to you when he
12  got back?
13       A.     I'm sure we discussed it.
14       Q.     What do you recall, if any,
15  discussions from his visit?
16       A.     Nothing specific.
17       Q.     Did he tell you that he had walked
18  around the property, seen some of the buildings?
19       A.     I don't recall having a discussion
20  with him about it specifically.
21            (Whereupon Exhibit No. 125, Email
22  dated 09/10/2008, was received and marked for
23  identification.)
24       Q.     Exhibit 125 is an email from Mr.
25  Silva to Ms. Kralovec, Mr. Krier and Mr.

95

1  Mirabelli regarding some sort of reimbursement
2  issue with Provost at Southlands?
3       A.     Yes.
4       Q.     Do you know what that's about?
5       A.     I don't.
6       Q.     Did you ever have any discussions
7  with Mr. Silva about some reimbursement issue?
8       A.     Not specifically, no.
9       Q.     Does it refer to the -- Granite's
10  not having reimbursed Southlands for the
11  operating deficits we talked about?
12       A.     I don't know specifically.
13            (Whereupon Exhibit No. 126, Email
14  dated 09/17/2008, was received and marked for
15  identification.)
16       Q.     I've given you an email string dated
17  from September of 2008.  The one I'm interested
18  in is towards the top of the page where you've
19  written to Mr. Brown and Mr. Silva, Financing
20  Southlands.
21       A.     Yes.
22       Q.     In the second paragraph where you
23  write, "This refinancing is all about buying time
24  and preserving the balance sheet."
25       A.     Yes.

96

1       Q.     In what way did the refinancing
2  preserve the balance sheet that the purchase did
3  not?
4       A.     If we own the property, we would
5  have procured financing of some sort to purchase
6  it, in which case we'd have been a borrower, and
7  had the leverage on our balance sheet.  As a
8  lender, we're a lender.
9       Q.     Presumably you have to come up with
10  the cash someplace to loan?
11       A.     Yes.
12       Q.     Would you have obtained the same
13  sort of financing to provide the financing for
14  the refinancing, or would you have done that out
15  of available cash?
16            MR. TRAHAN:  Object to form.
17       A.     I'm sorry, what?
18       Q.     Where was the funding coming for the
19  refinancing?  Would that have been separate
20  borrowing or no?
21       A.     Possibly.
22       Q.     To the extent you had to borrow the
23  money to do the refinancing, it would be similar
24  to borrowing the money to buy the property?
25       A.     Right.  But the -- if we procure

97

1    third party financing, which was the original
2    intent where we would be a first mortgage lender,
3    and then we were in a secondary position and
4    Alberta would remain the owner, Alberta would
5    have been responsible for the first mortgage, not
6    Granite Fund.
7        So that debt would not have been our
8    obligation, and that debt would have been off our
9    balance sheet.
10       Q.    Okay.
11           (Whereupon Exhibit No. 127, Email
12   dated 11/28/2008, was received and marked for
13   identification.)
14       Q.    Exhibit 127 is a series of emails
15   from approximately November 28th, 2008.
16       A.    Yes.
17       Q.    And I'm looking at the middle email
18   in the middle of the page, which is from you to
19   Mr. Flowers and Ms. Smith and others.  See that?
20       A.    Yes.
21       Q.    And you're talking about, "I think
22   this was resolved.  As presently contemplated,
23   Alberta will contribute about $3 million of
24   equity which is from the deficit funding amount
25   owed by Granite to Alberta."

