# EXHIBIT B.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

In the Matter of:

## Granite Southlands Town Center, LLC v. Alberta Town Center, LLC, et al.

09-CV-00799-ZLW-KLM

DEPOSITION OF:

# JAY ALEXANDER

| | |
|---|---|
| DATE TAKEN: | April 8, 2010 |
| PAGES: | 1-130 |
| REPORTED BY: | Nicole L. Kish |

**H+G**

Hunter + Geist, Inc.

**(303) 832-5966**

■ **www.huntergeist.com**
■ **depo@huntergeist.com**

1900 Grant Street, Suite 800
Denver, Colorado 80203
Fax: (303) 832-9525
Toll Free: 1-800-525-8490

Your Partner in Making the Record    Court Reporting & Videoconferencing

**1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLORADO
 3          CIVIL ACTION NO. 09-CV-00799-ZLW-KLM
 4  GRANITE SOUTHLANDS TOWN        :
 5  CENTER, LLC,
 6                  Plaintiff,     : CIVIL ACTION
 7          vs.                    :
 8  ALBERTA TOWN CENTER, LLC, LAND :
 9  TITLE GUARANTEE COMPANY,
10  DONALD G. PROVOST, ALLAN G.    :
11  PROVOST, and PETER M. CUDLIP,  :
12                  Defendants.    :
13
14       DEPOSITION UPON ORAL EXAMINATION OF:
15                  JAY ALEXANDER
16                  April 8, 2010
17  *******CONFIDENTIAL, ATTORNEYS' EYES ONLY*******
18
19
20
21          HUNTER & GEIST, INC.
22       1900 Grant Street, Suite 800
23         Denver, Colorado 80203
24   (303) 832-5966 - (800) 525-8490 (Toll Free)
25          www.huntergeist.com
```

**2**

```
 1       Computer-aided transcript of the deposition
 2  testimony of JAY ALEXANDER, taken
 3  stenographically in the above-entitled matter
 4  before NICOLE L. KISH, a Certified Court Reporter
 5  and Notary Public of the State of New Jersey, at
 6  the offices of BLACKROCK REALTY, 300 Campus
 7  Drive, Suite 300, Florham Park, New Jersey 07932,
 8  on Thursday, April 8, 2010, commencing at 9:04
 9  a.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1  A P P E A R A N C E S:
 2
 3          FULBRIGHT & JAWORSKI, LLP.
 4      BY:   PAUL TRAHAN, ESQ.
 5          600 Congress Avenue
 6          Suite 2400
 7          Austin, Texas 78701
 8          (512) 474-5201
 9          ptrahan@fulbright.com
10      For the Plaintiff, Granite Southlands
11      Town Center.
12
13          LINDQUIST & VENNUM, PLLP.
14      BY:   STUART N. BENNETT, ESQ.
15          600 17th Street
16          Suite 1800 South
17          Denver, Colorado 80202
18          (303) 573-5900
19          sbennett@linquist.com
20      For the Defendant, Alberta Town
21      Center, LLC.
22
23
24
25
```

**4**

```
 1              I N D E X
 2
 3  WITNESS                            PAGE
 4  JAY ALEXANDER
 5  Examination By Mr. Bennett           5
 6  Examination By Mr. Trahan          117
 7  Further Examination By Mr. Bennett 123
 8
 9          E X H I B I T S
10
11  ID       DESCRIPTION              PAGE
12  130      Email dated 12/11/2008    119
            (Retained by Council)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**1 (Pages 1 to 4)**

**5**

1  J A Y  A L E X A N D E R, having been first duly
2  sworn, testified as follows:
3  EXAMINATION BY MR. BENNETT:
4      Q.      Would you please state your name for
5  the record.
6      A.      Jay Alexander.
7      Q.      By whom are you employed?
8      A.      BlackRock.
9      Q.      What is your title?
10     A.      Managing director.
11     Q.      How long have you had that position?
12     A.      At BlackRock, six years.
13     Q.      Were you associated with a BlackRock
14  entity or one that it merged into prior to that?
15     A.      Well, that included -- the six years
16  includes the merged entity of State Street
17  Research Real Estate, so BlackRock's really been
18  five years.
19     Q.      So did you join BlackRock in
20  approximately 2005?
21     A.      Yeah, when the merger happened.
22     Q.      What are your duties as a managing
23  director?
24     A.      Well, I oversee the Commingled Fund
25  Group, and I take the lead strategy role on the

**6**

1  Granite Fund.
2      Q.      What is the Commingled Fund Group?
3      A.      Commingled Fund Group are funds that
4  have multiple clients in it, so that'd be the
5  Diamond Fund, the Granite Fund, our retail fund
6  and two apartment funds.
7      Q.      Granite Fund is an institutional
8  investor fund; is that right?
9      A.      Yep.
10     Q.      It has approximately --
11     A.      Primarily.
12     Q.      Primarily?  Are there some
13  individual -- high network individuals --
14     A.      There's a few, yeah.  There's a few
15  employees, myself included invested in it.
16     Q.      Okay.  Approximately how many
17  investors are in the Granite Fund?
18     A.      70ish.
19     Q.      You gave an interview in 2005 that
20  you reported in an outfit called REIS Insights.
21  Do you recall giving that interview?
22     A.      No.
23     Q.      Well, it's what's on the internet,
24  you know.  You talked about --
25     A.      I've -- now that you've -- you can

**7**

1  show it to me and I would -- that would jog my
2  memory, but I don't particularly remember the
3  interview session.
4      Q.      Okay.  Talked about joint venture
5  partnerships as a strategy pursued by BlackRock
6  realty advisors.  Do you recall that subject?
7      A.      Yep.
8      Q.      Does Granite Property Fund
9  participate in such joint venture partnerships?
10     A.      Yep.  Yes, it does.
11     Q.      And was the Southlands Shopping
12  Center project a joint venture project as you
13  described in your 2005 interview?
14     A.      I believe it was contemplated to be
15  a future joint venture, parts of it were.
16     Q.      Did you have any role in the
17  original acquisition -- or excuse me, strike
18  that.
19     Did you have any role in negotiating the
20  forward commitment contract between what was then
21  the Tower Fund and Alberta?
22     A.      You have to define what you mean by
23  that.  I would not have been -- I would not have
24  had really any direct negotiations with it.
25     Q.      Were you in a supervisory or

**8**

1  leadership role with respect to the project?
2      A.      I was -- I would have been the
3  strategy behind and a lot of economic concepts
4  would have been discussed with me, yeah, so
5  probably more of a leadership role, but no direct
6  day-to-day in any details I would not have been
7  involved in.
8      Q.      Was Mr. Corrigan the lead negotiator
9  for the Metropolitan Life Tower Fund side --
10     A.      Yeah.
11     Q.      -- of the transaction?
12     A.      Mm-hmm, yeah.
13     Q.      Do you know how the Tower Fund or
14  Metropolitan Life became interested in the
15  project in Colorado -- in the Southlands project?
16     A.      I think it was marketed through a
17  couple brokers that made myself and Steve
18  Corrigan aware of the opportunity.
19     Q.      Okay.  Did you meet with any of the
20  principals of Alberta at the time of the
21  negotiation?
22     A.      Yep.  Up front when we were looking
23  at the deal met with the brokers and Don at least
24  once maybe, maybe twice.
25     Q.      And you were involved in setting the

**2 (Pages 5 to 8)**

**9**

1  strategy for acquiring this property?
2      A.    Mm-hmm.
3      Q.    How would you describe that
4  strategy?
5      A.    At the time we were repositioning
6  the portfolio, and we were looking for attractive
7  retail investments as a strategy in -- through
8  the forward commitment structure to what we
9  perceived to gain access to properties at a
10  little below fully marketed pricing by having it
11  be more of a structured transaction. So that was
12  the strategy.
13      Q.    Was it a strategy for the Tower Fund
14  slash Granite Property Fund to acquire properties
15  through a forward commitment strategy as opposed
16  to an open market bid strategy?
17      A.    No, we did both.
18      Q.    Was there some allocation in what
19  percentage of assets you wanted to acquire
20  through each strategy?
21      A.    There were maximums that we were
22  looking to do, but there was no set -- you know,
23  percentages we were going after.
24      Q.    In terms of a maximum utilization of
25  a forward commitment approach for the Tower Fund

**10**

1  or Granite Fund, what was that?
2      A.    For that year it was we were trying
3  to do 25 percent of our expected acquisition
4  volume. The maximum we would do would be
5  35 percent in forward commitments.
6      Q.    And that was for that year being
7  year 2005?
8      A.    Mm-hmm.
9      Q.    You need to answer audibly yes or
10  no.
11      A.    Yes, yes.
12      Q.    Okay, thank you. When you say that
13  this acquisition was at least partially a joint
14  venture project, what did you mean by that?
15      A.    It was contemplated to be a joint
16  venture.
17      Q.    What was the contemplation, how did
18  that work?
19      A.    Well, most of our forward
20  commitments are we just buy it and the partners
21  out, and in this case, we were going to buy it
22  and only fund a portion of the value where
23  Alberta was going stay in as a partner. I don't
24  know, does that answer the question?
25      Q.    Yes. Was there at the outset a

**11**

1  contemplated percentage or division between
2  Granite and Alberta as to their ownership
3  interest after purchase?
4      A.    I imagine there was, but I don't
5  remember any details.
6      Q.    Do you recall their discussions
7  being it would be a 90/10 ownership of the
8  purchasing entity?
9      A.    That sounds familiar.
10      Q.    Sound about right?
11      A.    Yes. When I say contemplated, it's
12  because it's -- you know, it's not done 'till
13  it's done. So the strategy was to pursue a
14  forward commitment to an ultimate joint venture,
15  but when we've done those, those have always been
16  heavily negotiated for several months, and -- you
17  know, the original strategy being the forward
18  commitment to a contemplated joint venture -- you
19  know, has a fair amount of volatility of not
20  getting finalized, so half the time it doesn't.
21      Q.    The forward commitment contract,
22  which is called the Forward Purchase and Sale
23  Agreement in this case, did not outline the terms
24  of the prospective joint venture; is that right?
25      A.    I don't recall.

**12**

1      Q.    It was your expectation at least
2  that the ultimate joint venture would be subject
3  to negotiation and agreement between the parties?
4      A.    Mm-hmm.
5      COURT REPORTER: Yes?
6      A.    Yes.
7      Q.    And from time to time did the
8  parties attempt to negotiate that joint venture
9  agreement or are you aware?
10      A.    I believe yes.
11      Q.    And prior to the ultimate purchase,
12  that agreement was never finalized?
13      A.    No, it wasn't.
14      Q.    Do you know why?
15      A.    Yeah. I mean I have my own reasons
16  of thinking why it didn't happen.
17      Q.    Okay. What are those?
18      A.    Alberta was inattentive, busy with
19  other things, and basically working both sides of
20  the transaction.
21      When they felt they were in the money, they
22  were trying to get paid more. When they felt
23  they were out of the money, they tried to get out
24  of funding their ten percent.
25      So it went over a market period where we

*3 (Pages 9 to 12)*

**13**

1  felt the project at $160 million was worth $190,
2  and Don was fighting for more than $160 million,
3  and one time we negotiated he would buy it at
4  $172 million.
5      Then later on as the market started going
6  slippery because the thing got pushed out, he
7  felt that he was not signing the document because
8  he would have to fund in some losses, so his
9  inattentiveness, other business issues, maybe
10 even personal issues, and the fact that he was
11 trying to work both sides.
12     He was only going to sign a joint venture
13 document in my opinion as this went along if it
14 was in his best -- in his best interests.
15     Q.    What led you to believe that Mr.
16 Provost was inattentive through this project?
17     A.   I had been hearing through our team
18 and legal counsel that several times we had
19 delivered fully documented items or amendments
20 and different paperwork that he should have
21 signed, and took a significant time and in times
22 never responded.
23     Q.    Any specific documents that you can
24 recall that were delivered and not --
25     A.   No.

**14**

1      Q.    -- responded to?
2      A.   No.  The joint venture documents in
3  general.
4      Q.    Was there a time when a proposed
5  joint venture document was submitted to Alberta
6  that they did not respond to?
7      A.   I don't -- I don't recall.  They
8  might have ultimately responded, but there was
9  just always a very significant time lag from our
10 perspective that -- something being maybe just
11 a couple days to a couple months.
12     Q.    You also mentioned personal issues.
13 What personal issues are you aware of that were
14 affected?
15     A.   I had heard I think at one time that
16 Don -- one of Don's family members, maybe his
17 wife had cancer.  I think that was -- I might
18 have my partners mixed up, but I think that was
19 him.
20     Q.    Now you've mentioned that up to
21 35 percent for the year 2005 was contemplated as
22 a max for forward commitments for the property
23 fund, right?
24     A.   Mm-hmm.
25     Q.    Yes or no?

**15**

1      A.   Yes.
2      Q.    Thank you.  How close to that
3  percentage did you get for the year 2005?
4      A.   I don't exactly recall.  This
5  transaction was probably half the volume.
6      Q.    Half of the total volume of
7  commitments?
8      A.   40 -- 40 percent.  I mean it's $160
9  million, we were probably looking to do $1
10 billion in acquisitions, so $350 million would
11 have been our allocated target if I'm backing
12 into the math, so this is -- you know, $160
13 million of that $350, so it was a very sizable
14 transaction from our perspective.
15     Q.    Do you recall other forward
16 commitments that the Granite Property Fund made
17 in 2005?
18     A.   No.
19     Q.    And if I refer to Granite Property,
20 you understand that I also include the Tower
21 Fund, its predecessor?
22     A.   Exactly, understood.
23     Q.    Is it easier just to call it Granite
24 Property?
25     A.   Yeah -- yes.

**16**

1      Q.    Okay.  So you don't recall whether
2  you did any other forward commitments for the
3  Granite Property Fund in 2005?
4      A.   Oh, I know we did, I'm just not
5  particular which ones because some were 2005,
6  some were 2006 -- you know, we -- I imagine one
7  was probably -- that's the reason I'm going to
8  say I don't know in particular.
9      Q.    Because it's difficult to ascribe a
10 particular year to any transaction?
11     A.   Yeah.  I mean we do -- we have --
12 you know, we were doing a transaction a month,
13 either forward commitment or buying properties I
14 mean over this time period.
15     Yeah, we probably bought and sold 170
16 properties, so it all sort of -- it might be on
17 the low side, but so -- you know, it all sort of
18 -- going back three years gets kind of tricky.
19     Q.    Kind of merges one into the other?
20     A.   Well, it's not -- it's just the way
21 it went.
22     Q.    Now when you say you did 170
23 properties, was that all for the Granite Property
24 Fund?
25     A.   Yeah.

**17**

1    Q.    And over what period of time was
2  that?
3    A.    About a four-year time period.
4    Q.    And of those 170 properties, how
5  many were purchased on a forward contract?
6    A.    Roughly 15.  I could be way off on
7  that.  It's not 8, it's not 25.
8    Q.    So somewhere between 10 and 20 would
9  be a good estimate?
10   A.    Yeah.
11   Q.    Did you negotiate where you were the
12 lead negotiator on any of the forward commitment
13 contracts?
14   A.    No.
15   Q.    All handled by the acquisition
16 group?
17   A.    Yep, and sometimes in conjunction
18 with the other members of the portfolio
19 management team whom you already deposed.
20   Q.    Is there a standard or usual
21 provision in these forward commitments that the
22 purchases are subject to an as is, where is
23 provision in the contracts?
24        MR. TRAHAN:  Object to form.
25   A.    Yeah, it's kind of hard to --

**18**

1  forward commitment is predicated upon the
2  developer delivering the property in a specific
3  condition, so most of the cases I wouldn't say it
4  as-is.
5    Q.    It is not typical?  What I'm asking
6  is is it typical or standard practice to have an
7  as is, where is clause on a forward commitment
8  contract?
9         MR. TRAHAN:  Object to form.
10   A.    I wouldn't be able to comment on the
11 particulars of that.  The economic concept behind
12 it is if it's not built according to the quality
13 and the specs that are set out, we would have no
14 obligation to fund.
15   Q.    You have a set of exhibits in front
16 of you.  Looks like they're in order starting
17 with Exhibit 101, which is the Forward Purchase
18 and Sale Contract for this transaction.  Take a
19 look at that for a moment.  I have some questions
20 about it.
21   A.    I would say I've heard -- you know,
22 I haven't looked at an escrow agreement
23 specifically in over 15 years, so I think I -- I
24 don't know if -- I think I'm trying to save
25 myself time today.

**19**

1    If you ask questions about this and that,
2  I'm just going to defer.  It's not my job.  It
3  was the first five years of my career, but it
4  hasn't been since.
5    Q.    Okay.
6    A.    Not trying to push off anything, I'm
7  just being very honest that I'm not -- going to
8  say I don't know, or I defer that to other
9  people's judgment.
10   Q.    Understand.  And if you don't know
11 about this particular transaction, that's fine.
12 I just need to kind of get an idea --
13   A.    I understand.
14   Q.    -- where the scope of your
15 responsibilities were in this deal, and what I'm
16 particularly interested though is how this
17 contract compares to others that you're familiar
18 with, and is it a standard sort of contract,
19 which has kind of a standard interpretation, or
20 is this a uniquely -- negotiated unique to this
21 deal?
22   So that's kind of where I'm going with this
23 in terms of your experience, and one of the
24 aspects of this is that on page seven, there is
25 this provision that says this is an as is, where

**20**

1  is sale.
2    A.    Mm-hmm.
3    Q.    So my question for you is in your
4  experience, is this type of a provision where the
5  seller is selling the property on an as is, where
6  is basis with no warranties as to the condition
7  of the property, is that something that is
8  typically found in forward purchase contracts in
9  your experience or no?
10        MR. TRAHAN:  Object to form.  Asked
11 and answered.  Document speaks for itself.
12        THE WITNESS:  What do you want me to
13 do?
14        MR. TRAHAN:  Answer if you can.
15   A.    I would say I'm going to go back to
16 no matter how the legal language because I'm -- I
17 didn't negotiate this, the economic concept is
18 before we close on a forward commitment that the
19 property has to be delivered in satisfactory
20 condition to our sign off, and it has to be
21 according to plans and specs of what the site was
22 and the quality it was supposed to be, and in
23 other forward commitments where the quality was
24 not there, we did not fund.
25   Where the building was built a little

**21**

1  differently than was in the plans and it was
2  material in our judgment, we did not fund. I
3  don't -- I can't comment on this language.
4      Q.    Okay.  How many transactions are you
5  personally aware of where the condition of the
6  property was an issue that caused Granite not to
7  fund the property -- fund the acquisition?
8      A.    One in particular, another one was
9  heavily negotiated with the developer putting in
10 sizable amount of money in corrective measures
11 for an extended period of time before we funded.
12 So they corrected the construction issues that we
13 deemed material.
14     Q.    All right.  And which two properties
15 do you have in mind that were subject to these
16 negotiations?
17     A.    There was a property in Florida in
18 the Orlando area, and there was a center in Salt
19 Lake City.
20     Q.    Were these both for the Granite
21 Property Fund?
22     A.    Yep.
23     Q.    And were they both pursuant to
24 forward purchase contracts or forward commitment
25 contracts?

**22**

1      A.    Yeah, the same economic concept,
2  yes.
3      Q.    And you don't -- do you know what
4  provisions were contained in the agreements --
5      A.    No.
6      Q.    -- concerning the condition of the
7  property?
8      A.    Mm-mm, no.
9      Q.    If the concept as you've described
10 it was that the developer was going to deliver a
11 property in a certain condition subject to
12 certain plans and specifications, why would the
13 contract provide an as is, where is provision
14 with no representations or warranties regarding
15 the condition of the property?
16          MR. TRAHAN:  Object to form.
17     Q.    Those two concepts seem inconsistent
18 to me.
19     A.    Well, we would just inspect it and
20 sign off on it, and there would be other parts of
21 the contract where the developer was to give us
22 -- you know, possibly in contracts to give us
23 whenever they had active knowledge of any changes
24 in the property status would have to notify us.
25          So we had an -- I would just -- looking at

**23**

1  this, we'd had have a right to give final
2  inspection, and if we didn't accept it, then that
3  was it.
4      Q.    All right.  Did you prior to this
5  closing of this transaction exercise your rights
6  of inspection?
7      A.    I would imagine so, yeah.
8      Q.    Do you know one way or the other?
9      A.    Not in particular, no.
10     Q.    There was I think either Mr.
11 Piekarski or Mr. Silva told us that there was an
12 engineering firm that BlackRock contracted with
13 to kind of view the construction on an ongoing
14 basis.  Were you aware --
15     A.    Sure.
16     Q.    -- of hiring an engineering firm?
17     A.    Yeah.
18     Q.    Do you know what engineering firm
19 you relied on in this instance?
20     A.    No.
21     Q.    But it is kind of standard procedure
22 for BlackRock?
23     A.    Yeah, sure.
24     Q.    Now on page 11 of this agreement
25 there is a subparagraph (c), which is part of

**24**

1  paragraph or section 5.3, which is captioned, No
2  Disapproval Right.  It's page 11, paragraph (c).
3  Would you review that paragraph for me.
4      A.    Yeah, I've read it.  I don't know
5  why it's in there so I won't comment.
6      Q.    Okay.  This paragraph seems somewhat
7  inconsistent with what you've just described for
8  me as the economics of the deal that if the
9  condition of the property didn't meet your
10 expectations, you simply wouldn't fund.
11         This paragraph seems to say that the buyer
12 has no right to terminate the agreement as a
13 result of any matter relating to the condition of
14 the property.
15     A.    Yeah, doesn't seem right.
16     Q.    So that would be inconsistent with
17 your understanding of the deal?
18     A.    No, inconsistent of the premise of a
19 forward commitment.
20     Q.    Okay.  And so you don't know why
21 that provision is included?
22     A.    No.  I'd have to defer to those that
23 negotiated it.
24     Q.    When you -- on page 17 there's a
25 list of conditions to the buyer's obligation to

**25**

1  proceed with closing.  As you look through that,
2  there is nothing that warrants that the property
3  is any particular condition.
4      The only representations that even relate to
5  the property are that it's substantially
6  completed -- you know, that it has good title --
7  you know, that there's been a punch list
8  completed and so forth.
9      A.    Sure, but substantial completion
10  gets out of the concept.
11      Q.    Okay.  In your mind it has to be
12  completed in accordance with the plans and
13  specifications?
14      A.    Sure, exactly.
15      Q.    Okay.  Now there's also a provision
16  regarding estoppels in paragraph 8(k) on page 18.
17  What is your experience in contracts that require
18  delivery by the seller of estoppels from the
19  tenants?  Is that something you're familiar with?
20      A.    Mm-hmm.
21      Q.    Yes?
22      A.    Yes, every deal.
23      Q.    Every deal?
24      A.    Yep, except -- well, sometimes
25  depending on apartment transaction.

**26**

1      Q.    Every commercial deal where you have
2  retail tenants?
3      A.    Yeah, sure.
4      Q.    Okay.  Somehow paragraph 8(k),
5  romanette double i provides that the buyer has
6  the right to object to tenant estoppels tendered
7  by the seller under certain circumstances.
8      I'm going to ask you what knowledge you have
9  about the first one, which is either that it's
10  not in the form required, or it has a materially
11  and -- has been materially and adversely modified
12  from that form.
13      Was is your understanding of what
14  constitutes a material modification from the form
15  of a tenant estoppel?
16      A.    Well, most estoppels come back with
17  no markups at all.  So estoppels that have any
18  writing and -- because most of them come back
19  with not much on them or anything, just
20  wordsmithing, at times moderate wordsmithing.
21      Any time it's modified -- you know, that's a
22  change, and materiality is a very subjective
23  issue.
24      Q.    What in your view are the factors
25  that one considers in determining whether a

**27**

1  modification to a form is material?
2      MR. TRAHAN:  Object to form.
3      A.    I don't know.  It's -- restate the
4  question or I don't know how I can answer it.
5      Q.    Is it purely subjective so it just
6  is sort of in the eye of the beholder what
7  constitutes a material change, or are there some
8  kind of objective things that you would look at
9  to determine whether a change is material or not?
10      A.    I think it can be deemed pretty --
11  at times could be subjective.  Materiality would
12  have to be anything that changes square footage,
13  or once again, the quality outside of the specs
14  if there's a problem with the space, problems
15  with any of the mechanicals, things like that.
16      Anything where we'd inherit liability, so
17  anything that -- you know, we deem could cost
18  over -- you know, $50,000 dollars would be deemed
19  material on any project.
20      Q.    Really?  In a transaction that
21  involves $160 million dollars, you think a
22  $50,000 dollar item is a material question?
23      A.    I do.  We'd go back and at least
24  have a conversation with the developer about a
25  $50,000 dollar deduct.  Sometimes it might be

**28**

1  more, sometimes it might be less.
2      Q.    Now in this -- in the original FPSA,
3  the rights of the buyer in the event seller
4  breaches his obligation to provide tenant
5  estoppels is to terminate the agreement.  No
6  other rights.
7      In evaluating whether a tenant estoppel is a
8  deviation from the required form, did you
9  consider whether the defect in the estoppel is
10  sufficient to warrant terminating the project as
11  a whole?
12      MR. TRAHAN:  Objection to form.  Go
13  ahead.
14      A.    If I'm hearing your question right,
15  no.  We don't care if it's a material issue or
16  not.  If the estoppel's not brought back clean,
17  the seller or the developer has to deliver it
18  clean.  We don't care if the issue -- you know,
19  we don't want to inherit a lawsuit.
20      Q.    All right.  And so whether it's
21  sufficient enough to justify terminating the
22  contract is not something that you would
23  consider?
24      A.    No.
25      Q.    On page 25 there is a provision, I

**7 (Pages 25 to 28)**

**29**

1  guess it's 10.6, subparagraph (h) dealing with
2  off site improvements, and it provides that there
3  are certain off site improvements for roads,
4  utilities, traffic signals and so forth that will
5  be financed by a metropolitan district.
6      Are you familiar with the use of a
7  metropolitan district to fund certain public
8  improvements?
9      A.    Yes, the concept, yeah.  In this
10 particular instance, no.
11     Q.    Okay.  When a quasi-governmental
12 organization like a metropolitan district is
13 used, you don't have any expectation of acquiring
14 the property that the metropolitan district
15 funds, do you?
16     A.    It would have to be specified in the
17 documents.  I couldn't comment directly.
18     Q.    You were aware that because of this
19 provision or generally that this metropolitan
20 district was going to pay for the construction of
21 certain roads and other public improvements,
22 correct?
23     A.    In this transaction in particular I
24 can't comment on the precise knowledge of any of
25 that.

**30**

1      Q.    So other than what's said here, you
2  really didn't have any knowledge about how that
3  was going to be done in this transaction?
4      A.    Right.  I mean I could have known of
5  it generally that certain things had to be built,
6  but in particular regarding this transaction, I
7  wouldn't be able to tell you any particulars.
8      Q.    Let me back you up to page 16, I
9  skipped one provision in here.  There is a
10 section -- subsection (f) of section 7.2 on page
11 16 dealing with quote, "Change in Condition,"
12 closed quote.  Read that paragraph to yourself.
13     A.    It's standard.
14     Q.    This is something that you've seen
15 in other kinds of forward purchase contracts?
16     A.    Sure.
17     Q.    And in this particular instance,
18 this provision relates to a change of
19 circumstance, which makes -- which one, makes any
20 representation of -- or warranty of seller to
21 buyer under the agreement untrue or misleading,
22 or two, makes any covenant or agreement seller
23 incapable of being performed.
24     In connection with the defects in
25 construction or problems with construction, do

**31**

1  you believe that this paragraph somehow obligates
2  the seller to notify the buyer of construction
3  issues?
4      A.    Yes, sure.
5      Q.    When the seller is making no
6  representation to the buyer about the
7  construction, how does that fall into this
8  paragraph?
9          MR. TRAHAN:  Object to form.
10     A.    I don't know where you're going with
11 that.  I can't answer it.
12     Q.    Let me ask it this way, I may have
13 been confused.  If there is -- if there were a
14 construction problem with this property, what
15 representation or warranty of the seller to the
16 buyer is untrue or misleading as a result of
17 that?
18         MR. TRAHAN:  Object to form.
19     A.    I still don't understand it.
20         MR. TRAHAN:  If you don't understand
21 the question, you can't answer it.
22     A.    I don't understand the question.
23 This paragraph is if there's a construction
24 issue, the seller is obligated to tell the buyer,
25 and if there is an issue that they don't tell us

**32**

1  about, that would be misleading.
2      Most of the time as you know, the seller has
3  -- this is more of an active knowledge question
4  that there's many issues that go on on the
5  property that are subterranean or in the walls
6  that we wouldn't have any way of physically
7  having an engineering firm see, and this general
8  paragraph is to give them the obligation to
9  notify us of issues that aren't readily apparent.
10     Q.    The way it's written it seems like
11 there is an obligation to notify the buyer from
12 the seller in two circumstances; one is where
13 some other warranty or representation is untrue
14 or misleading without the disclosure, or any
15 covenant or agreement is incapable of being
16 performed.
17     A.    It does narrow it that way.
18     Q.    Okay.  So if there is a construction
19 issue, what representations or warranties that
20 the seller is making to the buyer are untrue or
21 misleading as a result of not disclosing a
22 construction issue --
23         MR. TRAHAN:  Object to form.
24     Q.    -- under this agreement?
25     A.    Well, I'm interpreting it as they

**33**

1  have active knowledge to tell us of issues, and
2  if there is issues that they're aware of and
3  don't tell us, then they're misleading us.
4      Q.    All right.  The second instance
5  where seller is supposed to notify the buyer is
6  if any covenant or agreement of the seller is
7  incapable of being performed.
8         What covenants or agreements of the seller
9  would be incapable of being performed if there
10 were a construction issue?
11        MR. TRAHAN:  Object to form.
12     A.    I don't know.  I'm not -- I don't
13 know.
14     Q.    So which of these two circumstances
15 do we put a construction issue, in subparagraph
16 (a) or (b)?
17        MR. TRAHAN:  Object to form.
18     A.    I actually don't even put it in
19 either one, I put it in the first sentence.  I
20 know it limits it, but --
21     Q.    So the way you would read this
22 paragraph is any change in condition with respect
23 to the property?
24     A.    Mm-hmm.
25     Q.    Period?

