1

1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 09-cv-00799-SJJ-KLM
3
    GRANITE SOUTHLANDS TOWN CENTER LLC,
4
    Plaintiff,
5
    vs.
6
    ALBERTA TOWN CENTER, LLC and
7   LAND TITLE GUARANTEE COMPANY,

8   Defendants.

9   _____

10                  REPORTER'S TRANSCRIPT
                     (TRIAL TO COURT)
11
    _____
12
                Proceedings before the HONORABLE
13  STERLING JOHNSON, JR., Senior Judge, United States
    District Court for District of Colorado, commencing at
14  9:10 a.m. on Monday, February 14, 2011, in Courtroom
    A702, United States Courthouse, Denver, Colorado.
15
                A P P E A R A N C E S
16
    FOR THE PLAINTIFF:
17  PAUL TRAHAN, ESQ., OSBORNE J. DYKES, III, ESQ. and
    LUCY D. ARNOLD, ESQ., Law Firm of Fulbright & Jaworski
18  L.L.P., 370 17th Street, Suite 2150, Denver, CO 80202

19  FOR THE DEFENDANTS:
    STUART N. BENNETT, ESQ. and STEVEN R. KABLER, ESQ.,
20  Law Firm of Jones & Keller, PC, 1999 Broadway, Suite
    3150, Denver, CO 80202
21

22

23                  ADRIENNE WHITLOW, CSR
                  8000 E. Girard Avenue, Unit 109
24                    Denver, CO 80231
          Proceeding Recorded by Mechanical Stenography
25            Transcription Produced via Computer

```
 1                      P R O C E E D I N G S

 2          (In open court at 9:10 a.m.)

 3                   THE COURT:  Be seated.  Good morning.

 4                   MR. BENNETT:   Good morning, your Honor.

 5                   MR. TRAHAN:  Good morning, your Honor.

 6                   THE COURT:  I understand that this is

 7     going to be a non-jury trial.

 8                   MR. BENNETT:   That's correct.

 9                   THE COURT:  First of all, would you note

10     your appearances.

11                   MR. TRAHAN:  Paul Trahan for the

12     Plaintiff Granite Southlands Town Center LLC, along

13     with Lucy Arnold and Jeff Dykes.

14                   THE COURT:  Okay.

15                   MR. BENNETT:  Good morning, your Honor.

16     Stuart Bennett on behalf of the Defendant Alberta Town

17     Center, LLC.  With me at counsel table is Mr. Cudlip

18     and Mr. Provost, both principals of the defendant, and

19     Mr. Kabler from my office.

20                   THE COURT:  Now, what we are going to do

21     this morning -- are there any administrative matters

22     that we have to take care of?

23                   MR. TRAHAN:  We don't believe so, not

24     from our perspective.  Your Honor, we had filed

25     Motions in Limine.  Given that this is going to be
```

3

1    a non-jury trial, we don't believe that those are

2    necessary anymore.

3                    THE COURT:  Okay.

4                    MR. BENNETT:  There are several motions

5    in limine from the defendant.  There's also a Motion

6    to Compel the attendance of one of the managing agents

7    for the plaintiff, and those should be in your file

8    someplace.

9                    THE COURT:  I do have that subpoena, and

10   this is for -- what's the fellow's name?

11                   MR. BENNETT:  Mr. Alexander.  Jay

12   Alexander.

13                   THE COURT:  Mr. Alexander, but he is not

14   a party to this lawsuit, nor is he an officer of

15   Granite; is that correct?

16                   MR. BENNETT:  He's an officer of the

17   parent company of Granite.

18                   THE COURT:  But he's not an officer of

19   Granite.

20                   MR. BENNETT:  That's correct.

21                   THE COURT:  And he lives more than a

22   hundred miles.

23                   MR. BENNETT:  New Jersey's more than a

24   hundred miles, your Honor.

25                   THE COURT:  And Rule 45 says that -- let

4

1   me see.  Do you want to be heard on this?

2              MR. TRAHAN:  Yes, your Honor.  We

3   believe for the reasons you've mentioned, in addition

4   to the fact that Mr. Alexander is not on the

5   defendants' witness list and those lists were filed

6   some six or seven months ago, and the fact that Mr.

7   Alexander, due to business travel arrangements that

8   have been on his calendar for months is unable to

9   attend, and the fact that we've got an executive

10  representative for Granite here today, we've actually

11  got two, that there is no need to have Mr. Alexander

12  here.  He doesn't have any information that would be

13  relevant to the narrow issues that are in dispute, and

14  we believe the motion should be denied.

15             THE COURT:  And what is the reason you

16  want him here?

17             MR. BENNETT:  Well, first of all, let me

18  answer that question.

19             He is a principal.  He is the only one

20  of the Granite representatives who goes back to the

21  date of the September 2005 Forward Purchase and Sale

22  Agreement which is in dispute.  Neither of the two

23  individuals that have been brought here by Granite

24  have any knowledge about the original negotiation of

25  the contract.

1                    THE COURT:  But you did depose him.

2                    MR. BENNETT:  I did.  And if your Honor

3    decides that you don't or won't compel his attendance,

4    then we will offer portions of his deposition for your

5    consideration.

6                    THE COURT:  Okay.  Well, I am not going

7    to order his appearance here.

8                    Now, the issue before me will be a

9    breach of contract.  The plaintiff alleges a breach of

10   contract, the defendant denies it; is that correct?

11                   MR. BENNETT:  Yes.

12                   THE COURT:  Okay.  What we're going to

13   do, I'm going to give you, each side, an opening, and

14   then how many witnesses will you have?

15                   MR. TRAHAN:  We will probably just have

16   two witnesses in our case in chief, your Honor.

17                   THE COURT:  And you?

18                   MR. BENNETT:  We have two as well, your

19   Honor.

20                   THE COURT:  So you mean we can hear the

21   testimony of the witnesses today?

22                   MR. BENNETT:  I would think so.

23                   THE COURT:  Now, the other thing is that

24   you're ordering the transcript?

25                   MR. TRAHAN:  Yes, your Honor.

6

1              THE COURT:  And you?

2              MR. BENNETT:  No, your Honor.

3              THE COURT:  Because what I'm going to do

4    is that after the testimony, I am going to give you an

5    opportunity to submit Proposed Findings of Facts and

6    Conclusions of Law, and I think that if that is so,

7    you might want to order the transcript.

8              MR. BENNETT:  I think I'll be ordering a

9    copy of the transcript, your Honor.

10             THE COURT:  Did you get that, Adrienne?

11             THE COURT REPORTER:  I got that.

12             THE COURT:  Okay.  Counsel.

13             MR. TRAHAN:  Yes, sir.

14             THE COURT:  Start your opening.

15             MR. TRAHAN:  All right.

16             May it please the Court, my name is Paul

17   Trahan, along with my colleagues Jeff Dykes and Lucy

18   Arnold.  We represent Granite Southlands Town Center,

19   the plaintiff in this lawsuit.  With us here today are

20   Granite representatives Chris Silva and Angela

21   Kralovec.

22             THE COURT:  Angela who?

23             MR. TRAHAN:  Kralovec.  K-r-a-l-o-v-e-c.

24             THE COURT:  Why is she sitting there?

25   Why isn't she sitting at the table?

```
 1                    MR. TRAHAN:  You're welcome to sit at
 2    the table.
 3                    THE COURT:  Especially since it's
 4    Valentine's day, too.  Go ahead.
 5                    MR. TRAHAN:  The property that is at --
 6                    THE COURT:  Just a second.
 7                    MR. TRAHAN:  The property that is at
 8    issue in this lawsuit is the Southlands Town Center.
 9    It is located in Aurora, Colorado, which is about 20
10    or 30 minutes southeast of Denver.
11                    On the screen I've put up a layout of
12    the Southlands Town Center, and this is a layout of
13    the stores at the Center.  And I will draw your
14    attention, your Honor, to the Cinema which is located
15    on the northern most end of the Center and is on the
16    town square of the Southlands Town Center.  And the
17    significance of the Cinema will become apparent, I
18    hope, in my opening.
19                    The Southlands Town Center is a mixed
20    use property.  It's got office space, it has a variety
21    of retail space, it's got several retail shops and
22    restaurants.  There are almost a hundred tenants at
23    the Southlands Town Center, but by far the largest
24    tenant is the Cinema.  My client is Granite Southlands
25    Town Center LLC which is controlled by a private real
```

8

1   estate investment trust called the Granite Fund.

2   Granite Southlands only asset is the Southlands Town

3   Center.

4            Now, the Granite Fund invests in real

5   estate for pension funds, like the pension fund like

6   for a city like Aurora.  So here today Granite is

7   pursuing this claim for $650,000 on behalf of those

8   pension funds and then any small investors who rely on

9   them for their retirement.

10            THE COURT:  This is the money that was

11   put in escrow?

12            MR. TRAHAN:  That's correct.  I'd like

13   to provide you with a brief overview of the project,

14   and we've put up some boards.  One of the boards

15   provides an overview of the closing.  We've put up two

16   boards.  We've put a board that provides an overview

17   of the transaction, and we put up a board that

18   provides a timeline, and hopefully those will prove

19   useful during the course of the opening.

20            Alberta was the developer for the

21   project and the owner of the property.  They began

22   development of the infrastructure sometime in the

23   summer of 2005.  During that same time period,

24   Alberta, the defendant in this lawsuit, was looking

25   for an investor.  Alberta ultimately reached an

9

1    agreement with Granite's predecessor.  The agreement

2    took the form of a Forward Purchase and Sale

3    Agreement, which will be Plaintiff's Exhibit No. 1,

4    whereby Granite agreed to purchase the property after

5    it was finished, provided it was built within certain

6    guidelines and certain specifications.  Granite

7    ultimately purchased the property for approximately

8    $160 million.

9              The parties wrapped up the details and

10   scheduled the closing for May 2008.  One of the

11   conditions to closing was that Alberta would provide

12   Granite with Tenant Estoppel Certificates which you're

13   going to here a lot about over the course of this

14   trial.

15             Let me explain to you what a Tenant

16   Estoppel Certificate is.  It is a certificate that a

17   tenant signs for the benefit of the buyer or the new

18   landlord, which in this case is Granite, and it says

19   that essentially that everything's okay with the

20   property and under release.  It's a powerful tool for

21   a buyer like Granite, because if a tenant later

22   complains about a problem that existed on the date of

23   the Estoppel Certificate, those claims are barred.

24   The certificate essentially estops the tenant from

25   making claims or claiming a default for problems that

10

1    existed on the date of the estoppel certificate.  An

2    estoppel is an affirmation by the tenant, also an

3    affirmation by the tenant as to all the essential

4    lease terms.  So it's very important for a buyer who's

5    going to become a new landlord to get these estoppel

6    certificates.

7              The parties original agreement, the

8    Forward Purchase and Sale Agreement, required Alberta

9    to deliver estoppel certificates that were no more

10   than thirty days old at the time of the closing.  So

11   the closing was originally scheduled in May, and

12   Alberta had a duty to secure tenant estoppel

13   certificates within a 30-day window of that closing.

14             THE COURT:  So within 30 days of May

15   would be sometime in April?

16             MR. TRAHAN:  Or sometime in May.  Up

17   until the date of the closing.

18             THE COURT:  All right.

19             MR. TRAHAN:  But May arrived, and the

20   parties realized there were too many outstanding

21   issues to close.  So if you'll look at the May 2008

22   marker on the timeline, the parties had the original

23   closing scheduled in May, and Alberta went out and got

24   a set of estoppels signed in May, a set of these

25   estoppel certificates signed in May.  But because

1   the --

2                     THE COURT:  Just a second.  You said a

3   set of these estoppel, and I'm looking at your Exhibit

4   E.  Is that E-470 that you have on the Elmo?

5                     MR. TRAHAN:  No, sir.  That is E-470.

6   That refers to the toll road.

7                     THE COURT:  Okay.  What is this exhibit

8   that you have on the Elmo?

9                     MR. TRAHAN:  The Elmo is not an exhibit

10  in the case.

11                    THE COURT:  Okay.

12                    MR. TRAHAN:  But we can mark it as

13  exhibit -- Oh.  That's just the timeline, and that's

14  what I was referring you to is the timeline.

15                    THE COURT:  What I'm getting at is that

16  reading your papers, as I understand it, is that the

17  estoppels were for the tenants who occupied more than

18  10% of the land?

19                    MR. TRAHAN:  That's correct.

20                    THE COURT:  And the Cinema is one of

21  those tenants that occupied more than 10%; is that

22  correct?

23                    MR. TRAHAN:  It is the only tenant that

24  occupies more than 10%.

25                    THE COURT:  So there's the only one

12

1   estoppel we're talking about?

2              MR. TRAHAN:  That's correct.

3              THE COURT:  Okay.

4              MR. TRAHAN:  So the parties agreed to

5   push the closing back until December.  Now, November

6   rolls around and new estoppel certificates are due,

7   and Alberta offers the May estoppel certificates in

8   satisfaction of its obligations under the Forward

9   Purchase and Sale Agreement.

10             Granite accurately points out these are

11  too old, they're more than 30 days before closing.

12  They're about six months old, and Granite rejected

13  them.  And no one disputes that Granite was within its

14  rights to reject them.  We don't know why Alberta did

15  not present fresh estoppel certificates for the

16  December closing.  We have learned there were

17  structural issues at the property that may have posed

18  an obstacle to Alberta in that regard, but we didn't

19  learn about that until after the closing.

20             So the parties agreed to push back the

21  closing.  When it became apparent that Alberta would

22  not be able to deliver fresh estoppel certificates

23  prior to closing, the parties had a decision to make.

24  They could either cancel the closing.  Because the

25  delivery of the estoppel certificates was a

13

1    precondition of closing, Granite could have chosen at

2    that time just pull the plug on the whole deal, so

3    that was one option.

4              Another option was to delay the closing,

5    to postpone it again, but if you'll recall, the

6    economy was suffering back in December 2008, and at

7    that time banks, especially, were under a lot of

8    pressure and scrutiny.  Bank of America had loaned

9    Alberta $160 million to build the Southlands Town

10   Center, and that loan had become due, had been renewed

11   and was coming due again in December 2008.  Bank of

12   America made it very clear they were not willing to

13   postpone the closing again and wanted their loan paid

14   off.

15             So as an accommodation to Alberta and to

16   allow the closing to go forward, Granite made a

17   critical decision.  It decided that it would delay the

18   deadline for Alberta to deliver estoppel certificates

19   until after closing, which was a big risk on its part

20   for the reasons that I've mentioned.  So in order to

21   account for that risk, Granite said, We will agree to

22   push the deadline beyond closing, but, and if you'll

23   look at this chart, they said, 650,000 of the closing

24   consideration needs to be placed into escrow.  And if

25   you don't deliver acceptable estoppel certificates,

14

1    sometimes will be referred to in this trial as clean

2    estoppel certificates, then we get the money.  And

3    Alberta had until March 1st, 2009 to deliver clean

4    estoppel certificates.  So that's the backdrop for

5    this dispute.

6              And as you pointed out, the Cinema

7    Estoppel is the only one we're really talking about,

8    and the reason for that is because Alberta had to

9    provide clean tenant estoppel certificates for tenants

10   who leased 75% of the total space and for each tenant

11   that leased 10% or more of the lease space.

12             THE COURT:  But you said the Cinema was

13   the only one who leased.

14             MR. TRAHAN:  That's correct.

15             THE COURT:  Okay.

16             MR. TRAHAN:  And it so happens that if

17   the Cinema Estoppel is good, then Alberta achieves the

18   75% requirement.  If it's bad, then it doesn't.  So it

19   really does just come down to whether the Cinema

20   Estoppel Certificate is sufficient.

21             I'd like to explain why the Cinema is so

22   important to Granite and to the Town Center.  They

23   represent over 72,000 square feet of the Center which

24   in itself is about 420,000 square feet.  The monthly

25   rent and shared expenses of the Cinema is over

15

1  $165,000.  So the revenue from the Cinema each year is

2  almost $2 million.

3           THE COURT:  When you say $160,000,

4  whatever the figure was, is that a month?

5           MR. TRAHAN:  That's per month.

6           THE COURT:  Okay.

7           MR. TRAHAN:  So the total for a year is

8  almost $2 million.  So from a financial perspective,

9  the Cinema is by far the most important tenant at the

10  Southlands Town Center, and the Cinema lease runs

11  until 2026.  So it runs for another 15 years.  So if

12  the Cinema -- not to mention the fact, as you can see

13  from this diagram, the Cinema is an anchor tenant on

14  the Town Center, and it's a huge draw of traffic to

15  the Center.  If Granite loses the Cinema, the

16  Southlands Town Center would suffer a tremendous

17  blow.

18           So the question becomes, how do we

19  determine if the Cinema Estoppel is sufficient.  What

20  we've done here is we have taken -- when the parties

21  agreed to delay the closing, they executed a document

22  that will be Plaintiff's Exhibit No. 17.  It is the

23  Fifteenth Amendment to the Forward Purchase and Sale

24  Agreement.

25           In the Fifteenth Amendment, we made a

1    couple of essential changes with respect to Alberta's

2    estoppel requirements.  One, it pushed the deadline

3    back to March 1st, 2009.

4              Now, to be clear, Judge, we are not

5    claiming that Alberta did not deliver the estoppel

6    certificate on time.  It did.  It delivered the Cinema

7    Estoppel sometime in January.

8              The second change was that for an

9    estoppel certificate to be acceptable, it needed to

10   satisfy the original criteria set out in the Forward

11   Purchase and Sale Agreement, which I've depicted here

12   in the document on your screen as No. 1; or it could

13   present estoppel certificates that were substantially

14   similar to the certificate that the Cinema signed in

15   May 2008.  So, and you'll hopefully know more about

16   this than you care to by the time we're done with

17   trial.  So the analysis you go through is you look at

18   the Form Certificate, which is Exhibit H to the

19   Forward Purchase and Sale Agreement and which will be

20   Plaintiff's Exhibit No. 46 --

21             THE COURT:  Hold it a second.  Go

22   ahead.

23             MR. TRAHAN:  You so take that form and

24   you compare it to the January 2009 Estoppel and you

25   see if the January 2009 Estoppel is in that form.  If

1    it's not, then you compare the January 2009 Estoppel

2    for the Cinema and see if it has been materially and

3    adversely modified from that form, and if it has been,

4    then it's rejected.  Or if there's something in there

5    that indicates that there's a landlord default, then

6    it's rejected, and that's under the original

7    agreement.  So that's the initial analysis.

8            Then Alberta also has the alternative of

9    producing an estoppel that's substantially similar to

10   the May 2008 Estoppel; the rationale there being,

11   Look.  We gave you an estoppel in May.  If we can

12   essentially get that same estoppel certificate from a

13   tenant in January, we don't want you to object to it.

14   We said, That's fine, if you can just get them to

15   update it and basically update the estoppel that you

16   gave us in May, that's fine, we'll agree to that.  So

17   that was the agreement.

18           THE COURT:  This is with the

19   understanding that it would be substantially similar.

20           MR. TRAHAN:  That's correct.

21           THE COURT:  Go ahead.

22           MR. TRAHAN:  One thing I'd like to point

23   out.  Now, Alberta's counsel is going to talk about

24   the terms of the Cinema Lease, and he's going to

25   argue, I think, that the Estoppel Certificate, even

1    though the Cinema Estoppel Certificate referenced a

2    cracked foundation, that that was not material because

3    the foundation was something that the Cinema was

4    responsible for.

5            Setting that argument aside for now,

6    what I'd like to do is point out on this chart is that

7    for purposes of that analysis, all we're talking about

8    is this component of the analysis.  So in other words,

9    even if -- it's our position that a cracked foundation

10   is an indication of a landlord default and other

11   things in the Cinema Estoppel.  But even if that's not

12   the case, if it's materially and adversely modified

13   from the form that is Exhibit 46, or it's not

14   substantially similar to the May 2008 Estoppel, it

15   fails.

16           So what I'd like to do, your Honor, is

17   compare, first of all, consistent with this analysis,

18   I'd like to compare the 2009 Estoppel, which is the

19   one that's the focus.  I'd like to first compare it to

20   the Form of Estoppel that is Exhibit H to the Forward

21   Purchase and Sale Agreement and Plaintiff's Exhibit

22   No. 46.

23           Now, the January 2009 Estoppel is

24   Plaintiff's Exhibit No. 23, so if you'd like to

25   reference that, but I've summarized it here.

```
 1              First of all, I'll show you paragraph 4

 2   of the Form of Estoppel and compare that to what is in

 3   the January 2009 Estoppel.

 4              THE COURT:  Now, Form of Estoppel is

 5   Exhibit H; is that correct?

 6              MR. TRAHAN:  That's correct.  Exhibit H,

 7   and it's Plaintiff Exhibit No. 46.  So what I've done

 8   here is I've taken paragraph 4, this paragraph 4 from

 9   the Form of Estoppel, and I've compared it to

10   paragraph 4 of the comparable paragraph which talks

11   about rent, et cetera, in the 2009 Estoppel.  So the

12   question is, is that a material and adverse

13   modification.  We submit to the Court that it is.

14   This watered-down language that is in the 2009

15   Estoppel is materially deficient in several respects.

16   It doesn't confirm the base rent, it doesn't speak to

17   whether the payments are current, it doesn't address

18   the agreed amount of the common area operating cost or

19   taxes, and it does not disclaim that the tenant has a

20   right to the security deposit.  We contend that these

21   are material and adverse modifications to the Estoppel

22   Certificate.

23              I'll also compare paragraph 5 to the

24   Form of Estoppel to the January 2009 Estoppel.

25   Paragraph 5 contains a summary of the landlord's
```

20

 1   obligations and an acknowledgment on the tenant's

 2   behalf, the Cinema's behalf that the landlord has

 3   fulfilled all of those obligations.

 4            You could see here that the January 2009

 5   Estoppel has deleted this paragraph altogether.  So

 6   the 2009 Estoppel has no confirmation that the

 7   landlord has fulfilled its obligations under the

 8   lease, no confirmation that the landlord has made

 9   required repairs, no conformation that the tenant's

10   improvements have been completed, and no confirmation

11   that the landlord has paid tenant allowances or other

12   credits.  We believe this is a material and adverse

13   modification from the agreed form.

14            Another significant deletion in the 2009

15   Estoppel is the provision regarding a disclaimer of

16   defenses, offsets, liens and claims.  This basically

17   is that provision in the Form of Estoppel which says

18   to Granite, Granite, new landlord, I don't have any

19   basis to sue you right now.  I don't have any basis

20   to offset my rent.  I don't have any defenses to my

21   obligation to pay rent.  The January 2009 Estoppel

22   deletes this paragraph in its entirety.  So Granite

23   has none of those assurances.  This is precisely the

24   sort of thing that's $650,000 we set aside for, your

25   Honor.

21

1           Here's another material difference

2    between the two documents.  The Form of Estoppel

3    contains very precise language about there being no

4    landlord default and no event which with the passage

5    of time, that would result in a landlord default.

6    Compare that to the language in the 2009 Estoppel.

7    All it says is to our knowledge without any duty to

8    investigate there are no defaults now existing.  That

9    doesn't offer near the protection that the form

10   paragraph 7 offers.

11          And then finally, in comparing the 2009

12   Estoppel with the Form of Estoppel, this was the one

13   that got everyone's attention.  In the January 2009

14   Estoppel the Cinema added a paragraph, and I'll let

15   you read it.  It references a cracked foundation and a

16   tenant dispute about who's responsible for it.  This

17   was nowhere in the Form of Estoppel, and this is a

18   material, material and adverse modification from the

19   Form of Estoppel.

20          We anticipate that Alberta's counsel

21   will argue that because there is an "As Is" provision

22   in the Forward Purchase and Sale Agreement, that

23   anything relating to the condition of the property

24   cannot be material.  And any reference in an Estoppel

25   Certificate that relates to the condition of the

22

1    property cannot be material because of the "As Is"

2    provision in the Forward Purchase and Sale Agreement.

3    I've got a few comments about that.

4              First of all, that argument ignores the

5    fact that the "As Is" provision only relates to the

6    relationship between the buyer, Granite, and seller,

7    Alberta.  And it only addresses whether Granite can

8    sue Alberta in relation to the condition of the

9    property after closing.  It's in Section 5.1, I

10   believe, of the Forward Purchase and Sale Agreement in

11   the "As Is" provision.  The provision does not concern

12   the relationship between the landlord and tenant in

13   any way, and that's what the estoppel is about.  The

14   estoppel is about the relationship between the

15   landlord and the tenant, not between the buyer and the

16   seller.  So they're taking a provision from one

17   agreement that is wholly unrelated to the relationship

18   between the tenant and the landlord, and they're

19   trying to shoehorn it, if that's the right term, into

20   the estoppel context.  It just doesn't fit.

21             There's a second fatal flaw, we think,

22   with this argument.  It assumes necessarily that the

23   condition of the property is immaterial, which is not

24   true.  The condition of the property was very material

25   to the parties, as is evident by the terms of the

1  Forward Purchase and Sale Agreement.  All of Article

2  VII of the Forward Purchase and Sale Agreement relates

3  to construction and the condition of the property.

4  It's over five pages.  In fact, 7.2(f) of the Forward

5  Purchase and Sale Agreement requires Alberta to notify

6  Granite of any changes in the condition of the

7  property.  It's our position that they failed to do

8  that, but that's not what's at issue in this lawsuit.

9  So to suggest that the condition of the property is

10  immaterial simply is not correct.

11          So going back to Alberta's burden, what

12  we've just talked about is No. 1.  Now I want to talk

13  about No. 2, and that is because Alberta could have

14  satisfied its burden by producing an estoppel that was

15  substantially similar.  Let me show you a few

16  comparisons here.

17          This is a comparison of the May Estoppel

18  to the January 2009 Estoppel.  We've seen this

19  provision before when we compared the January 2009

20  Estoppel to the Form of Estoppel.  I pointed out that

21  the no defenses sort of we don't have a claim basis

22  for a lawsuit against you paragraph had been deleted.

23  Well, guess what?  It was in the May 2008 Estoppel.

24  This key provision was in the May 2008 Estoppel, but

25  it was deleted in the January 2009 Estoppel.  That was

24

1   a significant red flag to Granite.  We're looking at

2   the May Estoppel, the tenant's saying we don't have

3   any lawsuits against you, we don't have any basis to

4   offset rents, et cetera, et cetera, $2 million a year

5   in rents, that was a significant term of the May 2008

6   Estoppel and the Form of Estoppel, and it's been

7   deleted in its entirely in the January 2009 Estoppel.

8   We would argue that that renders the estoppel not to

9   be substantially similar.

10         I should point out, your Honor, that

11   Judge Weinshienk, we think Judge Weinshienk has

12   essentially ruled on this issue.  I'll refer you to

13   your screen.  This is an excerpt from Judge

14   Weinshienk's Order denying Alberta's --

15         THE COURT:  Order for Summary Judgment?

16         MR. TRAHAN:  Yes, sir.

17         THE COURT:  Okay.

18         MR. TRAHAN:  We believe this matter's

19   been essentially decided, and for purposes of the

20   record, the Order says:  "No reasonable reading of the

21   two documents to produce a conclusion that the two

22   documents are substantially similar."  For the reason

23   we just mentioned, but also, your Honor, again,

24   comparing the May 2008 Estoppel to the January 2009

25   Estoppel, there it is again.  The May 2008 Estoppel

1    made no reference to the cracked foundation.  The

2    January 2009 Estoppel was the first time Granite saw

3    that.  So we would submit to you for at least those

4    two reasons the May 2008 Estoppel and the January 2009

5    Estoppel are not substantially similar.  So here's

6    Granite's assessment of the claims.

7              Essentially, Granite accommodated

8    Alberta by agreeing to accept the estoppels after

9    closing.  The parties put an important mechanism in

10   place to protect Granite in the event Alberta failed

11   to meet its burden, and that was the $650,000 that was

12   placed in escrow.  We believe the evidence clearly

13   demonstrates that Alberta failed to meet its burden to

14   producing clean estoppel certificates consistent with

15   the parties' agreements.  Now Alberta wants to ignore

16   the agreement and not only keep the money, but to

17   leave Granite's investors with all the risk associated

18   with that Cinema Estoppel.  I should point out that

19   all the estoppels didn't come back clean.  DCC

20   Architects, for example, their estoppel complained

21   about the cracks of walls --

22              MR. BENNETT:  Objection, your Honor.

23   This goes outside the issues for trial; that the DCC

24   Architects Estoppel Certificates is irrelevant to

25   anything we're talking about here today.  We have one

26

1    issue.  Does the Cinema Estoppel meet the contract

2    requirements.  Anything else is irrelevant.

3                 THE COURT:  Okay.

4                 MR. TRAHAN:  I'll stop there.  We can

5    limit our discussion to the single estoppel.  We'll be

6    fine with that, your Honor.

7                 THE COURT:  All right.

8                 MR. TRAHAN:  So Granite's position is

9    that what Alberta's done here is not fair and it's not

10   consistent with the parties' agreement.  So what we're

11   asking the Court to do is to enter a judgment

12   declaring that Granite is entitled to the escrow

13   funds, plus all the interest that's accrued on the

14   escrow funds and to award its attorneys fees as the

15   prevailing party which the parties have agreed will be

16   presented to the Court post-trial.

17                THE COURT:  Now, the interest, as I

18   understand it, is something like $12,000 so far?

19                MR. TRAHAN:  That's correct, your

20   Honor.  And there is interest that has accrued on the

21   money since it's been in the registry of the court.

22                THE COURT:  Okay.

23                MR. TRAHAN:  A portion of it was paid to

24   Alberta Development Partners, I think, not the party

25   to this lawsuit we don't think, but we believe that

1    money was paid improperly after Granite put the title

2    company on notice that the money should be released to

3    Granite.

4              THE COURT:  Now, as I understand it,

5    there was a third party, and that is the person who

6    had the escrow funds.  He delivered that to the court;

7    is that correct?

8              MR. TRAHAN:  That's correct.  They

9    didn't deliver that money to the court until, I

10   believe it was about -- I think it was in December of

11   last year, and the dispute arose in March of 2009.

12             THE COURT:  That party is not a party to

13   this lawsuit?

14             MR. TRAHAN:  They are a party to the

15   lawsuit.

16             THE COURT:  They are?

17             MR. TRAHAN:  They are, but they've been

18   excused from the need to attend trial.  Nobody's

19   seeking damages against them.  They're a necessary

20   party because they hold the funds.

21             THE COURT:  Okay.

22             MR. TRAHAN:  They remain a party because

23   they want the attorneys fees they've incurred in

24   connection with fulfilling their obligations as the

25   escrow holder.

28

1           THE COURT:  Okay.  Counsel?

2           MR. TRAHAN:  Judge, I would like to

3    comment, we do have Proposed Findings of Fact and

4    Conclusions of Law that we would like to submit to you

5    at the right time.  We've got those ready to go.

6           THE COURT:  Okay.  Go ahead.

7           MR. BENNETT:  Thank you, your Honor.

8    Good morning, your Honor.  Stuart Bennett on behalf of

9    the Defendant Alberta Town Center.  Thank you.

10          As Mr. Trahan properly notes, the issue

11   to be tried is whether Alberta or Granite is entitled

12   to the $650,000 that was escrowed from Alberta's sale

13   of the Town Center to the Southlands Shopping Center.

14   Of the shopping Center to Granite, I'm sorry.  Let me

15   make one comment at the very beginning.

16          The 650,000 was not escrowed to protect

17   Granite from some failure to deliver clean estoppels.

18   The testimony will be that it was escrowed to provide

19   an incentive to Alberta to timely get estoppels.

20   That's the only reason for it.

21          THE COURT:  The escrow was for what?

22          MR. BENNETT:  As a motivation factor to

23   motivate Alberta to get the tenant estoppel

24   certificates in after closing.  It has nothing to do

25   with any estimated potential damage or to indemnify

29

1    Granite for any loss it might incur because of

2    non-clean estoppel.

