# EXHIBIT H

Granite Southlands v. Alberta Town Center          MICHAEL KRIER          1/15/2010

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLORADO

 3    Civil Action No. 09-CV-00799-SLW-KLM

 4    GRANITE SOUTHLANDS TOWN CENTER      )
      LLC,                                )
 5                                        )
              Plaintiff,                  )
 6                                        )
      vs.                                 )
 7                                        )
      ALBERTA TOWN CENTER, LLC and LAND   )
 8    TITLE GUARANTEE COMPANY,            )
                                          )
 9              Defendants.               )
      _____)
10

11

12

13

14                 CONFIDENTIAL PORTIONS

15            Deposition of MICHAEL KRIER, taken

16         on behalf of the Defendants, at

17         1900 Main Street, 5th Floor, Irvine,

18         California, commencing at 8:00 a.m., on

19         Friday, January 15, 2010, before

20         Tami L. Le, CSR No. 8716, RPR.

21

22

23

24

25
```

Granite Southlands v. Alberta Town Center          MICHAEL KRIER          1/15/2010

Page 2

1    APPEARANCES OF COUNSEL:
2
3    For the Plaintiff:
4        FULBRIGHT & JAWORSKI, L.L.P.
         BY:  PAUL TRAHAN, ESQ.
5        600 Congress Avenue
         Suite 2400
6        Austin, Texas  78701-2978
         (512) 536-5288
7        ptrahan@fulbright.com
8
     For Defendants:
9
         LINDQUIST & VENNUM PLLP
10       BY:  STUART N. BENNETT, ESQ.
         600 17th Street
11       Suite 1800 South
         Denver, Colorado  80202
12       (303) 573-5900
         sbennett@lindquist.com
13
14
     Also present:
15
         Angela Kralovec (From Page 100)
16
17
18
19
20
21
22
23
24
25

Page 3

1            I N D E X
2    Deponent       Examined By         Page
3    Michael Krier      Mr. Bennett        6,106
4                       Mr. Trahan         104
5
6    Confidential portion               75,102
7
8    DEFENDANTS' EXHIBITS FOR IDENTIFICATION:
9      61 - Form of Estoppel Certificate, American    62
            Family Insurance, 3 pages
10
       62 - Form of Estoppel Certificate, Family      62
11          Life Counseling, 3 pages
12     63 - Form of Estoppel Certificate, Main        62
            Street Dental, 3 pages
13
       64 - Tenant Estoppel Certificate, QualDent     63
14          LLC, 2 pages
15     65 - Tenant Estoppel Certificate, Chico's      65
            FAS, Inc., 2 pages
16
       66 - Document entitled "Revised Operating      78
17          Deficit Analysis For the Twelve Months
            Ended December 31, 2008," with
18          handwritten notations, 1 page
19     67 - Document entitled "Granite Southlands     88
            Town Center 2008 Cam Reconciliation
20          Collections & Credits," 2 pages
21     68 - Document entitled "Alberta Town Center,   94
            LLC BlackRock Granite Property Fund,
22          L.P. Post Close True-up," 13 pages
23   EXHIBIT DISPOSITION:
24   Original Exhibits: Ongoing notebooks
25

Page 4

1            I N D E X  (Continued)
2
3    WITNESS INSTRUCTED NOT TO ANSWER
4        Page     Line
5        36       25
6        37       16
7        39       13
8        48        6
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1        IRVINE, CALIFORNIA; FRIDAY, JANUARY 15, 2010
2            8:00 A.M.
3
4            MICHAEL KRIER,
5        having been first duly sworn, was
6        examined and testified as follows:
7
8            EXAMINATION
9    BY MR. BENNETT:
10      Q   Good morning.  Would you please state your name
11   for the record.
12      A   Michael Krier.
13      Q   Mr. Krier, have you had your deposition taken
14   before?
15      A   Yes.
16      Q   So you are familiar with the proceeding?
17      A   Yes.
18      Q   Okay.  And you've met with Mr. Trahan prior to
19   the commencement of this deposition?
20      A   Yes.
21      Q   And he has explained the proceeding to you as
22   well?
23      A   Yes.
24      Q   All right.  You understand that you are under
25   oath and that your testimony has the same solemnity as

2 (Pages 2 to 5)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                              1/15/2010

Page 6

1    if it were given in a court of law?
2        A   Yes.
3        Q   It has the same penalties should you be found
4    to have intentionally misspoken or lied in this
5    deposition.
6            Do you understand that?
7        A   Yes.
8        Q   Okay.  You are presently employed by whom?
9        A   BlackRock.
10       Q   BlackRock what?
11       A   BlackRock, Inc.
12       Q   How is BlackRock, Inc. related to BlackRock
13   Realty Advisors, Inc.?
14       A   BlackRock -- BlackRock, Inc. is the, I guess --
15   well, let me -- BlackRock Realty Advisors is a legal
16   entity that was, I guess, kept in place after the
17   acquisition of -- of State Street Research, SSR Realty,
18   which is where most of our real estate personnel came
19   from.
20       Q   Okay.  Does BlackRock, Inc. own BlackRock
21   Realty Advisors, Inc.?
22       A   Yeah, I believe so.
23       Q   Are there any -- is it the sole shareholder or
24   are there other shareholders in BlackRock Realty
25   Advisors?

Page 7

1        A   It's a publicly traded company.
2        Q   BlackRock, Inc. is?
3        A   Yes.
4        Q   What are your duties and responsibilities for
5    BlackRock, Inc.?
6        A   I am a territory head in the asset management
7    group that oversee a portfolio of properties that we
8    oversee on behalf of our -- of various clients.
9        Q   Okay.  The -- you used the word "territory."  I
10   assume you have some responsibility for a geographic
11   region?
12       A   Yes.
13       Q   And what geographic area are you responsible
14   for?
15       A   Parts of the L.A. area, L.A., Orange County,
16   Northern California, Seattle, Portland, Denver, Salt
17   Lake, and Minneapolis.
18       Q   When you -- and you are responsible for a
19   portfolio of properties in those areas of the country?
20       A   Yes.
21       Q   What types of properties do you oversee?
22       A   Apartments, office, industrial and retail.
23       Q   Do you keep track of how many apartments are in
24   your portfolio?  So if I asked you how many apartments
25   are under your management, would you know the answer to

Page 8

1    that?
2        A   Generally.
3        Q   Okay.  Approximately how many apartments?
4        A   Probably 30 apartment projects.
5        Q   How many office projects?
6        A   I guess 12 -- 10 or 11 -- 10 to 12.
7        Q   Industrial?
8        A   Six.
9        Q   What is the difference between an office
10   project and an industrial project?
11       A   Office building -- this -- you're in an office
12   building --
13       Q   Okay.
14       A   -- here.  Industrial is warehouses,
15   manufacturing space.
16       Q   All right.  And then retail, how many retail
17   projects do you have in your area?
18       A   Three.
19       Q   What are those?
20       A   Two retail centers in Seattle, Lynnwood and
21   Harbor Point.  And technically two -- two projects, but
22   located in the same -- in the -- in the same overall
23   project, Southlands in Denver.
24       Q   And the two projects located in Southlands are
25   what?

Page 9

1        A   The Power Center and the Town Center.
2        Q   Okay.  The Power Center and the Town Center are
3    both located in the same property?
4        A   Yeah.
5        Q   Owned by different owners or were owned by
6    different owners?
7        A   There are different owner -- yes, there's
8    separate titles to those.  They are owned by the same --
9    the same client, same fund.
10       Q   Okay.  And when you talk about clients, these
11   are investment funds?
12       A   The owner of Southlands that -- or the portion
13   that BlackRock owns on behalf of its clients.  It's an
14   open-end commingled fund.
15       Q   What I'm asking is, is when you refer to
16   "client," is it the fund that you're referring to the
17   client or is it the investors in that fund that you're
18   referring to client?
19       A   I refer to the client as -- or the -- the fund
20   as the client and the investors in there are, you know,
21   prim-- you know, primarily pension funds.
22       Q   Okay.  Are the two projects at Southlands owned
23   by the same investment fund?
24       A   Yes.
25       Q   And that is what?

3 (Pages 6 to 9)

Granite Southlands v. Alberta Town Center     MICHAEL KRIER     1/15/2010

Page 10

1   A   Granite Fund.
2   Q   Is there a BlackRock entity that is the manager
3 of the Granite Fund?
4     MR. TRAHAN:   Object to form.
5     THE DEPONENT:   I'm not sure I understand the
6 question.
7   Q   BY MR. BENNETT:   Let me ask it this way:   What
8 entity, to your knowledge, is the manager of the Granite
9 Fund?   Does that make --
10   A   BlackRock -- BlackRock Realty Advisors, I
11 guess.
12   Q   Let me ask this question, maybe it will clear
13 it up a little.
14     What is the legal structure of the fund?   Is it
15 an LLC, partnership, limited partnership?   Do you know?
16   A   I believe it's a single asset -- each --
17 each -- each property within the overall project is
18 single -- single asset LLC.
19   Q   Is there a single -- is there an LLC for each
20 of the projects at Southlands?
21   A   Yes.
22   Q   And what is the name of the two LLCs?
23   A   The Power Center, I believe, is Southlands
24 Tower.   And I'm not sure of the legal -- I'm not sure of
25 the legal -- remember the legal name for the Town

Page 11

1 Center.
2   Q   Okay.   Do you have any day-to-day
3 responsibilities for the overseeing the two projects at
4 the Southlands shopping center in Denver -- or in
5 Aurora, I guess it is?
6   A   Day-to-day -- we're the asset -- we're the
7 asset manager.   We have engaged property managers to --
8 to run the day-to-day operations, but we are
9 regularly -- you know, or actively involved in the
10 oversight of the project.
11   Q   And that's kind of what I want to know.   What
12 do you do on a day-to-day basis -- let me back up.
13     You have hired a property manager called Forest
14 City?
15   A   Yes.
16   Q   So they are in charge of the day-to-day
17 dealings with tenants and consumers and so on?
18   A   Yes.
19   Q   What do you do to oversee the center on a
20 day-to-day basis -- and by "you," I mean you
21 individually -- if anything?
22   A   I have a --
23     MR. TRAHAN:   Object to form.
24     THE DEPONENT:   I have a person, Angela
25 Kralovec, that reports to me, who's the, I guess, more

Page 12

1 of the day-to-day asset manager, and she reports to me.
2 I participate -- generally participate on a weekly basis
3 with leasing calls and then Angela will discuss with me
4 any other issues at the property that would require
5 owner's decision, if you will.
6   Q   BY MR. BENNETT:   Do you have the authority
7 within your job description to make all decisions
8 relating to the property that require input from the
9 owner?
10   A   No.
11   Q   To whom -- who else would be involved in a
12 decision and what is the breakpoint between your
13 authority and this other individual or individuals?
14     MR. TRAHAN:   Object to form, vague.
15     THE DEPONENT:   Yeah, there are delegations of
16 authority that I -- provided a -- a lease fits within
17 guidelines set forth in a budget or is included in a
18 budget, if it's a capital item, then I have authority.
19 In excess of a lease that's larger than, say, 50,000
20 square feet, it would require a portfolio manager
21 approval or a capital investment unbudgeted or in excess
22 of I believe it's 250,000.
23   Q   BY MR. BENNETT:   Okay.   So for leases that come
24 within guidelines that do not involve more than 50,000
25 square feet, you have authority to enter into those

Page 13

1 leases without further input?
2   A   Yes.
3   Q   Okay.   And as to capital items less than
4 $250,000, you have the authority to approve those
5 without further input?
6   A   Provided it's budgeted.
7   Q   Okay.   Is -- is the title "portfolio manager,"
8 is that one individual or is that a group of
9 individuals?
10   A   It's a -- generally a group of individuals.
11   Q   And is there such a group of individuals that
12 has responsibility for the Southlands project?
13   A   Yes.
14   Q   Who are the members of that portfolio manager?
15   A   Andrew Piekarski and James Glenn.
16   Q   Anyone else?
17   A   That -- that's currently who I report to.
18   Q   All right.   And those two are your bosses?
19   A   They -- no, I wouldn't refer to them as my
20 boss.
21   Q   But you have reporting responsibility to them?
22   A   Yes.
23   Q   Who would you call your direct supervisor?
24   A   John Loehr.
25   Q   John Loehr?

4 (Pages 10 to 13)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                    1/15/2010

Page 14

1    A   Loehr, L-O-E-H-R.
2    Q   Where is he located?
3    A   New Jersey.
4    Q   And Mr. Piekarski is in New Jersey?
5    A   Yes.
6    Q   And how about Mr. Glenn?
7    A   Yes, in New Jersey.
8    Q   Are they all in the same office?
9    A   Yes.
10   Q   Are they all employees of BlackRock, Inc.?
11   A   Yes.
12   Q   Is Ms. Kralovec an employee of BlackRock, Inc.?
13   A   Yes.
14   Q   Does BlackRock Realty Advisors, Inc. have any
15   employees?
16   A   I -- I honestly don't know technically where --
17   where I fit into, you know, BlackRock, Inc., BlackRock
18   Realty Advisors, you know.  For my purpose, it's
19   BlackRock.
20   Q   Lawyers set up all these entities and then the
21   employees have no idea.  It always amazes me.  Okay.
22       Do you have any reporting responsibilities
23   outside of your direct reporting to your -- to
24   Mr. Loehr, your supervisor, and the portfolio manager?
25   Is that the extent of your reporting responsibilities?

Page 15

1    A   Yes.
2    Q   How frequently do you meet with Ms. Kralovec
3    over the Southlands property?
4    A   It varies, but at least on a -- on a weekly
5    basis, if not multiple times during the week.
6    Q   Do you have a standing agenda for your weekly
7    meetings with Ms. Kralovec?
8    A   The weekly meeting occurs with our leasing and
9    management personnel on Thursday mornings.
10   Q   So there is a standard topic to discuss leasing
11   and management of the center on Thursdays?
12   A   Leasing and rent relief is the primary topics.
13   Q   What is meant by "rent relief"?
14   A   Requests by existing tenants for rent relief
15   relative to their existing contract.
16   Q   So reduction in rent?
17   A   A sign of the times currently.
18   Q   So a reduction in the tenant's lease --
19   A   Yes.
20   Q   -- the stated lease rates?
21       Is that right?
22   A   Yes.
23   Q   And that's a common topic these days, I gather?
24   A   Very.
25   Q   Is there some -- do you have a policy as to

Page 16

1    under what circumstances you will or will not grant rent
2    relief to an existing tenant?
3        MR. TRAHAN:  Object to -- object to relevance.
4        THE DEPONENT:  Each -- each situation is case
5    by case.
6    Q   BY MR. BENNETT:  Has the tenant at the
7    Southlands Town Center known as the Cinema or Kerosotes
8    asked for rent relief?
9    A   No.