98

1        A.    Right.
2        Q.    Does this refer again to the same
3    thing we talked about earlier that pursuant to
4    the agreement to share operating deficits,
5    Granite owed Alberta approximately $3 million
6    dollars?
7        A.    Correct.
8        Q.    And when this was all resolved at
9    closing, did Granite -- other than the money we
10   know was paid at the closing, did Granite ever
11   write a check to Alberta for the operating
12   deficits?
13       A.    No.
14       Q.    So --
15       A.    Not to my knowledge, no.
16       Q.    As we talked about earlier, the
17   money that was netted out at closing is the way
18   all that issue got handled?
19       A.    I believe so, yes.
20       Q.    And so pursuant to that Eighth
21   Amendment in section five, no money ever actually
22   exchanged hands pursuant to that operating
23   deficit agreement?
24       A.    I don't believe so until closing.
25       Q.    Until it was all resolved in the

99

1    closing?
2        A.    Yes.
3        Q.    Okay.
4            (Whereupon Exhibit No. 128, Email
5    dated 12/03/2008, was received and marked for
6    identification.)
7        Q.    Exhibit 128 is an email string on
8    December 2nd and December 3rd, 2008.  This
9    document starts with an email from Mr. Provost to
10   you dated December 2, 2008 in which he asks, "Do
11   you have any thoughts on a 'buyout' figure.
12   Haven't been able to catch up with Peter and
13   probably should have a number in any event for us
14   to consider."  This relates to a change in the
15   deal from a refinance to a purchase?
16       A.    That's correct.
17       Q.    Did you initiate this discussion
18   orally with Mr. Provost, or should there be an
19   earlier email to him proposing the concept?
20       A.    I don't recall.
21       Q.    You respond to Mr. Provost's inquiry
22   about the buyout figure with, "Not really, it was
23   kind of a spur of the moment concept.  Let me
24   think about it."
25       Was it actually a spur of the moment from

100

1    you to change this to a purchase from a
2    refinance?
3        A.    When it became apparent that we were
4    not going to be able to reach an agreement on a
5    refinance or a joint venture, it became a what
6    about a buyout, so whether it was spur of the
7    moment, maybe that wasn't the best word to
8    choose, but --
9        Q.    I mean I think you would have
10   thought about this a bit before you proposed it
11   to Alberta?
12       A.    It had occured to us that nothing's
13   going to work, let's just buy them out.
14       Q.    And was that when it says us, was
15   that you and Mr. Alexander and Mr. Silva?
16       A.    The Granite team, that's correct.
17       Q.    Kind of a group decision?
18       A.    Yes.
19       Q.    All right.  And I don't see -- I
20   don't see anything in writing which shows how
21   this figure of -- that ultimately was arrived at
22   at closing of $2.15 million was agreed to.
23       Are you aware of any written exchange of
24   emails or correspondence discussing the number?
25       A.    I don't know.  I don't believe there

101

1    are any emails.  It was like phone conversation.
2       Q.    Okay.  So that was all done orally
3    as far as you recall?
4       A.    Yeah, I don't think there were any
5    emails.
6       Q.    All right.  And do you recall a
7    phone conversation where you discussed well, we
8    owe you $3 million, and you've got so much money
9    in the tenant improvement escrow, and -- you
10   know, arriving at some discussion about how you
11   get to $2.15 million?
12      A.    There was a conversation with --
13   there was a phone conversation, a conference call
14   between Don Provost, I believe Peter Cudlip was
15   on, I'm not sure if anybody else from Alberta was
16   on, Chris Silva and myself.
17      I'm not sure of the specific day, and we
18   were discussing how much Alberta had invested in
19   the deal roughly, and as part of that discussion,
20   we asked them what would it cost to take you out.
21      Q.    And so did Alberta come up with the
22   2.1 --
23      A.    Alberta came up with $2.15 number.
24      Q.    All right.  And your response to
25   that number was okay, but it's got to resolve our

102

1    obligation to the -- for the $3 million, and so
2    on and so forth?
3       A.    It was put together with the balance
4    of the open issues.
5       Q.    Okay.  Did you have any notes or
6    anything of those conversations?
7       A.    No.
8       Q.    Do you have any memos of hey, if
9    we're going to buy this, we got to get this issue
10   resolved and this issue resolved and this issue
11   resolved?
12      A.    No.
13      Q.    Nothing that says we got to be out
14   of this obligation to pay $3 million dollars?
15      A.    It was -- again, it was to be
16   netted.
17      Q.    Okay.  Was one of the reasons why
18   the Fifteenth Amendment deletes the provision
19   relating to the operating deficit because you
20   wanted to be released from that $3 million dollar
21   obligation?
22      A.    I don't know.
23      (Off the record discussion.)
24      (Whereupon Exhibit No. 129, Email
25   dated 12/8/2008, was received and marked for