**34**

1      A.    Yeah.  Generally I would stop it
2  there, but --
3      Q.    All right.  There's also -- under
4  subparagraph (g) on page 16, there's a provision
5  that requires a seller to make any warranties
6  from the construction professionals assumable by
7  the buyer.  See that paragraph?
8      A.    Mm-hmm.
9      Q.    Is that kind of a standard
10 provision?
11     A.    Mm-hmm.
12     Q.    Again, I need an audible response.
13     A.    Yes.
14     Q.    Thank you.  And in this particular
15 case, it's your understanding that when the deal
16 closed that Granite Property Fund did acquire the
17 warranties and guarantees of the contractors and
18 architects and so forth?
19        MR. TRAHAN:  Object to form.
20     A.    Yeah.  Warranties -- construction
21 warranties would pass on to us, yes.
22     Q.    So as buyer if there are
23 construction problems, you would have whatever
24 rights on the warranties or guarantees provided
25 by the construction professionals?

**35**

1         MR. TRAHAN:  Object to form.
2      A.    In addition to what would be typical
3  remedies against the developer.
4      Q.    And are you aware that BlackRock on
5  behalf of the property fund has sent notices to
6  the construction professionals of claimed defects
7  in the property?
8      A.    I'm not aware of that.
9      Q.    You're not at all?
10     A.    No.  I would have no particular
11 knowledge of that, no.
12     Q.    Okay.  Are you aware that as
13 recently within the last month that your --
14 Granite's lawyers have sent notices to the
15 construction professionals of alleged defects?
16        MR. TRAHAN:  Object to form.
17     A.    No.
18     Q.    Are you aware of the current status
19 of the investigation of the construction problems
20 at the property?
21     A.    I'm aware of the construction
22 issues, I'm not aware of the construction
23 inspection and the particular legalities and
24 anything we've submitted, no.
25     Q.    Okay.  What do you know about the

**36**

1  investigation of the construction issues at the
2  property?
3      A.    As I said, I don't know about the
4  investigation.  I know that there's construction
5  problems.
6      Q.    What problems are you aware of?
7      A.    The site, the property is settling.
8      Q.    When you say the property, all of
9  the property?
10     A.    No, portions of it.
11     Q.    Do you know what --
12     A.    Yeah, towards the movie theatre and
13 around the movie theatre.
14     Q.    Do you know how many buildings are
15 affected?
16     A.    Well, I know at least one.
17     Q.    Any more than that?
18     A.    No.
19     Q.    Have you been made aware that
20 there's a proposal to drill wells on the property
21 and install pumps to remove sub surface water?
22     A.    Mm-hmm, yes.
23     Q.    You've heard that?
24     A.    Mm-hmm.
25     Q.    Do you know the details of that?

**9 (Pages 33 to 36)**

Granite Southlands Town Center v. Alberta Town Center     JAY ALEXANDER                                4/8/2010

**37**

1    A.    No.
2    Q.    Do you know how many wells are
3    proposed to be drilled?
4    A.    No.
5    Q.    Do you know the locations of the
6    proposed wells?
7    A.    No.
8    Q.    Do you know estimated costs of
9    drilling the wells?
10   A.    No.
11   Q.    So all you know is that there has
12   been a proposal to drill wells to remove sub
13   surface water?
14   A.    Yep, and construction issues could
15   be anywhere to correct it $2 to $3 million bucks.
16   Q.    Have you gotten an estimate to that
17   nature, or is that just kind of eyeball?
18   A.    It's our general -- our general
19   estimate.
20   Q.    Have you had any estimates provided
21   by either contractors --
22   A.    I would not be aware of that, no.
23   Q.    What group in your organization
24   would know those details?
25   A.    We have an engineering group, and

**38**

1    Chris and Andrew would have more particulars on
2    that.
3    Q.    The engineering group is headed up
4    by a man named Philip Yee?
5    A.    Yep.
6    Q.    Would he have more information about
7    that?
8    A.    Sure.
9    Q.    Do you know if he's in charge of
10   supervising the investigation into the property
11   issues?
12   A.    He would be.
13   Q.    Is it -- strike that. You were
14   aware that this Forward Purchase and Sale
15   Agreement was part of the undertakings that were
16   used to secure financing for the construction on
17   this project?
18   A.    Yes.
19   Q.    And you were aware that the FPSA was
20   assigned to the consortium of banks it was
21   lending the construction money?
22   A.    That would be typical.
23   Q.    And the purpose of doing that is so
24   that if the borrower defaults, the lenders still
25   have a source of having their loans repaid by

**39**

1    enforcing the Forward Purchase and Sale
2    Agreement?
3    A.    I don't think you're exactly saying
4    that right, but generally I could answer yes.
5    Q.    How did I say it wrong?
6    A.    No, I -- you know, there's -- in a
7    forward commitment, the property once again has
8    to be delivered according to plans and specs, and
9    if it is not, the bank, or as you said the
10   consortium of banks has to look exclusively to
11   the developer.
12       We don't have that liability to fund. So
13   they underwrite the ability for the developer to
14   deliver the property in the condition and in the
15   timing that they're supposed to deliver it, and
16   if they don't, the banks -- we won't fund and the
17   banks go after the developer.
18   Q.    Now the banks have a right if the
19   developer defaults to cure --
20   A.    Sure.
21   Q.    -- if the developer defaults,
22   correct?
23   A.    That's exactly right, yeah.
24   Q.    If they acquire the property in a
25   certain time frame and so forth?

**40**

1    A.    Sure. Now yeah, most of the time
2    they're running against time constraints as you
3    noted, the bank, to cure a default by the
4    developer.
5    Q.    Okay. Were you involved in any of
6    the construction loan financing in terms of the
7    documentation of that?
8    A.    No.
9    Q.    So if I showed you the construction
10   loan agreement, you've never seen it before
11   probably?
12   A.    No, never seen it.
13   Q.    There should be Exhibit 102 in front
14   of you. These are financial statements for the
15   BlackRock Granite Property Fund for the year
16   ended there for the period ended June 30, 2008
17   and the year ended December 31, 2007.
18       There is a listing of properties on page
19   four. The properties that you indicated
20   previously that you had issues with on the
21   construction that you negotiated for the fund,
22   are they listed on this schedule of real estate,
23   the one in Utah?
24   A.    Can you restate your question?
25   Q.    Yeah. You mentioned there was a

**41**

1  property in Utah and a property in Florida that
2  you had construction issues with that you
3  negotiated.
4      A.    They're not here.
5      Q.    Were they not purchased or what
6  happened?
7      A.    As I said, one was not purchased,
8  one was eventually purchased.
9      Q.    Which is the one that was purchased?
10     A.    It's not on here.
11     Q.    Do you know why?
12     A.    Because it probably went into the
13  one in 2009.
14     Q.    Subsequent to these commercials?
15     A.    Or could have funded before 2007.
16     Q.    Do you recall approximately what
17  time this --
18     A.    Probably 2009.
19     Q.    Okay.  Do you know what the name of
20  this property was?
21     A.    No.
22     Q.    Which one was not purchased, was it
23  the Utah or the Florida?
24     A.    The Florida one in Baldwin Park.
25     Q.    I'm sorry?

**42**

1      A.    The area is called Baldwin Park.
2      Q.    And so that property has just never
3  been purchased by BlackRock --
4      A.    Right.
5      Q.    -- or by the property fund?  And the
6  Utah property, what was it called?
7      A.    I forget the name.
8      Q.    What part of Utah is it?
9      A.    Oh, it's in Salt Lake.
10     Q.    And it's a retail center?
11     A.    No, it's an apartment.  I'm just
12  blanking on the name.  People go by names around
13  here which I find is very interesting.
14         MR. TRAHAN:  How so?
15         THE WITNESS:  Oh, I just --
16         MR. TRAHAN:  We can talk about it
17  off the record.
18         COURT REPORTER:  Off the record?
19         THE WITNESS:  No, no, that's okay.
20  I just never call them by their names.  I call
21  them by their locations or their submarkets, so
22  --
23  BY MR. BENNETT:
24     Q.    On the -- on BlackRock's web site,
25  there's a statement that in 2008 the transaction

**43**

1  group executed 43 acquisitions totalling $1.5
2  billion, and 17 dispositions totalling $850
3  million.
4      Do you know of those 43 acquisitions how
5  many were acquired by the Granite Property Fund?
6         MR. TRAHAN:  Object to form.
7      A.    That would be these that are on this
8  sheet.
9      Q.    Well, they probably weren't all
10  acquired in 2008, were they?
11     A.    Sure.
12     Q.    Do you know which of the properties
13  that are listed on page four --
14     A.    Oh here, no.  Yeah, this is just a
15  list.
16     Q.    It doesn't give dates of
17  acquisition?
18     A.    Yeah.  Okay, this is the full list
19  of all the properties, okay.  Somewhere else in
20  this report -- well, this is just financial
21  statements, I thought this was the annual report.
22  The annual report would list which ones in
23  particular were bought during that year.  Let me
24  see if I can get the apartment -- the property
25  was Immigration Court, Salt Lake City, it's

**44**

1  listed here.  That was eventually funded.
2      There was a couple transactions associated
3  with Salt Lake, so we may be getting the one
4  mixed up, so --
5      Q.    But your best estimate today is that
6  it was this Immigration Court?
7      A.    Yeah, but there was a couple -- we
8  were actually dealing with three different
9  projects in this pod right here, so it's called
10  the Trolley Square Submarket of Salt Lake City,
11  so we're looking at the three different
12  transactions.
13     I'm pretty sure that Immigration was one
14  that had a construction issue that we allowed
15  them to correct and then we funded still.
16     Q.    And was this a forward commitment
17  contract?
18     A.    Mm-hmm.
19     Q.    Yes?
20     A.    I mean however -- yes, but it could
21  have been a presale, just depends.  Forward
22  commitments -- the difference between a presale
23  and a forward commitment is the forward
24  commitment we generally enter into a tri-party
25  agreement with the lender.

**11 (Pages 41 to 44)**

**45**

1   In a presale, we do not have -- the
2  developer's already got the financing lined up,
3  and we just agree to buy it at the end if it's
4  delivered in the condition and in the time it's
5  supposed to, so there's no tri-party agreement in
6  a presale.  So Immigration could have been a
7  presale.
8   **Q.   And do you know if in the**
9  **contractual documents for the Immigration Court**
10 **acquisition whether there were any**
11 **representations and warranties by the developer**
12 **as to the condition of the property?**
13  A.   I wouldn't have any knowledge.
14  **Q.   You don't know whether there was an**
15 **as is, where is provision?**
16  A.   Don't know.
17  **Q.   Do you believe it's approximately**
18 **correct that there were 43 acquisitions by**
19 **BlackRock in 2008 total?**
20  A.   I have no reason to believe that
21 that's not accurate.
22  **Q.   Is it consistent with your**
23 **recollection?**
24  A.   Sure.
25  **Q.   Of those 43 acquisition, do you know**

**46**

1  how many were pursuant to forward commitments?
2   A.   I do not.
3  **Q.   Do you know how many of them were**
4  **for the Granite Property Fund as opposed to other**
5  **funds?**
6   A.   In particular, no.
7  **Q.   Do you know approximately how much**
8  **in volume in 2008 the property fund acquired?**
9   A.   Nope, don't remember.
10  **Q.   Do you have an estimate?**
11  A.   No.
12  **Q.   Is that not something you kind of**
13 **keep track of for the fund?**
14  A.   As I said, it's -- you know, it's
15 been -- it's been five years where we typically
16 buy and sell in the typical except for last year,
17 so we typically buy anywhere from four to six
18 properties a quarter and sell two to three.
19  So you have nine transactions a quarter, so
20 I can't in particular say this is the block.  We
21 don't deal with it in discreet time, so that's
22 why I'm saying I tell you there was probably
23 20-some.
24  There was probably 20 buys, at least 20 buys
25 and 10 sales, so -- but that's what we do every

**47**

1  year.  So in particular, did it end up being 15
2  we bought or 35, that's not the way we do it.
3  That's not the way we look at it.
4   **Q.   In the acquisitions that you've made**
5  **for the Granite Property Fund, all of the retail**
6  **commercial ones have tenant estoppels that are**
7  **provided by the seller to you as buyer, right?**
8   A.   Yes.  I mean that is standard
9  protocol, yes.
10  **Q.   Do you know of any other transaction**
11 **where you objected to tenant estoppels in the**
12 **course of the acquisition?**
13  A.   Particularly?
14  **Q.   Yeah.**
15  A.   No.
16  **Q.   Do you believe you did?**
17  A.   Yes, all the time.  We do all the
18 time.
19  **Q.   And how typically are those issues**
20 **relating to tenant estoppels resolved, if there**
21 **is a typical way?**
22  A.   Most time is -- you know, a tenant
23 raises an issue.  Whether or not the landlord
24 deems it material or the current owner deems it
25 material or not material, but they correct it.

**48**

1  They settle it so that we get a -- you know,
2  month later we get a clean estoppel.
3   **Q.   Have you on occasion postponed the**
4  **closing date to allow resolution of object to**
5  **tenant estoppels?**
6   MR. TRAHAN:  Object to form.
7   A.   Yeah, it's all to be negotiated.
8   **Q.   Have you done that?**
9   A.   It would seem reasonable.
10  **Q.   Do you know why in this particular**
11 **instance in Southlands that the delivery date for**
12 **the tenant estoppels was not extended to allow**
13 **Alberta to deal with this cinema estoppel issue?**
14  MR. TRAHAN:  It was extended beyond
15 closing.  You know, that you're not talking about
16 closing, you're talking about beyond the day --
17  MR. BENNETT:  Beyond the dates after
18 providing closing.
19  A.   No, I do not know.
20  **Q.   Do you know if there was any**
21 **discussions about doing that?**
22  A.   No.
23  **Q.   In the properties that you have**
24 **acquired, you have accepted tenant estoppels that**
25 **had modifications from the prescribed form --**

**12 (Pages 45 to 48)**

Granite Southlands Town Center v. Alberta Town Center      JAY ALEXANDER      4/8/2010

**49**

1     MR. TRAHAN:  Object to form.
2    Q.  -- without objection?
3    A.  If it was a very -- you know,
4 sometimes there's wordsmithing that a tenant
5 typically didn't like, and once we looked at the
6 wordsmithing if we thought that was fine, we
7 could sign off on that.
8    If there was anything, as I said, we deemed
9 to possibly in-house inherent liability, and a
10 possible step into some sort of liability or cost
11 issue, it had to be settled, but wordsmithing --
12 you know, is more typical, and tenants put a lot
13 of petty complaints, space is warm.
14    Q.  HVAC doesn't work to their
15 satisfaction?
16    A.  Yeah -- you know, and then they go
17 out and the mechanic guy tweaks it, and they sign
18 off on it the next month.
19    Q.  Now there were a number of estoppel
20 certificates that Granite objected to in the
21 Southlands transaction.  I've gone through those
22 with your fellow team members.  Do you know
23 anything about them?
24    A.  Nope.
25    Q.  If I showed them to you, would you

**50**

1 have any knowledge about why they were rejected
2 or weren't rejected?
3    A.  No, we can save some time.  As I
4 said, I haven't looked at an estoppel in
5 fifteen years.
6    Q.  All right.  Well, I won't ask you to
7 go through all these then.
8    A.  I heard it's kind of painful, so I'm
9 just trying to save us all -- I mean I wish I
10 could say I saw them so we could go through them,
11 but I -- that would be deferred to Andrew, and
12 Andrew's responsibility as a managing director,
13 Chris is a director, and our legal counsel and
14 our property manager -- or I mean our asset
15 managers.  I would never see that.
16    Q.  Okay.  So it's not something you had
17 anything to do with in this transaction at all?
18    A.  No, I would say I have no particular
19 knowledge.
20    Q.  All right.  If you look at the
21 commercial retail and office properties that are
22 on page four of Exhibit 102, do you know or can
23 you look at that list and tell me which of those
24 properties were acquired pursuant to forward
25 commitment contracts?

**51**

1    A.  Some of them I can.
2    Q.  Tell me what you can identify as a
3 forward commitment deal.
4    A.  Southgate Market under retail.  We
5 didn't do any on the office side.
6    Q.  That was Chicago, Illinois?
7    A.  Mm-hmm.  Sierra Business Park may
8 have been under retail.
9    Q.  Sierra Business Park --
10    A.  It's like six or seven down.
11    Q.  Oh, that's under industrial, okay.
12    A.  The Alexander under residential.
13 Presale I think was Helix and Ellipse above that,
14 so Immigration Court might have been a presale
15 too.  So that's all that's popping up to me.
16    Q.  And so the two that were forward
17 contracts that would have tenant estoppels would
18 be Southgate and possibly Sierra?
19    A.  Mm-hmm.
20    Q.  You wouldn't typically get tenant
21 estoppel certificates from residential tenants,
22 would you?
23    A.  No.  I mean I've seen it very rarely
24 for a really large tenant for sometimes you might
25 have -- it might have been on my old portfolio,

**52**

1 but -- you know, a guy that was running the top
2 floor, he's renting four apartments for four
3 years or something -- you know, and he knocked
4 down some walls.
5    Q.  So some significant tenant you
6 might?
7    A.  Yeah, but a typical annual tenant
8 that has one space, no.
9    Q.  Are you aware with respect to either
10 the Southgate Market or the Sierra Business Park
11 any issues with respect to the tenant estoppels
12 that you received in those projects?
13    A.  I would not be aware.
14    Q.  And you wouldn't be aware in the
15 normal course in any event, would you?
16    A.  No, unless there's a major issue
17 that was deemed material that would deem it a
18 construction issue, a cost issue, a liability
19 issue, then it would be highlighted to me.
20    Q.  But only if it grows to that level?
21    A.  Yeah.
22    Q.  All right.  Let's talk about the
23 Cinema Estoppel Certificate.  I assume that in
24 this transaction with Southlands Shopping Center
25 that the issue relating to the cinema estoppel

**13 (Pages 49 to 52)**

**53**

1   was brought to your attention?
2       A.    The issue was, I have not seen the
3   estoppel.
4       Q.    You have not?
5       A.    Mm-mm.
6       Q.    What were you told about the
7   estoppel that raised an issue to your level?
8           MR. TRAHAN:  Object to form.
9       A.    Well, I was brought to it in general
10  that there were several tenants that have stated
11  an issue with the settling of their space, and it
12  was brought to my attention because we believe
13  that Alberta had active knowledge of that issue
14  before we closed, and we would -- I would have
15  never closed with a settling issue because I know
16  how much fill was put on that site, I've been on
17  the site several times -- well, not like ten
18  times, but we moved a lot of dirt, a lot of dirt
19  got moved at that site.
20      If there was a settling issue, we would have
21  never closed, no matter how small.  We've been in
22  situations where we moved just this much dirt in
23  the center, half the parking lot is gone.
24      Q.    So you've had experience in previous
25  projects with settling issues?

**54**

1       A.    Yep.  Yep, especially with this much
2   dirt.  This site was moved a lot, so I brought to
3   my attention because we believe they had active
4   knowledge of it.
5       We would have never closed, and we would
6   have never lost $60 million bucks.  The bank
7   would have went after Don.
8       Q.    When you say you lost $60 million
9   dollars, is that based on the appraisal of the
10  property?
11      A.    Yeah.  The value's about $100
12  million now, about $160 million we funded or a
13  little more, but we funded some construction, so
14  that's a material issue to me.
15      Q.    Okay.  The --
16      A.    So that's why it was brought to my
17  attention.
18      Q.    All right.  Now the evaluation of
19  the property was approximately $130 million when
20  you closed?
21      A.    Yeah, but it was -- that's
22  externally valued, so --
23      Q.    I mean you hire an evaluation
24  company, they give you a value, right?
25      A.    Sure, yeah.

**55**

1       Q.    You use that value to book the asset
2   on your -- on books and records?
3       A.    That's right.
4       Q.    And you have to mark-to-market the
5   value of your acquisitions; is that right?
6       A.    Yeah.
7       Q.    So at the time you closed, the
8   evaluation was based on market forces, had
9   nothing to do with the condition of the property,
10  did it?
11      A.    Generally I didn't review the
12  appraisal, but the appraisal would say that --
13  many appraisals don't get into the construction
14  issues.  We would have to notify an appraiser if
15  there was a construction issue.
16      Q.    And at the time you closed, you
17  weren't aware of any construction issues?
18      A.    No.
19      Q.    So -- and so you didn't advise the
20  appraiser of any construction issues when you
21  closed, right?
22      A.    Right.
23      Q.    So the $130 million dollar appraisal
24  was based on evaluation of the property, cash
25  flows and so forth?

**56**

1       A.    Yeah.
2       Q.    And there had been subsequent
3   write-downs of the property as well, correct?
4       A.    Yep.
5       Q.    Have you advised the appraisers of
6   any construction issues in connection with the
7   subsequent write-down?
8       A.    I have no precise knowledge of that.
9       Q.    Who handles that for the firm?
10      A.    That would flow through our asset
11  management area.  I think you've already deposed
12  them.
13      Q.    Mr. Krier and Ms. Kralovec?
14      A.    Yep.  They would talk to the
15  external appraiser about that issue.
16      Q.    So of the $60 million dollars in
17  write-downs, you don't know if any of that is
18  attributable to the condition of the property?
19      A.    That's right.
20          MR. TRAHAN:  Object to form.
21      Q.    You've never seen --
22      A.    But we knew when we closed there was
23  a material loss compared to our construction
24  costs given market conditions, and the property
25  having a material settling issue is a major

**57**

1  problem.  There's just no reason.
2      There would have been no reason to -- the
3  construction issue itself even if the property
4  was up $30 million because at one time it was,
5  and Don was trying to buy us out at $172 when he
6  thought the value was $190 or $90 million, we
7  wouldn't have funded if we thought it was $30
8  million in the profit.
9      We're not going to inherit $160 million
10  dollar property that has a settlement issue.
11  That's not going to happen.
12      Q.     You simply would not have authorized
13  --
14      A.     Never.
15      Q.     Do you believe that your
16  investigation has disclosed some sort of settling
17  issue at the property?
18      MR. TRAHAN:  Object to form.
19      A.     There is a settling issue and
20  there's a construction issue.
21      Q.     Well, now you are aware, are you --
22  or are you aware is probably the better way to
23  ask it, that the cinema constructed its own
24  building?
25      A.     I'm aware of that.

**58**

1      Q.     Okay.  And it was responsible under
2  its lease to construct the building, you're aware
3  of that?
4      A.     Yeah.
5      Q.     And so the developer did not
6  undertake to construct the cinema building that's
7  got the settlement problem?
8      MR. TRAHAN:  Object to form.
9      A.     That's accurate but there's other
10  tenants, smaller tenants that have settling
11  issues that are associated with other -- the
12  construction that Alberta did.
13      Q.     Okay.  There's one building,
14  Building E where the DCC Architects' space is,
15  you're aware of that tenant?
16      A.     I am aware of that building and that
17  tenant, yeah.
18      Q.     And there's also a tenant in that
19  building by the name of Pac Sun, Pacific Sun.
20  You aware of that tenant?
21      A.     I've heard the name.
22      Q.     So other than the building where DCC
23  Architects' space was located and the cinema, are
24  you aware of any other building on the entire
25  site that has a settlement issue?

**59**

1      A.     No.
2      Q.     Well, let's see -- you say you've
3  never seen the Cinema Estoppel Certificate.
4      MR. TRAHAN:  Can we take a break?
5      MR. BENNETT:  Oh, sure.
6      (Whereupon a break was taken.)
7      Q.     This is Exhibit 3, which is the
8  estoppel certificate from the cinema.  In
9  paragraph five is the paragraph where the tenant
10  has inserted this statement that it is disputing
11  the landlord's assertion that it is tenant's
12  responsibility to repair the cracked foundation
13  in the building.  You've never seen this
14  particular language before?
15      A.     No, not all of it.
16      Q.     This is somewhat different from your
17  statement that the tenant was asserting that
18  there was settlement in its building; would you
19  agree with that?
20      A.     No, I wouldn't agree with that.
21      Q.     Okay.  Do you attribute a cracked
22  foundation as the same thing as settling soils?
23      A.     Well, I went to the -- trying to
24  investigate why it cracked.  If the premises --
25  if the pad site had issues, that was delivered to

**60**

1  the tenant as you said, the tenant built the
2  space, but the site issues are basically sinking.
3      A cracked foundation might be due to the
4  developers, a material issue due to the
5  development.  So when you see cracked foundation,
6  yeah, it could be cement that was poured wrong,
7  which people would deem if the tenant built the
8  space, it's a tenant issue.
9      If it cracked because of soils below it that
10  was delivered by the landlord or the developer
11  was sinking, then -- you know, that -- but that's
12  not really our issue.  Our issue is -- it's not
13  our issue.  Doesn't really matter.
14      Q.     In your view --
15      A.     It's not a clean estoppel.
16      Q.     Okay.  In your view this disclosure
17  of a cracked foundation is sufficient grounds to
18  reject this estoppel certificate regardless?
19      A.     Yes.
20      Q.     And it doesn't matter to you whether
21  the tenant was in fact responsible for its own
22  foundation, and whether it was actually the
23  tenant's contractors and engineers that are
24  responsible for the cracked foundation, doesn't
25  matter to you?

**15 (Pages 57 to 60)**



**61**

1    MR. TRAHAN:  Object to form.
2    A.    Said it differently if I'm saying it
3  -- yeah, we wouldn't care.
4    Q.    And by that you mean you don't care
5  in rejecting this estoppel certificate whether
6  it's the tenant's responsibility or the
7  landlord's responsibility?
8    A.    Right.
9    Q.    In your view it's the material
10 change in the form?
11   A.    The material change in the form and
12 it's a material issue.
13   Q.    Is it adverse?
14   A.    Yes.
15   Q.    How is it adverse if it's the
16 tenant's responsibility?
17   A.    Well, I don't think this discerns
18 that it's the tenant's -- I don't think you know
19 it's -- by this we would see this and say we
20 don't know whose issue it is.  We don't really
21 care, but to us, especially with other tenants, a
22 poorly built site with a lot of fill is a major
23 issue.
24   So as I said, the cracked foundation is just
25 a result of we don't know whose problem it is,

**62**

1  but it needs to be corrected and we need a clean
2  estoppel.
3    Q.    Well, clearly a cracked foundation
4  can be caused by any number of issues?
5    A.    Sure.
6    Q.    Correct?
7    A.    Yeah, sure.
8    Q.    I mean anything from failing to
9  drill the piers properly, failing to build the
10 walls properly, cement issues --
11   A.    Soil issues, site issues.
12   Q.    Lots of issues?
13   A.    Sure.
14   Q.    And what you're telling me is that
15 regardless of who's ultimate responsibility that
16 is, you would not accept this?
17   A.    We would not accept it, and as I
18 said, there's no way from looking at this of
19 knowing -- this basically flags that there could
20 be a material issue with the site, and whether or
21 not we would start out thinking it's a $200,000
22 dollar fix -- you know, we've been in enough soil
23 issues that they ruin a property.
24   Once settling can happen -- continue to
25 happen for two years, and you lose -- $2,000

**63**

1  dollar issues went to $10 million with us, and
2  then the brokers and the tenants start
3  complaining and it gets a reputation in the
4  markets, can't attract tenants, and there's a
5  material dilution in value that's potentially out
6  there.  You would never -- you would never close.
7    Q.    Had -- well, strike that.  The
8  original Forward Purchase and Sale Agreement
9  provided that your remedy in the event of a
10 defective estoppel certificate was to not close,
11 terminate the FPSA and just back out of the deal,
12 right?
13   A.    Yeah, originally, yeah.
14   Q.    And can you say that had the
15 original provisions of the FPSA been present,
16 i.e., your option was to either close or
17 terminate this contract, would this disclosure
18 have been sufficient for you to terminate the
19 contract in your view?
20   A.    A hundred percent, yeah.
21   Q.    Absolutely?
22   A.    Absolutely.
23   Q.    And you would have then terminated
24 the contract, and run whatever risk of litigation
25 over the failure to close based on this

**64**

1  disclosure alone?
2    A.    Yeah, I don't think -- I don't
3  really think we were -- I think it's so -- it's
4  so undiscernible that a cracked foundation, you
5  may not be able to figure out who's to -- it's
6  definitely a reason to not close.
7    Q.    Now as you know, the Forward
8  Purchase and Sale Contract was amended to provide
9  a remedy for Granite relating to the tenant
10 holdback, right?
11   A.    Right.
12   Q.    It did not -- you no longer had the
13 right to terminate the contract, you had the
14 right to receive this $650,000 dollars that's in
15 escrow, correct?
16   A.    Subsequent, yes.
17   Q.    All right.  Now do you know how the
18 $650,000 was arrived at?
19   A.    No, I don't.  I don't precisely
20 recall.
21   Q.    Were you involved in discussions or
22 negotiations relating to the $650,000 dollar --
23   A.    No.
24   Q.    Do you know how the purchase price
25 of $161 million and change was arrived at?