3              The second issue:  There is no such

4    thing as a, quote, clean estoppel.  The words are not

5    used in any of the parties' contracts.  The only word

6    that's used is the Form H to the Forward Purchase and

7    Sale Agreement or you have the May 2008 Estoppels, and

8    then you have the question of whether there's been a

9    material alteration to the standard form or the

10   indication of a landlord default.  There's no such

11   thing as a, quote, clean estoppel.  There's no such

12   requirement to provide a, quote, clean estoppel.

13             Now, this is a matter of contract

14   interpretation.  You have already heard in Mr.

15   Trahan's presentation all of the evidence that you

16   need to hear, with a couple of exceptions.  You might

17   ask yourself, what are the parties going to testify

18   about here.  This is a matter of contract

19   interpretation for the Court.  There are no real

20   factual issues in this case.  There's no evidence

21   required.  All that is really needed is to look at the

22   unambiguous contracts and apply them in the context to

23   which they were adopted.  That context is --

24             THE COURT:  Basically, what you're

25   saying is that the facts are not in dispute?

30

1          MR. BENNETT:  There's no facts in

2    dispute of consequence.  This is a matter of contract

3    interpretation, which is a matter of law.  It's not a

4    factual issue.

5          THE COURT:  Okay.

6          MR. BENNETT:  And Granite's rejection of

7    the Cinema Estoppel, according to their counsel's

8    letter, which is the only one that rejected it, is

9    Exhibit 30 of the plaintiff's exhibit.  It says:  On

10   the face of the Estoppel Certificate we're rejecting,

11   and they're rejecting nine estoppels, one of which is

12   the Cinema.  And by the way, Alberta meets the 75%

13   requirement without the Cinema Estoppel Certificate;

14   not with it, without it.  So the 75% requirement has

15   been met, whether the Cinema Estoppel is valid or

16   not.  The only reason the Cinema Estoppel matters at

17   all is because one of the requirements is we had to

18   provide estoppel certificates from any tenant that

19   leases more than 10% of the rentable square footage,

20   and the Cinema does.  So that's why the Cinema

21   Estoppel is the one that we care about.

22          Now, Granite did not specify in its

23   rejection letter any grounds for objection to the

24   Cinema Estoppel.  It simply says we reject it based on

25   its face.  So this has left Granite --

1                    THE COURT:  The rejection letter is

2    Exhibit 30, you said?

3                    MR. BENNETT:  Exhibit 30.

4                    THE COURT:  I have a copy here.

5                    MR. BENNETT:  I'll put it on the screen

6    for you, your Honor.  This is a letter dated February

7    24th, 2009, from Fulbright & Jaworski.  It's signed by

8    Jane Snoddy Smith.

9                    THE COURT:  Jane who?

10                   MR. BENNETT:  Jane Snoddy, S-n-o-d-d-y

11   Smith.  Mr. Trahan's partner, we might add.

12                   THE COURT:  It's your partner?

13                   MR. TRAHAN:  Yes.

14                   THE COURT:  Okay.

15                   MR. BENNETT:  Fulbright & Jaworski

16   objected to the Estoppel Certificate, and Fulbright &

17   Jaworski is now trying to collect the 650,000 based on

18   their own work.

19                   Now, page 2.  Let's look at these

20   objections.  And if you would highlight the paragraph

21   right before the list, please.

22                   In the second sentence, Ms. Smith

23   writes:  "Granite hereby notifies Alberta that

24   Granite --

25                   THE COURT:  Just a second.

1               MR. BENNETT:  I'm sorry.  It's on the

2    screen there for you, your Honor.

3               THE COURT:  Okay.  Go ahead.

4               MR. BENNETT:  The second sentence:

5    "Granite hereby notifies Alberta that Granite objects

6    to the Delivered Estoppel Certificates delivered by

7    the following tenants in accordance with Section

8    8.1(k)(ii) of the Purchase Agreement for the reasons

9    apparent from the face of the certificates."

10              Now, if you'll highlight the list,

11   please.  Here are the nine certificates that Ms. Smith

12   objected to:  Chico's; DCC Architects; American Family

13   Insurance; Colorado Cinema Group; Noodles & Company;

14   White House Black Market, Inc.; QualDent LLC; Family

15   Life Counseling; and Main Street Dental.  The only one

16   we're concerned about today is Colorado Cinema,

17   because whether the other eight are accepted or not,

18   Alberta has still complied with that 75% threshold of

19   delivering tenants options.  So the only one we are

20   concerned about is Colorado Cinema.  And as you can

21   see from Ms. Smith's letter, she says, "on the face"

22   of it.  Doesn't say why, doesn't say there's a

23   material adverse modification, doesn't say there's an

24   omission about the amount of rent or the common area

25   expense or anything else.  Doesn't say that there's

1   this failure to comply with the landlord default

2   provision.  She just says "on the face."

3              So your task today is to look at the

4   Colorado Cinema Group Estoppel Certificates and say on

5   their face do they fail to comply with the

6   requirements of the contract.  Again, no factual issue

7   here.  What the Cinema Estoppel says, what the

8   contract requirements are are in the documents, and

9   they're not ambiguous.

10             So the only two grounds that are

11  relevant here are the ones that Mr. Trahan put on his

12  demonstration; one, that the certificate has been

13  materially and adversely modified from the required

14  form, and required form is something we can talk

15  about.  And the other is that indicates the continuing

16  existence of an actual material default of the

17  landlord under the applicable lease.  Those are the

18  only two issues we have to decide.  Does the Cinema

19  Estoppel Certificate represent a material and adverse

20  modification from the required form; or (2), does it

21  indicate a continuing actual existence of a landlord

22  default.  And we submit that it doesn't meet it.  Why

23  is that.

24             Would you pull up Exhibit 24, please.

25  Let's just highlight the top.  This is Plaintiff's

1    Exhibit 24.  This is addressed to BlackRock.

2    Highlight the next one.  And this is the certificate

3    for the Cinema.  It's a lease dated October 2,

4    original lease between Southlands Colorado as

5    landlord, original landlord, and Colorado Cinema

6    Group, LLC, a Delaware limited liability company.  It

7    lists all the amendments to the lease, and it defines

8    it as the "Demised Premises."  Let's go to paragraph

9    5.  Excuse me.  This is the 2008 Estoppel

10    Certificate.  I'm sorry, your Honor.  23 is the 2009.

11    Let's go to 23.  All right.

12              Now, when we go through this in the

13    evidence, your Honor, you will see that the May 2008

14    Cinema Estoppel Certificate and the January 2009

15    Cinema Estoppel Certificate are identical word for

16    word, every word except for paragraph 5.

17              Now, let's look at paragraph 5 of this

18    certificate.  This is the paragraph that everyone has

19    heartburn over, at least the plaintiffs do.  Paragraph

20    5 reads:  "Tenant is currently investigating and may

21    dispute Landlord's assertion that Tenant is

22    financially responsible for repairing the cracked

23    foundation that affects the structure of the Demised

24    Premises.  An investigation is underway to determine

25    which party is responsible for the repair and

1  financial responsibility for such foundation.  As of

2  the date of this document, Tenant disputes that it has

3  that responsibility for such repair.  Further,

4  Tenant's Proportionate Share for 2008 has not been

5  finalized."  The proportionate share is the common

6  area expense that everybody shares out at the Cinema.

7  It's not a material issue, it's resolved in the normal

8  course of doing business.

9          So the issue is, is the tenant stating

10  that it's investigating and may dispute landlord's

11  assertion that it has responsibility to repair its

12  cracked foundation?  Is that a material or adverse

13  modification of the required form?  And here's why

14  it's not material.  Material has it's common ordinary

15  meaning, it means something of consequence, of

16  importance.  The reason why it's not important is

17  because Granite bought this property as is where it is

18  with all faults.  All faults.  All this disclosure

19  says is there may be a default -- there may be a

20  fault, excuse me, with this particular building.  Now,

21  that is not material because Granite had no right not

22  to close this project on the basis of faults in the

23  construction.  It hadn't.  The documents, FPSA, which

24  we'll look at in great detail, has five paragraphs of

25  disclaimers of warranties by Alberta as to

1   construction.  It says it's as is with all faults.  It

2   says notwithstanding the generality of the foregoing,

3   we don't make any representations as to fitness, as to

4   construction.  It goes on and on and on.  It makes it

5   absolutely clear that Granite, in entering into this

6   contract before construction started, was waiving any

7   rights and assumed the risk that there would be

8   construction defects.  So whether the tenant said

9   there's a cracked foundation, whether Alberta said it

10  was a cracked foundation, or whether Granite in

11  exercising its inspection rights, which it had and

12  which it used, it discovered Granite had no

13  alternative but to close this transaction.

14             Now, the reason for that is really

15  critical, and it's something that Mr. Trahan did not

16  mention at all, and that is that the Forward Purchase

17  and Sale Agreement was a document that was part of the

18  financing of this project.  In order for Alberta to

19  borrow $158 million, one of the requirements was that

20  it had a takeout purchaser who had the financial

21  strength and wherewithal to perform, and Granite has

22  that financial strength and wherewithal.  So a

23  material term of the Loan Agreement is the existence

24  of and the enforceability of the FPSA.  That's why

25  Granite didn't accommodate Alberta in closing this

1   transaction.  The bank had the right to enforce it

2   against Granite regardless of whether Alberta

3   performed or not.  And we'll look at that.  It's in

4   the Loan Agreement.  There's also a thing called the

5   Tri-Party Agreement.  It's an agreement between the

6   banks --

7            THE COURT:  We've got a dispute between

8   Alberta and Granite, right?

9            MR. BENNETT:  Right.

10           THE COURT:  Right?

11           MR. BENNETT:  Right.

12           THE COURT:  Okay.

13           MR. BENNETT:  So the reason that this

14  FPSA is so important and why the condition of this

15  property is not relevant is because the banks were

16  relying on this document to provide the source of

17  repayment of their loan.  That's what it is, and

18  that's why they're arguing there's is no condition

19  of the property that Granite could object to at all.

20  That's why it is not material that this tenant says it

21  has a cracked foundation or it's investigating the

22  financial responsibility.

23           The second reason why that's not

24  material is because the tenant built its own

25  building.  This is an unusual circumstance.  All of

1    the rest of the shopping Center was built by Alberta's

2    contractors.  That was the general contractor.  It had

3    architects, it had engineers.  All of the rest of the

4    Center except for the Cinema were built by Alberta and

5    its subcontractors.  The tenant, in this case Colorado

6    Cinema, built its own building, so it hired the

7    engineers, it hired the architects, it hired the

8    contractors.  It indemnifies Alberta for any

9    construction defects.  It has an obligation to do

10   that.  So when the tenant says we're investigating, it

11   is investigating because the landlord, i.e., Alberta,

12   put the tenant on notice that you need to fix your

13   building.  You have a problem in your building and you

14   need to fix it, and we will exercise our rights of

15   indemnification if you don't.  So this is not evidence

16   of a default by the landlord, it is an evidence that a

17   landlord has made a demand on the tenant to perform

18   under its lease.  So it's not material there, either.

19                 Now, Mr. Trahan pointed out --

20                 THE COURT:  Just a second.  The issue

21   here is the cracked foundation in the Cinema; is that

22   correct?

23                 MR. BENNETT:  Yes.

24                 THE COURT:  And you say it's not

25   material.  What if there were five or six cracked

1   foundations?

2            MR. BENNETT:  Wouldn't matter.  No

3   condition of the property is the basis for Granite not

4   to close the transaction.  No condition.  And the

5   reason for that is that they bought, as part of the

6   Forward Purchase and Sale Agreement, we'll look at

7   this, they bought all of Alberta's rights under its

8   construction contracts.  Bought the rights on the

9   architects, the engineers, the general contractors and

10  all the subs.  So if there was a problem after

11  closing, Granite had all of the remedies that Alberta

12  would have.  That's the way the deal was structured.

13  So that's why it doesn't matter if there was one

14  foundation that was cracked or all of them were

15  cracked.  If there were no tenants, Granite still had

16  to buy the property.  That was the condition of making

17  the loan in the first place, and that's what the banks

18  were looking to was the financial wherewithal of

19  Granite to buy this property when it was completed.

20           THE COURT:  Now, conditions of making

21  the loan was between the bank and Alberta; is that

22  correct?

23           MR. BENNETT:  And Granite.

24           THE COURT:  And Granite.

25           MR. BENNETT:  And Granite.  They're all

1    parties to this.  That's why we have this Tri-Party

2    Agreement, because we have a Loan Agreement between

3    Alberta and the banks, but we have a Tri-Party

4    Agreement where Granite agrees that all of the

5    obligations under the loan -- excuse me.  All of the

6    rights under the Forward Purchase and Sale Agreement,

7    all of Alberta's rights are assigned to the banks.

8    The banks are the ones that have the right to exercise

9    the rights of Alberta under that Loan Agreement.  It's

10   assigned as collateral for the loan, and we'll look at

11   that.  That's why the context in which this contract

12   was entered, this is not your typical real estate

13   transaction where you have buyer and a seller and a

14   representation and warranties going back and forth.

15   In fact, originally the purchaser of this transaction

16   was going to be a joint venture between Granite and

17   Alberta, and that's in the Loan Agreement.  And

18   through all the negotiations in these 15 amendments

19   that the word of the Forward Purchase and Sale

20   Agreement, that concept of the joint venture never

21   came to fruition.  In fact, it was one of the disputes

22   between the parties when they got around to closing

23   this transaction and why there was a release and

24   termination agreement, because Granite no longer

25   wanted to participate in the joint venture.

1                Now, there's another point that Mr.

2     Trahan pointed out.  One of the standard provisions of

3     the Tenant Estoppel Form is that the landlord has paid

4     for all the tenant improvements, and he says that's

5     omitted from this Tenant Cinema Estoppel Agreement.

6     He says that's a material adverse alteration.  Well,

7     that's silly.  The reason why that paragraph isn't

8     there is because the landlord didn't build the

9     improvements for the Cinema, the tenant did.  So there

10    was nothing the landlord was required to do other than

11    pay, and the building was paid for out of Alberta's

12    funds out of its construction, but the tenant

13    constructed all of the improvements, not Alberta.

14                Now, the law is real clear that an "As

15    Is, Where Is" clause means that the buyer assumes the

16    risk of construction defects.  Assumes it.  So the

17    fact that a tenant tells Granite you have a cracked

18    foundation makes no difference whatsoever.  That is a

19    risk that Granite knowingly, voluntarily assumed when

20    it entered into the FPSA.  And by the way, none of the

21    witnesses for Granite negotiated the FPSA, they'll

22    have no testimony about what it means because they

23    weren't there.  They didn't do it.  Mr. Provost and

24    Mr. Cudlip, both of whom are here, both of whom

25    negotiated the FPSA can testify about what it means,

1    if the Court determines it's ambiguous.  But none of

2    Granite's witnesses were there.  In fact, the one

3    person who still works for Granite who was actually

4    involved in the negotiations of the transaction has

5    never been designated as a witness and is not here.

6                   THE COURT:  And who is that person

7    you're talking about?

8                   MR. BENNETT:  Steve Zezulak.

9                   THE COURT:  Did you call him as a

10   witness?

11                  MR. BENNETT:  Pardon me?

12                  THE COURT:  Did you call him as a

13   witness?

14                  MR. BENNETT:  No, your Honor.  I have

15   not deposed him.

16                  Now, as I said, all of this, I believe,

17   is a matter of law.  I don't think there's a factual

18   issue here that needs to be resolved.

19                  Let's talk about the two Cinema Estoppel

20   Certificates.  Mr. Trahan's description of how that

21   came about was somewhat incomplete.  The reason why

22   Alberta got a May 2008 Estoppel is because at that

23   time the loan was coming due, and it was the parties'

24   obligation to close the transaction or they both would

25   have been in default to those banks.  They negotiated

1    what is called the Fourteenth Amendment to the FPSA,

2    and by that they got the banks to agree to an outside

3    closing date of December 15th.  So it goes from May to

4    December 15th.  They had to pay $400,000 to the bank

5    in order to get them to agree to extend the closing

6    six months, and Alberta and Granite split that.

7                    THE COURT:  Now, the negotiation was

8    with three parties?

9                    MR. BENNETT:  With three parties.

10                    THE COURT:  Okay.

11                    MR. BENNETT:  The FPSA could not be

12    amended without the bank's consent.  So every time an

13    FPSA was amended, they had to go to the banks and say,

14    Do you agree.  There's one bank agent that they

15    negotiate with which was LaSalle Bank which later

16    became Bank of America.  But LaSalle bank was acting

17    on behalf of several other banks because no bank took

18    on this size of loan.

19                    Now, over the summer of 2008 the parties

20    attempted to refinance this transaction, and it became

21    apparent on December 2nd, 13 days before the outside

22    closing date, that that refinance wasn't going to

23    appear, and it is that day that Granite said, Let's go

24    ahead and close the purchase.  That is why Alberta had

25    to have additional time to get new estoppel

44

1    certificates, because up until December 2nd, this was

2    going to be a refinance, not a sale.  And so in less

3    than 13 days, and it's actually about six days because

4    all of the documents are dated December 12, they're

5    all actually done by December 8.  So in about six days

6    they put together this transaction for a $160 million

7    sale, and Alberta simply did not have the time to get

8    new tenant estoppel certificates in six days.

9              So that's why there are two sets of

10   estoppel certificates.  And Alberta specifically

11   negotiated the right to deliver either the 2008

12   Estoppel Certificate or new ones, provided that the

13   new ones were substantially similar to the 2008.  And

14   as I said, the Cinema Estoppel Certificate is

15   identical, but for the one paragraph that relates to

16   the foundation.  All the other paragraphs that Mr.

17   Trahan mentioned that are unacceptable and constitute

18   material adverse changes, they're all acceptable

19   because they were all part of the 2008 Estoppel

20   Certificate.  The only issue is this paragraph 5, is

21   it material adverse modification, and we submit it

22   isn't.

23             Now, you may have seen Granite's trial

24   brief.  It was filed Friday.  We filed ours, according

25   to Judge Weinshienk, on Monday, seven days before

45

1    trial.  Granite took the opportunity by filing the

2    brief five days after we did to respond to some of our

3    arguments.  I want to make now just a couple of

4    points.  Would you pull up 7.2(f), and that's on

5    Exhibit 1.  Paragraph 7.2(f).

6              You remember Granite has played this

7    game for quite some time now.  In fact, it's the basis

8    I believe of why Judge Weinshienk denied our Motion

9    for Summary Judgment.  Granite has maintained

10   throughout this lawsuit that Alberta had a duty to

11   disclose any change in the condition of the property,

12   period.  Mr. Trahan repeated it again today.  This is

13   the section of the contract that relates to

14   notification of a change in condition of the

15   property.  And I want to read this to you, because it

16   is not as Judge Weinshienk found it to be, nor as Mr.

17   Trahan represented it to be in court today.  That is:

18   "Change in Condition."  "Seller shall promptly notify

19   Buyer of any change in any condition with respect to

20   the Property or -- Granite stops right there, period.

21   Well, it goes on to say, "or in any portion thereof or

22   any event or circumstance of which Seller has

23   knowledge subsequent to the date of this Agreement

24   which (1) makes any representation or warranty of

25   Seller to Buyer under this Agreement untrue or

46

1    misleading or (2) makes any covenant or agreement of

2    Seller under this Agreement incapable of being

3    performed."  Alberta had no obligation to disclose

4    general changes in the condition of the property, only

5    if one of those --

6              THE COURT:  Why was it you said Judge

7    Weinshienk was wrong?

8              MR. BENNETT:  The reason she's wrong is

9    she relied on Granite's statement of what this

10   paragraph meant.  And when she wrote this Order, she

11   ellipsed out all of paragraph 7.2(f).  You know, to

12   play Romeo and Juliet is a comedy if you ellipse out

13   the ending.  That's what they did here.  They don't

14   read their contract.  Mr. Alexander, whose deposition

15   we'll offer to you, he says this paragraph should be

16   read to stop with the word "property."  He doesn't

17   like the rest of the paragraph, either, because it's

18   there, and it totally undermined Granite's position.

19   So if you read all of 7.2(f), Granite loses.  They

20   lose.  There is no obligation to disclose changes in

21   the property, only if it makes a representation of

22   warranty of seller untrue, or if it makes a covenant

23   or agreement impossible of performance.  And we will

24   go through all the representations of the warranties

25   of the seller.  They're in the document.  There isn't

1   one representation about the quality or the condition

2   of the property because it is assumed by the buyer.

3   Alberta makes no representations of warranties

4   regarding the condition of the property.  So it is

5   impossible for a change in the condition to make a

6   representation of warranty to seller untrue.

7              Now, so this whole thing about we had

8   a duty of disclosure is just bogus, and it's been

9   perpetuated throughout this lawsuit.  Because Mr.

10  Alexander reads this and admits that you have to read

11  it differently than what it says is why we wanted him

12  here.  He's the man who was the managing agent of

13  BlackRock, who was the managing agent for Granite at

14  the time.  But he did testify to it in his deposition,

15  and we'll walk through that testimony to you so you

16  can see that he just doesn't want to accept it.

17             Now, let's go to 5.3., and that will be

18  back a few.  I think it's (c).  Yes.  Highlight (c).

19             Now, of all of the other things we're

20  going to look as far as waiver of warranties and not

21  making any warranties weren't clear enough, 5.3(c) of

22  the FPSA says "No Disapproval Right."  And I've

23  highlighted in yellow the critical language.

24             "Buyer has the right to assess the

25  property and perform additional tests and

48

1    inspections."  It has that right.  It hired an

2    engineer to monitor the construction throughout the

3    entire process.  Okay.  But this goes on to say:

4    "Buyer's right to access the property to perform

5    additional tests and inspections is in no way to be

6    inferred or interpreted as Buyer's right to disapprove

7    of the Property, terminate this Agreement or receive a

8    refund of its Earnest Money Deposit, it being

9    understood that, except as specifically set forth in

10   this Agreement (this is the critical language), Buyer

11   has no right to terminate this Agreement as a result

12   of any, any matter relating to the condition of the

13   Property, its entitlements status or marketability."

14              Granite had to purchase the property

15   regardless of the condition of the property.  That's

16   why I said earlier it doesn't matter whether the

17   tenant estoppel says there's a problem with the

18   property, whether Alberta told them or whether Granite

19   discovered them, Granite had to buy the property.

20              THE COURT:  So they have to buy whatever

21   you gave them?

22              MR. BENNETT:  Whatever we gave them, and

23   their protections are two.  (1) they have to agree

24   that it's substantially completed in accordance with

25   the plans and specifications, and there's a long

1   section in the Agreement about determining substantial

2   completion, and any punch list items after completion

3   cannot exceed $500,000.  That process which we'll look

4   at means that Alberta's architects certifies it's

5   substantially complete, Granite has their own

6   engineers certify that it's substantially complete,

7   and the two of them appoint a third engineer or

8   architect to certify that it's substantially

9   complete.

10          So Granite's protection was its experts,

11   Alberta's experts and an independent expert all

12   certify that the property is constructed, it's

13   constructed in accordance with the plans and the

14   specifications and there are no punch list items in

15   excess of $500,000.  That was done long before

16   disclosure.  And then if later on they discover a

17   construction defect, a cracked foundation, whatever,

18   they have all the representations and warranties as

19   Alberta does from the engineers, from the

20   subcontractor, so they step into the shoes of a

21   developer as well.  They have all the rights that

22   Alberta would have to go against the construction

23   professionals.

24          So Granite was protected.  It's not like

25   this was just an all one-sided deal.  By the way, this

50

1   is their contract.  It was written by them, by Ms.

2   Jane Snoddy Smith.  She was the lawyer who wrote this

3   up.  So this is not Alberta putting all this stuff in

4   to somehow take advantage of Granite, the investment

5   fund that invests for pensions and widows and orphans

6   as Mr. Trahan would suggest.  All right.

7            The final thing I want to say about

8   Granite's trial brief.  They write this statement that

9   Alberta's representations as to the condition of the

10  property were key components, their words, key

11  components of the underlying transaction, and that is

12  just a blatant falsehood.  Alberta made no

13  representations in warranties as to the condition of

14  the property and states that in at least five

15  different places in the contract.  So that is why the

16  condition of this property is absolutely immaterial.

17  As a matter of law, under the parties' agreements you

18  need no testimony.  All you need to do is read the

19  documents.  Everything we could say in this trial has

20  been said.  Thank you, your Honor.

21            THE COURT:  Let's give the court

22  reporter a five minute recess.  Now, who is your first

23  witness?

24            MR. TRAHAN:  Mr. Silva.

25            THE COURT:  How long is he going to be?

1                    MR. TRAHAN:  Maybe an hour.  Forty-five

2    minutes, an hour.

3                    THE COURT:  Okay.  Take 10 minutes,

4    Adrienne.

5        (Recess taken at 10:24 a.m., reconvened at

6    10:45 a.m.)

7                    THE COURT:  Be seated.  Do you have a

8    witness?

9                    MR. TRAHAN:  Yes, your Honor.

10                   THE COURT:  All right.

11                   MR. TRAHAN:  The plaintiff calls Chris

12   Silva.

13       (CHRISTOPHER C. SILVA, PLAINTIFF'S WITNESS,

14   SWORN.)

15                   THE COURTROOM DEPUTY:  Please be

16   seated.  State your full name for the record and spell

17   your last name.

18                   THE WITNESS:  Sure.  Christopher Charles

19   Silva.  S-i-l-v-a.

20                   THE COURT:  You may proceed.

21                   MR. TRAHAN:  Before we begin our

22   questioning of Mr. Silva, the plaintiff would like to

23   pre-admit Exhibits 1 through 20, 23, 24, 28, 30, 46

24   and 63.

25                   THE COURT:  Any objection?

```
 1              MR. BENNETT:  No, your Honor.

 2              THE COURT:  They're received.

 3       (Exhibits 1 thru 20, 23, 24, 28, 30, 46 and 63

 4   were received.)

 5                  DIRECT EXAMINATION

 6   BY MR. TRAHAN:

 7       Q      Mr. Silva, good morning.

 8       A      Good morning.

 9       Q      Where do you live?

10       A      Florham Park, New Jersey.

11       Q      And who is your employer?

12       A      BlackRock, Incorporated.

13       Q      Please explain to the Judge how

14   BlackRock, Incorporated is related to the plaintiff in

15   this lawsuit, Granite Southlands Town Center LLC.

16       A      BlackRock is the real estate -- or the

17   advisor for a real estate investment trust called

18   BlackRock Granite Property Fund which controls Granite

19   Southlands.

20       Q      And when I described the relationship

21   between the Granite Fund and Granite Southlands in

22   opening; was that correct?

23       A      Yes, sir.

24       Q      So the Granite Fund does invest in

25   pension funds, and the Granite Southlands Town Center
```

1    is an LLC that only has one asset and that's

2    Southlands Town Center?

3           A      That is correct.

4           Q      Starting with college, if you could

5    please explain your educational background.

6           A      I graduated in 1992 from Seton Hall

7    University with a bachelor's degree in finance, and

8    I graduated in 2000 from New York University with a

9    master's degree in real estate development and

10   investment.

11          Q      So your master's degree was in real

12   estate?

13          A      That's correct.

14          Q      What was your first job in the real

15   estate business?

16          A      I worked for a small real estate

17   investment banking firm as essentially a real estate

18   portfolio analyst.

19          Q      And when did you begin that job?

20          A      It was in 1993.

21          Q      If you could please walk the Court

22   through your work experience in the real estate

23   industry from that time through today.

24          A      Sure.  Between 1993 and 2000, I worked

25   for two small northern New Jersey based real estate

54

1    investment banking firms, Crumheim Mortgage and the

2    other company called Pool & Company.  In 2000, I went

3    to work for a small real estate development firm in

4    Newark, New Jersey called Concord Realty Development

5    and focused primarily on building neighborhood strip

6    shopping centers.  And then in 2003, I took a position

7    with SSR Realty Advisors, which is the predecessor

8    firm of BlackRock.

9          Q    So you've been essentially with

10   BlackRock or its predecessors since that time?

11         A    That's correct.

12         Q    During that course of your employment

13   from that time period, did you get experience in

14   purchasing real estate?

15         A    Yes.  I started in 2003 with the

16   acquisitions group at BlackRock where I was on a team

17   that was responsible for the region which included the

18   northeast in Chicago, which was an acquisition

19   function for BlackRock.

20         Q    If you could please describe your

21   personal involvement with the Southlands Town Center

22   project.

23         A    Certainly.  My involvement was as an

24   assistant portfolio manager which at the time was

25   Tower Fund which later became a Granite Fund.  Early

55

1  2007 was when I first got involved, and I was

2  primarily the liaison between the portfolio and the

3  acquisitions group.

4        Q       Where is the Southlands Town Center?

5        A       It's located in Aurora, Colorado.

6        Q       Please describe the types of businesses

7  that make up the Southlands Town Center.

8        A       It's primarily retail tenants and office

9  users; restaurants, Cinema, shops, clothing stores;

10  things of that nature.

11        Q       When you drive into it, if you could

12  just describe for the Court what it looks like as you

13  drive into the Southlands Town Center.

14        A       It looks precisely like that.  It looks

15  like a Town Center.  So there's a main road which is,

16  I used to call it the spine of the project, and then

17  there's a couple of small roads that offshoot that,

18  and there's stores on either side of it.  And then on

19  the second floor of those stores are office tenants or

20  office uses.

21        Q       And then at the end of the main street

22  -- I put up a chart earlier.  At the end of the main

23  street is the Cinema; is that correct?

24        A       That's correct.  If you drive further

25  into the project down the main road, it terminates at

1   a town square area where there's a fountain.  And then

2   straight beyond the fountain, I guess it's also a

3   recreational area and then the Cinema.  You're looking

4   straight at the Cinema.

5          Q     There's an ice rink out there now?

6          A     I believe that's true.

7                MR. TRAHAN:  Plaintiffs offer this

8   drawing as Exhibit 121.

9                THE COURT:  Any objection?

10               MR. BENNETT:  I object, your Honor.  It

11  was not previously disclosed in discovery or any time

12  else.  I saw it the first time this morning.

13               THE COURT:  Just the drawing?

14               MR. BENNETT:  Just the drawing, just

15  this morning.  It's sort of irrelevant, but it has not

16  been disclosed and it was never produced.

17               THE COURT:  It's admitted.

18       (Exhibit 121 was received.)

19          Q     (By Mr. Trahan)  When did Granite

20  purchase the Southlands Town Center, Mr. Silva?

21          A     December of 2008.

22          Q     Am I correct in understanding that the

23  original agreement between Alberta and Granite's

24  predecessor was a Forward Purchase and Sale Agreement?

25          A     That is correct.

1              MR. TRAHAN:  And if you could, please,

2    Lucy, put up Exhibit No. 1.

3         Q    (By Mr. Trahan)  Is this the Forward

4    Purchase and Sale Agreement that we've been referring

5    to, Mr. Silva?

6         A    It appears to be so, yes.

7         Q    Please describe for the Court generally

8    how a Forward Purchase and Sale Agreement, this

9    Forward Purchase and Sale Agreement works.

10             MR. BENNETT:  Objection.  The document

11   speaks for itself.

12             THE COURT:  I'm going to allow it.  I'm

13   the trier of the fact.  It can help me.

14             MR. BENNETT:  All right.

15             THE COURT:  Go ahead.

16        A    Generally speaking, the document governs

17   the purchase of a property at a later date.  So we

18   contracted for the property, and then once it's

19   complete we would complete the purchase of the

20   property.  And this document outlines the

21   relationships and the obligations between the

22   parties.

23        Q    (By Mr. Trahan)  If you could please

24   refer to page 17 of the document, which is page 18 of

25   the electronic exhibit.

1           MR. TRAHAN:  That's page 11.  If you

2   could go another six pages in.  If you could page down

3   two pages.