10   Q   How do you refer to that tenant?  Do you call
11   it the Cinema or do you call it Kerosotes?  What's the
12   convenient term you use?
13   A   Cinema.
14   Q   Cinema.  So if I refer to the Cinema, you know
15   which tenant I'm referring to?
16   A   Yes.
17   Q   Has the Cinema refused to pay any of its rent
18   since BlackRock acquired the Southlands project?
19       MR. TRAHAN:  Object to relevance.
20       THE DEPONENT:  Not that I'm aware of.
21   Q   BY MR. BENNETT:  Has the Cinema been closed for
22   business at any time since BlackRock acquired the
23   Southlands project in December of 2008?
24       MR. TRAHAN:  Object; relevance.
25       THE DEPONENT:  No, not that I'm aware of.

Page 17

1    Q   BY MR. BENNETT:  Since December 2008, has the
2    Cinema made any demand upon BlackRock to repair any
3    portion of the leased premises in the Southlands --
4        MR. TRAHAN:  Objection.
5    Q   BY MR. BENNETT:  -- Town Center?
6        MR. TRAHAN:  Object; relevance.
7    Q   BY MR. BENNETT:  You can answer.  He's
8    preserving his record.
9    A   Yes.
10   Q   When was that?
11   A   We were first made aware of it after closing by
12   a copy of a letter.  I believe the letter was addressed
13   to -- to Alberta.
14   Q   How did you become aware of this letter?
15   A   It was provided to us by Alberta.
16   Q   How did you know that it existed?
17   A   They told me.
18   Q   Who is "they"?
19   A   I believe it was -- I believe it was Peter
20   Cudlip.
21       MR. TRAHAN:  C-U-D-L-I-P.
22   Q   BY MR. BENNETT:  This is a book of some of the
23   previously marked deposition exhibits.  I'm going to
24   give it to you for your reference.  Ask you to look at
25   the document under Tab 26, which was previously marked.

5 (Pages 14 to 17)

Granite Southlands v. Alberta Town Center                    MICHAEL KRIER                                                    1/15/2010

Page 18

1       (Documents handed to witness.)
2    Q   BY MR. BENNETT:  Is Exhibit 26 the letter that
3  you're referring to as having been provided to you by
4  Mr. Cudlip?
5    A   (Reviewing document.)
6       I don't think so.  I thought the letter was
7  dated in December.
8    Q   Do you know who the letter was from?
9    A   I -- I thought it was from their attorneys.
10   Q   Okay.  Is Exhibit 36 in your book?  Take a look
11  at Exhibit 36.  Is this the letter you have in mind?
12   A   (Reviewing document.)
13      I think so, yes.
14   Q   When did you first receive a copy of this
15  letter?
16   A   Some -- sometime in late December, I believe.
17   Q   Prior to the receipt of this letter, were you
18  aware of any controversy between Alberta and the Cinema
19  relating to its premises?
20   A   No.
21   Q   How did you receive a copy of this letter?
22   A   I believe it was sent by Alberta.
23   Q   Was it e-mailed to you, sent by mail?  How was
24  it -- hand-delivered?
25   A   I'm not sure.  I'm assuming it was pdf'd --

Page 19

1    Q   Okay.
2    A   -- by e-mail.
3    Q   What in this letter do you believe constitutes
4  a demand by the Cinema that Alberta make any repairs to
5  its premises?
6    A   (Reviewing document.)
7       Can you repeat the question?
8    Q   Yeah.  Is there anything in this letter that
9  constitutes a demand by the tenant, Cinema, for repairs
10  to be made to the premises that it has leased?
11      MR. TRAHAN:  Object to the extent it calls for
12  a legal conclusion.
13      THE DEPONENT:  It appears to be more of a -- in
14  trying to determine the cause of some foundation
15  movement that was occurring and cracking.
16   Q   BY MR. BENNETT:  Seems to be more of an
17  investigation letter; would you agree?
18   A   I guess so.
19   Q   All right.  So I think how we got started down
20  this path is I asked you if the Cinema had made any
21  demand of Granite to repair its premises.  You mentioned
22  this letter.
23      Are there any other letters where you believe
24  the Cinema has made a demand for the repair of its
25  premises by Granite?

Page 20

1       MR. TRAHAN:  Object to the form of the question
2  and relevance.
3       THE DEPONENT:  They haven't requested rent
4  relief associated with these foundation issues, and I
5  think there's still a determination going on as to what
6  the cause is and who's responsible.
7    Q   BY MR. BENNETT:  Okay.  So let me -- let me get
8  it clear.
9       Has the Cinema made a demand on Granite to
10  repair the foundation of the Cinema, to your knowledge?
11   A   Not that I'm aware.
12   Q   Okay.  And, to your knowledge, has -- have any
13  repairs been made to the Cinema building?
14      MR. TRAHAN:  Object to relevance.
15   Q   BY MR. BENNETT:  With respect to the
16  foundation, of course.  I'm sure they do some kinds of
17  repairs from time to time.
18   A   Not that I'm aware of.
19   Q   Has there been any litigation instituted by the
20  Cinema against Granite or Granite against the Cinema
21  relating to the foundation?
22      MR. TRAHAN:  Object to relevance.
23      THE DEPONENT:  No, not that I'm aware of.
24   Q   BY MR. BENNETT:  Has Granite made any --
25  Granite or BlackRock made any determination as to who is

Page 21

1  responsible for whatever construction problems exist
2  with the Cinema foundation?
3       MR. TRAHAN:  Object to relevance.
4       THE DEPONENT:  It's ongoing.
5    Q   BY MR. BENNETT:  So no determination has yet
6  been made?
7    A   No.
8    Q   After you received a copy of Exhibit 36, what
9  did you do in response, if anything?
10   A   We anticipated making a trip to the property
11  following closing.  We scheduled that for early January,
12  and this would be a topic of discussion at that meeting.
13   Q   Prior to the meeting -- well, strike that.
14      There was such a meeting in January of 2009?
15   A   Yes.
16   Q   Prior to the meeting, did you retain any
17  consultants to assist in your review of this matter?
18      MR. TRAHAN:  Object to relevance.
19      THE DEPONENT:  No, it was my understanding that
20  Alberta had -- had someone looking into this already.
21   Q   BY MR. BENNETT:  Did you receive any of the
22  reports of anyone who looked at the property for Alberta
23  prior to the January 7 meeting?
24   A   No.
25   Q   Had you visited the property prior to closing?

6 (Pages 18 to 21)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                              1/15/2010

Page 22

1    A   Yes.
2    Q   How often?
3    A   Usually -- I mean, if I went to Denver, I would
4   generally stop by Southlands.  In 2000-- in 2008, I
5   believe I made two visits there or maybe -- maybe three.
6    Q   Okay.  Which visits do you recall?
7    A   It was a September meeting that we -- that was
8   September -- September 11th.
9    Q   Who was present on that visit?
10    A   It was myself, Angela Kralovec, BlackRock,
11   Chris Silva, also with BlackRock, Justin Loiacono.
12    Q   How do you spell Mr. Loiacono's name?
13    A   L-O-I-A-C-O-N-O.
14    Q   What's his position?
15    A   He's a -- he's an associate with BlackRock,
16   also works with me on the asset management side.
17       MR. TRAHAN:  I'd like to make a running
18   objection to the questions about the September visit
19   as -- on relevance grounds.
20       MR. BENNETT:  Okay.
21       THE DEPONENT:  Then there were the people from
22   the Alberta side, Peter Cudlip, Jos, Inclan, Joe Bellio.
23    Q   BY MR. BENNETT:  Okay.  What did you do at the
24   September '08 meeting?
25    A   My -- my involvement, I believe I -- we got to

Page 23

1   the site about 8:30 or 9:00 o'clock.  And I had a
2   conference call that had been scheduled, so I spent the
3   next almost three hours on a conference call.
4    Q   Okay.
5    A   So fly all the way to Denver and get on a call.
6       And after the call was over, I went to lunch
7   with the group and then did a -- you know, a -- a
8   short -- or a relatively short tour of the property, and
9   left the site at approximately 3:00 or 3:30.
10    Q   Your three-hour conference call, did you take
11   that at the property or at a hotel or something?
12    A   At the property.
13    Q   Okay.  In the management offices?
14    A   Yes.  One of the -- one of the private offices
15   that -- within the management office.
16    Q   Okay.  Did you observe any cracking in any of
17   the walls in the management office when you were there?
18    A   No.
19    Q   Did you observe any settling of the entryway
20   floor slab in the management building when you were
21   there?
22    A   No.
23    Q   Did you walk up the stairs or did you take the
24   elevator?
25    A   I believe I walked up the stairs.

Page 24

1    Q   Okay.  Did you notice any cracking along the
2   stairwell?
3    A   No.
4    Q   Do you recall where you went to lunch?
5    A   What was the question?
6    Q   Do you recall where you went to lunch?
7    A   Yes.  Went to Ted's Montana Grill.
8    Q   Did you buy lunch?
9    A   I did.
10    Q   Somebody remembered that you bought lunch.
11   Nice of you.
12       Where did -- what part of the property did you
13   tour when you went around the property?
14    A   The only specific space I remember was we
15   toured one of the newer built-out spaces for a dentist
16   in a building that we call VR16.  It's part of the Power
17   Center.
18    Q   So that's not even part of the Alberta Town
19   Center or what was then the Alberta Town Center?
20    A   No.
21    Q   Okay.  Any other space that you looked at?
22    A   I don't recall any other space.
23    Q   Do you recall going to visit the Cinema?
24    A   No.
25    Q   Did you observe anything on the outside of the

Page 25

1   Cinema?
2    A   No.
3    Q   Do you know what the other representatives of
4   BlackRock did while you were on your three-hour
5   conference call?
6    A   I believe they were -- they met in the
7   conference room, and discussing, you know, financials,
8   marketing, maybe some -- well, would have dealt with
9   both -- mostly about the Power Center in terms of
10   financials because that's the property we owned at the
11   time, but discussion about leasing, et cetera.
12    Q   Okay.  Do you know if any of the other
13   representatives of BlackRock toured the property before
14   you did?
15    A   I don't think so.
16    Q   Did you join the group at the restaurant or did
17   you join them in the conference room and then walk to
18   the restaurant?
19    A   I joined them in the conference room and we all
20   walked to the restaurant.
21    Q   Did you tour any part of the property on the
22   way to the restaurant?
23    A   Not that I recall.
24    Q   And when did the tour that you mentioned take
25   place?  Was it after lunch?

7 (Pages 22 to 25)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                    1/15/2010

Page 26

1    A   After lunch.
2    Q   Was it on the way back to the management
3 offices?
4    A   Yes.
5    Q   So it's your recollection you walked to the
6 restaurant, walked to the VR16 space, and then back to
7 the management office?
8    A   Yeah.  We might have a -- a loop through
9 the rest of the Power Center on our way back to the
10 management office.
11    Q   Did you view any portion of the Town Center
12 while you were either on your way to lunch or
13 afterwards?
14    A   I suppose as I'm walking that I can visualize
15 what -- I mean, nothing specifically that --
16    Q   Other than what you could see on the way from
17 the management office to the restaurant to the Power
18 Center and back, you didn't stop at any portion of the
19 Town Center?
20       MR. TRAHAN:  Object to form.
21       THE DEPONENT:  Not that I recall.
22    Q   BY MR. BENNETT:  Okay.  You mentioned that you
23 were on the property three times and that September '08
24 was one.
25       What other times were you at the property?

Page 27

1    A   In -- in March of '08.
2    Q   Who was present then?
3    A   I was -- I was the only person.
4    Q   Who did you meet with?
5       MR. TRAHAN:  May I make a running objection to
6 the line of questions about his -- as on relevance
7 grounds as to his visit in March of 2008?
8       MR. BENNETT:  Okay.
9       THE DEPONENT:  I was -- I was actually waiting
10 for Angela to arrive at the airport, so I took the
11 opportunity to drive down to Southlands on my own and
12 went to -- I believe it was St. Patrick's Day that I was
13 there because I went to McCabe's.
14    Q   BY MR. BENNETT:  Okay.  Did you meet with
15 anybody or just go and have a green beer?
16       MR. TRAHAN:  Object; assumes facts not in
17 evidence.
18       THE DEPONENT:  I don't remember the green beer.
19 I did not meet with anyone on that trip.
20    Q   BY MR. BENNETT:  Did Angela arrive at the
21 airport?
22    A   Yes.
23    Q   And what did you do after you met her at the
24 airport?
25    A   We went and toured -- well, the next -- the

Page 28

1 next day we had some tours of multi-family projects that
2 we have in Denver.
3    Q   So the March '08 trip, except for your side
4 trip to McCabe's, was not for the purpose of visiting
5 the property?
6    A   At that time I was not in charge of Southlands.
7    Q   When did you become in charge of Southlands?
8    A   Approximately May, June, somewhere in that time
9 frame, of '08.
10    Q   And why did you become in charge of Southlands
11 at that time?
12    A   The retail -- the retail that BlackRock owned
13 on behalf of its clients was transferred under one
14 single asset management group.  So we had separate -- a
15 separate retail asset management group prior to that.
16    Q   Do you know who was in charge or had the
17 responsibility for Southlands prior to May of '08 when
18 you became responsible?
19    A   The primary asset manager was Hiroe Takeiuchi,
20 H-I-R-O-E, T-A-K-E-I-U-C-H-I.
21    Q   Where was Mr. Takeiuchi located?
22    A   Ms.
23    Q   Ms.  Sorry.
24    A   That's okay.
25    Q   Ms. Takeiuchi, where was she located?

Page 29

1    A   San Francisco.
2    Q   And you mentioned that you had been to the
3 Southlands center -- Southlands property one other time
4 besides May -- excuse me, March of '08 and September of
5 '08.  When was that?
6    A   June, sometime in June.
7    Q   Okay.  Did you meet with someone?
8    A   No, not at Southlands.
9    Q   What did you do when you went to the property?
10    A   I believe it was just a quick drive-through.  I
11 was on a trip with Angela again, and the primary purpose
12 of that trip was a retail asset that we owned -- at the
13 time owned in Broomfield called Broomfield Marketplace.
14    Q   Okay.  You mentioned that you had a meeting in
15 the first part of January 2009 regarding the Southlands
16 center; is that right?
17    A   Yes.
18    Q   And who was present at that meeting?
19       MR. TRAHAN:  I'd like a running objection to
20 this line of questions regarding the January 2009
21 meeting.
22       MR. BENNETT:  Yes.
23    Q   Who was present?
24    A   We were --
25       MR. TRAHAN:  On relevance grounds.

8 (Pages 26 to 29)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                                    1/15/2010

---

Page 30

1        THE DEPONENT:  There were, I guess, a number of
2   meetings that occurred over the course of a couple of
3   days.