103

1    identification.)
2       Q.    Exhibit 129 is a series of emails
3    from the 5th of December through the 8th of
4    December.  I'm looking at the one in the middle
5    of the page from you dated December 5, 2008 to
6    Mr. Finelli, F-I-N-E-L-L-I and others.
7       A.    Yes, yes.
8       Q.    Looks like you're advising that you
9    need $2.15 million to buy out Alberta; is that
10   right?
11      A.    Correct.
12      Q.    And it says, "Going to IC on
13   Monday."  Was the purchase arrangement that you
14   negotiated submitted to the investment committee?
15      A.    Yes.
16      Q.    And it was approved?
17      A.    Correct.
18      Q.    Okay.  And is this simply a request
19   for additional cash to close the deal; is that
20   what it is?
21      A.    It was to make them aware that we
22   would need something above the loan amount to
23   close the deal.
24      Q.    Okay.  And it says, "There will be
25   an escrow released to us."  Is that the $7

104

1    million dollar escrow that was put up under the
2    Fourteenth Amendment?
3       A.    I believe so, yes.
4       Q.    And what happened to the tenant
5    improvement escrow?  Was that released to you as
6    well?
7       A.    I'm not sure, I don't recall.
8       MR. TRAHAN:  I thought the $7
9    million was a letter of credit, not escrow.
10      MR. BENNETT:  You're right, it was a
11   letter of credit.
12      Q.    So the $7 million dollar letter of
13   credit would have been released to you?
14      A.    Yes.
15      Q.    But there was an escrow from Alberta
16   that was originally for tenant improvement costs,
17   so this escrow that you're talking about being
18   released must be the tenant improvement cost?
19      A.    I think -- as I recall we put up the
20   $7 million letter of credit which was partially
21   secured by Alberta's $3.2 million.  It was held
22   in escrow, I think, but the structure's a little
23   vague now.
24      Q.    And as part of the $2.15 million
25   payment to Alberta, you got a release of whatever

Granite Southlands Town Center v. Alberta Town Center        ANDREW PIEKARSKI                                    4/7/2010

105

1    was remaining in the escrow for the tenant
2    improvements?
3        A.    I'm sorry, I want to make sure I got
4    you, say that again.
5        Q.    I may have linked two things
6    together.
7        A.    That's why I want to --
8        Q.    You paid $2.15 million over and
9    above the loan amount to close the transaction?
10       A.    Well, yes.
11       Q.    And you received the escrow,
12   whatever was left in the escrow for the tenant
13   improvement leasing costs?
14       A.    That's correct.
15       Q.    And do you know how much that was?
16       A.    I don't.
17       Q.    Investment committee have any
18   comments on the deal?
19       A.    I don't recall specific comments.
20       Q.    Did they provide comments to the
21   management team in writing?
22       A.    Typically not, no, no.
23       Q.    Is there an actual meeting of the
24   investment committee, or is it just circulated
25   among the members?

106

1        A.    There are actual meetings because
2    this was -- I believe this one was a physical
3    meeting as well, sometimes smaller amounts are
4    done electronically, but I think I'm pretty sure
5    this one was a physical meeting next door.
6        Q.    And did you attend that meeting?
7        A.    Yes.
8        Q.    You're not a member of the
9    investment committee, were you?
10       A.    No, no.
11       Q.    Mr. Alexander was at the time?
12       A.    Yes.
13       Q.    Have you seen the accounting entries
14   of how this transaction was booked on Granite
15   Property Fund's books?
16       A.    The accounting entries, no.
17       Q.    Right, okay.  There isn't any
18   allocation of the purchase price among the $2.15
19   million paid to Alberta and the $3.2 or the
20   balance thereof refunded?
21       A.    I don't know.
22       Q.    As far as you know, it's whatever
23   the net cost was recorded on the books?
24       A.    Yeah, I don't -- beyond that I have
25   no idea.