**65**

1  A.  That's a construction cost at the
2  time, so that's --
3  Q.  Well, it was the amount of the
4  construction loan, right?
5  A.  Well, yeah.
6  Q.  Plus an additional $2.15 million
7  dollars, right?
8  A.  Could have been.
9  Q.  Do you recall that?
10  A.  No.
11  Q.  Do you know how the $2.15 million
12  was arrived at?
13  A.  No.
14  Q.  Do you know prior to the closing
15  that Granite owed Alberta approximately $3
16  million dollars?
17  MR. TRAHAN:  Object to form.
18  A.  I might have been made aware of
19  that, but I don't precisely recall.  Something I
20  would have been aware of.
21  Q.  You have no precise recollection of
22  that?
23  A.  Right.
24  Q.  Are you aware of negotiations
25  between Alberta and Granite concerning the total

**66**

1  compensation to be paid at closing?
2  A.  What do you mean by that?
3  Q.  Well, let me back up.  Let me give
4  you a little context.  In the Fourteenth
5  Amendment to the Forward Purchase and Sale
6  Agreement, the price was pegged at $160 million
7  dollars.  Were you aware of that?
8  A.  That seems accurate.
9  Q.  And prior to the Fourteenth
10  Amendment, there was a holdback for tenant
11  improvements and leasing costs that at the time
12  was about $8 million dollars; do you recall that?
13  A.  I remember an $8 million dollar
14  figure, yes.
15  Q.  As part of the Fourteenth Amendment,
16  the leasing holdback or tenant improvement
17  leasing cost holdback was eliminated, and the
18  price was pegged at $160 million dollars.  Do you
19  recall that?
20  A.  Not precise.
21  Q.  Also as part of the Fourteenth
22  Amendment, Alberta put up $3.2 million dollars in
23  a tenant improvement escrow.  Were you aware of
24  that?
25  A.  I know that there was construction

**67**

1  overruns, and they put some money up to deal with
2  the tenant improvements.
3  Q.  You don't recall the figure?
4  A.  No.
5  Q.  All right.  And you don't recall
6  that it was escrowed or do you?
7  A.  No.  Typically it would be escrowed.
8  Q.  As part of the Fourteenth Amendment,
9  the provisions relating to the tenant improvement
10  and leasing cost holdback were eliminated; were
11  you aware of that?
12  MR. TRAHAN:  Object to form.
13  A.  I don't precisely recall.
14  Q.  So prior to the closing, or prior to
15  the Fifteenth Amendment, which is the amendment
16  that you closed on, Granite was obligated to pay
17  $160 million dollars to purchase the property?
18  MR. TRAHAN:  Object to form.
19  A.  Roughly.
20  Q.  And as a result of negotiations
21  between the parties, the price ended up being
22  $161 million and change, and my question putting
23  that all in context is do you know how the price
24  went from $160 to $161?
25  MR. TRAHAN:  Object to form.

**68**

1  A.  No.
2  Q.  Now there was a period of time
3  during the Summer of 2008 and into the fall that
4  the parties were negotiating a refinance of the
5  property.  Were you aware of that?
6  A.  Yep, we were looking at it.  I have
7  no particular knowledge of it.
8  Q.  You don't know what the means of
9  refinancing were, and what the proposed
10  transactions were?
11  A.  No.
12  Q.  Mr. Piekarski and Mr. Silva prepared
13  a memorandum to the investment committee
14  outlining a proposed refinance transaction.  Were
15  you aware of that?
16  A.  Mm-hmm.
17  Q.  Again, yes or no?
18  A.  Yes.
19  Q.  Was the proposal actually presented
20  to the investment committee?
21  A.  I would imagine it was.
22  Q.  Do you recall it being?
23  A.  No.
24  Q.  Mr. Piekarski couldn't recall
25  whether the memorandum he had prepared was

**17 (Pages 65 to 68)**

**69**

1 actually presented to the committee, and what the
2 committee's action was.  Do you have any
3 recollection of the committee acting one way or
4 another on the proposed refinance?
5      A.     No, and I'm not -- as I said, I
6 would imagine it went to investment committee,
7 but it may not have.
8      Q.     You were on the investment committee
9 in November of 2008?
10      A.     Yep.
11      Q.     So you had just no recollection of
12 this refinance being presented to the committee?
13      A.     No precise knowledge of it, no.
14      Q.     Shortly after -- well, not shortly
15 after.  In December --
16      A.     Let me -- you're familiar with
17 investment committee, but there might have been
18 anywhere from eight -- anywhere from four to ten
19 transactions discussed in a very lengthy meeting,
20 typically five to six hours each week.
21      So you would look at 20 or 30 transactions
22 or more a month, so whether or not something of
23 $1 million and a half dollar change got any
24 airtime, it's fairly delegated even though it
25 would go through investment committee, but I

**70**

1 wouldn't -- there's just no reason to remember
2 that.
3      Q.     Well, the refinance transaction was
4 a commitment by Granite Property Fund to loan all
5 or some part of $160 million dollars.
6      That would have gotten -- a transaction of
7 that size would have gotten a substantial airing
8 in the investment committee, wouldn't it?
9      A.     Sure.
10      Q.     And you just don't recall that
11 happening?
12      A.     Mm-mm.
13      Q.     Yes or no?
14      A.     No.
15      Q.     The fact that you don't recall it,
16 does that lead you to believe that it was never
17 presented to the committee?
18      A.     No.  I don't know.
19      Q.     No knowledge one way or the other?
20      A.     Exactly.
21      Q.     All right.  In December, early
22 December 2008, the transaction was switched from
23 a refinance to a purchase by Granite Property
24 Fund.  Do you recall that?
25      A.     You know, I think I'd phrase what

**71**

1 you're trying to say differently.  We were
2 attempting to get a refinance, which we didn't
3 think had a lot of chance of happening, and then
4 when we determined that it wasn't to going to
5 happen, we tossed it by the side.
6      So I'm not sure -- you'd have to think about
7 it in the context and the mentality is that while
8 we were going down the path of a refinance, we
9 didn't -- outside of that, the subjective
10 overtone was that the refinance wasn't going to
11 happen.
12      Q.     Did you conclude that the refinance
13 wasn't going to happen?
14      A.     No.  Just -- no, we were hoping it
15 would happen, but we knew where the market was
16 going, we just didn't feel it had a high
17 probability of happening, but that's in the
18 context of the whole market.
19      The whole market at that time there was no
20 financing going on.  $160 million dollar retail
21 deal in Denver was very unfinanceable in December
22 of '08, zero chance.
23      Q.     Zero chance, okay.  As I understood,
24 BlackRock was intending to finance at least all
25 or some substantial portion of the refinance

**72**

1 internally; is that your recollection?
2      A.     Could have been.  No, I don't
3 precisely recall it.
4      Q.     All right.  So what the market was
5 doing -- if all of it were financed internally,
6 then it wouldn't matter what the market was
7 doing?
8      A.     Exactly, because that's -- basically
9 we're just changing our structure of our
10 ownership from an equity position to a debt
11 position.
12      Q.     And you don't recall any of the
13 details regarding the proposed --
14      A.     No, we were -- in that time as the
15 market was falling, we had taken other
16 transactions and converted our position from an
17 equity to a debt position.
18      So it was a typical thing we were doing to
19 protect ourselves because today -- you know, Don
20 would owe us $160 million instead of it being on
21 our books at $100.
22      Q.     You might have been better off doing
23 the financing, I don't know.
24      A.     What's that?
25      Q.     You might have been better off doing

**73**

1  the financing.
2  A.    No, we would have been, yeah --
3  Q.    Well, I don't know --
4  A.    -- but it's not collectible.  He
5  would have put the property back to us, but it's
6  not in collectibles.
7  Q.    I don't think he would have the
8  resources to pay you $160 million bucks.
9  A.    Well, we may find that out in future
10 discussion.
11 Q.    I think you've released him from all
12 those claims.  In the stack of exhibits in front
13 of you --
14 A.    Do you want this back?
15 Q.    You can just set it aside here, we
16 may have to refer back to it.  There's an
17 Exhibit 123 that should be near the bottom.
18 A.    I like that, that means we're
19 getting closer.
20 Q.    Don't count on it.
21 A.    1 what?
22 Q.    123.
23 A.    Okay.
24 Q.    Exhibit 123 is a memorandum from Mr.
25 Piekarski and Mr. Silva to you and to other

**74**

1  individuals, correct?
2  A.    Yeah -- yes.
3  Q.    And in this memorandum, take your
4  time to look at it if you need to, Mr. Piekarski
5  and Mr. Silva are describing the current
6  situation with the loan, and the request by
7  LaSalle Bank for a $32 million dollar either
8  letter of credit or a paydown on the note to --
9  as a condition to extending the maturity date.
10 Do you recall that subject?
11 A.    Yeah, vaguely, yep.  I mean I
12 remember the concept.
13 Q.    And do you recall that in fact the
14 banks did agree to extend the maturity date to
15 December 15, 2008?
16 A.    Mm-hmm.
17 Q.    You recall that?
18 A.    Yep.
19 Q.    And you recall that rather than
20 putting up a $32 million dollar letter of credit,
21 Granite ended up posting a $7 million dollar
22 letter of credit?
23 A.    I remember it went down sizably.
24 Q.    Were you involved in those
25 discussions with the banks or with Alberta?

**75**

1  A.    No, no.
2  Q.    That was all handled by Mr.
3  Piekarski and Mr. Silva?
4  A.    Yep.
5  Q.    There is on item 2 towards the
6  bottom of the page, there's a discussion that as
7  part of the equity that Alberta might put up is a
8  $2.6 million dollar receivable that Granite owed
9  for operating deficits to Alberta.
10 Do you recall being aware that Granite owed
11 Alberta approximately $2.6 million dollars?
12 MR. TRAHAN:  Object to form.
13 A.    I don't precisely recall it.
14 Q.    Do you recall that Granite owed
15 Alberta something?
16 A.    Yeah, or there was an agreement
17 where we could have paid them -- owed them
18 monies.
19 Q.    The Eighth Amendment to the Forward
20 Purchase and Sale Agreement is the agreement by
21 which Granite and Alberta agreed to share
22 operating deficits.  Do you recall that
23 amendment?
24 A.    Yes.  I don't recall the amendment,
25 I remember the concept and agreeing to it.

**76**

1  Q.    Okay.  So you had nothing to do with
2  negotiating --
3  A.    Right.
4  Q.    -- the Eighth Amendment?
5  A.    Right.
6  Q.    And you didn't review it at the time
7  it was signed?
8  A.    Right.
9  Q.    All right.  This memorandum was
10 written in April of 2008, and it discusses in the
11 last paragraph that the asset might be worth
12 something in the nature of $140 million at that
13 time.
14 A.    Seems reasonable.
15 Q.    Do you recall that by April of 2008
16 it appeared that the property was worth less than
17 your forward commitment?
18 A.    I don't precisely recall but it
19 seems reasonable.
20 Q.    So you knew the market was moving
21 against you by April of 2008?
22 A.    Yes.
23 Q.    Now a decline in the market value is
24 a risk that any party to a forward commitment
25 takes, right?  I mean you know that that's a

**19 (Pages 73 to 76)**

Granite Southlands Town Center v. Alberta Town Center     JAY ALEXANDER                    4/8/2010

**77**

1  possibility?
2      A.    Yeah -- yep.
3      Q.    And the hope is the market moves in
4  your favor, and you actually acquire an asset
5  that's worth more than what you've committed to
6  buy it?
7      A.    Yes.
8      Q.    All right.  Exhibit 122 should be
9  right in front of the one you just looked at.
10  This is a memorandum dated November 17th from Mr.
11  Piekarski and Mr. Silva to the investment
12  committee.
13      Take a look at this and see if it refreshes
14  your memory whether this proposal was or was not
15  submitted to the committee.
16      A.    It's definitely an investment type
17  of form, but I don't know whether or not it was
18  submitted.
19      Q.    And looking at it doesn't help
20  refresh your recollection?
21      A.    Nope.
22      Q.    Are there minutes of the investment
23  committee?
24      A.    Yes.
25      Q.    Do you know if this -- if this had

**78**

1  been presented to the investment committee, it
2  would be reflected on the minutes?
3      A.    Yes.  In general there may be a
4  technical if it wasn't voted upon.  If it was
5  just deferred, it might not be in the minutes,
6  but it would most likely be in the minutes.
7      Q.    Okay.  On page two of Exhibit 122 is
8  a description of the three loans that were
9  contemplated by this transaction; is that right?
10      A.    Yep.  It seems some of the very --
11  very typical of what we were doing at the time.
12      Q.    And in this proposal at least,
13  Granite is providing all three loans, $80 million
14  is the first, $49.6 is the second, and $30.4
15  million is the second mezzanine, correct?
16      A.    Mm-hmm.
17      Q.    I need an audible.
18      A.    Yes.
19      Q.    Thank you.  Under these
20  circumstances with Granite providing all of the
21  money, whether the market was moving against your
22  position in terms of the mortgage market would
23  not have made a difference in going forward with
24  the transaction, would it?
25      MR. TRAHAN:  Object to form.

**79**

1      A.    No.
2      Q.    Well, in light of this structure,
3  what led you to believe that this structure could
4  not have been accomplished in November of 2008?
5      A.    If we were providing all the money,
6  it could have been accomplished.
7      Q.    And you had a -- seemed like a
8  pretty firm recollection that you had concluded
9  that this loan transaction was not going to take
10  place?
11      A.    By a third party.
12      Q.    Okay.  Do you know -- did you
13  conclude that BlackRock didn't want to do this
14  transaction?
15      A.    No.
16      Q.    So I'm still trying to understand
17  why the transaction changed from a loan to a
18  purchase -- you know, sometime between
19  November 17th and December 2nd or 3rd.
20      A.    Better risk reward proposition.  I
21  don't -- we -- any time you look at any
22  investment, we try to structure the transaction
23  to where we feel it's the best risk adjusted
24  return.
25      Sometimes it's equity, sometimes it's mezz,

**80**

1  sometimes it's debt.  It's a very fluid market,
2  so this seems very consistent with what we've
3  done historically.
4      Q.    And as such, do you know why you --
5  you have a recollection apparently of just
6  thinking this deal was not going to happen?
7      A.    This deal -- there was a time where
8  Don and the group wanted to go out and get a
9  third party loan, and at that time, it was my
10  perception that you could try all you want, but
11  there wasn't a third party loan available to
12  replace the B of A loan.
13      Then we would enter into a situation where
14  we would make it worth our while to provide the
15  loan, so it's steps of trying to restructure a
16  transaction to a better risk adjusted position.
17      Q.    All right.  Well --
18      A.    So when I said there was no
19  financing available, I wasn't talking about our
20  ability to finance, I was talking about the
21  market.  If we were trying to take B of A out and
22  replace them with another lender like a JP Morgan
23  or a Wachovia, it wasn't going to be possible.
24      So then we would enter, which we did on --
25  you know, regular conversations about every

**20 (Pages 77 to 80)**

Granite Southlands Town Center v. Alberta Town Center       JAY ALEXANDER       4/8/2010

**81**

1  investment we were making is -- you know, if you
2  can't find a loan, you still like the
3  transaction, we just price it ourselves, so --
4  did that clarify?
5      Q.   I'm still having -- I'm not getting
6  a clear understanding of why this proposal, which
7  appears to be all internally financed by Granite
8  didn't take place, and why shortly within two
9  weeks the parties were now on a just buyout
10  Alberta rather than doing this refinance.
11     A.   I don't -- I don't recall.  You'd
12  have to get that from Andrew and Chris.
13     Q.   Well, he told me something similar
14  and I don't want to characterize his testimony
15  because I don't remember it precisely, but
16  something similar to what you said is we
17  concluded that the transaction was not going to
18  happen, and so my question to you is do you
19  recall that the group and Mr. Piekarski and Mr.
20  Silva kind of testified you guys all kind of
21  acted as a team, came to a consensus?
22     A.   I don't precisely recall.
23     Q.   Don't recall?
24     A.   I mean I'm just speculating so I
25  won't.  I mean Don could have had some judgment

**82**

1  against him.  Everything he was doing was falling
2  apart.  He was not financeable, so we wouldn't
3  finance someone that's not financeable.
4      Q.   Do you have some recollection that
5  Mr. Provost was not financeable at this time?
6      A.   No, I -- we knew he had some
7  dealings with Lehman that were really coming
8  apart, so -- no, but no precise knowledge.
9      Q.   All right.  Exhibit 128 should be in
10  front of you as well.
11     A.   This contemplated structure was a
12  better risk adjusted deal, so Don had recourse.
13  He had some recourse.
14     Q.   Had some recourse debt?
15     A.   Part of the structure was recourse
16  to him, so I knew that -- what number do you
17  want?
18     Q.   It would be 128.
19     A.   Now we're really getting close.  We
20  mustn't jump back.
21     Q.   This is a series of emails that
22  appear to be when the transaction is changing
23  from a finance to a purchase, and it's a series
24  of emails between Mr. Piekarski and Mr. Provost
25  on December 2nd and 3rd, 2008.

**83**

1      Starts at -- on the bottom of the second
2  page, Mr. Provost is writing to Mr. Piekarski
3  asking him if there are any thoughts on the
4  buyout figure and wants a number, and Mr.
5  Piekarski responds that, "It was kind of a spur
6  of the moment concept, let me think about it."
7      Do you have any recollection of like the
8  December 2nd, 3rd time frame of the deal changing
9  from a finance to a purchase?
10     A.   No.
11     Q.   Did you have discussions with Mr.
12  Piekarski before he proposed just a buyout of it
13  at a flat figure?
14     A.   No.
15     Q.   Did you have any discussions about
16  what the number should be?
17     A.   Well, let's put it this way, I don't
18  recall conversations.
19     Q.   And this email chain doesn't help
20  you remember any of them?
21     A.   No.  Let me look at it more though
22  because it's a little --
23     Q.   Sure.  It's a little hard to read.
24     A.   No, I mean it's -- because Don's
25  message, I don't know if it was -- seemed like

**84**

1  there should be another email on the bottom of
2  this.  Was Don responding to Andrew's thought of
3  a buyout originally, or did Don cite the buyout?
4  Doesn't really --
5      Q.   From Mr. Piekarski's testimony it
6  appears that he's the one who orally raised the
7  concept.  There does not appear to be an earlier
8  email, at least that we've been able to find in
9  our documents that starts this chain.
10     A.   Well, the general chain -- the
11  general concept of what was going on in the
12  market is that Don was no different than any of
13  our other joint venture partners, that they're
14  all coming apart, they're all going to have
15  material issues.
16     So our strategy at that time was to
17  structure out all the joint venture partners that
18  we felt would have material issues that would
19  impact the management, execution and value
20  proposition of the properties we had in the
21  pipeline with them.
22     So very, very consistent with our partner's
23  got problems, who knows if he's ultimately not
24  going to pay attention to this property, take
25  money from this property to fund other issues, so

**21 (Pages 81 to 84)**

**85**

1  our job as the fiduciary for our client was to
2  get out of the problem and to try to buy stuff
3  clean, so it's very consistent with our strategy.
4      So that's why we would have switched when
5  financing -- I don't know if it was the case, but
6  if -- you know, Don was unfinanceable, then it's
7  like let's just get him out, so very consistent.
8      Q.    And you were experiencing a similar
9  kind of problem with other prospective joint
10  venture partners?
11     A.    We had -- in our risk management
12  process we had highlighted, went through all of
13  our relationships with people that were -- all of
14  our partners were having problems naturally.
15     Don more so in my perception because he did
16  a bunch of land transactions, and he had done a
17  lot of stuff with Lehman, and he probably had a
18  lot of recourse, and so since he's in the
19  development business, yeah, he was one of the --
20  in my view, someone that was going to have
21  material problems of the real estate recession of
22  2007 through 2010, and our job was to get away
23  from him as cleanly as possible and as quickly as
24  possible.
25     Q.    Did you have specific information

**86**

1  about Mr. Provost's other business dealings, or
2  is this just a general perception?
3      A.    No, it's just general.  I think we
4  -- I think at times we had become -- about
5  certain partners had gained active knowledge, but
6  -- and most of our partners just started being
7  unresponsive and squirrely and property
8  inspections would show problems on execution.
9      So we just -- our general thing is we were
10  on a mission to take out all our -- to own all
11  our properties outright so that we could control
12  the property in the manner that our clients would
13  expect us to.
14     Q.    So at this time ending this proposed
15  or expected joint venture relationship was an
16  important criteria for you?
17     MR. TRAHAN:  Object to form.
18     A.    As I was saying, our strategy was
19  that we didn't want our joint venture partners'
20  problems in their other parts of their portfolio
21  to negatively impact execution of investments we
22  had with them.
23     So it was a general strategy to reach out
24  and try to structure transactions so that they
25  were no longer joint ventures.

**87**

1      Q.    Which is one of the genesis for the
2  Release and Termination Agreement in this case
3  which terminates the joint venture?
4      A.    No, I don't -- you know, I'm just
5  saying the strategy behind that time frame was
6  this.  The particulars -- you know, I defer to
7  Andrew.
8      Q.    All right.  You were aware that as
9  part of the closing of this transaction, a
10  Release and Termination Agreement was signed by
11  the parties?
12     MR. TRAHAN:  Object to form.
13     A.    I have no active knowledge.  Seems
14  reasonable.
15     Q.    So it's not something you requested
16  that Mr. Piekarski be sure to include as a
17  release of the joint venture?
18     A.    No, I don't recall.
19     Q.    But it was the strategy that you
20  were following as to get out of those joint
21  venture relationships that you had not only with
22  Mr. Provost but others?
23     MR. TRAHAN:  Object to form.
24     A.    I don't think -- but I -- I guess
25  every one of these would be a contemplated joint

**88**

1  venture because we never had a joint venture with
2  Don.
3      Every time we say joint venture here, it's
4  got to be a contemplated joint venture.  There
5  was nothing ever finalized.  He was never truly a
6  partner.
7      Q.    It was contemplated but you never
8  came to terms on the joint venture, correct?
9      A.    That's right.
10     Q.    And you wanted to terminate any
11  expectancy that you would be joint venture
12  partners as part of the closing of this
13  transaction?
14     A.    Yeah, we were -- if the idea was he
15  delivered a clean property in good condition
16  according to specs, and because of his other
17  problems, there would be no reason to be in a
18  joint venture with him.  So he became basically a
19  fee developer when we closed.
20     Q.    Now you have no specific information
21  that any of the problems you've identified
22  actually existed with Mr. Provost, do you?
23     A.    No.  We couldn't -- we had a program
24  to reach out to some of our partners and have
25  discussions with them about other issues, but in

**89**

1    general -- you know -- well, by this time we had
2    lost -- you know, Don just couldn't be trusted by
3    us, so there was just no reason why we think he
4    would start telling us the truth if we asked him
5    if he had other problems.
6         Q.     Where does that come from?  Why do
7    you think that Mr. Provost wouldn't tell you the
8    truth?
9         A.     Just consistent flip-flopping -- you
10   know, you could never -- he operated so much
11   differently than anyone else we really deal with
12   that every time we had an agreement, he would try
13   to change it at the last minute.
14        He would misconstrue things, just generally
15   a very bad potential partner.  He definitely,
16   definitely operated towards that.  Everyone lost
17   total -- no confidence vote for sure.
18        Q.     Is that your view, was that a view
19   shared by others here?
20        A.     It was my view and I shared it with
21   others.
22        Q.     So you had concluded that Mr.
23   Provost took varying positions in your
24   negotiations, and that led you to distrust him?
25        MR. TRAHAN:  Object to form.

**90**

1         A.     Yeah, I don't trust him at all.  I
2    think he's -- he proved himself dishonorable
3    through the whole process.
4         Q.     And what specific factors do you
5    point to in that that leads you to that
6    conclusion?
7         A.     I believe that he -- as I said early
8    on, he was busy.  He had other issues going on,
9    and as this thing evolved towards moving towards
10   a loss, he was using his lack of execution to his
11   benefit.
12        He played both sides of this transaction the
13   whole time.  It could be construed that his
14   delaying of -- his lack of timeliness of
15   executing all the documents at times they were
16   put in front of him is that he was contemplating
17   how to move around on this transaction to max --
18   to flip-flop.
19        So when it was in the money he wanted to buy
20   us out.  Never signed a joint venture agreement
21   because he was going to possibly sell it or
22   refinance it on his own and own it without us,
23   and then later on, he didn't sign it because he
24   had the fund losses.
25        Then he wanted to sign it because he thought

**91**

1    we'd have the fund -- he just moved -- totally
2    was dishonorable in my opinion.
3         Q.     Have you shared that view with
4    others here in BlackRock?
5         A.     I wouldn't say I've shared it as
6    adamantly as I'm sharing it here, but everybody
7    knows.  I don't think Andrew has a different
8    opinion.  I don't think Chris has a different
9    opinion, and they talked to him more regularly.
10   I met with Don on a couple occasions.
11        MR. TRAHAN:  Wait for a question.  I
12   don't know that there's a question.
13        Q.     Have you shared your view that Mr.
14   Provost is dishonorable with anyone outside of
15   BlackRock?
16        MR. TRAHAN:  Object to the form of
17   the question.
18        A.     I have not.
19        Q.     Have you shared this view with any
20   of the lenders that were involved in this
21   transaction?
22        MR. TRAHAN:  I'm going to object to
23   the form of the question.
24        A.     No, but I haven't.  I wouldn't do
25   that.  My job is to inform people internally.  I

**92**

1    wouldn't -- other people -- we have joint venture
2    partners that have great relationships with
3    people in the market, but we don't have a great
4    relationship with them, and there's partners that
5    we feel have been dishonorable besides Don that
6    have probably very strong relationships with
7    other money managers.
8         So -- you know, we wouldn't go outside and
9    say to anyone -- Don may have great relationships
10   with other people.  We don't believe -- he may --
11   I don't know how dishonorable I feel he's been, I
12   don't -- I think he's got bad relationships with
13   everybody.  That's why he did business with
14   Lehman.
15        Q.     Only people with bad relationships
16   did business with Lehman; is that your --
17        MR. TRAHAN:  Object to the form of
18   the question.  Please wait for an answer -- or
19   wait for a question.
20        Q.     Are you suggesting everyone who did
21   business with Lehman had bad relationships with
22   their bankers?
23        MR. TRAHAN:  Object to form of the
24   question.
25        A.     Since most of the people at Lehman

**23 (Pages 89 to 92)**

Granite Southlands Town Center v. Alberta Town Center     JAY ALEXANDER     4/8/2010

**93**

1  are generally very difficult to work with, I
2  don't think people work with Lehman a lot of
3  times out of a desire to work with Lehman versus
4  they have no one else that they can work with.
5  That's just my own opinion.
6      Q.    So in your view Lehman is sort of
7  the source of last resort?
8      A.    Could be.
9      Q.    You must not have been unhappy when
10 Lehman went out of business.
11         MR. TRAHAN:  Object to form.
12     A.    I have no opinion.  I'm just saying
13 they're not people you would -- we would choose
14 to do business with.
15     Q.    As the Fifteenth Amendment became --
16 was drafted after this series of emails in
17 December of 2008, did you have any role in
18 reviewing drafts of the agreement?
19     A.    No.
20     Q.    All handled by Mr. Piekarski and Mr.
21 Silva?
22     A.    Yeah.
23     Q.    Didn't come to your attention?
24     A.    No.
25     Q.    So if I showed you drafts of the

**94**

1  Fifteenth Amendment, you would have no knowledge
2  of --
3      A.    No knowledge.
4      Q.    -- of particular provisions?  In
5  this white book, the Release and Termination
6  Agreement is at tab 59.  Would you look at that,
7  please.
8      A.    I'm sure this is something Don
9  readily signed.
10     Q.    All right.  Exhibit 59 is the signed
11 Release and Termination Agreement entered into by
12 the parties in connection with BlackRock's
13 purchase of this property.  Have you seen this
14 document before?
15     A.    No.
16     Q.    Never seen it?
17     A.    Nope.
18     Q.    Did Mr. Silva have authority to sign
19 this on behalf of Granite?
20     A.    Yes, he did.
21         MR. TRAHAN:  Object to form.
22     Q.    Were the terms of this purchase
23 presented to the investment committee?
24     A.    What do you mean?
25     Q.    Was this purchase transaction --

**95**

1      A.    Sure.
2      Q.    -- submitted to the investment
3  committee?
4      A.    Sure.
5      Q.    Do you recall that being done?
6      A.    No, I don't recall that.  I'm sure
7  it was.
8      Q.    All right.
9      A.    There would be minutes of that.  Any
10 capital transaction has to be presented before
11 it's completed, so contemplated ones that never
12 get finalized sometimes aren't presented, but --
13     Q.    This one surely would have been?
14     A.    Yeah.
15     Q.    And would there be a memorandum
16 similar to the one we looked at earlier
17 describing the transaction?
18     A.    There should have been unless it was
19 deemed by the head of -- there could have been a
20 couple cases why it wasn't because it was
21 discussed enough in prior committee discussions
22 like when the joint venture -- the forward
23 commitment went through might have been deemed
24 sufficient if the terms were materially the same,
25 and the economics were materially the same.