4           THE COURT:  This is page 15.

5           MR. TRAHAN:  We're looking at page 17,

6   and if you could cull out that middle section.

7           THE COURT:  All right.  Go ahead.

8       Q    (By Mr. Trahan)  Mr. Silva, I'll draw

9   your attention to Article VIII, which is "Buyer's

10  Conditions Precedent To Closing."  Have I read that

11  correctly?

12      A    Yes.

13      Q    What is, generally speaking, a condition

14  precedent to closing?

15      A    Certain conditions that absolutely have

16  to be met under all conditions in order for a

17  purchaser to close on the property.

18      Q    So in order for Granite to be obligated

19  to close on this property, these conditions would need

20  to be met?

21      A    That's correct.

22           MR. TRAHAN:  And if you could please

23  return to the next page and highlight the "Estoppels"

24  section or cull out the "Estoppels" section which is

25  Section (k) at the bottom.

1          Q      (By Mr. Trahan)  And this Section (k)

2     regarding the estoppels, it's one of the conditions

3     precedent to closing; is that correct?

4          A      That's correct.

5          Q      So what does that mean?  What does that

6     mean having the estoppel requirements in their

7     "Conditions Precedent" section?

8          A      Well, it's important when we buy an

9     income producing property the primary contract that

10    drives the transaction or the leases between the

11    landlord and tenant.  That's really what generates the

12    income.  So the Estoppel Certificates basically state

13    that the tenant's lease is in full force and effect,

14    that there's no claims or liabilities or any issues

15    regarding this space.  Essentially, what we're going

16    to do is rely on these statements by the tenant as the

17    future owner of the property to make sure we're not

18    stepping into, you know, any issues that we hadn't

19    bargained for.

20         Q      I'd like to talk to you about the events

21    leading up to this ultimate closing.

22                THE COURT:  This ultimate closing,

23    you're referring to the issue that's at dispute in

24    this Court at this particular time?

25                MR. TRAHAN:  I'm talking about the

60

1    closing on the sale of the property, your Honor.

2            Q      (By Mr. Trahan)   When was the closing

3    originally scheduled, the closing for the sale of the

4    property originally scheduled to take place?

5            A      I believe it was May of 2008.

6            Q      And did it close at that time?

7            A      It did not.

8            Q      And did the parties call off the deal

9    all together?

10           A      We did not.

11           Q      Did they reschedule the closing?

12           A      We did.

13           Q      When did they reschedule it for?

14           A      For December of 2008.

15           Q      Did Alberta deliver estoppels to Granite

16   in anticipation of the originally scheduled May 2008

17   closing?

18           A      They did not.

19           Q      Did they ever deliver those May 2008

20   Estoppel Certificates?

21           A      They did.

22           Q      When did they do that?

23           A      I believe it was in November of 2008.

24           Q      Okay.   And did Granite accept them?

25           A      We did not.

61

1        Q     Why didn't Granite accept them?

2        A     We didn't accept them because the

3    conditions or the agreement was that they had to be

4    dated within 30 days of the closing.   These were

5    several months old, so we rejected them for that

6    reason.   They were just too old.

7              MR. TRAHAN:   If you could please cull up

8    exhibit, Plaintiff's Exhibit 24.

9        Q     (By Mr. Trahan)   If you could please

10   direct your attention to the screen, Mr. Silva.   If

11   you could cull out the top section a little bit more.

12   Have you seen this document before, Mr. Silva?

13       A     Can you scroll down, please.

14       Q     And it might be helpful to show the

15   signature block on the next page.   Or the next.

16       A     Yes.   Yes, I have.

17       Q     So this is the May 2008 Colorado Cinema

18   Estoppel; is that correct?

19       A     That's correct.

20       Q     Okay.   So you testified that Granite did

21   not accept the 2008 Estoppels.   So what did the

22   parties do with respect to the estoppels?

23       A     We agreed that because the closing was

24   in December that we would make it a post-closing.

25   That we would allow the seller to provide them to us

62

1    after we closed.

2           Q    Okay.

3           A    I believe that they had to supply them

4    by May 1st of 2009.  So we essentially gave them two

5    months or 60 days to do so.

6           Q    I believe the date was March 1st, 2009.

7    So that would have been about 60 days after the

8    closing?

9           A    Correct.

10          Q    And when was the closing?

11          A    I think it was mid-December, December

12   12th, 2008.

13          Q    Okay.

14               MR. TRAHAN:  If you could please show

15   Plaintiff's Exhibit No. 17.

16          Q    (By Mr. Trahan)  Do you see the document

17   on the screen, Mr. Silva?

18          A    Yes.

19          Q    This is the Fifteenth Amendment to the

20   Forward Purchase and Sale Agreement, correct?

21          A    Yes, sir.

22          Q    And is this the document that was

23   executed in connection with the delayed closing?

24          A    Yes, I believe it was.

25          Q    If you could please refer to page 3 of

63

1    this document.  And if you'll look down at the bottom,

2    it says:  "Section 8.1(k)(ii) of the Town Center FPSA

3    is amended by deleting in its entirety and inserting

4    in lieu thereof the following."  And then it talks

5    about the Estoppel Certificates, correct?

6         A    That's correct.

7         Q    If you could please take a moment to

8    look over this, and then we'll show you the rest of

9    the provision which is on the next page.

10        A    Okay.

11        Q    So it says here -- I'm going back to

12   that language just very briefly.  It says here that

13   Granite can object to its Estoppel Certificate if it

14   "is not in the form required under paragraph

15   7.2(i)."  That's the Exhibit H to the Forward Purchase

16   and Sale Agreement, correct?

17        A    Correct.

18        Q    "Or has been materially and adversely

19   modified from that form"; is that right?

20        A    Correct.

21        Q    So this is the operative language that

22   the Court is being asked to consider in determining

23   the deficiency of the Cinema Estoppel Certificate; is

24   that right?

25        A    Yes.

64

1          Q       And then there's the second potential

2     basis upon which Granite could object, and it says, it

3     "indicates the continuing existence of an actual

4     material default of the Landlord under the applicable

5     Lease," right?

6          A       Correct.

7          Q       Now, I'd ask you to refer to the next

8     page, the continuation of this provision, and if you

9     could cull out, I think you're going to have to cull

10    out the whole paragraph.

11             THE COURT:  Can he summarize it without

12    reading the whole thing?

13             MR. TRAHAN:  Well, is it correct that --

14    we'd be happy to, your Honor.

15         Q       (By Mr. Trahan)  If you'll refer to the

16    bottom, it talks about the March 1, 2009 delivering of

17    the estoppel, correct?

18         A       Yes, I see it.

19         Q       And then I'll refer your attention to

20    the language about midway through the top section

21    where it talks about the May 2008 Estoppel

22    Certificates, correct?

23         A       Yes.

24         Q       So it says there that Granite was

25    required to accept the Estoppel Certificate that was

1    "substantially similar (if you could highlight that,

2    Lucy) to the Tenant Estoppel Certificate that the

3    Tenant executed in or about May 2008"; is that

4    correct?

5              MR. BENNETT:  Can I object to the way

6    these questions are being asked?  They're all

7    leading.  I know it's a trial to the Court, but can't

8    we get the witness's testimony?

9              THE COURT:  I'm going to allow some

10   leading because it is a non-jury, but let him tell his

11   story.  Like I say, I'll give you some leeway.

12             MR. TRAHAN:  Understood, your Honor.

13        Q    (By Mr. Trahan)  So there's a reference

14   in the May 2008 Estoppels here, correct?

15        A    Yes, sir.

16        Q    And what is the significance of that

17   with respect to Alberta's obligation to deliver the

18   Estoppel Certificates?

19        A    Our understanding was we would accept

20   them provided that they were substantially similar to

21   the ones that were provided in May of 2008.

22        Q    There's also a reference in this

23   paragraph from the Fifteenth Amendment to $650,000.

24   You'll see that midway through this paragraph.

25        A    Yes.

66

1        Q      And what was the significance of the

2   $650,000?

3        A      It was to partially offset the risk that

4   we took in accepting these estoppels post-closing.  We

5   normally do not accept estoppel certificates

6   post-closing, but because we agreed to in this case,

7   we felt the need to have some security in the event

8   that there was a problem with some of these

9   estoppels.  Because at this point we never closed on

10  the property and naturally our leverage was gone the

11  day we closed on the acquisition, so we felt the need

12  that if there was an issue, at least we had something

13  on a compensatory basis.

14       Q      Without speaking to a dollar figure,

15  would the loss of a tenant like the Cinema to the

16  Southlands Town Center, would that have a negative

17  impact on the value of the property?

18             MR. BENNETT:  Object.  Irrelevant.

19  Whether it adds a value of the property or not is not

20  an issue.

21             THE COURT:  What was the question again?

22       Q      (By Mr. Trahan)  The question is what

23  impact, if any, would losing a tenant like the Cinema

24  have on the value of the Southlands Town Center.

25             THE COURT:  I'll sustain that.

```
 1          Q     (By Mr. Trahan)  Do you know if Alberta

 2    provided an Estoppel Certificate to the Cinema after

 3    the December 2008 closing?

 4          A     Yes.

 5          Q     Did they after the 2008 closing?

 6          A     Yes.

 7          Q     Okay.  I'm going to refer you to

 8    Plaintiff's Exhibit No. 23.  I'll refer you to Exhibit

 9    23.  Is this a copy of the Estoppel Certificate that

10    the Cinema delivered after the December 2008 closing?

11          A     Yes, it is.

12          Q     Okay.  That's Exhibit 23.  I'd like to

13    go over these Estoppel Certificates with you, Mr.

14    Silva, but before we do that I'd like to ask you a few

15    questions about the Cinema, okay?

16          A     Okay.

17          Q     How much square footage does the Cinema

18    have at the Town Center?

19          A     I believe it's 72,000 square feet.

20          Q     And how does that compare to the total

21    square footage at the Town Center?

22          A     I believe the Town Center proper is

23    about 440,000 square feet.

24          Q     And approximately speaking, what is the

25    Cinema's total monthly rent?
```

1        A      Total monthly rent, including any

2    additional charges, is 165,000 per month.

3        Q      And how does that break down in terms of

4    the various components of the revenue from the Cinema?

5        A      I believe it's approximately 108,000 for

6    base rent.  It's approximately 38,000 for real estate

7    tax charges and approximately 18,000 per month for

8    common area insurance charges.

9        Q      When does the Cinema lease expire?

10       A      I believe there's 15 years remaining, so

11   that would put it about 2026, if my math is correct.

12       Q      Does Granite consider the Cinema to be

13   an important tenant?

14       A      It is the anchor tenant.

15       Q      So what do you mean by an anchor tenant?

16       A      It's the largest tenant by square

17   footage of the property.  The nature of the Cinema's

18   business generates a lot of foot traffic to the

19   property, and that foot traffic winds up patronizing

20   some of the other restaurants and shops at the

21   property.  So it is an important tenant.

22       Q      Okay. I'd like to take a few minutes

23   with you going over a comparison of the Form of

24   Estoppel, which is Exhibit H, with the January 2009

25   Estoppel, okay?

69

1          A     Okay.

2          Q     I'll go ahead and show you on the Elmo

3     here.  I'll show you some of the documents that I went

4     over in closing and ask you to comment on it.

5                Here is an exhibit -- here is a

6     comparison of paragraph 4 from the Form Estoppel and

7     paragraph 4 from the January 2009 Estoppel.  Do you

8     see that?

9          A     Yes.

10         Q     And do you agree that that's an accurate

11    comparison of the two provisions?

12         A     You mean the original to the 2009

13    Estoppel?

14         Q     Right.  Are these accurate reproductions

15    of what's in the actual estoppel?

16         A     Oh, yes, yes.

17         Q     Okay.  What is the purpose of the

18    paragraph 4 in the Form of Estoppel?

19         A     Paragraph 4 sets forth the rental

20    amount, specifies what the monthly rent is.  It

21    specifies the obligation and that it is current.  It

22    also sets forth if there's any additional charges that

23    are due by the tenant, such as real estate taxes or

24    other common area charges and makes a statement about

25    the security deposit.

70

1      Q      If you could take a moment to compare

2  that to the paragraph 4 in the January 2009 Estoppel,

3  Mr. Silva, and please let me know when you're done.

4      A      Okay.

5      Q      Are they the same?

6      A      They are not the same.

7      Q      If you could please describe what you

8  perceive are the key differences.

9      A      I believe the key differences, there's

10  an absence of the statement of the rent, the actual

11  monthly rent amount.  There's also an absence of any

12  indication that there's an obligation to pay real

13  estate taxes or any other common area charges which

14  are a pretty sizable expense for this one tenant.  So

15  the absence of that is pretty material.  And it

16  doesn't state whether the rent is current, which also

17  an important part.

18      Q      Do you view these differences as

19  material?

20      A      Yes, I do.

21      Q      If you could please explain why.

22      A      Well, again, it's an income producing

23  property --

24          MR. BENNETT:  I'm sorry, your Honor, I

25  didn't get a chance to object.  His personal

1   understanding of what is material is irrelevant.  This

2   is a contract, it's clear on its face, he cannot offer

3   opinions about -- there's been no determination that

4   any of these language is ambiguous.

5                    THE COURT:  I think I agree.  I'm going

6   to have to determine whether it's material or not.

7                    MR. TRAHAN:  All right.  We would like

8   to go ahead and offer this demonstrative as

9   Plaintiff's Exhibit 122.

10                    THE COURT:  Any objection?

11                    MR. BENNETT:  No, your Honor.

12                    THE COURT:  Received.  Go ahead.

13        (Exhibit 122 was received.)

14        Q    (By Mr. Trahan)  I'll now show you

15   paragraph 5 from the Form of Estoppel.  If you could

16   please describe for the Court generally what paragraph

17   5 covers.

18        A    Paragraph 5 covers the landlord's

19   obligation with respect to the occupancy and

20   construction of the tenant space and affirms that any

21   obligations or amounts that are due in connection with

22   that space has been satisfied.

23        Q    And at the bottom of this page here, it

24   indicates that there's no such language in the January

25   2009 Estoppel.  Is that a correct representation?

72

1          A       Yes, it's correct.

2          Q       Do you believe the deletion of paragraph

3   5 from the January 2009 Estoppel is an important

4   difference between the two documents?

5          A       I do.

6                  MR. TRAHAN:   Plaintiffs offer this

7   demonstrative as Plaintiff's Exhibit No. 123.

8                  MR. BENNETT:   No objection.

9                  THE COURT:   Received.

10         (Exhibit 123 was received.)

11         Q       (By Mr. Trahan)   Now, I'll show you

12  paragraph 6 from the Form of Estoppel.   If you could

13  take a moment to review that and then describe to the

14  Court generally what that paragraph covers when you're

15  done.

16         A       Generally, it's a statement by the

17  tenant that they have no defense or offset against

18  rent or any claims against the landlord as of the date

19  of the Estoppel Certificate, which serves to assure us

20  as a buyer that we're not going to step into some

21  dispute at a later date with the tenant.

22         Q       By dispute, so you mean this lawsuit?

23                 THE COURT:   Did you say that Granite is

24  not going to step into some dispute between the tenant

25  and the landlord which is the person you are

73

1   purchasing this property from?

2                   THE WITNESS:  Correct.

3                   THE COURT:  And that was Alberta?

4                   THE WITNESS:  Correct.

5                   THE COURT:  Okay.

6       Q    (By Mr. Trahan)  So to be clear, this

7   provision offers your assurance that you're not going

8   to step into the middle of a lawsuit or subject

9   yourself to a lawsuit; is that correct?

10      A    That's correct.

11                  MR. TRAHAN:  Plaintiff's offer this

12  demonstrative as Exhibit 124.

13                  THE COURT:  Received.

14      (Exhibit 124 was received.)

15      Q    (By Mr. Trahan)  The demonstrative I've

16  put up here compares the Form of Estoppel to the

17  January 2009 Estoppel.  If you could take a moment to

18  review the paragraph at the bottom.

19      A    Okay.

20      Q    When did you first learn that the Cinema

21  was complaining about a cracked foundation?

22      A    Through this Estoppel Certificate.

23      Q    You didn't learn about the tenant's

24  complaints until January of 2009?

25      A    Correct.

74

1          Q      Are you aware of the fact that the

2    Cinema had been in ongoing discussions and disputes

3    with Alberta months prior to that time?

4                 MR. BENNETT:  Object to the form.  It's

5    still leading, your Honor, and this particular

6    question was also irrelevant.

7                 THE COURT:  The question was, was he

8    aware or did he know.  Did you know that?

9                 THE WITNESS:  I did not.

10         Q      (By Mr. Trahan)  Did you come to learn

11   that?

12         A      Yes.

13                MR. TRAHAN:  Plaintiff offers this

14   demonstrative as Exhibit 125.

15                THE COURT:  Received.

16        (Exhibit 125 was received.)

17         Q      (By Mr. Trahan)  And finally, I'll refer

18   you to paragraph 7 of the Form of Estoppel and ask you

19   to compare that to paragraph 6 of the January 2009

20   Estoppel, Mr. Silva.  If you would please do that and

21   let me know when you are done.

22         A      Okay.

23         Q      What do you view as the key differences

24   between these two provisions, if there are any?

25         A      Well, the primary difference is in the

75

1    required certificate there's a feature which protects

2    us for an event that over the passage of time could

3    amount to a landlord default.  And in the January 2009

4    Estoppel, that's absent.  So when I look at these two,

5    the second language could open up the potential that

6    over the course of time we could step into a lawsuit

7    for an event that's currently going on right now.  And

8    the fact that they've put, I guess, a knowledge

9    qualifier in the January 2009 Estoppel is less direct

10   than them saying there is no default.

11            MR. TRAHAN:  Plaintiff offers this

12   demonstrative as Exhibit 126.

13            THE COURT:  Received, 126.

14        (Exhibit 126 was received.)

15        Q    (By Mr. Trahan)  Now I'd like to take a

16   moment with you to review the differences between the

17   May 2008 Estoppel, which is Plaintiff's Exhibit No.

18   24, and the January 2009 Estoppel, which is

19   Plaintiff's Exhibit No. 23.  Would you agree that the

20   May 2008 Estoppel does not include any reference to a

21   cracked foundation or a tenant dispute?

22        A    Yes, I would agree.

23            MR. TRAHAN:  Plaintiff offers this

24   demonstrative as Plaintiff's Exhibit 127.

25            THE COURT:  Received.

1          (Exhibit 127 was received.)

2          Q     (By Mr. Trahan)  Mr. Silva, you were

3   here for the opening statements, correct?

4          A     Yes, I was.

5          Q     And you heard Alberta's counsel talk

6   about the "As Is" provision in the Forward Purchase

7   and Sale Agreement?

8          A     Yes, I did.

9          Q     Do you agree with the assertion that

10  Granite was obligated to close on the property

11  regardless of its condition?

12               MR. BENNETT:  Objection, your Honor.

13               THE COURT:  Sustained.

14         Q     (By Mr. Trahan)  I'm going to show you

15  the final demonstrative here in comparison, but I'm

16  going to show you a provision comparing the May 2008

17  Estoppel to the January 2009 Estoppel.  If you could

18  take a moment to review those and let me know when

19  you're done.

20         A     Okay.

21         Q     Again, you were here for opening

22  statements, Mr. Silva, and did you hear Mr. Bennett

23  say that when you compare these two documents, that

24  the January 2009 Estoppel is exactly the same as the

25  May 2008 Estoppel word for word, except for the

1   paragraph 5 that references the cracked foundation

2   that everyone has heartburn about?

3          A     I did hear him say that, yes.

4          Q     And did you hear when he said that the

5   May Estoppel and the January 2009 Estoppel were

6   identical but for the one paragraph that mentions the

7   cracked foundation?

8          A     I did hear that.

9          Q     That's not correct, is it, Mr. Silva?

10         A     No, it's not.

11               THE COURT:  Go ahead.

12         Q     (By Mr. Trahan)  What makes you say that

13   that statement that the two documents were identical

14   but for the one paragraph that mentions the cracked

15   foundation, what makes you say that statement's

16   incorrect?

17         A     Because this paragraph right here was

18   removed in the January 2009 Estoppel from the May of

19   2008 Estoppel.

20         Q     And this is the paragraph you testified

21   to earlier that assured Granite that it was not

22   stepping into the middle of a lawsuit or dispute,

23   correct?

24         A     Yes.  This actually is quite important

25   with respect to the estoppel, because it assures that

1    we're not going to be taking on future liability for

2    something that happened prior to our ownership of the

3    property.

4         Q    And the January 2009 Estoppel does not

5    give you any such assurances, correct?

6         A    It doesn't.

7         Q    I'd like to talk to you about the

8    complaint about the cracked foundation, okay?

9         A    Okay.

10        Q    Did Granite have an obligation as the

11   buyer to investigate the merits of the dispute within

12   this Tenant's Estoppel Certificate?

13             MR. BENNETT:  Objection.

14             THE COURT:  I'll allow that.

15        A    We did not have a duty to investigate

16   the merit.  It was between the tenant and the landlord

17   or the seller.  Our feeling, our opinion was the

18   seller had a duty to provide us with unqualified

19   estoppel certificates and nothing more and nothing

20   less.  So no, we did not feel as though we had a duty

21   to investigate the merit of the dispute.  It wasn't

22   between us.

23        Q    (By Mr. Trahan)  So if Alberta delivered

24   an estoppel that was substantially similar to the May

25   2008 Estoppel, you were bound to accept it?

1        A        That's correct.

2        Q        Regardless of whether you knew about

3   disputes or not between the landlord and the tenant?

4        A        Correct.

5        Q        So it was just about the estoppel

6   certificates?

7        A        Correct.

8        Q        I'd like to talk to you a moment about

9   the events following your receipt, Granite's receipt

10   of the 2009 Cinema Estoppel.  If you could please

11   refer to Exhibit 28.  We're going to flash it up on

12   your screen there.

13               MR. TRAHAN:  Has this been admitted,

14   28?  I'm sorry.  Plaintiff's offer the last

15   demonstrative as Exhibit 127.

16               THE COURT:  Received.

17               MR. TRAHAN:  128.  My apologies.

18               THE COURT:  Received.

19        (Exhibit 128 was received.)

20               MR. TRAHAN:  If you could cull out the

21   top portion starting with the "from" and take it all

22   the way down through the language -- there you go.

23        Q        By Mr. Trahan)  If you could please take

24   a moment to review this e-mail, Mr. Silva, starting at

25   the bottom.  The e-mail, the February 18th e-mail

80

1    addressed to Chris by Mr. Cudlip.

2              A    Okay.

3              Q    This appears to be a communication

4    between you and Mr. Cudlip for Alberta regarding the

5    Cinema Estoppel and the DCC Architect's Estoppel,

6    correct?

7              A    That's correct.

8              Q    Is this the first you learned that the

9    problems that the Cinema was receiving the Cinema

10   Estoppel Certificate?

11             A    That's correct.

12             Q    I expect you'll be asked about a

13   September 2008 trip to Southlands.  Were you there in

14   September of 2008?

15             A    I was there.

16             Q    Okay.  Who did you meet with?

17             A    I met with Peter, I met with --

18             Q    If you could please say the last names.

19             A    Sure.  Peter Cudlip.  I met with Jose

20   Inclan and a fellow by the name of Joe Bellio.

21             Q    All with Alberta?

22             A    All with Alberta.  And then from our

23   BlackRock's office, I met with Angela Kralovec.

24   Justin Loiacono was there, as well as Michael Krier.

25             Q    Okay.  And what was the nature of the

81

1    meeting?

2         A    We were approaching the closing in

3    December, and we thought it would be a good idea for

4    our project to have a bit of a meet and greet between

5    BlackRock and the management team.  And I know there

6    was a couple of transitional issues that Angela and

7    Mike wanted to work out with some of the management

8    folks there.  So it was again a bit of a integration

9    meeting to get to know the teams on both sides.

10        Q    Did you discuss the problems at the

11   Cinema at the September 2008 meeting?

12        A    We did not.

13        Q    Did you inspect the problems at the

14   Cinema at the 2008 meeting?

15        A    We did not.

16        Q    I'm going to refer you to Plaintiff's

17   Exhibit No. 30.  It's already been shown in the

18   opening.  This is a February 24, 2009 letter, I guess

19   that would be two years ago and 10 days.  This is the

20   letter from Fulbright & Jaworski to Alberta putting

21   them on notice of issues with the Estoppel

22   Certificates, correct?

23        A    Can I see the second page?  Yes, that's

24   correct.

25        Q    And was Fulbright & Jaworski your

1    counsel for purposes of rejecting the Southlands Town

2    Center transaction?

3         A    They were.

4         Q    And was Fulbright & Jaworski the firm

5    that you've retained to represent you in connection

6    with this lawsuit?

7         A    We have.

8         Q    Has it been necessary to retain

9    Fulbright & Jaworski to pursue the claim on the escrow

10   money?

11        A    It has.

12        Q    If you could please refer to Exhibit No.

13   35, which has not been previously admitted.  So if you

14   could not publish it to the Court just yet, if that's

15   possible.

16             THE COURTROOM DEPUTY:  No, it's not

17   possible.

18             MR. TRAHAN:  Okay.  I will show him a

19   hard copy of the exhibit.  May I approach the witness,

20   your Honor?

21             THE COURT:  You may.  Did you show it to

22   your adversary first?

23             MR. BENNETT:  Yes.  I have a copy, your

24   Honor.

25             MR. TRAHAN:  We've exchanged copies of

83

1    the exhibits.

2              THE COURT:  Questions?

3         Q    (By Mr. Trahan)  If you could take a

4    moment to review Exhibit No. 35 and describe what it

5    is generally.

6         A    It's a notification to the escrow agent

7    that Alberta had failed to meet the estoppel agreement

8    requirements by the allotted date and a request for

9    the turnover of the funds.

10             MR. TRAHAN:  Plaintiff's offer Exhibit

11   35.

12             MR. BENNETT:  No objection.

13             THE COURT:  Received.

14        (Exhibit 35 was received.)

15             MR. TRAHAN:  If you'd please publish

16   Exhibit 35.  I'll allow a moment for the Court to

17   review it.

18             THE COURT:  Go ahead.

19             MR. TRAHAN:  Your Honor, the next

20   exhibit that plaintiffs would like to offer is the

21   March 6, 2009 letter from Land Title that is

22   Plaintiff's Exhibit No. 36.  Plaintiff's offer Exhibit

23   No. 36.

24             THE COURT:  Received.

25        (Exhibit 36 was received.)

84

1          MR. TRAHAN:  If you could please publish

2    Exhibit 36.

3          Q    (By Mr. Trahan)  If you could please

4    take a moment to review Exhibit 36, Mr. Silva, and

5    then describe what it is.

6          A    It's a letter from the escrow agent

7    setting forth the fact that there's a dispute between

8    the parties, and that as a result of these conflicting

9    instructions that they're going to, I guess, remand

10   the funds to the courts.

11         Q    And that letter is dated March 6, 2009?

12         A    Can you scroll up?  I can't see it.

13         Q    I believe I can.

14         A    Thank you.  Yes, it is March 6th.

15         Q    And then if you could refer back to

16   Exhibit 35, which is the letter from Granite's counsel

17   to Land Title.  The date of that letter is?

18         A    March 4th, 2009.

19         Q    So this is just three days after the

20   deadline for Alberta to deliver the estoppels?

21         A    Correct.

22         MR. TRAHAN:  Thank you, Mr. Silva.

23   Plaintiff passes the witness.

24         THE COURT:  Cross.

25         MR. BENNETT:  Thank you, your Honor.

1                    CROSS-EXAMINATION

2    BY MR. BENNETT:

3                    THE COURT:  You may proceed.

4                    MR. BENNETT:  The witness is getting a

5    drink of water.

6                    THE WITNESS:  Thank you.

7                    THE COURT:  Better be drinking water.

8    Go ahead.

9                    MR. BENNETT:  Thank you, your Honor.

10        Q     (By Mr. Bennett)  Mr. Silva, you were

11   part of the Acquisitions Department of BlackRock in

12   2003, '4 and '5; is that right?

13        A     2003.  I started with Tower Fund in

14   2004.

15        Q     But you were not responsible for

16   properties that were located in the western part of

17   the United States like Southlands?

18        A     That's correct.

19        Q     You had responsibility for, I think you

20   said, the northeast and Chicago, right?

21        A     I did.  For a short time I worked in the

22   Joint Venture Acquisition Group which was a national

23   platform.  So for a short time I did have some

24   responsibility for properties outside of the northeast

25   and Chicago.

86

1          Q       This property was a joint venture

2     acquisition group property, wasn't it?

3          A       Yes.

4          Q       And by that, you mean that the ultimate

5     purchaser was not going to be BlackRock but a joint

6     venture between BlackRock and the developer, right?

7          A       That's what was contemplated.

8          Q       All right.  Now, BlackRock had a

9     strategy in 2004 and '5 of acquiring a certain

10    percentage of the portfolio for the Granite Property

11    Fund pursuant to these four contracts, right?

12         A       That's correct.

13         Q       The reason for doing that is you could

14    set the price at the time of contracting and

15    hopefully, with the market conditions and luck, the

16    value of the property would increase before you

17    actually had to acquire title, right?

18         A       That's one of the reasons.

19         Q       So that's one of the advantages to

20    Granite in buying the property pursuant to a Forward

21    Purchase and Sale contract, right?

22         A       There's others, but that's one of them,

23    sure.

24         Q       One of the other reasons is that you

25    don't have to go out and try to bid for properties

1    already on the market, right?

2          A    That's another reason.

3          Q    And there's not always enough properties

4    available for a fund like Granite to a buyer at any

5    given time; isn't that right?

6          A    Right.  That's possible.

7          Q    Now, you know that this Forward Purchase

8    and Sale Agreement that's Exhibit 1 was a part of the

9    financing of this project, right?

10         A    Yes.

11         Q    And you know that Granite entered into a

12   Tri-Party Agreement with both the lenders and Alberta

13   as part of the financing?

14         A    Correct.

15         Q    And essentially assigned the Forward

16   Purchase and Sale Agreement to the lenders as

17   collateral for their loan, right?

18         A    That's my understanding.

19         Q    And the lenders had the right to

20   exercise all of Alberta's rights under the Forward

21   Purchase and Sale Agreement in the event of a default

22   by Alberta, right?

23         A    That's my understanding.

24         Q    Now, this form of Forward Purchase and

25   Sale Agreement, Exhibit 1, do you know whether the As

88

1    Is, Where Is provision is a standard type provision

2    used in Granite's --

3              MR. TRAHAN:  Your Honor, I'll object to

4    the relevance and to its being argument; that I didn't

5    get to ask Mr. Silva questions about the As Is

6    provision.  I was refused the opportunity to do so

7    when an objection by Mr. Bennett was sustained.

8              THE COURT:  I'll sustain it.

9         Q    (By Mr. Bennett)  You recognize that

10   this Forward Purchase and Sale Agreement has an As Is,

11   Where Is provision in the contract, don't you?

12        A    I do.

13        Q    And let's go to paragraph 5, please.

14             THE COURT:  Page?

15             MR. BENNETT:  I have to get my notes.

16             THE COURT:  Page 7.

17             MR. TRAHAN:  Okay.  It's page 7 of the

18   agreement.  It's page 14 of the exhibit.  There's

19   several pages of unnumbered definitions and indexes.

20             MR. BENNETT:  Would you blow up the As

21   Is, Where Is, please.

22        Q    (By Mr. Bennett)  So Mr. Silva, you

23   recognize what we've put on the screen before you as

24   paragraph 5.1 of Exhibit 1 is the As Is, Where Is

25   provisions of this contract?

89

1          A      That appears to be so, yes.

2          Q      And the contract says:  "As an essential

3    inducement to Seller to sell the Property to Buyer on

4    the terms and conditions set forth in this Agreement,

5    Buyer acknowledges, understands and agrees as

6    follows," right?  That's what the contract says.