4        Q   BY MR. BENNETT:  Tell me what you remember
5   participating in those meetings.
6        A   We arrived on January 7th and went directly to
7   the property.  So we would have probably arrived around
8   lunchtime --
9        Q   Okay.
10       A   -- I believe, and went straight to lunch.  I
11  think that was at McCabe's.
12       Q   Okay.
13       A   I believe it was after that lunch that we then
14  did some -- we did an inspection of the cracking that
15  was occurring in the Cinema building.
16       Q   Who was present for that inspection?
17       A   Angela, Peter Cudlip, Jos, and myself.
18       Q   Okay.  What did you observe?
19       A   Observed some cracking in the back of the
20  building as well as a little service kind of alleyway
21  that's in between -- there's some retail that's also
22  part of the Cinema building, on the front of the Cinema
23  building, and there's a little service area in
24  between -- or kind of on the -- on the side.  And so we
25  inspected what was a fairly large crack in -- in the

---

Page 31

1   wall there.
2        Q   Okay.  So you saw cracks in the wall, in the
3   brick fascia?
4        A   Yes.
5        Q   Was it at joints in the brick fascia or
6   actually through the bricks themselves or could you
7   tell?
8        A   Well, they -- the bricks being cracked, they
9   were cracked along -- along a line that would indicate,
10  I guess, that there was movement behind it.
11       Q   So my question is a little different than that.
12  Did you see bricks that cracked, or did you see cracking
13  in joints around bricks, or did you see cracks at
14  expansion joints between the bricks, or some other
15  cracking?
16       A   Yeah, I don't think they were in -- at the
17  expansion joints, but there were -- yeah, there were
18  cracks in bricks as well as, you know, what would -- you
19  know, stucco.  The bricks really aren't -- they're more
20  of a aesthetic piece to the construction, not -- not
21  really the base of the construction.
22       Q   Okay.  What is the base of the construction, in
23  your view?
24       A   Steel frame, stucco finish.
25       Q   Did you see cracks in the stucco?

---

Page 32

1        A   Yes.
2        Q   Okay.  And this would be on the backside of the
3   building, as you described it?
4        A   Yes.
5        Q   All right.  And in this service alleyway?
6        A   Yes.
7        Q   Did you observe any settling of the sidewalk
8   next to the walls of the Cinema?
9        A   Yes.
10       Q   Any other things you observed about the
11  structure of the Cinema building?
12       A   Not that I recall.
13       Q   Okay.  Did you go inside?
14       A   No, I don't believe we did.
15       Q   Did you ask any questions of any of the Alberta
16  representatives?
17       A   Yes.
18       Q   What did you ask?
19       A   Trying to understand what the -- what the cause
20  of the cracking and what was being done to -- to fix it.
21       Q   Okay.  What did the Alberta people say?
22       A   That it was being investigated, but that it was
23  a -- their position was that it was a Cinema
24  responsibility.
25       Q   Okay.  Did you have any of the reports from the

---

Page 33

1   engineers Alberta hired with respect to this issue at
2   the meeting?
3        A   Not that I recall.  I think we received those
4   later.
5        Q   So at the time of this January meeting, you
6   believe the only document you had relating to the Cinema
7   issue was Exhibit 36, the Cinema lawyer's letter?
8        A   I think so.
9        Q   What documents did you subsequently receive
10  relating to the Cinema structure?
11       MR. TRAHAN:  Object to relevance.
12       THE DEPONENT:  I think they were sent to
13  Angela, some engineering reports done by a consultant
14  that they had hired.
15       Q   BY MR. BENNETT:  Okay.
16       A   Can't remember the name.
17       Q   Any others?
18       A   I don't recall.
19       Q   Did you receive proposals from various
20  engineers to do an investigation of the causes of the
21  issues at the Cinema building?
22       A   Can you repeat the question?
23       Q   Did you receive any engineering proposals to
24  investigate the cause of the problems at the Cinema?
25       MR. TRAHAN:  Object to relevance.

---

9 (Pages 30 to 33)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                    1/15/2010

Page 34

1      THE DEPONENT:  Not -- not on that trip, that I
2  recall.
3      Q   BY MR. BENNETT:  Okay.  Did you subsequently?
4      A   We brought the -- we brought the issues to the
5  attention of our, well, portfolio management as well as
6  architectural and engineering.  And then we subsequently
7  engaged a consultant.
8      Q   Okay.  When did you first engage a consultant
9  on this subject?
10      MR. TRAHAN:  Object to relevance.
11      THE DEPONENT:  I believe it was in February.
12      Q   BY MR. BENNETT:  Who did you engage?
13      A   Marx Okubo, M-A-R-X, O-K-U-B-O.
14      Q   Marx Okubo?
15      A   Yeah.
16      Q   Is that two names or is that one person's --
17      A   Two names.
18      Q   Where are they located?
19      A   They have an office in Denver.
20      Q   Did you deal with the Denver office?
21      A   Yes.
22      Q   Did you have a written engagement with Marx
23  Okubo?
24      A   Yes.
25      Q   Did you receive -- did they do any work on the

Page 35

1  project?
2      A   Yes.
3      Q   When did they do their work?
4      A   I guess starting in February/March of '09, and
5  it continues to -- to the current time.
6      Q   Has Marx Okubo given you any reports of the
7  work?
8      MR. TRAHAN:  Object to relevance.
9      THE DEPONENT:  Yes.
10      Q   BY MR. BENNETT:  When have they reported to you
11  on their work?
12      A   On a regular basis.
13      Q   Okay.  Have they done written reports on a
14  regular basis?
15      A   Yes.
16      Q   Have they done any destructive testing?
17      MR. TRAHAN:  Object to form -- or object to
18  relevance.
19      THE DEPONENT:  Destructive in what regard?
20      Q   BY MR. BENNETT:  Any demolition of the
21  structure, any drilling, any removal of topsoil to
22  investigate the foundation, any sort of invasive
23  testing?
24      A   Yes.
25      Q   What types?

Page 36

1      MR. TRAHAN:  I'm going to object to the
2  relevance of the question.
3      As you know, Stu, we're investigating the
4  problems out there and we anticipate litigation in that
5  regard.  The work that Mr. Krier is talking about is
6  being performed by consulting experts, and so I hesitate
7  to allow any further questioning in this regard out of
8  concern that it might pose issues in terms of waiving
9  the consulting expert privilege.
10      So I'm going to instruct Mr. Krier not to
11  answer any further questions about the work that's
12  performed or has been performed or is being performed at
13  the property in this regard.
14      MR. BENNETT:  Well, let me probe a little bit
15  into your objection.
16      Q   Mr. Krier, when your consultants have done this
17  destructive or invasive testing, has it been in
18  cooperation with the Cinema?
19      MR. TRAHAN:  Object to the form of the
20  question; it assumes facts not in evidence.
21      And I am going to -- it assumes facts not in
22  evidence.  There's no evidence that there's been
23  destructive testing, there's no evidence that any work's
24  been done in connection with the Cinema.  And on the
25  same basis as stated earlier, I'm going to object to

Page 37

1  relevance and, out of concern that we might -- that
2  we've got a consulting expert privilege that I don't
3  want to flirt with waiving, and I'm going to instruct
4  the witness not to answer.
5      MR. BENNETT:  Well, I'm not -- I may have
6  misunderstood Mr. Krier's testimony, but I thought he
7  told me that they had done destructive testing.  And it
8  seems to me if it was done in cooperation with the
9  Cinema or while the Cinema observed the testing, then
10  there's no privilege because a third party was involved.
11      So I think I'm entitled to at least find out
12  who was present during this testing, whether the
13  Cinema's engineers were also there, what -- you know,
14  what the nature of the testing that's been done and what
15  the results are if it's been shared with the Cinema.
16      If it's purely work product and nobody else
17  knows what's going on, I can understand your objection.
18  But if in fact it's being done in some sort of
19  cooperative matter in conjunction with the Cinema's
20  experts, then I don't think there's any privilege.
21      MR. TRAHAN:  I agree with your assessment.  If
22  you want to ask him questions about what work, what,
23  generally, interactions we've had with the Cinema, then
24  those questions are fine.
25      MR. BENNETT:  Well, that's what I'm trying to

10 (Pages 34 to 37)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                                    1/15/2010

Page 38

1   get to.
2         MR. TRAHAN:  Sure.
3     Q   BY MR. BENNETT:  In terms of doing this
4   testing, have you done it in conjunction with any
5   experts of the Cinema?
6     A   No, not that I'm aware of.
7     Q   Have any Cinema experts been present when your
8   experts or your consultants have been doing their work?
9     A   No, not that I'm aware of.
10    Q   Have you shared the results of any work -- any
11  testing that your consultants have done with the Cinema?
12    A   No, not that I'm aware of.
13    Q   Have you reached -- have your consultants
14  reached an opinion as to the cause or causes of the
15  structural issues at the Cinema?
16        MR. TRAHAN:  I'm going to object on relevance
17  grounds and on the grounds previously stated regarding
18  the consulting expert privilege and instruct the witness
19  not to answer.
20        MR. BENNETT:  I think I'm entitled to know
21  whether they have reached a conclusion.  I mean, tell me
22  "yes" or "no."  That doesn't involve any waiver of any
23  privilege if I can find out whether they have reached a
24  conclusion.
25        MR. TRAHAN:  I'm instructing you not to answer.

Page 39

1         MR. BENNETT:  All right.
2     Q   Have you had -- have you had any communications
3   with the Cinema or its attorneys relating to whose
4   responsibility it is to repair whatever foundation
5   issues exist at the Cinema?
6         MR. TRAHAN:  Object to relevance.
7         THE DEPONENT:  I don't recall any
8   correspondence from us.  While Alberta was still
9   managing the property, I believe there was some
10  correspondence between the attorneys, but I'm not -- I'm
11  not aware of anything from BlackRock.
12    Q   BY MR. BENNETT:  Okay.  So subsequent to this
13  Exhibit 36, which is the Cinema's lawyer's letter to
14  Alberta's lawyers over the Cinema issue, have there been
15  no exchange of correspondence between BlackRock's
16  lawyers and the Cinema's lawyers, to your knowledge?
17        MR. TRAHAN:  Object to form, assumes facts not
18  in evidence.
19        THE DEPONENT:  Not to my knowledge.
20    Q   BY MR. BENNETT:  Okay.  Has BlackRock retained
21  a law firm to represent it in this matter, in the Cinema
22  dispute?
23        MR. TRAHAN:  Object to relevance.
24        THE DEPONENT:  We retained Fulbright to, you
25  know -- in -- I guess not for a specific matter with the

Page 40

1   Cinema, no.
2     Q   BY MR. BENNETT:  Well, as you know, Alberta had
3   hired the law firm of Brownstein, Hyatt, Farber &
4   Schreck, which Exhibit 37 is addressed to, and also
5   asked BlackRock/Granite, whether they wished to retain
6   the services of Brownstein after the closing to continue
7   to represent the landlord in this dispute.
8         You're aware of that; right?
9     A   Yes.
10    Q   And BlackRock/Granite decided not to retain
11  Brownstein, Hyatt, Farber to continue the
12  representation; correct?
13    A   Correct.
14    Q   So to the best of your knowledge, you have not
15  hired anyone specifically, including Fulbright, to
16  represent BlackRock/Granite in this dispute with the
17  Cinema?
18        MR. TRAHAN:  Object to relevance.
19        THE DEPONENT:  I guess I see -- I see it all
20  related and Fulbright is representing us on -- on all of
21  the issues.
22    Q   BY MR. BENNETT:  Are you aware of any
23  correspondence between Fulbright and any lawyer
24  representing the Cinema with respect to these foundation
25  issues at the Cinema?

Page 41

1         MR. TRAHAN:  Object to relevance.
2         THE DEPONENT:  I don't recall.
3     Q   BY MR. BENNETT:  Has BlackRock/Granite conceded
4   in any way that it is responsible for repairing the
5   Cinema building?
6     A   No.
7     Q   Have you reviewed the Cinema lease?
8     A   Yes.
9     Q   Is that part of your responsibility, to be
10  aware of the terms of the leases with the tenants at
11  that facility?
12    A   Yes.
13    Q   And have you undertaken that review?
14    A   At some point, yes.
15    Q   Okay.  Do you know when you first reviewed the
16  Cinema lease?
17    A   I probably would have reviewed it when we --
18  when we were -- when we were looking at the acquisition,
19  2005.
20    Q   In 2005 you would have reviewed the Cinema
21  lease?
22    A   I had some responsibility at that time for
23  retail.
24    Q   Okay.  Were you involved in the original
25  Forward Purchase and Sale Agreement between Alberta and

11 (Pages 38 to 41)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                          1/15/2010

Page 42

1   what was then Metropolitan Life?
2      A   No.
3      Q   Were you involved in any of the subsequent
4   amendments to the Forward Purchase and Sale Agreement?
5      A   I don't -- I don't think so, no.
6      Q   Did you have any role in the negotiating of
7   either the 14th or 15th amendments to the Forward
8   Purchase and Sale Agreement?
9      A   No, I did not.
10     Q   Do you know who from BlackRock's side was
11  involved in those negotiations?
12     A   I believe it was primarily Chris Silva.
13     Q   Does Mr. Silva report to Mr. Piekarski or are
14  they more or less equals?
15     A   No, Chris didn't report to Andrew Piekarski.
16     Q   Do you know who Mr. Silva reports to?
17     A   Jay Alexander.
18     Q   And does Mr. Piekarski report to Mr. Silva?
19     A   No.
20     Q   Does Mr. -- who does Mr. Piekarski report to?
21     A   Jay Alexander.
22     Q   What is Mr. Alexander's position?
23     A   Chief investment officer.
24     Q   Subsequent to having -- you mentioned you had
25  reviewed the Cinema lease perhaps in 2005 in connection

Page 43

1   with the -- this property.  Did you have occasion to
2   review it subsequent to that time?
3      A   I -- I don't -- I don't recall.  I would
4   have -- I would have -- with -- with the dispute that
5   was occurring, I would have probably looked at it after
6   that, but I don't recall after, you know, some -- some
7   initial review that -- you know, as part of due
8   diligence.
9      Q   Did you do some sort of due diligence
10  investigation of the Cinema -- or, excuse me, of the
11  Southlands Town Center prior to the closing in December
12  of '08?
13     A   Yeah, until -- until the responsibility
14  transferred to the retail group, I had some ongoing