107

1        Q.    All right.  It's not something you
2    would have handled in making sure you got it
3    done?
4        A.    It's not something I would have
5    handled, it's not something in my role -- is
6    specific to my role.
7        Q.    You have accountants that do that
8    kind of thing?
9        A.    That's why we have them.
10       MR. BENNETT:  All right.  I think I
11   can let you go with that.  Thank you for your
12   time.  I appreciate it.
13   EXAMINATION BY MR. TRAHAN:
14       Q.    Just a quick couple questions.  With
15   respect to the estoppel certificates Mr.
16   Piekarski, did Granite as a buyer have any
17   obligation to investigate the issues set out, in
18   particular, estoppel certificates?
19       MR. BENNETT:  Object to the form,
20   lack of foundation.
21       A.    No.  It's the seller's
22   responsibility.
23       MR. TRAHAN:  No further questions.
24       (Deposition concluded at 5:35 p.m.)
25

108

1                    C E R T I F I C A T E
2        I, NICOLE LYNN KISH, a Certified Court
3    Reporter and Notary Public of the State of New
4    Jersey, do hereby certify that prior to the
5    commencement of the examination, ANDREW
6    PIEKARSKI, was duly sworn by me to testify the
7    truth, the whole truth and nothing but the truth.
8        I DO FURTHER CERTIFY that the foregoing
9    is a true and accurate transcript of the
10   testimony as taken stenographically by and before
11   me at the time, place and on the date set forth,
12   to the best of my ability.
13       I DO FURTHER CERTIFY that I am neither a
14   relative nor employee nor attorney nor counsel of
15   any of the parties to this action, and that I am
16   neither a relative nor employee of such attorney
17   or counsel, and that I am not financially
18   interested in the action.
19
20
21   ------------------------------------------------
22            NICOLE LYNN KISH
23       Notary Public of the State of New Jersey
24       My Commission expires September 10, 2011
25   Dated:  April 12, 2010

1      I, ANDREW PIEKARSKI, do hereby certify that
2    I have read the above and foregoing deposition and
3    that the same is a true and accurate transcription of
4    my testimony, except for attached amendments, if any.
5          Amendments attached   ( ) Yes   ( ) No
6
7
8
9          _____
             ANDREW PIEKARSKI
10
11
12
13      The signature above of ANDREW PIEKARSKI was
14    subscribed and sworn to before me in the county of
15    _____, state of Colorado, this _____ day of
16    _____, 2010.
17
18
19          _____
20          Notary Public
             My commission expires
21
22
23
24
25    Granite Southlands Town Center, LLC 4/07/10 (nlk)

April 16, 2010

Paul Trahan, Esq.
Fulbright & Jaworski L.L.P.
600 Congress Avenue
Suite 2400
Austin, Texas 78701

Re:  Granite Southlands Town Center, LLC, v. Alberta
      Town Center, LLC, et al.
Depositions of: Christopher Silva, Andrew Piekarski &
      Jay Alexander
Dear Mr. Trahan:
Enclosed are the original signature pages(s) of the
above-named deposition(s).  It was agreed that you would
arrange for signature of same by means of your copy
transcript(s) and the enclosed signature page(s).

Also enclosed are amendment sheets for changes if necessary.
Please return the signed and notarized signature page(s)
and amendment sheet(s), if any, to our office within
30 days from the date of this letter to comply with the
statute.

We will mail the original pages to the appropriate attorney
to be placed with the original sealed transcript and copies
to all other counsel.

If circumstances change and a copy transcript is not
available from your office for the witness to review, then
please notify the witness that he/she should contact our
office to make an appointment to read, sign, and make
corrections to a copy that we will make available at our office.

Thank you for your attention to this matter.

Sincerely,

Kathy Azcuenaga, Filing Assistant
HUNTER + GEIST, INC.
Registered Professional Reporters
c:  Stuart N. Bennett, Esq.