**96**

1      Q.    Would there have been a presentation
2  to the investment committee each time the Forward
3  Purchase and Sales Agreement was amended
4  substantively?
5      A.    No, no.
6      Q.    That would not be something that
7  would be presented?
8      A.    No.
9      Q.    Okay.  But the final transaction and
10 approval to spend $160 million dollars most
11 likely would have been?
12     A.    No.
13         MR. TRAHAN:  Object to form.
14     A.    No.  I'm not going to say yes or no
15 on that.  It was -- originally if the forward --
16 if the joint venture commitment or the forward
17 commitment to a joint venture was $160 million,
18 then later on it ended up being $160 million, but
19 it was just a straight acquisition without a
20 joint venture, that may have been signed off
21 outside investment committee.
22     Q.    Okay.  Who would have authority to
23 authorize that?
24     A.    Fred Lieblich possibly could have,
25 Ron Zuzack, myself.  Amendments -- I mean 16

Granite Southlands Town Center v. Alberta Town Center    JAY ALEXANDER    4/8/2010

**97**

1 amendments in this deal, no way.  This would not
2 have been viewed by investment committee 16
3 times.
4    Q.    Do you know --
5    A.    Chris has the authority as a
6 director to sign off on this on his own.
7    Q.    Without passing it through you, Mr.
8 Zuzack or Mr. Lieblich?
9    A.    Possibly.  Depending on -- I'd have
10 to look at the precise language of it, but a
11 release would not have been approved.
12    It's normal course of doing business.  It's
13 very, very standard operating.  It's not outside
14 of industry norms to sign a release.
15    Q.    But how about to actually close on
16 the forward purchase agreement; is that something
17 that would normally go through investment
18 committee?
19    A.    It would -- you can get approval
20 before -- you don't like this one, you can get
21 approval of something and then two months later
22 close on it.  You don't have to go again in two
23 months.
24    Q.    So do you know -- you don't know if
25 or when this acquisition was passed through

**98**

1 investment committee?
2    A.    It was through the -- at a minimum
3 it got one approval of the structure, $160
4 million was approved.
5    Q.    Was that approved subsequent to the
6 time that the original Forward Purchase and Sale
7 Agreement was entered into?
8    A.    Can you say that again?
9    Q.    Was the approval at the time the
10 original FPSA was signed, or was it subsequent in
11 or around the time it closed?
12    A.    It was probably way before it.
13    Q.    And you don't think -- it wasn't
14 necessary then having approved the Forward
15 Purchase and Sale Agreement originally to go back
16 to the investment committee; is that what you're
17 telling me?
18    A.    Right.
19    Q.    All right.  Now there are just a
20 couple things about this Fifteenth Amendment I
21 want to ask you.
22    One is it was standard procedure as you've
23 told us for Granite to be released from all its
24 obligations under the Forward Purchase and Sale
25 Agreement?

**99**

1    A.    I don't know if I said that.
2    Q.    You said a release was part of your
3 standard operating procedure?
4    A.    A release could be part of it,
5 whether or not it was part of this transaction,
6 I'm not saying that it has to be.  It's all
7 negotiated.
8    Q.    All right.  On page three of
9 Exhibit 59 there is a release of Granite.
10    MR. TRAHAN:  Object -- wait for a
11 question, please.
12    Q.    Do you see that?
13    A.    Yes.
14    Q.    Did you have any involvement in
15 negotiating or discussing the terms of this
16 release?
17    A.    No.
18    Q.    There is on page four a release of
19 the Alberta parties including all of the
20 principals individually.  Did you have any
21 discussions about those provisions?
22    A.    No.
23    MR. TRAHAN:  Object to form.
24    Q.    There is a provision on page five
25 that deals with exceptions to the parties'

**100**

1 releases.  Did you have any involvement in
2 negotiating those terms?
3    A.    No.
4    Q.    There is a provision on page seven,
5 paragraph eight that is a representation and
6 acknowledgment that there's no joint venture
7 between the parties.
8    Did you have any involvement in the
9 discussions regarding that provision?
10    MR. TRAHAN:  Object to form.
11    A.    Not in particular, no.  I knew -- I
12 was in agreement there was not going to be a
13 joint venture, yes.
14    Q.    Did you give some sort of
15 instructions to Mr. Silva or Mr. Piekarski to
16 make sure that there's no joint venture between
17 us?
18    A.    I don't -- I don't recall.  Might
19 have been their recommendation to me.
20    Q.    Do you recall that?
21    A.    No.
22    Q.    Was there -- were you aware that the
23 provisions of the Eight Amendment, dealing with
24 the sharing of operating deficits, were deleted
25 as part of the Fifteenth Amendment to the

**25 (Pages 97 to 100)**

**101**

1  contract?
2      A.    No, I wasn't aware of that.
3      Q.    Was it part of your concept that if
4  you were going to purchase the property, that you
5  were not going to share in any expenses any
6  further?
7      MR. TRAHAN:  Object to form.
8      A.    I don't understand.  There was an
9  agreement that there was a sharing of -- sort of
10  a look back 50/50 of profits and losses incurred
11  before the closing.
12      Q.    There was an agreed look back, what
13  does that mean?
14      A.    Well, I know there was -- the
15  economic concept that I agreed to was that when
16  for whatever reason this got extended out, the
17  closing, that Don made a request about a sharing
18  of profits and losses on the operations of the
19  property, and through Chris's recommendation, I
20  agreed with that.
21      Q.    All right.  That's part of the
22  Eighth Amendment; do you recall that?
23      A.    I remember agreeing -- I don't know
24  if it was Eighth Amendment, Ninth Amendment or
25  whatever.

**102**

1      I agreed to the economic concept that we
2  were going to share with sort of a true-up or a
3  look back, whatever you want to call it.
4      Q.    Now the Fifteenth Amendment, which
5  is where we got off on this, the Fifteenth
6  Amendment terminates the arrangement to share
7  operating deficits; did you know that?
8      A.    I did not know that.
9      Q.    Actually it doesn't terminate it, it
10  deletes it from the contract.  The language used
11  by the lawyers is delete in the provision.
12  You're not aware of that?
13      MR. TRAHAN:  Object to form.
14      A.    Mm-mm.
15      Q.    Yes or no?
16      A.    No.
17      Q.    Thank you.  So you had no
18  discussions with the parties about deleting the
19  agreement to share operating deficits?
20      A.    Or operating surpluses, no.  I had
21  no discussion that it's going to be deleted.
22      Q.    Goes both ways, you're going to
23  share operating deficits and surpluses?
24      A.    Right, yeah.
25      Q.    So you had no discussions, gave no

**103**

1  instructions to anyone to delete that provision
2  from the contract?
3      A.    Right.
4      Q.    And you don't know why it was
5  deleted?
6      A.    No.
7      MR. TRAHAN:  That's assuming what he
8  says is correct, but you don't know that, do you?
9      THE WITNESS:  No.
10      MR. BENNETT:  I mean we can go
11  through that if -- do we dispute that, Paul, that
12  the Fifteenth Amendment deletes paragraph five of
13  the Eighth Amendment?
14      MR. TRAHAN:  That's -- the agreement
15  speaks for itself.
16      MR. BENNETT:  Well, there's
17  controversy about it.
18      MR. TRAHAN:  There is an issue,
19  there's a dispute as to whether or not the
20  parties agreed to share in operating deficits
21  throughout the term of the project, and agreed to
22  true-up those operating deficits post closing.
23      We think the evidence clearly establishes
24  that the parties had an agreement as evidenced by
25  numerous back and forth between Peter Cudlip and

**104**

1  various individuals at Granite trying to
2  reconcile the true-up, as evidenced by the fact
3  that Alberta sued Granite for over $400,000
4  dollars to try to correct what it believed were
5  operating deficits that -- nor to its benefit in
6  the neighborhood of $400,000 dollars, as
7  evidenced by language in the release agreement
8  that you discussed with Mr. Piekarski yesterday,
9  as evidenced by language in the Fifteenth
10  Amendment, and as evidenced by the parties'
11  general conduct.
12      There was a clear agreement for the parties
13  to true-up operating deficits post closing.  We
14  think that's clear the evidence, so to suggest
15  that some provision in the Fifteenth Amendment
16  did away with that agreement is not accurate, and
17  to ask him to acknowledge that is misleading.
18      MR. BENNETT:  All I can ask him is
19  what the contract says.
20  BY MR. BENNETT:
21      Q.    Section five of the Eighth
22  Amendment, which is the operating deficit
23  provision is hereby amended by deleting it in its
24  entirety.  Were you aware of that provision?
25      MR. TRAHAN:  Object to form.

**26 (Pages 101 to 104)**

**105**

1    A.   No, and if I was aware of it, I
2  would have said it shouldn't have been deleted.
3  The economic concept we agreed with Don and I
4  approved with Chris was that we were going to
5  share in any operating surpluses or losses with
6  Don 50/50.
7    Q.   Why was the provision of the Eighth
8  Amendment, and you can take my word for it that
9  this is the provision that provides for the
10 operating deficit and revenue share, why was it
11 deleted in the Fifteenth Amendment?
12    MR. TRAHAN:  Object to form.
13    A.   Well, I think that it was -- it was
14 an error, right?  I mean my view is it's an
15 error.  It shouldn't have been deleted, and it's
16 something that Don would consistently pull at the
17 last minute in my opinion.
18    Q.   Are you suggesting Don is the one
19 who put the deletion of the Eighth Amendment --
20    A.   No, I'm just saying that --
21    MR. TRAHAN:  Wait for a question.
22    Q.   Are you suggesting Don or his
23 lawyers as the one that's inserted the deletion
24 of the fifth -- the section five of the Eighth
25 Amendment and the Fifteenth Amendment?

**106**

1    MR. TRAHAN:  Object to form.  He's
2  suggesting that language has implications that it
3  doesn't, so just be aware of that.  You can only
4  testify --
5    MR. BENNETT:  Well, you can't coach
6  the witness, Paul.  You can either object, or you
7  can --
8    MR. TRAHAN:  Well, ask him a
9  question.  I've lost track of what the question
10 is, and what language we were referring to.
11    Can we direct the question to some
12 particular language if you're going to question
13 him about it.
14    MR. BENNETT:  I have already done
15 so.
16 BY MR. BENNETT:
17    Q.   My question is --
18    A.   Where are you at then?
19    Q.   Do you have -- do you have the
20 Fifteenth Amendment in front of you, Exhibit 37?
21    A.   What's that?
22    Q.   It's Exhibit 37.  You have
23 Exhibit 37 in front of you?
24    A.   Mm-hmm.
25    Q.   Okay.  On page five, paragraph four,

**107**

1  there is a provision that says, quote, "Section
2  five of the Eighth Amendment to Amendment and
3  Agreement and Termination Agreement is hereby
4  amended by deleting it in its entirety."  Did I
5  read that right?
6    A.   Mm-hmm, yes.
7    Q.   You may take it as given that
8  section five of the Eighth Amendment is a
9  provision relating to sharing of operating
10 deficits.
11    I'll represent that that's true.  Do you
12 know why the Fifteenth Amendment deletes section
13 five of the Eighth Amendment?
14    A.   No.  I don't know why it would.
15    Q.   And it is your --
16    A.   Like I said, it was an error.
17    Q.   Your testimony is it's an error?
18    A.   Yes.
19    Q.   Are you suggesting that Mr. Provost
20 or his lawyers placed that provision in this
21 document by mistake?
22    A.   They placed it there by mistake?
23    Q.   Yes.
24    A.   I can't -- I guess I can't -- I
25 can't answer that.

**108**

1    Q.   Are you suggesting that Mr. Provost
2  or his lawyers inserted that provision in this
3  document?
4    A.   It did get inserted, I don't know
5  who inserted it.
6    Q.   Do you know whether your lawyers
7  drafted this document?
8    A.   No.
9    Q.   Do you know whether your lawyers
10 wrote the first draft that included this section?
11    A.   I don't know.
12    Q.   All right.  And if they did, they
13 put it in by mistake --
14    MR. TRAHAN:  Objection, calls for
15 speculation.
16    Q.   -- is that your testimony?
17    A.   If it was put in, it was put in by
18 mistake because that was not the agreement, and
19 the fact that it just reads section five versus
20 outlining, which I think is sneaky by somebody,
21 section five which outlines the pro rata sharing
22 of expenses or deficits, which it should say,
23 instead of just section five of the amendment
24 leaves it that you could gloss it over in the
25 last perusal.  That's why I think it smells.

Granite Southlands Town Center v. Alberta Town Center       JAY ALEXANDER                    4/8/2010

---

**109**

1    Q.    Well, all right.  Maybe you should
2   have a conversation with your lawyer.  You never
3   saw drafts of the Fifteenth Amendment, did you?
4    A.    No.
5    Q.    And you don't know which of the
6   lawyers drafted the first draft of the Fifteenth
7   Amendment?
8    A.    That's right.
9    Q.    All right.
10   A.    Because I'm focused on the economic
11  concept, I'll state the economic concepts that
12  were agreed to; one, was that there was a sharing
13  of deficits or surpluses, and if you want an
14  affirmative from me, I never agreed that that
15  should be eliminated or deleted, and because of
16  that, if that did get deleted, that was an error.
17   Q.    Okay.  Exhibit 54, which is going to
18  be in this book, leave that in front of you just
19  so you can confirm this for me.  Here's
20  Exhibit 54.
21       Exhibit 54 is the Eighth Amendment to the
22  Forward Purchase and Sale Agreement.  I direct
23  your attention to paragraph five on page two,
24  provision relating to operating deficits.  Read
25  that paragraph to yourself.

---

**110**

1    A.    Yeah.
2    Q.    This paragraph is the one pursuant
3   to which Alberta and Granite agreed to share
4   operating deficits or operating profits, correct?
5    A.    Yep, that's the concept that I
6   agreed to, yes.
7       MR. TRAHAN:  Is this the Eighth
8   Amendment?
9       MR. BENNETT:  This is the Eighth
10  Amendment, Exhibit 54.
11   Q.    And this is the paragraph five of
12  the Eighth Amendment, which is deleted in its
13  entirety by the Fifteenth Amendment, correct?
14      MR. TRAHAN:  Object to form.
15   A.    That's what the other document
16  states, it was deleted.
17   Q.    Okay.  And if your lawyers are the
18  ones that drafted that Fifteenth Amendment, the
19  first draft, which contained the deletion of
20  paragraph five of the Eighth Amendment, it's your
21  testimony that was a mistake?
22   A.    Yes.
23   Q.    All right.
24   A.    From what I agreed to, yes.
25   Q.    Sure, understand.  You still have

---

**111**

1   the Fifteenth Amendment in front of you --
2    A.    Mm-hmm.
3    Q.    -- which is Exhibit 37.  There is a
4   paragraph 11 on page six, talks about a property
5   expense proration reconciliation.
6       Do you have any knowledge of why this
7   provision is contained in the Fifteenth
8   Amendment?
9    A.    Proration at closing is standard.
10   Q.    Sure.  And this provision provides
11  that any prorations of expenses made at closing
12  will be reconciled by March 31, 2009, correct?
13   A.    Mm-hmm.
14   Q.    Yes or no?
15   A.    Yes.
16   Q.    Okay.  Did you have any involvement
17  in discussion of this provision?
18   A.    No.
19   Q.    Do you know what prorations of
20  expenses were made at closing?
21   A.    No.
22   Q.    Did you ever see the settlement
23  statements?
24   A.    No.
25   Q.    So you have no information -- if I

---

**112**

1   gave them to you, all you could do is read --
2    A.    It's like the -- it's like the
3   estoppels.  I would spend a lot of time saying I
4   haven't seen it and I don't know.
5    Q.    All right.  Are you aware under the
6   original provisions of the Forward Purchase and
7   Sale Agreement that all prorations of expenses
8   made at closing were final and binding on the
9   parties with the exception of taxes?
10      MR. TRAHAN:  Object to form.
11   A.    I'm not particularly or precisely --
12  I was not precisely aware of that.
13   Q.    All right.  Is it standard in your
14  experience for prorations made at closing on an
15  acquisition to be final with the exception of
16  real estate taxes?
17      MR. TRAHAN:  Object to form.
18   A.    It all can be negotiated depending
19  on what's outstanding, so most of the time taxes
20  are one of the major items that's outstanding, so
21  it seems to be what was done here is usual.
22   Q.    Okay.  Tell me a bit about your
23  background.  What's your formal education?
24   A.    I got my undergrad in economics from
25  DePauw University with a W at the end, an MBA in

---

28 (Pages 109 to 112)

**113**

1  finance with a focus on real estate from Indiana
2  University.
3      Q.    And what year?
4      A.    1987 my undergrad, 1992 my grad.
5      Q.    And what's your employment
6  background?  What did you do after college?
7      A.    I worked for the Principal Financial
8  Group for about 13 years where I ran their big
9  Core Flagship Fund for ten of that.
10     Q.    In what office?
11     A.    Out of Des Moines, Iowa where the
12  Principal Financial Group is headquartered.
13     Q.    Did you grow up in Iowa?
14     A.    No.
15     Q.    What part of the country did you
16  grow up in?
17     A.    Midwest.
18     Q.    So what was the Principal Financial
19  Group's big fund that you managed?
20     A.    The Principal U.S. Property Account.
21     Q.    And what types of assets did the
22  U.S. Property Account hold?
23     A.    Same as Granite.
24     Q.    Commercial retail, office?
25     A.    Residential.

**115**

1      A.    Right, exactly.
2      Q.    You're not in the execution phase,
3  if you will?
4      A.    Right.  Well, depends on where -- I
5  think earlier in my career I was more associated
6  -- I have would have been in Chris's shoes or
7  Andrew's shoes, but later on -- you know, in a
8  big fund -- you know, the execution stuff is done
9  at Chris's level.
10     Executing of documents, negotiating of
11  documents is done at Chris's level and Andrew's
12  level.
13     Q.    Okay.  Have you ever been at the
14  negotiating a contract level?
15     A.    Yeah, at times, at various times but
16  not detailed language.
17     Q.    During what years were you the
18  portfolio manager for the Principal U.S.
19  Property Fund?
20     A.    '94 -- 1994 through 2003.
21     Q.    What did you do after that?
22     A.    I came here.
23     Q.    2003 you came to the State Street --
24     A.    Mm-hmm.
25     Q.    -- Fund?

**114**

1      Q.    Residential, apartments, industrial?
2      A.    Mm-hmm.
3      Q.    Yes or no?
4      A.    Yes.
5      Q.    Thank you.  What position -- were
6  you always a portfolio manager for the U.S.
7  Property Fund?
8      A.    Yes.
9      Q.    You were never in charge of
10  acquisitions for that fund?
11     A.    It was part of the portfolio
12  manager, it's the same structure.
13     Q.    You oversaw the acquisitions group?
14     A.    No.  I mean as a portfolio manager,
15  you just help out and have strategic oversight to
16  the acquisitions that are being made for your
17  fund.
18     Q.    You have never been a director of
19  acquisitions for any fund --
20     A.    Right.
21     Q.    -- correct?  You've always been a
22  portfolio manager?
23     A.    Right.
24     Q.    So your level has always been at the
25  strategic level, correct?

**116**

1      A.    Yeah, to BlackRock to run this fund.
2      Q.    And it was originally called the
3  Tower Fund?
4      A.    Mm-hmm.
5      Q.    Right?
6      A.    Yes.
7      Q.    And at that time Metropolitan Life
8  was the advisor -- no, excuse me, was the owner
9  of the fund?
10     A.    Yes.
11     Q.    And BlackRock Realty Advisors was
12  the advisor to the fund?
13     A.    Yes.  Met Life owned the fund.
14     Q.    I think I said that.
15     A.    Right, and SSR was the advisor to
16  it.
17     Q.    And SSR was merged into BlackRock?
18     A.    Yes.
19     Q.    And was that in 2000 -- when was
20  that, 2005?
21     A.    Ish, yeah, right at the end, right
22  at the beginning, end of '04.
23         MR. BENNETT:  Why don't we take a
24  short break.  I'll look over my notes, make sure
25  I haven't forgotten something critical to ask

**117**

1  you.
2           (Whereupon a break was taken.)
3           MR. BENNETT:  I pass the witness.
4  EXAMINATION BY MR. TRAHAN:
5     Q.    Mr. Alexander, my name is Paul
6  Trahan, and I represent Granite in this lawsuit.
7  Do you understand that?
8     A.    Yes.
9     Q.    Earlier Mr. Bennett asked you about
10 the Colorado Cinema Estoppel; do you remember
11 that testimony?
12    A.    Yes.
13    Q.    And in particular he asked you to
14 look at the January 2009 Cinema Estoppel that I
15 believe is Exhibit 3.  Do you recall?
16    A.    Yes.
17    Q.    Do you have an opinion based on your
18 knowledge and experience as to whether the
19 modifications set forth in that estoppel are
20 material and adverse?
21           MR. BENNETT:  Object to the form,
22 lack of foundation.
23    A.    This paragraph five is a material
24 issue and a material change.
25    Q.    Would you consider that to be an

**118**

1  adverse modification to the form certificate?
2     A.    Yes, yes.
3     Q.    And would you consider that an
4  adverse and material modification when comparing
5  that to the May 2008 Colorado Cinema Certificate?
6           MR. BENNETT:  Object to the form,
7  lack of foundation.
8     A.    I don't really remember the -- I
9  don't -- I didn't see the May 1 --
10    Q.    Well, let's take a look at it.  It's
11 Exhibit 2, I believe.  There's no reference to a
12 cracked foundation in the May certificate, is
13 there?
14           MR. BENNETT:  Lack of foundation,
15 document speaks for itself.
16    A.    Yep, it's a -- a cracked foundation
17 in this wording is a material change and an
18 adverse one.
19    Q.    And there's no reference to a
20 cracked foundation in the May 2008 estoppel that
21 is Exhibit 2, is there?
22    A.    That is correct.
23    Q.    Mr. Bennett asked you earlier about
24 the deletion of section five of the Eighth
25 Amendment, that reference in the Fifteenth

**119**

1  Amendment to the Forward Purchase and Sale
2  Agreement.  Do you remember that testimony and
3  that line of questions?
4     A.    Mm-hmm.
5     Q.    Do you have any reason to believe
6  that the deletion of section five of the Eighth
7  Amendment relieved Alberta of its obligation to
8  true-up operating deficits?
9           MR. BENNETT:  Object to the form,
10 lack of foundation.
11    A.    No.
12    Q.    Based on your understanding of the
13 parties' agreement, do the parties have an
14 obligation to split operating deficits that
15 accrued during 2008?
16    A.    Yes, it was supposed to be trued-up
17 at closing.
18           (Whereupon Exhibit No. 130, Email
19 dated 12/11/2008, was received and marked for
20 identification.)
21    Q.    I'll refer you to what's been marked
22 as Deposition Exhibit Number 130.  Please take a
23 moment to review it and let me know when you're
24 done.
25    A.    Yes, I reviewed it.

**120**

1     Q.    This is an email -- a December 11,
2  2008 email from Brian Patrick, who was serving as
3  Granite's counsel to Erica Weber, who was
4  representing Alberta; is that correct?
5     A.    Yes.
6     Q.    And it says, "Erica, it has come to
7  our attention that the rents received from the
8  property for the first 11 days of December have
9  not been split 50/50 on the settlement statement
10 per the agreement of the parties in the Eighth
11 Amendment to the contract.
12    Please confirm that this income will be
13 reflected in the true-up for the property that
14 will occur on or before March 31, 2009."  Did I
15 read that correctly?
16    A.    Yes.
17    Q.    And then Peter Cudlip, who's with
18 Alberta responded to Mr. Patrick's email,
19 correct?
20    A.    Yes.
21    Q.    And he says in an email to Brian
22 Patrick with a number of CCs, he says, "We will
23 true-up all of 2008 prior to March 31."  Did I
24 read that correctly?
25    A.    Yes.

**121**

1    Q.    And does this email confirm your
2  understanding of the party's agreement?
3    A.    Yes.
4    Q.    And that was -- the parties'
5  agreement was to true-up accrued operating
6  deficits for 2008 by March 31, 2009; is that
7  correct?
8    A.    Mm-hmm, yes.
9    Q.    Mr. Bennett asked you earlier about
10  how much you thought it would cost to --
11    A.    Let me clarify right here what's
12  really interesting is that this per the agreement
13  of the parties in the Eighth Agreement to the
14  contract and the true-up said both parties, not
15  only our counsel at closing, but their accountant
16  believed that the Eighth Amendment was still in
17  force.
18    Q.    Understood.  Mr. Bennett also asked
19  you about how much you believed it would cost to
20  fix the settling problems at Southlands; do you
21  remember those questions?
22    A.    Mm-hmm, yes.
23    Q.    And you testified as I recall that
24  you thought it would be between $2 to $3 million
25  dollars; was that your testimony?

**122**

1    A.    Yes.
2    Q.    Do you know if in fact that number's
3  correct?
4    A.    No.
5    Q.    You would ultimately defer to
6  others?
7    A.    Yes.
8    Q.    Did your estimate take all of the
9  costs into account or merely the direct costs?
10    A.    From just prior very cursory
11  conversations, I have heard, and this is coming
12  just I believe from a very preliminary look and
13  general feel from some of our professionals that
14  it would be a direct cost of $2 to $3 million
15  bucks to fix.
16    Indirect costs, whereas what I've been more
17  focused on are in the reputation of the property.
18  We've had to move tenants out, people in the
19  market are aware of that, the stigma attached
20  with the property, and the difficulty that it
21  could create in releasing spaces as a property
22  operates so that the true economic cost could be
23  significant -- could be as much as just a little
24  bit higher to -- you know, five times as much
25  called $10 million bucks, a dilution in value

**123**

1  associated with the settling.
2    If this settling issue becomes more
3  material, which we've seen in the past does
4  occur, and becomes difficult to fix, it could
5  have a real huge impact upon value, $10, $20
6  million bucks in a project this big.
7    So a cracked foundation is a very material
8  issue, especially when you just get aware of it
9  through an estoppel, and it just -- there's just
10  no reason why -- that's a huge, huge issue.
11    Q.    Is it -- would it be accurate to say
12  that the direct and indirect cost of this
13  settling issue has yet to be determined?
14    A.    Yes.  I think the property's not
15  sellable right now.  It's very liquid in its
16  current state.  If you went out to market the
17  property, people would say you got a settlement
18  issue that you got to correct before we could
19  even look at buying.  Still liquid as it sits
20  today.  That's a huge cost.
21    MR. TRAHAN:  No further questions.
22  Thank you, Mr. Alexander.
23  FURTHER EXAMINATION BY MR. BENNETT:
24    Q.    Mr. Alexander, on Exhibit 130,
25  you've never seen this document before it was

**124**

1  handed to you today, have you?
2    A.    I had not seen it before today.
3    Q.    Okay.  So your testimony about it is
4  based solely on reading what the document says?
5    A.    Yep.
6    Q.    You have no personal knowledge of
7  either the communication from Mr. Patrick to Ms.
8  Weber or Mr. Cudlip's response to Mr. Patrick,
9  correct?
10    A.    That's correct.
11    Q.    And Mr. Patrick is writing per the
12  agreement of the parties in the Eighth
13  Amendment on December 11, 2008, correct?
14    A.    Yes.
15    Q.    And the Fifth Amendment to the
16  contract deleting the paragraph of the Eighth
17  Amendment was signed three days earlier,
18  December 8th, 2008, wasn't it?
19    A.    I forget the exact date, but that's
20  probably correct.
21    Q.    So Mr. Patrick doesn't seem to know
22  what the provisions of the Fifteenth Amendment
23  were with respect to the Eighth Amendment to the
24  contract, does he?
25    MR. TRAHAN:  Object to form.