7          A      Yes, that's what the first sentence

8    says.

9          Q      Okay.  Now the first recital is:  "Buyer

10   is a sophisticated purchaser who is an experienced

11   investor in and owner of the property."

12              MR. TRAHAN:  Object to relevance.  It

13   constitutes argument and lack of foundation.

14              THE COURT:  He's asking this is what the

15   document says, and it is in evidence.  Does it say

16   that?  Yes or no.  You can answer.

17          A      Yes, that's what the first part of it

18   says, yes.

19          Q      (By Mr. Bennett)  Okay.  It goes on to

20   say:  "Except as otherwise specifically provided

21   herein or for any warranty that is part of the

22   Intangible Property assigned to Buyer at the Closing

23   pursuant and subject to the terms hereof, neither

24   Seller nor any of their agents, brokers or employees

25   has made and does not make any representations or

90

1    warranties of any kind whatsoever, whether oral or

2    written, express or implied, with respect to the

3    Property."  Did I read that properly?

4          A    Yes.

5          Q    Now, continuing on in the last sentence

6    of the first paragraph, beginning in the middle of the

7    sentence:  "the Property is being sold to Buyer," (and

8    I've highlighted in yellow you can see where I'm

9    reading), the property is being sold to Buyer on the

10   Closing Date in its then "As Is, Where Is" condition,

11   with all faults."  Did I read that properly?

12         A    Yes.

13         Q    Now, paragraph (b) goes on:  "In

14   particular without limiting the generality of" the

15   foregoing, and then it provides some more statements

16   about the lack of representations of the warranty,

17   doesn't it?

18         A    It mentions representations and

19   warranties, yes.

20         Q    And the part that I've highlighted in

21   the middle of the paragraph:  "Neither Seller nor any

22   of its agents, brokers or employees has made and does

23   not make any representations of warranties of any kind

24   whatsoever, whether oral or written, express or

25   implied, with respect to," (then it has the economic

91

1    value of the property, adequacy of water and so forth,

2    skipping down) "or the physical condition of the

3    property," correct?

4         A    That's what it says.

5         Q    All right.  Now, let's go to the next

6    paragraph.  It's continued on with the absence of

7    warranties regarding environmental matters, the

8    presence of asbestos or petroleum products, whether

9    the project complies with local, municipal, regional,

10   state and federal requirements, or other statutes,

11   laws, codes, ordinances, regulations or requirements,

12   right?

13        A    That's what the paragraph says.

14        Q    Okay.  Thank you.  Now, let's go to

15   paragraph -- let's look at 5.2 for a minute.  Under

16   their contract, Granite had the right to inspect the

17   property, didn't it?

18        A    Well, it doesn't cover this particular

19   paragraph.

20        Q    Okay.  The title of this whole section

21   is "Inspection and Approval of Property."  You

22   recognize that Granite had the right to inspect the

23   property, right?

24        A    Yes, we did.

25        Q    And Granite actually hired engineers to

92

1    conduct inspections, didn't they?

2          A    We did.

3          Q    And they were on-site frequently,

4    weren't they?

5          A    I'm not sure of the frequency of the

6    visits.  I know that they made periodic inspections,

7    but I don't know if it was frequent or what the time

8    frame was.

9          Q    All right.  Now, let's go to the next

10   page, please.  5.3(c) is where I want to get to.  So

11   now on 5.3(c) on page 11 of the document and page 18

12   of the exhibit, the buyer specifically has no right to

13   terminate the Agreement as a result of any matter or

14   anything relating to the condition of the property,

15   its entitlements status or marketability, right?

16         A    That's what it says.

17         Q    So you knew that Granite under this

18   contract, you had no right to terminate this agreement

19   as a result of anything relating to the condition of

20   the property, didn't you?

21         A    That's what the contract says.

22         Q    No ambiguity in that, is there?

23         A    I didn't draft it.

24         Q    Well, as you're sitting there, is there

25   anything ambiguous about that provision?

93

1        A     Well, I think you have to take this

2    provision in context with the rest of the contract.

3        Q     As you read it today, is that provision

4    ambiguous?  Do you not understand what it means?

5              MR. TRAHAN:  Objection.  Argumentative.

6              THE COURT:  Yes, I think he has

7    explained it, but I'll allow you to answer it.  Can

8    you answer it?

9        A     Again, I think my opinion is, is that it

10   has to be taken in context with the rest of the

11   provisions of the contract.

12       Q     (By Mr. Bennett)  What specific

13   provisions do you have in mind, Mr. Silva?

14       A     Well, there's other provisions that

15   would, you know, govern our closing of the asset.

16       Q     Okay.  And specifically, the conditions

17   of closing that you mentioned on direct?

18       A     Yes.

19       Q     The conditions to closing.  All right.

20             Now, you have never, yourself,

21   personally negotiated any Forward Purchase and Sale

22   Agreement, have you?

23       A     It wasn't in my job skills, no.

24       Q     So the answer is you have not ever

25   negotiated any Forward Purchase and Sale Agreement?

94

1        A     Not in its entirety.  Certain provisions

2    of it, I have.

3        Q     Have you ever negotiated the As Is,

4    Where Is provisions of a Forward Purchase and Sale

5    Agreement?

6        A     Not to my knowledge.

7        Q     So you don't have any special knowledge

8    as to the meaning that this contract has when it says

9    the sale is on an As Is, Where Is basis?

10       A     I didn't negotiate this provision.  I

11   didn't draft it; so, no.

12       Q     So the answer is you have no special

13   knowledge, right?

14       A     I understand the spirit of it, but I

15   didn't draft it.

16       Q     Now your normal job duties at BlackRock

17   were to set strategies for the fund and the

18   acquisition of its properties, right?

19       A     That was one of them.

20       Q     And you worked with groups that execute

21   that strategy, the property acquisition group and the

22   property management group, right?

23       A     Asset management, the research group;

24   that's correct.

25       Q     And it isn't even your job normally to

1    review contracts between the parties, is it?

2          A      Not particularly so.  That would fall in

3    the acquisitions component of their duties.

4          Q      Okay.  And the person who was in charge

5    of the acquisitions group for Colorado or for the area

6    that encompassed Colorado was this Mr. Steve Corrigan,

7    correct?

8          A      At the time, that's correct.

9          Q      And it was Mr. Corrigan or his group

10   that negotiated the Forward Purchase and Sale

11   Agreement with my client Alberta Town Center.

12         A      Yes, they were the primary group that

13   did it.

14                MR. BENNETT:  Let's go to paragraph 7.2,

15   page 23.  Highlight paragraph (f), please.

16         Q      (By Mr. Bennett)  This is paragraph

17   7.2(f) on page 23 of Exhibit 1.  You have no special

18   knowledge or understanding of this particular

19   provision either, do you?

20         A      Well, I understood just generally if

21   there was a change in condition of the property that

22   we would be notified.

23         Q      So you read that to stop with the word

24   "Property."  "Seller shall promptly notify Buyer of

25   any change in any condition with respect to the

1    Property," period.  That was your expectation?

2         A     Well, if there's a change in the

3    property, we just expected that we would be notified

4    if there was a change in condition.

5         Q     Okay.  So you do not understand that

6    that obligation of seller to notify buyer is subject

7    to two conditions; one being it makes a representation

8    or warranty of Seller to Buyer under this Agreement

9    are untrue or misleading, right?

10        A     That's what's written.

11        Q     And the second is:  "Makes any covenant

12   or agreement of Seller under this Agreement incapable

13   of being performed," right?

14        A     Okay.

15        Q     Those two paragraphs modify, under this

16   Agreement, seller's obligation to notify buyer of a

17   change in condition of the property, don't they?

18        A     That's the way it's drafted.

19        Q     Okay.  You don't know, as you sit here

20   today, what representations and warranties the seller

21   made regarding the condition of the property, do you?

22        A     I'd have to read the document.

23        Q     And you haven't done that in preparing

24   to testify in this court today?

25        A     Not in its entirety, no.

97

1          Q      So can you tell me any representations

2     or warranties the seller made in this document?

3          A      I'd have to read it.

4          Q      So as you sit here, you can't?

5          A      No.

6                 MR. BENNETT:  Let me go to the

7     Representations and Warranties here.  It's on page 34,

8     paragraph 11.2.  If you could highlight the "Seller's

9     Representations and Warranties" at the bottom of the

10    page.

11         Q      (By Mr. Bennett)  So "Seller's

12    Representations and Warranties."  11.2.  "Seller

13    represents and warrants to Buyer as follows as of the

14    Effective Date and as of the Closing Date (unless

15    otherwise specified herein as being as of either such

16    date)."  Did I read that right?

17         A      Yes.

18         Q      So you recognize that these are the

19    Seller's Representations and Warranties set forth in

20    the contract; is that right?

21         A      That appears to be the heading for it,

22    yes.

23         Q      Okay.  And the first paragraph deals

24    with fact that the seller is a limited liability

25    company, duly organized, validly existing, et cetera.

98

1        A      Correct.

2        Q      Let's go to the next page.  The next

3   seller's representations:  "This Agreement and all

4   documents executed by the Seller that are being

5   delivered to Buyer at the closing are, or at the time

6   of closing will be duly authorized, executed and

7   delivered by seller."  It goes on.  So that's a duly

8   execution of all the closing documents, correct?

9        A      Correct.

10       Q      Let's go to the next paragraph C.

11  "Seller is not a foreign person as defined in Section

12  1445 of the Internal Revenue Code, IRC," right?

13       A      Yes.

14       Q      Okay.  These first three provisions, any

15  of them have anything to do with the condition of the

16  property?

17       A      Doesn't appear to.

18       Q      Let's go to "d", the fourth

19  representation of the warranty of seller.  "A true and

20  correct copy of each and every lease regarding the

21  Property has been delivered to Buyer.  As of the

22  Closing Date, except for Qualifying Leases or other

23  leases entered into in accordance with this Agreement,

24  there are no leases or other tenancy agreements

25  affecting the property."  Read that right?

99

1         A      It goes on to say that the landlord is

2    not in default or breach of any material terms,

3    representations, covenants or conditions set forth in

4    any of the Qualifying Leases.

5         Q      Well, let me get my first question

6    asked, then we'll go to that one.  The first two

7    sentences which I read, I read them correctly, right?

8         A      Correct.

9         Q      Buyer gets all of the leases and (2),

10   there aren't any other leases other than qualifying

11   leases which the buyer has agreed to, right?

12        A      Correct.

13        Q      Now the next sentence is:  "As of the

14   Closing Date, Seller, as Landlord, is not in default

15   or breach of any of the material terms,

16   representations, covenants or conditions set forth in

17   any Qualifying Lease."  Correct?

18        A      Correct.

19        Q      That may or may not have anything to do

20   with the condition of the property depending upon the

21   underlying leases, right?

22        A      It may or may not; that's correct.

23        Q      Okay.  So if the seller has no

24   obligation to repair any condition in a tenant's

25   lease, the fact that he hasn't done so would not be

1   a breach of this particular representation, right?

2        A    I'm sorry.  Can you ask that again?

3        Q    Sure.  Let's start with the easier one.

4             If the landlord is obligated to repair a

5   tenant's premises and it hasn't done so, then it may

6   be violating this representation that it is not in

7   default for breach of any lease, right?

8        A    Again, it could be a violation of rent.

9        Q    Okay.  And if the lease doesn't impose

10  upon the landlord any obligation to repair or maintain

11  the premises, then failing to repair or maintain it is

12  not a landlord default, is it?

13       A    No, but if there was a requirement to

14  repair, it would be.

15       Q    Correct.  All right.  So this is a

16  paragraph that perhaps, depending upon the condition

17  of the property, paragraph 7.2(f) might require some

18  disclosure?

19       A    Correct.

20       Q    All right.  Let's go on to the next

21  one.  The fifth one, paragraph (e) is there's no

22  attachments, execution proceedings, insolvency or

23  bankruptcy proceedings, correct?

24       A    Correct.

25       Q    Has nothing to do with the condition of

1    the property, right?

2         A    Appears not.

3         Q    Let's go to (f).  "Seller has been

4    adequately represented by competent legal counsel, and

5    this Agreement is the product of an arm's-length

6    negotiation between Seller and Buyer."  Is that the

7    next representation?

8         A    Yes.

9         Q    Has nothing to do with the condition of

10   the property, either, sir; is that correct?

11        A    Correct.

12        Q    Okay.  Next one.  "There is no on-going

13   or to Seller's knowledge any pending litigation

14   against Seller or the property.  Seller has not

15   received written notice of any threatened litigation

16   against Seller or the Property."  Depending on whether

17   there was a threat involving the condition of the

18   property, that might be involved in the Notice

19   Provision of 7.2(f).

20        A    It could be.

21        Q    All right.  And then let's look at (h).

22   "Seller is not a "party in interest" within the

23   meaning of Section 3(14) of the Employee Retirement

24   Income Security Act of 1974, as amended ("ERISA"),"

25   and it has provisions.  That representation of

1  warranty has nothing to do with the condition of the

2  property, does it?

3          A      Correct.

4          Q      Go to the next page.  So that concludes

5  all of seller's -- and you can tell from Exhibit 1,

6  page 36, that that concludes all of the seller's

7  representations and warranties made under that

8  heading.

9          A      It appears to be, correct.

10         Q      Now, it is also not part of your normal

11 duties to review contracts with estoppel provisions,

12 is it?

13         A      I normally do not review contracts for

14 purchase and sale during the normal course of my job

15 duties, no.

16         Q      All right.  So you don't review

17 contracts for the acquisition of a property,

18 generally?

19         A      Again, that task falls primarily on the

20 acquisitions group who works in conjunction with our

21 counsel.

22         Q      Okay.  Now, you testified that you have

23 a general understanding of the purpose of tenant

24 estoppel certificates, right?

25         A      Correct.

1          Q      You've expressed a couple of opinions

2     today about whether things were important or not

3     within the tenant's estoppel.

4          A      Correct.

5          Q      And it is your belief that you have no

6     obligation, you, being Granite, not you, personally.

7     You, being Granite, has no obligation to look at a

8     tenant's lease in determining whether the tenant's

9     certificate is correct or not?

10         A      Well, the lease may not give you all the

11    details regarding a dispute that has been identified

12    in Estoppel Certificate.  Typically, when a dispute is

13    notified between, or noticed between a landlord and a

14    tenant, it's incumbent upon the seller or the landlord

15    to remove that dispute and resolve it.  It's not our

16    obligation to go and determine what the merits of that

17    dispute are.  By merely reading a lease, I'm not

18    convinced that we're going to find out if there's

19    merit from a dispute that's noticed in an estoppel

20    certificate.

21         Q      Let me go back to my question.  It is

22    your position, you, in rejecting a tenant estoppel,

23    have no obligation to even look at the tenant's lease

24    in making a decision about whether the certificate is

25    appropriate or not?

1          A     No.

2          Q     It is your position, correct?

3          A     That is my position, correct.

4          Q     And it is your position that any dispute

5    that is reflected, no matter how minor or how large on

6    a tenant estoppel, is grounds for rejecting it?

7          A     That's not true.  There are some

8    disputes that may be of a minor nature, as you

9    indicated earlier over, you know, the tenant's per

10   square foot percentage on a real estate tax

11   reimbursement.  There are certain things that, you

12   know, are of a minor nature that will get resolved

13   that aren't material to the risk of the tenant's

14   estoppel or purchasing a property.  It comes down to

15   a material nature does it change the risk profile of

16   that tenant.  And if there's a dispute on a large

17   tenant in a shopping center that we're going to be

18   purchasing, that is a material issue for us.

19         Q     Any dispute at all with a major tenant

20   and a significant seller?

21         A     No, I wouldn't say any dispute.  I mean,

22   it would have to be of a material nature.  And the one

23   that was identified in the Colorado Cinema's Estoppel

24   to us was a major issue.

25         Q     Now, you're not aware, are you, of any

1  deal -- strike that.

2            You have never personally been involved

3  in rejecting any tenant estoppel because of a

4  condition of the tenant space; is that right?

5       A     I don't believe I have.

6       Q     Generally speaking, in determining

7  whether something is important or material under the

8  contract language, you follow the advice of your

9  attorneys, right?

10      A     Naturally.

11      Q     And that's what happened here.  It was

12  the attorneys who rejected the Cinema Estoppel, isn't

13  that right?

14      A     That's not true.  The issue was brought

15  to the forefront in the Estoppel Certificate.  We had

16  a discussion with our attorneys, and it's a consensus

17  based decision.  And it was our counsel's advice that

18  we reject the Estoppel Certificate based upon what was

19  written by the tenant.  We adhere to their advice.  So

20  it is not solely the attorney's decision.  It is a

21  consensus between the two parties.

22      Q     There were nine tenant estoppels

23  rejected on Ms. Smith's letter, correct?  Do you

24  remember that, or do you need to look at it?  It's

25  Exhibit 30, page 2.  So there are nine tenant

1   estoppels that were rejected, correct?

2        A    Correct.

3        Q    Did you have discusses on each one of

4   those with your attorneys before they were rejected or

5   only the Cinema?

6        A    I believe it was only the Cinema was the

7   one where I was involved.

8        Q    All right.  So if I were to ask you what

9   the basis of any of the other tenant estoppels were

10  rejected, you would not have any knowledge of that?

11       A    I wouldn't.

12       Q    Now, let's pull up the two tenant

13  estoppels.  Let's start with Exhibit 23.  23, you

14  previously identified as the Cinema Estoppel

15  Certificates, correct, the one that you received in

16  January of 2009?

17       A    Can you go to the date, please?

18       Q    Sure.  Go to the last page.

19       A    Yes, that appears to be the one we

20  received in 2009.

21       Q    And Exhibit 24 is the 2008 Estoppel

22  Certificate, right?

23       A    I'm sorry?

24       Q    Exhibit 24 is the 2008 Estoppel

25  Certificate.

1        A    I don't see that in front of me.

2        Q    All right.  Well, we'll get to that in a

3    minute.  Let's deal with -- so on the left-hand side

4    is Exhibit 23.  Can you read that?

5        A    Yes.

6        Q    Okay.  And on the right-hand side is

7    Exhibit 24.

8        A    Okay.

9        Q    Correct?

10       A    Yes.

11       Q    And we know that Exhibit 23 is the

12    January 2009 Cinema Estoppel Certificate and Exhibit

13    24 is the May 2008, right?

14       A    Can you scroll to the last page of 24

15    just so I can see the date?

16       Q    Sure.

17       A    Correct.

18       Q    Okay.

19       A    Thank you.

20       Q    So we've got the right two documents

21    we're looking at.

22            Now, let's look at paragraph 1 of each

23    one of these Estoppel Certificates.  We have

24    highlighted now paragraph 1 from each of the two

25    estoppels?

108

1          A      Yes.

2          Q      Would you agree with me they are

3    identical?

4          A      Yes.

5          Q      Let's go to paragraph 2.  Paragraph 2 of

6    each of the two Estoppels is identical, correct?

7          A      Correct.

8          Q      Okay.  Paragraph 3.  Can you read those

9    and confirm for me that they are identical.

10         A      Correct.

11         Q      And these two paragraphs from each of

12   the Estoppel Certificates say that the term of the

13   lease is commenced, the tenant has accepted

14   possession, all improvements have been constructed.

15   The landlord has paid for all tenant improvement

16   allowance as required, and the tenant has not assigned

17   a lease or sublet any portion, correct?

18         A      Correct.

19         Q      Let's go to the next one.  These two

20   paragraphs are identical?

21         A      Yes.

22         Q      Okay.  And I understand from your

23   testimony on direct that you have some concern that

24   paragraph 4 doesn't comply with the Form Estoppel

25   Certificate attached to the Forward Purchase and Sale

1   Agreement, right?

2          A       Correct.

3          Q       However, this paragraph 4 does provide

4   that all the minimum rent, percentage rent,

5   contributions to marketing fund have been paid in

6   accordance with the amounts required under the lease,

7   right?

8          A       Correct, but it doesn't --

9          Q       There is no dispute and can be no

10  dispute with this tenant about what the minimum rent

11  is, what the percentage rent is or what the

12  contribution to the marketing fund were.

13              MR. TRAHAN:  Your Honor, we ask that the

14  witness please be allowed to fully answer each

15  question.

16              THE COURT:  Well, I do this to all

17  litigants in my Court, and I do it on behalf of the

18  court reporter.  And I'm very sympathetic because I

19  used to do the same thing that she did.  I always tell

20  the lawyers and the witnesses we can all sing together

21  but we can't all talk together.  It's a very difficult

22  thing to do what she is doing.  So when the witness is

23  talking, you have to listen, and when the lawyer's

24  talking, you have to listen.  You can't be talking at

25  the same time because it's very confusing, and it's

1   difficult to make a record when you're doing that.

2              Well, this is as good a time as any to

3   stop.  I have a meeting with another judge at a

4   quarter after twelve.  So you can go to lunch, say,

5   for about an hour, hour and fifteen minutes and we'll

6   be back here, okay?

7       (Recess taken at 12:08 p.m., reconvened at

8   1:38 p.m.)

9              THE COURT:  Be seated.  You're still

10  under oath.  You may resume.

11             MR. BENNETT:  Thank you, your Honor.

12                  CROSS-EXAMINATION (Cont'd)

13  BY MR. BENNETT:

14      Q    Before the break, Mr. Silva, we were

15  looking at Exhibits 23 and 24 and comparing the

16  various paragraphs of the two Cinema Estoppels.  Do

17  you recall that?

18      A    Yes, sir.

19      Q    And we have on the screen in front of

20  you paragraph 4 of Exhibit 23 and paragraph 4 of

21  Exhibit 24, both of which are identical, correct?

22      A    Correct.

23      Q    All right.  Let's go to the next

24  paragraph, then.  Let's skip (5) for a moment because

25  we know there's a change there.  Let's look at (6).

1                    So paragraph 6 of each of the two

2    Exhibits 23 and 24, you'll agree with me that these

3    two provisions are identical, correct?

4           A    Correct.

5           Q    All right.  Let's look at paragraph 7.

6    All right.  So paragraph 7 relates to the tenant's

7    options to extend initial term.  The two paragraphs

8    from Exhibits 23 and 24 are also identical, aren't

9    they?

10          A    I'm still reading.

11          Q    Okay.  Take your time.

12          A    Yes, they appear similar.

13          Q    Well, not similar.  They're identical,

14   aren't they?

15          A    They're the same, correct.

16          Q    Okay.  Thank you.  All right.  Let's

17   look at the next paragraph.  Paragraph 8 from Exhibit

18   23 and paragraph 8 from Exhibit 24 are also identical,

19   are they not?

20          A    They're the same.

21          Q    Okay.  And here the tenant is

22   representing a warranty which there are no agreements

23   other than are set forth in the lease regarding free

24   rent, partial rent, rebate of rental payments or any

25   other type of rental concession, right?

112

1          A     Correct.

2          Q     Let's go to paragraph 5 of Exhibit 24.

3    Okay.  This is the paragraph that says:  "There are no

4    existing claims, defenses or offsets by or in favor of

5    the Tenant against Landlord, except that the Tenant is

6    currently disputing Tenant's Proportionate Share of

7    2008, including the Tenant's share of real estate

8    taxes for the Demised Premises for 2007, as well as

9    Tenant's share of real estate taxes for the Demised

10   Premises, has not yet been finalized."  Did I read

11   that right?

12         A     Yes.

13         Q     Now, under your understanding of the

14   Fifteenth Amendment, if the estoppel delivered in

15   January of 2009 had been identical to the one

16   delivered in May of 2008, this paragraph would have

17   been acceptable and, in fact, Granite agreed it would

18   accept this tenant estoppel, didn't it?

19               MR. TRAHAN:  Objection.  Calls for --

20               THE COURT:  Sustained.

21         A     If they were --

22               THE COURT:  Sustained.

23         Q     (By Mr. Bennett)  When the Judge

24   sustains an objection, you don't have to answer it.

25         A     I'm sorry.

1          Q     All right.  So this provision has a

2     number of provisions in it that relate to tenant

3     disputes, doesn't it?

4          A     Yes.

5          Q     The tenant is disputing proportion

6     share.  That's the common area of maintenance charges,

7     is that what that is?

8          A     Correct.

9          Q     So it's disputing its proportionate

10    share for 2008, it is disputing its share of real

11    estate taxes, and it is disputing its share for 2007,

12    correct?

13         A     Correct.

14         Q     All right.  Now, let's look at paragraph

15    5 from the January 2009 Estoppel, and it's a little

16    more complicated because it runs off two pages, so we

17    have to bring it up separately.

18               All right.  So paragraph 5 now from

19    Exhibit 23, the January 2009 Estoppel, has this

20    language about "Tenant is currently investigating and

21    may dispute Landlord's that Tenant is financially

22    responsible for repairing the cracked foundation,"

23    correct?

24         A     Correct.

25         Q     And so there's an investigation underway

1    to determine which party is responsible, right?

2         A    That's what it says.

3         Q    Okay.  And the tenant goes on to say

4    that it disputes its responsibility for the repair,

5    right?

6         A    Correct.

7         Q    Finally, the tenant says its

8    proportionate share in 2008 has not been finalized,

9    right?

10        A    Yes.

11        Q    So the disclosures from the May 2008

12   Estoppel relating to a dispute over 2007 and 2007

13   taxes has been dropped.

14        A    Or appears to have been resolved.

15        Q    Or appears to have been resolved. It's

16   not in the second estoppel, is it?

17        A    No, it is not.

18        Q    Now, you do not have an opinion about

19   whether the Exhibit 23 and Exhibit 24 are

20   substantially similar, do you?

21        A    I do.

22        Q    You do?  And how do you arrive at that?

23        A    Well, the two paragraphs are different.

24        Q    All right.  Are the two documents

25   similar?

1          A     No.

2          Q     They're not?  They are identical in all

3    respects except for one paragraph, aren't they?

4          A     Correct, which makes it not identical.

5          Q     I didn't ask you if it was identical.

6    But are the two documents substantially similar?  Do

7    you have an opinion today as we sit here what that

8    language meant when it was used in the Fifteenth

9    Amendment?

10         A     Yes, I do.

11         Q     And what is the basis of your opinion?

12               THE COURT:  Just a second.  What is his

13   opinion?

14               MR. BENNETT:  Okay.  I'll ask that

15   first, Judge.

16               THE COURT:  How can he give a basis for

17   an opinion and I don't know the opinion?

18               MR. BENNETT:  Okay.

19         Q     (By Mr. Bennett)  Let me ask, what's

20   your opinion?

21         A     My opinion is they're different.

22         Q     Are they substantially similar?

23         A     They are not substantially similar.

24         Q     Okay.  What is the basis of your view

25   that they are not substantially similar?

1         A      The risk profile has changed from one

2   document to the next.

3         Q      The risk profile for whom?

4         A      For us as the buyer with respect to the

5   assertions that the tenant is making.  The comfort

6   that the tenant is giving us in its estoppel, in the

7   second estoppel, is less than the one before.  The

8   assurances that they're giving us in this estoppel are

9   less than the first one.

10        Q      Okay.  When did you come to this opinion

11  that these documents are not substantially similar?

12        A      Once we got the second one and we

13  started going through it with counsel to see what the

14  differences were.

15        Q      Do you have any independent knowledge

16  what "substantially similar" meant as used in the

17  Fifteenth Amendment, Exhibit 17?

18        A      What do you mean by "independent

19  knowledge"?

20        Q      Independent knowledge based upon your

21  own experience and knowledge.

22              THE COURT:  You mean without counsel?

23              MR. BENNETT:  Yes.  Without counsel.

24        A      Yes.

25              MR. BENNETT:  May I approach the

1    witness?  I need to refer him to his deposition, your

2    Honor.

3              THE COURT:  Go ahead.

4              MR. BENNETT:  Thank you.  Would you like

5    to unseal it or shall I?

6              THE COURT:  You can unseal it.

7              THE COURTROOM DEPUTY:  This is the

8    deposition of Christopher Silva, taken April 7, 2010.

9         Q    (By Mr. Bennett)  Okay.  Mr. Silva, you

10   have in front of you your deposition taken in April of

11   2010; is that right?

12        A    Correct.

13        Q    Do you recall that I appeared at your

14   conference room in New Jersey to take your deposition?

15        A    I do.

16        Q    And you were sworn under oath to tell

17   the truth at that time?

18        A    Correct.

19        Q    I direct you to page 86 of your

20   deposition, beginning on line 14.  Do you have that?

21        A    Yes.

22        Q    I asked you the following question:

23   "And if the certificate that is delivered by the

24   Cinema Group is substantially similar to the

25   certificate dated in May is an acceptable form under

118

1   the Fifteenth Amendment," correct?  And you gave the

2   following answer:  "Well, I'd have to, you know, seek

3   counsel opinion to find out what substantially similar

4   meant."  Was that your answer at the time?

5            A     Yes.

6            Q     And I asked you, beginning on page 87,

7   line 1:  "And you had no independent understanding of

8   what was meant when counsel used the words

9   "substantially similar."  And you gave the answer:

10  "I didn't draft it, so the answer would be no."

11            Those were the questions and answers you

12  gave at the time, correct?

13            A     Correct.

14            Q     Now, you had no role in drafting the

15  Fifteenth Amendment to the FPSA, did you?

16            A     I did not.

17            Q     You were on the business side of the

18  transaction along with Mr. Riekarski?

19            A     That's correct.

20            Q     Let's look at Exhibit 17, and it is the

21  page beginning on page 4 of the exhibit.  If you would

22  highlight the top paragraph down to the yellow.  This

23  is in the paragraph which deals with the subject of

24  when Granite could object to tenant estoppels.  Do you

25  recall looking at that on your direct examination?

1        A     Correct.  Yes.

2        Q     And I want to highlight for you the

3   sentence that begins on the fourth line, "Buyer may

4   not object to -- do you see that language?

5        A     Yes.

6        Q     One is any Tenant Estoppel solely

7   because a tenant refused to make a certification in

8   paragraph 11 of the exhibit.  That's not in this case,

9   right?

10        A     Right.

11        Q     We're not concerned with that.

12        A     I'm not sure.  What is paragraph 11?

13        Q     We'll look at it.  That's the ERISA

14   Disclosure Statement.  Do you recall that?

15        A     Yes.

16        Q     All right.  Let's look at the second

17   reason.  So this is the second reason why buyer may

18   not object to a Tenant Estoppel, and that is "Any

19   Tenant Estoppel Certificate delivered to Buyer on or

20   after the date that is 30 days before the Closing Date

21   for a tenant that is substantially similar to the

22   Tenant Estoppel Certificate for that Tenant executed

23   in or about May 2008 and previously delivered to

24   Buyer."  Did I read that right?

25        A     Yes.

1          Q      This is the provision of the Fifteenth

2     Amendment that allows the use of a January 2009

3     Estoppel Certificate if it is substantially similar to

4     the May 2008 Certificate previously given; is that

5     right?

6          A      Yes.

7          Q      And you didn't have any role in drafting

8     this language, correct?

9          A      I did not.

10         Q      Did you have any role in negotiating

11     this provision?

12         A      I did not.

13         Q      Now, the team that rejected the Cinema

14     Estoppel consisted of you, Mr. Riekarski and your

15     lawyers, right?

16         A      Correct.

17         Q      And possibly Mr. Alexander?

18         A      I don't think that Mr. Alexander was

19     involved in it.

20         Q      Okay.  Just you, Mr. Riekarski and

21     counsel?

22         A      Correct.

23         Q      Ms. Kralovec was not involved in that

24     decision, was she?

25         A      I don't believe she was, no.

1          Q       And rejecting the Cinema Estoppel

2     Certificate in January of 2009, you did not look at

3     the Cinema Lease, right?

4          A       I did not.  I, personally, did not.

5          Q       Do you know if anyone did?

6          A       I don't know.  I would suspect that our

7     counsel did.