15  responsibilities to review -- to review leases that were
16  provided by Alberta, you know, a little bit on the
17  construction draws.
18     Q   Were you part of the acquisition team, if there
19  was one --
20     A   No.
21     Q   -- for the property?
22         Who was -- comprised the acquisition team from
23  BlackRock's side?
24     A   Steve Corrigan was the -- would have been the
25  primary person.

Page 44

1      Q   Where is he located?
2      A   In my office in Newport Beach.
3      Q   Does he report to you?
4      A   No.
5      Q   Who does he report to?
6      A   Currently reports to Bill Finelli.
7      Q   Did he report to someone else in 2008?
8      A   Yes.
9      Q   Who was that?
10     A   Ron Zuzack, Z-U-Z-A-C-K.
11     Q   Who else was involved in the acquisition of the
12  property from BlackRock's standpoint?
13     A   I think a person named Eddie Yrure would have
14  been the acquisition analyst working with Steve
15  Corrigan.  He is no longer with the company.
16     Q   Was Mr. -- was Ms. Kralovec involved in the
17  acquisition?
18     A   No.  She wasn't employed by BlackRock at the
19  time.
20     Q   And what time frame are you referring to?
21     A   Middle of 2005 to early to middle part of 2006.
22     Q   Was there any work done immediately prior to
23  the closing by the acquisition team?
24     A   Prior -- well --
25     Q   Prior to December 2008.

Page 45

1      A   I don't recall.
2      Q   Was there a different team besides
3   Mr. Corrigan?
4          MR. TRAHAN:  I assume you mean sort of
5   immediately prior to the closing?
6          MR. BENNETT:  Immediately prior, yes.
7      Q   In the weeks before the closing, was there any
8   work done by the acquisition team with respect to the
9   property?
10     A   Well, I -- I believe they were -- were involved
11  in the -- the various documents and amendments that were
12  being negotiated.
13     Q   Okay.  As far as the negotiations, you've
14  already indicated that that was done primarily by
15  Mr. Piekarski or Mr. Silva?
16     A   Yes.
17     Q   Anyone else involved in those negotiations, to
18  your knowledge?
19     A   Steve Corrigan on the acquisition.
20     Q   Was there any work done by the acquisition team
21  to inspect the property prior to closing or immediately
22  prior to?
23         MR. TRAHAN:  Object to relevance --
24         THE DEPONENT:  Not that I --
25         MR. TRAHAN:  -- and ambiguity.

12 (Pages 42 to 45)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                                  1/15/2010

Page 46

1     THE DEPONENT:  Not that I'm aware of.
2     Q   BY MR. BENNETT:  Okay.  Now, by at least this
3   January meeting, 2009, you were aware of the issues
4   relating to the Cinema's foundation and Alberta's
5   position that it was the Cinema's responsibility for
6   their own building; is that right?
7     A   Yes.
8     Q   Did you review, subsequent to that meeting, the
9   Cinema lease to determine whether you agreed or
10   disagreed with Alberta's assessment of the Cinema's
11   responsibility?
12     MR. TRAHAN:  Object; asked and answered.
13     THE DEPONENT:  I believe I did.
14     Q   BY MR. BENNETT:  Okay.  Did you form any
15   opinion as to whether it was the Cinema's responsibility
16   for their own structure?
17     A   No, I don't think I came to a conclusion.  I
18   think it -- you know, subject to an -- to doing an
19   investigation, that determination would come later.
20     Q   Okay.  If I understand your testimony
21   correctly, that determination has yet been -- to be
22   made --
23     MR. TRAHAN:  Object to relevance.
24     Q   BY MR. BENNETT:  -- is that correct?
25     MR. TRAHAN:  To the extent it requires you to

Page 47

1   reveal information about the consulting work -- or the
2   consulting expert work that's been done, I'm going to
3   instruct you not to answer.
4     Q   BY MR. BENNETT:  You can answer if you can,
5   subject to your counsel's objection.
6     A   I'm -- I -- so I won't answer that.
7     Q   Okay.  Without telling me what the
8   determination is, have you developed, in your view,
9   enough facts to know and reach a conclusion as to whose
10   responsibility it is to repair the Cinema?
11     MR. TRAHAN:  Object to relevance and instruct
12   the witness not to answer for the reasons previously
13   stated.
14     MR. BENNETT:  He can still tell me whether he
15   has enough facts.  That's not privileged.
16     Q   I'm not asking what those facts are, I just
17   need to know whether you feel you have enough facts as
18   of this date to make a determination as to whose
19   responsibility it is to repair the Cinema building.
20     Are you instructing him not to answer that
21   question?
22     MR. TRAHAN:  I'm instructing him not to
23   answer --
24     MR. BENNETT:  Okay.
25     MR. TRAHAN:  -- on the grounds previously

Page 48

1   stated.
2     Q   BY MR. BENNETT:  Did you have any involvement
3   in the determination by BlackRock not to accept the
4   estoppel certificate that the Cinema provided with
5   respect to the closing of this transaction?
6     A   Yes, I would have received a copy of what had
7   been provided by the Cinema.
8     Q   Did you receive a copy of the May 2008 estoppel
9   certificate provided by the cinema?
10     A   In May of '08, I wasn't -- I wasn't responsible
11   for the asset so I probably did not receive that.
12     Q   Okay.  Copy of the May estoppel certificates
13   for the property were furnished to BlackRock's counsel
14   in November of 2008.  Were those subsequently provided
15   to you?
16     A   They probably were.
17     Q   Do you recall receiving them?
18     A   I don't recall.
19     Q   When do you recall receiving a copy of the
20   January 2009 estoppel certificate signed by the cinema?
21     A   At the time that it was provided.
22     Q   Did you review that certificate?
23     A   Yes.
24     Q   And did you have a role in making a decision to
25   reject that certificate?

Page 49

1     A   I wouldn't have been the primary person making
2   that determination, but I -- you know, I guess I
3   reviewed it and agreed that it wasn't an acceptable
4   estoppel certificate.
5     Q   Who was the primary person who was responsible
6   for making the determination to reject the cinema
7   estoppel certificate?
8     A   Legal counsel and portfolio management.
9     Q   And portfolio management is Mr. Piekarski?
10     A   And Mr. Silva.
11     Q   Okay.  Did you have conversations with them
12   about whether the cinema estoppel certificate was
13   sufficient?
14     A   I don't -- I don't recall.
15     Q   Did you have any -- any written communications
16   with them over the cinema estoppel certificate?
17     A   No, I don't believe there is.
18     Q   Okay.  What is your understanding of the
19   reasons why the cinema estoppel certificate was
20   rejected?
21     A   References -- the document was modified and
22   included reference to a -- to the foundation cracking
23   condition.
24     Q   Is that the sole reason?
25     MR. TRAHAN:  Object to form.

13 (Pages 46 to 49)

Granite Southlands v. Alberta Town Center        MICHAEL KRIER                    1/15/2010

Page 50

1    THE DEPONENT: I think that was the -- the
2  major change that they had -- they had inserted into the
3  January version that was different than the May version.
4    Q   BY MR. BENNETT: Okay.  And what is
5  significant, in your view, about the fact that the
6  Cinema inserted a paragraph relating to the foundation
7  condition?
8    A   Obviously a potential major -- a major issue in
9  terms of what -- the repair and who was going to be
10  responsible for it.
11    Q   Okay.  And if they -- if the Cinema is in fact
12  responsible for it, is that a significant issue in your
13  mind?
14    MR. TRAHAN: Object to relevance.
15    THE DEPONENT: I -- I -- I suppose if they are
16  ultimately responsible for it.
17    Q   BY MR. BENNETT: So let me understand, if the
18  cinema is actually responsible under their lease for the
19  repair of their own premises, what difference does it
20  make to you that they put in a statement in the tenant
21  estoppel that they have a foundation problem?
22    MR. TRAHAN: Object to relevance, object to the
23  form of the question as compound, and object to the
24  extent it calls for a legal conclusion.
25    THE DEPONENT: I'm going to rely on that

Page 51

1  estoppel going forward.  And I guess at that time
2  there's no determination what the -- of who is
3  responsible and...
4    Q   BY MR. BENNETT: All right.  So is it your
5  testimony, then, that regardless of who is ultimately
6  responsible, the mere fact that it is included in the
7  document makes it significant in your mind?
8    A   Yes.
9    Q   Regardless of who ends up being responsible for
10  the foundation?
11    A   Yes.
12    MR. TRAHAN: Stu, when it's convenient, I'd
13  like to take a break.
14    MR. BENNETT: All right.  Let me just finish up
15  on this little subject and then I'd be happy to.
16    Q   Did you have any discussions with any other
17  person at BlackRock over the Cinema's insertion of this
18  paragraph regarding the foundation issues in this May
19  estoppel certificate?  I asked you about Piekarski or
20  Silva.  Did you talk to anybody else, that you recall?
21    A   Not that I recall.  But -- no.
22    Q   Okay.  Did you have any conversations with the
23  attorneys at Fulbright over the cinema estoppel
24  certificate?
25    A   I -- I suppose that I did.  I just don't recall

Page 52

1  the -- any specific conversation.
2    Q   Were you one of the BlackRock representatives
3  that was communicating with Fulbright & Jaworsky
4  concerning the closing of this transaction?
5    A   I wasn't the primary -- the primary contact.
6  That would have been, you know, Chris Silva, Andrew
7  Piekarski.
8    Q   But you think you did have some communications
9  with the attorneys concerning the Cinema estoppel?
10    A   I was on -- I was being provided with, you
11  know, copies of this -- the estoppels or other
12  correspondence that was -- that was being circulated.
13    Q   Okay.  Was there a -- was there a conference
14  call among the lawyers and the BlackRock representatives
15  relating to the estoppel certificates?
16    A   I don't recall.
17    Q   Do you know who you provided input to the
18  attorneys with respect to the cinema estoppel?
19    MR. TRAHAN: I'll object to this line of
20  questions, that the communications that you're
21  discussing with the witness, Mr. Bennett, are clearly
22  protected by the attorney/client privilege.
23    To the extent you want -- you -- you're
24  entitled to information regarding to the general -- to
25  whether BlackRock sought legal advice, et cetera, I

Page 53

1  believe you've covered that.  I don't know where this
2  line of questions is going, but you're starting to get
3  into the details of specific interactions with
4  BlackRock's counsel.  And I believe that is privileged
5  and is starting to cross the line as to -- as to where
6  you're entitled to go.
7    MR. BENNETT: I think I'm entitled to find out
8  if communications took place.  I'm not asking about the
9  substance, just whether they did.  And the main purpose
10  for the discussion is did BlackRock as a entity make a
11  business decision about the estoppel certificates or did
12  the lawyers by themselves, without consulting BlackRock,
13  make the decision.  That's what I want to know is was it
14  made as a business decision with input from the client
15  or did the lawyers by themselves make the decision.
16    Q   So if you know, did you put -- provide input to
17  the lawyers?  That's all I want to know.
18    MR. TRAHAN: If -- I'll object to the question
19  as compound.  If the question is, did you provide input
20  to legal counsel in connection with BlackRock's decision
21  to object to the estoppel certificate, you can answer
22  that question.
23    THE DEPONENT: The answer is yes.
24    Q   BY MR. BENNETT: Okay.  And -- but you do not
25  recall how or -- or whether it was -- you do not recall

14 (Pages 50 to 53)

Granite Southlands v. Alberta Town Center                MICHAEL KRIER                                    1/15/2010

Page 54

1   whether it was in writing or in a telephone
2   conversation?
3       A   No.
4       Q   All right.
5           MR. BENNETT:  Okay.  We can take your break
6   now.
7           (Recess taken from 9:24 a.m. to 9:34 a.m.)
8       Q   BY MR. BENNETT:  So in reaching the decision to
9   reject the cinema estoppel certificate, it was not
10  important in your mind to understand what the lease
11  provided vis-a-vis their responsibility for the
12  improvements on the Cinema property; is that right?
13          MR. TRAHAN:  Object to the form of the
14  question.  I don't recall that he's testified in that
15  regard.
16          MR. BENNETT:  Well, let me ask it that way.
17      Q   Is it your testimony that because this cinema
18  estoppel contained a disclosure relating to a foundation
19  condition, it did not matter to you, in rejecting that
20  certificate, whether the lease obligated the cinema to
21  repair its own property?
22      A   No.
23          MR. TRAHAN:  By "you," you mean you
24  individually?
25          MR. BENNETT:  Yeah, I'm talking about him

Page 55

1   individually.
2       Q   So it was not necessary for you to review the
3   lease in an attempt to determine whether the cinema was
4   actually responsible or not?
5       A   I guess as a buyer, I would see that as the
6   responsibility of the seller to work that through with
7   the -- with the tenant and get them to remove it if that
8   was truly the case.
9       Q   Okay.  How about the other estoppel
10  certificates that were rejected, did you have any role
11  in reviewing them?  As you recall, there were nine in
12  total that were rejected by BlackRock.
13      A   Yeah, I would have received copies of them.
14      Q   Did you have input into the rejection of each
15  of those?
16      A   Yes, I guess to a certain extent.
17          MR. BENNETT:  Did you mark any deposition
18  exhibits in Allan Provost's deposition, do you know?
19          MR. TRAHAN:  I don't know, but I'll check.
20          MR. BENNETT:  I don't know what to tell you to
21  start with.
22          While he's checking, I'll give you this to look
23  at.
24          (Document handed to the deponent.)
25          THE DEPONENT:  (Reviewing document.)

Page 56

1       Okay.
2       Q   BY MR. BENNETT:  I've handed you the estoppel
3   certificate from American Family Insurance.  We'll make
4   this an exhibit as soon as I know what number to mark it
5   as.
6           Have you had an opportunity to look at this?
7       A   I don't recall specifically, no.
8       Q   Well, you looked at it --
9       A   At some --
10      Q   Have you looked at it during this deposition?
11      A   No.
12      Q   Let me ask it again.  Have you had an
13  opportunity to review it now?
14      A   Yes.
15      Q   Okay.  Thank you.
16          Do you know on what basis this tenant estoppel
17  certificate was rejected?
18      A   (Reviewing document.)
19          I'm not sure what the basis on this is.