**125**

1    A.    I can't comment on that, I guess.
2    Q.    All right.  In terms of the costs
3  associated with the cracked foundation in the
4  cinema, at this point it's all speculation as to
5  what it will cost to fix the project, isn't it?
6    A.    Yes.
7    MR. TRAHAN:  Object to form.
8    Q.    At this point you don't have any
9  bids from any contractor that you're aware of to
10  do any remedial work on the property; is that
11  right?
12    A.    I am not aware of any.
13    Q.    And you haven't even seen as of this
14  date any plan or proposal to fix the property?
15    A.    Nope.
16    Q.    And your concern about settling at
17  the site and so forth is based upon your prior
18  experience with other projects where the
19  settlement issue became worse over time?
20    A.    And a --
21    MR. TRAHAN:  Object to form.
22    A.    And yes, and a discussion upon a
23  recent property site visit where walls are
24  deteriorating, and stepping into spaces that are
25  covered with rugs to stop people from tripping.

**126**

1  That's a major tenant and safety issue, and a
2  major dilution in value.
3    Q.    Did you recently visit the site; is
4  that what you're telling me?
5    A.    I did not, no.  As I said, I was
6  told from a visit of another person.
7    Q.    Who --
8    A.    Mr. Silva.
9    Q.    I'm sorry, Mr. Silva did?
10    A.    Mr. Silva did, yeah.
11    Q.    And do you know what building he's
12  referring to that had rugs on the floor to keep
13  -- to avoid a tripping hazard?
14    A.    Probably the one you said earlier
15  was Building E, but I'm not exactly sure.
16    Q.    All right.  So you're not sure which
17  building Mr. Silva had in mind when he was
18  telling you this?
19    A.    Maybe you got to it in his
20  deposition, but --
21    Q.    And as far as you know, the only two
22  buildings that are involved with any kind of
23  foundation issues are the cinema and this
24  Building E?
25    A.    No, I'm not going to say that.  You

**127**

1  said that earlier today it was just Building E.
2  You said something about Building E, but my
3  understanding is we -- there were not clean
4  estoppels from tenants other than the cinema.
5    Q.    And that's your only knowledge about
6  any other building issues are from tenant
7  estoppels from other tenants?
8    A.    Mm-hmm, right.
9    Q.    And if all of those --
10    A.    And from Chris Silva talking about
11  the separation of the walls, and the need to put
12  carpets over the entryways to tenant spaces so
13  that their customers wouldn't trip going in and
14  out of the space from the settlement.
15    Q.    And you don't know which building
16  Mr. Silva has referenced to in that?
17    A.    No.
18    Q.    And you have no knowledge of any
19  foundation issues except from tenant estoppels
20  that disclose them, and Mr. Silva's conversation
21  with him --
22    A.    That's correct.
23    Q.    -- correct?
24    A.    That's right.
25    MR. BENNETT:  I think those are all

**128**

1  the questions I have.  Thank you.
2    MR. TRAHAN:  No further questions.
3  I would like to note that there's a protective
4  order in this case, and I'd like to designate
5  each of the three transcripts as confidential,
6  and I'd like to designate the testimony for Mr.
7  Alexander today relating to the estimated cost of
8  repairing the settling issues at the property,
9  I'd like to designate that as attorneys' eyes
10  only.
11    MR. BENNETT:  I don't think we have
12  an attorneys' eyes only provision in our
13  settlement agreement.
14    MR. TRAHAN:  We do.
15    MR. BENNETT:  Do we?
16    MR. TRAHAN:  Yes.
17    MR. BENNETT:  I don't remember that
18  we had that, but you could be right.
19    MR. TRAHAN:  We do.  We have a
20  highly confidential attorneys' eyes only
21  information designation, and I'm designating all
22  of the discussions about the estimated cost of
23  repairs at the Southlands Town Center as highly
24  confidential attorneys' eyes only information.
25    MR. BENNETT:  I'm not agreeing to

Granite Southlands Town Center v. Alberta Town Center     JAY ALEXANDER                                          4/8/2010

**129**

1    that designation as to that testimony.
2        MR. TRAHAN:  But you will honor it?
3        MR. BENNETT:  I will preserve it
4    until we can take it up with the Court if we
5    decide we need to.
6        MR. TRAHAN:  Understood, but you
7    will honor it?
8        MR. BENNETT:  Yes.
9        (Deposition concluded at 12:04 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1            I, JAY ALEXANDER, do hereby certify that
2    I have read the above and foregoing deposition and
3    that the same is a true and accurate transcription of
4    my testimony, except for attached amendments, if any.
5            Amendments attached   ( ) Yes   ( ) No
6
7
8
9                         _____
                                  JAY ALEXANDER
10
11
12
13        The signature above of JAY ALEXANDER was
14    subscribed and sworn to before me in the county of
15    _____, state of Colorado, this _____ day of
16    _____, 2010.
17
18
19
20                         _____
                                  Notary Public
                                  My commission expires
21
22
23
24
25    Granite Southlands Town Center, LLC 4/08/10 (nlk)

**130**

1        C E R T I F I C A T E
2        I, NICOLE LYNN KISH, a Certified Court
3    Reporter and Notary Public of the State of New
4    Jersey, do hereby certify that prior to the
5    commencement of the examination, JAY ALEXANDER,
6    was duly sworn by me to testify the truth, the
7    whole truth and nothing but the truth.
8        I DO FURTHER CERTIFY that the foregoing
9    is a true and accurate transcript of the
10    testimony as taken stenographically by and before
11    me at the time, place and on the date set forth,
12    to the best of my ability.
13        I DO FURTHER CERTIFY that I am neither a
14    relative nor employee nor attorney nor counsel of
15    any of the parties to this action, and that I am
16    neither a relative nor employee of such attorney
17    or counsel, and that I am not financially
18    interested in the action.
19
20
21    ---------------------------------------------
22        NICOLE LYNN KISH
23        Notary Public of the State of New Jersey
24        My Commission expires September 10, 2011
25    Dated: April 14, 2010

April 16, 2010

Paul Trahan, Esq.
Fulbright & Jaworski L.L.P.
600 Congress Avenue
Suite 2400
Austin, Texas 78701

Re:  Granite Southlands Town Center, LLC, v. Alberta
     Town Center, LLC., et al.
Depositions of: Christopher Silva, Andrew Piekarski &
     Jay Alexander
Dear Mr. Trahan:
Enclosed are the original signature pages(s) of the
above-named deposition(s).  It was agreed that you would
arrange for signature of same by means of your copy
transcript(s) and the enclosed signature page(s).

Also enclosed are amendment sheets for changes if necessary.
Please return the signed and notarized signature page(s)
and amendment sheet(s), if any, to our office within
30 days from the date of this letter to comply with the
statute.

We will mail the original pages to the appropriate attorney
to be placed with the original sealed transcript and copies
to all other counsel.

If circumstances change and a copy transcript is not
available from your office for the witness to review, then
please notify the witness that he/she should contact our
office to make an appointment to read, sign, and make
corrections to a copy that we will make available at our office.

Thank you for your attention to this matter.

Sincerely,

Kathy Azcuenaga, Filing Assistant
HUNTER + GEIST, INC.
Registered Professional Reporters
C:  Stuart N. Bennett, Esq.

**33 (Pages 129 to 132)**

130

1                    C E R T I F I C A T E

2            I, NICOLE LYNN KISH, a Certified Court

3    Reporter and Notary Public of the State of New

4    Jersey, do hereby certify that prior to the

5    commencement of the examination, JAY ALEXANDER,

6    was duly sworn by me to testify the truth, the

7    whole truth and nothing but the truth.

8            I DO FURTHER CERTIFY that the foregoing

9    is a true and accurate transcript of the

10   testimony as taken stenographically by and before

11   me at the time, place and on the date set forth,

12   to the best of my ability.

13           I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of

15   any of the parties to this action, and that I am

16   neither a relative nor employee of such attorney

17   or counsel, and that I am not financially

18   interested in the action.

19

20

21   ------------------              --------------

22            NICOLE LYNN KISH

23       Notary Public of the State of New Jersey

24       My Commission expires September 10, 2011

25   Dated:   April 14, 2010



# Hunter + Geist, Inc.

**(303) 832-5966**

April 16, 2010

1900 Grant Street, Suite 800
Denver, Colorado 80203
Fax: (303) 832-9525
Toll Free: 1-800-525-8490
www.huntergeist.com
depo@huntergeist.com

Paul Trahan, Esq.
Fulbright & Jaworski L.L.P.
600 Congress Avenue
Suite 2400
Austin, Texas 78701

Re:  Granite Southlands Town Center, LLC, v. Alberta
     Town Center, LLC., et al.
Depositions of: Christopher Silva, Andrew Piekarski &
                Jay Alexander

Dear Mr. Trahan:

Enclosed are the original signature pages(s) of the
above-named deposition(s).  It was agreed that you would
arrange for signature of same by means of your copy
transcript(s) and the enclosed signature page(s).

Also enclosed are amendment sheets for changes if necessary.
Please return the signed and notarized signature page(s)
and amendment sheet(s), if any, to our office within
30 days from the date of this letter to comply with the
statute.

We will mail the original pages to the appropriate attorney
to be placed with the original sealed transcript and copies
to all other counsel.

If circumstances change and a copy transcript is not
available from your office for the witness to review, then
please notify the witness that he/she should contact our
office to make an appointment to read, sign, and make
corrections to a copy that we will make available at our office.

Thank you for your attention to this matter.

Sincerely,

Kathy Azcuenaga, Filing Assistant
HUNTER + GEIST, INC.
Registered Professional Reporters

c:  Stuart N. Bennett, Esq.



# Hunter + Geist, Inc.

**(303) 832-5966**

1900 Grant Street, Suite 800
Denver, Colorado 80203
Fax: (303) 832-9525
Toll Free: 1-800-525-8490
www.huntergeist.com
depo@huntergeist.com

April 16, 2010


Stuart N. Bennett, Esq.
Lindquist & Vennum PLLP
600 17th Street
Suite 1800 South
Denver, Colorado 80202

Re: Granite Southlands Town Center, LLC v. Alberta Town Center, LLC, et al.
Case No.: 09-cv-00799-ZLW-KLM

We are filing with your office by Messenger Service the following:

Christopher Silva,
Andrew Piekarski &
Jay Alexander _____     Original Transcript.
                                  Signature page(s)/amendment(s) to be
                                  provided to Hunter + Geist, Inc.,
                                  who will furnish copies to all counsel
                                  of record.

_____           Exhibit(s).


_____           Master Videotape(s)/DVD(s).


_____           Unsigned, notice duly given on
                                  _____, since hearing is set
                                  for _____.


HUNTER + GEIST, INC.
Court Reporting, Legal Videography, and Videoconferencing

c: Paul Trahan, Esq.

srk

# CONCORDANCE

**A**

ability 39:13 80:20
  130:12
able 18:10 30:7 64:5
  84:8
above-entitled 2:3
above-named 132:9
Absolutely 63:21,22
accept 23:2 62:16,17
accepted 48:24
access 9:9
accomplished 79:4,6
account 113:20,22
  122:9
accountant 121:15
accrued 119:15 121:5
accurate 45:21 58:9
  66:8 104:16 123:11
  130:9 131:3
acknowledge 104:17
acknowledgment 100:6
acquire 9:14,19 34:16
  39:24 77:4
acquired 43:5,10 46:8
  48:24 50:24
acquiring 9:1 29:13
acquisition 7:17 10:3
  10:13 17:15 21:7
  43:17 45:10,25 47:12
  96:19 97:25 112:15
acquisitions 15:10 43:1
  43:4 45:18 47:4 55:5
  114:10,13,16,19
acted 81:21
acting 69:3
action 1:3,6 69:2
  130:15,18
active 22:23 32:3 33:1
  53:13 54:3 86:5
  87:13
adamantly 91:6
addition 35:2
additional 65:6
adjusted 79:23 80:16
  82:12
adverse 61:13,15
  117:20 118:1,4,18
adversely 26:11
advise 55:19
advised 56:5
advisor 116:8,12,15
advisors 7:6 116:11
affirmative 109:14
agree 45:3 59:19,20
  74:14
agreed 75:21 101:12,15
  101:20 102:1 103:20
  103:21 105:3 109:12
  109:14 110:3,6,24

132:9
agreeing 75:25 101:23
  128:25
agreement 11:23 12:3,9
  12:12 18:22 23:24
  24:12 28:5 30:21,22
  32:15,24 33:6 38:15
  39:2 40:10 44:25
  45:5 63:8 66:6 75:16
  75:20,20 87:2,10
  89:12 90:20 93:18
  94:6,11 96:3 97:16
  98:7,15,25 100:12
  101:9 102:19 103:14
  103:24 104:7,12,16
  107:3,3 108:18
  109:22 112:7 119:2
  119:13 120:10 121:2
  121:5,12,13 124:12
  128:13
agreements 22:4 33:8
ahead 28:13
airing 70:7
airtime 69:24
al 132:6
Alberta 1:8 3:20 7:21
  8:20 10:23 11:2
  12:18 14:5 48:13
  53:13 58:12 65:15,25
  66:22 74:25 75:7,9,11
  75:15,21 81:10 99:19
  104:3 110:3 119:7
  120:4,18 132:5
Alexander 1:15 2:2 4:4
  5:6 51:12 117:5
  123:22,24 128:7
  130:5 131:1,9,13
  132:7
ALLAN 1:10
alleged 35:15
allocated 15:11
allocation 9:18
allow 48:4,12
allowed 44:14
amended 64:8 96:3
  104:23 107:4
amendment 66:5,10,15
  66:22 67:8,15,15
  75:19,23,24 76:4
  93:15 94:1 98:20
  100:23,25 101:22,24
  101:24 102:4,6
  103:12,13 104:10,15
  104:22 105:8,11,19
  105:25,25 106:20
  107:2,2,8,12,13
  108:23 109:3,7,21
  110:8,10,12,13,18,20
  111:1,8 118:25 119:1
  119:7 120:11 121:16

124:13,15,17,22,23
  132:11,12
amendments 13:19
  96:25 97:1 131:4,5
amount 11:19 21:10
  65:3
Andrew 38:1 50:11
  81:12 87:7 91:7
  132:6
Andrew's 50:12 84:2
  115:7,11
annual 43:21,22 52:7
answer 10:9,24 20:14
  27:4 31:11,21 39:4
  92:18 107:25
answered 20:11
apart 82:2,8 84:14
apartment 6:6 25:25
  42:11 43:24
apartments 52:2 114:1
apparent 32:9
apparently 80:5
appear 82:22 84:7
appeared 76:16
appears 81:7 84:6
appointment 132:18
appraisal 54:9 55:12,12
  55:23
appraisals 55:13
appraiser 55:14,20
  56:15
appraisers 56:5
approach 9:25
appropriate 132:14
approval 96:10 97:19
  97:21 98:3,9
approved 97:11 98:4,5
  98:14 105:4
approximately 5:20
  6:10,16 41:16 45:17
  46:7 54:19 65:15
  75:11
April 1:16 2:8 76:10,15
  76:21 130:25 132:1
architects 34:18 58:14
  58:23
area 21:18 42:1 56:11
arrange 132:10
arrangement 102:6
arrived 64:18,25 65:12
ascribe 16:9
aside 73:15
asked 20:10 89:4 117:9
  117:13 118:23 121:9
  121:18
asking 18:5 83:3
aspects 19:24
asserting 59:17
assertion 59:11
asset 50:14 55:1 56:10

76:11 77:4
assets 9:19 113:21
assigned 38:20
Assistant 132:23
associated 5:13 44:2
  58:11 115:5 123:1
  125:3
assumable 34:6
assume 52:23
assuming 103:7
as-is 18:4
attached 122:19 131:4
  131:5
attempt 12:8
attempting 71:2
attention 53:1,12 54:3
  54:17 84:24 93:23
  109:23 120:7 132:19
attorney 130:14,16
  132:14
attorneys 1:18 128:9
  128:12,20,24
attract 63:4
attractive 9:6
attributable 56:18
attribute 59:21
audible 34:12 78:17
audibly 10:9
Austin 3:7 132:4
authority 94:18 96:22
  97:5
authorize 96:23
authorized 57:12
available 80:11,19
  132:17,18
Avenue 3:13 132:3
avoid 126:13
aware 8:18 12:9 14:13
  21:5 23:14 29:18
  33:2 35:4,8,12,18,21
  35:22 36:6,19 37:22
  38:14,19 52:9,13,14
  55:17 57:21,22,25
  58:2,15,16,20,24
  65:18,20,24 66:7,23
  67:11 68:5,15 75:10
  87:8 100:22 101:2
  102:12 104:24 105:1
  106:3 112:5,12
  122:19 123:8 125:9
  125:12
Azcuenaga 132:23
a.m 2:9

**B**

b 4:9 33:16 80:12,21
back 16:18 20:15 26:16
  26:18 27:23 28:16
  30:8 63:11 66:3 73:5
  73:14,16 82:20 98:15

101:10,12 102:3
  103:25
background 112:23
  113:6
backing 15:11
bad 89:15 92:12,15,21
Baldwin 41:24 42:1
bank 39:9 40:3 54:6
  74:7
bankers 92:22
banks 38:20 39:10,16
  39:17,18 74:14,25
based 54:9 55:8,24
  63:25 117:17 119:12
  124:4 125:17
basically 12:19 60:2
  62:19 72:8 88:18
basis 20:6 23:14
beginning 116:22
behalf 35:5 94:19
beholder 27:6
believe 7:14 12:10
  13:15 31:1 45:17,20
  47:16 53:12 54:3
  57:15 70:16 79:3
  90:7 92:10 117:15
  118:11 119:5 122:12
believed 104:4 121:16
  121:19
benefit 90:11 104:5
Bennett 3:14 4:5,7 5:3
  42:23 48:17 59:5
  103:10,16 104:18,20
  106:5,14,16 110:9
  116:23 117:3,9,21
  118:6,14,23 119:9
  121:9,18 123:23
  127:25 128:11,15,17
  128:25 129:3,8
  132:25
best 13:14,14 44:5
  79:23 130:12
better 57:22 72:22,25
  79:20 80:16 82:12
beyond 48:14,16,17
bid 9:16
bids 125:9
big 113:8,19 115:8
  123:6
billion 15:10 43:2
binding 112:8
bit 112:22 122:24
BlackRock 2:6 5:8,12
  5:13,19 7:5 23:12,22
  35:4 40:15 42:3
  45:19 71:24 79:13
  91:4,15 116:1,11,17
BlackRock's 5:17
  42:24 94:12
blanking 42:12

Case No. 1:09-cv-00799-SJJ-KLM    Document 184-2    filed 02/16/11    USDC Colorado    pg 41
Granite Southlands Town Center v. Alberta Town Center    JAY ALEXANDER    4/6/2010

Page 2

**block** 46:20
**book** 55:1 94:5 109:18
**books** 55:2 72:21
**borrower** 38:24
**bottom** 73:17 75:6 83:1
84:1
**bought** 16:15 43:23
47:2
**breaches** 28:4
**break** 59:4,6 116:24
117:2
**Brian** 120:2,21
**brokers** 8:17,23 63:2
**brought** 28:16 53:1,9
53:12 54:2,16
**bucks** 37:15 54:6 73:8
122:15,25 123:6
**build** 62:9
**building** 20:25 57:24
58:2,6,13,14,16,19,22
58:24 59:13,18
126:11,15,17,24
127:1,2,6,15
**buildings** 36:14 126:22
**built** 18:12 20:25 30:5
60:1,7 61:22
**bunch** 85:16
**business** 13:9 51:7,9
52:10 85:19 86:1
92:13,16,21 93:10,14
97:12
**busy** 12:18 90:8
**buy** 10:20,21 13:3 45:3
46:16,17 57:5 77:6
85:2 90:19
**buyer** 24:11 26:5 28:3
30:21 31:2,6,16,24
32:11,20 33:5 34:7,22
47:7
**buyer's** 24:25
**buying** 16:13 123:19
**buyout** 81:9 83:4,12
84:3,3
**buys** 46:24,24

**C**

**c** 3:1 23:25 24:2 130:1
130:1 132:25
**call** 15:23 42:20,20
102:3
**called** 6:20 11:22 42:1
42:6 44:9 116:2
122:25
**calls** 108:14
**Campus** 2:6
**cancer** 14:17
**capital** 95:10
**captioned** 24:1
**care** 28:15,18 61:3,4,21
**career** 19:3 115:5

**carpets** 127:12
**case** 10:21 11:23 34:15
85:5 87:2 128:4
**cases** 18:3 95:20
**cash** 55:24
**caused** 21:6 62:4
**CCs** 120:22
**cement** 60:6 62:10
**center** 1:5,8 3:11,21
7:12 21:18 42:10
52:24 53:23 128:23
131:25 132:5,6
**certain** 22:11,12 26:7
29:3,7,21 30:5 39:25
86:5
**certificate** 52:23 59:3,8
60:18 61:5 63:10
118:1,5,12
**certificates** 49:20 51:21
**Certified** 2:4 130:2
**certify** 130:4,8,13
131:1
**chain** 83:19 84:9,10
**chance** 71:3,22,23
**change** 26:22 27:7,9
30:11,18 33:22 61:10
61:11 64:25 67:22
69:23 89:13 117:24
118:17 132:16
**changed** 79:17
**changes** 22:23 27:12
132:11
**changing** 72:9 82:22
83:8
**characterize** 81:14
**charge** 38:9 114:9
**Chicago** 51:6
**choose** 93:13
**Chris** 38:1 50:13 81:12
91:8 97:5 105:4
127:10
**Christopher** 132:6
**Chris's** 101:19 115:6,9
115:11
**cinema** 48:13 52:23,25
57:23 58:6,23 59:3,8
117:10,14 118:5
125:4 126:23 127:4
**circumstance** 30:19
**circumstances** 26:7
32:12 33:14 78:20
132:16
**cite** 84:3
**City** 21:19 43:25 44:10
**CIVIL** 1:3,6
**claimed** 35:6
**claims** 73:12
**clarify** 81:4 121:11
**clause** 18:7
**clean** 28:16,18 48:2

**carpets** — 
60:15 62:1 85:3
88:15 127:3
**cleanly** 85:23
**clear** 81:6 104:12,14
**clearly** 62:3 103:23
**client** 85:1
**clients** 6:4 86:12
**close** 15:2 20:18 63:6
63:10,16,25 64:6
82:19 97:15,22
**closed** 30:12 34:16
53:14,15,21 54:5,20
55:7,16,21 56:22
67:16 88:19 98:11
**closer** 73:19
**closing** 23:5 25:1 48:4
48:15,16,18 65:14
66:1 67:14 87:9
88:12 101:11,17
103:22 104:13 111:9
111:11,20 112:8,14
119:17 121:15
**coach** 106:5
**collectible** 73:4
**collectibles** 73:6
**college** 113:6
**Colorado** 1:2,23 3:17
8:15 117:10 118:5
131:15
**come** 26:16,18 89:6
93:23 120:6
**coming** 82:7 84:14
122:11
**commencement** 130:5
**commencing** 2:8
**comment** 18:10 21:3
24:5 29:17,24 125:1
**commercial** 26:1 47:6
50:21 113:24
**commercials** 41:14
**Commingled** 5:24 6:2,3
**commission** 130:24
131:20
**commitment** 7:20 9:8
9:15,25 11:14,18,21
16:13 17:12 18:1,7
20:18 21:24 24:19
39:7 44:16,23,24
50:25 51:3 70:4
76:17,24 95:23 96:16
96:17
**commitments** 10:5,20
14:22 15:7,16 16:2
17:21 20:23 44:22
46:1
**committed** 77:5
**committee** 68:13,20
69:1,3,6,8,12,17,25
70:8,17 77:12,15,23
78:1 94:23 95:3,21

**96**:2,21 97:2,18 98:1
98:16
**committee's** 69:2
**communication** 124:7
**company** 1:9 54:24
**compared** 56:23
**compares** 19:17
**comparing** 118:4
**compensation** 66:1
**complaining** 63:3
**complaints** 49:13
**completed** 25:6,8,12
95:11
**completion** 25:9
**comply** 132:13
**Computer-aided** 2:1
**concept** 18:11 20:17
22:1,9 25:10 29:9
74:12 75:25 83:6
84:7,11 101:3,15
102:1 105:3 109:11
110:5
**concepts** 8:3 22:17
109:11
**concern** 125:16
**concerning** 22:6 65:25
**conclude** 71:12 79:13
**concluded** 79:8 81:17
89:22 129:9
**conclusion** 90:6
**condition** 18:3 20:6,20
21:5 22:6,11,15 24:9
24:13 25:3 30:11
33:22 39:14 45:4,12
55:9 56:18 74:9
88:15
**conditions** 24:25 56:24
**conduct** 104:11
**confidence** 89:17
**confidential** 1:18 128:5
128:20,24
**confirm** 109:19 120:12
121:1
**confused** 31:13
**Congress** 3:5 132:3
**conjunction** 17:17
**connection** 30:24 56:6
94:12
**consensus** 81:21
**consider** 28:9,23
117:25 118:3
**considers** 26:25
**consistent** 45:22 80:2
84:22 85:3,7 89:9
**consistently** 105:16
**consortium** 38:20
39:10
**constitutes** 26:14 27:7
**constraints** 40:2
**construct** 58:2,6

**constructed** 57:23
**construction** 21:12
23:13 29:20 30:25,25
31:2,7,14,23 32:18,22
33:10,15 34:6,20,23
34:25 35:6,15,19,21
35:22 36:1,4 37:14
38:16,21 40:6,9,21
41:2 44:14 52:18
54:13 55:13,15,17,20
56:6,23 57:3,20 58:12
65:1,4 66:25
**construed** 90:13
**contact** 132:17
**contained** 22:4 110:19
111:7
**contemplated** 7:14
10:15 11:1,11,18
14:21 78:9 82:11
87:25 88:4,7 95:11
**contemplating** 90:16
**contemplation** 10:17
**context** 66:4 67:23 71:7
71:18
**continue** 62:24
**contract** 7:20 11:21
17:5 18:8,18 19:17,18
22:13,21 28:22 44:17
63:17,19,24 64:8,13
101:1 102:10 103:2
104:19 115:14 120:11
121:14 124:16,24
**contracted** 23:12
**contractor** 125:9
**contractors** 34:17
37:21 60:23
**contracts** 17:13,23 20:8
21:24,25 22:22 25:17
30:15 50:25 51:17
**contractual** 45:9
**control** 86:11
**controversy** 103:17
**conversation** 27:24
109:2 127:20
**conversations** 80:25
83:18 122:11
**converted** 72:16
**copies** 132:15
**copy** 132:10,16,18
**Core** 113:9
**correct** 29:22 37:15
39:22 44:15 45:18
47:25 56:3 62:6
64:15 74:1 78:15
88:8 103:8 104:4
110:4,13 111:12
114:21,25 118:22
120:4,19 121:7 122:3
123:18 124:9,10,13
124:20 127:22,23

corrected 21:12 62:1
corrections 132:18
corrective 21:10
correctly 120:15,24
Corrigan 8:8,18
cost 27:17 49:10 52:18
  65:1 66:17 67:10
  121:10,19 122:14,22
  123:12,20 125:5
  128:7,22
costs 37:8 56:24 66:11
  122:9,16 125:2
Council 4:12
counsel 13:18 50:13
  120:3 121:15 130:14
  130:17 132:15
count 73:20
country 113:15
county 131:14
couple 8:17 14:11,11
  44:2,7 91:10 95:20
  98:20
course 47:12 52:15
  97:12
Court 1:1 2:4 12:5
  42:18 43:25 44:6
  45:9 51:14 129:4
  130:2
covenant 30:22 32:15
  33:6
covenants 33:8
covered 125:25
cracked 59:12,21,24
  60:3,5,9,17,24 61:24
  62:3 64:4 118:12,16
  118:20 123:7 125:3
create 122:21
credit 74:8,20,22
criteria 86:16
critical 116:25
Cudlip 1:11 103:25
  120:17
Cudlip's 124:8
cure 39:19 40:3
current 35:18 47:24
  74:5 123:16
cursory 122:10
customers 127:13