8          Q       All right.  But you don't know that?

9          A       I don't know that.

10          Q       Okay.  And in rejecting the Cinema

11     Lease, you don't know whether the -- excuse me, the

12     Cinema Estoppel, you don't know whether the Cinema

13     built its own building, do you?

14          A       I don't.

15          Q       And you didn't know at the time whether

16     the Cinema was responsible for all of the construction

17     of the improvements on its lease?

18          A       I didn't.

19          Q       And in your view, a dispute with a

20     tenant is material, regardless of the merits of the

21     dispute, who's right or who's wrong?

22          A       I would think that's the case.  I mean,

23     there's disputes that are minor, there's minor issues

24     in estoppels that can be taken care of over time; but

25     if there's a dispute between a landlord or a tenant,

122

1    it's not our duty to investigate the merit of it.

2         Q     All right.  Let me direct you again to

3    your deposition on page 100, beginning at line 2.  Are

4    you with me?

5         A     Yes.

6              MR. TRAHAN:  Your Honor, we object.

7    He's not laid a proper predicate for impeaching this

8    witness.  He's not asking what he testified to

9    previously, if there's any explanation--

10             THE COURT:  You can ask him, "Were you

11   asked this question, did you give this answer."

12             MR. BENNETT:  That's where I'm about to

13   go, Judge.

14             THE COURT:  Okay.

15        Q     (By Mr. Bennett)  You were asked this

16   question, Mr. Silva.  "All right.  So regardless of

17   the merits of the Tenant's dispute, you view paragraph

18   5 as a material adverse alteration?"

19        A     Yes.

20        Q     And you gave the answer:  "It's a

21   dispute between the tenant and the landlord, and that

22   is a material issue for us."

23        A     Yes.  In this case, we believe that it

24   was.

25        Q     Now, you testified that one of the

123

1   reasons why this dispute was so important to you is

2   because the Cinema pays approximately $2 million a

3   year in rent, right?

4           A      That's correct.

5           Q      165,000 a month, I think you testified.

6   In fact, you have never missed a rent payment from the

7   Cinema since you bought the property, have you?

8           A      I don't believe we have, but I'm not,

9   you know, entirely familiar with that.

10          Q      And there's no litigation pending with

11  the Cinema, correct?

12          A      Currently, there is not.

13          Q      And it's been almost two years -- well,

14  it's been two years and ten days since you closed on

15  this transaction, isn't it?

16          A      Correct, but there's nothing that said

17  that there couldn't be litigation.

18          Q      Now, one of the things you wanted this

19  Tenant Estoppel for was to avoid having to get into a

20  litigation over construction defects, right?

21          A      Correct.

22          Q      That's one of the things you said.  All

23  right.

24                 Let's look at page 36 of Exhibit 1.

25                 MR. BENNETT:  Would you highlight the

124

1    paragraph beginning with 11.3.  All right.

2           Q       (By Mr. Bennett)  11.3 is "Continuation

3    and Survival of Representations and Warranties,"

4    correct?

5           A       Yes.

6           Q       Paragraph reads:   "All representations

7    and warranties by the respective parties contained

8    herein are intended to and shall remain true and

9    correct as of the time of Closing, shall be deemed to

10   be material, and shall survive the execution and

11   delivery of this Agreement, the delivery of the

12   Special Warranty Deed and transfer of title to the

13   Property for a period of 9 months."  Did I read that

14   right?

15          A       Yes.

16          Q       It goes on to say:  "The foregoing

17   limitation shall not affect in any way Buyer's ability

18   to bring an action against contractor, any

19   subcontractor or any other person or entity other than

20   Seller after the end of such 9 month period," correct?

21          A       Correct.

22          Q       So this document contemplated that there

23   might be litigation by the buyer after closing

24   relating to claims against contractors, subcontractors

25   or other persons and entities, correct?

125

1         A     It could.

2         Q     All right.  Now, let's go to Exhibit 1,

3   page 9.  And if we look at page 1 -- do you have that?

4         A     It's on the screen, yes.

5         Q     Page 9 of Exhibit 1.  Do you have that?

6         A     Yes.

7         Q     The first then you bought is the land,

8   right?  It's not a trick question.  You bought the

9   land?

10        A     Yes.

11        Q     You bought the roads, you bought the

12  ingress and egress and all of that, right?

13        A     Yup.

14        Q     Okay.  Let's go to the next page.  You

15  brought the improvements on the land; the buildings,

16  the structures, the fixtures, the apparatus, equipment

17  and so forth, right?

18        A     Correct.

19        Q     Let's look at what else you bought.  You

20  bought all the leases, correct?

21        A     Correct.

22        Q     Let's go to the next one.  You bought

23  any service contracts, paragraph (d), correct?

24        A     Yes.

25        Q     Okay.  Next.  You bought any personal,

126

1  tangible personal property used by the seller in

2  connection with the land or the improvements, right?

3          A     Correct.

4          Q     Now let's look at the last one.  You

5  bought intangible property used exclusively in

6  connection with the ownership use or operation of the

7  real property, right?

8          A     That's what it says.

9          Q     Okay.  Now skipping a little ahead to

10  the fourth line or (ii):  "All warranties and

11  guarantees, to the extent assignable by Seller without

12  the consent of any third-party (unless such consent

13  has been obtained) and without the payment of any

14  additional consideration for such assignment, whether

15  or not or written, or all or any portion of the

16  Property, including without limitation," and I've

17  highlighted the following sentence for you:

18  "Including without limitation, all construction

19  warranties and guarantees (if any) from the Seller's

20  Architect, the contractor, all subcontractors and all

21  engineers and other third parties involved in the

22  construction of the improvements."  Right?

23          A     That's the way it's written.

24          Q     Okay.

25               MR. TRAHAN:  Your Honor, we'll object to

127

1    the relevance of this line of questioning and for lack

2    of foundation.  We will stipulate that the document

3    which is in evidence says what it says.  There's

4    really no questions here.  This witness has testified

5    that he didn't have a hand in negotiating this

6    agreement, he doesn't have any separate specific

7    special knowledge about this agreement, and there

8    continues to be questions and questions and questions

9    about reading the document into the record.

10              THE COURT:  Counsel, what do you say

11   about that?  The witness did not have anything to do

12   in producing this agreement.

13              MR. BENNETT:  I understand that.  The

14   question, though, is he's testified that they didn't

15   want to buy any lawsuits, and that's why the change to

16   the Cinema Estoppel was material to him.  And yet we

17   know from looking at the agreement, one, the agreement

18   contemplates lawsuits over construction.

19              THE COURT:  But he didn't draft the

20   agreement, and he didn't have anything to do with it.

21              MR. BENNETT:  I understand, your Honor,

22   but he's opined as to what was material.  And under

23   the terms of the agreement, I think I'm entitled to

24   inquire --

25              THE COURT:  Sustained.  Sustained.

128

1          MR. BENNETT:  Okay.

2          Q     (By Mr. Bennett)  Now, at the time of

3     closing, the Cinema had been opened for about two

4     years, hadn't it?

5          A     I'm not sure the date the Cinema

6     opened.  I don't have the exact date that they opened.

7          Q     It had been opened for some period of

8     time, you know that?

9          A     I know it was open.  I don't know how

10    long, though.

11         Q     And granted they had its employees on

12    the Center at least monthly during the entire

13    construction period and after the shopping center

14    opened, didn't it?

15         A     I don't believe that Granite had

16    employees on-site monthly.

17         Q     Do you know a Mr. Krier?

18         A     I do.

19         Q     Do you know how often Mr. Krier visited

20    the site?

21         A     I don't know his frequency of visits.

22    He's based in our west coast office.

23         Q     Under the Fifteenth Amendment, the May

24    2008 Estoppels previously delivered to Granite were

25    acceptable to Granite provided they were updated in a

1    substantially similar form, correct?

2          A    That's my understanding of Granite.

3          Q    So Exhibit H, which is Exhibit H to the

4    Forward Purchase and Sale Agreement, which is

5    Plaintiff's Exhibit 46, is not the relevant form to be

6    considered in determining whether the Cinema Estoppel

7    Certificate is materially altered, is it?

8               MR. TRAHAN:  Objection.  Calls for a

9    legal conclusion.

10              THE COURT:  What's the question again?

11              MR. BENNETT:  Exhibit H, which is

12   attached to the Forward Purchase and Sale Agreement,

13   is not the relevant form for determining what --

14              THE COURT:  I'll sustain that.

15              MR. BENNETT:  Then I have no further

16   questions of this witness.

17              THE COURT:  Redirect.

18              MR. TRAHAN:  Yes, your Honor.  Just a

19   few questions.

20              THE COURT:  Go ahead.

21                   REDIRECT EXAMINATION

22   BY MR. TRAHAN:

23         Q    Mr. Silva, when you were visiting with

24   Mr. Bennett about the difference between the May 2008

25   Estoppel and the January 2009 Estoppel, the suggestion

130

1   was there was only one difference between the two

2   documents, but that's not correct, is it?

3          A     That's correct.

4          Q     Is that correct, what he said correct?

5          A     No, it's not correct.

6          Q     Why do you say that?

7          A     Because there was another change to the

8   document.

9          Q     So the one change here we've got is

10  deletion of the disclaimer of defenses, offsets, liens

11  and claims, correct?

12         A     Correct.

13         Q     Do you consider that to be a substantial

14  difference between the two documents?

15         A     Yes, I do.

16         Q     And then the second change is this,

17  correct?

18               MR. BENNETT:  Excuse me, Paul.  I didn't

19  mean to interrupt.  I have copies here.

20         Q     (By Mr. Trahan)  And the second

21  difference between the May 2008 Estoppel and the

22  January 2009 Estoppel is this.  Correct, Mr. Silva?

23         A     That's correct.

24         Q     The May 2008 Estoppel did not include

25  any reference to a cracked foundation or tenant

1   disputes relating to the cracked foundation, correct?

2          A     That is correct.

3          Q     Do you consider that to be a substantial

4   difference between the two documents?

5          A     I do.

6          Q     Mr. Bennett asked you if there was any

7   ongoing litigation with the Cinema about the cracked

8   foundation.  Do you recall those questions?

9          A     I do.

10         Q     There is litigation ongoing at the

11  Southlands Town Center right now concerning the

12  construction defects with these very same parties in

13  this room; isn't that correct?

14                MR. BENNETT:  Objection, your Honor.

15  What we're here about is the Cinema Estoppel and

16  nothing else.  Whether there's litigation involving

17  other tenants or other buildings is irrelevant and

18  should not be considered, your Honor.

19                MR. TRAHAN:  May I respond?  I asked Mr.

20  Silva about other litigation that's ongoing regarding

21  the defects at the Cinema.  And the reason I believe

22  that's relevant, your Honor, and that Mr. Bennett

23  opened the door is that the suggestion is, is that

24  there is not a reasonable likelihood that the Cinema

25  will file suit against Granite.  We strongly

1   disagree --

2              THE COURT:  I'll allow it.  I'll allow

3   it.

4        Q    (By Mr. Trahan)  Mr. Silva, you're aware

5   of existing litigation concerning property defects at

6   this property currently, correct?

7        A    I am.

8        Q    And you're aware that Granite has spent

9   upwards of $2 million to correct structural defects at

10  the Southlands Town Center, correct?

11             MR. BENNETT:  Objection.  This is

12  leading, your Honor.

13             THE COURT:  Yes, I'm going to sustain

14  that.

15       Q    (By Mr. Trahan)  Do you have familiarity

16  with repairs that have been and are being made at the

17  Southlands Town Center?

18       A    I do.  After closing, we hired our

19  consultant, and I know that there's been ongoing work

20  there and the costs have been fairly substantial to

21  date.  I believe that the repairs were not complete as

22  of yet.  There's still more work to be done.

23       Q    Do you have any knowledge as to whether

24  tenants have had to move out of their space so that

25  repairs can be done?

133

1          A     I do.

2                 MR. BENNETT:  Objection, your Honor, as

3    to other tenants.  We're talking about the Cinema.

4    It's not clear whether there's any litigation

5    involving the Cinema.

6                 MR. TRAHAN:  Your Honor, may I respond,

7    please?

8                 MR. BENNETT:  If he would withdraw the

9    questions relating to the Cinema --

10                THE COURT:  I'll sustain the objection.

11         Q     (By Mr. Trahan)  Are you concerned, Mr.

12   Silva, about litigation that the Cinema might bring

13   against Granite as a result of construction problems

14   at the Cinema?

15                MR. BENNETT:  Objection.  What his

16   concern is has nothing to do with what --

17                THE COURT:  Sustained.

18                MR. TRAHAN:  No further questions.

19   Thank you, Mr. Silva.

20                THE COURT:  Anything else, Mr. Bennett?

21                MR. BENNETT:  No, your Honor.

22                THE COURT:  You can step down.  Do you

23   have another witness?

24                MS. ARNOLD:  Yes, your Honor.  Call Mr.

25   Blake.

1                    THE COURT:  Mr. Who?

2                    MS. ARNOLD:  Mr. Blake.

3          (THOMAS BLAKE, PLAINTIFF'S WITNESS, SWORN.)

4                    THE COURTROOM DEPUTY:  Please be seated.

5    State your full name for the record and spell your

6    last name.

7                    THE WITNESS:  My name is Thomas Blake.

8    Last name is B-l-a-k-e.

9                    DIRECT EXAMINATION

10   BY MS. ARNOLD:

11        Q    Mr. Blake, who do you work for?

12        A    I work for Land Title Guarantee Company.

13        Q    An what's your title?

14        A    Assistant vice president.

15        Q    And was that the same position you held

16   in March of 2009?

17        A    Yes.

18        Q    Are you familiar with the escrow account

19   that's at issue in this case?

20        A    Yes, I am.

21        Q    And how are you familiar with it?

22        A    It's my responsibility in my department

23   and under my management to maintain and supervise the

24   accounts and to administer the escrow agreements.

25        Q    And so you were familiar with the Escrow

1    Agreement that is in this matter, which is Exhibit 20?

2         A    Yes.

3              THE COURT:  Is there a question?

4         Q    (By Ms. Arnold)  And the Escrow

5    Agreement is the agreement that governs the Escrow

6    Account?

7         A    Correct.

8         Q    And are you familiar with --

9              MS. ARNOLD:  I think I can put this up

10   on the Elmo, actually.  You can switch it back.

11        Q    (By Ms. Arnold)  Are you familiar with

12   this document?

13        A    Yes, I am.

14        Q    Can you tell me what it is.

15        A    It's an internal document that we

16   generate that details all of the funds in and out of

17   an escrow account.

18        Q    Does this document relate to the Escrow

19   Account at issue in this matter?

20        A    Yes, it does.

21        Q    And you've seen these before, then?

22        A    Yes.

23        Q    Does this document tell you how much

24   interest has accrued on the amount that was deposited

25   into escrow?

136

1      A      It details monthly how much interest was

2  posted, but it doesn't tally it per se.  It doesn't

3  keep a running record.

4      Q      Does it tell you who that interest was

5  paid to?

6      A      Yes.  In this instance here, all of the

7  interest that was disbursed was paid to Alberta

8  Development.

9      Q      And do you happen to know how much

10  interest was paid to Alberta Development?

11      A      A total of $8,852.53.

12             THE COURT:  Eight thousand what?

13             THE WITNESS:  $8,852.53.

14             THE COURT:  Okay.

15      Q      (By Ms. Arnold)  If you look on this

16  document down, there's a date of May 11th, 2010, and

17  there's a line that says "Alberta Development," and

18  then is that the last payment that was made to Alberta

19  Development?

20             THE COURT:  May 11th?

21             MS. ARNOLD:  May 11th.

22             THE COURT:  Interest paid, you say?

23             MS. ARNOLD:  I believe so.

24             THE COURT:  Oh.  Okay.

25      A      It's actually a disbursement and, yes,

1   that's the last interest payment made to Alberta

2   Development.

3        Q     (By Ms. Arnold)  What happened after May

4   11th --

5                THE COURT:  This document is in

6   evidence, right?

7                MS. ARNOLD:  Actually, I'm going to

8   offer it.  May I offer it?

9                THE COURT:  Any objection?

10               MR. BENNETT:  No, your Honor.

11               THE COURT:  Received.

12               THE COURTROOM DEPUTY:  What number is

13   it?

14               MS. ARNOLD: It is Exhibit 100.

15       (Exhibit 100 was received.)

16        Q     (By Ms. Arnold)  What happened after May

17   11th?

18        A     After May 11, because parties within our

19   organization were contacted, we made a decision not to

20   disburse any additional interest at that time until

21   the matter was resolved.

22        Q     What happened with the interest?

23        A     The interest just stayed in here until

24   we disbursed the final amount of the check to the

25   clerk of the court.

1        Q    Then if you look on page 2 of this same

2  exhibit, is that the payment you're talking about to

3  the clerk of the court?

4        A    Correct.

5        Q    Of that payment that was made to the

6  clerk of the court, can you tell me how much of that

7  amount was accrued interest?

8        A    In that was $3,173.31.

9        Q    And the balance of 650 was the amount

10  that was deposited?

11        A    Was the principal, correct.

12        Q    I'm going to show you a document that's

13  been marked as Exhibit 35.  I don't believe this has

14  been -- it is in evidence?  Do you recognize this

15  letter?

16        A    Yes, I've seen this letter.

17        Q    Did you receive it on or about March

18  4th?

19        A    Yes.

20        Q    I'm going to show you page 2.  Is that

21  the signature of Jane Smith?  That's familiar?

22        A    Yes.

23        Q    And this has been marked into evidence

24  as Exhibit 36.  Do you recognize this document?

25        A    Yes.  It's a letter I drafted on March

1   6th.

2          Q      So that's your signature on the bottom?

3          A      Yes, it is.

4          Q      And did you send it out about that date?

5          A      Yes, I did.

6          Q      I'm going do show you another document

7   that's marked Exhibit 37.  Do you recognize this

8   letter?

9          A      Yes.  It's a letter I drafted March 11,

10  2010.

11         Q      And that's your signature at the bottom?

12         A      Yes, it is.

13         Q      You sent it out about March 11th?

14         A      Yes.  I sent it faxed and U.S. mail.

15                MS. ARNOLD:  I'd like to offer Exhibit

16  37 into evidence.

17                THE COURT:  Received.

18       (Exhibit 37 was received.)

19         Q      (By Ms. Arnold)  I'm going to show you

20  that Escrow Agreement on the Elmo that we talked

21  about.

22         A      Okay.

23         Q      That's the Escrow Agreement that we

24  discussed that governs the account in this case?

25         A      Yes, it is.

1          Q      And this is the last page.  Is that a

2    signature of a Land Title representative?

3          A      Yes.  That's Leigh Renfro.  She's our

4    commercial closing manager and an assistant vice

5    president.

6               MS. ARNOLD:  Pass the witness.

7               MR. BENNETT:  No questions, your Honor.

8               THE COURT:  You can step down.  Do you

9    have another witness?

10              MR. TRAHAN:  No, your Honor.  Plaintiff

11   rests.

12        (Plaintiff rests.)

13              THE COURT:  Counsel.

14              MR. BENNETT:  Thank you, your Honor.  I

15   will call Donald Provost, please.

16        (DONALD PROVOST, DEFENDANT'S WITNESS, SWORN.)

17              THE COURTROOM DEPUTY:  Please be

18   seated.  State your full name for the record and spell

19   your last name.

20              THE WITNESS:  Sure.  Donald Provost.

21   P-r-o-v-o-s-t.

22              MR. BENNETT:  May I have just a moment,

23   your Honor, to get my exhibit list.

24              THE COURT:  You may proceed.

25                        DIRECT EXAMINATION

1  BY MR. BENNETT:

2       Q     Afternoon, Mr. Provost.  Would you

3  please describe for the Court the relationship that

4  you have with the Defendant Alberta Town Center.

5       A     I'm one of the partners of Alberta Town

6  Center.

7       Q     And have you been a partner since

8  Alberta Town Center was created?

9       A     Yes.

10      Q     Who are the other partners in Alberta

11 Town Center?

12      A     Peter Cudlip, C-u-d-l-i-p, and Allen

13 Provost, who is now deceased.

14            THE COURT:  You have to keep your voice

15 up and speak clearly because the court reporter is

16 taking down everything.

17            THE WITNESS:  Thank you.  Peter Cudlip,

18 C-u-d-l-i-p and Allen Provost, P-r-o-v-o-s-t.

19      Q     (By Mr. Bennett)  And Allen Provost was

20 your father?

21      A     Correct.

22      Q     And he is now deceased?

23      A     Correct.

24      Q     Would you please describe your

25 experience in the real estate business.

142

1          A      Twenty years of developing real estate

2    in the Denver metro area and a few other cities around

3    the country.

4          Q      All right.  And you were involved in the

5    development of the property we know as the Southlands

6    Shopping Center?

7          A      Correct.

8          Q      Can you describe for us in general what

9    that Center consists of.

10         A      The Southlands Town Center project

11   itself, I guess as it's been previously described this

12   morning, comprises approximately 450,000 square feet

13   of two-story life-style Town Center retail, retail on

14   the main level, office on the second level anchored by

15   a supporting goods retail area, a bookstore, theater

16   and several other women's ready-to-wear fashion and

17   national retail tenants.

18         Q      I have displayed before you, Mr.

19   Provost, an aerial photograph of a piece of

20   property --

21                THE COURT:  Is this in evidence?

22                MR. BENNETT:  It is not, your Honor.

23                THE COURT:  Do you want to introduce

24   it?

25                MR. BENNETT:  Sure.  I'll move the

1    admission of this.  It would be Defendant's Exhibit R.

2                    THE COURT:  Any objection?

3                    MR. DYKES:  Your Honor, we object to

4    this exhibit as well as all defendants exhibits that

5    defendant has listed because they were not listed

6    timely.  We only received this list about three days

7    ago.  I'm not sure what the Exhibit R is.  There may

8    be additional exhibits.

9                    THE COURT:  Do you want to respond to

10   that?

11                   MR. BENNETT:  Sure, your Honor.  We have

12   listed a number of exhibits that we anticipate using

13   for cross-examination.  All the other exhibits that we

14   have are documents that were originally listed by

15   plaintiffs, which they withdrew during the last week,

16   and so we added them to our list because the

17   plaintiffs were no longer going to offer them.

18                   THE COURT:  I'm going to admit it.

19       (Exhibit R was received.)

20                   THE COURTROOM DEPUTY:  Can I ask if they

21   have another list?  Because that's not on here.

22                   THE COURT:  Can we get another list?

23                   MR. BENNETT:  Sure.  We will supplement

24   our exhibit list with R.  We had not anticipated

25   actually offering this exhibit, only to illustrate the

144

1    witness's testimony.

2          Q     (By Mr. Bennett)  Okay.  So Exhibit R is

3    an aerial photograph of what?

4          A     It's an aerial photograph of the

5    Southlands project at large which includes the

6    Southlands Town Center.

7          Q     So the Town Center is not the only

8    property that's constructed on at Southlands Shopping

9    Center?

10         A     No.

11         Q     What else is there?

12         A     There's some large format anchor boxes.

13   Walmart commonly would be known as Walmart, Sam's

14   Club, JC Penny, as well as several junior anchor

15   national retailers, Bed, Bath and Beyond, Toys "R" Us

16   and a collection of those type of tenants, as well as

17   25 or so out-parcel pads that include everything from

18   restaurants to car wash and multi-tenant retail

19   buildings.

20         Q     Now the Walmart style stores, where are

21   they on this paragraph?

22         A     On the left-hand side.

23         Q     And there are three buildings there that

24   we can see?

25         A     Yes.  From the bottom to the top, you

145

1    have Walmart, Sam's Club and then JC Penny and then

2    two other national retailers to the north of JC Penny

3    -- to the south of JC Penny.

4          Q       And who presently owns those stores?

5          A       Walmart owns their Super Walmart and the

6    Sam's Club, and JC Penny owns their JC Penny lots.

7          Q       Now, you also mentioned there are some

8    other buildings that are not part of the Alberta Town

9    Center; is that right?

10         A       Correct.

11         Q       And where are those on this photograph?

12         A       In the foreground of the photograph, as

13   well as in the background on either side of the Town

14   Center.

15               THE COURT:  Is there something that you

16   can use, an grease marker that you can use?

17               MR. BENNETT:  I'm told I can draw on

18   here.

19               THE COURT:  I thought so, but he's

20   testifying.

21               MR. BENNETT:  Maybe you can draw on it.

22               THE COURTROOM DEPUTY:  Can you push the

23   right corner with your thumb?

24               MR. BENNETT:  The right corner?

25               THE COURTROOM DEPUTY:  Yes.

1          MR. BENNETT:  Right there?

2          THE COURTROOM DEPUTY:  Yes.  Your Honor,

3   we didn't have any technology training in here, so I

4   didn't get a chance to get these things collated and

5   set up properly.  So we're not going to be able to do

6   anything.

7          MR. BENNETT:  Okay.

8          THE COURT:  Can we get this?

9          THE COURTROOM DEPUTY:  I'd have to call

10  Automation up here, so it's going to take a few

11  minutes.

12         THE COURT:  That's all right.  Is there

13  a stylist or something he can do from over there?

14         THE COURTROOM DEPUTY:  It went away

15  now.  I don't know how well it's going to draw,

16  though.  You can try.

17         MR. BENNETT:  I do have a hard copy.

18         THE COURT:  Okay.  Go ahead.  What is

19  that?

20         THE WITNESS:  This is the Power Center

21  which was commonly referred to as the Southlands Power

22  Center.

23         THE COURT:  What does the Power Center

24  do?

25         THE WITNESS:  It has Power Center boxes,

1   or traditional Power Center boxes included in it.

2            THE COURT:  Is that the electricity and

3   the heat and everything?

4            THE WITNESS:  No.  It would be, your

5   Honor, would be tenants such as Bed, Bath and Beyond,

6   Toys "R" Us, Best Buy.

7            THE COURT:  And they call it the Power

8   Center?

9            THE WITNESS:  Power Center is a common

10  industry term for a center with those type of tenants

11  would be a Power Center.

12           THE COURT:  Okay.

13       Q    (By Mr. Bennett)  Okay.  Now, show us

14  then where the outline of the Alberta Town Center is.

15       A    Well, just for everybody's

16  clarification, what's on the screen right now is an

17  outline of the Power Center.

18           THE COURT:  No, but the question was

19  where is the Alberta Center.

20           THE WITNESS:  The Alberta Center, I'll

21  outline that for you now, Judge.

22           THE COURT:  That's the Alberta Town

23  Center?

24           THE WITNESS:  Everything in the shaded

25  area.

148

1                    THE COURT:  Everything in that area is

2     the Alberta Town Center?

3                    THE WITNESS:  Correct.

4                    THE COURT:  Okay.

5          Q     (By Mr. Bennett)  And point out for us

6     where the Cinema building is located.  Okay.  And then

7     the rest of the buildings that are in the shaded area

8     are all part of the Town Center, the Granite property

9     pursuant to this transaction that we're discussing?

10         A     Correct.

11         Q     Now, describe for us what your role was

12    in the development of this piece of property that is

13    now known as the Southlands Shopping Center.

14         A     In 2001, 2002, we began assimilating

15    seven different parcels which comprised in the

16    aggregate about 300 acres which ended up being known

17    as, commonly known as the Southlands Shopping Center

18    in its totality, including approximately 230 acres of

19    commercial land and 70 acres of residential land

20    that's marked with an "X" to the east of Aurora

21    Parkway.

22                    We assembled the land, seven different

23    sellers, had a closing on the land in September of

24    2003.  At that time we commenced construction of all

25    the franchise utilities; horizontal infrastructure,

1   relocation of power lines, relocation of gas lines,

2   construction of arterial roadways and the such to

3   create super paths to deliver to Walmart and Sam's, as

4   they were both opening in the fall of 2004.

5            We continued with construction and

6   delivered the Power Center marked with an "X" there in

7   the fall of 2005, and then we delivered the Town

8   Center parcel earlier in '05 with the grand opening in

9   the fall of 2006.

10       Q    Now when this Forward Purchase and Sale

11   Agreement was entered into in September of 2005, you

12   had delivered pads for the Walmart and Sam's Club and

13   JC Penny stores; is that correct?

14       A    JC Penny's followed later.  The date was

15   post Walmart and Sam's.

16       Q    Okay.  And you had already constructed

17   the Power Center in September of 2005?

18       A    The Power Center opened in the fall of

19   '05.

20       Q    Okay.  So I'm trying to get at the time

21   the Forward Purchase and Sale Agreement was entered

22   into, part of the overall, the shopping Center had

23   been built?

24       A    Correct.

25       Q    And what remained to be built is what is

1  now in the shaded area known as the Alberta Town

2  Center.

3          A       Correct.

4          Q       Tell us how you went about raising the

5  funds to build the balance of the Alberta Town Center.

6          A       Well, we put typical due diligence

7  materials together, pro formas that included costs and

8  revenue projections.  We put an investment summary

9  together and started having discussions with various

10  groups regarding the Town Center and financing of the

11  Town Center.  Some folks that had been involved in

12  this project for a period of time, brokers at Cushman

13  & Wakefield, Mike Grimm and Tim Richey were engaged to

14  help us find a joint venture partner for the project.

15               To that end, we had discussions with, at

16  the time, Tower Fund and now Granite with respect to a

17  Forward Purchase and Sale Agreement or a synthetic

18  takeout, what's known in the industry as a bankable

19  takeout.  We needed a bankable takeout leveraging the

20  balance sheet of a large institutional part in order

21  to borrow the funds to build the project.

22          Q       And in your experience, what constitutes

23  a bankable takeout?  What are the primary attributes

24  of a bankable takeout?

25          A       Again, a bankable takeout, again it's an

1  industry term that means just that, that it's a

2  document that a bank or a group of banks can rely on

3  and bank, and those type of agreements are done very

4  one-sided in favor of the lending institution because

5  the lending institution wants to know clearly that

6  absent not building the project that they have a buyer

7  for the project, otherwise they wouldn't loan a

8  hundred percent of the cost.  It's been discussed here

9  that the costs were 160 million, 158 million was the

10  purchase price.  That's the cost of the project.  We

11  didn't make any money on the sale of the project.  It

12  was just a takeout of the project that Granite had to

13  perform under.

14        Q     Okay.  So was the Forward Purchase and

15  Sale Agreement entered into any bankable takeout

16  agreement, as you've used the term?

17        A     Yes, because as it was being negotiated,

18  that document was also provided to the draft of that

19  document, the comments were made by bank counsel along

20  with the Tri-Party Agreement because the FPSA was

21  pledged to the bank group as collateral for the loan,

22  essentially.  They needed to have that document or

23  they wouldn't make the loan.

24        Q     And you were involved in the negotiation

25  of the Forward Purchase and Sale Agreement?

1       A       Correct.

2       Q       Who was involved from Granite's side, or

3   at that time the Town Center?

4       A       There was a lot of people involved.

5   Steve Corrigan was involved from California, met on a

6   couple of occasions with Jay Alexander, and then both

7   of our respective counsels.  Peter Cudlip was involved

8   as well, but not on the front lines like I was.

9       Q       Now, look at Exhibit A.  Can you see

10   that well enough to recognize it?

11       A       Yes.

12       Q       What is it?

13       A       Tri-Party Agreement.

14       Q       And this is an agreement among whom?

15       A       Among LaSalle National Bank, Alberta

16   Town Center, LLC, and Metropolitan Life Insurance

17   Company.

18       Q       And does it relate to this financing of

19   the development of the Alberta Town Center property?

20       A       Yes.

21               MR. BENNETT:  I move the admission of

22   Exhibit A.

23               MR. DYKES:  Your Honor, we object on the

24   grounds of relevance, and I'd like to hand up to the

25   Court our written objection to this exhibit and

1    several others that have been designated as untimely.

2              THE COURT:  You gave a copy to your

3    adversaries?

4              MR. DYKES:  Yes, your Honor.

5              THE COURT:  How do you respond to that?

6              MR. BENNETT:  May I review their

7    objection, your Honor?