20      Q   There doesn't appear to be anything on the face
21  of this certificate that would indicate a basis for
22  objection, would there?
23          MR. TRAHAN:  Objection; asked and answered.
24          THE DEPONENT:  In my brief review, I -- I'm not
25  seeing it.

Page 57

1       Q   BY MR. BENNETT:  Okay.
2       A   Is there a red line that would show me what --
3           MR. TRAHAN:  Just answer the questions.
4           THE DEPONENT:  Okay.
5       Q   BY MR. BENNETT:  Is there some document that
6   would help you with that?
7       A   Well, I -- you know, if there were changes made
8   to what was sent to them, I...
9       Q   Don't know that there is a red line.  What we
10  have is that, and we have your counsel's letter that
11  rejects that cinema -- excuse me, that rejects that
12  estoppel certificate.  And according to the letter, it's
13  rejected on the face of the certificate.
14          So is there anything that you see on the face
15  of the certificate that would cause that to be rejected?
16          MR. TRAHAN:  Object; asked and answered.
17      Q   BY MR. BENNETT:  You can answer again.
18      A   In my -- in my brief review, yeah, I don't -- I
19  don't see...
20      Q   Okay.  Let me hand you the estoppel certificate
21  for Family Life Counseling and ask you to review that
22  for a moment.
23          (Document handed to the deponent.)
24      A   (Reviewing document.)
25          Okay.

15 (Pages 54 to 57)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                              1/15/2010

Page 58

1       MR. BENNETT: Again, we'll mark this as the
2   next exhibit as soon as I know what number.
3       (Document handed to counsel and the deponent.)
4       Q   BY MR. BENNETT: Do you see any basis for
5   rejecting this form of estoppel certificate?
6       A   The tenant has noted some issue with the HVAC
7   system and has noted it in the Paragraph 5.
8       Q   Okay. And is that, in your view, a sufficient
9   basis in and of itself to reject this estoppel
10   certificate?
11      A   It's been modified from what was the approved
12   form and it indicates that there's an issue that's
13   unresolved.
14      Q   Okay. So this handwritten note on Page 2 which
15   says, quote, "Note: Continued issues with my HVAC
16   system," somebody's initials and a date, "1-8-09" is
17   sufficient in and of itself to reject this certificate?
18      MR. TRAHAN: Object; asked and answered.
19      THE DEPONENT: I believe so.
20      Q   BY MR. BENNETT: Okay. Is it your testimony,
21   then, that any notation other than the exact words on an
22   estoppel certificate are sufficient bases to reject it?
23      MR. TRAHAN: Object; calls for speculation.
24      THE DEPONENT: I guess it depends on what is is --
25   what the -- you know, what the issue is or if it can be

Page 59

1   specifically quantified. There are ways to resolve
2   these, but to the extent it's changed, it doesn't meet
3   the -- doesn't meet the requirement of the purchase
4   agreement.
5       Q   BY MR. BENNETT: All right. Prior to the
6   rejection of the Family Life Counseling estoppel
7   certificate, was any effort made by BlackRock to
8   quantify the extent of the HVAC system note that's set
9   forth on this certificate?
10      A   I'm not sure we were aware of it.
11      Q   Well, you saw the note; right?
12      A   Yeah.
13      Q   And it was the basis of the note you rejected
14   the certificate; right?
15      A   Yes.
16      Q   Okay. Did you make any effort to find out,
17   well, what's kind of -- how significant of a problem is
18   this?
19      MR. TRAHAN: Object to relevance.
20      THE DEPONENT: Again, I would assume we would
21   look to the seller to get the tenant to remove that
22   clause from the estoppel and either solve their issue
23   for them or come back and quantify it to me as to what
24   it -- what it's going to cost. I don't know it's my --
25   my responsibility to investigate it and -- and get it

Page 60

1   removed.
2       Q   BY MR. BENNETT: Okay. Did you have any
3   communications with Alberta prior to rejecting this
4   certificate about the nature or extent of the problems
5   with the HVAC system?
6       A   Not that I recall.
7       Q   Did you give -- did you have any written
8   communications with Alberta requesting them to consult
9   with the tenant to have this note removed prior to
10   rejecting this certificate?
11      A   No, not that I recall.
12      Q   Would that have been your responsibility or
13   someone else at BlackRock to have those communications
14   with Alberta?
15      MR. TRAHAN: Object to the form of the
16   question. It assumes it was anybody's responsibility.
17      THE DEPONENT: Probably would have come from --
18   from counsel.
19      Q   BY MR. BENNETT: Okay.
20      MR. TRAHAN: By the way, there were no exhibits
21   at the Allan Provost's deposition, I'm told. So I think
22   that means we can start with 61.
23      MR. BENNETT: I believe so. Okay.
24      (Discussion held off the record.)
25      MR. BENNETT: Let's go back on the record.

Page 61

1   Let's do a little housekeeping.
2       Q   We have marked as Exhibit 61, Mr. Krier, the
3   American Family Insurance estoppel certificate; is that
4   right?
5       A   Yes.
6       Q   And we have marked as Exhibit 62 the Family
7   Life Counseling form of estoppel certificate; is that
8   right?
9       A   Yes.
10      Q   Thank you.
11      (Defendants' Exhibits 61 and 62 were marked
12   for identification.)
13      MR. BENNETT: This is Exhibit 63.
14      (Defendants' Exhibit 63 was marked for
15   identification.)
16      (Document handed to counsel and the deponent.)
17      Q   BY MR. BENNETT: Exhibit 63 is the form of
18   estoppel certificate for Main Street Dental (Langenfeld,
19   D.D.S.).
20      Would you review that, please, and tell me
21   what, on the face of this certificate, justified the
22   rejection of this estoppel certificate by BlackRock?
23      A   (Reviewing document.)
24      Okay.
25      Q   Okay. Is there anything on the face of

16 (Pages 58 to 61)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                    1/15/2010

Page 62

1  Exhibit 63 that would, in your view, justify rejecting
2  this tenant estoppel certificate?
3       MR. TRAHAN:  Object to relevance.
4       THE DEPONENT:  The deletion of Paragraph No. 8.
5       Q   BY MR. BENNETT:  Well, Paragraph 8 is deleted
6  and the tenant has inserted that it has two five-year
7  options listed in the lease.
8       A   Yes.
9       Q   Is that a basis for objection?
10      A   Yes, because it didn't include the rest of the
11 language about having no option or preferential right to
12 purchase, it just dealt with the -- or rights of first
13 refusal, other -- other rights, it just -- it just
14 identified a -- that they have two five-year options.
15      Q   All right.  So that's the basis on which you
16 objected to that certificate?
17      A   Yeah, I don't -- assuming that these dates are
18 now correct, that would be the basis.
19      Q   All right.
20          (Defendants' Exhibit 64 was marked for
21 identification.)
22          (Document handed to counsel and the deponent.)
23          THE DEPONENT:  (Reviewing document.)
24          Okay.
25      Q   BY MR. BENNETT:  Okay.  Exhibit 64 is a form of

Page 63

1  estoppel certificate for QualDent LLC.
2          Do you know on what basis this estoppel
3  certificate was rejected?
4       A   It doesn't look to be in the same form as --
5          MR. TRAHAN:  The question is, do you know what
6  the basis for rejecting this tenant estoppel was.
7  That's the question.
8          MR. BENNETT:  I think he was beginning to
9  answer.
10      Q   So please proceed with your answer.
11      A   It's not clear to me on what's here, but it
12 appears to be missing some references to any options
13 that they might have or purchase options.
14      Q   The Paragraph 8 that we looked at earlier is
15 not in this lease?
16      A   Doesn't look like it.
17      Q   Okay.  And the statement in Paragraph 4 of this
18 lease that says that the lease terminates on June 30th,
19 2013 --
20      A   Oh, no.
21      Q   -- and the tenant has the following renewal
22 extension options, one additional five-year term --
23      A   Okay.
24      Q   -- is not sufficient?
25      A   I guess that covers it.

Page 64

1       Q   Okay.
2       A   It doesn't have the other -- although I
3  can't -- I can't tell from this how it was modified
4  versus how it went out, but...
5       Q   Okay.  So looking at this document, you cannot
6  tell whether it has any significant changes from the
7  form of the lease other than it's been retyped -- excuse
8  me, form of the tenant estoppel other than it's been
9  retyped?
10      A   Yeah, it's not -- if it was -- if there had
11 been no changes made to it as it was sent out, then, of
12 course, it would have been accepted.  I can't tell the
13 changes that were made.
14      Q   All right.
15          (Defendants' Exhibit 65 was marked for
16 identification.)
17          (Document handed to counsel and the deponent.)
18          THE DEPONENT:  (Reviewing document.)
19          Okay.
20      Q   BY MR. BENNETT:  Okay.  Exhibit 65 is a form of
21 estoppel certificate from Chico, Store No. 620.
22          Do you know on what basis this tenant estoppel
23 certificate was rejected?
24      A   It looks like a number of changes were made
25 and -- including some reference to a request made to the

Page 65

1  landlord for -- to confirm some operating cotenancy
2  requirement, but providing a -- a rent roll.
3          And then the two paragraphs at the end, in
4  effect, make the estoppel really unenforceable for --
5  for the -- for the buyer in terms of -- I mean, what --
6  what you look to get from an estoppel certificate is
7  that everything's current, that there are no claims.
8  And the last two paragraphs, in effect, allow them to --
9  to come back later and say, yeah, we signed an estoppel,
10 but, you know, we -- we missed this and we're
11 entitled -- still entitled to it.  It leaves it wide
12 open for the -- the new owner on -- on issues that they
13 may not have any knowledge of.
14      Q   All right.  What is the significance of this
15 operating cotenancy requirement?  Is that a major issue?
16      A   To the extent that it allows them to -- to pay
17 other -- other rent than what they're contractually
18 obligated to do, it would certainly be significant.
19      Q   Do you know what the -- what the operating
20 cotenancy requirement is?
21      A   I -- for this tenant, not offhand, no.
22      Q   So you don't know what the significance of
23 their -- their statement that they haven't received a
24 current tenant roster is or what effect it might have on
25 the tenant's obligation to pay rent; is that right?

17 (Pages 62 to 65)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER          1/15/2010

Page 66

1    A   Repeat the question.
2    Q   Yeah.  You do not know what the -- the
3   significance of the operating cotenancy requirement is
4   or how it would affect this tenant's obligation to pay
5   rent?
6    A   I don't know, no.
7    Q   All right.  Now, do you have any information
8   that Alberta did not meet the requirement in the Forward
9   Purchase and Sale Agreement as amended that it provide
10  estoppels from tenants occupying at least 75 percent of
11  the rented space at the center?
12   A   I'm sorry.  Repeat the question again.
13   Q   Sure.  Let me break into two so it's maybe
14  easier for you.
15       You know that under the Forward Purchase and
16  Sale Agreement there was a requirement that Alberta
17  provide estoppel certificates from tenants occupying
18  75 percent of the rented space?
19   A   Right.
20   Q   Do you have any information that Alberta did
21  not meet that requirement?
22   A   The -- the rejected -- the rejected estoppels
23  and correspondence back to Alberta indicated that that
24  requirement hadn't been met.
25   Q   Do you know how much the rented space was,

Page 67

1   total rented space, at the center at the time of
2   closing?
3    A   Not offhand, no.
4    Q   Okay.  And do you know what percentage of
5   accepted tenant estoppel certificates were delivered to
6   Granite?
7    A   No, I don't know the exact number.
8    Q   Do you have any knowledge to dispute that
9   76 percent of the rented space -- or estoppel
10  certificate from tenants occupying 76 percent of the
11  rented space were provided and not objected to?
12   A   No, I don't -- do I have -- can you repeat that
13  question?
14   Q   Sure.  Do you have any knowledge to dispute
15  that 76 percent of the rented space was given -- I got
16  to restart that.
17       Do you have any knowledge to dispute that
18  Alberta gave you tenant estoppel certificates from
19  tenants occupying 76 percent of the rented space?
20   A   Well, the correspondence that was delivered
21  back indicating that the -- the threshold hadn't been
22  met, so I --
23   Q   Have you personally calculated the amount of
24  tenant estoppels you received and the total rented
25  space?

Page 68

1    A   No.
2    Q   Do you know who has?
3    A   No.
4    Q   So you don't know who within BlackRock would
5   have analyzed the rented square feet, the amount of
6   certificates received, the amount of square footage
7   attributable to each certificate?
8       MR. TRAHAN:  Objection; asked and answered.
9       THE DEPONENT:  No, I don't know who reviewed
10  that specifically.
11   Q   BY MR. BENNETT:  Prior to closing, did Granite
12  hire some company called New Market Real Estate to
13  review the property?
14   A   Yes.
15   Q   What is New Market Real Estate?  What kind of
16  company is that?
17   A   Appraisal company.
18   Q   What office of New Market Real Estate did
19  Granite deal with?
20   A   I'm not sure.  I believe it was Chicago, but...
21   Q   Do you know a person, name or individual, with
22  whom you dealt?
23   A   Was it -- I'm not sure.  I think -- I think it
24  was a gentleman, Carey, last name Carey.
25   Q   K-E-R-R-Y?

Page 69

1    A   C-A-R-E-Y, but I'm not sure.
2    Q   Okay.  And you think from Chicago?
3    A   Yes.
4    Q   And do you know what work that New Market Real
5   Estate Group did with respect to the Southlands property
6   before closing?
7       MR. TRAHAN:  Objection as to the line of
8   questions relating to New Market's activities on the
9   Southlands facility on relevance grounds.
10   Q   BY MR. BENNETT:  You can go ahead and answer.
11   A   Completing a market appraisal.
12   Q   What work did they actually do?  Did they visit
13  the property?
14   A   Yes.
15   Q   Do you know what inspections they did at the
16  property while they were there?
17   A   Not specifically, no.
18   Q   Do you have some general knowledge?
19   A   I assume it would be outlined in the report.
20   Q   Did they do a report?
21   A   Yes.
22   Q   When did you -- were you the person who hired
23  them?
24   A   No.
25   Q   Who in BlackRock hired them?

18 (Pages 66 to 69)

Granite Southlands v. Alberta Town Center      MICHAEL KRIER      1/15/2010

Page 70

1    A   Probably would have been Mike Yurinich.
2    Q   Another spelling.