### D

D 4:1 5:1
date 48:4,11 74:9,14
  124:19 125:14 130:11
  132:13
dated 4:12 77:10
  119:19 130:25
dates 43:16 48:17
day 48:16 131:15
days 14:11 120:8
  124:17 132:13

day-to-day 8:6
DCC 58:14,22
deal 8:23 19:15,21 24:8
  24:17 25:22,23 26:1
  34:15 46:21 48:13
  51:3 63:11 67:1
  71:21 80:6,7 82:12
  83:8 89:11 97:1
dealing 29:1 30:11 44:8
  100:23
dealings 82:7 86:1
deals 99:25
Dear 132:8
debt 72:10,17 80:1
  82:14
December 40:17 69:15
  70:21,22 71:21 74:15
  79:19 82:25 83:8
  93:17 120:1,8 124:13
  124:18
decide 129:5
decline 76:23
deduct 27:25
deem 27:17 52:17 60:7
deemed 21:13 27:10,18
  49:8 52:17 95:19,23
deems 47:24,24
default 40:3
defaults 38:24 39:19,21
defect 28:9
defective 63:10
defects 30:24 35:6,15
Defendant 3:20
Defendants 1:7
defer 19:2,8 24:22 87:6
  122:5
deferred 50:11 78:5
deficit 104:22 105:10
deficits 75:9,22 100:24
  102:7,19,23 103:20
  103:22 104:5,13
  107:10 108:22 109:13
  109:24 110:4 119:8
  119:14 121:6
define 7:22
definitely 64:6 77:16
  89:15,16
delaying 90:14
delegated 69:24
delete 102:11 103:1
deleted 100:24 102:21
  103:5 105:2,11,15
  109:15,16 110:12,16
deletes 102:10 103:12
  107:12
deleting 102:18 104:23
  107:4 124:16
deletion 105:19,23
  110:19 118:24 119:6
deliver 22:10 28:17

39:14,15
delivered 13:19,24
  20:19 39:8 45:4
  59:25 60:10 88:15
delivering 18:2
delivery 25:18 48:11
Denver 1:23 3:17 71:21
DePauw 112:25
depending 25:25 97:9
  112:18
depends 44:21 115:4
deposed 17:19 56:11
deposition 1:14 2:1
  119:22 126:20 129:9
  131:2
Depositions 132:6
deposition(s) 132:9
Des 113:11
describe 9:3
described 7:13 22:9
  24:7
describing 74:5 95:17
description 4:11 78:8
designate 128:4,6,9
designating 128:21
designation 128:21
  129:1
desire 93:3
detailed 115:16
details 8:6 11:5 36:25
  37:24 72:13
deteriorating 125:24
determine 27:9
determined 71:4
  123:13
determining 26:25
developer 18:2 21:9
  22:10,21 27:24 28:17
  35:3 39:11,13,17,19
  39:21 40:4 45:11
  58:5 60:10 88:19
developers 60:4
developer's 45:2
development 60:5
  85:19
deviation 28:8
Diamond 6:5
difference 44:22 78:23
different 13:20 44:8,11
  59:16 84:12 91:7,8
differently 21:1 61:2
  71:1 89:11
difficult 16:9 93:1
  123:4
difficulty 122:20
dilution 63:5 122:25
  126:2
direct 7:24 8:5 106:11
  109:22 122:9,14
  123:12

directly 29:17
director 5:10,23 50:12
  50:13 97:6 114:18
dirt 53:18,18,22 54:7
Disapproval 24:2
discerns 61:17
disclose 127:20
disclosed 57:16
disclosing 32:21
disclosure 32:14 60:16
  63:17 64:1
discreet 46:21
discussed 8:4 69:19
  95:21 104:8
discusses 76:10
discussing 99:15
discussion 73:10 75:6
  102:21 111:17 125:22
discussions 11:6 48:21
  64:21 74:25 83:11,15
  88:25 95:21 99:21
  100:9 102:18,25
  128:22
dishonorable 90:2 91:2
  91:14 92:5,11
dispositions 43:2
dispute 103:11,19
disputing 59:10
district 1:1,2 29:5,7,12
  29:14,20
distrust 89:24
division 11:1
document 13:7,13 14:5
  20:11 94:14 107:21
  108:3,7 110:15
  118:15 123:25 124:4
documentation 40:7
documented 13:19
documents 13:23 14:2
  29:17 45:9 84:9
  90:15 115:10,11
doing 16:12 38:23
  48:21 72:5,7,18,22,25
  78:11 81:10 82:1
  97:12
dollar 27:22,25 55:23
  57:10 62:22 63:1
  64:22 66:13 69:23
  71:20 74:7,20,21 75:8
dollars 27:18,21 54:9
  56:16 64:14 65:7,16
  66:7,12,18,22 67:17
  70:5 75:11 96:10
  104:4,6 121:25
Don 8:23 13:2 14:16
  54:7 57:5 72:19 80:8
  81:25 82:12 84:2,3,12
  85:6,15 88:23 92:7
  91:10 92:5,9 94:8
  101:17 105:3,6,16,18

105:22
DONALD 1:10
Don's 14:16 83:24
double 26:5
draft 108:10 109:6
  110:19
drafted 93:16 108:7
  109:6 110:18
drafts 93:18,25 109:3
drill 36:20 37:12 62:9
drilled 37:3
drilling 37:9
Drive 2:7
due 60:3,4
duly 5:1 130:6
duties 5:22

### E

E 3:1,1 4:1,9 5:1,1
  58:14 126:15,24
  127:1,2 130:1,1
earlier 84:7 95:16
  115:5 117:9 118:23
  121:9 124:17 126:14
  127:1
early 70:21 90:7
easier 15:23
economic 8:3 18:11
  20:17 22:1 101:15
  102:1 105:3 109:10
  109:11 122:22
economics 24:8 95:25
  112:24
education 112:23
eight 69:18 100:5,23
Eighth 75:19 76:4
  101:22,24 103:13
  104:21 105:7,19,24
  107:2,8,13 109:21
  110:7,9,12,20 118:24
  119:6 120:10 121:13
  121:16 124:12,16,23
either 16:13 23:10 26:9
  33:19 37:21 52:9
  63:16 74:7 106:6
  124:7
eliminated 66:17 67:10
  109:15
Ellipse 51:13
email 4:12 83:19 84:1,8
  119:18 120:1,2,18,21
  121:1
emails 82:21,24 93:16
employed 5:7
employee 130:14,16
employees 6:15
employment 113:5
enclosed 132:9,10,11
ended 40:16,16,17
  67:21 74:21 96:18

enforcing 39:1
engineering 23:12,16
  23:18 32:7 37:25
  38:3
engineers 60:23
enter 44:24 80:13,24
entered 94:11 98:7
entire 58:24
entirety 104:24 107:4
  110:13
entity 5:14,16 11:8
entryways 127:12
equity 72:10,17 75:7
  79:25
Erica 120:3,6
error 105:14,15 107:16
  107:17 109:16
escrow 18:22 64:15
  66:23
escrowed 67:6,7
especially 54:1 61:21
  123:8
Esq 3:4,14 132:2,25
establishes 103:23
estate 5:17 40:22 85:21
  112:16 113:1
estimate 17:9 37:16,19
  44:5 46:10 122:8
estimated 37:8 128:7
  128:22
estimates 37:20
estoppel 26:15 28:7,9
  48:2,13 49:19 50:4
  51:21 52:23,25 53:3,7
  59:3,8 60:15,18 61:5
  62:2 63:10 117:10,14
  117:19 118:20 123:9
estoppels 25:16,18 26:6
  26:16,17 28:5 47:6,11
  47:20 48:5,12,24
  51:17 52:11 112:3
  127:4,7,19
estoppel's 28:16
et 132:6
evaluating 28:7
evaluation 54:18,23
  55:8,24
event 28:3 52:15 63:9
eventually 41:8 44:1
everybody 91:6 92:13
evidence 103:23 104:14
evidenced 103:24 104:2
  104:7,9,10
evolved 90:9
exact 124:19
exactly 15:4,22 25:14
  39:3,23 70:20 72:8
  115:1 126:15
examination 1:14 4:5,6
  4:7 5:3 117:4 123:23

130:5
exception 112:9,15
exceptions 99:25
exclusively 39:10
excuse 7:17 116:8
executed 43:1
executing 90:15 115:10
execution 84:19 86:8
  86:21 90:10 115:2,8
exercise 23:5
**Exhibit** 18:17 40:13
  50:22 59:7 73:17,24
  77:8 78:7 82:9 94:10
  99:9 106:20,22,23
  109:17,20,21 110:10
  111:3 117:15 118:11
  118:21 119:18,22
  123:24
exhibits 18:15 73:12
existed 88:22
expect 86:13
expectancy 88:11
expectation 12:1 29:13
expectations 24:10
expected 10:3 86:15
expense 111:5
expenses 101:5 108:22
  111:11,20 112:7
experience 19:23 20:4
  20:9 25:17 53:24
  112:14 117:18 125:18
experiencing 85:8
expires 130:24 131:20
extend 74:14
extended 21:11 48:12
  48:14 101:16
extending 74:9
external 56:15
externally 54:22
eye 27:6
eyeball 37:17
eyes 1:18 128:9,12,20
  128:24

_____

F

f 30:10 130:1
fact 13:10 60:21 70:15
  74:13 104:2 108:19
  122:2
factors 26:24 90:4
failing 62:8,9
failure 63:25
fair 11:19
fairly 69:24
fall 31:7 68:3
falling 72:15 82:1
familiar 11:9 19:17
  25:19 29:6 69:16
family 14:16
far 126:21

favor 77:4
fee 88:19
feel 71:16 79:23 92:5
  92:11 122:13
fellow 49:22
felt 12:21,22 13:1,7
  84:18
fiduciary 85:1
fifteen 50:15
**Fifteenth** 67:15 93:15
  94:1 98:20 100:25
  102:4,5 103:12 104:9
  104:15 105:11,25
  106:20 107:12 109:3
  109:6 110:13,18
  111:1,7 118:25
  124:22
fifth 105:24 124:15
fighting 13:2
figure 64:5 66:14 67:3
  83:4,13
**Filing** 132:23
fill 53:16 61:22
final 23:1 96:9 112:8,15
finalized 11:20 12:12
  88:5 95:12
finance 71:24 80:20
  82:3,23 83:9 111:3
financeable 82:2,3,5
financed 29:5 72:5 81:7
financial 40:14 43:20
  113:7,12,18
financially 130:17
financing 38:16 40:6
  45:2 71:20 72:23
  73:1 80:19 85:5
find 42:13 73:9 81:2
  84:8
fine 19:11 49:6
firm 23:12,16,18 32:7
  56:9 79:8
first 5:1 19:3 26:9
  33:19 78:14 108:10
  109:6 110:19 120:8
five 5:18 19:3 46:15
  59:9 69:20 99:24
  103:12 104:21 105:24
  106:25 107:2,8,13
  108:19,21,23 109:23
  110:11,20 117:23
  118:24 119:6 122:24
fix 62:22 121:20 122:15
  123:4 125:5,14
flags 62:19
**Flagship** 113:9
flat 83:13
flip-flop 90:18
flip-flopping 89:9
floor 52:2 126:12
**Florham** 2:7

**Florida** 21:17 41:1,23
  41:24
flow 56:10
flows 55:25
fluid 80:1
focus 113:1
focused 109:10 122:17
following 87:20
follows 5:2
footage 27:12
force 121:17
forces 55:8
foregoing 130:8 131:2
forget 42:7 124:19
forgotten 116:25
form 17:24 18:9 20:10
  22:16 26:10,12,14
  27:1,2 28:8,12 31:9
  31:18 32:23 33:11,17
  34:19 35:1,16 43:6
  48:6,25 49:1 53:8
  56:20 57:18 58:8
  61:1,10,11 65:17
  67:12,18,25 75:12
  77:17 78:25 86:17
  87:12,23 89:25 91:16
  91:23 92:17,23 93:11
  94:21 96:13 99:23
  100:10 101:7 102:13
  104:25 105:12 106:1
  110:14 112:10,17
  117:21 118:1,6 119:9
  124:25 125:7,21
formal 112:23
forth 25:8 29:4 34:18
  39:25 55:25 103:25
  117:19 125:17 130:11
forward 7:20 9:8,15,25
  10:5,19 11:14,17,21
  11:22 14:22 15:15
  16:2,13 17:5,12,21
  18:1,7,17 20:8,18,23
  21:24,24 24:19 30:15
  38:14 39:1,7 44:16,21
  44:23,23 46:1 50:24
  51:3,16 63:8 64:7
  66:5 75:19 76:17,24
  78:23 95:22 96:2,15
  96:16 97:16 98:6,14
  98:24 109:22 112:6
  119:1
found 20:8
foundation 59:12,22
  60:3,5,17,22,24 61:24
  62:3 64:4 117:22
  118:7,12,14,16,20
  119:10 123:7 125:3
  126:23 127:19
four 40:19 43:13 46:17
  50:22 52:2,2 69:18

99:18 106:25
**Fourteenth** 66:4,9,15
  66:21 67:8
four-year 17:3
**FPSA** 28:2 38:19 63:11
  63:15 98:10
frame 39:25 83:8 87:5
**Fred** 96:24
**Free** 1:24
front 8:22 18:15 40:13
  73:12 77:9 82:10
  90:16 106:20,23
  109:18 111:1
**Fulbright** 3:3 132:3
full 43:18
fully 9:10 13:19
fund 5:24 6:1,2,3,5,5,5
  6:7,8,17 7:8,21 8:9,13
  9:13,14,25 10:1,22
  13:8 14:23 15:16,21
  16:3,24 18:14 20:24
  21:2,7,7,21 24:10
  29:7 34:16 35:5
  39:12,16 40:15,21
  42:5 43:5 46:4,8,13
  47:5 70:4,24 84:25
  90:24 91:1 113:9,19
  114:7,10,17,19 115:8
  115:19,25 116:1,3,9
  116:12,13
funded 21:11 41:15
  44:1,15 54:12,13 57:7
funding 12:24
funds 6:3,6 29:15 46:5
further 4:7 101:6
  123:21,23 128:2
  130:8,13
future 7:15 73:9

_____

G

g 1:10,10 34:4
gain 9:9
gained 86:5
**GEIST** 1:21 132:23
general 14:3 32:7 37:18
  37:18 53:9 78:3
  84:10,11 86:2,3,9,23
  89:1 104:11 122:13
generally 29:19 30:5
  34:1 39:4 44:24
  55:11 89:14 93:1
genesis 87:1
getting 11:20 44:3
  73:19 81:5 82:19
give 22:21,22 23:1 32:8
  43:16 54:24 66:3
  100:14
given 56:24 107:7
giving 6:21
gloss 108:24

go 20:15 27:23 28:12
  32:4 39:17 42:12
  49:16 50:7,10 69:25
  80:8 92:8 97:17,22
  98:15 103:10
Goes 102:22
going 9:23 10:21,23
  13:5,12 16:7,18 19:2
  19:7,22 20:15 22:10
  26:8 29:20 30:3
  31:10 57:9,11 71:4,8
  71:10,13,16,20 78:23
  79:9 80:6,23 81:17
  84:11,14,24 85:20
  90:8,21 91:22 96:14
  100:12 101:4,5 102:2
  102:21,22 105:4
  106:12 109:17 126:25
  127:13
good 17:9 25:6 88:15
gotten 37:16 70:6,7
grad 113:4
Granite 1:4 3:10 6:1,5
  6:7,17 7:8 9:14 10:1
  11:2 15:16,19,23 16:3
  16:23 21:6,20 34:16
  40:15 43:5 46:4 47:5
  49:20 64:9 65:15,25
  67:16 70:4,23 74:21
  75:8,10,14,21 78:13
  78:20 81:7 94:19
  98:23 99:9 104:1,3
  110:3 113:23 117:6
  131:25 132:5
Granite's 35:14 120:3
Grant 1:22
great 92:2,3,9
grounds 60:17
group 5:25 6:2,3 17:16
  37:23,25 38:3 43:1
  80:8 81:19 113:8,12
  114:13
Group's 113:19
grow 113:13,16
grows 52:20
GUARANTEE 1:9
guarantees 34:17,24
guess 29:1 87:24
  107:24 125:1
guy 49:17 52:1
guys 81:20

**H**

h 4:9 29:1
half 11:20 15:5,6 53:23
  69:23
handed 124:1
handled 17:15 75:2
  93:20
handles 56:9

happen 12:16 57:11
  62:24,25 71:5,11,13
  71:15 80:6 81:18
happened 5:21 41:6
happening 70:11 71:3
  71:17
hard 17:25 83:23
hazard 126:13
head 95:19
headed 38:3
headquartered 113:12
heard 14:15 18:21
  36:23 50:8 58:21
  122:11
hearing 13:17 28:14
heavily 11:16 21:9
Helix 51:13
help 77:19 83:19
  114:15
he/she 132:17
high 6:13 71:16
higher 122:24
highlighted 52:19
  85:12
highly 128:20,23
hire 54:23
hiring 23:16
historically 80:3
hold 113:22
holdback 64:10 66:10
  66:16,17 67:10
honest 19:7
honor 129:2,7
hope 77:3
hoping 71:14
hours 69:20
huge 123:5,10,10,20
hundred 63:20
HUNTER 1:21 132:23
HVAC 49:14

**I**

ID 4:11
idea 19:12 88:14
identification 119:20
identified 88:21
identify 51:2
Illinois 51:6
imagine 11:4 16:6 23:7
  68:21 69:6
Immigration 43:25
  44:6,13 45:6,9 51:14
impact 84:19 86:21
  123:5
implications 106:2
important 86:16
improvement 66:16,23
  67:9
improvements 29:2,3,8
  29:21 66:11 67:2

inattentive 12:18 13:16
inattentiveness 13:9
incapable 30:23 32:15
  33:7,9
include 15:20 87:16
included 5:15 6:15
  24:21 108:10
includes 5:16
including 99:19
income 120:12
inconsistent 22:17 24:7
  24:16,18
incurred 101:10
Indiana 113:1
indicated 40:19
indirect 122:16 123:12
individual 6:13
individually 99:20
individuals 6:13 74:1
  104:1
industrial 51:11 114:1
industry 97:14
inform 91:25
information 38:6 85:25
  88:20 111:25 128:21
  128:24
inherent 49:9
inherit 27:16 28:19
  57:9
inserted 59:10 105:23
  108:2,4,5
Insights 6:20
inspect 22:19
inspection 23:2,6 35:23
inspections 86:8
install 36:21
instance 23:19 29:10
  30:17 33:4 48:11
institutional 6:7
instructions 100:15
  103:1
intending 71:24
interest 11:3
interested 8:14 19:16
  130:18
interesting 42:13
  121:12
interests 13:14
internally 72:1,5 81:7
  91:25
internet 6:23
interpretation 19:19
interpreting 32:25
interview 6:19,21 7:3
  7:13
invested 6:15
investigate 59:24
investigation 35:19
  36:1,4 38:10 57:16
investment 68:13,20

69:6,8,17,25 70:8
  77:11,16,22 78:1
  79:22 81:1 94:23
  95:2 96:2,21 97:2,17
  98:1,16
investments 9:7 86:21
investor 6:8
investors 6:17
involved 8:7,25 40:5
  64:21 74:24 91:20
  126:22
involvement 99:14
  100:1,8 111:16
involves 27:21
in-house 49:9
Iowa 113:11,13
Ish 116:21
issue 21:6 26:23 28:15
  28:18 31:24,25 32:19
  32:22 33:10,15 44:14
  47:23 48:13 49:11
  52:16,18,18,19,25
  53:2,7,11,13,15,20
  54:14 55:15 56:15,25
  57:3,10,17,19,20
  58:25 60:4,8,12,12,13
  61:12,20,23 62:20
  103:18 117:24 123:2
  123:8,10,13,18
  125:19 126:1
issues 13:9,10 14:12,13
  21:12 31:3 32:4,9
  33:1,2 35:22 36:1
  37:14 38:11 40:20
  41:2 47:19 52:11
  53:25 55:14,17,20
  56:6 58:11 59:25
  60:2 62:4,10,11,11,12
  62:23 63:1 84:15,18
  84:25 88:25 90:8
  126:23 127:6,19
  128:8
item 27:22 75:5
items 13:19 112:20
i.e 63:16

**J**

J 5:1
January 117:14
Jaworski 3:3 132:3
Jay 1:15 2:2 4:4 5:6
  130:5 131:1,9,13
  132:7
Jersey 2:5,7 130:4,23
job 19:2 85:1,22 91:25
jog 7:1
join 5:19
joint 7:4,9,12,15 10:13
  10:15 11:14,18,24
  12:2,8 13:12 14:2,5

84:13,17 85:9 86:15
  86:19,25 87:3,17,20
  87:25 88:1,3,4,8,11
  88:18 90:20 92:1
  95:22 96:16,17,20
  100:6,13,16
JP 80:22
judgment 19:9 21:2
  81:25
jump 82:20
June 40:16
justify 28:21

**K**

Kathy 132:23
keep 46:13 126:12
kind 16:18,19 17:25
  19:12,19,22 23:13,21
  27:8 34:9 37:17
  46:12 50:8 81:20,20
  83:5 85:9 126:22
kinds 30:15
KISH 2:4 130:2,22
knew 56:22 71:15
  76:20 82:6,16 100:11
knocked 52:3
know 6:24 8:13 9:22
  10:24 11:12,17,19
  12:14 15:12 16:4,6,8
  16:12,17 18:21,24
  19:8,10 22:3,22 23:8
  23:18 24:4,20 25:6,7
  26:21 27:3,4,17,18
  28:18 31:10 32:2
  33:12,13,20 35:25
  36:3,4,11,14,16,25
  37:2,5,8,11,24 38:9
  39:6 41:11,19 43:4,12
  45:8,14,16,25 46:3,7
  46:14 47:10,22 48:1
  48:10,15,19,20 49:3
  49:12,16,22 50:22
  52:1,3 53:15 56:17
  60:11 61:18,20,25
  62:22 64:7,17,24
  65:11,14 66:25 67:23
  68:8 70:18,25 72:19
  72:23 73:3 76:25
  77:17,25 79:12,18
  80:4,25 81:1 83:25
  85:5,6 87:4,6 89:1,2
  89:10 91:12 92:8,11
  97:4,24,24 99:1
  101:14,23 102:7,8
  103:4,8 107:12,14
  108:4,6,9,11 109:5
  111:19 112:4 115:7,8
  119:23 122:2,24
  124:21 126:11,21
  127:15

knowing 62:19
knowledge 22:23 26:8
  29:24 30:2 32:3 33:1
  35:11 45:13 50:1,19
  53:13 54:4 56:8 68:7
  69:13 70:19 82:8
  86:5 87:13 94:1,3
  111:6 117:18 124:6
  127:5,18
known 30:4
knows 84:23 91:7
Kralovec 56:13
Krier 56:13

_____ L _____

L 2:4 5:1
lack 9:10,10,14 117:22
  118:7,14 119:10
lag 14:9
Lake 21:19 42:9 43:25
  44:3,10
land 1:8 85:16
landlord 47:23 60:10
landlord's 59:11 61:7
language 20:16 21:3
  59:14 97:10 102:10
  104:7,9 106:2,10,12
  115:16
large 51:24
LaSalle 74:7
lawsuit 28:19 117:6
lawyer 109:2
lawyers 35:14 102:11
  105:23 107:20 108:2
  108:6,9 109:6 110:17
lead 5:25 8:8 17:12
  70:16
leadership 8:1,5
leads 90:5
lease 58:2
leasing 66:11,16,17
  67:10
leave 109:18
leaves 108:24
led 13:15 79:3 89:24
legal 13:18 20:16 50:13
legalities 35:23
Lehman 82:7 85:17
  92:14,16,21,25 93:2,3
  93:6,10
lender 44:25 80:22
lenders 38:24 91:20
lending 38:21
lengthy 69:19
letter 74:8,20,22
  132:13
let's 52:22 59:2 83:17
  85:7 118:10
level 52:20 53:7 114:24
  114:25 115:9,11,12

115:14
liability 27:16 39:12
  49:9,10 52:18
Lieblich 96:24 97:8
Life 8:9,14 116:7,13
light 79:2
limits 33:20
LINDQUIST 3:13
line 119:3
lined 45:2
liquid 123:15,19
list 24:25 25:7 43:15,18
  43:22 50:23
listed 40:22 43:13 44:1
listing 40:18
litigation 63:24
little 9:10 20:25 54:13
  66:4 83:22,23 122:23
LLC 1:5,8 3:21 131:25
  132:5,6
LLP 3:3
loan 40:6,10 65:4 70:4
  74:6 79:9,17 80:9,11
  80:12,15 81:2
loans 38:25 78:8,13
located 58:23
locations 37:5 42:21
long 5:11
longer 64:12 86:25
look 18:19 25:1 27:8
  39:10 47:3 50:20,23
  69:21 74:4 77:13
  79:21 83:21 94:6
  97:10 101:10,12
  102:3 116:24 117:14
  118:10 122:12 123:19
looked 18:22 49:5 50:4
  77:9 95:16
looking 8:22 9:6,22
  15:9 22:25 44:11
  62:18 68:6 77:19
Looks 18:16
lose 62:25
loss 56:23 90:10
losses 13:8 90:24
  101:10,18 105:5
lost 54:6,8 89:2,16
  106:9
lot 8:3 49:12 53:18,18
  53:23 54:2 61:22
  71:3 85:17,18 93:2
  112:3
Lots 62:12
low 16:17
LYNN 130:2,22
L.L.P 132:3

_____ M _____

M 1:11
mail 132:14

major 52:16 56:25
  61:22 112:20 126:1,2
making 31:5 32:20 81:1
man 38:4
managed 113:19
management 17:19
  56:11 84:19 85:11
manager 50:14 114:6
  114:12,14,22 115:18
managers 50:15 92:7
managing 5:10,22
  50:12
manner 86:12
March 111:12 120:14
  120:23 121:6
marked 119:19,21
market 9:16 12:25 13:5
  51:4 52:10 55:8
  56:24 71:15,18,19
  72:4,6,15 76:20,23
  77:3 78:21,22 80:1,21
  84:12 92:3 122:19
  123:16
marketed 8:16 9:10
markets 63:4
markups 26:17
mark-to-market 55:4
material 21:2,13 26:14
  27:1,7,9,19,22 28:15
  47:24,25,25 52:17
  54:14 56:23,25 60:4
  61:9,11,12 62:20 63:5
  84:15,18 85:21
  117:20,23,24 118:4
  118:17 123:3,7
materiality 26:22 27:11
materially 26:10,11
  95:24,25
math 15:12
matter 2:3 20:16 24:13
  53:21 60:13,20,25
  72:6 132:19
maturity 74:9,14
max 14:22 90:17
maximum 9:24 10:4
maximums 9:21
MBA 112:25
mean 7:22 10:14 12:15
  15:8 16:11,14 30:4
  44:20 47:8 50:9,14
  51:23 54:23 61:4
  62:8 66:2 74:11
  76:25 81:24,25 83:24
  94:24 96:25 101:13
  103:10 105:14 114:14
means 68:8 73:18
  132:10
measures 21:10
mechanic 49:17
mechanicals 27:15

meet 8:19 24:9
meeting 69:19
members 14:16 17:18
  49:22
memorandum 68:13,25
  73:24 74:3 76:9
  77:10 95:15
memory 7:2 77:14
mentality 71:7
mentioned 14:12,20
  40:25
merely 122:9
merged 5:14,16 116:17
merger 5:21
merges 16:19
message 83:25
met 8:23 91:10 116:13
metropolitan 8:9,14
  29:5,7,12,14,19 116:7
mezz 79:25
mezzanine 78:15
Midwest 113:17
million 13:1,2,4 15:9,10
  15:13 27:21 37:15
  43:3 54:6,8,12,12,19
  55:23 56:16 57:4,6,8
  57:9 63:1 64:25 65:6
  65:11,16 66:6,12,13
  66:18,22 67:17,22
  69:23 70:5 71:20
  72:20 73:8 74:7,20,21
  75:8,11 76:12 78:13
  78:15 96:10,17,18
  98:4 121:24 122:14
  122:25 123:6
mind 21:15 25:11
  126:17
minimum 98:2
minute 89:13 105:17
minutes 77:22 78:2,5,6
  95:9
misconstrue 89:14
misleading 30:21 31:16
  32:1,14,21 33:3
  104:17
mission 86:10
mistake 107:21,22
  108:13,18 110:21
mixed 18:14 44:4
Mm-hmm 8:12 9:2
  10:8 12:4 14:24 20:2
  25:20 33:24 34:8,11
  36:22,24 44:18 51:7
  51:19 68:16 74:16
  78:16 106:24 107:6
  111:2,13 114:2
  115:24 116:4 119:4
  121:8,22 127:8
Mm-mm 22:8 53:5
  70:12 102:14

moderate 26:20
modification 26:14
  27:1 118:1,4
modifications 48:25
  117:19
modified 26:11,21
Moines 113:11
moment 18:19 83:6
  119:23
money 12:21,23 21:10
  38:21 67:1 78:21
  79:5 84:25 90:19
  92:7
monies 75:18
month 16:12 35:13
  48:2 49:18 69:22
months 11:16 14:11
  97:21,23
Morgan 80:22
mortgage 78:22
move 90:17 122:18
moved 53:18,19,22
  54:2 91:1
moves 77:3
movie 36:12,13
moving 76:20 78:21
  90:9
multiple 6:4
mustn't 82:20