8              THE COURT:  The document is supposed to

9    be presented five days before trial.  This was

10   presented three days; is that right?

11             MR. DYKES:  Your Honor, I believe the

12   documents were supposed to be marked back in July of

13   2009.  There were lists that were due as part of the

14   Final Pretrial Order, and these documents were not on

15   there.

16             MR. BENNETT:  Supposed to be 2010.

17             MR. DYKES:  2010, I'm sorry.

18             THE COURT:  Counsel?

19             MR. BENNETT:  Your Honor, There have

20   been a number of exhibits that have been admitted

21   today that we saw for the first time from plaintiffs

22   this morning, including all of the, quote,

23   demonstrative exhibits that have now been admitted

24   into evidence.  They were never provided to us before

25   the trial.  So the idea that plaintiff objects to our

1  having provided copies of these documents last week is

2  somewhat duplicitous.  We provided these documents

3  sometime in the last week, some of the admissible

4  documents we intended to use.

5          THE COURT:  We have no jury, just "Yours

6  Truly" as the fact-finder.  What harm is there in me

7  seeing these?

8          MR. DYKES:  Well, I would have to go

9  one-by-one to answer completely; but I would say as a

10 general proposition there are many of these, if not

11 all, that are simply irrelevant.  This Tri-Party

12 Agreement is an example.  This is an agreement which

13 has nothing to do with the issue that we're here to --

14         THE COURT:  I understand that.  This is

15 a dispute between Granite and Alberta.

16         MR. DYKES:  Yes.  Granite and Alberta.

17 Correct, your Honor.

18         THE COURT:  And what is this document?

19         MR. BENNETT:  This document is an

20 agreement between Alberta, Granite's predecessor,

21 which is called Tower, and the banking group.  The

22 reason it's relevant is it shows that this Forward

23 Purchase and Sale Agreement was a bankable credit that

24 the banks relied on for repayment of their loan which

25 goes to whether Granite could terminate this agreement

1   without substantial grounds, which goes to whether the

2   materiality of this one tenant and one Cinema Estoppel

3   Certificate has any bearing on anything.

4            THE COURT:  I am not unsophisticated,

5   and I'm aware of what the dispute is all about.

6   Tri-Party Agreements or anything else, I can just

7   dissect you.  I'm going to allow it, for whatever it's

8   worth.  You can argue it's relevance and make note of

9   the fact what the lawsuit is about.

10            MR. DYKES:  Thank you, your Honor.

11            THE COURT:  Okay.

12            MR. BENNETT:  So Exhibit A is admitted,

13   your Honor?

14            THE COURT:  Yes.

15            MR. BENNETT:  Thank you.

16            THE COURT:  For whatever it's worth.

17            MR. BENNETT:  Hopefully, I can

18   demonstrate it's worth something.  All right.

19       (Exhibit A was admitted.)

20       Q    (By Mr. Bennett) all right.  Let's

21   highlight the provisions of paragraphs B and C,

22   please, on the first page of Exhibit A.  Paragraph B

23   recites that "Alberta, as Seller, and Tower, as

24   Purchaser, have entered into a Forward Purchase and

25   Sale Agreement and Escrow Instructions dated September

1    29, 2005."  Did I read that right, Mr. Provost?

2         A    Correct.

3         Q    The referenced Agreement is the Forward

4    Purchase and Sale Contract that we're dealing with

5    here; is that correct?

6         A    Correct.

7         Q    Okay.  And then the Tri-Party Agreement

8    continues:  "The Forward Contract provides for Tower's

9    purchase from Alberta of the property, including

10   improvements thereon, construction costs which will be

11   from proceeds of loan," correct?

12        A    Correct.

13        Q    Let's look at paragraph C.  "As

14   conditions precedent to Lender making the Loan, Lender

15   has required that:  (a) Alberta collaterally assign to

16   Lender all of Alberta's right, title and interest,

17   existing as of the closing of the Loan or thereafter,

18   in and to the Forward Contract and (b), Tower consent

19   to such assignment and agree to the matter set forth

20   in this Agreement," correct?

21        A    Correct.

22        Q    So pursuant to this Agreement, Alberta

23   agreed to assign the Forward Purchase and Sale

24   Agreement to the lender as collateral; is that right?

25        A    Correct.

157

1          Q     Okay.  Now, let's look at page 3 of

2    Exhibit A, and let's look under paragraph 4, "Notice

3    of Cure Rights of Forward Contract."  So if in the

4    event that Tower ever notified Alberta in writing of

5    any default or claimed default by Alberta under the

6    Forward Contract, Tower, and Tower is Granite, right?

7          A     Correct.

8          Q     Okay.  "Tower shall send a copy of the

9    written notice and concurrently therewith to Lender at

10   the address set forth below."  Did I read that right?

11         A     Correct.

12         Q     Now, let's go to the next paragraph and

13   let's go to paragraph c.  So Lender, under paragraph

14   c, on page 3 of Exhibit A:  "Lender shall be permitted

15   to remedy any default or claimed default specified in

16   any default notice within an equal period of time,"

17   right?

18         A     Correct.

19         Q     So under this Agreement, the lender had

20   rights to cure any default that Alberta might have

21   committed, correct?

22         A     Correct.

23         Q     Now, let's look at paragraph 6 on page

24   4.  What do these provisions relate to?

25         A     The Lender, as it states in the first

1    sentence, states the "Lender shall not be deemed to

2    assume any of Alberta's obligations or duties under

3    the Forward Contract."

4         Q    Okay.  And let's go to paragraph b.  If

5    there's a default -- this provision related to the

6    Event of a Default under the Loan Agreement, correct?

7         A    Correct.

8         Q    And if Alberta were to default under the

9    Loan Agreement, then the Lender has the right to

10   exercise all of Alberta's rights under the Forward

11   Contract?

12        A    Correct.

13        Q    Now, look at page 5 of Exhibit A,

14   paragraph 7(b).  Under this Agreement, the Tri-Party

15   Agreement of which Tower/Granite is a party, quote:

16   "Each of Tower and Lender assumes all responsibility

17   for keeping itself informed as to the condition

18   (financial or otherwise) of Alberta, the condition of

19   the Property and all other matters relating to Alberta

20   and the property and, except for notices expressly

21   required by this Agreement, neither Lender nor Tower

22   shall have any duty whatsoever to obtain, advise or

23   deliver information or documents to the other."  Under

24   this paragraph, Granite and the Lenders have the duty

25   to keep themselves informed about the condition of the

1    property, right?

2              MR. DYKES:  Your Honor, I'm going to

3    renew our objection based on relevance, also on the

4    Best Evidence Rule.  Also, counsel is simply leading

5    his witness.  He's simply characterizing an agreement

6    and asking the witness to agree with him --

7              THE COURT:  You are doing a lot of

8    leading, counsel.

9              MR. BENNETT:  I will stop it, your

10   Honor.

11        Q    (By Mr. Bennett)  Page 6, paragraph 11.

12   This is titled "Quarterly Certificates."  What is this

13   about?

14        A    It's a provision in the Tri-Party

15   Agreement that requires Tower in this Agreement which

16   the successor is granted obviously to provide

17   quarterly certificates to the lender in a form

18   attached as Exhibit C.

19        Q    And what was the subject of those

20   certificates?

21        A    Without seeing Exhibit C, I would both

22   imagine that there's no existing defaults or other

23   issues associated with the property, because if you

24   look at the last sentence, it says the certificates

25   shall be a condition precedent to Lender's obligation

1    to disburse proceeds from the loan.  So obviously the

2    lender was looking for a quarterly confirmation from

3    Granite that there was no issues of the property.  If

4    there was issues, then obviously the lender would step

5    in and look for a remedy.

6            Q    Go to the last page of the exhibit.  Is

7    the last page of Exhibit A this Exhibit C to the

8    Agreement which sets forth the form of the Quarterly

9    Certificate?

10           A    Yes.

11           Q    And throughout the project, did Granite

12   provide these certificates to the lender as required?

13           A    I would believe so, or the lender

14   wouldn't have funded the loan.

15           Q    Let's look at Exhibit 1, then.  Exhibit

16   1 is the Forward Purchase and Sale Agreement; is that

17   right?

18           A    Yes, it is.

19           Q    And we've gone through some of these

20   paragraphs, so I won't go through them again.  Can you

21   describe how it was that this contract came to have

22   the provisions relating to the As Is, Where Is

23   provision?

24                MR. DYKES:  Your Honor, I'll object to

25   that.  First of all, there is no ambiguity that

161

1    requires any explanation or any elucidation or

2    construction by witness of these provisions.

3    Secondly, any interpreting history is irrelevant.

4              MR. BENNETT:  I'm not asking the

5    witness, I did not ask the witness for interpretation

6    of the As Is, Where Is.  I asked him how it came

7    about.  So in interpreting a contract, the Court is

8    to determine the circumstances of the parties and

9    interpret the contract in light that the parties --

10              THE COURT:  Was he one of the drafter's

11   of the contract?

12              MR. BENNETT:  He was one of the

13   negotiators.

14              THE COURT:  I said, was he one of the

15   drafters?

16              MR. BENNETT:  No.  Mr. Provost didn't

17   write this document.  Mr. Trahan's partner wrote it.

18              THE COURT:  I'll sustain that.

19        Q    (By Mr. Bennett)  Mr. Provost, who

20   actually drafted the first draft of the Forward

21   Purchase and Sale Agreement?

22        A    Fulbright & Jaworski.

23        Q    Any particular person?

24        A    I don't know who drafted it.  I

25   imagine --

1                    THE COURT:  Sustained.  Sustained.

2    Don't imagine.

3            Q     (By Mr. Bennett)  Don't guess.  Okay.

4    So somebody from Fulbright & Jaworski?

5            A     Correct.

6            Q     And were there drafts exchanged back and

7    forth among the parties?

8            A     Yes.

9            Q     Do you know whether the As Is, Where Is

10   provisions of the contract were contained in the

11   original draft prepared by Fulbright & Jaworski?

12                   MR. DYKES:  Objection.  It's irrelevant,

13   your Honor.

14                   THE COURT:  I'm going to allow it.  Do

15   you know?  Yes or no.

16                   THE WITNESS:  Yes.

17           Q     (By Mr. Bennett)  Okay.  Do you know why

18   this contract provides for an As Is, Where Is

19   provision?

20                   THE COURT:  Sustained.

21           Q     (By Mr. Bennett)  Does the seller under

22   this Agreement make any representations or warranties

23   concerning the condition of the property?

24           A     No.

25           Q     Exhibit 1 contains a provision relating

1     to the furnishing of the stocks, correct?

2             A     What are you referring to?

3             Q     Exhibit 1.  That's the FPSA.

4             A     Oh, yes.

5             Q     Okay.  Was that provision amended at any

6     time during the Fifteen Amendments to the Forward

7     Purchase and Sale Agreement?

8             A     Yes.

9             Q     And when was that?

10            A     Amendment Fifteen.

11            Q     Yes, Amendment Fifteen.  Were you

12    involved in the negotiation of the Amendment Fifteen

13    to the contract?

14            A     Yes.

15            Q     Once the Forward Purchase and Sale

16    Agreement and the Tri-Party Agreement were signed, did

17    Alberta obtain a loan?

18            A     Yes.

19            Q     And did it construct the property?

20            A     Yes.

21            Q     Now, does the Forward Purchase and Sale

22    Agreement have a provision about what Alberta's

23    obligations were in constructing the property?

24            A     Yes.

25            Q     And what were those obligations?

1            MR. DYKES:  Your Honor, I'll object to

2    counsel simply characterizing a written document that

3    we've already read a good fraction of and into

4    evidence.  I don't see the relevance of this

5    testimony, and I object on the basis of Best Evidence

6    Rule.  The document is in evidence.

7            THE COURT:  I'll let him talk about it.

8    Go ahead.  Don't waste time.

9            THE WITNESS:  I believe there's a couple

10   of provisions in there, your Honor, that finding the

11   exact paragraph and cite that require us to complete

12   the project for the plans and specifications and have

13   those certified by an architect, as well as an

14   architect or engineer representing Granite, and to

15   also receive certificates of occupancy for those

16   buildings, as well, that are subject to the actual

17   sale.

18       Q    (By Mr. Bennett) Okay.  And if you

19   would look at Exhibit 1, page 20.  Are these the

20   provisions relating to Alberta's obligation to build

21   the property in accordance with the plans and

22   specifications and the determination of substantial

23   completion?

24       A    Can I go back and see what this sentence

25   is titled?

1        Q       Sure.  Go back a page or two.

2     "Construction of the Buildings; Other Seller Covenants."

3     That's on page 19.

4        A       Correct.

5        Q       Okay.  And I just want you to identify

6     for the Court that this is where this document deals

7     with Alberta's construction of the property and the

8     determination of when it's complete.

9        A       Correct.  Yes, it is.

10        Q       All right.  And is it accurate to say

11     that under these provisions, Alberta's architect was

12     involved in the process, an architect or consultant

13     for Granite was involved, and there was a third-party

14     independent consultant involved?

15        A       Can you flip forward one page, please.

16            MR. BENNETT:  Highlight the paragraph

17     (d)(i) at the top of the page.

18        A       I can see Marx/Okubo as the third party,

19     correct.

20        Q       Okay.  So this provision on page 20,

21     paragraph (d)(i), relates to the Buyer's inspecting

22     architect, the independent consultant and seller's

23     architect, right?

24        A       Correct.

25        Q       And was that process followed to

1    determine that Alberta had, in fact, completed the

2    project, substantially completed the project in

3    accordance with the plans and specifications?

4         A    Yes, it was.

5         Q    All right.  Now, you heard some

6    testimony this morning about the original closing date

7    being May of 2008.  Did you hear that?

8         A    Yes.

9         Q    Was the original closing date for this

10   transaction May 2008?

11        A    No.

12        Q    When was the original closing?

13        A    Original closing date was, when you look

14   at the FPSA here, but the original closing date was

15   some period of time shortly after completion of the

16   project.

17        Q    And which would have been when?

18        A    The Center opened in October of 2006.

19        Q    Why did the property not close then

20   shortly after the Center opened?

21        A    The original intent all along from day

22   one was to have this FPSA serve as a means to finance

23   the construction of the project.  Following completion

24   of the construction of the project, the parties

25   Alberta and Granite would form a joint venture

1    agreement and own the property on a go-forward basis.

2          Q    Was that joint venture ever formed?

3          A    No, it wasn't.

4          Q    Was that a matter of dispute that

5    remained between Granite and Alberta up until the

6    final closing?

7          A    Yes, it was.

8          Q    What negotiations took place to extend

9    the closing from May of 2008 until --

10              THE COURT:  You're leading again,

11   counsel.

12              MR. BENNETT:  I'm sorry.

13         Q    (By Mr. Bennett)  Were there

14   negotiations relating to the extension of the closing

15   date from May of 2008 until December of 2008?

16         A    Yes.

17         Q    And was there a written amendment to the

18   contract?

19         A    Yes.

20         Q    Look at Exhibit 16 of the plaintiff's

21   exhibits.  What is Exhibit 16?

22         A    Fourteenth Amendment to Amendment

23   Agreement and Termination Agreement.

24         Q    Is the Fourteenth Amendment the

25   Amendment by which the closing date was extended to

1    December of 2008?

2         A    I believe so, but I'd need to see the

3    rest of the document.

4         Q    All right.  Let's look at paragraph 2 on

5    page 2.  Review that and tell me if this is the

6    Agreement by which the closing date was extended to

7    December 15th.

8         A    Yes, it is the paragraph that extended

9    the closing date to December 15th.

10         Q    And did Alberta and Granite pay anything

11    to the banks to get this concession?

12         A    I believe so.

13         Q    Look at paragraph 3 on page 2 of Exhibit

14    16.  Does this paragraph relate to the payment of

15    money to the banks for an extension of the closing

16    date?

17         A    Yes.

18         Q    Okay.  Excuse me.  Let's find out.  When

19    was the Fourteenth Amendment executed?  Would you flip

20    to the last page, page 13 and 14.  This is page 16.

21    Excuse me.  Page 13.  Alberta signed this on May 9,

22    2008?

23         A    Correct.

24         Q    What date did Granite sign it?  Next

25    page.  Southlands Tower Center, this is another party

169

1    to the contract?

2          A     Correct.

3          Q     LaSalle Bank signed this?

4          A     It looks like LaSalle signed on May --

5          Q     May 8.  Go to page 11, please.   And

6    Granite signed?

7          A     May 8.

8          Q     After the Fourteenth Amendment was

9    signed, what negotiations, if any, took place among

10   the parties in the summer of 2008 leading up to the

11   closing in December?

12         A     Exceptions regarding the refinancing,

13   recapitalization of the assets given the current

14   situation, Granite had an in-house debt person who

15   worked to solicit and secure debt for them, their

16   various assets, they engaged him, I forget the

17   gentleman's name, but they engaged him to go to the

18   market and determine what debt was available.

19              Following that effort, it was apparent

20   that given the general erosion in the marketplace that

21   both on the retail side, as well as the debt market

22   side, that there wasn't going to be satisfactory

23   third-party market rate debt financing available for

24   the assets, so then the discussions started occurring

25   between Chris Silva, Andrew Riekarski and myself

1    regarding a structure whereby Granite would become a

2    lender and provide different charges of debt, senior

3    debt, and then both a second piece of debt, a third

4    piece of debt.  So three different slices of debt all

5    priced differently to allow the FPSA to be resolved.

6         Q    And did anything come of the three

7    charges of debt from Granite?

8         A    No.  Several turn sheets went back and

9    forth, documents were being negotiated among Gibbs &

10   Dunn, our counsel, and Fulbright & Jaworski.  Then as

11   the date was approaching, the date meaning the

12   Fourteenth Amendment purchase date of December 15th,

13   sometime a few weeks before that, either late

14   November, early December, I don't recall the specific

15   date, received a call from Andrew Riekarski who said

16   that Granite had determined they no longer wanted to

17   pursue the structured debt financing and wanted to

18   just execute a straight purchase of the asset pursuant

19   to the FPSA.

20        Q    So this was in late November, early

21   December, and you had an outside closing date of

22   December 15th?

23        A    Correct.

24        Q    Did you have time in those 15 days to

25   solicit tenant estoppels from all the tenants at the

1    Southlands Center?

2         A    No.

3         Q    Did you negotiate with Granite the

4    provisions of the Fifteenth Amendment that set the

5    date for providing the estoppels for March 1?

6         A    Yes.

7         Q    Okay.  Was that as an accommodation as

8    it's been described by Mr. Trahan?

9         A    No.

10         Q    What was the reason for the March 1,

11    2009 Tenant Estoppel?

12         A    It was the reality of the situation.

13    Estoppels weren't going to be achieved, aren't

14    achieved in any closing in two weeks.

15         Q    Did you have a role in negotiating the

16    $650,000 holdback from the closing price?

17         A    Yes, I did.

18         Q    What was the purpose of the $650,000

19    holdback?

20         A    Make sure we got them estoppels.

21         Q    Was there ever a discussion that you

22    participated in that it was to compensate Granite in

23    the event that the estoppels were not, quote, clean?

24              MR. DYKES:  Object, your Honor.  This is

25    asking for talk among negotiators to contradict the

1   document.

2                   THE COURT:  What was the question

3   again?

4                   MR. BENNETT:  Whether the $650,000 was,

5   as characterized by Mr. Silva, to compensate Granite

6   in the event the estoppel certificates were not clean.

7                   THE COURT:  He was involved in the

8   negotiations?

9                   MR. BENNETT:  He negotiated it.

10                  THE COURT:  I'll allow it.

11        A    Never had that conversation.  But if the

12   true --

13                  THE COURT:  The answer is no.

14        Q    (By Mr. Bennett)  Now, Mr. Provost, how

15   was the 650,000 arrived at?

16        A    There was no mathematical formula or

17   equations.  Negotiations between myself and Andrew

18   resulted in picking a figure that Andrew felt was

19   substantial enough to keep our eye on the ball and

20   that provided enough incentive for us to secure the

21   estoppels.

22        Q    Were you involved in negotiating the

23   provision of the Fifteenth Amendment that we've looked

24   at that allows you to provide estoppels similar,

25   substantially similar to the May 2008 Estoppel?

1       A       Yes.

2       Q       What was the purpose of that provision?

3       A       Clearly, back in May of --

4               MR. DYKES:  I would object again based

5       on the Parole Evidence Rule and based on the Best

6       Evidence Rule.  This is an attempt to characterize a

7       document which is in evidence, it's clear, and it

8       speaks for itself.

9               THE COURT:  I'm going to allow it.

10      A       Ask the question again, please.

11      Q       (By Mr. Bennett)  Sure.  What was the

12      purpose, or what was your purpose in negotiating the

13      ability to provide tenant estoppels that were

14      substantially similar to the May 2008 Estoppels?

15      A       We recently within the last six months

16      had secured those estoppels and wanted to re-approach

17      the tenants with a baseline of, hey, you just executed

18      these estoppels six months ago, and we'd like to --

19      after selling the shopping center, we'd like you to

20      review your previous estoppel and work on that versus

21      starting from ground zero.

22      Q       All right.  Do you have an opinion about

23      whether the two Cinema Estoppels we've looked at,

24      Exhibits 23 and 24, are substantially similar in light

25      of what you negotiated in the Fifteenth Amendment?

1          MR. DYKES:  Object to the question as

2     calling for opinion evidence and not any matter of

3     fact.

4          THE COURT:  No.  The other witness

5     testified to whether he thought they were similar or

6     not.  I'm going to allow him.  Doesn't matter, anyway,

7     because I'm going to make the decision.

8          MR. BENNETT:  That was my point this

9     morning, Judge.  I think you should just decide this.

10         Q     (By Mr. Bennett)  Okay.  Go ahead, Mr.

11    Provost.

12         A     Yes.

13         Q     Now, in your understanding of the

14    Fifteenth Amendment, is Exhibit H to the original

15    FPSA, does that have any bearing on what is an

16    appropriate estoppel certificate, if the tenant had

17    provided the May 2008 Estoppel?

18         A     No.

19         Q     What is the appropriate form, if the

20    tenant had provided a May 2008 Estoppel?

21         A     The May 2008 Estoppel.

22         Q     So to compare the '09 versus the '08?

23         A     Correct.

24         MR. BENNETT:  May I have one minute,

25    your Honor.

1          Q     (By Mr. Bennett)  Let's look at Exhibit

2     B.  What is Exhibit B?

3          A     The Construction Loan Agreement.

4          Q     And is it the Loan Agreement for this

5     transaction?

6          A     Yes.

7          Q     And does it reference the assignment of

8     the Forward Purchase and Sale Agreement as collateral

9     for this agreement?

10         A     Other than that, it does, but I'm just

11    looking at the cover page here.

12              MR. BENNETT:  I would move the admission

13    of Exhibit B, your Honor.

14              MR. DYKES:  Your Honor, we object on

15    grounds of relevance, as well as untimely designation.

16              THE COURT:  What was B for?

17              MR. BENNETT:  B is the Construction Loan

18    Agreement.  This is the agreement pursuant to which

19    Alberta obtained a loan, and it has references to the

20    Forward Purchase and Sale Agreement and the interplay

21    between that and the construction loan.

22              THE COURT:  Well, I don't know what

23    relevance this has.  I agree, I'm going to allow it in

24    anyway.  As I said before, I'm not unsophisticated,

25    and I know what this issue is all about.

1          MR. BENNETT:  Okay.

2          (Exhibit B was received.)

3          Q     (By Mr. Bennett)  Are you familiar, Mr.

4    Provost, with the Lease for the Cinema?

5          A     Yes.

6          Q     Okay.   Look at Exhibit C.  Is this the

7    Lease for the Colorado Cinema Group?

8          A     Yes.

9          THE COURT:  What relevance does that

10   have to do with this lawsuit?

11          MR. BENNETT:  Every relevance, your

12   Honor.  This is the Lease by which the Cinema was

13   obligated to build its own building, so that any

14   tenant defects or any construction defects are the

15   Cinema's responsibility, not Alberta's.  So any

16   disclosure about a dispute between Alberta and the

17   Cinema is over the tenant's building.  It built.

18   Alberta didn't build it.

19          THE COURT:  This is Exhibit B?

20          MR. BENNETT:  C, your Honor.

21          THE COURT:  C?  All right.  Go ahead.

22          MR. BENNETT:  So I would move the

23   admission of Exhibit C, which is the Lease with the

24   Cinema.

25          THE COURT:  Same objection, same

177

1    ruling.

2          (Exhibit C was received.)

3               (By Mr. Bennett)  In general, Mr.

4    Provost, does Exhibit C contain provisions relating to

5    the Cinema's construction of the Cinema building?

6          A    Yes, it does.

7          Q    Does it contain provisions relating to

8    the Cinema's indemnification of Alberta from any

9    construction defect?

10         A    Yes, it does.

11              MR. BENNETT:  Thank you, your Honor.

12   Those are the questions I have.

13              THE COURT:  Cross.

14              MR. DYKES:  Thank you, your Honor.

15              MR. TRAHAN:  Your Honor, could we take a

16   quick break, a bathroom break?

17              THE COURT:  I'm the one supposed to be

18   asking for that, you're too young.  We'll take a --

19   but only for the court reporter.  Take five minutes.

20              MR. TRAHAN:  Thank you, your Honor.

21         (Recess taken at 3:13 p.m., reconvened at

22   3:25 p.m.)

23                    CROSS-EXAMINATION

24   BY MR. DYKES:

25         Q    Mr. Provost, did I understand you to say

1   that you held an ownership interest in Alberta Town

2   Center, LLC?

3          A     I believe we held it through a different

4   entity, our collective interests.

5          Q     You held an ownership interest

6   indirectly with Southlands Town Center before it was

7   sold?

8          A     Indirectly, yes.

9          Q     How would you hold that interest?

10          A     I believe the entity was Southlands Town

11   Center Management LLC.  I'm not sure.

12          Q     All right.  Now, during the time before

13   the project was sold, which was December the 12th,

14   2008, did you have any responsibility for day-to-day

15   operations at the Center?

16          A     No.

17          Q     You had no management oversight?

18          A     Not day-to-day; no, sir.

19          Q     What is your responsibility there with

20   respect to any management that you have?  Was it

21   primarily landscaping maintenance checking to make

22   sure that the appearance was good?

23          A     Landscape maintenance; no, I didn't do

24   that.

25          Q     I believe you said you did have some

1      responsibility for renegotiating the FPSA?

2              A      Yes.

3              Q      Also the amendments to the FPSA?

4              A      Yes.

5              Q      And you've had 20 years experience as a

6      real estate professional?

7              A      Correct.

8              Q      Would you admit to being a knowledgeable

9      and sophisticated person capable of negotiating an

10     agreement such as the FPSA?

11             A      Yes.

12             Q      And the amendments to it?

13             A      Yes.

14             Q      And you were represented by Mr. Drew

15     Flowers?

16             A      Yes.

17             Q      He's --

18             A      In the Los Angeles office.

19             Q      All right.  And was the Granite side

20     also represented by counsel, namely, my partner James

21     Smith of Fulbright & Jaworski?

22             A      Yes.

23             Q      Was it Steve Corrigan, not as lawyer on

24     the opposite side, but as the principal.

25                    Now I want to call your attention to

180

1  electronic page 143, not the number at the bottom of

2  the page.

3             THE COURT:  You get your firm on there.

4  You're advertising, hum?

5             MR. DYKES:  I suppose so.

6        Q    (By Mr. Dykes)  I'll show you page 43

7  of Plaintiff's Exhibit No. 1, which is the FPSA, and

8  particularly, I want to call your attention to

9  paragraph 14.5.  The next to the last sentence in

10  there reads as follows:  "As such, the terms -- let me

11  back up a sentence:  "Further, each party hereby

12  acknowledges that such party and its counsel, after

13  negotiation and consultation, have reviewed and

14  revised this Agreement."  Is that a true statement?

15        A    Yes, that's what it says.

16        Q    All right.  And not only what it says,

17  but that is a fact, isn't it?

18        A    Correct.

19        Q    "As such -- it goes on:  "As such, the

20  terms of this Agreement shall be fairly construed and

21  the usual rule of construction, to the effect that any

22  ambiguities herein should be resolved against the

23  drafting party, shall not be employed in the

24  interpretation of this Agreement or any amendments,

25  modifications or exhibits hereto or thereto."  And

1   that was part of your agreement, was it not?

2        A     That's what it says.

3        Q     You heard the opening statements in this

4   case, right?

5        A     Yes, I did.

6        Q     You heard your counsel suggest that

7   there's no ambiguity in this agreement?

8        A     Correct.

9        Q     Are you contending in this case that

10  there is some portion of this agreement that is

11  somehow unclear, ambiguous that we can't understand it

12  as it's written?

13       A     No.

14       Q     Now, we've talked about Estoppel

15  Certificates.  I think we all have an understanding of

16  what those means.  Can you confirm that the

17  requirement for the Estoppel Certificate was in the

18  FPSA starting on day one?  Starting with the original

19  Agreement in 2005?

20       A     The requirement for five estoppel

21  certificates?

22       Q     Yes, sir.

23       A     Yes, it was.

24       Q     And it stayed in there for Amendment

25  one, Amendment two all the way through to Amendment

1   Fifteen, right?

2         A     Correct.

3         Q     Now, Amendment Fifteen, it was modified

4   in the sense that the deadline was pushed back,

5   correct?

6         A     It and other terms.

7         Q     And other terms.  All right.  But does

8   the fact that that Estoppel requirement was in the

9   Agreement from the very beginning and stayed there

10  until the very end, does that suggest to you that it

11  was a matter of importance to the buyer?

12        A     There's a lot of provisions that stayed

13  in the Agreement for the entire Agreement.

14        Q     Have you been on the buyer side of real

15  estate transactions in your career where you have

16  required an Estoppel Certificate?

17        A     Yes.

18        Q     Now, you saw earlier -- I'll direct your

19  attention to paragraph 24 of Exhibit 1.  That Article

20  VIII of the FPSA specifies certain conditions

21  precedent to Buyer's obligation to proceed to closing,

22  correct?

23        A     Correct.

24        Q     And if we turn the page and go to page

25  25, we see that the subparagraph (k) is actually

1    entitled "Estoppels," and is one of those conditions

2    precedent; is that true?

3         A    Correct.

4         Q    And if we back up just two paragraphs

5    earlier to paragraph (i) on that same page, we see

6    that there is a requirement in this Conditions

7    Precedent section as follows:  "The buildings shall

8    be completed in accordance with the plans and

9    specifications."  That was a requirement in the

10   Conditions Precedent section, correct?

11        A    Correct.

12        Q    Now, I want to ask you about Exhibit C,

13   which is the Cinema Lease, and particularly Article

14   III, paragraph 4.  I have that up on the Elmo.  Can

15   you read that now?

16        A    Yes.

17        Q    I want to just read and consider with

18   you the first sentence.

19        A    Which paragraph?  3?

20        Q    Paragraph 4.  "Prior to delivering the

21   'buildable pad' to Tenant -- I'll just stop there a

22   moment.  Do you have an understanding what a buildable

23   pad is?

24        A    Typically, as I define the term of this

25   lease?

184

```
1          Q     I will represent to you that I don't
2     believe it is, but I'm not probably the one to be
3     testifying.
4          A     No.  I was just curious if it was a
5     defined term, because I've not seen the entire
6     document in here.
7                THE COURT:  You have to answer the
8     question, don't ask them.
9                THE WITNESS:  Sure.
10          A     Can you ask the question again?
11          Q     (By Mr. Dykes)  Do you have an
12     understanding of what a buildable pad means?
13          A     Yes, in general.
14          Q     All right.  And it says here that it
15     will be delivered to Tenant, right?  Or it says here,
16     "Prior to delivering the 'buildable' pad to tenant."
17          A     Correct.
18          Q     Does that mean that the landlord, being
19     Alberta, would deliver a buildable pad to Tenant,
20     being the seller?
21          A     Yes.
22          Q     And is that what happened?
23          A     Yes.
24          Q     So back again, what did get delivered by
25     way of a buildable pad?
```

185

1        A      The buildable pad, compacted pad

2    building, pad footprint to accommodate the theater

3    building.