3    A   We got great names.  Y-U-R-I-N-I-C-H.
4    Q   I think if you have a name that starts with a
5  Y, you got a good chance of getting hired.
6    A   No Smiths or Jones.
7    Q   Where is Mike Yurinich located?
8    A   New Jersey.
9    Q   What group within BlackRock is he?
10   A   Evaluations.
11   Q   Is it your understanding that in doing a market
12 value appraisal, that the appraiser would typically do
13 a -- an inspection of the buildings for condition?
14      MR. TRAHAN:  Object to relevance.
15   Q   BY MR. BENNETT:  Is that part of the appraisal?
16   A   They would do a general, you know, review of
17 the property, tour, if you will.
18   Q   Do you know if somebody from New Market Real
19 Estate Group did a tour?
20   A   I understand they did, yes.
21   Q   Do you know who -- whether they met with any
22 Alberta representatives when they did their tour?
23   A   I'm assuming so, yes.
24   Q   Do you know?
25   A   I don't know who they met with, no.

Page 71

1    Q   Did you receive a copy of any report that New
2  Market Real Estate Group did?
3    A   I don't know that I received it directly, no.
4    Q   Have you seen it?
5    A   Not -- not that I can recall.
6    Q   All right.  Do you know if it contains any
7  reports by the appraisers with respect to the condition?
8  Does it make any observations about the condition of the
9  buildings?
10      MR. TRAHAN:  Objection; calls for speculation.
11      THE DEPONENT:  I -- I believe it does, yes.
12   Q   BY MR. BENNETT:  Does it report observing any
13 cracks, settlement, foundation settlement, sidewalk
14 settlement, road settlement?
15   A   Not to my knowledge.
16   Q   Do you know when their inspection was done?
17   A   Early December.
18   Q   Before the closing anyway; right?
19   A   I believe so, yes.
20   Q   Do you know when the report was received?
21      MR. TRAHAN:  Is that December or September?
22      MR. BENNETT:  December, he said.
23      THE DEPONENT:  I'm not -- I'm not sure when
24 it -- when it was received.
25   Q   BY MR. BENNETT:  Was it received before the

Page 72

1  closing?
2    A   I don't recall.
3    Q   Do you know --
4    A   I believe so, but...
5    Q   You believe so.
6       Do you know why BlackRock would request a
7  market value appraisal of this property prior to
8  closing?
9       MR. TRAHAN:  Object to relevance.
10      THE DEPONENT:  To establish a market value
11 on -- on the property.
12   Q   BY MR. BENNETT:  And do you know why BlackRock
13 would want a market value established prior to closing
14 when it's already obligated to purchase the property for
15 a certain price?  What's the function of that?
16   A   Get a correct market value.
17   Q   Why is that important to BlackRock?
18   A   For valuation of the -- of the account.
19   Q   The account for the fund?
20   A   Yes.
21   Q   Do you know if the fund accounts for the
22 property on the basis of market value or on acquisition
23 cost?
24   A   It's a market value account.
25      MR. TRAHAN:  Object to that line of questioning

Page 73

1  to the extent it calls for an assumption that BlackRock
2  was obligated to close on the property.
3    Q   BY MR. BENNETT:  Now, the -- you're aware that
4  the 15th amendment to the Purchase and Sale Agreement
5  established a purchase price for the property, correct,
6  or do you know that?
7    A   Yes.
8    Q   And you know that the purchase price was
9  established at the amount of the outstanding loan
10 balance plus a certain amount?
11   A   Yes.
12   Q   Okay.  And in rough numbers, that's
13 $161 million, approximately; right?
14   A   Yes.
15   Q   So is it your testimony, then, that the Granite
16 Fund, when it books this asset, books it at the market
17 value established by New Market Real Estate Group rather
18 than the purchase price established by the Forward
19 Purchase and Sale Agreement?
20   A   Repeat the question.
21      MR. TRAHAN:  Do you mind reading the question
22 back?
23      MR. BENNETT:  I can rephrase it.
24      MR. TRAHAN:  Okay.
25   Q   BY MR. BENNETT:  Is it your testimony that

19 (Pages 70 to 73)

Page 74

1  when -- when Granite Fund books this asset on its
2  balance sheet, it books it at the market value
3  established through the appraisal rather than on the
4  acquisition cost set forth in the Forward Purchase and
5  Sale Agreement?
6      MR. TRAHAN:  Object to relevance.
7      THE DEPONENT:  Yes, that would be the process.
8  Q   BY MR. BENNETT:  Do you know the value
9  established by the New Market Real Estate Group for the
10 property?
11 A   I don't recall.
12 Q   Do you recall approximately?
13 A   Something less than 160 million.
14 Q   Do you know how much less?
15 A   Somewhere I think between 120, 130 million.
16 Q   Okay.  Does Granite Fund have to adjust the
17 market value of this account on a mark-to-market type
18 accounting?
19 A   Yes.
20 Q   How frequently does it do that?
21 A   Quarterly.
22 Q   Since acquisition?
23      MR. TRAHAN:  Before I forget, I'm going to
24 designate all the testimony relating to how BlackRock
25 values its properties, appraises its properties, books

Page 75

1  its -- the values of its properties, et cetera, I'm
2  going to designate that as confidential under the
3  protective order in the case.
4      MR. BENNETT:  That's fine.
5  Q   Has -- on its quarterly mark-to-market
6  valuations, has the value of this property been going up
7  or down?
8  A   Down.
9  Q   Do you know how -- by how much in the four
10 quarters since the acquisition this property has
11 declined in value?
12      MR. TRAHAN:  Object to relevance.
13      THE DEPONENT:  Approximately 20 or --
14 20 percent, 25 -- 20 percent.
15 Q   BY MR. BENNETT:  Do you know if any of the
16 decline in the market value attributed to this property
17 has been associated with any alleged construction
18 defects at the property?
19      MR. TRAHAN:  Object to relevance.
20 Q   BY MR. BENNETT:  Has the condition of the
21 property been a factor in any of the adjustments on the
22 market value of the property, to your knowledge?
23 A   Not to my knowledge, no.
24 Q   Have you done any work on the adjustment of
25 closing expenses, proration of income and revenue

Page 76

1  subsequent to the closing?
2  A   Yes.
3  Q   Okay.  What have you done in that regard?
4  A   Worked with Angela, Peter Cudlip, the
5  accountant, Robin, to try to come to an agreement on --
6  on the various income, expenses, prorations, et cetera.
7  Q   What is your understanding of where the parties
8  stand on their attempt to come to agreement?
9  A   Have resolved -- or are subject to, you know,
10 confirmation of, you know, information that we at this
11 point haven't been provided the result of the number is,
12 but there still are a number of items outstanding.
13 Q   Can you tell me what items are outstanding in
14 your -- from your point of view?
15 A   It would be helpful if I could review the
16 schedule that -- would that be okay?
17 Q   Sure.  Which schedule would you like to review?
18 One that you prepared or one that Mr. Cudlip has
19 prepared?  What would be the most helpful for you?
20 A   It's the form that's been circulated back and
21 forth.  I think Alberta originally created it and it's
22 been modified by both parties.
23 Q   Okay.
24      THE DEPONENT:  Is it okay?
25      MR. TRAHAN:  If it would help you -- your

Page 77

1  testimony to refer to that schedule, then refer to it.
2  Q   BY MR. BENNETT:  It isn't a test of memory.
3  I'm happy to give you whatever you need to --
4      MR. TRAHAN:  Have you got it handy?
5      THE DEPONENT:  Yeah.  There's some notes.
6  Q   BY MR. BENNETT:  If you've got something, that
7  would be great.  If not, I'll show you what I've got.
8      (Document handed to counsel.)
9      THE DEPONENT:  There's the schedule.  I'm sure
10 you've seen it.
11 Q   BY MR. BENNETT:  All right.  Let me see what
12 you've got there.
13      Let's go off the record a moment.
14      (Discussion held off the record.)
15      (Recess taken from 10:17 a.m. to 10:23 a.m.)
16      (Defendants' Exhibit 66 was marked for
17 identification.)
18      (Document handed to counsel and the deponent.)
19 Q   BY MR. BENNETT:  I have handed you Exhibit 66,
20 Mr. Krier.  And can you identify for the record what
21 this is?
22 A   This is a -- an Excel spreadsheet that's been
23 used by both parties to -- to calculate a true-up of
24 operating deficits prior to closing.
25 Q   Okay.  And this one is dated December 10, 2009

CONTAINS CONFIDENTIAL MATERIAL

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                          1/15/2010

Page 78

1  and has a caption "Revised Operating Deficit Analysis
2  For the Twelve Months Ending December 31, 2008"; right?
3      A   Yes.
4      Q   All right.  So looking at this sheet, can you
5  identify for me the -- the items that you think have
6  been agreed upon subject to confirmation for the
7  underlying documents?
8      A   Where I've drawn a line below what is -- the
9  line is "Subtotal Due to ATC/Due (From) BlackRock."
10     Q   Yes.
11     A   What is above that, I think we generally are in
12  agreement with, but we -- we still -- we still need the
13  support of the underlying expenses that are in these
14  numbers to be provided by -- by Alberta.  We haven't --
15  to this point we haven't received enough information
16  to -- to agree for certain that every expense that is in
17  there should be and there is some -- you know, a number
18  of the changes are based on going from an accrual to a
19  cash basis.
20         The statements were done on an accrual basis
21  and then there were adjustments made based on actual
22  cash payments later, and we have yet to -- we've taken
23  it at this point based on what they've provided, that --
24  and, again, assuming that they provide us the backup
25  that supports it, we think that everything above that

Page 79

1  line is -- is resolved.
2      Q   Okay.  What backup have you requested that has
3  not been provided?
4      A   A detailed general ledger and -- with a
5  breakdown of -- of the expenses associated with each
6  line item.
7      Q   And when do you think the detail general ledger
8  was requested but not provided?
9      A   Quite some time ago.
10     Q   By that do you have a time frame?
11     A   I think we requested it on a number of
12  occasions, probably starting back in the -- a few months
13  after closing, or if not before.
14     Q   Now, were you receiving from Alberta prior to
15  closing during the year 2008 monthly accounting reports,
16  financial reports?
17     A   Yes.
18     Q   And were those insufficient for your purposes
19  in evaluating this -- these numbers?
20     A   Those were -- those were done on an accrual
21  basis, and I think we were generally in a -- you know,
22  in agreement with those -- with those reports, but there
23  were adjustments that were made after -- you know, I
24  think really after closing is when we saw these
25  adjustments put in on a cash basis, and we've yet to --

Page 80

1  to really understand what those relate to, whether the
2  expenses that are in there are -- are, you know, truly
3  property expenses and should be shared.  If we could get
4  that information, then we can put that issue aside.
5      Q   Okay.  Now, then, let's look at, then, what
6  items -- what is your position on the items called
7  "Other Items"?  And underneath the "Other Items" column,
8  there's "Property Taxes Reconciled," "Fat Burger
9  Payments" and "Legal Bills."
10         What is the position of Granite on those items?
11     A   Those all tie back into the schedule that's
12  above.  And I think, subject to probably some adjustment
13  of Fat Burger for additional payments that have been
14  received since this date, I think we're okay with those
15  entries.
16     Q   And who has received the payments by Fat
17  Burger?
18     A   Alberta.
19     Q   So to the extent that there were payments
20  received from Fat Burger subsequent to November 30,
21  2009, those would be amounts that would be due to
22  Granite?
23     A   50 percent -- I believe it's 50 percent of
24  those payments.  It was a settlement agreement and a
25  payment plan that extends, I believe, into 2011.

Page 81

1      Q   Okay.
2      A   So that's a matter that would stay open.
3      Q   Okay.  Is it your agreement that those Fat
4  Burger payments are shared 50/50 as they are received
5  going forward?
6      A   Yes, although they have not been -- we have not
7  received our share --
8      Q   Okay.
9      A   -- to this point.
10     Q   It looks like at the moment Alberta is
11  acknowledging that there are $10,000 representing
12  Granite's share of what should be paid to date -- or to
13  April 30th?
14     A   Yeah, I think we agree with that number.
15     Q   To November 30.  I misspoke.  To November 30.
16  All right.
17         Do you know what the legal bill paid by ATC is?
18  Looks like that's something that Alberta is claiming
19  Granite owes it.
20     A   I'm not sure what this is.
21     Q   All right.  But you don't think it's disputed?
22     A   I don't know.  I don't think so.
23     Q   All right.  So let's talk about what items,
24  then, on the schedule, to your knowledge, are in
25  dispute.

21 (Pages 78 to 81)

Granite Southlands v. Alberta Town Center     MICHAEL KRIER     1/15/2010

Page 82

1    A   Those are the items down below "Unresolved."
2    Q   Okay.
3    A   This net number of -- I think the $53,000 kind
4 of due from -- I think it's actually based on the
5 schedule that I think is owed to Alberta, it's a
6 positive number, provided, again, we get the backup that
7 supports it.
8    Q   Okay. So as far as you know, that number's
9 agreed to subject to backup from the general ledger?
10    A   And an agreement to what -- yeah. We get the
11 backup and we agree with what they've included, then
12 yes.
13    Q   All right. Okay. Then there's a December 2008
14 item that is -- excuse me, December 2008 income that's
15 listed as a disputed item. And there's a note that says
16 a difference between 1,107,000 and 1,013,000 is
17 disputed. Do you understand what that dispute's about?
18    A   Yes. The $1,013,000 number was what was
19 posted -- posted in December. Alberta completed -- they
20 were doing the accounting of the property at the time.
21 And subsequent to that, they've increased it by $94,000,
22 and we have not seen what -- what additional I guess
23 there were postclosing income items that somehow didn't
24 get in -- in the financial statement, were not accrued
25 anywhere else, and that they are entitled to a share of

Page 83

1 those.
2       We need to understand what those items are, to
3 the extent that the money was actually received. And I
4 think they're suggesting we have received the money,
5 then, yes, we can agree as to -- you know, if it's for a
6 time period that's previous to closing, then, yes,
7 they're entitled to their share of that. But we don't
8 have -- we don't have the backup and we think some of
9 this may be double-counted in -- in accounts receivable
10 already.
11    Q   Okay. What Mr. Cudlip has noted on the
12 schedule is that Alberta needs to see the '08 and '09
13 tenant ledgers in order to verify the difference in
14 these two numbers.