_____ N _____

N 3:1,14 4:1 5:1 132:25
name 5:4 41:19 42:7,12
  58:19,21 117:5
named 38:4
names 42:12,20
narrow 32:17
naturally 85:14
nature 37:17 76:12
near 73:17
necessary 98:14 132:11
need 10:9 19:12 34:12
  62:1 74:4 78:17
  127:11 129:5
needs 62:1
negatively 86:21
negotiate 12:8 17:11
  20:17
negotiated 11:16 13:3
  19:20 21:9 24:23
  40:21 41:3 48:7 99:7
  112:18
negotiating 7:19 68:4
  76:2 99:15 100:2
  115:10,14
negotiation 8:21 12:3
negotiations 7:24 21:16
  64:22 65:24 67:20
  89:24
negotiator 8:8 17:12

neighborhood 104:6
neither 130:13,16
network 6:13
never 12:12 13:22
    40:10,12 42:2,20
    50:15 53:15,21 54:5,6
    56:21 57:14 59:3,13
    63:6,6 70:16 88:1,5,7
    89:10 90:20 94:16
    95:11 109:2,14 114:9
    114:18 123:25
New 2:5,7 130:3,23
NICOLE 2:4 130:2,22
nine 46:19
Ninth 101:24
nlk 131:25
Nope 46:9 49:24 77:21
    94:17 125:15
normal 52:15 97:12
normally 97:17
norms 97:14
notarized 132:12
Notary 2:5 130:3,23
    131:20
note 74:8 128:3
noted 40:3
notes 116:24
notices 35:5,14
notify 22:24 31:2 32:9
    32:11 33:5 55:14
    132:17
November 69:9 77:10
    79:4,19
number 49:19 62:4
    82:16 83:4,16 119:22
    120:22
number's 122:2
numerous 103:25

—————————

            O

object 17:24 18:9 20:10
    22:16 26:6 27:2 31:9
    31:18 32:23 33:11,17
    34:19 35:1,16 43:6
    48:4,6 49:1 53:8
    56:20 57:18 58:8
    61:1 65:17 67:12,18
    67:25 75:12 78:25
    86:17 87:12,23 89:25
    91:16,22 92:17,23
    93:11 94:21 96:13
    99:10,23 100:10
    101:7 102:13 104:25
    105:12 106:1,6
    110:14 112:10,17
    117:21 118:6 119:9
    124:25 125:7,21
objected 47:11 49:20
objection 28:12 49:2
    108:14

objective 27:8
obligated 31:24 67:16
obligates 31:1
obligation 18:14 24:25
    28:4 32:8,11 119:7,14
obligations 98:24
occasion 48:3
occasions 91:10
occur 120:14 123:4
office 50:21 51:5
    113:10,24 132:12,17
    132:18,18
offices 16:4
Oh 16:4 42:9,15 43:14
    51:11 59:5
okay 6:16 7:4 8:19
    10:12 12:17 16:1
    19:5 21:4 24:6,20
    25:11,15 26:4 29:11
    32:18 35:12,25 40:5
    41:19 42:19 43:18,19
    50:16 51:11 54:15
    58:1,13 59:21 60:16
    71:23 73:23 76:1
    78:7 79:12 96:9,22
    106:25 109:17 110:17
    111:16 112:22 115:13
    124:3
old 51:25
once 8:24 27:13 39:7
    49:5 62:24
ones 16:5 43:22 47:6
    95:11 110:18
ongoing 23:13
open 9:16
operated 89:10,16
operates 122:22
operating 75:9,22
    97:13 99:3 100:24
    102:7,19,20,23
    103:20,22 104:5,13
    104:22 105:5,10
    107:9 109:24 110:4,4
    119:8,14 121:5
operations 101:18
opinion 13:13 91:2,8,9
    93:5,12 105:17
    117:17
opportunity 8:18
opposed 9:15 46:4
option 63:16
ORAL 1:14
orally 84:6
order 18:16 128:4
organization 29:12
    37:23
original 7:17 11:17
    28:2 63:8,15 98:6,10
    112:6 132:9,14,15
originally 63:13 84:3

96:15 98:15 116:2
Orlando 21:18
outfit 6:20
outline 11:23
outlines 108:21
outlining 68:14 108:20
outright 86:11
outset 10:25
outside 27:13 71:9
    91:14 92:8 96:21
    97:13
outstanding 112:19,20
overruns 67:1
oversaw 114:13
oversee 5:24
oversight 114:15
overtone 71:10
owe 72:20
owed 65:15 75:8,10,14
    75:17
owned 116:13
owner 47:24 116:8
ownership 11:2,7 72:10

—————————

            P

P 3:1,1
Pac 58:19
Pacific 58:19
pad 59:25
page 4:3,11 19:24
    23:24 24:2,24 25:16
    28:25 30:8,10 34:4
    40:18 43:13 50:22
    75:6 78:7 83:2 99:8
    99:18,24 100:4
    106:25 109:23 111:4
pages 132:14
pages(s) 132:9
page(s) 132:10,12
paid 12:22 66:1 75:17
painful 50:8
paperwork 15:8
paragraph 24:1,2,3,6
    24:11 25:16 26:4
    30:12 31:1,8,23 32:8
    33:22 34:7 59:9,9
    76:11 100:5 103:12
    106:25 109:23,25
    110:2,11,20 111:4
    117:23 124:16
Park 2:7 41:24 42:1
    51:7,9 52:10
parking 53:23
part 23:25 38:15 42:8
    66:15,21 67:8 70:5
    75:7 82:15 87:9
    88:12 99:2,4,5 100:25
    101:3,21 113:15
    114:11
partially 10:13

participate 7:9
particular 16:5,8,10
    19:11 21:8 23:9 25:3
    29:10,23 30:6,17
    34:14 35:10,23 43:23
    46:6,20 47:1 48:10
    50:18 59:14 68:7
    94:4 100:11 106:12
    117:13
particularly 7:2 19:16
    47:13 112:11
particulars 18:11 30:7
    38:1 87:6
parties 12:3,8 67:21
    68:4 81:9 87:11
    94:12 99:19,25 100:7
    102:18 103:20,24
    104:10,12 112:9
    119:13,13 120:10
    121:4,13,14 124:12
    130:15
partner 10:23 88:6
    89:15
partners 10:20 14:18
    84:13,17 85:10,14
    86:5,6,19 88:12,24
    92:2,4
partnerships 7:5,9
partner's 84:22
parts 7:15 22:20 86:20
party 76:24 79:11 80:9
    80:11
party's 121:2
pass 34:21 117:3
passed 97:25
passing 97:7
path 71:8
Patrick 120:2,22 124:7
    124:8,11,21
Patrick's 120:18
Paul 3:4 103:11 106:6
    117:5 132:2
pay 29:20 67:16 73:8
    84:24
paydown 74:8
pegged 66:6,18
people 42:12 60:7
    85:13 91:25 92:1,3,10
    92:15,25 93:2,13
    122:18 123:17 125:25
people's 19:9
perceived 9:9
percent 10:3,5 12:24
    14:21 15:8 63:20
percentage 9:19 11:1
    15:3
percentages 9:23
perception 80:10 85:15
    86:2
performed 30:23 32:16

33:7,9
period 12:25 16:14
    17:1,3 21:11 33:25
    40:16 68:2
person 126:6
personal 13:10 14:12
    14:13 124:6
personally 21:5
perspective 14:10
    15:14
perusal 108:25
Peter 1:11 103:25
    120:17
petty 49:13
phase 115:2
Philip 38:4
phrase 70:25
physically 32:6
Piekarski 23:11 68:12
    68:24 73:25 74:4
    75:3 77:11 81:19
    82:24 83:2,5,12 87:16
    93:20 100:15 104:8
    132:6
Piekarski's 84:5
piers 62:9
pipeline 84:21
place 79:10 81:8
    130:11
placed 107:20,22
    132:15
Plaintiff 1:6 3:10
plan 125:14
plans 20:21 21:1 22:12
    25:12 39:8
played 90:12
please 5:4 92:18 94:7
    99:11 119:22 120:12
    132:12,17
PLLP 3:13
Plus 65:6
pod 44:9
point 90:5 125:4,8
poorly 61:22
popping 51:15
portfolio 9:6 17:18
    51:25 86:20 114:6,11
    114:14,22 115:18
portion 10:22 71:25
portions 36:10
position 5:11 72:10,11
    72:16,17 78:22 80:16
    114:5
positions 89:23
possibility 77:1
possible 49:10 80:23
    85:23,24
possibly 22:22 49:9
    51:18 90:21 96:24
    97:9

post 103:22 104:13
posting 74:21
postponed 48:3
potential 89:15
potentially 63:5
poured 60:6
practice 18:6
precise 29:24 56:8
  65:21 66:20 69:13
  82:8 97:10
precisely 64:19 65:19
  67:13 72:3 75:13
  76:18 81:15,22
  112:11,12
predecessor 15:21
predicated 18:1
preliminary 122:12
premise 24:18
premises 59:24
prepared 68:12,25
presale 44:21,22 45:1,6
  45:7 51:13,14
prescribed 48:25
present 63:15
presentation 96:1
presented 68:19 69:1
  69:12 70:17 78:1
  94:23 95:10,12 96:7
preserve 129:3
pretty 27:10 44:13 79:8
previous 53:24
previously 40:20
price 64:24 66:6,18
  67:21,23 81:3
pricing 9:10
Primarily 6:11,12
Principal 113:7,12,18
  113:20 115:18
principals 8:20 99:20
prior 5:14 12:11 23:4
  65:14 66:9 67:14,14
  95:21 120:23 122:10
  125:17 130:4
pro 108:21
probability 71:17
probably 8:5 15:5,9
  16:7,15 40:11 41:12
  41:18 43:9 46:22,24
  57:22 85:17 92:6
  98:12 124:20 126:14
problem 27:14 31:14
  57:1 58:7 61:25 85:2
  85:9
problems 27:14 30:25
  34:23 35:19 36:5,6
  84:23 85:14,21 86:8
  86:20 88:17,21 89:5
  121:20
procedure 23:21 98:22
  99:3

proceed 25:1
process 85:12 90:3
Professional 132:24
professionals 34:6,25
  35:6,15 122:13
profit 57:8
profits 101:10,18 110:4
program 88:23
project 7:12,12 8:1,15
  8:15 10:14 13:1,16
  27:19 28:10 38:17
  103:21 123:6 125:5
projects 44:9 52:12
  53:25 125:18
properly 62:9,10
properties 9:9,14 16:13
  16:16,23 17:4 21:14
  40:18,19 43:12,19
  46:18 48:23 50:21,24
  84:20 86:11
property 7:8 9:1,14
  14:22 15:16,19,24
  16:3,23 18:2 20:5,7
  20:19 21:6,7,17,21
  22:7,11,15,24 24:9,14
  25:2,5 29:14 31:14
  32:5 33:23 34:16
  35:5,7,20 36:2,7,8,9
  36:20 38:10 39:7,14
  39:24 40:15 41:1,1,20
  42:2,5,6 43:5,24
  45:12 46:4,8 47:5
  50:14 54:10,19 55:9
  55:24 56:3,18,24 57:3
  57:10,17 62:23 67:17
  68:5 70:4,23 73:5
  76:16 84:24,25 86:7
  86:12 88:15 94:13
  101:4,19 111:4
  113:20,22 114:7
  115:19 120:8,13
  122:17,20,21 123:17
  125:10,14,23 128:8
property's 123:14
proposal 36:20 37:12
  68:19 77:14 78:12
  81:6 125:14
proposed 14:4 37:3,6
  68:9,14 69:4 72:13
  83:12 86:14
proposition 79:20
  84:20
proration 111:5,9
prorations 111:11,19
  112:7,14
prospective 11:24 85:9
protect 72:19
protective 128:3
protocol 47:9
proved 90:2

provide 22:13 28:4
  64:8 80:14
provided 34:24 37:20
  47:7 63:9
provides 26:5 29:2
  105:9 111:10
providing 48:18 78:13
  78:20 79:5
provision 17:21,23
  19:25 20:4 22:13
  24:21 25:15 28:25
  29:19 30:9,18 34:4,10
  45:15 99:24 100:4,9
  102:11 103:1 104:15
  104:23,24 105:7,9
  107:1,9,20 108:2
  109:24 111:7,10,17
  128:12
provisions 22:4 63:15
  67:9 94:4 99:21
  100:23 112:6 124:22
Provost 1:10,11 13:16
  82:5,24 83:2 87:22
  88:22 89:7,23 91:14
  107:19 108:1
Provost's 86:1
ptrahan@fulbright.c...
  3:9
public 2:5 29:7,21
  130:3,23 131:20
pull 105:16
pumps 36:21
punch 25:7
purchase 11:3,22 12:11
  18:17 20:8 21:24
  30:15 38:14 39:1
  63:8 64:8,24 66:5
  67:17 70:23 75:20
  79:18 82:23 83:9
  94:13,22,25 96:3
  97:16 98:6,15,24
  101:4 109:22 112:6
  119:1
purchased 17:5 41:5,7
  41:8,9,22 42:3
purchases 17:22
purchasing 11:8
purely 27:5
purpose 38:23
pursuant 21:23 46:1
  50:24 110:2
pursue 11:13
pursued 7:5
push 19:6
pushed 13:6
put 33:15,18,19 49:12
  53:16 66:22 67:1
  73:5 75:7 83:17
  90:16 105:19 108:13
  108:17,17 127:11

putting 21:9 67:22
  74:20
p.m 129:9

Q
quality 18:12 20:22,23
  27:13
quarter 46:18,19
quasi-governmental
  29:11
question 10:24 20:3
  27:4,22 28:14 31:21
  31:22 32:3 40:24
  67:22 81:18 91:11,12
  91:17,23 92:18,19,24
  99:11 105:21 106:9,9
  106:11,12,17
questions 18:19 19:1
  119:3 121:21 123:21
  128:1,2
quickly 85:23
quote 30:11,12 107:1

R
R 3:1 5:1 130:1
raised 53:7 84:6
raises 47:23
ran 113:8
rarely 51:23
rata 108:21
reach 86:23 88:24
read 24:4 30:12 33:21
  83:23 107:5 109:24
  112:1 120:15,24
  131:2 132:18
readily 32:9 94:9
reading 124:4
reads 108:19
real 5:17 40:22 85:21
  112:16 113:1 123:5
really 5:17 7:24 27:20
  30:2 51:24 60:12,13
  61:20 64:3 82:7,19
  84:4 89:11 118:8
  121:12
realty 2:6 7:6 116:11
reason 16:7 45:20 57:1
  57:2 64:6 70:1 88:17
  89:3 101:16 119:5
  123:10
reasonable 48:9 76:14
  76:19 87:14
reasons 12:15
recall 6:21 7:6 11:6,25
  13:24 14:7 15:4,15
  16:1 41:16 64:20
  65:9,19 66:12,19 67:3
  67:5,13 68:22,24
  70:10,15,24 72:3,12
  74:10,13,17,19 75:10

75:13,14,22,24 76:15
  76:18 81:11,19,22,23
  83:18 87:18 95:5,6
  100:18,20 101:22
  117:15 121:23
receivable 75:8
receive 64:14
received 52:12 119:19
  120:7
recession 85:21
recollection 45:23
  65:21 69:3,11 72:1
  77:20 79:8 80:5 82:4
  83:7
recommendation
  100:19 101:19
reconcile 104:2
reconciled 111:12
reconciliation 111:5
record 5:5 42:17,18
records 55:2
recourse 82:12,13,14
  82:15 85:18
refer 15:19 73:16
  119:21
reference 118:11,19,25
referenced 127:16
referring 106:10
  126:12
refinance 68:4,14 69:4
  69:12 70:3,23 71:2,8
  71:10,12,25 81:10
  90:22
refinancing 68:9
reflected 78:2 120:13
refresh 77:20
refreshes 77:13
regarding 22:14 25:16
  30:6 72:13 100:9
regardless 60:18 62:15
Registered 132:24
regular 80:25
regularly 91:9
REIS 6:20
reject 60:18
rejected 50:1,2
rejecting 61:5
relate 25:4
relates 30:18
relating 24:13 47:20
  52:25 64:9,22 67:9
  107:9 109:24 128:7
relationship 86:15 92:4
relationships 85:13
  87:21 92:2,6,9,12,15
  92:21
relative 130:14,16
release 87:2,10,17 94:5
  94:11 97:11,14 99:2,4
  99:9,16,18 104:7

Granite Southlands Town Center v. Alberta Town Center       JAY ALEXANDER

released 73:11 98:23
releases 100:1
releasing 122:21
relied 23:19
relieved 119:7
remedial 125:10
remedies 35:3
remedy 63:9 64:9
remember 7:2 11:5
  46:9 66:13 70:1
  74:12,23 75:25 81:15
  83:20 101:23 117:10
  118:8 119:2 121:21
  128:17
remove 36:21 37:12
renting 52:2
rents 120:7
repaid 38:25
repair 59:12
repairing 128:8
repairs 128:23
replace 80:12,22
report 43:20,21,22
reported 6:20
Reporter 2:4 12:5
  42:18 130:3
Reporters 132:24
repositioning 9:5
represent 107:11 117:6
representation 30:20
  31:6,15 32:13 100:5
representations 22:14
  25:4 32:19 45:11
representing 120:4
reputation 63:3 122:17
request 74:6 101:17
requested 87:15
require 25:17
required 26:10 28:8
requires 34:5
Research 5:17
residential 51:12,21
  113:25 114:1
resolution 48:4
resolved 47:20
resort 93:7
resources 73:8
respect 8:1 33:22 52:9
  52:11 124:23
respond 14:6
responded 13:22 14:1,8
  120:18
responding 84:2
responds 83:5
response 34:12 124:8
responsibilities 19:15
responsibility 50:12
  59:12 61:6,7,16 62:15
responsible 58:1 60:21
  60:24

restate 27:3 40:24
restructure 80:15
result 24:13 31:16
  32:21 61:25 67:20
retail 6:5 9:7 26:2
  42:10 47:5 50:21
  51:4,8 71:20 113:24
Retained 4:12
return 79:24 132:12
revenue 105:10
review 24:3 55:11 76:6
  119:23 132:17
reviewed 119:25
reviewing 93:18
reward 79:20
right 6:8 11:10,24
  14:23 21:14 23:1,4
  24:2,12,15 26:6 28:14
  28:20 30:4 33:4 34:3
  39:4,18,23 42:4 44:9
  47:7 50:6,20 52:22
  54:18,24 55:3,5,21,22
  56:19 61:8 63:12
  64:10,11,13,14,17
  65:4,7,23 67:5 70:21
  72:4 76:3,5,8,9,25
  77:8,9 78:9 80:17
  82:9 87:8 88:9 94:10
  95:8 98:18,19 99:8
  101:21 102:24 103:3
  105:14 107:5 108:12
  109:1,8,9 110:23
  112:5,13 114:20,23
  115:1,4 116:5,15,21
  116:21 121:11 123:15
  125:2,11 126:16
  127:8,24 128:18
rights 23:5 28:3,6
  34:24
risk 63:24 76:24 79:20
  79:23 80:16 82:12
  85:11
roads 29:3,21
role 5:25 7:16,19 8:1,5
  93:17
romanette 26:5
Ron 96:25
Roughly 17:6 67:19
rugs 125:25 126:12
ruin 62:23
run 63:24 116:1
running 40:2 52:1

                S

S 3:1 4:9
safety 126:1
sale 11:22 18:18 20:1
  38:14 39:1 63:8 64:8
  66:5 75:20 98:6,15,24
  109:22 112:7 119:1

sales 46:25 96:3
Salt 21:18 42:9 43:25
  44:3,10
satisfaction 49:15
satisfactory 20:19
save 18:24 50:3,9
saw 50:10 109:3
saying 39:3 46:22 61:2
  86:18 87:5 93:12
  99:6 105:20 112:3
says 19:25 103:8
  104:19 107:1 120:6
  120:21,22 124:4
sbennett@linquist.com
  3:19
schedule 40:22
scope 19:14
sealed 132:15
second 33:4 78:14,15
  83:1
section 24:1 30:10,10
  104:21 105:24 107:1
  107:8,12 108:10,19
  108:21,23 118:24
  119:6
secure 38:16
see 32:7 34:7 43:24
  50:15 59:2 60:5
  61:19 77:13 99:12
  111:22 118:9
seen 30:14 40:10,12
  51:23 53:2 56:21
  59:3,13 94:13,16
  112:4 123:3,25 124:2
  125:13
sell 46:16,18 90:21
sellable 123:11
seller 20:5 25:18 26:7
  28:3,17 30:20,22 31:2
  31:5,15,24 32:2,12,20
  33:5,6,8 34:5 47:7
selling 20:5
sent 35:5,14
sentence 33:19
separation 127:11
September 130:24
series 82:21,23 93:16
serving 120:2
session 7:3
set 9:22 18:13,15 73:15
  117:19 130:11
setting 8:25
settle 48:1
settled 49:11
settlement 57:10 58:7
  58:25 59:18 111:22
  120:9 123:17 125:19
  127:14 128:13
settling 36:7 53:11,15
  53:20,25 56:25 57:16

57:19 58:10 59:22
  62:24 121:20 123:1,2
  123:13 125:16 128:8
seven 19:24 51:10
  100:4
share 75:21 101:5
  102:2,6,19,23 103:20
  105:5,10 110:3
shared 89:19,20 91:3,5
  91:13,19
sharing 91:6 100:24
  101:9,17 107:9
  108:21 109:12
sheet 43:8
sheets 132:11
sheet(s) 132:12
shoes 115:6,7
Shopping 51:7 52:24
short 116:24
shortly 69:14,14 81:8
show 7:1 86:8
showed 40:9 49:25
  93:25
side 8:9 16:17 51:5 71:5
sides 12:19 13:11 90:12
Sierra 51:7,9,18 52:10
sign 13:12 20:20 22:20
  49:7,17 90:23,25
  94:18 97:6,14 132:18
signals 29:4
signature 131:13 132:9
  132:10,10,12
signed 13:21 76:7 87:10
  90:20 94:9,10 96:20
  98:10 124:17 132:12
significant 13:21 14:9
  14:10 52:5 122:23
signing 13:7
Silva 23:11 68:12 73:25
  74:5 75:3 77:11
  81:20 93:21 94:18
  100:15 126:8,9,10,17
  127:10,16 132:6
Silva's 127:20
similar 81:13,16 85:8
  95:16
simply 24:10 57:12
Sincerely 132:20
sinking 60:2,11
site 20:21 29:2,3 36:7
  42:24 53:16,17,19
  54:2 58:25 59:25
  60:2 61:22 62:11,20
  125:17,23 126:3
sits 123:19
situation 74:6 80:13
situations 53:22
six 5:12,15 46:17 51:10
  69:20 111:4
sizable 15:13 21:10

sizably 74:23
size 70:7
skipped 30:9
slash 9:14
slippery 13:6
small 53:21
smaller 58:10
smells 108:25
sneaky 108:20
soil 62:11,22
soils 59:22 60:9
sold 16:15
solely 124:4
somebody 108:20
somewhat 24:6 59:16
sorry 41:25 126:9
sort 16:16,17 19:18
  27:6 49:10 57:16
  93:6 100:14 101:9
  102:2
Sound 11:10
sounds 11:9
source 38:25 93:7
South 3:16
Southgate 51:4,18
  52:10
Southlands 1:4 3:10
  7:11 8:15 48:11
  49:21 52:24 121:20
  128:23 131:25 132:5
space 27:14 49:13 52:8
  53:11 58:14,23 60:2,8
  127:14
spaces 122:21 125:24
  127:12
speaks 20:11 103:15
  118:15
specific 13:23 18:2
  85:25 88:20 90:4
specifically 18:23
specifications 22:12
  25:13
specified 29:16
specs 18:13 20:21 27:13
  39:8 88:16
speculating 81:24
speculation 108:15
  125:4
spend 96:10 112:3
split 119:14 120:9
spur 83:5
square 27:12 44:10
squirrely 86:7
SSR 116:15,17
stack 73:12
standard 17:20 18:6
  19:18,19 23:21 30:13
  34:9 47:8 97:13
  98:22 99:3 111:9
  112:13

start 62:21 63:2 89:4
started 13:5 86:6
starting 18:16
starts 83:1 84:9
state 2:5 5:4,16 109:11
  115:23 123:16 130:3
  130:23 131:15
stated 53:10
statement 42:25 59:10
  59:17 120:9
statements 40:14 43:21
  111:23
states 1:1 110:16
status 22:24 35:18
statute 132:13
stay 10:23
stenographically 2:3
  130:10
step 49:10
stepping 125:24
steps 80:15
Steve 8:17
stigma 122:19
stop 34:1 125:25
straight 96:19
strategic 114:15,25
strategy 5:25 7:5 8:3
  9:1,4,7,12,13,15,16
  9:20 11:13,17 84:16
  85:3 86:18,23 87:5,19
Street 1:22 3:15 5:16
  115:23
strike 7:17 38:13 63:7
strong 92:6
structure 9:8 72:9 79:2
  79:3,22 82:11,15
  84:17 86:24 98:3
  114:12
structured 9:11
Stuart 3:14 132:25
stuff 85:2,17 115:8
sub 36:21 37:12
subject 7:6 12:2 17:22
  21:15 22:11 74:10
subjective 26:22 27:5
  27:11 71:9
Submarket 44:10
submarkets 42:21
submitted 14:5 35:24
  77:15,18 95:2
subparagraph 23:25
  29:1 33:15 34:4
subscribed 131:14
subsection 30:10
subsequent 41:14 56:2
  56:7 64:16 98:5,10
substantial 25:9 70:7
  71:25
substantially 25:5
substantively 96:4

subterranean 32:5
sued 104:3
sufficient 28:10,21
  60:17 63:18 95:24
suggest 104:14
suggesting 92:20
  105:18,22 106:2
  107:19 108:1
Suite 1:22 2:7 3:6,16
  132:4
Summer 68:3
Sun 58:19,19
supervising 38:10
supervisory 7:25
supposed 20:22 33:5
  39:15 45:5 119:16
sure 23:15,23 25:9,14
  26:3 30:16 31:4 38:8
  39:20 40:1 43:11
  44:13 45:24 54:25
  59:5 62:5,7,13 70:9
  71:6 83:23 87:16
  89:17 94:8 95:1,4,6
  100:16 110:25 111:10
  116:24 126:15,16
surely 95:13
surface 36:21 37:13
surpluses 102:20,23
  105:5 109:13
switched 70:22 85:4
sworn 5:2 130:6 131:14

**T**

T 4:9 130:1,1
tab 94:6
take 5:25 18:18 59:4
  74:3 77:13 79:9
  80:21 81:8 84:24
  86:10 105:8 107:7
  116:23 118:10 119:22
  122:8 129:4
taken 2:2 59:6 72:15
  117:2 130:10
takes 76:25
talk 42:16 52:22 56:14
talked 6:24 7:4 91:9
talking 48:15,16 80:19
  80:20 127:10
talks 111:4
target 15:11
taxes 112:9,16,19
team 13:17 17:19 49:22
  81:21
technical 78:4
tell 30:7 31:24,25 33:1
  33:3 46:22 50:23
  51:2 89:7 112:22
telling 62:14 89:4 98:17
  126:4,18
ten 12:24 53:17 69:18

113:9
tenant 26:6,15 28:4,7
  47:6,11,20,22 48:5,12
  48:24 49:4 51:17,20
  51:24 52:5,7,11 58:15
  58:17,18,20 59:9,17
  60:1,1,7,8,21 64:9
  66:10,16,23 67:2,9
  126:1 127:6,12,19
tenants 25:19 26:2
  49:12 51:21 53:10
  58:10,10 61:21 63:2,4
  122:18 127:4,7
tenant's 59:11 60:23
  61:6,16,18
tendered 26:6
term 103:21
terminate 24:12 28:5
  63:11,17,18 64:13
  88:10 102:9
terminated 63:23
terminates 87:3 102:6
terminating 28:10,21
Termination 87:2,10
  94:5,11 107:3
terms 9:24 11:23 19:23
  40:6 78:22 88:8
  94:22 95:24 99:15
  100:2 125:2
testified 5:2 81:20
  121:23
testify 106:4 130:6
testimony 2:2 81:14
  84:5 107:17 108:16
  110:21 117:11 119:2
  121:25 124:3 128:6
  129:1 130:10 131:4
Texas 3:7 132:4
thank 10:12 15:2 34:14
  78:19 102:17 114:5
  123:22 128:1 132:19
that'd 6:4
theatre 36:12,13
thing 13:6 59:22 72:18
  86:9 90:9
things 12:19 27:8,15
  30:5 89:14 98:20
think 8:16 14:15,17,18
  18:23,24 23:10 27:10
  27:21 39:3 51:13
  56:11 61:17,18 64:2,3
  64:3 70:25 71:3,6
  73:7,11 83:6 86:3,4
  87:24 89:3,7 90:2
  91:7,8 92:12 93:2
  98:13 103:23 104:14
  105:13 108:20,25
  115:5 116:14 123:14
  127:25 128:11
thinking 12:16 62:21