4        Q      Does that mean a piece of land on which

5    a building could be done?

6        A      Yes.

7        Q      Does it consist of dirt, soil?

8        A      Yes.

9        Q      And whatever may be thereunder, bedrock

10   or whatever may be found thereunder?

11       A      Not necessarily.

12       Q      Well, whatever is under the surface of

13   the ground goes with the lot, doesn't it?

14       A      A buildable pad is a buildable pad.

15       Q      All right.  Let me come back into the

16   meaning of a buildable pad.  What do you understand

17   that to mean?

18       A      A buildable pad is just that.  It's a

19   footprint to accommodate the tenant's building.

20       Q      Footprint being an area of surface on

21   the land?

22       A      Yes.

23       Q      Did I understand you to say that it was

24   compacted?

25       A      Sometimes it's compacted, sometimes it's

1   not.

2         Q     Whatever it was, that was the

3   responsibility of Alberta to furnish to the Center.

4         A     Correct.

5         Q     And it did furnish it.

6         A     Correct.

7         Q     Now, let me call your attention to

8   Plaintiff's Exhibit 42, and to the best of our

9   technology, I'm going to treat that to the Elmo.

10              I'm showing you Exhibit 42.  Do you

11  recognize that as a copy of a letter dated September

12  8, 2008 from Ground Engineering, an engineering

13  consulting firm, to Alberta?

14        A     Yes, according to Joe Bellio.

15        Q     Joe Bellio, he was an employee of

16  Alberta, correct?

17        A     Correct.

18        Q     And was this a response from an

19  engineering firm that Alberta had hired to do some

20  investigation about the foundation problems at the

21  Center?

22        A     May I see the rest of the letter,

23  please?

24        Q     Yes.

25        A     Okay.

1       Q     There's a portion of the third page, and

2  I'll show you that when you tell me you're ready.

3       A     Right.   I'm ready.

4       Q     Now, returning to the first page, Ground

5  Engineering has written about two particular tenants

6  bases, the first being Pac Sun that we're not

7  concerned with here in this case, and the second being

8  the theater, correct?

9       A     Correct.

10           MR. BENNETT:   Objection to examination

11  on this document until it's been offered and received,

12  and I do object to its being offered and received.

13           MR. DYKES:   Well, we'd offer the

14  document, your Honor.   I believe this has been

15  authenticated.   This is part of the engineering

16  investigation, and I believe it will show that there

17  is at a minimum a genuine issue in question as to the

18  liability of the landlord for the foundation problems.

19           THE COURT:   What was the objection

20  again?

21           MR. BENNETT:   The objection is lack of

22  relevance.

23           THE COURT:   This is cross-examination.

24           MR. BENNETT:   I understand, but it still

25  has to be relevant to something.   This document is

1   something that Alberta --

2            THE COURT:  That what?

3            MR. BENNETT:  This document that we're

4   talking about was commissioned by Alberta.  It was not

5   relied upon by Granite in their letter rejecting the

6   Cinema stock.

7            THE COURT:  I've let a lot of stuff in

8   that is not relevant.  He said you opened.  I'm going

9   to allow it.  I'm allowing it on the issue for

10  impeachment of this witness.

11           MR. DYKES:  Yes, your Honor.

12  (Exhibit 42 was admitted.)

13       Q    (By Mr. Dykes)  Mr. Provost, I'll call

14  your attention to the sentence beginning at the top of

15  page 2.  It reads:  "It is our opinion (again being

16  written by the engineers), "It is our opinion that the

17  word flatwork settlement is related to backfill of the

18  structure as well as potential settlement of the deep

19  fill comprising this area."  Now, does that implicate

20  to you, sir, the buildable pad that was furnished not

21  by the theater but by the landlord, Alberta?

22       A    No.

23       Q    Now, you learned of the settlement

24  issues at the theater in the summer of 2008, correct?

25       A    No.

1       Q     When did you learn it?

2       A     January, February.  It's in my

3   deposition.

4       Q     January or February of 2008?

5       A     2009.

6       Q     When you were asked at your deposition,

7   didn't you say that you were aware of that issue in

8   June, July or August of 2008?

9               MR. BENNETT:  Objection.  If he's going

10   to try to impeach him with a deposition, he needs to

11   show it to the witness and let him confirm where he's

12   supposed to have said that.

13               MR. DYKES:  I think I just asked a

14   foundation question.

15               THE COURT:  If you asked and he answers

16   that, he can only answer yes or no.

17       A     Would you ask the question again,

18   please.

19       Q     (By Mr. Dykes)  Didn't you say at your

20   deposition that you had learned of the settlement

21   problem at the Cinema in the summer of 2008?

22       A     I don't recall.

23               MR. DYKES:  Could we have the original

24   deposition, please.

25               THE COURTROOM DEPUTY:  I have the

1   original deposition of Allen G. Provost taken January

2   11, 2010.

3             THE COURT:  Was that the wrong one?

4             MR. BENNETT:  Wrong Provost.

5             MR. DYKES:  Your Honor, I'm going to

6   withdraw that question.

7             THE COURT:  All right.

8        Q    (By Mr. Dykes)  Mr. Provost, regardless

9   of the nature of the particular settlement or

10   separation of deflection problems, by whatever name

11   you call them at the Cinema that came to light in

12   2008, whether or not to you, but to others, it was at

13   least clear to you that there was a dispute between

14   Alberta and the Cinema that developed in late 2008,

15   wasn't there?

16        A    Based on what document?

17        Q    Well --

18             THE COURT:  Did it become obvious to you

19   that there was a dispute?

20             THE WITNESS:  No.

21             THE COURT:  Okay.  The answer's no.

22        Q    (By Mr. Dykes)  Didn't you testify in

23   your deposition that there was an exchange of letters

24   with Carol Stokes being the then owner of the theater?

25        A    I don't recall.

1          Q      Well, simply to refresh your

2     recollection, then, let me show you a Deposition

3     Exhibit 10 in this case?

4                 THE COURT:  Is it in evidence?

5                 MR. DYKES:  It is not in evidence, your

6     Honor.  I'm showing it to the witness only to refresh

7     recollection.

8                 THE COURT:  All right.

9          Q      (By Mr. Dykes)  I call your attention to

10    the final sentence of the first paragraph.  Does that

11    refresh your recollection that the theater was taking

12    the position that the settlement issue was the

13    responsibility of the landlord, Alberta?

14         A      That's what the letter says.

15         Q      And you knew that at the time, didn't

16    you?

17         A      No.

18         Q      Are you satisfied today?

19         A      I'm not copied on that.

20                THE COURT:  Well, just a second.

21    Remember what I told you.  You both can't talk

22    together.  While he's talking, you've got to keep

23    quiet.  While you're talking, he'll keep quiet.  Now,

24    repeat what you said.

25         Q      (By Mr. Dykes)  It is clear there was a

1    dispute in which Alberta was putting the theater on

2    notice, as it said, telling you in effect you have to

3    fix the foundation problem and the theater on its side

4    was saying back to the landlord, no, it's your

5    responsibility, Mr. Landlord.

6            A    That's what the letter says.

7            Q    And that's what the letter said, and

8    that was the fact, that was the position of the two

9    parties?

10           A    I never saw those letters until later,

11   so I can't comment.

12           Q    Okay.  Now, I want you to confirm, if

13   you will, tell the Court, is it your position that a

14   cracked foundation is not a serious problem?

15           A    No, it's not.

16           Q    It's not your position?

17           A    No, it's not.

18           THE COURT:  Wait a second.  Is it not

19   your position, or is it not a serious problem?

20           THE WITNESS:  Not a serious problem.

21           (By Mr. Dykes)  And as a buyer, if you

22   were to learn that a building you were going to buy

23   has a cracked foundation, that would not be important

24   to you?

25           A    No.

1                    MR. DYKES:  I'll pass the witness, your

2    Honor.

3                    THE COURT:  Any redirect?

4                    MR. BENNETT:  May I have just a moment,

5    your Honor?

6                    THE COURT:  Okay.

7                    MR. BENNETT:  Thank you.

8                    MR. BENNETT:  No redirect, your Honor.

9                    THE COURT:  Okay.  You can step down.

10   Do you have another witness?

11                   MR. BENNETT:  No, your Honor.  The

12   defense rests.

13       (Defense rests.)

14                   THE COURT:  Defense rests.  Okay.  What

15   I will do, as I promised, I'll give you an opportunity

16   to file a Proposed Findings of Fact and Conclusions of

17   Law.  How long do you think it will take you?

18                   MR. TRAHAN:  As soon as we have -- I

19   don't know how long the transcript will take.  We

20   would like the benefit of a transcript.

21                   THE COURT:  You'll get the benefit of a

22   transcript.

23                   MR. TRAHAN:  Just a couple of weeks

24   after we get the transcript.

25                   THE COURT:  Just say for a March date,

194

1    an April date?

2              MR. TRAHAN:  March date would be fine.

3    Depending on when we get the transcript, just a few

4    weeks after that.

5              THE COURT:  Okay.  What's an agreeable

6    date?

7              MR. BENNETT:  You know, your Honor, we

8    don't need more than a week after the transcript, so

9    March 15th is plenty early enough for us.

10             THE COURT:  March 15th.  You can submit

11   it to me --

12             THE COURT REPORTER:  Can you give me

13   longer than March 15th?

14             MR. BENNETT:  Well, we didn't ask

15   approval.

16             THE COURT:  Give them an April date.

17   April 15th.

18             MR. BENNETT:   April 15th is fine, your

19   Honor.

20             MR. TRAHAN:  Your Honor, we would like a

21   moment to confer about whether we need to put on a

22   rebuttal witness.

23             THE COURT:  Go ahead.  Confer.

24             MR. TRAHAN:  Your Honor, we would like

25   to call Peter Cudlip.  He's one of the principals of

1    Alberta.

2                    THE COURT:  Okay.

3         (PETER M. CUDLIP, REBUTTAL WITNESS, SWORN.)

4                    THE COURTROOM DEPUTY:  Please be

5    seated.  State your full name for the record and spell

6    your last name.

7                    THE WITNESS:  My name is Peter M. Cudlip.

8    C-u-d-l-i-p.

9                    THE COURT:  Proceed.

10                       DIRECT EXAMINATION

11   BY MR. TRAHAN:

12         Q    Good afternoon, Mr. Cudlip.

13         A    Good afternoon.

14         Q    You were here for the opening

15   statements, weren't you, Mr. Cudlip?

16         A    Yes.

17         Q    And you were here when Mr. Bennett said

18   that when you compare the May 2008 Estoppel to the

19   January 2008 Estoppel, they're exactly the same word

20   for word, except for the paragraph about the cracked

21   foundation.  Were you here for that testimony?

22         A    Yes.

23         Q    Do you agree with that?

24         A    Yes.

25         Q    And what I've shown you here on this

1   opaque projector is the May 2008 Estoppel and then the

2   paragraph about the cracked foundation, correct?

3          A    Correct.

4          Q    Let me show you this.  This is the

5   paragraph about no lawsuits, liens, claims, offsets,

6   defenses?

7               THE COURT:  What are you showing him,

8   for the record?

9               MR. TRAHAN:  I'm showing him the May

10  2008 --

11              THE COURT:  No.  What's the number?

12              MR. TRAHAN:  I apologize, your Honor,

13  it's Exhibit 128.

14              THE COURT:  In evidence?

15              MR. TRAHAN:  It's in evidence.  And the

16  prior exhibit that I was referencing was Exhibit 127.

17              THE COURT:  Okay.

18          Q    (By Mr. Trahan) So if you could please

19  refer to Exhibit 128, you see that the May 2008

20  Estoppel contained a paragraph regarding "No existing

21  claims, defenses or offsets by or in favor of the

22  Tenant."  Did I read that correctly?

23          A    Yes.

24          Q    And that language is not in the January

25  2009 Estoppel is it, Mr. Cudlip?

1    A    I don't have that in front of me right

2    now.  So I don't believe so, but I don't have it in

3    front of me.

4    Q    Well, assume with me, if you will, that

5    that is a correct statement.  It's Mr. Bennett's

6    statement word for word they're the same except for

7    the cracked foundation paragraph is not correct, is

8    it?

9    A    I think we are talking about the cracked

10   paragraph foundation.

11        THE COURT:  No.  The question is, is it

12   the same?

13   A    Would you state your question again for

14   me.

15   Q    (By Mr. Trahan)  Assume with me, if you

16   will, that Exhibit 128 is an accurate representation

17   of what's in the May Estoppel compared to what's in

18   the January 2009 Estoppel.  Can you do that with me

19   please, Mr. Cudlip?

20   A    Yes.

21   Q    Would you agree that this language

22   that's in paragraph 5 of the May 2008 Estoppel is not

23   in the January 2009 Estoppel?

24   A    Correct.

25   Q    And that that is different than the

198

1    paragraph about the cracked foundation?

2         A    Yes.

3         Q    Thank you.  I'm going to refer you to

4    Plaintiff's Exhibit No. 1, and in particular I want to

5    refer you to Article VII.  If you could please take a

6    look at your screen.

7         A    Okay.

8         Q    If you could please read into the record

9    the title of Article VII.

10        A    "Construction of the Buildings; Other

11   Seller Covenants."

12        Q    Would you agree that Article VII relates

13   to conditions of the building?

14        A    I'd have to read the whole article.

15        Q    Would you please take a moment to review

16   it, Mr. Cudlip.

17        A    I've read -- okay.

18             THE COURT:  Repeat the question.

19        Q    (By Mr. Trahan)  The question is; would

20   you agree that Article VII of the Forward Purchase and

21   Sale Agreement, which is Plaintiff's Exhibit No. 1,

22   relates to the construction of the Southlands Town

23   Center in its condition?

24        A    It relates to, if you put back to the

25   previous page --

199

1                    THE COURT:  Does it relate to it?  Yes

2    or no.

3                    THE WITNESS:  Yes.

4                    THE COURT:  Okay.  Yes.

5         Q    (By Mr. Trahan)  Is it your position

6    that the condition of the property was immaterial for

7    purposes of this transaction?

8         A    Yes.

9         Q    So if Alberta built a building that was

10   upside-down, would Granite have been obligated to

11   close on the purchase of the building?

12        A    Yes, as long as it had been built within

13   the applicable laws, codes, ordinances and other legal

14   requirements, and to the plans and specifications as

15   modified.

16        Q    So Alberta had a duty to build the

17   building in compliance with certain plans and

18   specifications?

19        A    Yes.

20        Q    Doesn't that relate to the condition of

21   the property?

22        A    We built it per the plans and

23   specifications.

24        Q    What if you built it in such a way to

25   where the slabs would sink or crack, would that be

1    inconsistent with the plans and specifications?

2            A    If you look at the specifications, one

3    of them is the Geotech Report, and the Geotech Report

4    says on fills, and I don't know if this is an exhibit,

5    but fills of this depth you can expect one to two

6    inches of settlement over the property.  Standard

7    language in Colorado, Geotech and what it's designed

8    for.

9            Q    Did the plans and specifications say

10   that the owner should expect the slabs in the largest

11   tenant of the building to crack?

12           A    I cannot respond to that because the

13   Cinema built their own building and had their own

14   Geotech Report, and I did not review that.

15           Q    I want to talk to you about that.  Is it

16   your position that Granite had a duty to delve into

17   the Cinema dispute?

18           A    I didn't understand your question.

19           Q    Is it your position that Granite had an

20   obligation to look into Alberta's dispute between --

21   with the Cinema about the cracked foundation and to

22   determine who was right?

23           A    I'd have to go back and look at the

24   contract to respond to that.

25           Q    Okay.  Well, we have an Estoppel

1   Certificate that references a cracked foundation.  Do

2   you acknowledge that?

3        A    Correct.

4        Q    And you were actively involved in the

5   construction of this project, weren't you, Mr. Cudlip?

6        A    Oversight of it, yes.

7        Q    And you were actively involved in

8   discussions and dealings with Granite with respect to

9   this project, weren't you?

10       A    Yes.

11       Q    And you're familiar with the estoppel,

12  the January 2009 Estoppel that references a cracked

13  foundation?

14       A    Yes.

15       Q    Your counsel has taken the position to

16  this Judge that Granite had the duty to go into and

17  determine whether there was a default -- whether that

18  cracked foundation constituted a default under the

19  Colorado Cinema Lease.  Do you agree with that

20  position?

21       A    Restate your question.

22       Q    Do you agree with your counsel's

23  argument that Granite had a duty to look into whether

24  the cracked foundation constituted a default under the

25  Cinema Lease?

1        A     Again, my answer is that I'd have to go

2   back and look at the contract.

3        Q     Okay.  So you don't have a position on

4   that one way or the other?

5        A     I'd have to go back and look at the

6   contract to see if they had a duty to look at that.

7        Q     To see if Granite had a duty to look

8   into that?

9        A     Correct.

10        Q     So you're not taking a position on

11   that?  You don't have an opinion in that regard?

12             THE COURT:  It's asked and answered.

13        Q     (By Mr. Trahan)  All right.  There's

14   been a lot of discussion about this -- I'm going to

15   take you back to Article VII which talks about

16   construction of the buildings, et cetera, and I want

17   to point out to you that this provision includes

18   certain covenants.  Do you see that on your screen?

19        A     Yes.

20        Q     All right.  I'm going to take you to

21   Section 7.2(f), which is "Other Seller Covenants," and

22   this is a very important covenant that's been

23   highlighted by your counsel.  Let's see if I can zoom

24   here.  All right.  Let me take a look at this.  Now

25   I'm going to freeze it.

1               If you would take a look at that, that's

2      the "Change in Condition." Is it Alberta's position

3      that Alberta had no duty to notify Granite of a change

4      in the condition of the property?

5               A     Correct.

6               Q     Okay.  Let's look at paragraph (f)

7      here.  If you'd read that with me.  "Change in

8      Condition."  "Seller shall promptly notify Buyer of

9      any change in any condition with respect to the

10     Property or any portion thereof."  Did I read that

11     correctly?

12              A     Correct.

13              Q     And the second clause is: "or Seller

14     shall promptly notify Buyer of any event or

15     circumstance of which Seller has knowledge which makes

16     any representation of warranty of Seller misleading or

17     makes any covenant or agreement incapable of being

18     performed."  Did I read that correctly?

19              MR. BENNETT:  Objection.  That's not

20     what the document says, your Honor.

21              THE COURT:  Well, he can answer it yes

22     or no.  Did he read it correctly?

23              A     Yes, you read it correctly.

24              Q     (By Mr. Trahan)  The conditions about

25     whether or not the changes, these qualifications in

204

1  (a) and (b), those don't modify changes in the

2  condition of the property.  They modify events or

3  circumstances of which seller has knowledge, doesn't

4  it?

5          A    No, I disagree.

6          Q    So Alberta had no duty to notify Granite

7  of changes in the condition of the property?

8          A    No.

9          Q    In fact, Alberta was aware of cracked

10  walls and cracked foundations prior to the closing,

11  wasn't it?

12          A    Yes.

13          Q    And it's your position that Alberta had

14  no duty to disclose that?

15          A    Alberta didn't have no duty to disclose

16  it, but we did.

17          Q    When did you disclose it?

18          A    When Angela Kralovec and Chris Silva

19  and --

20               THE COURT:  The question is when.

21               THE WITNESS:  When?  September '08.

22          Q    (By Mr. Trahan)  Do you have a single

23  spec of paper evidencing that you notified Granite of

24  a cracked foundation on the space of the largest

25  tenant on the property?

1          A      Physically inspected the property with

2     them.

3                 THE COURT:   The question is, do you have

4     any paper.

5                 THE WITNESS:   No.

6          Q      (By Mr. Trahan)  Do you think that's the

7     sort of thing you should put in writing, Mr. Cudlip?

8                 MR. BENNETT:   Objection, your Honor.

9     This doesn't go to the Cinema Estoppel, it goes to

10    whether there was some disclosure of the prior

11    condition.  That's not the issue.

12                THE COURT:   I'll allow it.

13         Q      (By Mr. Trahan)  Now I'd like to show

14    you Article VIII of the Forward Purchase and Sale

15    Agreement, which is Plaintiff's Exhibit No. 1, and

16    these are conditions precedent to closing, correct,

17    Mr. Cudlip?

18         A      Correct.

19         Q      It says here one of the conditions

20    precedent to closing.  First of all, that means that

21    if these aren't met, then Granite doesn't have to

22    close on the sale of the property, right?

23         A      I would have to review the whole

24    contract to see if that was a correct statement.

25         Q      Are you familiar with what conditions

1    precedent are generally in connection with real estate

2    contracts and so forth?

3           A     Yes.

4           Q     And generally, they mean that the buyer

5    doesn't have to close unless these conditions are

6    met.  Would you agree with that?

7           A     Correct.

8           Q     So let's look at paragraph 8.1(c),

9    "Compliance by Seller."  "Seller shall have

10   materially complied with each and every covenant or

11   condition of this Agreement to be kept or complied

12   with by Seller prior to the closing."  Did I read that

13   correctly?

14          A     Correct.

15          Q     So this was not an unconditional

16   obligation to closing, was it?

17          A     Other than these items, yes.

18          Q     Let's talk about these items.  Another

19   one of the items, another one of the conditions

20   precedent was that the building shall be completed in

21   accordance with the plans and specifications, correct?

22          A     Correct.

23          Q     And it's your position that that has

24   nothing to do with the condition of the property?

25          A     No.  It says what it says.  Says we have

1    to build in accordance with the plans and the

2    specifications.

3         Q    Okay.  And there is another requirement

4    here that says that Granite doesn't have to close

5    unless there's a certification as to the punch list.

6    Do you agree with that?  Punch list of construction

7    items.

8         A    Again, this is the Covenant section?

9         Q    This is in the Conditions Precedent

10   section?

11        A    Yes.  It says we have to complete the

12   building, issue a certificate of substantial

13   completion.

14        Q    Would you acknowledge that relates to

15   the condition of the property?

16        A    Yes.

17        Q    And then we've got the Estoppels

18   provision here that we've heard a lot about, and that

19   was a condition precedent to closing, wasn't it?

20        A    Correct.

21        Q    Would you agree with me that the

22   Estoppel section is very specific as to what criteria

23   the Estoppels need to satisfy?

24        A    Yes.

25        Q    Would you agree with me that those

1   criteria make no reference, no exception regarding the

2   condition of the property?

3        A     Restate your question.

4        Q     Would you agree that the specific

5   criteria that the parties agreed would apply to the

6   acceptability of estoppels made no exception as to the

7   condition of the property?

8        A     I'm not sure I understood your question

9   exactly, but the criteria in this paragraph (k) does

10  not talk about condition of the property.

11       Q     Would you agree that the "As Is"

12  provision in the Agreement relates to the obligations

13  between the buyer and the seller, Granite and Alberta?

14       A     Yes.

15       Q     Would you agree that the Estoppel

16  Certificates relate to the relationship between the

17  landlord and the tenant?

18       A     It relates to all three of the parties.

19       Q     To the buyer, the seller and the

20  tenant.

21       A     Correct.

22       Q     Okay.  Do you agree with Mr. Provost

23  that a cracked foundation is not a material issue from

24  a buyer's perspective?

25       A     Yes, that if they accept that the

1    foundation is cracked.

2          Q     If you as a buyer got an Estoppel

3    Certificate that referenced a cracked foundation,

4    would you be alarmed by that?

5          A     I would take a look at it.

6          Q     How about if it was for the biggest

7    extent of the property, would you be alarmed by that?

8          A     As I said, I would take a look at it.

9                MR. TRAHAN:  Thank you, Mr. Cudlip.

10   Pass the witness, your Honor.

11               THE COURT:  Cross.

12               MR. BENNETT:  Thank you, your Honor.

13                     CROSS-EXAMINATION

14   BY MR. BENNETT:

15         Q     Mr. Cudlip, explain what you mean that a

16   cracked foundation doesn't necessarily mean a serious

17   problem.

18         A     Out in the hallway here you have a crack

19   in the hallway.  Is that a serious problem?  You know,

20   you have to take a look at it.  A cracked foundation

21   doesn't necessarily mean the building is going to fall

22   down.  A cracked foundation doesn't necessarily mean

23   you're going to incur any sort of financial

24   obligation.

25         Q     Was it the Cinema's responsibility to

1    build its own building, and did it indemnify Alberta

2    for any damage relating to its construction?

3         A    Yes.

4         Q    And that's contained in the lease?

5         A    Yes.

6         Q    So had Granite taken a look at the

7    Cinema Lease before rejecting the Cinema Estoppel, it

8    could have observed those conditions?

9         A    Yes.

10        Q    Now, Mr. Provost was questioned about

11   the Ground Engineering report.

12        A    Yes.

13        Q    Do you recall that report?

14        A    Yes.

15        Q    Do you recall what Ground Engineering

16   concluded about the settlement issues that it

17   observed?

18        A    I'd have to look at it again.

19        Q    Let me pull that out.

20             MR. BENNETT:  Excuse me, your Honor.

21   I've got to get the exhibit.

22        Q    (By Mr. Bennett)  Would you look at

23   Exhibit 42, please.  Can you see that, Mr. Cudlip?

24        A    Can you magnify it one more step.

25             THE COURT:  Can you enlarge it?

1          A     Okay.   There you go.

2          Q     (By Mr. Bennett)   Now, we're dealing

3    here with the feeder, right?   We're not dealing with

4    Pac Sun.

5          A     Correct.

6          Q     Okay.   So the Ground Engineering report

7    says that the west end of the theater is moving

8    differentially to the rest of the building.   The

9    exterior walls are offset approximately one or more

10   inches from each other.   Does it say anything about a

11   cracked foundation?

12         A     No.

13         Q     Let's go to the next page.   Again, let's

14   just look at the theater again.   Read that to

15   yourself.

16         A     Okay.

17         Q     What was Ground Engineering's opinions

18   expressed in this exhibit as to what should be done

19   about the theater?

20         A     That there should be some surveying

21   performed to see if the structures are moving or which

22   such moving has stopped.

23         Q     And what were they examining in

24   connection with the movement of the structure?   Or

25   what were they concerned about the source of the

212

1    movement?

2           A       That there's potential settlement

3    resulting in differential movement, potentials of the

4    structure.  The shallow drilled piers.

5           Q       So they were concerned about whether the

6    Cinema had drilled their piers to an adequate depth?

7           A       Correct.

8           Q       All right.  Go to the next page.  As to

9    the rest of the site, what was Ground Engineering's

10   view of the observed structures?

11          A       That they are performing as -- I can't

12   really read.

13          Q       Intended?

14          A       -- intended.  Normally, they anticipate

15   settlement of the soils replaced to be approximately

16   one inch of the fill depth.

17          Q       So as to the work that Alberta did which

18   was the fills on the site, Ground Engineering at the

19   time believed it was performing as intended.

20          A       Correct.

21          Q       Their concern about the Cinema was the

22   Cinema had not drilled its piers to the proper depth?

23          A       Correct.

24          Q       Is that what you knew at the time of the

25   closing of this project?

1          A        Correct.

2          Q        Now, in your experience as a real estate

3     developer in this state, is it common to have some

4     cracks in foundation?

5          A        Correct.

6          Q        And whether it's serious or not depends

7     on the extent of the cracking?

8          A        Yes.

9          Q        Do you know if anyone has ever excavated

10    the Cinema building to determine if there is, in fact,

11    a cracked foundation?

12         A        I've not observed that.

13         Q        Not while you were a property manager at

14    the Center?

15         A        Right.

16         Q        And did you continue to manage the

17    Center after the closing?

18         A        Yes.

19         Q        For how long?

20         A        Southlands Shopping Center management of

21    which I was a principal continued to manage the

22    Alberta Town Center until March 31st, 2009.

23         Q        Now, you were asked some questions about

24    the Forward Purchase and Sale Agreement, Exhibit 1.

25    Do you recall that?

1        A      Right.

2        Q      And whether Alberta had the obligation

3 to build the structures it built in accordance with

4 the plans and specifications.

5        A      Correct.

6        Q      And you acknowledged that it did, right?

7        A      Right.

8        Q      How did the parties determine for

9 purposes of the closing whether Alberta had met that

10 requirement?

11       A      The buyer was given Certificates of

12 Substantial Completion and copies of the Certificates

13 of Occupancy from the City of Aurora.

14       Q      And then did the buyer have a right to

15 have its architect inspect those?

16       A      Yes.

17       Q      Did it afford itself of that right?

18       A      I cannot answer that.

19       Q      Did the buyer and the seller's architect

20 have the right to designate an independent third

21 party?

22       A      Yes.

23       Q      Do you know if they availed themselves

24 of that right?

25       A      I know that the buyer hired a Mark Acugo

1   during the construction of the project, but I don't

2   know if they did anything after the construction of

3   the project.

4            Q     The project was completed in approximately

5   2006, the fall of 2006?

6            A     October 2006.

7            Q     So it had been completed for more than

8   two years prior to the closing of this matter.

9            A     Correct.

10           Q     Did Granite have the right under the

11  FPSA to inspect the property?

12           A     Yes.

13           Q     And did they avail themselves of that

14  right?

15           A     During the construction period, yes, and

16  periodically after the construction period.

17           Q     In paragraph 7.2(f), pull that up as

18  Exhibit 1, which is on page 23 of the exhibit, page

19  23.  Do you read subparagraph (f), clauses (a) and (b)

20  to modify the entire "Change in Condition" provision?

21           A     Restate your question.

22           Q     I'll try it again.  Do you see that

23  there are two circumstances under which Alberta has

24  to notify the buyer.

25           A     Correct.

216

1          Q      "(a) In a condition that makes a

2     representation or warranty of the Seller under the

3     Agreement untrue or misleading, or (b) makes a

4     covenant or agreement of Seller under this Agreement

5     incapable of being performed."  Do you believe that

6     that applies to all the provisions it preceded?

7          A      Yes.

8          Q      That was your understanding of how this

9     Agreement worked?

10         A      Correct.

11                MR. BENNETT:  No further questions.

12                MR. TRAHAN:  Just a couple.

13                THE COURT:  Go ahead.

14                     REDIRECT EXAMINATION

15    BY MR. TRAHAN:

16         Q      Mr. Cudlip, I'm going to show you again

17    my markup of the subsection that relates to your,

18    Alberta's, duty to notify Granite of changes in

19    condition, okay?  Did you disagree with this reading,

20    my interpretation of this section?

21         A      I don't understand what you're reading,

22    and I don't understand what you're saying or you're

23    reading.  You got to read the whole paragraph within

24    its context.  You can't just take parts of it out.

25         Q      My reading is there is two independent

1   clauses here.  Do you disagree with that?

2        A    I disagree with that.

3             MR. TRAHAN:  Your Honor, we offer this

4   page as marked as a separate Plaintiff's Exhibit No.

5   129.

6             THE COURT:  That's into evidence anyway,

7   isn't it?

8             MR. TRAHAN:  Not as marked.  We'd like

9   it in evidence as it's marked, your Honor.

10            THE COURT:  Any objection?

11            MR. BENNETT:  Yes, your Honor.  There's

12  no witness that's testified to this, only counsel has

13  testified that it should be read the way it's marked

14  up here.  It's counsel's marked, not anybody else's.

15            MR. TRAHAN:  May I remark?

16            THE COURT:  May you remark?  Go ahead.

17            MR. TRAHAN:  Mr. Cudlip's testimony will

18  have more meaning if this document's in evidence, your

19  Honor.

20            THE COURT:  It's in evidence anyway, but

21  whether it's there as you have highlighted it really

22  is of no great moment because we have the transcript

23  and we have the document in evidence.  Okay.  So the

24  application to have you mark it up, I'll deny that,

25  because I've seen it.  I know what you're talking

2           Q    (By Mr. Trahan)  Mr. Cudlip, you

3   reference tile cracks in the hall.  You're not

4   suggesting that the problems that the Colorado Cinema

5   were comparable to the tile cracks in the hall at this

6   courthouse, are you?