15       Have you -- have you provided those to them?
16    A   I believe we were looking into that yesterday.
17 You know, the books were kept by Alberta at the time.
18 So I've always been assuming that they have those
19 ledgers themselves because they were -- they were doing
20 the books.
21    Q   Okay. Apparently they think they don't. Do
22 you have any objection to providing those ledgers if
23 they don't have them?
24    A   Provided that we have them.
25    Q   All right. Okay.

Page 84

1    A   For -- they have come up with the numbers.
2 There's some basis for -- I mean, what -- what the
3 backup behind those, that's what we need to review.
4    Q   Okay.
5    A   I'll just give you an example of one that I
6 think could be something. There's a reference to a 5K
7 run.
8    Q   Okay.
9    A   That might be an item where you wouldn't
10 necessarily accrue the income when the event took place
11 in September or October, or whatever it was, and a check
12 subsequently comes in once all of the accounting is done
13 by the organization that ran it.
14    Q   Okay.
15    A   Otherwise, I'm not sure why the item wouldn't
16 show up in the financial statement somewhere as a
17 billing, as a -- some reimbursement on accounts
18 receivable, something.
19    Q   All right. What is the next item on here? I
20 can barely read this. It looks like there is a 2008
21 delinquent rent.
22    A   Yeah, there's no numbers in here.
23    Q   Has there been delinquent rent collected post
24 sale by BlackRock that would be attributable to Alberta
25 that has been collected?

Page 85

1    A   Yes.
2    Q   Okay. And has that information been provided
3 or calculated?
4    A   Yes.
5    Q   Okay. And do you know what that number is?
6    A   I don't. It's been -- it's been ongoing
7 discussion, you know, with Peter Cudlip. I think we --
8 we agree on what the -- what the outstanding list is,
9 and we can -- we will provide their share of what has
10 actually been collected.
11    Q   Okay. So that's a matter of Granite providing
12 what it has collected and what is attributable to the
13 period of time when Alberta owned the property, and you
14 agree that whatever that share is, that is to be
15 credited to Alberta or paid to Alberta?
16    A   Once -- if it -- if and when it is received.
17    Q   And there have been collections to date that
18 are attributable to Alberta's time that they owned the
19 property?
20    A   Yes, but not a significant amount.
21    Q   And you don't know what that amount is at
22 present?
23    A   I -- I -- I don't. I think -- I think the
24 number is in the range of -- actually I shouldn't
25 speculate. Angela would have a better handle on that

22 (Pages 82 to 85)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER          1/15/2010

Page 86

1   number.
2      Q   Okay.  So that would be an Angela question?
3      A   Yes.
4      Q   And then there's a line item for "2008 CAM
5   Reconciliation."
6         Can you describe what the nature of the dispute
7   there is?
8      A   Yeah, post- --- postclosing, a reconciliation of
9   the expenses that had been billed to the tenants was
10  completed in roughly -- before the end of March,
11  probably, in 2009 to -- to true-up for actuals versus
12  what was billed to the tenant.  That, to this point, has
13  resulted in a negative of 90- -- 90- -- almost $93,000,
14  that's the line there (indicating), because we have --
15  we have not collected a number of -- of items that were
16  owed.  And we have issued credits to many tenants that
17  were entitled to credits based on an overpayment in
18  2008.
19        So Alberta's share of that would be 50 percent
20  of everything up to the closing date, and our -- and we
21  would have 100 percent of -- of it after.  That's why
22  the number isn't quite 50/50 here --
23     Q   Okay.
24     A   -- I believe.
25     Q   So the collections of common area maintenance

Page 87

1   expenses is 92,000 less than the billings?
2      A   Yes.
3      Q   And that's attributable to two things, some for
4   noncollections and some for credits?
5      A   Well, the credits that have been given versus
6   the collections that have actually been made result in a
7   net number that shows on the page.  There is still an
8   additional amount that effectively is an accounts
9   receivable.  Tenants are working through audits.  Once
10  they complete that, hopefully they will -- will pay that
11  bill.
12     Q   Okay.  While we're on that subject, let's mark
13  this exhibit.
14        (Defendants' Exhibit 67 was marked for
15        identification.)
16        (Document handed to counsel and the deponent.)
17        MR. BENNETT:  Is this 67?
18        THE REPORTER:  Yes.
19     Q   BY MR. BENNETT:  Exhibit 67 is a document that
20  Mr. Trahan provided to me within the last week.
21        Do you recognize this document?
22     A   Yes.
23     Q   Okay.  What is this?
24     A   This -- this would -- this would be the CAM --
25  a summary of the CAM reconciliation showing who's

Page 88

1   getting credits versus who is owed -- who owes money.
2      Q   Okay.  And this appears to have the same figure
3   rounded as Exhibit 66, that the amount received versus
4   credits taken is a negative 92,932.57; correct?
5      A   No.
6      Q   Different?
7      A   Actually, yes, I'm sorry.  That reflects, as of
8   1-06, the amount actually received versus the credits
9   taken, yes.  So the balances that are still left out
10  here is still what's left to be either credited or
11  collected.
12     Q   And where are those balances?  Is that under
13  the term -- under the column "Balance"?  Is that
14  $155,146?
15     A   Yes.
16     Q   And that's to either be collected or credited?
17     A   It's the net of all the numbers that are above
18  that.  Some are positive, some are credits.
19     Q   It looks like plainly the biggest number in the
20  whole group is related to the Sports Authority.
21     A   Yes.
22     Q   And what is the issue vis-a-vis the Sports
23  Authority?  Why haven't we collected $155,000 from them,
24  is apparently the issue?
25     A   It's a very large reconcile number for them.

Page 89

1   They -- being a major tenant, they have some pretty
2   significant audit rights and have exercised that.  And
3   we are -- we are proceeding with working through
4   those -- those issues.
5         We already know there are a number of the
6   items, and Peter Cudlip is aware of this, that are going
7   to get excluded.  The 155- will be reduced.  The
8   estimate of that right now, I think, is -- I think I
9   wrote it on here, is 140,000.  So it's about 15,000 of
10  that number that's already been determined that we
11  should back out of the -- of the number.
12        Hopefully -- or when we -- we get to a
13  resolution with the tenant, they will hopefully write
14  that check, at which time Alberta will be entitled to
15  their share of what's actually collected.
16     Q   Okay.  I see on Exhibit 66 you've written the
17  number of "155,244," and then "Sports Authority" and the
18  number "139,788."
19     A   Yeah.
20     Q   155,244 is the amount currently billed to
21  Sports Authority, the 139- is the amount that you
22  believe -- or it should be reduced to 139- as of the
23  present time?
24     A   That's -- yeah, that's the current status based
25  on what we've determined that we should back out, and

23 (Pages 86 to 89)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                                    1/15/2010

Page 90

1   there are still other unresolved questions.
2       Q   Okay.  And do you have an estimate of the
3   magnitude of the unresolved items that still have to be
4   addressed?
5       A   No.
6       Q   The rest of the numbers on Exhibit 67, this CAM
7   reconciliation where it shows either negatives, which
8   means I assume that's amount of money due to the tenant
9   or positives are amounts to be collected from the
10  tenant; is that right?
11      A   Yes.
12      Q   Okay.  Are those all resolved?  Are those hard
13  numbers or are there still negotiations going on with
14  those?
15      A   Some -- some are still being negotiated.  I
16  would say the credits -- you have a default on some of
17  these, but the credits that are showing up here simply
18  mean that the tenant hasn't applied that to a payment.
19  They're entitled to it, they're aware of it, they just
20  haven't done it.
21      Q   Okay.
22      A   So those clearly will be given and, in my
23  opinion, should just be taken at this point and -- to
24  reduce whatever the obligation is.  We're going to give
25  those credits.  The fact that they haven't actually been

Page 91

1   applied yet doesn't really -- in my opinion, is not that
2   relevant.
3       Q   Let's take an example so I understand.
4       A   Okay.
5       Q   Let's take C106 Talbots.
6       A   Talbots.
7       Q   You show a balance of 3,251.53 as a negative,
8   which means they're due a credit on their common area
9   expense?
10      A   Yes.
11      Q   And they have billings against which they could
12  apply that credit, they just haven't done so?
13      A   Yes.
14      Q   All right.  And when they do, is that credit
15  applicable to a time when Alberta owned the property?
16      A   Yes, it's 2008.
17      Q   Okay.  So that would reduce -- that's a number
18  that's going to reduce Granite's future common area
19  maintenance collections and, therefore, it's chargeable
20  now to Alberta; is that your position?
21      A   Yes.
22      Q   Okay.  All right.  So I understand.
23      A   I think those credits should be taken now, and
24  the balances that remain are accounts receivable.  Once
25  they're collected, they're shared.

Page 92

1       Q   And I see one here there's a Rumors Barbershop
2   for $6,900.97 -- excuse me, $6,997.10, which you
3   indicate "Default."
4       A   Tenant has vacated and is no longer in
5   existence.
6       Q   So that's probably noncollectible at this
7   point?
8       A   Correct.
9       Q   So that shows as a positive number in this
10  total balance, but it probably should be written off as
11  uncollectible?
12      A   Yes.
13      Q   All right.  And --
14      A   We have not done that yet --
15      Q   I see.
16      A   -- relative to -- we have made -- we have filed
17  claims.  To the extent we collect something out of those
18  claims, we will share it.  So at some point I'm -- I'm
19  assuming this schedule, it will -- you know, we'll, on a
20  quarterly basis or whatever we agree to, provide them a
21  statement updating what we've actually collected and
22  here's your share of it.  And at some point it will just
23  be zero.
24      Q   Okay.  Then the final item on the schedule,
25  total prepaid balance is 17,937.  Do you know what that

Page 93

1   number represents?
2       A   Yes.  Those are -- made a note here.  Those
3   actually were prepayments of rent that ultimately relate
4   to income or rent that is due in 2009.  So when a tenant
5   signs a lease, anticipates that they're going to open in
6   December or November, they don't actually open until
7   January, but they've prepaid their first month's rent,
8   that rent would be due for January and would --
9   wouldn't -- Alberta would not be entitled to any portion
10  of that since it doesn't -- it wasn't for a period of
11  time that they were an owner.
12      Q   Okay.  And so the number on this schedule is
13  17,937, which you believe are prepayments by tenants in
14  2008 for rent that will become due in 2009?
15      A   Correct.
16      MR. BENNETT:  All right.  Now, here is -- this
17  is Exhibit 68.
18      (Defendants' Exhibit 68 was marked for
19  identification.)
20      (Document handed to counsel and the deponent.)
21      Q   BY MR. BENNETT:  There should be another copy
22  of that laying around on the table someplace.  Do you
23  have it?
24      MR. TRAHAN:  (Indicating.)
25      MR. BENNETT:  You do.  Okay.

24 (Pages 90 to 93)

depo@huntergeist.com                    HUNTER + GEIST, INC.                    303.832.5966 / 800.525.8490

Granite Southlands v. Alberta Town Center                    MICHAEL KRIER                                              1/15/2010

Page 94

1    THE DEPONENT:  Are we done with 67?
2    Q    BY MR. BENNETT:  Let's hang onto it for a
3  minute.  Oh, 67, I think we're done with, yes.  I think
4  I understand all that.
5        68 is a schedule similar to the one that is 66,
6  but I believe to be more recently updated by Mr. Cudlip
7  than 66.  And one of the areas where the number is
8  different is on this tenant prepaid balances, which you
9  show on 66 as 17,937 and Mr. Cudlip shows as 9,104 on
10  Exhibit 68.
11        Do you know the different -- basis for the
12  difference in those numbers?
13        MR. TRAHAN:  What's the line item again?
14        MR. BENNETT:  It's the "Total Prepaid" --
15  "Tenant Prepaid Balance."  It's next-to-the-last item on
16  the "Unresolved Items."
17        THE DEPONENT:  No, I don't know what the
18  difference is.
19    Q    BY MR. BENNETT:  And you haven't had any
20  conversations to understand the difference between the
21  17,000 the 9,104?
22    A    No; Angela probably has.
23    Q    All right.  So I'll ask Angela about that.
24  Okay.
25    A    Okay.

Page 95

1    Q    Also Mr. Cudlip has a different number for the
2  CAM reconciliation.  He has the net difference of 62,214
3  whereas on Exhibit 66 it's 92,933.
4        And do you know the basis of that?
5    A    Yeah, that -- if you refer back to 67 again --
6    Q    I knew we weren't done.  Okay.
7    A    -- the total in the first column is -- is the
8  net of everything, assuming it was all collected and
9  credited as it was billed.
10    Q    Okay.
11    A    The second column is what we've actually
12  collected or credited.  And the third column, the 155-
13  is what's outstanding.  Peter's number just nets
14  everything out and assumes that we've collected and
15  credited everything.  And as you pointed out on the one
16  item there, that's a tenant that's defaulted, is gone,
17  is probably never going to be collected.  So they're not
18  going to get their share of anything that we don't
19  collect.
20    Q    Let's see.  That shows as a -- where is that
21  default?  Rumor's Barbershop, that's a positive number
22  in the 62,000 figure.  So if you took it out, that would
23  increase the deficit --
24    A    Yes.
25    Q    -- by 6,000-some-hundred dollars?

Page 96

1    A    Yes.  And as I've already -- as I talked about
2  before, the number on Sports Authority is already at
3  least $15,000 less than what is showing on this
4  schedule.
5    Q    Okay.  All right.  I think I understand our
6  differences anyway.  I'm not sure how we resolve them,
7  but at least I understand where we're differing.
8        Then there is the final item on Exhibit 66.
9  And that also shows up on 68.  That's this SSMC past due
10  rent.
11        That's actually not a reconciliation item,
12  that's actually the Southlands' management rent for
13  their office space in 2008?
14    A    Yes.
15    Q    Okay.  I don't think there's a dispute about
16  that, is that right, that amount of rent is due from
17  Alberta to Granite?
18    A    Yes.