80:6
third 79:11 80:9,11
thought 43:21 49:6
  57:6,7 84:2 90:25
  121:10,24
thoughts 83:3
three 16:18 44:8,11
  46:18 78:8,13 99:8
  124:17 128:5
Thursday 2:8
till 11:12
time 8:20 9:5 11:20
  12:7,7 13:3,21 14:4,9
  14:15 16:14 17:1,3
  18:25 21:11 26:21
  32:2 39:25 40:1,2
  41:17 45:4 46:21
  47:17,18,22 50:3 55:7
  55:16 57:4 65:2
  66:11 68:2 71:19
  72:14 74:4 76:6,13
  78:11 79:21 80:7,9
  82:5 83:8 84:16
  86:14 87:5 88:3 89:1
  89:12 90:13 96:2
  98:6,9,11 112:3,19
  116:7 125:19 130:11
timeliness 90:14
times 13:18,21 26:20
  27:11 53:17,18 86:4
  90:15 93:3 97:3
  115:15,15 122:24
timing 39:15
title 1:9 5:9 25:6
today 18:25 44:5 72:19
  123:20 124:1,2 127:1
  128:7
told 23:11 53:6 81:13
  89:23 126:6
Toll 1:24
top 52:1
tossed 71:5
total 15:6 45:19 65:25
  89:17
totalling 43:1,2
totally 91:1
Tower 7:21 8:9,13 9:13
  9:25 15:20 116:3
Town 1:4,8 3:11,20
  128:23 131:25 132:5
  132:6
track 46:13 106:9
traffic 29:4
Trahan 3:4 4:6 17:24
  18:9 20:10,14 22:16
  27:2 28:12 31:9,18,20
  32:23 33:11,17 34:19
  35:1,16 42:14,16 43:6
  48:6,14 49:1 53:8
  56:20 57:18 58:8

59:4 61:1 65:17
  67:12,18,25 75:12
  78:25 86:17 87:12,23
  89:25 91:11,16,22
  92:17,23 93:11 94:21
  96:13 99:10,23
  100:10 101:7 102:13
  103:7,14,18 104:25
  105:12,21 106:1,8
  108:14 110:7,14
  112:10,17 117:4,6
  123:21 124:25 125:7
  125:21 128:2,14,16
  128:19 129:2,6 132:2
  132:8
transaction 8:11 9:11
  12:20 15:5,14 16:10
  16:12 18:18 19:11
  23:5 25:25 27:20
  29:23 30:3,6 42:25
  47:10 49:21 50:17
  52:24 68:14 70:3,6,22
  78:9,24 79:9,14,17,22
  80:16 81:3,17 82:22
  87:9 88:13 90:12,17
  91:21 94:25 95:10,17
  96:9 99:5
transactions 21:4 44:2
  44:12 46:19 68:10
  69:19,21 72:16 85:16
  86:24
transcript 2:1 130:9
  132:15,16
transcription 131:3
transcripts 128:5
transcript(s) 132:10
tricky 16:18
tried 12:23
trip 127:13
tripping 125:25 126:13
tri-party 44:24 45:5
Trolley 44:10
true 107:11 122:22
  130:9 131:3
trued-up 119:16
true-up 102:2 103:22
  104:2,13 119:8
  120:13,23 121:5,14
truly 88:5
trust 90:1
trusted 89:2
truth 89:4,8 130:6,7,7
try 79:22 80:10 85:2
  86:24 89:12 104:4
trying 10:2 12:22 13:11
  18:24 19:6 50:9 57:5
  59:23 71:1 79:16
  80:15,21 104:1
tweaks 49:17
twice 8:24

**two** 6:6 21:14 22:17
  30:22 32:12 33:14
  46:18 51:16 62:25
  78:7 81:8 97:21,22
  109:23 126:21
**type** 20:4 77:16
**types** 113:21
**typical** 18:5,6 35:2
  38:22 46:16 47:21
  49:12 52:7 72:18
  78:11
**typically** 20:8 46:15,17
  47:19 49:5 51:20
  67:7 69:20

**U**

**ultimate** 11:14 12:2,11
  62:15
**ultimately** 14:8 84:23
  122:5
**undergrad** 112:24
  113:4
**understand** 15:20
  19:10,13 31:19,20,22
  79:16 101:8 110:25
  117:7
**understanding** 24:17
  26:13 34:15 81:6
  119:12 121:2 127:3
**understood** 15:22
  71:23 121:18 129:6
**undertake** 58:6
**undertakings** 38:15
**underwrite** 39:13
**undiscernible** 64:4
**unfinanceable** 71:21
  85:6
**unhappy** 93:9
**unique** 19:20
**uniquely** 19:20
**UNITED** 1:1
**University** 112:25
  113:2
**unresponsive** 86:7
**untrue** 30:21 31:16
  32:13,20
**use** 29:6 55:1
**usual** 17:20 112:21
**Utah** 40:23 41:1,23
  42:6,8
**utilities** 29:4
**utilization** 9:24
**U.S** 113:20,22 114:6
  115:18

**V**

**v** 132:5
**vaguely** 74:11
**value** 10:22 54:24 55:1
  55:5 57:6 63:5 76:23

84:19 122:25 123:5
  126:2
**valued** 54:22
**value's** 54:11
**various** 104:1 115:15
**varying** 89:23
**VENNUM** 3:13
**venture** 7:4,9,12,15
  10:14,16 11:14,18,24
  12:2,8 13:12 14:2,5
  84:13,17 85:10 86:15
  86:19 87:3,17,21 88:1
  88:1,3,4,8,11,18
  90:20 92:1 95:22
  96:16,17,20 100:6,13
  100:16
**ventures** 86:25
**versus** 93:3 108:19
**view** 23:13 26:24 60:14
  60:16 61:9 63:19
  85:20 89:18,18,20
  91:3,13,19 93:6
  105:14
**viewed** 97:2
**visit** 125:23 126:3,6
**volatility** 11:19
**volume** 10:4 15:5,6
  46:8
**vote** 89:17
**voted** 78:4
**vs** 1:7

**W**

**W** 112:25
**Wachovia** 80:23
**wait** 91:11 92:18,19
  99:10 105:21
**walls** 32:5 52:4 62:10
  125:23 127:11
**want** 20:12 28:19 73:14
  79:13 80:10 81:14
  82:17 86:19 98:21
  102:3 109:13
**wanted** 9:19 80:8 88:10
  90:19,25
**wants** 83:4
**warm** 49:13
**warrant** 28:10
**warranties** 20:6 22:14
  32:19 34:5,17,20,21
  34:24 45:11
**warrants** 25:2
**warranty** 30:20 31:15
  32:13
**wasn't** 12:13 71:4,10
  71:13 78:4 80:11,19
  80:23 95:20 98:13
  101:2 124:18
**water** 36:21 37:13
**way** 16:20 17:6 23:8

31:12 32:6,10,17
  33:21 47:2,3,21 57:22
  62:18 69:3 70:19
  83:17 97:1 98:12
**ways** 102:22
**web** 42:24
**Weber** 120:3 124:8
**week** 69:20
**weeks** 81:9
**wells** 36:20 37:2,6,9,12
**went** 12:25 13:13 16:21
  41:12 54:7 59:23
  63:1 67:24 69:6
  74:23 85:12 93:10
  95:23 123:16
**weren't** 43:9 50:2
  55:17
**we're** 44:11 57:9 72:9
  73:18 82:19
**we've** 11:15 35:24
  53:21 62:22 80:2
  84:8 122:18 123:3
**white** 94:5
**wife** 14:17
**wish** 50:9
**witness** 4:3 20:12 42:15
  42:19 103:9 106:6
  117:3 132:17,17
**word** 105:8
**wording** 118:17
**wordsmithing** 26:20,20
  49:4,6,11
**work** 10:18 13:11
  49:14 93:1,2,3,4
  125:10
**worked** 113:7
**working** 12:19
**worse** 125:19
**worth** 13:1 76:11,16
  77:5 80:14
**wouldn't** 18:3,10 24:10
  30:7 32:6 45:13
  51:20 52:14 57:7
  59:20 61:3 70:1,8
  72:6 82:2 89:7 91:5
  91:24 92:1,8 127:13
**write-down** 56:7
**write-downs** 56:3,17
**writing** 26:18 83:2
  124:11
**written** 32:10 76:10
**wrong** 39:5 60:6
**wrote** 108:10
**www.huntergeist.com**
  1:25

**X**

**X** 4:1,9 5:1

**Y**

**Y** 5:1
**yeah** 5:21 6:14 8:4,10
  8:12 12:15 15:25
  16:11,15,25 17:10,25
  22:1 23:7,17,23 24:4
  24:15 26:3 29:9 34:1
  34:20 36:12 39:23
  40:1,25 43:14,18 44:7
  47:14 48:7 49:16
  52:7,21 54:11,21,25
  55:6 56:1 58:4,17
  60:6 61:3 62:7 63:13
  63:13,20 64:2 65:5
  73:2 74:2,11 75:16
  77:2 85:19 88:14
  90:1 93:22 95:14
  102:24 110:1 115:15
  116:1,21 126:10
**year** 10:2,6,7 14:21
  15:3 16:10 40:15,17
  43:23 46:16 47:1
  113:3
**years** 5:12,15,18 16:18
  18:23 19:3 46:15
  50:5 52:3 62:25
  113:8 115:17
**Yee** 38:4
**yep** 6:9 7:7,10 8:22
  17:17 21:22 25:24
  37:14 38:5 54:1,1
  56:4,14 68:6 69:10
  74:11,18 75:4 77:2
  78:10 110:5 118:16
  124:5
**yesterday** 104:8

**Z**

**zero** 71:22,23
**Zuzack** 96:25 97:8

**$**

**$1** 15:9 69:23
**$1.5** 43:1
**$10** 63:1 122:25 123:5
**$100** 54:11 72:21
**$130** 54:19 55:23
**$140** 76:12
**$160** 13:1,2 15:8,12
  27:21 54:12 57:9
  66:6,18 67:17,24 70:5
  71:20 72:20 73:8
  96:10,17,18 98:3
**$161** 64:25 67:22,24
**$172** 13:4 57:5
**$190** 13:1 57:6
**$2** 37:15 121:24 122:14
**$2,000** 62:25
**$2.15** 65:6,11
**$2.6** 75:8,11
**$20** 123:5

**$200,000** 62:21
**$3** 37:15 65:15 121:24
  122:14
**$3.2** 66:22
**$30** 57:4,7
**$30.4** 78:14
**$32** 74:7,20
**$350** 15:10,13
**$400,000** 104:3,6
**$49.6** 78:14
**$50,000** 27:18,22,25
**$60** 54:6,8 56:16
**$650,000** 64:14,18,22
**$7** 74:21
**$86** 62:12,13
**$80** 78:13
**$850** 43:2
**$90** 57:6

**0**

**04** 116:22
**07932** 2:7
**08** 71:22
**09-CV-00799-ZLW-...**
  1:3

**1**

**1** 73:21 118:9
**10** 17:8 46:25 130:24
**10.6** 29:1
**101** 18:17
**102** 40:13 50:22
**11** 23:24 24:2 111:4
  120:1,8 124:13
**117** 4:6
**119** 4:12
**12/11/2008** 4:12 119:19
**12:04** 129:9
**122** 77:8 78:7
**123** 4:7 73:17,22,24
**128** 82:9,18
**13** 113:8
**130** 4:12 119:18,22
  123:24
**14** 130:25
**15** 17:6 18:23 47:1
  74:15
**16** 30:8,11 34:4 96:25
  97:2 132:1
**17** 24:24 43:2
**17th** 3:15 77:10 79:19
**170** 16:15,22 17:4
**18** 25:16
**1800** 3:16
**1900** 1:22
**1987** 113:4
**1992** 113:4
**1994** 115:20

**2**

**2** 75:5 118:11,21
**2nd** 79:19 82:25 83:8
**20** 17:8 46:24,24 69:21
**20-some** 46:23
**2000** 116:19
**2003** 115:20,23
**2005** 5:20 6:19 7:13
   10:7 14:21 15:3,17
   16:3,5 116:20
**2006** 16:6
**2007** 40:17 41:15 85:22
**2008** 40:16 42:25 43:10
   45:19 46:8 68:3 69:9
   70:22 74:15 76:10,15
   76:21 79:4 82:25
   93:17 118:5,20
   119:15 120:2,23
   121:6 124:13,18
**2009** 41:13,18 111:12
   117:14 120:14 121:6
**2010** 1:16 2:8 85:22
   130:25 131:16 132:1
**2011** 130:24
**2400** 3:6 132:4
**25** 10:3 17:7 28:25

---
**3**
---
**3** 59:7 117:15
**3rd** 79:19 82:25 83:8
**30** 40:16 69:21 132:13
**300** 2:6,7
**303** 1:24 3:18
**31** 40:17 111:12 120:14
   120:23 121:6
**35** 10:5 14:21 47:2
**37** 106:20,22,23 111:3

---
**4**
---
**4/08/10** 131:25
**40** 15:8,8
**43** 43:1,4 45:18,25
**474-5201** 3:8

---
**5**
---
**5** 4:5
**5.3** 24:1
**50/50** 101:10 105:6
   120:9
**512** 3:8
**525-8490** 1:24
**54** 109:17,20,21 110:10
**573-5900** 3:18
**59** 94:6,10 99:9

---
**6**
---
**600** 3:5,15 132:3

---
**7**
---
**7.2** 30:10
**70ish** 6:18

**78701** 3:7 132:4

---
**8**
---
**8** 1:16 2:8 17:7
**8th** 124:18
**8(k)** 25:16 26:4
**800** 1:22,24
**80202** 3:17
**80203** 1:23
**832-5966** 1:24

---
**9**
---
**9:04** 2:8
**90/10** 11:7
**94** 115:20



Deposition of:

**JAY ALEXANDER**

Granite Southlands Town Center, LLC
v.
Alberta Town Center, LLC, et al.

April 8, 2010

Case Number
09-CV-00799-ZLW-KLM

H+G

Hunter + Geist, Inc.
303.832.5966

Disk Contains:

· ASCII
· E-TRAN
· H+G Services.pdf

WWW.USATABS.COM 800-498-6162

As of April 16, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-00799-ZLW-KLM

GRANITE SOUTHLANDS TOWN CENTER, LLC,

Plaintiff,

v.

ALBERTA TOWN CENTER, LLC,
LAND TITLE GUARANTEE COMPANY,
DONALD G. PROVOST, ALLAN G. PROVOST,
and PETER M. CUDLIP,

Defendants.

---

### MASTER INDEX OF EXHIBITS

---

I N D E X

Deposition of Jose Inclan, January 6, 2009:

1   Exhibit H Form of Estoppel Certificate

2   Estoppel Certificate, 5/12/08

3   Estoppel Certificate, 1/13/09

4   E-mail to Bellio, McFarland from McGee,
    6/20/08, Subject:  RE:  Southlands
    Cinema, with attached e-mails

5   Gmail to Joe, Me, Melissa from Inclan,
    7/2/08, with attached e-mail

6   E-mail to Mydlowski from Inclan,
    7/17/08, Subject:  Cinema

7   Gmail to Joe, Me, Mark from Suedkamp,
    9/8/08, with attached e-mails

8   Letter to Bellio from Guikema and
    Suedkamp, 9/8/08, Subject:  Settlement
    Pac Sun, Theater, Southland Development,
    Aurora, Colorado

9   Letter of Transmittal to Kerasotes
    Theatres from Kellogg, 9/12/08, Re:
    Southlands Cinema

10  Letter to Inclan from Policicchio,
    9/16/08, Re:  Colorado Cinema, 23955
    E. Plaza Ave., Aurora, CO 80016

11  E-mail to Inclan from Mydlowski,
    9/23/08, Subject:  FW:  Cinemia
    Building Movement, with attached e-mails

12  E-mail to McFarland from Inclan,
    9/24/08, Subject:  Accepted:  Southlands
    Cinema geo-technical

13  Southlands Meeting Agenda

14   Letter to Cinema Group, LLC and
     Providence Equity Partners, Inc., from
     Kahn, 10/24/08, RE:  Colorado Cinema,
     23955 E. Plaza Avenue, Aurora, CO 80016

15   Gmail to Me from Inclan, 11/4/08, with
     attached e-mail

16   Letter to Inclan from Martin/Martin
     Consulting Engineers

17   Letter to Inclan from Estenssoro,
     11/19/08, Re:  Proposal for Engineering
     Services, The Shops at Southlands Mall,
     Aurora, Colorado WJE No. 2008.5358.P

18   Gmail to Jose, Me, Michael, Robin from
     Kralovec, 1/6, with attachment

19   E-mail to Kralovec from Zezulak, 4/16/09,
     Subject:  Town Center True Up - Original
     Budget Variance Reports pdf, with
     attachments

Deposition of Peter M. Cudlip, January 7, 2009:

20   E-mail to Inclan, Deeter from Bellio,
     4/4/08, Subject:  Re: Bldg. E, Suite 235,
     with attached e-mail

21   E-mail to Inclan from Bellio, 6/2/08,
     Subject:  RE:  Colorado Cinema at
     Southlands, with attached e-mails

22   E-mail to McFarland, Bellio from McGee,
     6/20/08, Subject:  Southlands Cinema,
     with attached e-mails

23   E-mail to Cudlip from Bellio, 6/30/08,
     Subject:  FW:  DCC Interior Damages
     Ltr 062508, with attached e-mails

24   Gmail to Joe, Me, Melissa from Inclan,
     7/2/08, with attached e-mail

25   Letter to Bellio from Guikema and
     Suedkamp, 9/8/08, Subject:  Settlement,
     Pac Sun, Theater, Southlands Development,
     Aurora, Colorado

26   Letter to Inclan from Policicchio,
     9/16/08, RE:  Colorado Cinema

27   E-mail to Cudlip, Inclan, Bellio,
     McFarland, Deeter from McGee, 9/23/08,
     Subject:  RE:  Cinema Building Movement,
     with attached e-mails

28   Letter to Policicchio, Silleck, Wilde
     from Kahn, 10/24/08, RE:  Colorado
     Cinema

29   E-mail to Cudlip from Inclan, 10/29/08,
     Subject:  Building Movement

30   E-mail to Kralovec from Inclan, 1/15/09,
     Subject:  Forensic Engineers Proposals

31   E-mail to Cudlip from Inclan, 11/4/08,
     Subject:  FW:  Forensic engineer, with
     attached e-mails

32   Letter to Inclan from Martin/Martin

33   Letter to Lund and Neff from Accurate
     EngiSurv, LLC, 11/20/08, Subject:
     Monitoring Services, Southlands Town
     Center, Aurora, CO

34   Letter to Silva and Litt from Flowers,
     11/21/08, Re:  Southlands Town Center,
     Aurora, Colorado (the "Property");
     Forward Purchase and Sale Agreement and
     Escrow Instructions dated as of
     September 29, 2005, by and between
     Alberta Town Center, LLC, a Colorado
     limited liability company ("Alberta" or
     "Seller"), and BlackRock Granite Property
     Fund, L.P., a Delaware limited liability
     partnership ("Granite" or "Buyer")
     (as amended, the "Purchase Agreement")

35   Invoice from Construction Logic, L.L.C.
     to Southlands Management, 11/26/08

36   Letter to Kahn from Schmetterer, 12/18/08,
     Re:  Colorado Cinema

37   Fifteenth Amendment To Amendment And
     Agreement And Termination Agreement,
     12/8/08

38   E-mail to Cudlip, dgp@albdev.com,
     Piekarski from Silva, 2/18/09, Subject:
     Re:  Escrow Release, with attached
     e-mail

39   E-mail to Don Provost from Cudlip,
     2/24/09, Subject:  Re:  Sorry I missed
     you, with attached e-mails

40   Letter to Donald Provost, Fred Pillon,
     Drew Flowers from Smith, 2/24/09,
     Re:  Southlands Town Center,
     Aurora, Colorado ("Property"); Forward
     Purchase and Sale Agreement and
     Escrow Instructions dated as of
     September 29, 2005, between Alberta
     Town Center, LLC, ("Alberta" or
     "Seller"), and Granite Southlands
     Town Center LLC, a Delaware limited
     liability company (as designee of
     BlackRock Granite Property Fund, L.P.,
     a Delaware limited partnership, under
     the Purchase Agreement (as hereinafter
     defined))("Granite" or "Buyer"),
     as amended (the "Purchase Agreement")

41   Letter to Silva and Litt from Flowers, 2/27/09, Re:  Southlands Town Center, Aurora, Colorado (the "Property"); Forward Purchase and Sale Agreement and Escrow Instructions dated as of September 29, 2005, by and between Alberta Town Center, LLC, a Colorado limited liability company ("Alberta" or "Seller"), and Granite Southlands Town Center LLC, a Delaware limited liability company (as designee of BlackRock Granite Property Fund, L.P., a Delaware limited partnership, under the Purchase Agreement (as hereinafter defined))("Granite" or "Buyer"), (as amended, the "Purchase Agreement")

42   Affidavit of Peter M. Cudlip

43   Exhibit A-4

44   Defendant Alberta Town Center, LLC's Answer and Counterclaims to Plaintiff's Original Complaint

45   Alberta Town Center, LLC, BlackRock Granite Property Fund, L.P. Post Close True-Up, Revised Operating Deficit Analysis For the Twelve Months Ended December 31, 2008.  Prepared: December 10, 2009

46   Alberta Town Center, LLC, BlackRock Granite Property Fund, L.P. Post Close True-Up, Revised Operating Deficit Analysis For the Twelve Months Ended December 31, 2008

47   Alberta Town Center, LLC, Revised Project Cash Flow Report, March 2008

48   Alberta Town Center, LLC, Revised Project Cash Flow Report, July 31, 2008

49   Alberta Town Center, LLC, Revised Project Cash Flow Report, August 31, 2008

50   Alberta Town Center, LLC Year-to-date Ledger - Accrual 10/21/08

51   Paid Pre Closing

52   Lease

53   Defendant Alberta Town Center, LLC's
     Answer and Counterclaims to Plaintiff's
     First Amended Complaint


Deposition of Donald G. Provost, January 8, 2009:

54   Eighth Amendment To Amendment And
     Agreement And Termination Agreement,
     2/28/08

55   Letter to Piekarski from Noack,
     1/28/09, RE:  Form of Estoppel
     Certificate, DCC Architects, LLC,
     Lease of premises Suite 235

56   Letter to Piekarski from Noack,
     1/28/09, RE:  DCC Architects, LLC,
     Lease of premises Suite 235, damage
     to property/requested repairs and
     requested revisions to the Form of
     Estoppel Certificate

57   Form of Estoppel Certificate

58   Letter to Inclan from Bow-Richardson,
     6/28/08

59   Release And Termination Agreement,
     12/12/08

60   Letter to Callison Architecture,
     Magnussen Klemencic Associates,
     HC Beck, and Ground Engineering
     Consultants from McFarland, 3/5/09,
     RE:  Southlands Town Center, Aurora,
     Colorado (the "Project")


Deposition of Michael Krier January 15, 2010:

61 - Form of Estoppel Certificate, American
     Family Insurance, 3 pages

62 - Form of Estoppel Certificate, Family
     Life Counseling, 3 pages

63 - Form of Estoppel Certificate, Main
     Street Dental, 3 pages

64 - Tenant Estoppel Certificate, QualDent
     LLC, 2 pages

65 - Tenant Estoppel Certificate, Chico's
     FAS, Inc., 2 pages

66 - Document entitled "Revised Operating
     Deficit Analysis For the Twelve Months
     Ended December 31, 2008," with
     handwritten notations, 1 page

67 - Document entitled "Granite Southlands
     Town Center 2008 Cam Reconciliation
     Collections & Credits," 2 pages

68 - Document entitled "Alberta Town Center,
     LLC BlackRock Granite Property Fund,
     L.P. Post Close True-up," 13 pages

Deposition of Angela Kralovec, January 15, 2010:

69 - Affidavit of Angela Kralovec dated the
     22nd day of December, 2009, 5 pages

70 - March 24, 2009 e-mail string between
     Steve Zezulak and Angela Kralovec, with
     attachment, 4 pages

71 - E-mail string between Steve Zezulak and
     Angela Kralovec, the latest of which is
     dated March 27, 2009, 2 pages

72 - E-mail string between Steve Zezulak and
     Angela Kralovec, the latest of which is
     dated March 27, 2009, 3 pages

73 - April 16, 2009 e-mail from Steve Zezulak
     to Angela Kralovec, with attachment,
     33 pages

74 - April 15, 2009 e-mail from Steve Zezulak
     to Angela Kralovec, with attachment,
     3 pages

75 - June 1, 2009 e-mail string between
     Michael Krier and Peter Cudlip, 3 pages

76 - E-mail string between Angela Kralovec
     and Peter Cudlip, the latest of which is
     dated October 7, 2009, 3 pages

77 - E-mail string among Angela Kralovec, Peter Cudlip, Robin Boileau and Steve Zezulak, 2 pages

78 - Document entitled "Post Purchase A/P," 2 pages

79 - E-mail string among Angela Kralovec, Peter Cudlip, Elizabeth Hyatt and Steve Zezulak, the latest of which is dated June 17, 2009, 2 pages

80 - E-mail string among Peter Cudlip, Angela Kralovec and Michael Krier, the latest of which is dated August 31, 2009, 2 pages

81 - April 29, 2009 letter from Elizabeth A. Starrs to BlackRock Realty Advisors, Inc., with attachments, 13 pages

82 - March 5, 2009 letter from Erica H. Weber to Granite Southlands Town Center LLC, 2 pages

Deposition Steven Zezulak, March 22, 2010:

83  Alberta Town Center, LLC, BlackRock Granite Property Fund, L.P., Revised Operating Deficit Analysis For the Eleven Months Ended November 30, 2008

84  Deposit Slip, 1/5/2009

85  Statement of Settlement "Purchasers," 12/12/08

86  Alberta Town Center, LLC, Revised Project Cash Flow Report, January 2008

87  Alberta Town Center, LLC, Revised Project Cash Flow Report, February 2008

88  Alberta Town Center, LLC, Revised Project Cash Flow Report, March 2008

89  Alberta Town Center, LLC, Revised Project Cash Flow Report, April 2008

90   Alberta Town Center, LLC, Revised
     Project Cash Flow Report, May 2008

91   Alberta Town Center, LLC, Revised
     Project Cash Flow Report, June 2008

92   Alberta Town Center, LLC, Revised
     Project Cash Flow Report, July 31, 2008

93   Alberta Town Center, LLC, Revised
     Project Cash Flow Report, August 31, 2008

94   Alberta Town Center, LLC, Revised
     Project Cash Flow Report, September 30, 2008

95   Alberta Town Center, LLC, Revised
     Project Cash Flow Report, October 31, 2008

96   Alberta Town Center, LLC, Revised
     Project Cash Flow Report, November 30, 2008

97   Alberta Town Center, LLC, Revised
     Project Cash Flow Report, December 2008

98   Management Agreement

99   Cash Flow Summary

100  Revised Operating Deficit Analysis For the
     Twelve Months Ended December 31, 2009

Deposition of Christopher Silva, April 7, 2010

101  Forward Purchase and Sale
     Agreement and Escrow
     Instructions Packet

102  BlackRock Granite Property
     Fund, Inc. Consolidated
     Financial Statements as of and
     for the Period Ended June 30,
     2008 and Year Ended December
     31, 3007

103  Estoppel Certificate,
     Diversified Properties
     Management Group, Inc., d/b/a
     Sweet & Sassy

104  Estoppel Certificate, American
     Fidelity Assurance Company

| | |
|---|---|
| 105 | Estoppel Certificate, Chipotle Mexican Grill, Inc. |
| 106 | Estoppel Certificate, Hallmark Retail, Inc. |
| 107 | Estoppel Certificate, The Finish Line, Inc. |
| 108 | Estoppel Certificate, LimitedBrands, Bath & Body Works |
| 109 | Tenant Estoppel, Tween Brands, Inc. |
| 110 | Email dated 01/28/2009 |
| 111 | Letter with Attachments dated 02/06/2009 |
| 112 | Email dated 02/18/2009 |
| 113 | Email dated 02/21/2009 |
| 114 | Letter dated 02/24/2009 |
| 115 | Letter dated 03/03/2009 |
| 116 | Letter dated 03/03/2009 |
| 117 | Fax dated 03/04/2009 |
| 118 | Statement of Settlement "Sellers" |
| 119 | Statement of Settlement "Purchasers" |
| 120 | Email dated 09/22/2008 |
| 121 | Email dated 11/11/2008 |

Deposition of Andrew Piekarski, April 7, 2010

| | |
|---|---|
| 122 | Memo dated 11/17/2008 |
| 123 | Letter dated 04/03/2008 |
| 124 | Fourteenth Amendment |

125      Email dated 09/10/2008

126      Email dated 09/17/2008

127      Email dated 11/28/2008

128      Email dated 12/03/2008

129      Email dated 12/8/2008


<u>Deposition of Jay Alexander, April 8, 2010</u>

130      Email dated 12/11/2008
         (Retained by Council)