7           A    No.  I was just using that as an

8   example.

9           Q    But just to be clear, you're not

10  suggesting to this Court that the Cinema -- the cracks

11  in the Cinema's foundation were comparable to the tile

12  cracks in this hall?

13          A    No.

14          MR. TRAHAN:  I am going to publish, but

15  it's not yet in evidence, your Honor, so if you could

16  just disregard the screen.

17          THE COURT:  Do you want it in evidence?

18  Is there an objection to it?

19          MR. TRAHAN:  I do want it into evidence.

20          THE COURT:  Is there an objection?

21          MR. TRAHAN:  He has indicated that he

22  does, but I'll go ahead and offer Plaintiff's Exhibits

23  No. 116-003, which is a portion of a composite which

24  is 116, but I'm only offering a single page.

25          THE COURT:  Is 116 in evidence?

1          MR. TRAHAN:  116 is not.  Then I'm going

2    to offer 116-04 as a separate exhibit, and then I'm

3    going to offer Plaintiff's Exhibit 120.

4          THE COURT:  Now, describe what those

5    documents are.

6          MR. TRAHAN:  Exhibit 116-003 is a

7    communication within Alberta regarding the structural

8    review of the Cinema, the slab problems, and it's

9    dated June 2008.  That's Exhibit 116-003.  Exhibit

10   116-004 is another internal communication at Alberta,

11   dated June 2008 regarding Alberta's engagement of an

12   engineering firm to conduct a sonar study on the slab

13   of the Cinema foundation.  And Exhibit 120 -- I take

14   that back.  I'm going to offer Exhibit 69, which is a

15   better copy of Exhibit 120, is a June 25, 2008 letter

16   to Alberta from a major tenant at Southlands Town

17   Center complaining of cracks in the walls, et cetera.

18   And this goes to Mr. Provost's testimony that he

19   didn't learn about the structural problems at the

20   Southlands Town Center until after closing.  This

21   document's dated almost six months before closing.

22   So those are the three exhibits we'll offer.

23         THE COURT:  Counsel.

24         MR. BENNETT:  Let's take each one of

25   them.  Exhibit 69 relates to another tenant, doesn't

1    have anything to do with the Cinema.  I've objected to

2    any discussion of other tenants and you've sustained

3    it before.  This letter is nothing more than another

4    one of these letters relating to --

5                    THE COURT:  You said that this is a

6    dispute between the plaintiff and Alberta, but you've

7    been bringing in third parties, and you object to

8    this?

9                    MR. BENNETT:  I don't think I've brought

10   in third parties, your Honor.  We've been limited to

11   the Cinema.  There are other tenants out there who

12   have issues, but those are not part of the issue.

13                   THE COURT:  You didn't bring in

14   testimony about other parties?

15                   MR. BENNETT:  I don't think so, did I?

16                   THE COURT:  I think you did.

17                   MR. BENNETT:  Well, your recollection

18   will be better than mine, then.  I don't think I

19   brought up any other tenant.

20                   THE COURT:  I'm going to allow it.

21   Next.

22        (Exhibit 69 was received.)

23                   MR. TRAHAN:  Let me go to 116-003 and

24   116-004.

25                   MR. BENNETT:  And I don't have copies of

1    those.  Those were not furnished to us prior to trial,

2    so I don't know what you're talking about.

3                MR. TRAHAN:  I'm told that they were

4    supplied to you, but I'll be happy to provide you with

5    another copy.

6                MR. BENNETT:  I don't think I've got any

7    of those copies.  I have no objection to 116-003, your

8    Honor.

9                THE COURT:  Okay.

10                MR. BENNETT:  And let me look at

11    116-004.  I have no objection to 116-004.

12                THE COURT:  Okay.  Received.

13         (Exhibits 116-003 and 116-004 were received.)

14                THE COURT:  Is that it, counsel?

15                MR. TRAHAN:  Yes, sir.  I'd like to ask

16    the witness a few questions about these exhibits.

17                THE COURT:  Go ahead.

18         Q    (By Mr. Trahan)  I've put up Exhibit

19    116-003, Mr. Cudlip.  If you could please take a

20    moment to review it and let me know when you're done.

21                THE COURT:  Go ahead.

22         A    Yes, I'm done.

23         Q    (By Mr. Trahan)  If you could please --

24    this is a June 2nd, 2008 e-mail from Mike McGee to

25    Drew Kellogg and others, including you.  Correct, Mr.

1    Cudlip?

2          A      Correct.

3          Q      And who is the Joe referenced here?

4          A      Joe Bellio.

5          Q      And who is Joe Bellio?

6          A      Joe Bellio is the senior property

7    manager out at Southlands Shopping Center.

8          Q      Okay.  And he was someone you worked

9    with at Alberta in connection with the Southlands Town

10   Center?

11         A      Yes.

12         Q      And do you acknowledge that is a

13   discussion about the problems at the Cinema in June

14   2008?

15         A      Correct.

16         Q      And this is more than six months before

17   closing?

18         A      Correct.

19         Q      Did you ever provide a copy of this

20   document to anyone at Granite?

21         A      I did not provide a copy.

22         Q      I'll refer now to Exhibit 116-004.  This

23   is a June 20, 2008 e-mail from Mike McGee to Bryan

24   McFarland and again Joe Bellio, correct?

25         A      Correct.

1          Q     And it says:  "I've requested that

2    Ground research a sonar study of the Cinema

3    foundations."  Did I read that correctly?

4          A     Correct.

5          Q     "If we can shoot that deep (60'+)

6    they'll propose a study."  Correct?

7          A     Correct.

8          Q     Who is Ground?

9          A     Ground Engineering was the Geotech

10   engineer employed by Alberta Town Center.

11         Q     So this problem was serious enough for

12   Alberta to retain an engineer in turn to investigate

13   it?

14         A     They requested Ground to search the

15   sonar study, yes.

16         Q     Did Alberta retain an engineering firm

17   to investigate problems with the Colorado Cinema?

18         A     Yes.

19         Q     Did Alberta retain legal counsel to

20   represent it in connection with disputes over the

21   problems at the Colorado Cinema?

22         A     Did you say Alberta?

23         Q     Did Alberta.  I meant to say Alberta, if

24   I didn't.  Let met restate the question.  Did Alberta

25   retain legal counsel to represent it in connection

1    with the dispute with the Cinema over the foundation

2    problem?

3        A    Yes.

4        Q    So the problem was serious enough for

5    Alberta to retain an engineering firm and a law firm,

6    but you think that Granite should have accepted that

7    Estoppel in reference to the cracked foundation in

8    that Estoppel by just simply looking at the lease and

9    concluding it wasn't the landlord's problem, it was

10   the tenant's problem?  Do you really think that's

11   reasonable to ask?

12             MR. BENNETT:  Objection.  Argumentative.

13             THE COURT:  I'll sustain that.

14       Q    (By Mr. Trahan)  If this was the

15   Cinema's problem, and all Granite needed to do was

16   look at the lease to figure that out, why was Alberta

17   going to so much trouble?

18       A    I do not think we were going through so

19   much trouble.  We were looking at figuring out what

20   the issue was and responding to the letters that the

21   Cinema wrote us in response to the letters we wrote

22   them.

23       Q    Mr. Bennett asked you about Granite's

24   right to inspect the property.  Do you remember that

25   question?

1          A      Yes.

2          Q      The reason that Granite had a right to

3    inspect the property is because of the condition of

4    the property was very important; isn't that correct,

5    Mr. Cudlip?

6          A      I can't speak on behalf of Granite.

7          Q      Do you agree that Mr. Provost was not

8    made aware of these problems that were -- these

9    problems at DCC Architects, which is -- let me ask you

10   about this exhibit.  This is the June 25, 2008 letter

11   to Jose Inclan.  He was with Alberta Town Center,

12   correct?

13         A      Pardon?

14         Q      Jose Inclan is with Alberta Town Center,

15   correct?

16         A      He actually was employed by Southlands

17   Shopping Center management.

18         Q      Okay.  But he was somebody who you were

19   working with with respect to the Southlands Town

20   Center?

21         A      He was the general manager of the

22   shopping center, yes.

23         Q      Did he provide you with a copy of this

24   letter from DCC Architects in June 2008 that had

25   pictures of cracks in the wall?

1          A     I can't recollect exactly when he showed

2     this letter to me.

3          Q     But you did see it?

4          A     Yes, I did.

5          Q     And you do acknowledge this letter is

6     dated almost six months before closing?

7          A     Yes, I do.

8          Q     Do you have any information that would

9     suggest that this letter was ever provided to Granite

10    prior to closing?

11         A     I do not know.

12         Q     You if were a buyer, is this the sort of

13    thing you'd want to know, that a major tenant was

14    complaining about cracks in the walls and cracked

15    foundations?

16              MR. BENNETT:  Objection to the

17    characterization of DCC Architects as a major tenant.

18    There's no evidence of that.  It's argumentative,

19    assumes facts not in evidence.

20              THE COURT:  Rephrase the question.

21         Q     (By Mr. Trahan)  If you were a buyer,

22    would you want to know about tenant complaints about

23    cracks in the walls and cracked foundations that were

24    documented?  Would you want to see those documents

25    prior to closing?

1          A      If they were major, yes.  These were not

2     major issues at this time when this letter was

3     presented to him.

4          Q      So you didn't think that DCC Architects,

5     this letter, was cause for concern?

6          A      We looked at it, and we were having it

7     investigated.

8          Q      All right.  Let's take a look at this

9     letter.  It says here:  "Enclosed are photographs and

10    verbal descriptions of damage due to building movement

11    that is no fault of the tenant or its occupants."  Did

12    I read that correctly?

13         A      Correct.

14         Q      And would you acknowledge that this

15    exhibit includes page upon page of complaints and

16    photographs regarding cracks in the walls and a

17    sinking foundation?

18         A      Would you finish going through it?

19         Q      Yes, sir.

20         A      Appears to me about three or four pages.

21         Q      And do you acknowledge that the gasket

22    around the glass wall in the conference room is

23    falling out?

24              MR. BENNETT:  Objection, your Honor.  I

25    know you've allowed this exhibit, but now we're going

228

1    into DCC Architects has nothing to do with the Cinema,

2    has nothing to do with the building of the Cinema.

3              THE COURT:  The question is him looking

4    at this exhibit, does he acknowledge that the gasket

5    is falling from the wall.  Yes or no.

6         A    Looking at this exhibit, yes.

7         Q    (By Mr. Trahan)  Would you agree that

8    DCC Architects was complaining about large cracks

9    developing as well?  And they go all the way -- and

10   that they are expanding?  Would you acknowledge that?

11        A    That's what this letter says.

12        Q    And you did receive this letter?

13        A    I did review it.  I did not receive it.

14        Q    Did you ever provide Mr. Provost with a

15   copy of this letter?

16        A    I do not believe so.

17        Q    Do you acknowledge or do you agree with

18   Mr. Provost's statement that he was aware of the

19   short-term problems?  Do you agree with this statement

20   that he was not aware of the structural problems at

21   the Cinema or at DCC Architects or at the Center

22   generally until January or February of 2009?

23              MR. BENNETT:  Objection.

24              THE COURT:  I'll sustain that.

25        Q    (By Mr. Trahan)  Do you acknowledge that

1    you were aware of the structural problems at the

2    Southlands Town Center prior to the December 12, 2008

3    closing?

4            A     Yes, I was, and so was Granite.

5            MR. TRAHAN:  Pass the witness.  No

6    further questions.  Thank you, Mr. Cudlip.

7            MR. BENNETT:  No further questions.

8            THE COURT:  You can step down.  April

9    15th, both will have --

10            MR. TRAHAN:  Excuse me, your Honor.

11    We've got one witness Mr. Dykes would like to put on

12    regarding the issue of notice to Granite, a notice

13    when Granite was notified.

14            THE COURT:  Go ahead.

15            MR. DYKES:  Call Angela Kralovec.

16        (ANGELA KRALOVEC, REBUTTAL WITNESS, SWORN.)

17            THE COURTROOM DEPUTY:  Please be

18    seated.  State your full name for the record and spell

19    your last name.

20            THE WITNESS:  Angela Kralovec.

21    K-r-a-l-o-v-e-c.

22            THE COURT:  You may proceed.

23            MR. DYKES:  Thank you, your Honor.

24                    DIRECT EXAMINATION

25    BY MR. DYKES:

1       Q       Would you state your name, please.

2       A       Angela Kralovec.

3       Q       And by whom are you employed?

4       A       BlackRock, Incorporated.

5       Q       What is your position with BlackRock?

6       A       I'm an asset manager.

7       Q       What does that mean, as far as your

8    responsibilities?

9       A       I act as the owner on designated

10   commercial properties, on behalf of pension funds and

11   our pension fund clients.

12      Q       What geographical area are these

13   properties in?

14      A       I cover three main areas; Minnesota,

15   Colorado and share responsibility for Southern

16   California.

17      Q       In 2008 and 2009, was the Southlands

18   Town Center part of your responsibility?

19      A       Yes.  Starting in June of 2008.

20      Q       Starting in June of 2008?

21      A       Yes.

22      Q       Is that correct?  Okay.

23              Now, the closing we know was December

24   the 12th of 2008, and I want to begin by asking you,

25   as plainly as I can, did you know of the structural

1   problems at the Cinema at the Southlands Town Center

2   before it's closing in December of 2008?

3        A    No.

4        Q    Now, Ms. Kralovec, you heard Mr. Cudlip

5   testify, correct?

6        A    Yes.

7        Q    You heard him say that he felt Alberta

8   had no duty to notify Granite of those structural

9   problems.  Did you hear that?

10        A    Yes.

11        Q    Did you hear him also say that

12   nevertheless, he had made Granite aware of those

13   structural problems?

14        A    Yes.

15        Q    And did you hear him say that he did

16   that by making Angela Kralovec, you, aware of those

17   problems?

18        A    Yes.

19        Q    Let me ask you again, as plainly as I

20   can, is that true or not?

21        A    It is not true.

22        Q    All right.  Now, he's mentioned

23   specifically the time of September of 2008.  Were you

24   in communication with Mr. Cudlip or others at Alberta

25   in September of 2008?

1          A     Yes, I was.

2          Q     All right.  Would you explain in what

3     respect you met with them or spoke with them.

4          A     We had spoken, starting in approximately

5     July 2008, and as Chris Silva mentioned earlier, in

6     September, I believe it was September 11, 2008, we

7     came to the site to meet with Alberta representatives,

8     Southlands Shopping Center management representatives

9     and to visit the site at that time.

10          Q     Let me first ask you when this visit to

11     the site occurred.  When, in September?

12          A     September, I believe it was September

13     11, 2008.

14          Q     All right.  And why were you going to

15     the Center?

16          A     It was our first time meeting with what

17     were to be our joint venture partners and the

18     management team of Southlands.  Additionally, we had

19     already purchased the Southlands Power Center, and we

20     were going to discuss some issues upstanding related

21     to that property.

22          Q     And next let me ask you who was there on

23     behalf of BlackRock for this visit?

24          A     Chris Silva, Justin Loiacono from our

25     Newport Beach office, and Mike Krier from our Newport

1    Beach office.

2          Q    And yourself?

3          A    And myself.

4          Q    So that was the four of you were the

5    BlackRock representatives?

6          A    Correct.

7          Q    I failed to ask you earlier, where were

8    and are you based in your employment with BlackRock?

9          A    I'm based in Newport Beach, California.

10          Q    So you came from California?

11          A    Yes.

12          Q    And Mr. Silva came from New Jersey?

13          A    Correct.

14          Q    And Mr. Krier also from California?

15          A    Yes.

16          Q    All right.  Now, who were the

17    representatives for Alberta that you met with?

18          A    There was Peter Cudlip, Joe Bellio and

19    Jose Inclan who, I guess, is a Southlands Shopping

20    Center management employee, but he was there as well,

21    and then I believe Robin Boileau was called in as

22    well.

23          Q    Was she a person knowledgeable about

24    accounting issues?

25          A    Yes.

234

1     Q     Now, if you would just describe to us

2   the course of this meeting in an overview fashion.

3   When did it start, what happened, and how long did it

4   last?

5     A     We started approximately 10:30 in the

6   morning, I believe we got on site, because I know we

7   had meetings off-site in the morning before that.  We

8   met up in a conference room on the second level.

9               THE COURT:  Where?

10              THE WITNESS:  Of Building E at the

11  shopping center with shopping center management

12  offices.  We, in general, got an overview of the

13  Southlands development from Peter Cudlip.  He gave us

14  a start to finish on how the project came to be

15  developed, what had happened.  Then we also discussed

16  some outstanding financial issues related to

17  Southlands Power Center.

18              We then went to lunch at House Montana

19  Grill.  Everyone aside from Robin came to lunch.  And

20  then after lunch we walked across the town square and

21  went over to see VR1 which is a large vacant space in

22  the Park Center, and we walked further backed to VS16

23  which was a dentist that had just been built out.

24    Q     Now, when was the meeting over?

25    A     About 2:30 in the afternoon.  After we

1    walked back from VS16, we got in Joe Bellio's car.

2    Chris Silva, Justin Loiacono and I went with Joe

3    Bellio.  Mike Krier went upstairs to make a phone

4    call, and we drove back towards the Walmart, Sam's

5    Club, Southlands to see the overview of the Southlands

6    site since it was very large.

7            Q    After the tour?

8            A    After the walking tour.

9            Q    After the walking tour you did a driving

10   tour?

11           A    Yes.

12           Q    And then after that, what?

13           A    After that, we left.  We had heard --

14   Alberta mentioned, I believe it was Peter Cudlip had

15   mentioned that they were working on -- I think it was

16   Joe Bellio, I'm sorry, mentioned that they were

17   working on a corner store project not too distant from

18   this one, and they had put in a fitness center that

19   was potentially looking at leasing in Southlands as

20   well, so we wanted to go see that concept, so we took

21   off and went across town.

22           Q    And after that?

23           A    After that we went back to the hotel, we

24   had dinner.  The next day we attended to other

25   business related to our current properties and other

236

1    retail properties around town.

2          Q     So that was the end of the visit at

3    Southlands and with the Southlands people?

4          A     That's correct.

5          Q     Now, during the meeting that you've just

6    described, did Mr. Cudlip say to you or in your

7    hearing anything to the effect that there were

8    foundation problems or structural issues at the

9    theater?

10          A     No.

11          Q     Did Mr. Cudlip show you any structural

12    problems at the Cinema; any separations or anything of

13    that nature?

14          A     No.

15          Q     Or did anyone else, any of the other

16    Alberta representatives say to you something to the

17    effect that there are structural issues or

18    construction issues at the theater?

19          A     No.

20          Q     Or did any other Alberta representative

21    take you to the theater and say, Here they are?

22          A     No.

23          Q     Did anyone give you the letter that

24    we've seen dated September the 8th from Ground

25    Engineering, 3 days before your meeting, did anyone

1  give you that letter?

2          A      Not at that time.

3          Q      Not at that time.  When did you first

4  see that letter?

5          A      When the tenant -- after we closed on

6  the property, the tenant came to us complaining about

7  these issues, again, and said, You didn't respond to

8  our earlier letter.  And we said, Well, we're new

9  ownership.  We're not aware of the letter, and they

10  furnished a copy.

11          Q      How did you first learn of the

12  structural issues at the Center?

13          A      Peter mentioned something after closing

14  about the theater, complaining about issues with the

15  cracked slab.  And then he said we've been telling

16  them it's their problem.  Do you want to continue to

17  retain counsel.  We have a couple of bids to monitor

18  movement.  What do you want to do about it.  And I

19  said, Well, I'm not quite clear as to what this all

20  involves.  If you could forward with bids, I'd

21  appreciate it.  And then about January 5th, he

22  forwarded a letter that had been received by, I think

23  it was by the counsel that Alberta had retained from

24  the theater stating that, you know, we still believe

25  that this is under dispute, and we think this is not

1   our responsibility.

2       Q    Was that letter sent by the theater or

3   by the theater's lawyers?

4       A    I believe the theater's lawyers.

5            THE COURT:  When was the letter dated?

6            THE WITNESS:  December 16th, I think,

7   2008.  It was after our close, I know.

8            MR. DYKES:  May I have a moment?  I

9   think I can solve that question.

10           THE COURT:  Go ahead.

11      Q    (By Mr. Dykes)  I'll show you

12  Plaintiff's Exhibit 65.  Can you say whether or not

13  this is the letter you were just referring to?

14      A    I believe so.

15      Q    I'll point out that it's dated December

16  the 18th, 2008 from the law firm of DLA Piper.  It's

17  two pages.  It references at the top Colorado Cinema

18  and gives the address Aurora, Colorado.

19           MR. DYKES:  Your Honor, we'd offer

20  Exhibit 65.

21           THE COURT:  Counsel.

22           MR. BENNETT:  Lack of foundation, your

23  Honor.  There's no one who's identified this letter as

24  having been sent or received.

25           THE COURT:  I'm going to receive it.

1          (Exhibit 65 was received.)

2                    MR. DYKES:  We pass the witness, your

3     Honor.

4                    THE COURT:  Cross.

5                    MR. BENNETT:  No questions, your Honor.

6                    THE COURT:  Okay.  You can step down.

7     Is that it?

8                    MR. TRAHAN:  Plaintiff has no further

9     rebuttal, your Honor.  We rest.

10                   THE COURT:  Okay.

11                   MR. BENNETT:  Your Honor, I have one

12    further thing.

13                   In light of your Honor's ruling on Mr.

14    Alexander, we have some deposition testimony to

15    tender.  We also have some deposition testimony of Mr.

16    Riekarski to tender who was not available for trial

17    because of a medical condition.  So we've provided

18    designation, and we'd like to submit those for your

19    Honor's consideration.

20                   MR. TRAHAN:  We'd object to those

21    designations on several points, your Honor.  First of

22    all, we object to Jay Alexander's designations because

23    we still haven't seen them.  We object to --

24                   THE COURT:  You haven't seen who?

25                   MR. TRAHAN:  We haven't been provided

1    with any deposition designations for Jay Alexander's

2    deposition, is all I'm saying.  In addition to that,

3    Jay Alexander was not identified as a witness for the

4    defense, so we object on those grounds.  And for the

5    reasons we heard about here today, he has no

6    information relevant to the estoppel dispute.

7                We also object to the deposition

8    excerpts from Andrew Riekarski for some of the same

9    reasons.  One, Mr. Riekarski was not identified by the

10   defendant as a witness.  If he had, perhaps we would

11   have made more of an effort to get him here and

12   perhaps he could have changed his medical condition.

13               THE COURT:  Now, who is Mr. Piekarski?

14               MR. TRAHAN:  Mr. Piekarski was a member

15   of the team that worked along side of Mr. Silva in

16   connection with this, and he doesn't possess any

17   information that Mr. Silva doesn't also possess.

18               THE COURT:  What is his deposition

19   testimony going to show?

20               MR. BENNETT:  It will show some of the

21   discussions with Mr. Provost relating to the Fifteenth

22   Amendment, interpretation of the contract.  The

23   contract interpretations that are different from Mr.

24   Trahan's offer today.  The reason why we just

25   designated is because he was a will-call witness in

1   this trial, designated so in the Pretrial Order.  We

2   didn't discover until December 7th, one week ago

3   today, that he was not going to be here.

4              THE COURT:  One week ago today?

5              MR. BENNETT:  One week ago today, we

6   were told that this will-call witness --

7              THE COURT:  You said December 7th.

8              MR. BENNETT:  Sorry.  Whatever day's the

9   date.  February 7th.

10             THE COURT:  Okay.

11             MR. BENNETT:  February 7th, we were told

12  that this will-call witness was not going to show.

13             MR. TRAHAN:  Not Pearl Harbor Day.

14             THE COURT:  All right.  I'm going to,

15  for whatever it's worth, I'm going to allow that

16  testimony.  But what about the Jay Alexander?  What

17  does he have to offer?

18             MR. BENNETT:  He has to offer what I've

19  discussed before, that he thinks the FPSA should be

20  read differently than it actually reads.

21             THE COURT:  He thinks?

22             MR. BENNETT:  That's what he said.  And

23  he admits, though, that it reads the way we contend;

24  that there was no obligation to give disclosures about

25  the condition of the property unless the two

1   conditions were met.

2                  THE COURT:  But isn't that my function

3   as a trier of fact?

4                  MR. BENNETT:  Your Honor, as I said in

5   my opening, I don't think any of this testimony should

6   have been received.  I think it has been your

7   responsibility from the beginning to interpret these

8   contracts.  But if we're going to have all this

9   testimony, then I think we ought to be able to have

10  Mr. Alexander's testimony.

11                 THE COURT:  I'm going to allow it in.

12                 MR. TRAHAN:  We'd like to know what the

13  designations are, and we'd like an opportunity to

14  counter designate.  We'd also like --

15                 THE COURT:  What are the designations,

16  counsel?

17                 MR. BENNETT:  I'll give them a copy,

18  your Honor.

19                 THE COURT:  Okay.

20                 MR. BENNETT:  The only reason they don't

21  have them is I thought maybe you would order him to

22  appear and then we wouldn't have to go through that.

23                 THE COURT:  You were very optimistic

24  weren't you?

25                 MR. BENNETT:  I was optimistic.

1           THE COURT:  Didn't hear about me, huh?

2           MR. TRAHAN:  We'd also like an

3    opportunity to counter designate for Andrew

4    Riekarski's deposition as well.

5           THE COURT:  Who?

6           MR. TRAHAN:  We would like to make

7    counter designations in Andrew Riekarski's deposition

8    as well.  If he's going to designate portions of the

9    transcript, we'd just like to designate other portions

10   of the transcript.

11          THE COURT:  How long is it?

12          MR. BENNETT:  It's about a hundred and

13   some pages.  We've designated 20.

14          THE COURT:  Specify the portions that

15   you want to designate, and then you specify the

16   portions that you want to designate.

17          MR. BENNETT:  We've already done that,

18   your Honor.

19          THE COURT:  You've already done that?

20   And you haven't done that, have you?

21          MR. TRAHAN:  When he says he's done

22   that, what Mr. Bennett means is he sent us an e-mail

23   in that regard.  I think that in order for -- I'd just

24   like a little more formal designation so that we'll

25   know what we're dealing with.  We're prepared to

1  counter designate.  We can do that on the record right

2  now.

3            MR. BENNETT:  I'll tender you the copies

4  that we've redacted so you can have it.

5            THE COURT:  Well, Put it on the record.

6  Or what you can do is to put it on ECF.

7            MR. TRAHAN:  They'll file designations,

8  and then we'll file counter designations?

9            THE COURT:  Right.

10            MR. TRAHAN:  Okay.  That's what we'll

11  do, then, your Honor.

12            MR. BENNETT:  Then you would like copies

13  of the actual marked-up transcripts?

14            THE COURT:  Absolutely.

15            MR. BENNETT:  Okay.  We'll provide

16  those.

17            THE COURT:  Now, the other thing --

18            MR. BENNETT:  Would you like those now,

19  your Honor, because I have them with me.

20            THE COURT:  But he doesn't have his.

21            MR. TRAHAN:  I do have mine.

22            THE COURT:  Right now?

23            MR. BENNETT:  If his are the same, I can

24  hand you what we've got right now.

25            THE COURT:  All right, good.

1            MR. BENNETT:  We don't have marked-up

2  copies of the pages, but we have the designations and

3  we've also got objections that we --

4            THE COURT:  But I still want you to put

5  it on ECF.

6            MR. TRAHAN:  We will put it on ECF, and

7  should we hand you a copy now?

8            THE COURT:  Yes, I'll take it.  And by

9  April 15th there will be a joint submission of the

10  Proposed Findings of Fact and Conclusions of Law.

11  Both sides have to have them in on the 15th.

12            MR. BENNETT:  We'll each do our own?

13  We'll submit Proposed Findings of Fact and

14  Conclusions --

15            THE COURT:  Oh, yes.

16            MR. BENNETT:  And then they'll do

17  theirs.

18            THE COURT:  Yes.  I assume that your

19  Proposed Findings of Fact and Conclusions of Law will

20  be different than his and vice-versa.

21            MR. TRAHAN:  He may have had a change of

22  heart, your Honor, but I understand you.  Would you

23  like for me to hand these to you now?

24            THE COURT:  He's a lawyer.

25            MR. TRAHAN:  Are you suggesting he has

1  no heart?

2              THE COURT:  All I said is he's a lawyer.

3              THE COURTROOM DEPUTY:  I just want to be

4  clear.  You're asking them to file their designations

5  and their counter designations?

6              THE COURT:  No.  They're going to give

7  them to me, but they're also going to file them on the

8  ECF.

9              THE COURTROOM DEPUTY:  Well, I just need

10  to be clear on that.

11              THE COURT:  Yes.  I'm getting it

12  physically, but they're still going to file it.

13              MR. TRAHAN:  May I approach?

14              THE COURT:  See the boss.  Top dog.

15  Anything else they have to do, Bernique?

16              MR. TRAHAN:  Not from plaintiff, your

17  Honor.

18              THE COURT:  You're not Bernique.

19              MR. TRAHAN:  Oh.  I'm Sorry.

20              THE COURT:  If they do, just let me

21  know.

22              THE COURTROOM DEPUTY:  Okay.

23              THE COURT:  All right.  I'll see you

24  later on.  Have a good day.

25         (Recess taken at 4:57 p.m.)

247

```
 1                        INDEX

 2    Item                                      Page

 3        OPENING STATEMENTS

 4            By Mr. Trahan                         6

 5            By Mr. Bennett                       28

 6    PLAINTIFF'S WITNESSES

 7        CHRISTOPHER C. SILVA

 8            Direct Examination by Mr. Trahan     52

 9            Cross-Examination by Mr. Bennett     85

10            Redirect-Examination by Mr. Trahan  129

11        THOMAS BLAKE

12            Direct Examination by Ms. Arnold    134

13    (Plaintiff Rests)                          140

14    DEFENDANT'S WITNESSES

15        DONALD PROVOST

16            Direct Examination by Mr. BENNETT   140

17            Cross-examination by Mr. Dykes      177

18    (Defendants Rest)                          193

19    PLAINTIFF REBUTTAL WITNESSES

20        PETER M. CUDLIP

21            Direct Examination by Mr. Trahan    195

22            Cross-examination by Mr. Bennett    209

23            Redirect Examination by Mr. Trahan  216

24        ANGELA KRALOVEC

25            Direct Examination by Mr. Dykes     229
```

248

```
 1                    PLAINTIFF'S EXHIBITS

 2     Exhibit          Offered          Received

 3     1-20               51                52
       23-24              51                52
 4     28                 51                52
       30                 51                52
 5     35-36              83                83
       37                138               138
 6     42                187               188
       63                 51                52
 7     65                238               238
       69                219               220
 8     100               137               137
       116-003           218               221
 9     116-004           218               221
       121                56                56
10     122                71                71
       123                72                72
11     124                73                73
       125                74                74
12     126-127            75                75
       128                79                79
13     129               217               --

14                    DEFENDANTS EXHIBITS

15     Exhibits         Offered          Received

16     A                152               155
       B                175               175
17     C                176               176
       R                142               143
18                          *   *   *   *   *

19

20

21

22

23

24

25
```

249

1                    REPORTER'S CERTIFICATE

2              I, ADRIENNE WHITLOW, Certified Shorthand

3    Reporter in and for the State of Colorado, do hereby

4    certify that the foregoing is a true and correct

5    transcript of the proceedings had in the within

6    entitled and numbered cause on the date hereinbefore

7    set forth.

8        Dated this 2nd day of April, 2011.

9

10         /s/Adrienne Whitlow, CSR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25