19    Q    Okay.  All right.  Are there any other items
20  that you're aware of on the reconciliation of costs and
21  expenses, commonly called the true-up issues, than what
22  we've discussed so far?
23    A    No.
24    Q    We've covered everything?
25    A    I believe so.

Page 97

1    Q    Okay.  Since Forest City became your property
2  manager, BlackRock/Granite has had the access to all of
3  the files maintained by the management company; is that
4  right?
5    A    Maintained by what management company?
6    Q    By Forest City.
7    A    Yes.
8    Q    And included within the files maintained by
9  Forest City are files relating to each tenant?
10    A    Yes.
11    Q    Have you ever had an opportunity to review
12  those files?
13    A    No, not personally.
14    Q    Do you know if Ms. Kravolek (sic) has?
15    A    I believe she has.
16    Q    Kralovec.  I always put the V and the L in the
17  wrong place.
18        Kralovec, you believe she has?
19    A    I'm not sure, but I think probably on some
20  visit she's reviewed those files.
21    Q    And contained in those files generally are
22  communications between the tenant and the management
23  company relating to issues in the tenant space?
24    A    Yes.
25        MR. TRAHAN:  Objection; calls for speculation.

25 (Pages 94 to 97)

Page 98

1    Q   BY MR. BENNETT:  And do you know if included
2  within the files that have been in the possession of
3  Granite since at least April of 2009 are communications
4  with DCC Architects and their issues relating to their
5  space?
6        MR. TRAHAN:  Object; assumes facts not in
7  evidence.
8    Q   BY MR. BENNETT:  Do you know?
9    A   Yeah, I believe there is.
10   Q   Included within that tenant file are pictures
11 of or a letter including pictures of cracks in the DCC
12 Architects' space; is that right?
13   A   I believe so.
14   Q   All right.  Have you seen those letters?
15   A   Yes, only recently.
16   Q   Okay.  What was the occasion of your seeing
17 them?
18   A   A review of -- of the exhibits.
19   Q   Okay.  You did not see them any time during
20 2008, excuse me, 2009 after you took over the property?
21       MR. TRAHAN:  Can you restate the question?
22       MR. BENNETT:  Yeah, I misspoke.  I'll rephrase
23 it.
24   Q   You did not have occasion to review those --
25 the tenant file for DCC Architects or the contents

Page 99

1  thereof at any time during 2009?
2    A   No.
3    Q   Do you know if Ms. Kralovec did?
4    A   I'm not sure.
5    Q   Is Exhibit 58 in your book there?
6    A   Yes.
7    Q   Do you know if Exhibit 58 was contained within
8  the files maintained by Forest City at the property at
9  all times since April 1st, 2009 to present?
10       MR. TRAHAN:  Objection; calls for speculation.
11 He's already testified he's not reviewed the files.
12       THE DEPONENT:  I don't know.
13   Q   BY MR. BENNETT:  Okay.
14       (Ms. Kralovec enters the deposition room.)
15       MR. TRAHAN:  Stu, this is Angela.
16       MS. KRALOVEK:  Hi.
17       MR. BENNETT:  Hi, I'm Stu Bennett.
18       MS. KRALOVEK:  Angie Kralovec.
19       MR. BENNETT:  Nice to meet you.  Well, you got
20 here just in time.  I think we're about done.  You can
21 have some lunch and we'll start with you after lunch.
22       MS. KRALOVEK:  Okay.
23   Q   BY MR. BENNETT:  At the time Alberta -- excuse
24 me.  At the time of the closing, Alberta had obtained a
25 proposal from the engineering firm of Wiss, Janney,

Page 100

1  Elstner to conduct an investigation of the Cinema
2  property.
3        Were you aware of that?
4    A   What was the date?
5    Q   At the time of the closing.
6    A   I don't believe so.
7    Q   Did -- did Granite or BlackRock ever retain the
8  firm of Wiss, Janney, Elstner to do any work with
9  respect to the property?
10   A   They are currently engaged.
11   Q   They are currently engaged?
12   A   Yes.
13   Q   Do you know when they were engaged?
14   A   Somewhere around February or March of 2009.
15   Q   You previously gave me the name of another
16 engineering firm.
17   A   I think I referenced them as Marx Okubo.
18   Q   Right.
19   A   That was our property condition PCA company
20 that had been reviewing the draws, but I -- Wiss, Janney
21 was the consultant that we engaged.
22   Q   All right.  So Wiss, Janney is the correct name
23 of the engineering firm you hired in or about February
24 of 2009?
25   A   Yes.

Page 101

1    Q   Okay.  And were they retained pursuant to the
2  proposal they had previously given Alberta or did you
3  negotiate a new one?
4    A   We negotiated a new agreement.
5    Q   Did you change the scope of their work from the
6  proposal?
7        MR. TRAHAN:  Wiss, Janney -- I'm going to
8  designate this area of testimony as confidential.  Wiss,
9  Janney is the consulting expert that Granite has
10 retained in connection with addressing the issues at the
11 property now, so we're going to designate the identity
12 of Wiss, Janney as confidential.
13       I'm instructing the witness not to testify
14 regarding the work that Wiss, Janney has done in
15 connection with the property or the results of its
16 investigation.
17   Q   BY MR. BENNETT:  So you're declining to answer
18 any questions about the work Wiss, Janney has done or
19 any evaluations they've made or any reports they've
20 given you?
21   A   Yes, at the -- based on my counsel's --
22       MR. TRAHAN:  And just to be clear, the
23 objection's based on relevance, first of all, and then
24 also I object on the basis that the information is
25 privileged.

26 (Pages 98 to 101)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                              1/15/2010

Page 102

1      MR. BENNETT:  All right.  Okay.  Well, with
2  that, I think I have concluded this deposition for now.
3      If your proposed amended complaint were to be
4  granted, we would reserve the right to take further
5  discovery based upon the issues raised in the proposed
6  Second Amended Complaint.  So I'm not concluding this
7  deposition if in the event something more is allowed to
8  go forward in this case.
9      THE DEPONENT:  Okay.
10     MR. TRAHAN:  Okay.  Don't say "okay."  That was
11 not a question.  That's --
12     MR. BENNETT:  That was a statement.
13     THE DEPONENT:  It's on the record now.
14     MR. TRAHAN:  He wasn't asking for your
15 agreement and I didn't take your "okay" to mean that you
16 agree to that; correct?
17     THE DEPONENT:  Yes.
18     MR. BENNETT:  I'm making a statement of my
19 reservations of rights.  I'm not waiving the right to
20 take any further depositions in the event your presently
21 proposed Second Amended Complaint should be granted.
22     MR. TRAHAN:  Off the record.
23     Well, before we go off, I'd like to take a
24 break, see if we need to answer any questions, and then
25 we may go back on the record.  If not, then there's no

Page 103

1  need to go back on, just to state that we've concluded,
2  but we're going to go off for that purpose.
3      (Discussion held off the record.)
4      (Recess taken from 11:04 a.m. to 11:32 a.m.)
5      MR. TRAHAN:  I've got a few questions.
6
7                EXAMINATION
8  BY MR. TRAHAN:
9    Q   Mr. Krier, my name is Paul Trahan, and I
10 represent Granite in connection with this lawsuit;
11 correct?
12   A   Yes.
13   Q   Mr. Bennett asked you some questions about the
14 specific estoppel certificate earlier; correct?
15   A   Yes.
16   Q   Just to be clear, you're not here as a
17 corporate representative of Granite or BlackRock, are
18 you?
19   A   No.
20   Q   You're just here in your individual capacity?
21   A   Yes.
22   Q   And I understood your answers to the previous
23 questions about the specific estoppel certificate to be
24 based solely on your review of those individual estoppel
25 certificates here today; is that correct?

Page 104

1    A   Yes.
2    Q   Mr. Bennett also asked you about the purchase
3  price of the Southlands Town Center.  Were you directly
4  involved in negotiating the purchase price?
5    A   No.
6    Q   Are you generally familiar with the fact that a
7  release was signed in connection with the closing on the
8  sale of that property?
9    A   Yes.
10   Q   Are there individuals within BlackRock who are
11 more familiar with and better qualified to testify about
12 any separate consideration that was provided in
13 connection with that release?
14   A   Yes.
15   Q   Mr. Bennett also asked you about the
16 quarterly -- or Granite's quarterly evaluation of the
17 Southlands Town Center.
18       Do you remember that testimony?
19   A   Yes.
20   Q   And he asked you about the impact that the
21 defects at the property have had on those quarterly
22 evaluations.
23       Do you remember that testimony?
24   A   Yes.
25   Q   And I understood your testimony to be that the

Page 105

1  defects have not affected the quarterly evaluations; is
2  that correct?
3    A   Yes.
4    Q   And why is that?
5    A   They're not currently contemplated within the
6  value or market value that's being -- market value of
7  the property.
8    Q   So the quarterly evaluations have not taken
9  these defects into account?
10   A   No.
11   Q   Am I correct, they have not taken -- the
12 valuations have not taken these defects into account?
13   A   Right.
14   Q   You're not suggesting that these defects have
15 not -- you're not suggesting that the defects have not
16 had any negative impact on the value of the property,
17 are you?
18   A   No.
19     MR. TRAHAN:  Pass the witness.
20
21           FURTHER EXAMINATION
22 BY MR. BENNETT:
23   Q   Do you know what individuals at BlackRock have
24 more knowledge about the negotiation of the
25 15th amendment to the Forward Purchase and Sale

27 (Pages 102 to 105)

Granite Southlands v. Alberta Town Center          MICHAEL KRIER                          1/15/2010

Page 106

1  Agreement other than yourself?
2      A   Yes.
3      Q   Who are those?
4      A   Priscilla, Andrew Piekarski.
5      Q   Anyone else?
6      A   No.
7      Q   I assume counsel was also involved?
8      A   Yes.
9      Q   Do you know who principally at Fulbright was
10  involved in the negotiations?
11     A   Jane Smith.
12     Q   Okay.
13     A   Finally gave you an easy name.
14     Q   How about that?  The only easy name we've had
15  all day.
16         All right.  I have no further questions at this
17  time subject to the same reservation I made earlier
18  regarding the scope of this deposition in the event the
19  Second Amended Complaint should be permitted.
20         MR. TRAHAN:  We'll reserve our questions for
21  trial.
22         Thank you, Mr. Krier.
23         THE REPORTER:  Do you need a copy?
24         MR. TRAHAN:  Yes.
25         (Discussion held off the record.)

Page 107

1          MR. TRAHAN:  If you could please send me a copy
2  of the transcript, and I will forward it to Mr. Krier to
3  make sure he has an opportunity to review it and make
4  any changes or corrections.
5          (The deposition concluded at 11:37 a.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 108

1          I, MICHAEL KRIER, do hereby certify that
2  I have read the above and foregoing deposition and
3  that the same is a true and accurate transcription of
4  my testimony, except for attached amendments, if any.
5          Amendments attached  ( ) Yes  ( ) No
6
7
8
9      _____
       MICHAEL KRIER
10
11
12
13         The signature above of MICHAEL KRIER was
14  subscribed and sworn to before me in the county of
15  _____, state of _____,
16  this _____ day of _____, 2010.
17
18
19
20      _____
        Notary Public
21      My Commission expires:
22
23
24
25  Granite Southlands Town Center, LLC 01/15/10 (tll)

Page 109

1          DEPOSITION OFFICER'S CERTIFICATE
2
3  STATE OF CALIFORNIA              )
                                    )  ss.
4  COUNTY OF ORANGE                 )
5
6
7          I, TAMI L. LE, hereby certify:
8          I am a duly qualified Certified Shorthand
9  Reporter in the State of California, holder of
10  Certificate Number CSR 8716 issued by the Court
11  Reporters Board of California and which is in full force
12  and effect.  (Fed. R. Civ. P. 28(a)).
13          I am authorized to administer oaths or
14  affirmations pursuant to California Code of Civil
15  Procedure, Section 2093(b), and prior to being examined,
16  the deponent was first duly sworn by me.  (Fed. R. Civ.
17  P. 28(a), 30(f)(1).
18          I am not a relative or employee or attorney
19  counsel of any of the parties, nor am I a relative or
20  employee of such attorney or counsel, nor am I
21  financially interested in this action.  (Fed. R. Civ.
22  28).
23          I am the deposition officer that stenographically
24  recorded the testimony in the foregoing deposition and
25  the foregoing transcript is a true record of the

28 (Pages 106 to 109)

Granite Southlands v. Alberta Town Center                MICHAEL KRIER                                          1/15/2010

Page 110

1  testimony given by the witness.  (Fed. R. Civ. P.
2  30(f)(1)).
3      Before completion of the deposition, a review of
4  the transcript  [x] was  [ ] was not requested.  If
5  requested, any changes made by the deponent (and
6  provided to the reporter) during the period allowed, are
7  appended hereto.  (Fed. R. Civ. P. 30(e)).
8
9  Dated:  January 21, 2010.
10
11
12  _____
             TAMI L. LE
13        Certified Shorthand Reporter No. 8716, RPR
14
15
16
17
18
19
20
21
22
23
24
25

January 27, 2010

Paul Trahan, Esq.
Fulbright & Jaworski L.L.P.
600 Congress Avenue
Suite 2400
Austin, Texas 78701

Re:  Granite Southlands Town Center, LLC, v. Alberta
      Town Center, LLC., et al.
Depositions of: Michael Krier & Angela Kralovec

Dear Mr. Trahan:

Enclosed are the original signature pages(s) of the
above-named deposition(s).  It was agreed that you would
arrange for signature of same by means of your copy
transcript(s) and the enclosed signature page(s).
Also enclosed are amendment sheets for changes if necessary.
Please return the signed and notarized signature page(s)
and amendment sheet(s), if any, to our office within
30 days from the date of this letter to comply with the
statute.
We will mail the original pages to the appropriate attorney
to be placed with the original sealed transcript and copies
to all other counsel.
If circumstances change and a copy transcript is not
available from your office for the witness to review, then
please notify the witness that he/she should contact our
office to make an appointment to read, sign, and make
corrections to a copy that we will make available at our office.
Thank you for your attention to this matter.
Sincerely,

Shaun Kandalec
HUNTER + GEIST, INC.
Registered Professional Reporters

c:  Stuart N. Bennett, Esq.

---

1  STATE OF CALIFORNIA            )
                                  )   ss.
2  COUNTY OF ORANGE               )
3
4
5
6      I, TAMI L. LE, Certified Shorthand Reporter,
7  Certificate No. 8716, RPR, hereby:
8      The foregoing deposition is a true and correct
9  copy of the original transcript of the proceeding taken
10  by me as thereon stated.
11
12  Dated:  January 21, 2010.
13
14  _____
             TAMI L. LE
15        Certified Shorthand Reporter No. 8716, RPR
16
17
18
19
20
21
22
23
24
25

29 (Pages 110 to 112)