# EXHIBIT I

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                    1/15/2010

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLORADO

 3

     Civil Action No. 09-CV-00799-SLW-KLM

 4

     GRANITE SOUTHLANDS TOWN CENTER      )

 5   LLC,                               )

                                        )

 6              Plaintiff,              )

                                        )

 7   vs.                                ) 09-CV-00799-SLW-KLM

                                        )

 8   ALBERTA TOWN CENTER, LLC and LAND  )

     TITLE GUARANTEE COMPANY,           )

 9                                      )

                Defendants.             )

10   _____)

11

12

13

14

15

16              Deposition of ANGELA KRALOVEC,

17         taken on behalf of the Defendants, at

18         1900 Main Street, 5th Floor, Irvine,

19         California, commencing at 12:40 p.m.,

20         on Friday, January 15, 2010, before

21         Tami L. Le, CSR No. 8716, RPR.

22

23

24

25
```

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC          1/15/2010

---

Page 2

1  APPEARANCES OF COUNSEL:
2
3  For the Plaintiff:
4      FULBRIGHT & JAWORSKI, L.L.P.
       BY:  PAUL TRAHAN, ESQ.
5      600 Congress Avenue
       Suite 2400
6      Austin, Texas  78701-2978
       (512) 536-5288
7      ptrahan@fulbright.com
8
   For Defendants:
9
       LINDQUIST & VENNUM PLLP
10     BY:  STUART N. BENNETT, ESQ.
       600 17th Street
11     Suite 1800 South
       Denver, Colorado  80202
12     (303) 573-5900
       sbennett@lindquist.com
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1          I N D E X  (Continued)
2  DEFENDANTS' EXHIBITS FOR IDENTIFICATION:        Page
   (Continued)
3
   79 - E-mail string among Angela Kralovec,       93
4      Peter Cudlip, Elizabeth Hyatt and Steve
       Zezulak, the latest of which is dated
5      June 17, 2009, 2 pages
6  80 - E-mail string among Peter Cudlip, Angela   95
       Kralovec and Michael Krier, the latest
7      of which is dated August 31, 2009,
       2 pages
8
   81 - April 29, 2009 letter from Elizabeth A.    95
9      Starrs to BlackRock Realty Advisors,
       Inc., with attachments, 13 pages
10
   82 - March 5, 2009 letter from Erica H. Weber   142
11     to Granite Southlands Town Center LLC,
       2 pages
12
13
14  WITNESS INSTRUCTED NOT TO ANSWER
15     Page    Line
16     107     2
17     120    14
18     138    21
19
   EXHIBIT DISPOSITION:
20
   Original Exhibits: Ongoing notebooks
21
22
23
24
25

---

Page 3

1             I N D E X
2  Deponent        Examined By        Page
3  Angela Kralovec    Mr. Bennett     6,151
4                     Mr. Trahan      145
5
6  DEFENDANTS' EXHIBITS FOR IDENTIFICATION:
7  69 - Affidavit of Angela Kralovec dated the      8
       22nd day of December, 2009, 5 pages
8
   70 - March 24, 2009 e-mail string between        60
9      Steve Zezulak and Angela Kralovec, with
       attachment, 4 pages
10
   71 - E-mail string between Steve Zezulak and     62
11     Angela Kralovec, the latest of which is
       dated March 27, 2009, 2 pages
12
   72 - E-mail string between Steve Zezulak and     63
13     Angela Kralovec, the latest of which is
       dated March 27, 2009, 3 pages
14
   73 - April 16, 2009 e-mail from Steve Zezulak    65
15     to Angela Kralovec, with attachment,
       33 pages
16
   74 - April 15, 2009 e-mail from Steve Zezulak    66
17     to Angela Kralovec, with attachment,
       3 pages
18
   75 - June 1, 2009 e-mail string between          67
19     Michael Krier and Peter Cudlip, 3 pages
20 76 - E-mail string between Angela Kralovec       70
       and Peter Cudlip, the latest of which is
21     dated October 7, 2009, 3 pages
22 77 - E-mail string among Angela Kralovec,        72
       Peter Cudlip, Robin Boileau and Steve
23     Zezulak, 2 pages
24 78 - Document entitled "Post Purchase A/P,"      91
       2 pages
25

---

Page 5

1      IRVINE, CALIFORNIA; FRIDAY, JANUARY 15, 2010
2         12:40 P.M.
3
4            ANGELA KRALOVEC,
5      having been first duly sworn, was
6      examined and testified as follows:
7
8            EXAMINATION
9  BY MR. BENNETT:
10     Q   Would you please state your name for the
11 record.
12     A   Angela Kralovec.
13     Q   By whom are you employed, Ms. Kralovec?
14     A   BlackRock.
15     Q   Do you know what entity of BlackRock?
16     A   BlackRock Realty.
17     Q   Realty Advisors?
18     A   BlackRock Realty Advisors, yes.
19     Q   What are your job responsibilities with
20 BlackRock Realty Advisors?
21     A   I am an asset manager of multiple commercial
22 real estate assets on behalf of multiple clients.
23     Q   And as you use the term "clients," who do you
24 refer to?
25     A   Funds.  There are a variety of funds that

---

depo@huntergeist.com          HUNTER + GEIST, INC.          303.832.5966 / 800.525.8490

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                                    1/15/2010

---

Page 6

1  are -- I refer to as clients.
2     Q   So the investments funds that are advised and
3  managed by BlackRock are the people you refer to as
4  clients?
5     A   There are clients within those funds, so yes.
6     Q   Do you refer to the investors in those funds as
7  your clients or only the funds themselves?
8     A   I would say both.
9     Q   Okay.
10    A   I mean...
11    Q   All right.  Do you have any reporting
12 responsibilities to the investors in the funds that
13 BlackRock manages?
14    A   I report through the portfolio management.  I
15 report to portfolio management, who reports to the
16 fund -- the clients.
17    Q   Okay.  Do you know if the information you
18 provide to portfolio management is put together or
19 accumulated and then into reports that are given to
20 investors?
21    A   I don't know every time if it's given to
22 investors, if that's what you're asking.
23    Q   But on occasion the information you provide to
24 portfolio management is incorporated into some sort of
25 report --

---

Page 7

1     A   Yes.
2     Q   -- to your fund investors?
3     A   That's correct.
4     Q   Do you know if any information you have
5  prepared relating to the Southlands shopping center has
6  been accumulated in a report to investors of your funds?
7     A   I'm not aware.
8         (Defendants' Exhibit 69 was marked for
9     identification.)
10        (Document handed to counsel and the deponent.)
11    Q   BY MR. BENNETT:  Have you ever given sworn
12 testimony in a deposition before?
13    A   No.
14    Q   Have you met with counsel for BlackRock and
15 discussed the procedures we're going to follow today?
16    A   Yes.
17    Q   So you understand that you are under oath?
18    A   Yes.
19    Q   And that you understand the meaning of an oath?
20    A   Yes.
21    Q   And you understand that this deposition has the
22 same solemnity as if given at trial?
23    A   Yes.
24    Q   And it also bears the same potential sanctions
25 or penalties if you should be found to have

---

Page 8

1  intentionally lied or misled us in this deposition.
2     A   I understand.
3     Q   You also understand that we need oral responses
4  to my questions, and that if at any time you do not
5  understand a question, I'll be happy to rephrase it.
6     Agreed?
7     A   I agree.
8     Q   Okay.  Wonderful.
9         I have handed to you what the court reporter
10 has marked as Exhibit 69.  This is an affidavit of
11 Angela Kralovec filed in the United States District
12 Court for the District of Colorado on or about
13 December 23, 2009.
14        Do you recognize it?
15    A   Yes.
16    Q   Did you prepare it?
17    A   No.
18    Q   Who prepared your affidavit?
19    A   Fulbright, on my behalf.
20    Q   Did you review your affidavit before you signed
21 it?
22    A   Yes.
23    Q   Is it true and accurate, to the best of your
24 ability?
25    A   Yes.

---

Page 9

1     Q   Do you keep track of the number of properties
2  that you are responsible for overseeing?
3     A   Yes.
4     Q   And how -- and how do you describe them?  By
5  property, by number of units?  How do you refer to them?
6     A   Multiple ways, depending on what the purpose
7  is.
8     Q   Okay.  Let's take -- for example, you say you
9  met -- you manage multihousing retail and office real
10 estate investments in California.
11    A   Yes.
12    Q   How would you describe the unit -- the
13 properties that you are responsible for managing in
14 California?
15    A   I would say that I have -- let me count -- six
16 stabilized multi-family properties that are my direct
17 responsibility in California.
18    Q   Okay.  So that would be six multi-family
19 residential properties?
20    A   That's correct.
21    Q   And when you -- when you use the word
22 "stabilized," what does that mean?
23    A   It means they are fully leased.  They have been
24 leased for a stabilized period of time.  They are not in
25 lease-up.

---

Granite Southlands v. Alberta Town Center        ANGELA KRALOVEC                          1/15/2010

Page 10

1    Q   So they have been built and fully leased for
2  some period of time?
3    A   Yes.
4    Q   Do you have some multi-family residential
5  properties in the state of California that are in the
6  lease-up phase?
7    A   No.
8    Q   Do you have any other retailer office
9  investments in California that you supervise or are
10 responsible for?
11   A   I have one office property; and retail, I have
12 within the multi-family properties; no independent
13 retail centers.
14   Q   Okay.  What is the nature of the retail
15 properties that are located within the multi-family
16 properties?
17   A   Typically they are street-level retail with
18 apartment units above and behind.
19   Q   Do you have a -- a number in mind of what the
20 square footage of the retail is within these
21 multi-family properties or is that a number you keep
22 track of?
23   A   I -- approximately 20,000.
24   Q   Okay.  In all -- in all six?
25   A   No.  That would be in two assets in particular.

Page 11

1    Q   Okay.  So 10,000 each or thereabouts?
2    A   One 15,000 and the remainder the other.
3    Q   And about 5,000 in the other.
4        So out of the six residential properties, you
5  have two that have retail within it?
6    A   Let me correct.  The 15,000 is actually in a
7  property that's under development, so we are in the
8  process of leasing it up.
9    Q   Okay.
10   A   And that is not included in those other
11 stabilized multi-family properties I referred to
12 earlier.
13   Q   So you have one project that is in lease-up in
14 the state of California?
15   A   It's not in lease-up.  It's under development.
16   Q   Under development.  Hasn't started lease-up
17 yet?
18   A   Yes.
19   Q   Gotcha.
20       The one office property you have in the state,
21 how many square feet is that approximately?
22   A   It's the 430,000 square feet referred to in the
23 back.
24   Q   430,000.  And where is that on the back that
25 you're referring to?

Page 12

1    A   In my resum, that was attached.
2    Q   Oh, okay.  The first line under "Asset Manager"
3  where it refers to 430,000 square feet?
4    A   Uh-huh.
5    Q   Okay.  And the 430,000 square feet is one
6  property located in the state of California?
7    A   Yes.
8    Q   And the 2500 multi-family units, is that all
9  within the six properties that you described earlier?
10   A   Yeah.
11   Q   How many units are in the six that you
12 described?
13   A   Can I use paper and pencil?
14   Q   Sure.  I'll give you a piece of paper.
15   A   Okay.
16       (Document handed to the deponent.)
17   Q   BY MR. BENNETT:  Do you need a pen too?
18   A   Yeah.  I'll grab one from my purse.
19       I think I made a mistake.  There were seven
20 stabilized multi-family properties.
21   Q   Okay.
22   A   Now I need to total.
23       2,008.
24   Q   So 2,008 units in the seven stabilized
25 multi-family residential properties in the state of

Page 13

1  California?
2    A   That's correct.
3    Q   And so the balance of the 2500 units that you
4  referred to in the resum, are located where?
5    A   The ones that are primary to me are in
6  Minnesota.
7    Q   And that would be approximately 420 units?
8    A   That's right.
9    Q   And how many properties in Minnesota?
10   A   Two.
11   Q   Any retail in the lo- -- located in the
12 Minnesota properties?
13   A   Yes, in one of them.
14   Q   And approximately how many square feet in that?
15   A   3500.
16   Q   Is that one retail property?
17   A   It's two units.
18   Q   Two units.
19   A   If that's what you're asking.
20   Q   All right.  Now, you also say in your resum,
21 that you are responsible for 760,000 square feet of
22 retail space?
23   A   Correct.
24   Q   Where are -- where is that retail space
25 located?

Page 14

1    A   In Colorado.
2    Q   And what properties is that comprised of?
3    A   Southlands Town Center and Southlands Power
4  Center.
5    Q   Okay.  And would you describe the retail space
6  in Colorado as stabilized and fully leased?
7    A   The Power Center I would describe as
8  stabilized, not fully leased, but stabilized.  The Town
9  Center, I would not describe as stabilized or fully
10  leased.
11   Q   And what is the distinction between the two?
12   A   Fully leased means that it's at its assumed
13  average occupancy that you would expect for that
14  industry standard.  The issue with the Town Center and
15  the Power Center is that neither are at their full
16  capacity or even close.
17   Q   Okay.  And what is the difference between your
18  characterizing the Power Center as stabilized and the
19  Town Center as not being stabilized?
20   A   The Power Center actually reached a fully
21  leased point or at least what we would typically
22  consider stabilized and fully leased.  It only had, at
23  any point -- at one point 3,000 square feet that was not
24  leased.  The Town Center never got to that point.
25  Although there have been tenants who have left the Power

Page 15

1  Center, and thus I would say it's not fully leased
2  anymore, it had stabilized at one point.
3    Q   Have you ever been involved in the negotiation
4  of a Forward Purchase and Sale Agreement for the
5  acquisition of retail --
6    A   No.
7    Q   -- space?
8        One of the helpful things in a deposition is if
9  you'll let me finish my questions before you start your
10  answer.
11       Okay?
12   A   Got it.
13   Q   All right.  And I'll try not to interrupt your
14  questions, and then we'll have a nice clean record,
15  maybe.
16       Okay?
17   A   Okay.
18   Q   So you had nothing to do with the Forward
19  Purchase and Sale Agreement that was negotiated in or
20  about 2005 with respect to the Southlands Town Center;
21  is that right?
22   A   Right.
23   Q   And you had nothing to do with the Forward
24  Purchase and Sale Agreement relating to the Power Center
25  as far as negotiating?

Page 16

1    A   No.
2    Q   Did you participate in the negotiations with
3  respect to any of the amendments to the Forward Purchase
4  and Sale Agreement relating to the Town Center?
5    A   No.
6    Q   That would include the 15th amendment pursuant
7  to which the purchase was closed?
8    A   I was not involved in the negotiation.
9    Q   Do you have any knowledge of what the parties
10  intended with respect to any of the terms used in the --
11  in the Forward Purchase and Sale Agreement and any of
12  its amendments?
13   A   Yes.
14   Q   Okay.  And what terms do you believe you have
15  some knowledge about that were used by the parties in
16  the Forward Purchase and Sale Agreement?
17   A   I believe I understand the terms under -- the
18  purchase price and the -- I mean, the -- date's
19  stated in the document.
20   Q   Okay.
21   A   If you gave me the Forward Purchase and Sale
22  Agreement or the amendments, I probably could tell you
23  more.
24   Q   All right.  Well, in your affidavit, for
25  example, you indicate that:

Page 17

1        "The Cinema Estoppel has been
2        materially and adversely modified from
3        the form it is attached to the exhibit
4        to the Forward Purchase and Sale
5        Agreement," in Paragraph 5.
6        Do you see that?
7    A   Yes.
8    Q   What knowledge do you have about what the
9  parties intended by the use of the terms "material and
10  adversely modified" as used in the Forward Purchase and
11  Sale Agreement?
12   A   I know as an industry standard and as what I
13  have read within those agreements.
14   Q   So you have no knowledge of how those terms
15  were used by the parties at the time they were
16  negotiated?
17   A   I was not part of the negotiation.
18   Q   All right.  And what knowledge do you have
19  about how the terms "materially and adversely modified"
20  are used in the industry?
21   A   I have reviewed estoppels in multiple occasions
22  throughout my career.
23   Q   In what context?
24   A   When I worked for Merrill Lynch, I was privy to
25  the closing documents related to a variety of different

5 (Pages 14 to 17)

Granite Southlands v. Alberta Town Center     ANGELA KRALOVEC     1/15/2010

Page 18

1 purchases and saw estoppels associated with them.
2    Q   And what was your role at Merrill Lynch in
3 connection with purchase or sales of multi-family
4 condos, hotels, et cetera?
5    A   I was the one to provide a final check that --
6 of -- the creditworthiness of the deal; that it had met
7 the obligations that we were setting forth; and that the
8 deal terms were acceptable to the bank.
9    Q   And "the bank" being Merrill Lynch?
10    A   Yes.
11    Q   Were these properties, then, that Merrill Lynch
12 was acting as the purchaser?
13    A   The loan -- the lender.
14    Q   The lender. So the context in which you have
15 reviewed estoppel certificate was for the purpose of
16 meeting loan requirements as described by Merrill Lynch?
17    A   That is correct. I also reviewed estoppels in
18 negotiation of the distribution of a retail asset in
19 Colorado in April 2009.
20    Q   What property was that?
21    A   Broomfield Marketplace.
22    Q   And was BlackRock a seller of that property?
23    A   That is correct.
24    Q   And so in that connection, it was BlackRock
25 that was securing tenant estoppels for the purchaser?

Page 19

1    A   Yes.
2    Q   All right. What is your understanding of the
3 term "material" as used in the 15th amendment -- or
4 "materially" as used in the 15th amendment to the
5 Forward Purchase and Sale Agreement in this case?
6    A   It is something that would substantially change
7 the agreement.
8    Q   The overall agreement?
9    A   The element that is material.
10    Q   Okay. So in order to be material, in your
11 understanding of that term, it would have to be
12 something that was material to the overall agreement to
13 purchase the shopping center?
14    A   It would have to be material within that
15 estoppel in this case.
16    Q   Okay. So what is the term "material," as you
17 understand it, used to be judged against? The terms of
18 the lease, the --
19    A   No.
20    Q   -- the economic terms of the lease?
21    A   In this case --
22      MR. TRAHAN: Object; compound question.
23    Q   BY MR. BENNETT: Okay. Let me break it up.
24      To what transaction or document does the use of
25 the word "material" relate to in connection with an

Page 20

1 estoppel from a tenant?
2    A   In this case there was a standard form attached
3 to the Forward Purchase and Sale Agreement that this
4 estoppel materially deviated from.
5    Q   So now -- so any deviation from the standard
6 form is a difference; right?
7    A   True.
8    Q   Okay. So how does one determine, in your view,
9 what is a material deviation and what is an immaterial
10 deviation, if there is such a thing?
11    A   One that substantially alters the terms that
12 it's referring to.
13    Q   All right. So the terms of the relevant lease?
14    A   Yes.
15    Q   Okay.
16    A   And the -- and whatever else it's referring to,
17 if it doesn't refer to the lease, there might be other
18 items.
19    Q   Well, the tenant estoppel relates to a
20 particular tenant and a particular lease; right?
21    A   Yes.
22    Q   Okay. And so in order for a deviation from the
23 standard form to have any relevance, it has to relate to
24 the terms of the tenant's tenancy, does it not?
25    A   Yes.

Page 21

1      MR. TRAHAN: Object to the form of the
2 question, calls for a legal conclusion.
3    Q   BY MR. BENNETT: Okay. Well, I'm not asking
4 for legal conclusions, I'm asking for your understanding
5 of the use of the word "materially" as used in the
6 Forward Purchase and Sale Agreement, Amendment 15. Do
7 you understand? I'm not asking for a legal
8 interpretation, I'm asking for what your understanding
9 is from your usage in the business.
10      Okay?
11    A   Okay.
12    Q   And that's how you've been answering to this
13 point; right?
14    A   To this point, yes.
15    Q   All right.
16    A   Repeat the question you just asked, if you want
17 to re-ask it.
18    Q   I think we've understood each other. I just
19 want to make sure that your counsel's objection isn't
20 one that you've been answering on a legal basis as
21 opposed to a factual or industry standard basis, as you
22 understand the term.
23    A   Correct.
24    Q   All right. So you would agree with me that not
25 all changes to the form of tenant estoppel would be

Granite Southlands v. Alberta Town Center     ANGELA KRALOVEC     1/15/2010

Page 22

1  material if it related to trivial or minor issues on the
2  lease?
3      A   Yeah, I don't know -- it depends what you call
4  "trivial and minor," though.
5      Q   You've also defined it as the terms of
6  "substantially changing the deal," I think is the word
7  you used.
8      A   "Substantially changing."
9      Q   The agreement?
10     A   The agreement.
11     Q   All right.  So if the difference between the
12  estoppel form and the form attached to the
13  15th amendment is something that does not substantially
14  change the agreement, i.e., the underlying lease, it
15  would not, in your definition, be material?
16     A   Not necessarily, because if there were an issue
17  revealed in the estoppel that is -- for instance, a
18  landlord default that would also be considered material
19  and may not be directly in the lease, they may not --
20  the lease may not speak to every single instance of
21  which there could be a material issue.
22     Q   All right.  Well, under the terms of the
23  Forward Purchase and Sale Agreement, a landlord default
24  is a separate category of -- or separate basis to object
25  to the -- to a tenant estoppel; correct?

Page 23

1      A   I'd have to review the Forward Purchase and
2  Sale Agreement.
3      Q   Do you recall that there were three bases on
4  which BlackRock could object to a tenant estoppel?
5      A   I recall, yes.
6      Q   All right.  One was a material and adversely
7  modification -- adverse modification from the form
8  attached to the Forward Purchase and Sale Agreement?
9          MR. TRAHAN:  Object to the form of the
10  question.  The witness has testified that she'd need to
11  refer to the agreement before answering questions about
12  it.
13     Q   BY MR. BENNETT:  Well, she said -- forget it.
14         Do you recall that one of the grounds was a
15  material and adverse modification from the appropriate
16  form?
17     A   Yes.
18     Q   Another was an indication of a landlord
19  default?
20     A   Once again, I need to review it, but, yes, that
21  sounds familiar.
22     Q   All right.  And do you recall what the third
23  ground was?
24     A   Not off the top of my head.
25     Q   All right.  Now, let's talk about the use of

Page 24

1  the word "adverse."  What constitutes an adverse
2  modification in your estimation?
3      A   Something that would negatively impact.
4      Q   Negatively impact whom?
5      A   The agreement, the current terms.
6      Q   Of which agreement?
7      A   The lease and the landlord/tenant relationship.
8      Q   Okay.
9      A   And the -- the -- I guess could be the center
10  as a whole, the --
11     Q   Are you suggesting that adverse is adverse to
12  the shopping center as a whole?  Is that what you're
13  suggesting?
14     A   It could be.  I don't -- if it materially
15  deviates and is negatively impacting, yes.
16     Q   Negatively impacting what?
17         MR. TRAHAN:  Object to this line of questions
18  in that they require her to speculate, and no specific
19  defects or estoppel is being -- is the subject of the
20  questions.  You're just asking, I understand, in a
21  hypothetical what might "adverse" mean and what
22  potential circumstances.  And there's a host of
23  circumstances that would require her to speculate.
24         MR. BENNETT:  That's not a basis for objection.
25         MR. TRAHAN:  Object as vague, it calls for

Page 25

1  speculation.
2      Q   BY MR. BENNETT:  All right.  Now, so in your
3  estimation, "adversely modified" means adverse or has a
4  negative impact to the agreement; is that right?
5      A   Well, it says --
6          MR. TRAHAN:  Object; asked and answered.
7      Q   BY MR. BENNETT:  I want to get back to where we
8  were before we had these series of objections.
9          You testified that an adverse modification is
10  one that negatively impacts the agreement.  Did I
11  understand that right?
12     A   It says "to the prescribed form."
13     Q   Okay.  So a negative impact from the prescribed
14  form?
15     A   Yes.
16     Q   Negative to whom?
17     A   To the potential buyer.
18     Q   Okay.  The potential buyer as landlord; right?
19     A   Yes.
20     Q   All right.  In the course of the estoppel
21  certificates that you testified that you had reviewed or
22  were familiar with in your work at Merrill Lynch, have
23  you ever seen a tenant estoppel that contained a
24  recitation of a cracked foundation, such as the Cinema
25  estoppel certificate?

7 (Pages 22 to 25)

Granite Southlands v. Alberta Town Center                ANGELA KRALOVEC                                  1/15/2010

Page 26

1    A   No.
2    Q   Never ran across that before?
3    A   No.  It would not have passed loan committee.
4    Q   All right.  That's not my question.
5        You never saw a -- you never saw a --
6    A   No.
7    Q   -- an estoppel certificate that had a similar
8    kind of disclosure?
9    A   No.  Sorry.
10   Q   All right.  So your view that it would not have
11   passed Merrill Lynch's loan committee is totally
12   hypothetical?
13   A   Correct.
14   Q   And when you say that this type of disclosure
15   would not -- would be considered material and adverse to
16   those in the real estate industry, quoting from
17   Exhibit 69, have you ever seen a circumstance where
18   others in the industry have concluded such a disclosure
19   to be material or adverse?
20   A   Not in specific.
21   Q   All right.  Have any of the properties that you
22   have ever reviewed in your work at Merrill Lynch or at
23   BlackRock contained foundations that were, quote,
24   cracked?
25   A   Can you repeat the question?

Page 27

1    Q   Sure.  In any of your prior experience, whether
2    at Merrill Lynch or BlackRock, have you ever ran across
3    a property that was described as having a cracked
4    foundation?
5    A   Described where?  When you say "described,"
6    described where?
7    Q   In any context, have you ever had a situation
8    where any of your properties have had a cracked
9    foundation?
10   A   No.
11   Q   So the disclosure in the Cinema estoppel of a
12   cracked foundation is your first instance of ever having
13   to deal with such a disclosure?
14   A   Correct.
15   Q   Now, was it part of your job in connection with
16   BlackRock's acquisition of the Southlands center to
17   review the Cinema -- to review the estoppel
18   certificates?
19   A   No.
20   Q   Did you in fact review them?
21   A   Yes.
22   Q   Did you offer any opinions to anyone about
23   whether they should or should not be objected to?
24   A   No.
25   Q   Did you communicate your opinions to anybody?

Page 28

1    A   No.
2    Q   Do you --
3        MR. TRAHAN:  I assume you're asking prior to
4    the time the objections were made.
5        MR. BENNETT:  Yes.
6        THE DEPONENT:  I didn't review prior to the
7    time the objections were made.
8    Q   BY MR. BENNETT:  Let's clear that up.
9        So prior to the time the objections to the
10   estoppel certificates provided by Alberta to Granite,
11   you did not review them?
12   A   Say the question again.  I'm sorry.
13   Q   Prior to the time that BlackRock objected to
14   the estoppel certificates provided by Alberta, you had
15   not reviewed them?
16   A   Not all of them.
17   Q   Had you reviewed any of them?
18   A   I had been forwarded a couple.
19   Q   Okay.  Do you know which ones?
20   A   Cinema was the one that sticks out.  I don't
21   remember otherwise.
22   Q   Why was the -- do you know why the Cinema
23   estoppel was one of the few that were forwarded to you
24   prior to Granite's objection?
25   A   Because it was notification of an issue at the

Page 29

1    asset.
2    Q   Who forwarded the certificate to you?
3    A   It must have been someone in New Jersey, but I
4    don't recall.
5    Q   And you reviewed it prior to the objection?
6    A   Yes, I -- as far as I recall.
7    Q   Okay.  And you had an opinion that it
8    represented a material and adverse modification; right?
9    A   Yes.
10   Q   Okay.  And did you convey that opinion to
11   anyone in BlackRock?
12   A   I did not convey it.  It was conveyed to me.
13   It was -- I agreed, but it was conveyed to me.
14   Q   Okay.  Well, I am -- I'm asking about your
15   opinion, not the document itself.
16   A   My opinion --
17   Q   Your opinion wasn't conveyed to you, was it?  I
18   think it was your opinion.
19   A   It was my opinion, yes.
20   Q   We got that part.  So now -- so you formed this
21   opinion after reviewing the estoppel -- the Cinema
22   estoppel certificate, that it was a material deviation
23   from the required form; right?
24   A   Yes.
25   Q   Now, did you convey your thoughts to anybody

8 (Pages 26 to 29)

Granite Southlands v. Alberta Town Center            ANGELA KRALOVEC            1/15/2010

Page 30

1   else?
2      A   No.
3      Q   At least not prior to the objection date?
4      A   No.
5      Q   Do you know who made the decision to reject the
6   Cinema estoppel certificate?
7      A   I can't point directly, no.
8      Q   Okay.  Did anyone ask whether you concurred in
9   the decision to reject the Cinema estoppel certificate?
10     A   I don't remember them asking.
11     Q   Did you speak with the lawyers from Fulbright
12  handling this transaction prior to the rejection of the
13  Cinema estoppel?
14     A   Yes, but I was also dealing with other
15  properties at the time.  I can't say whether it was
16  about this particular instance.
17     Q   Okay.  And do you know who -- which of the
18  lawyers at Fulbright were handling this transaction?
19     A   Jane Smith.
20     Q   So you recall speaking with Ms. Smith, but you
21  don't recall whether it was about this particular issue
22  or not?
23     A   Correct.
24     Q   Did you have any role in any of the other
25  tenant estoppels that were rejected by Granite that were

Page 31

1   furnished by Alberta?
2      A   What do you mean by "role"?
3      Q   Well, did you review them and form an opinion
4   whether they should or should not be rejected?
5      A   Not prior to -- not prior to the objection.
6      Q   Okay.  Not prior to the objection.  All right.
7      So have you since reviewed them?
8      A   Yes.
9      Q   And do you have an opinion as to whether any of
10  the certificates -- estoppel certificates that were
11  rejected should or should not have been rejected?
12     A   Yes.
13     Q   Okay.  What is your opinion in that regard?
14     A   They should have been ejected.
15     Q   All of the ones -- all nine?
16     A   I'd have to review again in detail.
17     Q   Okay.  Well, let me ask you to look at
18  Exhibit 61.
19     A   Okay.
20     (Document handed to the deponent.)
21     THE DEPONENT:  (Reviewing document.)
22     I would need to compare it to the original form
23  and their lease in order to form an opinion.
24     Q   BY MR. BENNETT:  Okay.  Now, you've testified
25  that you did review them --

Page 32

1      A   Yes.
2      Q   -- the ones that were rejected and it was your
3   opinion that they should be rejected?
4      A   Yes.
5      Q   Okay.  Looking at Exhibit 61, do you presently
6   recall why you thought this -- this certificate should
7   be rejected?
8      A   I believe it was because there was a term that
9   did not match the lease, but I don't recall off the top
10  of my head what it was.  I would need to see the lease.
11     Q   Okay.  How about Exhibit 62?  Can you look at
12  Exhibit 62 and tell me if you presently recall why you
13  thought this estoppel certificate should be rejected.
14     (Document handed to the deponent.)
15     THE DEPONENT:  (Reviewing document.)
16     Again, I would like to compare it to the lease,
17  but I would not particularly note the continued issues with
18  HVAC system.  I believe that was the main issue.
19     Q   BY MR. BENNETT:  Under what circumstances would
20  a note about the HVAC meet your definition of material
21  and adverse?
22     MR. TRAHAN:  Object; calls for speculation.
23     Q   BY MR. BENNETT:  You can answer.
24     A   Oh, do I answer?
25     Q   Unless he tells you not to answer, you have to

Page 33

1   answer.
2      A   I would need to know what the issues with the
3   HVAC system were.  If the HVAC system is not working and
4   points to a larger issue, that would certainly be
5   material.  I don't have -- this does not allow enough
6   information to know.
7      Q   Well, you testified it was your belief that
8   each of these certificates should be rejected?
9      A   Yes.
10     Q   Did you have any information about the HVAC
11  system before you reached that conclusion?
12     A   Other than what has been stated here, no.
13     Q   So in order to know whether a statement or --
14  regarding the HVAC system is material or adverse, you'd
15  need to know more about it?
16     A   Well, I would say that any issue with an HVAC
17  system is material.  HVAC systems are complicated.
18     Q   So you don't need to know anything more about
19  the HVAC system, that in itself is enough?
20     A   I'd like to know, but this is enough to reject
21  it on face.
22     Q   All right.
23     A   There should be further detail.
24     Q   I think you have -- those are actually my
25  copies.  There should be the same set in front of you.

9 (Pages 30 to 33)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                                    1/15/2010

Page 34

1   Do you have those over there?
2      A   Right here (indicating)?
3      Q   Yeah, there they are.  So look at Exhibit 63,
4   if you would, please.  They are marked with stamps on
5   the bottom.
6      A   Okay.
7      Q   Okay.  Do you have that one?
8         Same question for this one, this is the
9   estoppel certificate for Main Street Dental.
10     A   This one alters the term of expiration.
11     Q   Do you know if the lease actually does expire
12   on the date the tenant indicated?
13     A   I don't know offhand.
14     Q   Okay.
15     A   It does reference other notes in the back as
16   well that -- crosses out language that is typical within
17   the estoppel, including the tenant agreeing that it has
18   no right of first refusal or offer.
19     Q   Well, the tenant sets forth at the bottom of
20   the page that it has two five-year options listed in the
21   lease for renewal of the space.
22     A   Again, I'd have to review the lease in
23   conjunction with this to confirm.
24     Q   Okay.  And if the lease does provide for two
25   five-year options to renew, then there's nothing

Page 35

1   materially adverse to the lease, is there?
2      A   Assuming that the lease expiration term is
3   correct as well.  All terms need to be correct.
4      Q   All right.  So in order to know whether the
5   Main Street Dental estoppel certificate should be
6   rejected, one needs to know the terms of the lease?
7      A   Correct.
8      Q   And whether the tenant has properly set forth
9   not only its expiration date, but also its options for
10   renewal periods?
11     A   Yes.
12     Q   Okay.  Do you -- did you check the lease before
13   you formed your opinion that this tenant estoppel
14   certificate should be rejected?
15     A   I must have.
16     Q   Okay.  Do you know if any of the handwritten
17   additions to this certificate are incorrect or not
18   consistent with the lease?
19     A   I do not know offhand.
20     Q   All right.  How about 64, which is in front of
21   you there.
22     A   (Reviewing document.)
23        This is --
24     Q   This is the estoppel certificate for QualDent
25   LLC.

Page 36

1      A   This is not in the standard form attached to
2   the Forward Purchase and Sale Agreement.  It omits
3   language that is typical in an estoppel.
4      Q   What language is omitted?
5      A   I'd like to see the original Forward Purchase
6   and Sale Agreement estoppel form to see exactly what --
7   I know this isn't material, but it's not -- I know that
8   it's not the same as what was in there.  I don't know
9   why it was altered.
10     Q   Okay.  Well, let's start with, first of all,
11   the fact that it is retyped in and of itself doesn't
12   matter, does it?
13     A   No.
14     Q   All right.  So as long as it contains the same
15   information, it doesn't matter that the tenant chose to
16   retype the document?
17     A   As long as it contains everything, yes.
18     Q   In the book in front of you there are tabs.
19     A   Uh-huh.
20     Q   And I think if you turn to Tab 1 you'll see
21   Exhibit H.
22     A   Okay.
23     Q   Do you recognize this as the form of estoppel
24   certificate attached to the Forward Purchase and Sale
25   Agreement?

Page 37

1      A   Yes.
2      Q   All right.  In comparing Exhibit H -- or,
3   excuse me, Exhibit 1 to Exhibit 64, in what ways has the
4   form been modified?
5      A   (Reviewing document.)
6         It changes a variety of language throughout.  I
7   mean, for instance:
8         "All work to be performed for
9         tenant under the lease has been
10         performed as required and has been
11         accepted by tenant."
12   In the form estoppel:
13         "Landlord has performed all of its
14         obligations, if any, required to have
15         been performed by the Landlord prior to
16         the date hereof on the Lease including,
17         if required in the Lease, making
18         repairs required to be made by the
19         Landlord," and it goes on.
20         But this is a shortened form of this
21   (indicating).  And I'm sure if I spent some more time, I
22   could find the other changes.
23     Q   Okay.  If the tenant says that all work has
24   been -- that is required of the landlord to be
25   performed, the tenant has been accepted, is that

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                          1/15/2010

Page 38

1   sufficient, even though it leaves out something about
2   improvements or repairs, if it simply says "all work"?
3   Is that a material difference?
4        A   Not by itself.
5        Q   Okay.  Do you recall why or what provisions of
6   the QualDent tenant estoppel you relied upon to
7   determine that it should be rejected?
8        A   Not off the top of my head.
9        Q   Okay.  Okay.  The last one I have for you is
10  Exhibit 65, which is the Chico's FAS, Inc. estoppel
11  certificate.
12        Do you have that one in front of you there?
13        A   Yes.
14        Q   Okay.  What about this certificate do you
15  believe justifies its rejection?
16        A   Immediately I see that the:
17              "Tenant has made several requests
18          to Landlord to provide a current tenant
19          roster so Tenant may confirm that the
20          Operating Co-Tenancy Requirement has
21          been satisfied, to date Tenant has not
22          received the requested information and
23          as such hereby reserves any and all
24          rights and/or remedies available to the
25          Tenant as a result of a failure of the

Page 39

1              Operating Co-Tenancy Requirement."
2        Q   Okay.  How significant is that disclosure?
3        A   Depending on the terms of the remainder of the
4   lease, could be fairly significant.
5        Q   What is a cotenancy -- an operating cotenancy
6   requirement?
7        A   It means that there are -- they may have either
8   named other tenants that need to be operating in order
9   for them to be paying full rent or operating at all or
10  they may at least have named a certain percentage of the
11  center that must be open and operating in order for
12  them -- open and operating or paying full rent.  They
13  may be entitled to a significant discount or to close if
14  the landlord does not meet this test.
15        Q   And do you know which of those circumstances,
16  if any, exist with respect to this tenant?
17        A   I'd have -- no.
18        Q   Okay.  And did you review the cotenancy
19  requirement for Chico's before reaching the conclusion
20  that this tenant estoppel certificate should be
21  rejected?
22        A   I have reviewed it.
23        Q   Okay.  And was there any significant risk to
24  the landlord as a result of this disclosure?
25        A   It depends on the interpretation of the lease.

Page 40

1   In this particular lease, if I remember correctly, they
2   refer to the center -- referred to an amendment in the
3   lease that talks about the center and the occupancy
4   requirement in that center.  I believe that it was
5   ambiguous as to what square footage it was referring to
6   and whether we were currently in -- meeting the
7   requirement.  But I'd have to review the lease again to
8   remember.  It's been many months.
9        Q   Has -- subsequent to the acquisition by
10  BlackRock, has Chico's sought a reduction in its rent as
11  a result of some breach of the operating cotenancy
12  requirement?
13        A   I believe so.
14        Q   And has that been awarded to it, reduction in
15  its rent?
16        A   I don't remember offhand.  There have been a
17  number of these discussions.
18        Q   Okay.  Now, in your book --
19        A   Can we go back for one second?
20        Q   Sure.  Do you want to clarify something?
21        A   On tenant estoppel, Exhibit No. 64, for
22  QualDent, it occurs to me -- I was focused on preparing,
23  but it occurs to me that it says in here that:
24              "All work to be performed for
25          Tenant under Lease has been performed

Page 41

1          as required and has been accepted by
2          Tenant and any payments, free rent or
3          other payments, credits, allowances or
4          abatements required to be given by
5          Landlord to Tenant have already been
6          received by Tenant except full Tenant
7          improvement allowance and refund of
8          $2500 of construction bond."
9        Q   Okay.  What about that?
10        A   It says that the landlord has not met its
11  obligations in the tenant's eyes.
12        Q   All right.  Do you know how much, if any, of
13  the tenant improvement allowance had not been provided
14  to this tenant?
15        A   I don't know.
16        Q   Does it matter to you whether it's $10 or
17  $10,000 in terms of whether it's a material problem?
18        A   It does matter, but I don't know that, reading
19  this estoppel.
20        Q   All right.  So in order to reject this
21  estoppel, you would have to know how much of the tenant
22  improvement allowance the tenant claims was -- had not
23  been provided?
24        MR. TRAHAN:  Object; calls for speculation.
25        THE DEPONENT:  That's not true.  I would object

11 (Pages 38 to 41)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                              1/15/2010

Page 42

1  on the fact that it -- to this estoppel based on the
2  fact that it can be $10,000.  I don't know that it -- I
3  presume the worst.
4      Q   BY MR. BENNETT:  And how about a refund of
5  $2500, is that a material problem, in your view, under
6  this estoppel certificate?
7      A   Yes.
8      Q   $2500?
9      A   It should be corrected by the previous
10 landlord.  That's typical.
11     Q   Okay.  Do you know whether at the time of this
12 estoppel certificate the tenant was entitled to a refund
13 of its bonds?
14     A   I do not know.
15     Q   Would it be important to you to know that
16 before deciding whether to reject the tenant estoppel
17 certificate?
18     A   It would be helpful.
19     Q   Did you ever find out whether --
20     A   I have not.
21     Q   -- QualDent was entitled to a refund of its
22 construction bond?
23     A   I have not.
24     Q   Do you know if the construction bond has before
25 been refunded?

Page 43

1      A   I do not.
2      Q   Do you know if any portion of the tenant
3  improvement allowance was ever paid to the tenant?
4      A   I do not know.
5      Q   You don't know the resolution of QualDent's
6  issues in its certificate?
7      A   I don't.
8      Q   All right.  Now, let's go on.  There is, at
9  Tab 3 and 4, the certificate -- the estoppel
10 certificates provided by the Cinema.
11     A   Yes.
12     Q   Okay.  Do you have those?
13     A   Yes.
14     Q   I'm sorry.  2 and 3.
15     A   Okay.
16     Q   I looked in the wrong place.
17         Exhibit 2 is a certificate provided by the
18 Cinema on May 12, 2008; right?
19     A   (Reviewing document.)
20         Hold on.
21         Yes.
22     Q   And Exhibit 3 is one dated January 13th, 2009?
23     A   Yes.
24     Q   Okay.  You were aware from your review of the
25 Cinema tenant estoppels that the Cinema had provided two

Page 44

1  estoppels, or were you?
2      A   I was aware I had not seen them both.
3      Q   How were you aware?
4      A   I had been told that there were a set of May
5  estoppels that had been received.
6      Q   Okay.  Who told you that?
7      A   Legal.  I believe it was Jane Smith.
8      Q   So you had a conversation with your counsel
9  about that?
10     A   Yes.
11     Q   And you understood from the 15th amendment to
12 the Forward Purchase and Sale Agreement that an estoppel
13 certificate that was in the same form or substantially
14 the same form as the May estoppel would be sufficient
15 under this agreement?
16         MR. TRAHAN:  Object; calls for legal
17 conclusion.
18         THE DEPONENT:  Can you repeat the question,
19 please?
20     Q   BY MR. BENNETT:  You understood that a
21 permitted form of tenant estoppel certificate was one
22 that did not substantially deviate from the earlier May
23 estoppel certificate?
24         MR. TRAHAN:  Object to the question; it calls
25 for a legal conclusion.

Page 45

1      Q   BY MR. BENNETT:  You understood that?
2      A   Yes.
3      Q   Okay.  So in comparing whether the Cinema
4  estoppel certificate provided in January of 2009 was
5  sufficient, the appropriate form would be to compare it
6  to the May 2008 estoppel certificate?
7          MR. TRAHAN:  Object to the form of the
8  question, calls for legal conclusion.
9          THE DEPONENT:  I would say that it should have
10 been compared to the original estoppel form attached to
11 the Forward Purchase and Sale Agreement.  But it should
12 also -- you could also look to the May certificate, but
13 it needed to meet the form required in the Forward
14 Purchase and Sale Agreement.
15     Q   BY MR. BENNETT:  Look at Exhibit 37 for a
16 moment.  It should be in your tab there.
17     A   Yeah.
18     Q   Have you reviewed the 15th amendment before
19 today?
20     A   Yes.
21     Q   Okay.  Did you review it on or about the time
22 it was signed in December of 2008?
23     A   No.
24     Q   When was the first time you ever saw the
25 15th amendment?

12 (Pages 42 to 45)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                          1/15/2010

---

Page 46

1    A   I don't recall.
2    Q   Was it in or around the time that BlackRock
3   acquired the property?
4    A   It was probably after.  I just don't remember
5   when.
6    Q   Was it before or in connection with your review
7   of tenant's certificates?
8    A   It may have been.  I can't say.
9    Q   All right.  Look at Page 4.
10    A   Okay.
11    Q   Beginning in the fourth line, there is a
12   statement "Provided however..."
13        Do you see that line?
14    A   Uh-huh.
15    Q   "...Buyer may not object to, one, any
16        Tenant Estoppel Certificate solely
17        because the Tenant refuses to make
18        the certification in Paragraph 11 of
19        the form of Tenant Estoppel
20        Certificate attached as Exhibit H."
21        That's not applicable here.  It relates to
22   ERISA, I think.
23        And Item 2:
24        "Any form of Estoppel Certificate
25        delivered to Buyer on or after the date

---

Page 47

1        that is 30 days before the closing for
2        a Tenant that is substantially similar
3        to the Tenant Estoppel Certificate for
4        that Tenant executed in or about
5        May 2008 and previously delivered to
6        Buyer."
7        Were you aware of that provision when you were
8   looking at the Cinema tenant estoppel certificate?
9        MR. TRAHAN:  Object to the form of the
10   question, compound question.
11        THE DEPONENT:  I -- no.
12    Q   BY MR. BENNETT:  Okay.  The answer is "no."
13   All right.
14        So in your view, the appropriate comparison for
15   the Cinema estoppel certificate was the form signed in
16   January and the form attached to -- as Exhibit H to the
17   FPSA; right?
18    A   I have since read this, but, yes.
19    Q   Okay.  So at the time you were reviewing the
20   Cinema estoppel certificate for compliance, you were not
21   aware of the provisions of the 15th amendment that says
22   that if it is substantially similar to the previous
23   estoppel certificate, it's okay?
24        MR. TRAHAN:  Object to the form of the
25   question, calls for a legal conclusion, misstates the

---

Page 48

1   witness' prior testimony.
2        THE DEPONENT:  If you could repeat the
3   question, please.
4    Q   BY MR. BENNETT:  Sure.  At the time you were
5   reviewing the Cinema estoppel certificate, you were not
6   aware of this provision of paragraph -- of the
7   15th amendment relating to the previously tendered
8   estoppel certificates?
9    A   Not that I was not aware.  I was made aware
10   through legal.  I don't recall specifically reviewing it
11   side by side with the estoppel certificates.  I can't
12   remember which came first.
13    Q   All right.  So do you think you reviewed the
14   January Cinema estoppel certificate vis-a-vis Exhibit H?
15    A   I believe so.
16    Q   All right.  Okay.
17        In your Exhibit 1 -- or Exhibit 69, excuse me,
18   which is your opinion -- or your affidavit, excuse me --
19    A   Uh-huh.
20    Q   -- Paragraph 5 on Page 2, and I'm looking in
21   the middle of the paragraph where it starts:
22        "In particular, the references to a
23        cracked foundation..."
24        Do you see that language?
25    A   Yes.

---

Page 49

1    Q   It says:
2        "In particular, the references to a
3        cracked foundation in paragraph 5 of
4        the Cinema Estoppel are material and
5        adverse, and the qualifications
6        Colorado Cinema included in paragraph 6
7        regarding the existence of a default
8        constitute material and adverse
9        modifications to the prescribed form."
10        Is that what you stated?
11    A   Yes.
12    Q   Okay.  Now, let's look now back at Exhibit 3.
13    A   (Witness complies.)
14    Q   Paragraph 6, which is referred to in your
15   affidavit, which is on Page 2.
16        Do you have that?
17    A   Say that again.  Paragraph 6?
18    Q   Paragraph 6 of the tenant estoppel.
19    A   Okay.
20    Q   You reference that in your affidavit; right?
21    A   Yes.
22    Q   Okay.  And you believe that the Paragraph 6, as
23   set forth in the Cinema estoppel, is a material and
24   adverse modification to the required form; right?
25    A   Not that.  I believe that there are other

---

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                               1/15/2010

Page 50

1  pieces of the estoppel that are a material and adverse
2  change.
3      Q   But not Paragraph 6?
4      A   I'd have to check against the previous estoppel
5  form and the original form attached to FPSA.  But not in
6  itself -- in and of itself.
7      Q   Well, your affidavit, go back to your
8  affidavit, Exhibit 69.
9      A   Yes.
10     Q   Unless I'm misreading, it says "the
11 qualifications" --
12     A   It's to the prescribed form.  I'm sure it has
13 to be with the FPSA, and I'd have to compare against
14 that.
15     Q   Let me finish my question because you promised
16 me you wouldn't --
17     A   Sorry.
18     Q   "The qualifications Colorado Cinema
19         included in paragraph 6 regarding the
20         existence of a default constitute
21         material and adverse modifications to
22         the prescribed form."
23         So when you wrote your affidavit, Paragraph 6
24 of Exhibit 3 was objectionable to you?
25     A   Yes.

Page 51

1      Q   And is it your testimony today, reviewing it
2  today, it is not objectionable?
3      A   I would like to review the attachment to the
4  Forward Purchase and Sale Agreement.
5      Q   That's Exhibit 1.
6      A   Okay.
7      Q   You can take them out of the book if you'd
8  like.  I mean, if it's easier.
9      A   (Witness complies.)
10     Q   Make it easier for you.
11     A   (Reviewing document.)
12         Well, the issue is -- I'd say there's two
13 issues, but the issue is the estoppel certificate
14 contradicts itself in that it says there are no
15 defaults, and yet in the Paragraph 5, it specifically
16 points to the fact that it may dispute the landlord's
17 assertion that the tenant is financially responsible for
18 repairing the cracked foundation and that affects the
19 structure of the demised premises.
20         And then it does deviate from the original
21 form.  Give me a minute.
22         (Reviewing document.)
23         In the original form it says:
24         "There is no event in which
25         notice -- with notice or the passage of

Page 52

1          time or both would constitute a default
2      of the undersigned or of the Landlord
3      under the Lease."
4          This doesn't -- the tenant estoppel for
5  Colorado Cinemas did not include that clause.
6      Q   Okay.  So is it a basis, in your view, for
7  objecting to the Cinema's estoppel certificate that
8  Paragraph 6 is different from the language of Exhibit 1?
9      A   In conjunction with Paragraph 5, yes.
10     Q   Let's leave Paragraph 5 out for a moment.  By
11 itself, is Paragraph 6, because it differs from the
12 specific language in Paragraph 1, is that a basis for
13 objection?
14     A   Yes.
15     Q   Okay.  Now, then look at Exhibit 2 in
16 Paragraph 6.
17     A   Uh-huh.
18     Q   Okay.  Exhibit 2, Paragraph 6, and Exhibit 3,
19 Paragraph 6, are identical.
20     A   Yes.
21     Q   Right.  Okay.  Under the 15th amendment, the
22 paragraph we looked at, "a form that is not
23 substantially dissimilar from the May 2008 certificate,"
24 is acceptable, is it not?
25         MR. TRAHAN:  Object to the characterization of

Page 53

1  the agreement.  Object that it calls for legal
2  conclusion.
3          THE DEPONENT:  (Reviewing document.)
4          I would need to look at the agreement as a
5  whole.  I don't think you can pull that out
6  independently.
7      Q   BY MR. BENNETT:  All right.  So you will not
8  agree with me that Paragraph 6 of Exhibit 2 and
9  Paragraph 6 of Exhibit 3 are identical and therefore not
10 objectionable under the 15th amendment?
11     A   I agree that the two are identical.  I don't
12 agree that -- necessarily that they are not
13 objectionable.
14     Q   Okay.  And what is it in the 15th amendment
15 that you think allows Granite to object, even though the
16 paragraph of the May 8th estoppel certificate and the
17 paragraph of the January 2009 estoppel certificate are
18 not only similar, they are identical?
19         MR. TRAHAN:  Object; calls for legal
20 conclusion, lack of foundation and asked and answered.
21         MR. BENNETT:  I don't think so.  She wants to
22 look at the document as a whole.
23     Q   What about the document as a whole, Exhibit --
24 the 15th amendment, allows you to make that conclusion?
25         MR. TRAHAN:  Same objections.

14 (Pages 50 to 53)

Granite Southlands v. Alberta Town Center            ANGELA KRALOVEC                                    1/15/2010

Page 54

1      THE DEPONENT:  Again, I don't -- I would have
2  to spend hours poring over it to figure out exactly what
3  it is, but I would -- I can't tell you off the top of my
4  head.
5      Q   BY MR. BENNETT:  Okay.  Now, let's talk about
6  Paragraph 5 of the Cinema estoppel, Exhibit 3.
7      A   Uh-huh.  Yes.
8      Q   "Tenant is currently investigating
9          and may dispute Landlord's assertion
10          that Tenant is financially
11          responsible for repairing the cracked
12          foundation that affects the
13          structure."
14          That's what the provision says; right?
15      A   Which estoppel are you on?
16      Q   Exhibit 3.
17      A   Exhibit 3.
18      Q   January '09.
19      A   Sorry.  Say that again.
20      Q   Paragraph 5:
21          "Tenant is currently investigating
22          and may dispute..."
23          And it goes on; correct?
24      A   Uh-huh.
25      Q   Need a verbal response.

Page 55

1      A   Yes.
2      Q   Thank you.
3          That suggests that the tenant may, in the
4  future, dispute whether landlord has -- is responsible,
5  but is not presently.
6          Do you agree?
7      MR. TRAHAN:  Object to calls for speculation.
8      THE DEPONENT:  It reserves the right, so it
9  does -- I would -- it is not presently, but it may in
10  the future reserves that right.
11      Q   BY MR. BENNETT:  Okay.  Now, has the Cinema
12  ever made a demand, to your knowledge, upon Granite or
13  BlackRock to pay for the repairs to the cracked
14  foundation?
15      MR. TRAHAN:  Object to relevance.
16      THE DEPONENT:  Not to my knowledge.
17      Q   BY MR. BENNETT:  Okay.  Has Granite or
18  BlackRock ever agreed up to this date that it is
19  responsible for repairing the tenant's cracked
20  foundation?
21      A   Not to my knowledge.
22      Q   Okay.  Have any repairs, to your knowledge,
23  been made to the Cinema's foundation?
24      MR. TRAHAN:  Object to relevance.
25      THE DEPONENT:  Not to the foundation that I

Page 56

1  know of.
2      Q   BY MR. BENNETT:  Okay.  Has the Cinema ever
3  refused to pay any rent to Granite or BlackRock as a
4  result of this cracked foundation to date?
5      MR. TRAHAN:  Object to relevance.
6      THE DEPONENT:  Not to my knowledge.
7      Q   BY MR. BENNETT:  Paragraph 5 also indicates
8  that:
9          "The Tenant's proportionate
10          share" -- I guess of common area
11          expense, I assume that means -- "for
12          2008 has not been finalized."
13          Is that what that means?
14      A   Yes.
15      Q   Okay.  And has it been resolved by now in 2010?
16      A   I would have to check.  There are some that
17  still are outstanding.  I don't know of the Cinema off
18  the top of my head.
19      Q   Has, to your knowledge, the tenant continued an
20  investigation to determine what party is responsible for
21  the repair and financial responsibility for the
22  foundation?
23      A   I don't know.
24      Q   Has the tenant ever, to your knowledge, sent a
25  letter to BlackRock/Granite since January of 2009

Page 57

1  claiming that it is BlackRock/Granite's responsibility?
2      MR. TRAHAN:  Object to relevance.
3      THE DEPONENT:  Not to my knowledge.
4      Q   BY MR. BENNETT:  So the matter of who is
5  responsible for the cracked foundation and repairing it
6  is still an open issue, as far as you know?
7      MR. TRAHAN:  Object to relevance.
8      THE DEPONENT:  As far as I know.
9      Q   BY MR. BENNETT:  What work have you done on the
10  reconciliation of income and expense between Granite and
11  Alberta, which the parties sometimes call the true-up
12  issue?
13      A   I have been involved in discussions from the
14  beginning and reviewing numbers, supplying information,
15  requesting information, et cetera.
16      Q   Okay.  Are you aware of any information that
17  you have requested from Alberta that you have not
18  received?
19      A   I have requested for -- requested the detail
20  general ledgers for 2008, and I don't believe I've
21  received them.
22      Q   And what information do you need from the
23  detail general ledgers that you haven't received?
24      A   I need to know how the expenses changed from a
25  cash to accrual basis from January through

15 (Pages 54 to 57)

Granite Southlands v. Alberta Town Center       ANGELA KRALOVEC                     1/15/2010

Page 58

1    November 2008.
2        Q    Don't you mean the other way around, from
3    accrual to cash?
4        A    I'm sorry, yes, that's what I meant.
5        Q    Okay.  So the -- let's back up a bit.
6            During 2008, you received on a monthly basis
7    ledgers showing accrual of income and expense?
8        A    Yes.
9        Q    Okay.  And that was pursuant to your role, to
10   Granite's role, under the FPSA that it was entitled to
11   financial reports?
12       A    Yes.
13       Q    And you got those on a monthly basis?
14       A    I can't say that all 12 were given.  I can say
15   that I believe most of them were given to us.
16       Q    All right.  And would they come to you when
17   Alberta sent them to Granite or did they come to
18   somebody else?
19       A    When I took over the asset, they started coming
20   to me, but my first property visit was in September, so
21   I don't believe they were coming to me up until
22   September when we went there and verbally told them;
23   maybe a couple months earlier, but, yeah, not all of
24   2008, I know.
25       Q    Okay.  So you didn't become responsible in --

Page 59

1    from Granite's perspective for the Southlands center
2    until sometime in 2008?
3        A    Yes, it was June 2008 or July -- I'm sorry,
4    July 2008, right along that timeline when Hiroe -- when
5    the asset changed hands from Hiroe.
6        Q    So in approximately July 2008 is when you
7    began -- or when you became responsible for this
8    property.  And sometime subsequent to that you began
9    receiving monthly accrual based financial statements
10   from the owner?
11       A    Correct.
12       Q    I've got a series of documents I'll ask you
13   about and see what these things relate to in terms of
14   the documents you've asked for and maybe you haven't
15   received.
16           (Defendants' Exhibit 70 was marked for
17           identification.)
18           (Document handed to counsel and the deponent.)
19       Q    BY MR. BENNETT:  Okay.  Exhibit 70 are two
20   e-mails and attachments from -- between you and
21   Mr. Zezulak and others at Alberta; correct?
22       A    Correct.
23       Q    And in -- when you read these, you read from
24   bottom up.  So if we start at the bottom of the first
25   page of Exhibit 70, we see an e-mail from you to

Page 60

1    Mr. Zezulak dated March 24, 2009?
2        A    Uh-huh.
3        Q    Right?
4        A    Yes.
5        Q    Thank you.
6            And in that you ask him to provide the 2008
7    financials for the Town Center; correct?
8        A    Yes.
9        Q    And Mr. Zezulak then responds on March 24th:
10           "Angela, please see the attached";
11           correct?
12       A    Correct.
13       Q    And attached is the Alberta Town Center LLC
14   Revised Project Cash Flow Report, December 31, 2008?
15       A    Yes.
16       Q    Okay.  Correct?
17       A    Correct.
18       Q    All right.  So this provides you, at least for
19   December, the cash flow report for the project; correct?
20       A    Yes.
21       Q    Okay.  So at your request, Mr. Zezulak provided
22   that document to you?
23       A    Yes.
24       Q    All right.  Now, was that sufficient -- is that
25   what you were asking for in Exhibit 70?

Page 61

1        A    No.
2        Q    Okay.  What were you asking for that was not
3    provided?
4        A    I needed the full year of 2008 financials, not
5    just December.
6            MR. BENNETT:  All right.  So let's mark this.
7            (Defendants' Exhibit 71 was marked for
8            identification.)
9            (Document handed to counsel and the deponent.)
10       Q    BY MR. BENNETT:  So Exhibit 71 is a follow-on
11   to the two e-mails we just looked at --
12       A    Yes.
13       Q    -- right?
14       A    Yes.
15       Q    Okay.  So you respond to Mr. Zezulak, again, on
16   March 24th:
17           "Thank you.  Is it possible to get
18           YTD" -- year-to-date -- "info as well?"
19           Correct?
20       A    Correct.
21       Q    And then it looks like you respond on
22   March 27th:
23           "I really need the information by
24           month for 2008.  Please send ASAP.
25           Thanks."

16 (Pages 58 to 61)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                                      1/15/2010

Page 62

1      Do you see that?
2    A    Yes.
3    Q    Now, do you know whether Mr. Zezulak provided
4  you the monthly information for 2008?
5    A    I believe he did.
6    Q    He did?
7    A    At some point.
8    Q    Okay.
9      (Defendants' Exhibit 72 was marked for
10  identification.)
11      (Document handed to counsel and the deponent.)
12    Q    BY MR. BENNETT:  Exhibit 72 then follows on
13  with the e-mail that you were asking for information
14  year to date.  Mr. Zezulak writes, on Friday,
15  March 27th:
16      "See the attached per your
17      request."
18      You respond on March 27th:
19      "Thanks Steve."
20      Correct?
21    A    Correct.
22    Q    So have you received at that point the monthly
23  2008 information that you requested?
24    A    I don't know if it was exactly what I
25  requested.  I'd have to see the attachment.  I'm sure I

Page 63

1  received some information that provided information on
2  2008.
3    Q    Okay.  Well, do you know, as of today, whether
4  you have received the monthly 2008 information that you
5  asked for?
6    A    Other than seeing the detailed GL's, general
7  ledgers, I believe I have.
8    Q    All right.
9    A    My issue is I have not seen the detail general
10  ledgers.  And I also asked for an explanation and
11  detailed comparison of what change on a cash versus
12  accrual basis -- or accrual to cash, as you may -- that
13  explains the variances in certain line items.
14    Q    Have you identified particular line items or do
15  you just want every item?
16    A    I originally asked for every item.  We have
17  since gone back and done a little bit of homework on our
18  own to narrow it down to the larger items, but I would
19  like every item, frankly.
20    Q    Have -- do you know of any written
21  communication with Alberta or Mr. Zezulak identifying
22  those larger line items that you're wanting backup for?
23    A    I asked for all line items.  I don't know that
24  I narrowed it down to the larger line items.
25    Q    You have done that internally, but you don't

Page 64

1  think you communicated that to Mr. Zezulak?
2    A    I think I communicated it to Peter.  I know I
3  did at a meeting in October 2009.
4    Q    All right.  And Peter is Mr. Cudlip?
5    A    Peter Cudlip, yes.
6      (Defendants' Exhibit 73 was marked for
7  identification.)
8      (Document handed to counsel and the deponent.)
9    Q    BY MR. BENNETT:  Exhibit 73 is an April 16th,
10  2009 e-mail from Mr. Zezulak to you forwarding original
11  budget variance reports.  It says:
12      "Angela, please see attached."
13      And attached are monthly budget variance
14  reports for the Alberta Town Center?
15    A    Yes.
16    Q    Is this information you requested?
17    A    Yes.
18    Q    What, if anything, did you use the budget
19  variance reports for?
20    A    As the basis for starting -- like, as I
21  explained earlier, I wasn't receiving all of the monthly
22  reports from the beginning of 2008, and thus I was
23  missing some pieces and wanted to get a full set.
24    Q    Okay.  Is it -- what is your understanding of
25  whether the monthly budget variance reports are done on

Page 65

1  a cash or accrual basis?
2    A    I believe they are done on an accrual basis.
3    Q    So these would be accrual-based statements, as
4  far as you know?
5    A    As far as I know.
6    Q    Okay.
7    A    It doesn't state.
8      (Defendants' Exhibit 74 was marked for
9  identification.)
10      (Document handed to counsel and the deponent.)
11    Q    BY MR. BENNETT:  Exhibit 74 is an e-mail from
12  Mr. Zezulak to you dated April 15th, 2009.  And it
13  attaches something related to the Bank of America loan.
14    A    Uh-huh.
15    Q    In Exhibit 74, Mr. Zezulak writes:
16      "Based on your email yesterday
17      afternoon after our phone call, the
18      only other outstanding items you
19      requested and haven't yet received are
20      the monthly financial statements for
21      2008 (original versus revised),
22      correct?"
23      Is that what Mr. Zezulak wrote?
24    A    It is.
25    Q    And was that an accurate statement at that

17 (Pages 62 to 65)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                              1/15/2010

Page 66

1    time?
2        A    At that time, yes.
3        Q    Had you at that time requested the detail
4    monthly ledger reports?
5        A    I don't recall.  I think -- I believe that it
6    was only after receiving the next step of information
7    that I realized that -- didn't provide the answers and I
8    asked for the general ledger.
9        Q    So up until April of '09, you had not requested
10   the general ledgers?
11       A    Not to my knowledge.
12       Q    Do you know when you first requested general
13   ledgers from Alberta?
14       A    Shortly after this (indicating).  Because upon
15   receiving those monthly financial reports, I realized I
16   couldn't make heads or tails of them as to what was
17   different on cash versus accrual basis without seeing
18   those general ledgers.
19           (Defendants' Exhibit 75 was marked for
20       identification.)
21           (Document handed to counsel and the deponent.)
22       Q    BY MR. BENNETT:  Okay.  Exhibit 75, the first
23   page is an e-mail dated June 1 from Mr. Krier to
24   Mr. Cudlip and others, including yourself; correct?
25       A    Yes.

Page 67

1        Q    Okay.  In that Mr. Krier writes:
2            "We need to tie together the
3        differences between the cash and
4        accrual and what adjustments were made.
5        I think I now have the GL (robin please
6        confirm) for December which would
7        indicate which expenses are for
8        December and which expenses would be
9        for a prior period and therefore have a
10       higher allocation."
11           Did I read that right?
12       A    That's right.
13       Q    So this is on the same subject you're talking
14   about -- the GL being the general ledger?
15       A    Yes.  Although there are two separate line
16   items within this true-up because December was separated
17   from January through November.
18       Q    Okay.  Because the allocation's different?
19       A    Yes.
20       Q    Up until December 1st, the allocation is based
21   50/50?
22       A    Up until closing, the allocation was 50/50.
23       Q    Then thereafter it was 100 percent?
24       A    Granite.
25       Q    Granite.  All right.

Page 68

1            Okay.  Now, on the second page of Exhibit 75,
2    there is an e-mail -- I guess it starts on the bottom
3    of -- the first page from Peter Cudlip to Michael Krier.
4    Mr. Cudlip wrote:
5            "Mike, Thanks.  My counsel has
6        advised me not to send the G/L for all
7        of 2008.  However, if you have specific
8        items that you need back up on please
9        let me know."
10       A    Uh-huh.
11       Q    Is that the last word on this request for GL,
12   is Mr. Cudlip's statement that his lawyers told him not
13   to send them to you?
14           MR. TRAHAN:  Object; asked and answered.  I
15   believe she testified she asked for it again in October.
16           MR. BENNETT:  I don't think so.
17       Q    But you can answer the question.
18       A    I verbally have asked for it since.
19       Q    Okay.
20       A    I don't believe -- I don't know if there's
21   e-mails asking for it since.
22       Q    All right.  And have you gotten the same
23   response from -- from Alberta that, upon counsel's
24   advice, they're not going to give you the -- the entire
25   general ledger, or what has the response been?

Page 69

1        A    Well, I asked -- because of this response, I --
2    I went at it a different way and asked for -- to see the
3    variance in the major line items between -- on a cash
4    versus accrual basis and to see the detail behind those
5    major line items that have the changes.  And the general
6    ledger would -- pieces -- I don't have to see all of the
7    general ledger for all of 2008 in order to get there.  I
8    would be able to do it with pieces.  That's what I
9    explained to Peter.  And I don't remember -- his
10   response was a nod, if I remember correctly.
11       Q    A nod.  "Yes" or "no" nod?
12       A    A positive nod.
13       Q    When was the last time you had a conversation
14   with Mr. Cudlip about that?
15       A    October.
16       Q    Okay.
17           (Defendants' Exhibit 76 was marked for
18       identification.)
19           (Document handed to counsel and the deponent.)
20       Q    BY MR. BENNETT:  This is a series of e-mails
21   relating to this meeting that you're describing in
22   October of 2009; correct?
23       A    Yes.
24       Q    And it appears that you agreed to meet at
25   11:00 a.m. on Monday, looks like that would have been

18 (Pages 66 to 69)

Granite Southlands v. Alberta Town Center                ANGELA KRALOVEC                                    1/15/2010

Page 70

1   the --
2       A   12th.
3       Q   -- 12th or 13th, whatever day that Monday was;
4   is that right?
5       A   That's right.
6       Q   And do you recall that meeting taking place?
7       A   Yes.
8       Q   And it was at that meeting that you asked
9   Mr. Cudlip verbally for certain general ledger items to
10  at least explain the larger items?
11      A   That's right.  I still don't have comfort in
12  the changes on a cash versus accrual basis.
13      Q   All right.  So in order to get this true-up
14  matter resolved from your perspective, at least, it is
15  necessary for Alberta to respond and get you the general
16  ledgers that you've requested?
17      A   And explain -- the general ledger was the first
18  step.  Again, I get information and then I review it and
19  then I realize I still need to go and get more
20  information.  I need to probably ask questions of them
21  directly in order to understand what's in the general
22  ledger.  It depends what's in the general ledger at the
23  end of the day.
24      Q   All right.
25  ///

Page 71

1       (Defendants' Exhibit 77 was marked for
2   identification.)
3       (Document handed to counsel and the deponent.)
4       Q   BY MR. BENNETT:  Exhibit 77 begins with an
5   e-mail from Peter regarding the 2008 CAM and checks that
6   were received and deposited in January.
7       A   Uh-huh.
8       Q   Correct?
9       A   Correct.
10      Q   And then your response to Mr. Cudlip, attaching
11  copies of the checks.
12      Do you know what checks were at issue at that
13  time?
14      A   I -- no, not offhand.
15      Q   Is there still an outstanding item relating to
16  the period for which checks deposited in January or
17  February relate and whether Alberta is entitled to
18  credit for those as part of the revenue?
19      A   I am clear on how I see it.  I don't know if
20  they did agree with...
21      Q   And what do you -- what do you understand to be
22  the difference in your points of view, if there is one?
23      A   I believe the checks that were received should
24  be applied to the most current balance.  They believe
25  they should be applied to the oldest balance.  So that

Page 72

1   if a tenant had stopped paying rent in November, let's
2   say, and then made their first payment thereafter in
3   February, I would apply it to February rent.  They are
4   applying it -- they want to apply it to November rent.
5       Q   And what -- is there some standard do you
6   believe resolves that one way or another?
7       A   The industry standard is to apply it to the
8   most current balance.  I mean, obviously the hope is to
9   get all outstanding balances from a tenant, but...
10      Q   So it's either a LIFO or a FIFO deal?
11      A   That's the question.
12      Q   And it's to Alberta's benefit to do it LIFO
13  and -- no, or FIFO, and your benefit to do LIFO?
14      A   Yes.
15      Q   All right.  And so that matter is just
16  outstanding?
17      A   Correct.
18      Q   There's a difference of opinion as to which
19  rent period it should be applied to?
20      A   Correct.
21      Q   All right.  Okay.
22      There's also a discussion of the Sports
23  Authority.  I understand that there is a $155,000
24  billing to Sports Authority for common area maintenance,
25  and that they are -- they are exercising their rights to

Page 73

1   audit that billing; is that your understanding of the
2   status?
3       A   They are exercising their right to review the
4   financial information.  I don't believe they're calling
5   it an official audit, but yes.
6       Q   Okay.  And Mr. Krier testified that he believes
7   there's at least a $15,000 deduction from the billing
8   that should be applied.
9       Is that consistent with your understanding?
10      A   That's about right.  I'd like to see the CAM
11  statement that I believe Paul sent to you a couple
12  nights ago because that does have, up in the upper
13  right-hand corner, what we -- do you know what I'm
14  talking about?
15      Q   Yes, I do.  It's in front of you --
16      A   In here?
17      Q   Yes.  It's marked as Exhibit 67, I believe.
18      A   I see it.  Yeah.
19      So yes, the balance for Sports Authority looks
20  to be going from $155,244 to $139,778.
21      Q   Okay.  And you're referring to the upper
22  right-hand corner of Exhibit 67?
23      A   That's correct.
24      Q   And it shows a credit of 15,466.10 from the
25  $155,000 billing; is that right?

19 (Pages 70 to 73)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                          1/15/2010

Page 74

1    A    That's our estimate, yes.
2    Q    Okay.  It looks like that's composed of two
3 items, one is a $58,000 credit from 2007 and a $53,000
4 increase from the amounts due in 2008 --
5    A    Correct.
6    Q    -- is that right?
7       And it nets to $15,000?
8    A    Correct.
9    Q    Okay.  All right.
10      Okay.  Do you know the basis of the $58,000
11 credit for the common area maintenance billed to the
12 Sports Authority in 2007?
13    A    Generally, it had to do with the belief of what
14 expenses should be applied to the office versus the
15 retail portion of the center per their lease.  It's an
16 interpretation of the lease and expense application.
17    Q    And have you at this point agreed to that
18 $58,000 credit?
19    A    Not yet.
20    Q    All right.
21    A    We are -- it has not been finalized.
22    Q    All right.  But you anticipate agreeing to that
23 amount?
24    A    In conjunction with the 2008 additional due,
25 yes.

Page 75

1    Q    Okay.  What is the basis for the additional
2 amount due for 2008?
3    A    Well, basically we're holding them to if they
4 interpret it one way for 2007, it needs to be
5 interpreted the same way for 2008.
6       I'd have to review the details again in
7 conjunction with their lease, but it's -- it's
8 additional money that was paid.  Like I say, I just
9 would need to see the lease again.
10    Q    All right.  Have you discussed this potential
11 credit to the Sports Authority common area maintenance
12 with Mr. Cudlip?
13    A    Yes.
14    Q    Okay.  And do you know what his position is,
15 whether this $15,000 reduction is correct or not?
16    A    I don't believe he had a position on it.  We
17 told him that this is the direction things were heading
18 and he said he understood.
19    Q    Okay.  Not that he agreed or disagreed, but
20 just that he understood?
21    A    Correct.
22    Q    All right.  Now, let's -- let's -- Exhibit 66
23 should be in front of you.
24    A    Uh-huh.
25    Q    It's Mr. -- the schedule provided by Mr. Cudlip

Page 76

1 with Mr. Krier's handwritten notes on it.
2    A    Yes.
3    Q    Are you familiar with this document?
4    A    Yes.
5    Q    Okay.  Do you agree that the items above the
6 line that Mr. Krier has drawn on this report immediately
7 below "Subtotal Due to ATC/Due From BlackRock" are,
8 subject to verification, undisputed?
9    A    Correct.
10    Q    All right.  And then the other items, the
11 property taxes, the Fat Burger payments, those are also
12 under dispute -- undisputed at this point in time?
13    A    Yes.  Although I would like to see the backup
14 for the Fat Burger payments received.  I haven't seen
15 any -- the copies of the checks or a schedule showing
16 the amount paid versus the payment due.
17    Q    Okay.  And it is your understanding that the
18 Fat Burger is a settlement with the tenant where they
19 are making periodic payments?
20    A    Correct.
21    Q    And the agreement between Alberta and Granite
22 is to split those 50/50?
23    A    Correct.
24    Q    All right.  And according to this accounting,
25 so far there have been payments which, I guess, in

Page 77

1 gross, would be 20,000, of which 10,000 is due Granite?
2    A    That's my understanding.
3    Q    All right.  Now, on the unresolved items on
4 Exhibit 66 --
5    A    Uh-huh.
6    Q    -- the first item is "Due To/(From) BlackRock
7 to November."  This 53,176 is an indication that $53,000
8 is due Alberta.  That is undisputed because it comes
9 from the top schedule, provided that you get
10 verification of the items in the top schedule; is that
11 right?
12    A    Can you rephrase the question?
13    Q    Yeah, it's kind of a long question.
14      The 53,176 is a number that, if all of the
15 numbers in the top half of this page are verified, you
16 would agree is due Alberta?
17    A    They -- no, they don't have anything to do with
18 one another.
19    Q    Oh, okay.
20    A    The un- -- the 53,176 is for the January
21 through November period.  The items up above are for
22 mainly December 2008.  So they are two different
23 periods.
24    Q    All right.  What is the -- the
25 pre-December 2009, what is -- how is that $53,000

20 (Pages 74 to 77)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                          1/15/2010

Page 78

1    arrived at?
2        A   Pre-December 2008, you mean?
3        Q   I'm sorry, 2008.
4        A   That is the difference between the cash and
5    accrual basis as provided by Alberta.  The original
6    amount that Granite was to pay was all -- half of all
7    deficits that were accumulated between January and
8    November 2008.  When we got to the end of the year and
9    all payments were made and that the books were changed
10   to a cash basis, Alberta believes that Granite still
11   owes half of the remaining balance that was paid, which
12   would be $53,176.
13       Q   Okay.  I understand.
14           And then you've got a note on this schedule:
15           "AK" -- that's you; right?
16       A   That's right.
17       Q   -- "moved to unresolve."
18           Sounds like it at one time had been resolved?
19       A   In the schedule that you had provided for
20   our -- I received through Paul anyway, that Alberta had
21   provided in this form, they had this up in the
22   "Resolved" category.
23       Q   Oh.
24       A   I pulled it down because I don't believe it to
25   be resolved.

Page 79

1        Q   That's why I was confused.
2        A   Yes.
3        Q   I see.  Yes, if you look at Exhibit 68, which
4    should be in front of you.
5        A   Got it.
6        Q   Looks like this (indicating).
7        A   Yeah.
8        Q   You recognize this as spreadsheets of a type
9    that Mr. Cudlip has prepared?
10       A   Yes.
11       Q   And I see under --
12       A   "Other" --
13       Q   -- "Resolved Items, Other Items," it has the
14   53,176 as due from BlackRock as undisputed?
15       A   Correct.
16       Q   And you've moved it into disputed?
17       A   Yes.
18       Q   Now I understand.  Okay.
19           And the basis for your claiming it is undis- --
20   or it is disputed is because of this backup that you
21   wanted to see on the explanation of cash versus accrual
22   accounting?
23       A   That's the -- yes.  I don't understand the
24   difference.  That's yes.
25       Q   Okay.  And then we've got a dispute apparently

Page 80

1    over the amount of the 2008 income.  There's a
2    difference of 94,589?
3        A   Yes.
4        Q   And that relates to the deposit -- the deposit
5    of checks in 2009, which we discussed earlier.  Is that
6    the basis of that difference in income or do you think
7    there's something else?
8        A   That's -- that's partially it.  I don't -- I'm
9    not fully clear as to where this money's come from,
10   honestly.  They provided a schedule, and I believe it's
11   Page 8 in Exhibit 68.
12       Q   Okay.
13       A   Or at least it says that at the bottom.  And it
14   shows some items that are now in the Timberline
15   Schedule LZ amount.
16       Q   Okay.
17       A   Or you can see it better in Schedule L,
18   Timberline amount, that weren't in the original column
19   to the left of that totaled $108,225.
20           It looks to me like Aspen Alley, McCabe's, Med
21   Spa, Jess Image, Snuggle Bug, Wine Experience, Hot Topic
22   and Subway have all been -- shown up as amounts they
23   believe we collected.
24       Q   And should be credited?
25       A   And should be credited.

Page 81

1        Q   Okay.
2        A   This is new -- a newer item.  I believe it
3    arose in October.  I still -- we still are doing some
4    research because I know on a number of those tenants,
5    they are still delinquent.
6        Q   Okay.
7        A   Or they were included -- for instance, at
8    McCabe's, the $44,401 that is on this schedule as
9    received, well, they are also on our -- the page before,
10   the accounts receivable post close, as owing $40,375.
11   So -- and I know that we're working out a payment plan
12   with them that kind of reduced that amount by -- as
13   coming clean on that collection.  So I think they're
14   counting in two different buckets.  They think we
15   received it, but they also think it's receivable.
16       Q   Where does -- if it's a receivable, where is it
17   accounted for on our reconciliation to this point?  Is
18   it totally excluded because it hasn't been paid?
19       A   It's in the unresolved bucket item because it
20   needs to be just trued-up on a quarterly basis.  We --
21   as we receive payments from tenants, we'll get it.  It's
22   in the 2008 delinquent rent bucket where you can see
23   "Additional 2008 Rent Collected Post Sale BlackRock to
24   pay quarterly when collected."
25       Q   And if Alberta is correct that it has been

21 (Pages 78 to 81)

Granite Southlands v. Alberta Town Center    ANGELA KRALOVEC    1/15/2010

Page 82

1    received, it shows up on this Page 8 that you've pointed
2    out and should -- should increase the December gross
3    income?
4        A    If it was received and that it was -- and it
5    was applicable to that period, yes.
6        Q    Okay.
7        A    I'm also not clear as to what period these are
8    applicable.  There's no dates.
9        Q    Okay.  Let me see here.
10       A    If you refer back to Exhibit 70.
11       Q    Hang on.  Let me find 70.  Exhibit 70.  Okay.
12   I have it.
13       A    It shows that as of December 31st, 2008, the
14   total income was $1,107,694 --
15       Q    Right.
16       A    -- which is what we've always held to be the
17   final income amount.  As you can see, they are now
18   saying that the total -- oh, I'm sorry.  Misstating.
19   That's what they're saying, but they've only given us
20   evidence before, and they were our accountants since
21   they were the property managers, that there were
22   $1,013,105 received.  So there's -- these are the
23   disputed items that make the change between those two.
24       Q    And do you not understand where Alberta comes
25   up with the difference between 1,107,000 and the

Page 83

1    reported 1,013,000?
2        A    I -- I can see it from the schedule.  I just
3    don't -- I think -- I think they're mistakes.  I think
4    some of them are mistakes, and a couple I need to do
5    research on.  But I -- as I pointed to McCabe's, which
6    shows a $44,401 receipt, I know at close had a $40,375
7    balance.  And I know we've worked on them with -- for a
8    payment plan since that brings them current, but not for
9    that full amount.
10           So I don't think they could have ever made a
11   $44,000 payment.  They would have been current then and
12   I know they wouldn't be on a payment plan.
13       Q    So you don't believe you've collected this
14   $44,000 --
15       A    Correct.
16       Q    -- that's reflected on Page 8 --
17       A    Correct.
18       Q    -- of Exhibit 68?
19       A    That's correct.
20       Q    You're interrupting again.
21       A    Sorry.
22           MR. TRAHAN:  It's perfectly natural because you
23   do it in conversation, but it just makes her job
24   impossible.
25           THE DEPONENT:  Sorry.

Page 84

1        Q    BY MR. BENNETT:  Let me get just a clear
2    question and answer.
3            Do you not believe that the $44,000 figure for
4    McCabe's reflected on Page 8 of Exhibit 68 is correct,
5    that you did not collect that money and, in fact, you're
6    in a negotiation with McCabe's to bring their -- to pay
7    their delinquent rent?
8        A    That's correct.
9        Q    Are there other items on Page 8 of Exhibit 68
10   that you think are -- that Alberta is incorrect on that
11   have not been collected that they're claiming is
12   collected?
13       A    I believe that Aspen Alley for 6221 is not --
14   has not been collected.
15       Q    And is still delinquent?
16       A    Yes.  We have a judgment against them, but we
17   have not received money.
18       Q    All right.
19       A    Med Spa, I'm not sure on.
20       Q    Med Spa.  Let me find them.  It's almost
21   impossible to read these.
22       A    Down below McCabe's.
23       Q    6,764?
24       A    I believe so.
25       Q    6700 approximately?

Page 85

1        A    Yeah.  I'm not clear whether they paid -- they
2    are current now, so they certainly have paid, but I
3    don't -- I'm not sure why they're on this schedule.
4        Q    Okay.
5        A    Jess Image.
6        Q    Jess Image.  Let me find that here.  Okay.  I
7    see it.
8        A    For a thousand dollars.
9        Q    Thousand dollars?
10       A    They are still delinquent and went bankrupt,
11   so...
12       Q    You haven't collected their thousand dollars?
13   Okay.
14       A    Snuggle Bug went bankrupt.  Well, actually
15   shouldn't say they went bankrupt.  They went dark.  We
16   are pursuing them, but the 5873 is still outstanding.
17       Q    All right.
18       A    Wine Experience, I think it's $5500, is still
19   outstanding.  They're operating, but they're -- we're
20   working on an agreement to pay very minimal rent
21   current, and they have not caught up on any of the past
22   due rent.
23       Q    Okay.
24       A    And then the last two items of Hot Topic and
25   Subway --

22 (Pages 82 to 85)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                         1/15/2010

Page 86

1    Q    Yes.
2    A    -- I'm not understanding -- I believe that Hot
3  Topic and Subway were included previously in our income
4  balances. Subway should never have made a $13,704
5  payment since their rent is $2200 a month and they were
6  always current. So, again, these are just -- I'm not --
7  I'm just not clear on where these numbers are coming
8  from.
9    Q    All right. And what is your information about
10 Hot Topic?
11   A    Hot Topic was always paying percentage rent, so
12 they may owe this amount and may have paid this amount,
13 but, again, I'm not clear.
14   Q    All right. Let's see, is there any other items
15 that we have disputes on?
16        The CAM reconciliation, you believe, in total
17 is a $92,000 reduction from the billed CAM? Is that --
18 is my understanding correct?
19   A    That is the sum of the amount of credits that
20 have been taken and the amount of collections that have
21 been received to date.
22   Q    Okay. And that's shown on Exhibit 67?
23   A    Correct.
24   Q    Okay. And on Mr. Cudlip's schedule, which is
25 Exhibit 68, he shows CAM at a total of 62,214?

Page 87

1    A    And --
2    Q    And that figure is the net of all the amounts
3  billed or credited, but not necessarily collected; is
4  that --
5    A    Originally billed and credited, yes.
6    Q    Right. And so the 62,000 shown on Mr. Cudlip's
7  schedule is -- does not reflect adjustments that you've
8  agreed to or defaults that have occurred and the like?
9    A    Correct.
10   Q    All right. And then there's a difference
11 between Mr. Cudlip's schedule on 68 for tenant prepaid
12 balances. He shows the figure at 9,104, and your
13 schedule shows 17,936.
14        Do you know the difference there?
15   A    Yes.
16        (Reviewing document.)
17        In Exhibit 68, Page 2.
18   Q    Page 2. Okay.
19   A    You can see that American Family Insurance, the
20 first line --
21   Q    Yes.
22   A    -- for 2421 was the amount prepaid. They show
23 over to the right that 100 percent was supposed to go to
24 Granite for 2421.
25   Q    Yes.

Page 88

1    A    But then you go to the Granite total line, and
2  it's at $1,210. It was cut in half inadvertently. So
3  it needs to be brought up to the full 2421.
4    Q    Okay. That's one difference. Okay.
5    A    The second one is American Fidelity Assurance,
6  that 2229.50 was prepaid. Again, Granite should -- it
7  is in the Granite column for 2229.50, but when it goes
8  to Granite total it is 1,114.75. It should be at the
9  full 2229.50.
10   Q    So you don't think there's anything to be split
11 with Alberta on either American Family or American
12 Fidelity?
13   A    No. They were tenants that occupied after
14 close.
15   Q    Okay.
16   A    And then the last one was Keller Williams.
17 It's in the same bucket. They occupied after close.
18 They prepaid $13,016.38. You can see it's in the
19 hundred percent Granite line. And then when it's
20 brought over to the Granite total, it is half of the
21 original amount. It needs to be $13,016.38.
22   Q    All right.
23   A    So when you break it down that way, it means
24 that there's $17,937 that needs to go from Alberta to
25 Granite.

Page 89

1    Q    Now, those were prepaids. Was that money
2  placed in any kind of an escrow as prepaid rent or was
3  it taken in by Alberta as general income?
4    A    I believe it was taken in as general income,
5  which is why it wasn't included in escrow or in the
6  closing statement.
7    Q    Okay. So the prepaids did not flow through in
8  any kind of escrow or deposit account directly to
9  Granite?
10   A    No.
11   Q    Okay. Does that cover all of our issues on our
12 true-up schedules, as far as you know?
13   A    As far as I know -- oh, did we discuss
14 delinquent rent, 2008 delinquent rent?
15   Q    Let's discuss it. I'm not sure if we did or
16 not.
17        What do we have on delinquent rents?
18   A    There were a number of tenants that had not
19 paid full rent as of close. They are listed --
20   Q    I don't think either schedule, either yours or
21 Mr. Cudlip's, has any schedules for delinquent rents.
22   A    Right. And I need to gather those figures.
23 But I do know that McCabe's has been on a payment plan
24 and has been making payments, and those should be split
25 with Alberta.

23 (Pages 86 to 89)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                                    1/15/2010

Page 90

1    Q   Okay.
2    A   And I do know that Children's Place and Subway
3  have come current a hundred percent.
4        The delinquent receivable balance on Children's
5  Place was $331.87; on Subway, it was $379.99; and on
6  McCabe's, it was $4,375.12. We've received a hundred
7  percent of the Children's Place, a hundred percent of
8  Subway. McCabe's, we have received approximately half
9  that amount. I need to get the exact figures and work a
10 schedule -- put a schedule together showing what amount
11 is due to each of us.
12   Q   All right. Okay.
13       Why don't we take a five-minute break if we're
14 done with true-up.
15       (Recess taken from 2:47 p.m. to 2:59 p.m.)
16   Q   BY MR. BENNETT: One of the schedules that's
17 attached to Mr. Cudlip's Exhibit 68 is the postclosing
18 payables.
19       Are you aware of any dispute or controversy
20 over the postclosing payables -- let me hand you this
21 exhibit.
22       (Defendants' Exhibit 78 was marked for
23 identification.)
24       (Document handed to counsel and the deponent.)?
25       THE DEPONENT: I believe that we came to

Page 91

1  agreement on these December expenses.
2    Q   BY MR. BENNETT: So Exhibit 78 is a schedule
3  called "Post Purchase A/P," which would be payables for
4  the month of December payable sometime in 2009; is that
5  right?
6    A   They were payable in 2008 and some led into
7  2009.
8    Q   All right. And as far as you know, Alberta and
9  Granite have reached agreement on these payables and the
10 appropriate proration?
11   A   As far as I know.
12   Q   There was also a time when there was some
13 dispute over the proration of taxes.
14   A   Yes.
15   Q   And do you know if that matter has been
16 resolved?
17   A   I believe it has.
18   Q   Okay. And that -- is that reflected in the
19 expenses allocated between the parties on Exhibit 66?
20   A   It -- it is under "Other Items."
21   Q   "Other Items: Property Taxes Reconciled"?
22   A   Yes.
23   Q   So there is an agreement that Alberta owes
24 Granite 55,880 on taxes?
25   A   Correct.

Page 92

1    Q   So I've got an e-mail in June that apparently
2  there was some dispute about the amount of the taxes and
3  how they were being allocated, but you think that's been
4  resolved?
5    A   It's been since resolved.
6        (Defendants' Exhibit 79 was marked for
7  identification.)
8        (Document handed to counsel and the deponent.)
9    Q   BY MR. BENNETT: Exhibit 79, you have in front
10 of you?
11   A   Yes.
12   Q   It is a series of -- there are two e-mails
13 between you and Mr. Cudlip and others relating to this
14 Aspen Alley and something called Aryuveda --
15   A   Yes.
16   Q   -- and Fat Burger.
17       We talked about those. Is the status of those
18 delinquent accounts any different than set forth in
19 Exhibit 79?
20   A   Status today?
21   Q   Yes.
22   A   Yes. McCabe's has signed their agreement and
23 has been making payments on a payment plan. I believe I
24 gave them a copy -- I believe I gave Alberta a copy of
25 that agreement. And that was one of the tenants I was

Page 93

1  referencing that has come -- started to come current. I
2  believe actually has come current as of January.
3    Q   Is there an issue as to the allocation of
4  McCabe's payments vis-a-vis whether you apply it to the
5  last due amount or the first due amount?
6    A   Not to -- that I understand. The agreement
7  does provide, though, for a reduced amount of payments.
8  We had to settle with them in order to get them current.
9  But it's even throughout that term, so I can -- I can
10 just forward a schedule showing exactly how they've paid
11 based on what.
12   Q   I don't know if Mr. Cudlip is aware of that
13 agreement. I'll check and, if we need it, we can
14 communicate it with Mr. Trahan.
15   A   Okay.
16   Q   And then what is the last item on the -- in the
17 last paragraph on the first page of 79 about the
18 different amounts for deposit? Do you know what that
19 is?
20   A   I don't know.
21   Q   Do you know what account is referenced there,
22 TF262 No. 140800?
23   A   I don't know what account it's referring to off
24 the top of my head. It's a receivables account, I
25 believe, but I don't know.

24 (Pages 90 to 93)

Granite Southlands v. Alberta Town Center                ANGELA KRALOVEC                                    1/15/2010

Page 94

1    Q   Okay.
2        (Defendants' Exhibit 80 was marked for
3    identification.)
4        (Document handed to counsel and the deponent.)
5    Q   BY MR. BENNETT:  Exhibit 80 is a follow-on to
6    Exhibit 79 where it looks like you forwarded the Fat
7    Burger and McCabe settlements to Mr. Cudlip.  But in his
8    follow-on e-mail at the top of the page, it indicates
9    that he never got the attachment, which perhaps
10   indicates Mr. McCabe has not received the two -- as of
11   August 31, 2009, had not received the settlement papers.
12   So looks like we need to look into that.
13   A   Yeah, I would imagine if we didn't e-mail it,
14   we would have given it to him in one of our meetings.
15   But we can send it again.  That's not a problem.
16   Q   Okay.
17       (Defendants' Exhibit 81 was marked for
18   identification.)
19       (Document handed to counsel and the deponent.)
20   Q   BY MR. BENNETT:  Exhibit 81 is a letter from
21   Elizabeth Starrs to BlackRock Realty Advisors relating
22   to an extension of time to complete this resolution of
23   property expenses under the FPSA as amended.  She
24   recites that it was originally March 31st, then extended
25   to April 15th and later to April 30th.

Page 95

1        Are you aware of those extensions of time?
2    A   I've seen this letter.
3    Q   Okay.  Are you aware of any extension of time
4    agreed to by the parties after April 30th, 2009 to
5    complete this analysis of the property expenses and
6    proration?
7    A   I'm not aware.
8    Q   Do you know what position the parties have
9    taken about their ongoing efforts to try to get this
10   resolved?
11   A   I do not.
12   Q   As far as you know, there have been no further
13   agreements between the parties to extend the deadline?
14   A   I do not know of any.
15   Q   Have you ever been offered to provide expert
16   testimony in any proceeding in which Alberta or Granite
17   was involved?
18   A   No.
19   Q   It's not part of your job duties or
20   responsibilities to provide testimony in litigation
21   which Granite or BlackRock is involved?
22   A   No.
23   Q   Okay.  Have you prepared any memoranda to your
24   supervisors regarding the facts in this case?
25   A   I have prepared memoranda that updates

Page 96

1    portfolio management as well as my boss on the status of
2    the Town Center, but not particular to this case.
3    Q   Okay.  So as part of the ongoing business
4    reporting responsibilities?
5    A   Yes.
6    Q   And in -- in the preparation of those reports
7    to your boss and to portfolio management, have you
8    included comments about this litigation?
9    A   No.
10   Q   Your immediate is supervisor, Mr. Krier?
11   A   Yes.
12   Q   And portfolio management is Mr. Piekarski,
13   Mr. Silva?
14   A   It is Mr. Piekarski.  Mr. Silva is no longer on
15   Granite, he's on a different fund.
16   Q   Okay.  When did his position with respect to
17   Granite change?
18   A   It was late spring 2009.  I don't know the
19   exact date.
20       MR. TRAHAN:  What year did you say?
21       THE DEPONENT:  2009.
22       MR. TRAHAN:  2009.
23   Q   BY MR. BENNETT:  Was the first time that you
24   physically visited the Southlands center was
25   September 2008?

Page 97

1    A   It's the first time I set foot on site.  We
2    drove through the parking lot in June 2008, I believe it
3    was June 25th, but it was just a drive-by.
4    Q   Didn't see much driving by, did you?
5    A   No.  It was there.
6    Q   Okay.  Tell me about your first physical visit
7    where you actually got out of the car in September 2008.
8        MR. TRAHAN:  Objection; calls for a narrative.
9        THE DEPONENT:  September 11, 2008, we got to
10   the site.  It was relatively early in the morning, I
11   want to say around 9:30.  We met with Peter and Jos, and
12   Joe Bellio.  Mike Krier was with me and Justin Loiacono
13   was with me.
14   Q   BY MR. BENNETT:  I think we had his name
15   spelled.
16   A   L-O-I -- wait.  L-O-I-A-C-O-N-O.
17   Q   How many of those vowels do you pronounce?
18   A   Only the ones you remember.
19   Q   Loiacono, is that how it's pronounced?
20   A   Loiacono.
21       MR. TRAHAN:  Please wait for a question.  I
22   don't know if there's a question on the table.
23   Q   BY MR. BENNETT:  You went to the site at about
24   9:30 in the morning, met with Peter, Jos,, Joe Bellio.
25   Mr. Loiacono was with you and Mr. Krier was with you --

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                    1/15/2010

Page 98

1      A   Correct.
2      Q   -- is that correct?
3          I think Mr. Krier testified that he had about a
4   three-hour conference call.
5          Do you recall that?
6      A   That's correct.
7      Q   So he did not participate in any meetings while
8   he was on his conference call; is that right?
9      A   No, no.
10     Q   Did he take that call in a conference room at
11  the -- Southlands' management's offices?
12     A   It was in an office.
13     Q   In the management office?
14     A   In the management office.
15     Q   All right.  And what did you do while Mr. Krier
16  was on his telephone call?
17     A   Met with Peter, Jos, and Joe, got an overview
18  of the Southlands project from development.  Peter gave
19  us the background of how it was developed, what pieces
20  were done first, how the road was relocated.  And then
21  also gave us an overview of the Metro District and how
22  that works.
23         And then we -- after he gave us this overview
24  and we just talked in general about the project, we
25  discussed Power Center operational issues, because that

Page 99

1   was the piece that we actually fully owned at the time.
2   And in particular, there were discussions about payment
3   on VR2 and 3, went over the details regarding that.
4          We talked generally about leasing, office and
5   retail.  And then I -- I know I ducked out at a couple
6   points to go join in Mike's conference call, but that
7   was for no more than 30 minutes.
8          About 11:30, I want to say, we broke for lunch
9   and went to Ted's Montana Grill.  Chris Silva joined us
10  for lunch.  I think he arrived some point later on in
11  the morning.  I don't remember what point.  He had
12  another meeting off site before that.
13         And then after lunch we walked back towards the
14  Power Center to go walk by the sites, see all the
15  tenants back there.  And in particular, there was a
16  dental tenant that had just been built out so we walked
17  through that space.  We walked back towards the
18  management office.
19         Chris left and went to the airport.  Mike -- I
20  believe Mike went to go on another call for some reason.
21  And Justin and I went in Joe Bellio's car and went for a
22  drive over towards the multi-family site and toward the
23  rest of the Metro District 2 that's on the other side.
24         Got back, went back up to the management office
25  and said goodbye to everybody and drove to -- to 24 Hour

Page 100

1   Fitness.  There was another site that Alberta had
2   developed and they had opened up a 24 Hour Fitness, who
3   was a potential tenant for the Town Center -- the Power
4   Center, actually, so we wanted to go see them, that
5   build-out.  We got there about 4:00 p.m., toured the
6   site, went to our hotel, and that was it.
7      Q   During the course of either going to or from
8   lunch, did you walk by the Cinema building?  Did you see
9   the Cinema building in any fashion?
10     A   We -- we passed it.  We didn't stop.
11     Q   So you didn't look at anything at the Cinema
12  building at that time?
13     A   No.
14     Q   I assume you went in the building that houses
15  the management offices through the lobby?
16     A   It -- at the beginning of the day we entered
17  there, yes.
18     Q   Entered the lobby.
19         Did you observe any cracks in the lobby?
20     A   Nothing noticeable.
21     Q   Did you see any cracking in the drywall in the
22  management offices themselves?
23     A   No.
24     Q   Did you exit the management offices through the
25  back stairwell?

Page 101

1      A   I don't recall.  It would make sense, but I
2   don't recall.
3      Q   Closest way out of the building to go where you
4   were going; right?
5      A   Yes.
6      Q   Okay.  But you don't recall exactly exiting
7   that northwest stairwell out of the management office
8   building?
9      A   It wasn't memorable if we did, yes.
10     Q   So you don't recall if there had been any
11  cracking in the drywall in that stairwell?
12     A   No.
13     Q   So you recall seeing nothing about any
14  construction issues while you were there?
15     A   None.
16     Q   All right.  Did you do a trip report of any
17  kind?
18     A   I don't believe so.
19     Q   Is that something you don't do as a standard
20  practice?
21     A   We verbally communicate with portfolio on a
22  biweekly basis.  I'm sure we had a conversation about
23  the trip after, but we don't take written notes, no.
24     Q   Okay.  Do you know if any written documentation
25  of any kind was prepared after your trip that summarizes

26 (Pages 98 to 101)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                          1/15/2010

Page 102

1   what you did and what you saw on the trip?
2      A   I don't believe so, other than our expense
3   reports, but no.
4      Q   And your expense reports would simply show the
5   expenses you incurred, your hotel, flight, meals, tips,
6   so forth?
7      A   Yes.
8      Q   Okay.  Mr. Krier says that he bought lunch.  Do
9   you remember Mr. Krier buying lunch?
10     A   When we are together he usually buys lunch.
11     Q   Okay.  Mr. Silva didn't pick up lunch?
12     A   No.  I don't know.
13     Q   Okay.  When was the first time that you recall
14  being aware of any kinds of construction issues with
15  respect to the property?
16     A   Construction -- what do you mean by
17  "construction issues"?
18     Q   Well, a defect in the drywall, cracks, cracked
19  foundation, settling sidewalks, settling road, any kind
20  of construction issue of any kind.
21     A   That would have been when I received the letter
22  after close from the Cinema on or about December 18th.
23  I think that's when it's dated.  I don't remember if
24  that's when I received it.
25     Q   From the Cinema or the Cinema's lawyers?

Page 103

1      A   Cinema's lawyers.
2      Q   Look at Exhibit 36, I believe.
3      A   (Reviewing document.)
4      Q   Is that the first time you knew of any issues
5   relating to the Cinema structure?
6      A   Yes.
7      Q   And how did you come by this letter?  It's
8   addressed to Brownstein, Hyatt, Farber & Schreck, which
9   is the lawyers for Alberta.
10     A   It was sent to me.  I don't remember how, if it
11  was e-mail or by UPS.
12     Q   Do you know who sent it to you?
13     A   I don't remember.  I believe it was Peter
14  Cudlip, but I don't -- I can't say for sure.
15     Q   All right.  Did you respond in writing to the
16  receipt of this letter?
17     A   I'd have to check my records.  I don't
18  remember.
19     Q   Have you reviewed any records in preparing for
20  your deposition?
21     A   Yes.  As far as records related to this and
22  checking to see if I had an e-mail, I did not.
23     Q   Have you provided e-mails to your counsel or
24  Granite's --
25     A   Yes.

Page 104

1      Q   -- in connection with this dispute?
2      And have you provided e-mails to Granite's
3   counsel during this time frame, in this December 2008
4   time frame?
5      A   Yes.
6      Q   How are your e-mails archived?  Are they done
7   centrally?  Is it up to you?  How is the process?
8      A   We do it.  It is -- there is a backup system if
9   they're -- in case of a failure that's kept, I don't
10  know for how long.  But we are responsible for
11  separating, but I don't --
12     MR. TRAHAN:  What is the question?
13     Q   BY MR. BENNETT:  How do you archive your
14  e-mails?  Do you keep your e-mails on your own computer?
15     A   It's all kept on a larger server.
16     Q   Okay.
17     A   We work off of a published desktop, which means
18  that it's all on a server basis.  There's nothing on my
19  hard computer.
20     Q   And are e-mails archived centrally off the
21  Exchange server?
22     A   Yeah, that's my understanding, yes.
23     Q   Okay.  And was it up to you to request your
24  e-mails to be captured and delivered to counsel or was
25  it done by some central IT department?

Page 105

1      A   It was done by me.
2      Q   Okay.  And what instructions did you give to
3   the -- well, who would you instruct to capture those
4   e-mails for you?
5      A   I know -- I guess I was given the instruction
6   that anything and everything related to Southlands Town
7   Center should be remitted.  So that was what I did.
8      Q   And how did you remit that?
9      A   I -- our -- our admin, who helps in legal
10  cases, came around and showed us where to put all the
11  documents and how to actually go and save our electronic
12  files to a shared server so that they could be uploaded
13  electronically.
14     Q   And you did that?
15     A   Yes.
16     Q   All right.  And you don't recall if in those
17  e-mails there is a response to your receipt of
18  Exhibit 36?
19     A   I don't recall.
20     Q   All right.  Do you recall anything that you did
21  following the receipt of Exhibit 36?
22     A   I remember sending it to counsel and having a
23  conversation with Jane Smith.
24     Q   Okay.  Did you have any conversations with any
25  BlackRock people?

Granite Southlands v. Alberta Town Center        ANGELA KRALOVEC                           1/15/2010

Page 106

1      A   Mike Krier.
2      Q   What do you recall discussing with Mike Krier?
3          MR. TRAHAN:  Hold on just a second.  This is --
4   just to be clear, this is during what time frame?
5          THE DEPONENT:  After -- December -- after I
6   received it on December 18th.
7          MR. TRAHAN:  So the letter's dated
8   December 18th.
9          THE DEPONENT:  I don't know that I received it
10  on December 18th.  I remember receiving it --
11         MR. TRAHAN:  Do you remember when you received
12  it?
13         THE DEPONENT:  I mean, it was within days of
14  that date.  I remember it was either the 19th, 20th or
15  21st.
16         MR. TRAHAN:  I'd like to talk to her off the
17  record about when she got this.  And the reason I'm
18  concerned is once there was an anticipation of
19  litigation, then any communications she would have had
20  with counsel or in-house relating to the subject matter
21  of this litigation would constitute work product and
22  privilege.  So I don't want her to testify about those
23  things.  It's not clear to me what time frame this is.
24         Is your question just what communications she
25  had internally about this document when she received it?

Page 107

1          MR. BENNETT:  Or, you know, when she received
2   it, who inside BlackRock she spoke to about it and what
3   was discussed.
4          MR. TRAHAN:  And that was in late December?
5          THE DEPONENT:  Yes.
6          MR. TRAHAN:  Let me visit with her off the
7   record about that.
8          (Recess taken from 3:27 p.m. to 3:31 p.m.)
9          MR. TRAHAN:  When we took a break, I had an
10  opportunity to visit with Ms. Kralovec off the record
11  and have concluded that the discussions she had and you
12  questioned her about were after the point at which
13  BlackRock anticipated litigation, specifically the
14  litigation that we're in right now.  So I'm going to
15  instruct Ms. Kralovec to not answer that question.
16         MR. BENNETT:  Okay.  Well, let me follow up
17  with that, then.
18     Q   When you received Exhibit 36, did you believe
19  that this letter constituted something that you could
20  litigate with Alberta about?
21     A   I couldn't draw that conclusion directly from
22  the letter.  I could only conclude that there was a
23  substantial issue that needed to be investigated.
24     Q   Okay.  When did you first come to the
25  realization that matters discussed in Exhibit 36 could

Page 108

1   be the subject of litigation?
2      A   When did I come to it?
3      Q   Yes.
4      A   When counsel told me so.
5      Q   And did you speak to your boss, Mr. Krier,
6   before you spoke with Ms. Smith about Exhibit 36?
7      A   I believe I spoke after.  I coincidentally had
8   been talking to Jane about another matter right when I
9   somehow right when I received this letter or right after
10  I received this letter, and mentioned it to her.  And
11  after that conversation, I went down to Mike and talked
12  to him.
13     Q   So after speaking with counsel is when you came
14  to the realization that this might be a matter for
15  litigation?
16     A   Correct.
17     Q   Other than Mr. Krier, did you speak with anyone
18  else about the matters in Exhibit 36?
19     A   I know we had a discussion with portfolio
20  management, which would include Chris Silva and Andrew
21  Piekarski.
22     Q   Did that occur before or after your
23  conversation with Ms. Smith?
24     A   After.
25     Q   After receiving Exhibit 36, did you have any

Page 109

1   conversations with Mr. Cudlip about what this was all
2   about?
3      A   I believe I did.
4      Q   What do you recall of those conversations?
5      A   I recall him saying that, you know, "This is
6   something that the Cinema's come forward with, but it's
7   their problem, and do you want our -- do you want to
8   retain the same legal firm so that you guys can take
9   care of this?"
10     Q   What was your response to Mr. Cudlip?
11     A   I said, "I don't have an answer for you right
12  away.  I need to -- let me look a little more into
13  this."  And I knew that we would be planning a visit in
14  early January, as soon as we could get out there, to go
15  see the issues for ourselves.  So I said that I would be
16  out to see the issues soon.
17     Q   Okay.  Did -- in your conversation with
18  Mr. Cudlip, did it take -- strike that.
19         When did your conversation with Mr. Cudlip take
20  place?
21     A   After I received this letter.  I don't know how
22  long after.  We trade calls at times.
23     Q   Was it -- was your conversation with Mr. Cudlip
24  before or after your conversation with Ms. Smith?
25     A   I'm sure after.

28 (Pages 106 to 109)

Granite Southlands v. Alberta Town Center     ANGELA KRALOVEC     1/15/2010

Page 110

1  Q   Did Mr. Cudlip suggest to you in your
2  conversation that he had brought the matter of the --
3  the structure of the Cinema building to your attention
4  prior to closing?
5  A   Not that I recall.
6  Q   Did you ask Mr. Cudlip whether there were any
7  other buildings besides the Cinema building that had any
8  problems, in your conversation with him?
9  A   I don't remember asking.
10  Q   Okay.  When did you first become aware of any
11  issues with respect to the building in which the
12  Southlands management office was located?
13  A   The day that we were -- arrived on site,
14  January 6th, 2009.
15  Q   And how did you become aware of issues there?
16  A   As we were walking up to the management office
17  in the stairwell, I -- we saw large cracks in the wall.
18  And I didn't remember seeing them previously.  And then
19  we went into the management office and we could see
20  cracks there, as well as I noticed the conference room
21  door would not shut because of the movement.
22  Q   Okay.  And you don't recall having seen those
23  when you were on site in September?
24  A   I didn't notice them, but -- I don't recall.
25  Q   Do you have any reason to believe they weren't

Page 111

1  present in September 2008?
2  A   If somebody patched over them and...
3  Q   Do you have any reason to believe before
4  September 8 someone patched over them and then they
5  reappeared afterwards?
6  A   Well, we have heard from maintenance that they
7  were patching repairs through this time period, so
8  it's -- yes, I just can't state it was exactly at that
9  time.
10  Q   Who in management has told you they were making
11  repairs during this period of time?
12  A   This is through -- Jeff Nemec, N-E-M-E-C, has
13  relayed, per conversations with his maintenance team,
14  including Marco Blinder, I believe it is.
15  MR. TRAHAN:  Blinder.
16  THE DEPONENT:  B-L-I-N-D-E-R.
17  Q   BY MR. BENNETT:  Can you relate any of the
18  conversations that Mr. Nemec has told you about Mr. --
19  his conversations with his maintenance team?
20  A   Only that they were instructed to patch cracks
21  as they became apparent.
22  Q   Anything else that Mr. Nemec has told you about
23  his conversations with the maintenance people?
24  A   Not that I recall.
25  Q   Now, did you -- when you received Exhibit 36,

Page 112

1  did you ask to see any further documentation regarding
2  this dispute with the Cinema?
3  A   I believe I did.
4  Q   Who did you ask that of?
5  A   Again, I believe it was Peter.
6  Q   And what was his response?
7  A   That he'd send me the letter from Colorado
8  Cinema that this -- that this refers to.  Let me see.
9  Am I mixing --
10  Q   The letter that's referred to in the first
11  sentence is a letter from Alberta to -- well, actually,
12  from Brownstein, Hyatt to the Cinema?
13  A   Correct.
14  Q   He said he'd send you that letter?
15  A   I believe so.  I asked for it.
16  Q   Okay.  Did you get it?
17  A   I don't recall.
18  Q   Did you ask for any other documentation?
19  A   I didn't -- no, not at that time.
20  Q   Did you ask Mr. Cudlip if they had done any
21  work to investigate the extent or nature of the problem
22  at the Cinema?
23  A   I don't know that I asked, but I believe he
24  volunteered that they -- that they believed that the
25  issue was related to piers not reaching the bedrock.

Page 113

1  Q   Okay.  Did you ask to see any documentation of
2  that?
3  A   I'm sure I did.
4  Q   Okay.  What was Mr. Cudlip's response?
5  A   "Okay."
6  Q   Did he send you any information relating to the
7  basis of his view that the problems related to piers not
8  being drilled to the proper depth?
9  A   No.  I know that during my January 6th visit, I
10  received a document -- I'm trying to remember.  It was
11  from ground engineering, I believe, that I believe was
12  what he was referring to when he said -- made that
13  statement.
14  Q   Okay.  And who did you receive the ground
15  engineering document from?
16  A   I think it was Jos,.
17  Q   That would be Mr. Inclan?
18  A   Yes, Mr. Inclan.
19  Q   When you went to the site on January 6th, you
20  were aware that tenant files were maintained by the
21  management company on each tenant?
22  A   Yes.
23  Q   Did you ask to see the tenant files with
24  respect to the Cinema?
25  A   I don't believe so.

29 (Pages 110 to 113)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                    1/15/2010

Page 114

1    Q   Did you review them, whether you asked to see
2  them or not?
3    A   Not at that time, that I remember.
4    Q   When was the first time you ever reviewed the
5  tenant file maintained by the management company with
6  respect to the Colorado Cinema?
7    A   I think it was in March or April.
8    Q   Was Southlands shopping center management still
9  the manager or had Forest City taken over when you first
10 reviewed the Cinema tenant file?
11   A   I believe Forest City had taken over, so that
12 would make it April.
13   Q   Forest City took over April 1, 2009?
14   A   Correct.
15   Q   And that was the first time you actually asked
16 for and reviewed the tenant file?
17   A   I had no reason to believe there was anything
18 in the tenant file other than the lease.
19   Q   Did you, in reviewing the tenant file, find any
20 communications in the file besides the lease?
21   A   I found a copy of -- I believe it was this
22 letter (indicating).
23   Q   Okay. Exhibit 36?
24   A   And I believe the ground engineering report was
25 in there.

Page 115

1    Q   Okay.
2    A   I don't know if you would call it a report.  It
3  was like -- I believe it was like two or three pages.  I
4  don't know what you'd call it.
5    Q   I think it's in your booklet.  Let's see if we
6  have it here.
7        (Reviewing document.)
8        Well, I know it's in here.  Hold on a sec.
9  I'll find it for you.
10       (Reviewing document.)
11       Exhibit 25.  Is 25 in your tabs there?
12   A   Yes.  Yes.
13   Q   Is this the ground -- Exhibit 25, is this the
14 report you believe that Mr. Inclan gave you at the time
15 of your visit in January of 2009?
16   A   I believe so.  It looks a little different, but
17 I --
18   Q   Well, there's another version of it.  There's
19 also -- I don't know if I gave you Exhibit 8.  Do you
20 have Exhibit 8?
21   A   I don't.
22   Q   This is Exhibit 8, which is an e-mail copy of
23 the same document.
24       (Document handed to the deponent.)
25       THE DEPONENT:  That would make -- no.  No, I --

Page 116

1    Q   BY MR. BENNETT:  Doesn't help you?
2    A   No.  I'm -- it was a while ago.  It's possible
3  this was the document (indicating).
4    Q   Okay.  What else did you see in the tenant
5  files of the Cinema besides the lease, Exhibit 25,
6  Exhibit 36?  Anything else?
7    A   I don't recall.
8    Q   Was a copy of the December 8th letter from
9  Brownstein, Hyatt to the Cinema in the file?
10   A   I thought it was.
11   Q   Okay.  That's December 8?
12   A   Maybe.  Actually, I'm not sure.  I know the
13 December 18th letter.  I don't know if December 8th was.
14 I believe at some point I have seen the December 8th
15 letter, though.  I just don't remember when I saw it.
16   Q   When did you first see a proposal from Wiss,
17 Janney, Elstner to do a -- to do monitoring and
18 investigation of the Cinema building?
19   A   Well, they were currently hired by Granite to
20 do monitoring.
21   Q   Right.  Did you see a proposal from Wiss,
22 Janney to Alberta to do monitoring of the building?
23   A   Possibly.
24   Q   You don't recall?
25   A   I don't recall.  I -- I don't recall if I saw

Page 117

1  it before we were attempting to hire them or after.  I
2  believe it was after.
3    Q   Okay.
4        MR. TRAHAN:  I'm going to designate -- the
5  current work at the property, I'm going to designate
6  their identity and any work -- any reference --
7  testimony referencing their work there as confidential
8  under the parties' protective order.
9    Q   BY MR. BENNETT:  Look at Exhibit 17.  That
10 should be in your book, I think.
11   A   (Witness complies.)
12   Q   This is a proposal dated November 19th, 2008
13 from Wiss, Janney, Elstner Associates to Mr. Jos,
14 Inclan.
15   A   Uh-huh.
16   Q   When do you first believe you first saw that
17 document, if you did?
18   A   It was after January -- I should say it was
19 after -- it was January or later.  I don't recall
20 exactly.  It was somewhere between January and March.
21       MR. TRAHAN:  2009?
22       THE DEPONENT:  2009.  Yes.
23   Q   BY MR. BENNETT:  Look at Exhibit 30, please.
24   A   (Witness complies.)
25       Okay.

30 (Pages 114 to 117)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC          1/15/2010

Page 118

1    Q    This is a e-mail from Mr. Inclan to you dated
2  January 15th, 2009, which includes a proposal, 11-19-08,
3  pdf regarding the Southlands shopping center, a survey
4  and proposal reference and an updated proposal.
5        Do you recall receiving this e-mail?
6    A    Now that I see it, yes.
7    Q    All right.  And do you recall that included in
8  this e-mail with attachments was Exhibit 17, the Wiss,
9  Janney proposal?
10   A    That would make sense.
11   Q    Do you recall it?
12   A    I -- yes.
13   Q    All right.  And Mr. Inclan wrote:
14       "Peter asked that I forward you the
15       proposal I received from the forensic
16       engineers I had evaluate the building
17       movement issue.  Please see attached."
18       Did I read that right?
19   A    Yes.
20   Q    So by at least January 15th, you had received
21  the Wiss, Janney proposal relating to building movement;
22  correct?
23   A    Correct.
24   Q    All right.  When was the first time that
25  BlackRock or Granite hired any engineers to look at the

Page 119

1  building movement issue?
2        MR. TRAHAN:  Object to relevance.
3        THE DEPONENT:  It would have been, I want to
4  say, February, March time frame, 2009.
5    Q    BY MR. BENNETT:  What engineers did you first
6  hire?
7    A    Wiss, Janney, Elstner.
8    Q    Has BlackRock Granite hired any other engineers
9  to review the building movement issues at Southlands
10  center?
11       MR. TRAHAN:  Object to relevance.
12       THE DEPONENT:  We have hired other soils
13  engineers.
14   Q    BY MR. BENNETT:  Okay.  What soils engineers
15  have you hired?
16       MR. TRAHAN:  I'm going to object to relevance
17  and instruct the witness not to answer.  This -- this
18  work relates to work that's being performed -- BlackRock
19  and Granite's engagement of these engineers to perform
20  this work is work that they're being -- these individual
21  entities are being asked to do as consulting experts in
22  anticipation of litigation relating to the construction
23  defects at the property and is therefore protected by
24  the consulting expert privilege, and instruct the
25  witness not to answer questions about the work that's

Page 120

1  being done or the identity of the entities that have
2  been asked to do the work.
3    Q    BY MR. BENNETT:  Well, when were the soils
4  engineers first hired?
5    A    I would say approximately July 2009.
6    Q    So you had no soils engineers hired prior to
7  the time that you rejected the Cinema estoppel
8  certificate; is that right?
9    A    Wiss, Janney has people who -- I -- do you want
10  me --
11       MR. TRAHAN:  I think it's just a question about
12  a date.  I mean, you just testified you hired soils
13  engineers in July.
14       THE DEPONENT:  Yes.
15       MR. TRAHAN:  The estoppels were objected to in
16  March.  I think it's just a timing issue.
17       MR. BENNETT:  Actually, February, but...
18       MR. TRAHAN:  February.
19   Q    BY MR. BENNETT:  Now, the question is, were any
20  soils engineers hired prior to the rejection of the
21  Cinema estoppel certificate in January -- or in
22  February?  And I think you said that the soils engineers
23  were hired in July, but Wiss, Janney has soils engineers
24  on staff; is that correct?
25       MR. TRAHAN:  Object to the form of the

Page 121

1  question, compound.
2        THE DEPONENT:  They -- I believe that they have
3  some soils expertise, but we've since hired additional
4  soils...
5    Q    BY MR. BENNETT:  And my question, then, is, is
6  had Wiss, Janney done any work on which Granite relied
7  in rejecting the Cinema estoppel certificate in
8  February 2009?
9    A    Can you repeat the question?
10   Q    Yeah.  Had Wiss, Janney done any work on which
11  Granite relied in rejecting the Cinema estoppel
12  certificate in February 2009?
13       MR. TRAHAN:  Object to relevance.
14       THE DEPONENT:  I don't believe so.
15   Q    BY MR. BENNETT:  Look at Exhibit 38.  Do you
16  have that in your book?
17   A    No.
18   Q    Do not have 38.  Here's Exhibit 38.
19       (Document handed to the deponent.)
20   Q    BY MR. BENNETT:  And I'm interested in the
21  e-mail at the top of the page from Chris Silva to Peter
22  Cudlip dated February 18, 2009.
23   A    (Reviewing document.)
24       Yes.
25   Q    Do you have that?

31 (Pages 118 to 121)

Granite Southlands v. Alberta Town Center                    ANGELA KRALOVEC                                        1/15/2010

Page 122

1     A    Yes.
2     Q    Mr. Silva writes that:
3          "Two of the estoppels indicate
4     some" -- what's the words he used --
5     "pretty severe" --
6     A    ..."indicating a fairly substantial
7     settlement issue."
8     Q    Right.  Settlement issue.
9          And he says he's hired a structural engineer to
10    do a review on a expedite basis.
11    A    Yes.
12    Q    Do you know the structural engineer Mr. Silva
13    is referring to?
14    A    I believe it would have been Wiss, Janney.
15    Q    Do you know when you first got any reports from
16    Wiss, Janney pursuant to this expedited retention?
17    MR. TRAHAN:  Object to relevance.
18    THE DEPONENT:  First I saw was in June, I
19    believe.
20    Q    BY MR. BENNETT:  So nothing that Wiss, Janney
21    did was relied upon by BlackRock to reject the Cinema
22    estoppel certificate; is that right?
23    MR. TRAHAN:  Objection; asked and answered.
24    MR. BENNETT:  I don't think so.  I don't mean
25    to repeat myself, but...

Page 123

1     THE DEPONENT:  We didn't have a report.
2     Q    BY MR. BENNETT:  Did you have any kind of oral
3     response from them?
4     A    I wasn't aware of it.
5     Q    All right.  Can I have that back so I can put
6     it in my book.
7     (Document handed to counsel.)
8     Q    BY MR. BENNETT:  Look at Exhibit 10.
9     A    I don't have it.
10    Q    Well, I'll give you that.
11    (Document handed to the deponent.)
12    Q    BY MR. BENNETT:  This is a letter dated
13    September 16, 2008.
14    A    Yes.
15    Q    And it is from Kerosotes to Jos, Inclan; is
16    that correct?
17    A    Correct.
18    Q    Have you seen this letter before?
19    A    Yes.
20    Q    When did you first see this letter?
21    A    I believe this was one that was in the tenant
22    file.
23    Q    And so the first time you would have seen it
24    was sometime after April 1, 2009 when you reviewed the
25    tenant file?

Page 124

1     A    That's what I remember.
2          (Document handed to counsel.)
3     Q    BY MR. BENNETT:  To your knowledge, has the
4     Cinema ever written Granite or BlackRock claiming that
5     Granite or BlackRock has defaulted under the terms of
6     their lease?
7     A    Not that I know.
8     Q    And to your knowledge, the Cinema has never
9     made a written demand for BlackRock/Granite to cure any
10    problems with their building?
11    A    Not that I know.
12    Q    And has never withheld any rent on the basis of
13    any of the building issues at the Cinema?
14    A    No.
15    Q    Do you have Exhibit 18 in your book?
16    A    Uh-huh.
17    Q    Turn to Exhibit 18.
18    A    (Witness complies.)
19    Q    This is an e-mail from Mr. Cudlip's e-mail file
20    from you to him and Michael and Robin; is that right?
21    A    Yes.
22    Q    And in this you forward an agenda for your
23    meeting on January 7th, 2009?
24    A    Yes.
25    Q    And is the agenda that is attached the exhibit

Page 125

1     you used for the meeting in January 2009?
2     A    I believe so.
3     Q    This indicates that you were to be at the
4     property from the 7th through the 9th.
5          Were you there that long?
6     A    Yes.
7     Q    And did you go through with the attendees each
8     of the agenda items listed?
9     A    I believe so.
10    Q    One of the agenda items is, at the lower half
11    of the page, the movie theater structure?
12    A    Yes.
13    Q    Okay.  And what did you discuss and with whom
14    during the meetings on January 7 through 9 about the
15    movie theater structure?
16    A    We asked to see the theater first and asked
17    what -- where we could see the evidence of the structure
18    movement.  We were informed that from the outside you
19    can only see in some small areas.  From the inside it's
20    also difficult to see because there are curtains on the
21    walls where the Cinema is.  But we discussed the letter
22    that their attorney had sent, and I believe Peter
23    reiterated, you know, do you want to retain the same
24    counsel to have -- to take on this issue with them going
25    forward.  And then more importantly, we went to see the

Granite Southlands v. Alberta Town Center    ANGELA KRALOVEC    1/15/2010

Page 126

1  theater.
2    Q  Okay.  What do you recall -- who went to view
3  the theater?
4    A  Mike Krier, Jos, Inclan, Peter Cudlip and
5  myself.
6    Q  Okay.  And what -- what did you observe?
7    A  We went to the west side of the theater and
8  there's a -- what do you call it? -- inlet, I guess, if
9  you will, that leads to a back door where the theater
10  can bring things out to their dumpsters.  If you -- Jos,
11  pointed out that when you move the dumpsters aside or in
12  the boxes that were sitting there, you could see the
13  cracking in the wall on the exterior of the theater
14  where he pointed out that it appears that the theater
15  has cracked and shifted in two different directions.
16    Q  Are these vertical cracks in the walls of the
17  Cinema?
18    A  Yes.
19    Q  Okay.  Is there more than one?
20    A  That was the main one.  I believe on the very
21  rear of the Cinema there may have been one they tried to
22  point to as well.  It was very hard to see.
23    Q  Okay.  What else did you observe on the outside
24  of the theater?
25    A  That was it.  That area was the best place to

Page 127

1  view issues with the theater.  Otherwise we walked
2  around -- we could see -- that's not true.  We could see
3  a little separation in the northwest corner where the
4  ground had separated from the building where you could
5  see the former caulk line would have been even with the
6  ground.
7    Q  And how much separation would you estimate
8  there was?
9    A  I believe at its widest point, it was maybe a
10  couple inches at the time.
11    Q  Okay.  And this would be either the wall
12  raising or the ground settling, and you'd see a gap
13  between what used to be where the sidewalk was and where
14  it is now?
15    A  Correct.
16    MR. TRAHAN:  Object; calls for speculation.
17    Q  BY MR. BENNETT:  Okay.  Only two possibilities.
18  Either the building went up or the sidewalk went down?
19    A  Something moved.
20    Q  Something moved.  Okay.
21    All right.  And you could see that on the
22  northwest corner of the Cinema?
23    A  Yes.
24    Q  All right.  Now, I think you testified earlier
25  that you also saw for the first time at your January

Page 128

1  meeting that there were cracks in the management -- in
2  the building where the management office is, and you
3  could see the floor had settled some in the entryway?
4    A  Yes.
5    Q  And there were cracks in the stairwell;
6  correct?
7    A  Yes.
8    Q  And there were cracks in the management office?
9    A  Yes.
10    Q  Okay.  And the conference room door didn't
11  close properly?
12    A  Yes.
13    Q  Did you ask what that was all about?
14    A  Yes.
15    Q  Okay.  What -- what response did you receive
16  there?
17    A  I -- "yeah, it looks like things have shifted."
18    Q  Who gave you that response?
19    A  Jos, Inclan.
20    Q  All right.  Did you ask the extent of the
21  shifting?  Did you ask for more detail?
22    A  I -- we asked if this was new.  And they said,
23  "Well, we saw a couple minor cracks before, but yes,
24  this -- these are new cracks."
25    Q  Who said that?

Page 129

1    A  Jos, Inclan.
2    Q  All right.  Did you ask Mr. Cudlip if these
3  were new cracks?
4    A  I don't recall.
5    Q  Did you ask whether Alberta had done any
6  investigation of the settling in this building?
7    A  I don't recall.
8    Q  Do you know this building to be known as
9  Building E?
10    A  Yes, it is building E.
11    Q  Did you ask if any of the tenants in Building E
12  had complained about any cracking?
13    A  I don't remember.
14    Q  All right.  When did you first learn that --
15  that a tenant in the Building E by the name of DCC
16  Architects had complained about cracking in their suite?
17    A  I believe it was after our visit in January.  I
18  believe it was later on that January.
19    Q  How did you first learn of that?
20    A  A letter was sent, so I believe it was,
21  portfolio management that was forwarded along to me.
22    Q  Look at Exhibit 55, if you have it.
23    A  Yeah.
24    Q  Is this the letter that you're referring to?
25    A  That's correct.

33 (Pages 126 to 129)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                                    1/15/2010

Page 130

1    Q   And this is a letter dated January 28th from
2  Anest, A-N-E-S-T, & Brown to Andrew Piekarski.
3    A   Yes.
4    Q   What did you do after you received this letter?
5    A   Called Jos, to ask if he had any details
6  regarding the letter and knew what was going on.  He
7  said she has some work -- minor repairs that need to be
8  done.  And then otherwise at that point we were in the
9  midst of trying to engage Wiss, Janney, Elstner to
10 investigate further structural items with the center.
11   Q   Okay.  Was it part of Wiss, Janney's task to
12 look at building E as well as the Cinema?
13   A   Yes.
14   Q   Look at Exhibit 58.
15   A   Uh-huh, yes.
16   Q   Have you seen this letter before?
17   A   Yes, it was attached.
18   Q   I'm sorry.  It was attached to what?
19   A   I believe it was attached to one of the earlier
20 letters to -- when did I...
21       (Reviewing document.)
22       Yeah, it was attached to the January 28th, 2009
23 letter.
24   Q   Okay.  There's actually two January 28th, 2009
25 letters.

Page 131

1    A   The one from Anest & Brown -- I'm sorry, the
2  one...
3    Q   There's two Anest & Brown letters dated
4  January 28th.  Which of the two are you referring?
5    A   I'm referring to the one that shows the "Lease
6  of Premises Suite 235 Damaged Property Requested
7  Repairs."
8    Q   Okay.  Exhibit 56?
9    A   Exhibit 56, yes.
10   Q   All right.  Did you see both of the two
11 January 28th, 2009 letters or only the second of the
12 two?
13   A   I believe only the second of the two.
14   Q   Okay.  So only Exhibit 56?
15   A   Yes.
16   Q   All right.  And Exhibit 56 has Exhibit 58
17 attached to it or it had?
18   A   It did.
19   Q   And you saw that at or about the time you saw
20 Exhibit 56?
21   A   Yes.
22   Q   And did you call Jos, about the information set
23 forth in Exhibit 58?
24   A   Yes.
25   Q   And what did Mr. Inclan tell you about that?

Page 132

1    A   I believe he said that, yes, they had to make
2  some minor repairs to their space and that they would go
3  and make these repairs as well.
4    Q   Okay.  Okay.  Did you do anything further about
5  Exhibit 58, other than talk to Mr. Inclan?
6    A   Forwarded it on to legal counsel and we
7  prepared a response to the tenant.
8    Q   What did your response to the tenant say?
9    A   We had -- I believe it was sent from
10 portfolio -- Andrew Piekarski at portfolio and it
11 basically said that we are looking -- investigating the
12 issues at hand and we'll make the minor repairs
13 needed -- or make repairs as needed, I should say.  I'd
14 have to look at the letter to know for sure.
15   Q   Do you know approximately how long after
16 Exhibit 56 that Mr. Piekarski's response was prepared?
17   A   I believe a couple weeks later it was sent out.
18   Q   And were repairs made to the DCC Architects'
19 space at Granite's direction?
20   A   Jos, told me yes.
21   Q   Okay.  Okay.  Anything else that occurred in
22 the January 7 through 9 meeting relative to either
23 Building E or the Cinema's construction issues?
24   A   There were no other discussions that I recall.
25 We -- I investigated other buildings on site just on a

Page 133

1  random basis, checking in tenant spaces to see if I
2  could see evidence of movement further up the street.
3    Q   When did you do that?
4    A   That was on the 9th, that Friday morning.
5    Q   What did you discover?
6    A   That the best evidence was in Building E, that
7  there appeared to be minor issues at Building F, and you
8  could see some threshold issues at Building G.  Further
9  up the street there didn't seem to be much evidence.
10 There were minor cracks in the wall in Building D.  The
11 Gap suite specifically I remember seeing.
12   Q   Gap?
13   A   Yes.
14   Q   The tenant is Gap?
15   A   The tenant is Gap.
16   Q   Have any of the issues you observed on
17 January 9, 2009 in Buildings F, G or D worsened over the
18 12 months or so that Granite has owned the property?
19       MR. TRAHAN:  Object to relevance.
20       THE DEPONENT:  It appears Building D --
21       MR. TRAHAN:  D?
22       THE DEPONENT:  I'm sorry.  F, G, E, Building E,
23 the conditions have worsened in certain suites.
24   Q   BY MR. BENNETT:  My question specifically was
25 to those issues you discovered in F, G and D.

34 (Pages 130 to 133)

Page 134

1    A   Oh.  Have they worsened since -- at all?
2    Q   Yes, since your first observation of them in
3 January 2009.
4    A   Yes, they have.
5    Q   In what respects?
6    A   Building G, there's been some further threshold
7 movement.  Building F, the revolving door at Ted's
8 Montana Grill has required adjustment due to movement --
9 or we believe it's due to movement.  And then
10 Building D, the cracking has worsened and has become
11 more visible in not only the Gap space, but also Gap
12 Kids and Banana Republic.
13    Q   Were you aware that prior to closing, that
14 Granite retained the services of New Market Real Estate
15 Group, Inc.?
16    A   Yes.
17    Q   Did you retain them to do the work?
18    A   I did not.
19    Q   Do you know who did?
20    A   That would have been done through valuations,
21 Michael Yurinich.
22    Q   Did you receive -- strike that.
23        New Market Real Estate Group is an appraisal
24 company?
25    A   Yes, national appraisal firm.

Page 135

1    Q   Do you know what office was used?  Do they have
2 several?
3    A   They do have several.  The two lead appraisers
4 on it, one lives in Southern California here and I
5 believe the other lives in -- I can't recall.  It's
6 either Delaware or Connecticut, somewhere on the East
7 Coast.
8    Q   And which office do they work out of?
9    A   I honestly don't know.  You'd have to look at
10 the report.
11    Q   Did you receive a copy of the report?
12    A   Yes.
13    Q   And it assesses the market value of the
14 Southlands Town Center?
15    A   Yes.
16    Q   And the value that this report came up with was
17 used to book the asset for the mutual -- or the
18 investment fund that is your client?
19    A   Yes.
20    Q   And from time to time that market value has
21 been revised downward?
22    A   Yes.
23    Q   And in the last 12 months by approximately 20
24 to 25 percent; is that correct?
25    A   That sounds about right.

Page 136

1    Q   And has any of the conditions of the buildings
2 at the Southlands Town Center had anything to do with
3 the markdown in the market value of the real estate?
4    A   The conditions were not contemplated in the
5 report, but they would have an impact.
6    Q   But they have not to date?
7    A   But they have not to date.
8    Q   And so nothing in the adjustment of the market
9 value as of this date is reflective of the condition of
10 the real estate?
11    MR. TRAHAN:  Object to form; asked and
12 answered.
13    THE DEPONENT:  Correct.
14    MR. BENNETT:  Okay.  This New Mark Real Estate
15 Group report, Paul, is -- figures prominently in your
16 motion to amend the Complaint.
17    MR. TRAHAN:  Do we need to be on the record?
18    MR. BENNETT:  Yeah, I just want to put this on
19 the record.  We sent an e-mail to Jeff Dykes, your
20 partner, asking him to produce a copy of that right
21 away.  We haven't gotten a response.  Do you know what
22 your position would be on giving us a copy of that?
23    MR. TRAHAN:  I need to look at the report and
24 see.
25    MR. BENNETT:  If you'd get back to us on that

Page 137

1 as soon as you can, I'd appreciate it.
2    Q   You have a copy of it, I assume?
3    A   Yes.
4    MR. TRAHAN:  May I ask how you -- what your
5 position is as to the relevance of that report regarding
6 the outstanding issues in the lawsuit, the escrow
7 dispute and the true-up dispute?
8    MR. BENNETT:  I wouldn't think it has anything
9 to do with them, but in responding to your motion to
10 amend, I think we should be entitled to see that so we
11 can evaluate our response to the motion to amend.  As
12 far as I know, it doesn't have anything to do with the
13 rest of the case.  Until I see it, I don't know for
14 sure, but I -- I don't think it does.
15    Q   Have you ever reviewed the Cinema lease?
16    A   Yes.
17    Q   Have you ever reviewed it for the purpose of
18 evaluating whether the Cinema or Granite/BlackRock is
19 responsible for the repairs to the Cinema?
20    A   In general, yes.
21    Q   Have you reached any conclusions based on your
22 review of the lease as to who's responsible?
23    MR. TRAHAN:  I'm going to object to the
24 question on relevance grounds.  And to the extent
25 Ms. Kralovec engaged in review of the lease regarding

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                    1/15/2010

---

Page 138

1   the issues that are in dispute here and as part of the
2   defense of this lawsuit, I'm going to instruct you not
3   to answer.
4         MR. BENNETT:  I guess you don't have to answer.
5     Q   Let me ask it this way:  Did you review the
6   Cinema lease prior to the time when Granite objected to
7   the Cinema estoppel certificate?
8     A   Yes.
9     Q   Okay.  And did you review the lease for
10  purposes of evaluating whether the Cinema estoppel
11  certificate should be objected to or not?
12    A   Yes.
13    Q   And did you conclude that -- whether or not the
14  Cinema was responsible for the repairs to its own
15  building under the terms of its lease?
16        MR. TRAHAN:  Object; calls for a legal
17  conclusion, and I'll object on relevance.
18        You can answer.
19        THE DEPONENT:  I didn't come to a conclusion.
20  I didn't believe it was clear.
21    Q   BY MR. BENNETT:  Okay.  And what areas of
22  ambiguity did you find in the lease?
23    A   I'd have to review the lease to know.  I don't
24  recall off the top of my head.
25    Q   Okay.  Were you able to find anywhere in the

---

Page 139

1   lease that the landlord was obligated to do any
2   construction of the Cinema building?
3         MR. TRAHAN:  Object to form, asked and
4   answered.
5         MR. BENNETT:  I don't think so.
6     Q   You can go ahead and answer.
7     A   I don't believe they were responsible for the
8   construction of the building itself.
9     Q   Okay.
10        MR. BENNETT:  All right.  Let me take a few
11  minutes, I'll look at my notes and see if there's
12  anything else I need to cover.  Otherwise, I think we're
13  about finished.
14        (Recess taken from 4:23 p.m. to 4:32 p.m.)
15    Q   BY MR. BENNETT:  While we were off the record,
16  I gave you a copy of Exhibit 52, which has been marked
17  as a copy of the Cinema lease.
18        Have you had a chance to look at that?
19    A   Yes.
20    Q   And can you, from your review of the lease,
21  tell me what provisions you believe create some
22  ambiguity about who is responsible between the landlord
23  and the tenant for any construction deficiencies in the
24  foundation?
25        MR. TRAHAN:  Objection; calls for a legal

---

Page 140

1   conclusion, lack of foundation.
2         THE DEPONENT:  The term "building pad" is
3   the -- it doesn't -- the lease does not speak to the --
4         MR. TRAHAN:  What's the question?
5     Q   BY MR. BENNETT:  What provisions of the lease
6   give rise to an ambiguity as to who may be responsible
7   for repairing any foundation problems for the Cinema?
8         MR. TRAHAN:  Objection -- same -- on the same
9   grounds.
10    Q   BY MR. BENNETT:  Okay.  You're referring to the
11  lease provisions regarding the building pad?
12    A   Yeah.  It says that:
13        "The theater shall be rough graded
14        and all utilities should be installed."
15        And the lease doesn't speak to whose
16  responsibility it would be if there are soil conditions
17  which cause the rise of the building as pointed out in
18  Kerosotes' September 16th, 2008 letter.
19    Q   Have you seen any document that imposes any
20  kind of specifications or standards for the construction
21  of the building pad or the soils beneath the pad?
22        MR. TRAHAN:  Object to relevance.
23        THE DEPONENT:  There's -- the closest thing is
24  that there's, you know, a building -- should be --
25        (Reviewing document.)

---

Page 141

1         Work letter that talks about the theater
2   improvements, but I have not seen the construction
3   documents related to the foundation of the theater.
4     Q   BY MR. BENNETT:  Okay.  Anything else in the
5   lease itself that you think gives rise to an ambiguity
6   as to who may be responsible for the -- any issues
7   relating to the foundation?
8         MR. TRAHAN:  Objection; relevance, calls for a
9   legal conclusion, lack of foundation.
10        THE DEPONENT:  Not that I can see.
11    Q   BY MR. BENNETT:  Okay.  All right.  You can
12  give me that back then.
13        (Document handed to counsel.)
14        MR. BENNETT:  Thank you.
15    Q   I may have asked you this, if I did, I
16  apologize, you didn't have anything to do with the
17  negotiation of the 15th amendment; is that right?
18    A   That's right.
19        (Defendants' Exhibit 82 was marked for
20  identification.)
21        (Document handed to counsel and the deponent.)
22        MR. BENNETT:  82, is that where we're at?
23        THE REPORTER:  Yes.
24    Q   BY MR. BENNETT:  I've handed you Exhibit 82.
25  Do you have that?

---

36 (Pages 138 to 141)

Granite Southlands v. Alberta Town Center        ANGELA KRALOVEC                    1/15/2010

Page 142

1     A   Yes.
2     Q   Exhibit 82 is a letter from Gibson, Dunn &
3   Crutcher to Granite Southlands Town Center.
4         Would this letter have been directed to you?
5     A   No.  Directed to me?
6     Q   Yes.
7     A   No.  It was directed to Michael Krier.
8     Q   Did you see it at or about the time it was
9   received?
10    A   Yes.
11    Q   Did you have any discussions with Mr. Krier
12  about whether the services of Brownstein, Hyatt,
13  Farber & Schreck should be terminated with respect to
14  the issues between the landlord and Colorado Cinema
15  Group?
16    A   Possibly.
17    Q   Do you recall what they were?
18    A   Not in detail.
19    Q   Okay.  You knew by at least the date of this
20  letter that the management -- or the legal services from
21  Brownstein, Hyatt were being terminated because
22  Southlands Shopping Center Management was no longer
23  being retained as the management company for the
24  facility; correct?
25    A   Yes.

Page 143

1     Q   Have you done any analysis of the number of
2   estoppel certificates that Granite has received to which
3   it has not objected?
4     A   I have not.
5     Q   So you don't know whether the certificates that
6   it has received to which it has not objected equal or
7   exceed 75 percent of the rented space?
8     A   I have seen analysis that would suggest that it
9   does not meet that requirement, but I have not prepared
10  any.
11    Q   Who has done that analysis?
12    A   Our legal counsel as well as portfolio
13  management.  I'm not sure who on the portfolio
14  management team.
15    Q   Okay.  And what form does this analysis take
16  that you've seen?
17    A   It looked like a spreadsheet.  I saw the
18  printout of it.
19    Q   Okay.  Do you retain a copy?
20    A   Not -- it may be in my records.  I don't know.
21    Q   Do you know when it was done?
22    A   Had to be January, February 2009, but I
23  don't -- I don't recall specifically.
24        MR. BENNETT:  All right.  I believe those are
25  all the questions I have at present.  I do reserve my

Page 144

1   right to continue this deposition in the event the court
2   were to grant your motion to amend the Complaint.  But
3   at this time those are all the questions I have, subject
4   to resolution of the various objections you've made and
5   instructions not to answer to the witness.
6         MR. TRAHAN:  I have -- I want to take a minute
7   to look at my notes and see if I've got any questions
8   for the witness.  So if we could go off the record.
9         (Recess taken from 4:40 p.m. to 4:53 p.m.)
10
11              EXAMINATION
12  BY MR. TRAHAN:
13    Q   Ms. Kralovec, I'll refer you to deposition
14  Exhibit No. 66.
15    A   (Reviewing document.)
16    Q   This is the spreadsheet with Mr. Krier's notes
17  on it that relates to the true-up analysis; is that
18  correct?
19    A   Yes.
20    Q   And you were asked questions earlier about the
21  "Due to/from BlackRock to November," N-O-V, toward the
22  bottom among "Unresolved Items"; correct?
23    A   Yes.
24    Q   Just to be clear for the record, this -- this
25  number will change if you discover that expenses were

Page 145

1   included or were charged to the property improperly;
2   correct?
3     A   Yes.
4     Q   So if there are legal fees, for example, that
5   Gibson, Dunn & Crutcher charged to the property that
6   were in fact expenses that Alberta alone should have
7   incurred, then that would change this number; correct?
8     A   Yes.
9     Q   By the same token, if expenses relating to
10  Alberta's arbitration with Callison Architects was -- if
11  those expenses were charged to the property improperly,
12  then those -- those figures would need to be backed out
13  as well?
14    A   Correct.
15    Q   And that would change this line item?
16    A   Yes.
17    Q   I'll refer you to Deposition Exhibit 77.
18  You'll recall earlier Mr. Bennett asked you questions
19  about this exhibit.  Please let me know when you have
20  the exhibit handy.
21    A   I have it.
22    Q   In the top e-mail, which is a November 27, 2009
23  e-mail from you to Peter Cudlip and others, including
24  Steve Zezulak, Z-E-Z-U-L-A-K, and Robin Boileau,
25  B-O-I-L-E-A-U, you asked the question, "When can we

Granite Southlands v. Alberta Town Center        ANGELA KRALOVEC                        1/15/2010

Page 146

1  expect" -- or the e-mail's directed to Peter, and you
2  ask:
3              "When can we expect VR2 and 3
4        payment?  It has been months since we
5        agreed on the balance."
6        Did I read that correctly?
7    A   Yes.
8    Q   What does the VR2 and 3 payment refer to?
9    A   On Power Center, VR2 and 3 are a parcel that
10  Alberta still owns.  There's an Office Depot on the
11  site, but the second parcel was never developed.  As
12  part of that, there have been expenses that the Power
13  Center has been carrying that were meant to be paid for
14  by Alberta and -- as they're owner of VR2 and 3.  They
15  owe us -- I have to look at the spreadsheet to remember
16  how much, but it was approximately $280,000.
17    Q   So Alberta has acknowledged an obligation to
18  pay Granite $280,000, but it has to date refused to make
19  that payment?
20    A   Every time I ask, they state that they are
21  researching it.  And they will -- they have agreed to
22  pay, but don't know where the payment is.
23    Q   So they're researching where the payment is,
24  not researching whether they owe the payment?
25    A   There -- exactly, yes.

Page 147

1    Q   And they've agreed that they owe it, they have
2  just yet to make the payment?
3    A   Yes.
4    Q   Did you receive any response from Mr. Cudlip to
5  your November 2009 inquiry?
6    A   I don't believe so.
7        MR. BENNETT:  Object to these questions; it's
8  not relevant to this lawsuit.
9    Q   BY MR. TRAHAN:  I'll refer you to Exhibit 64.
10  Exhibit 64 is the estoppel certificate for QualDent;
11  correct?
12    A   Yes.
13    Q   And Granite objected to this estoppel
14  certificate; is that correct?
15    A   Yes.
16    Q   When Mr. Bennett was questioning you earlier,
17  he asked you questions about whether Granite performed
18  any due diligence in connection with this estoppel.
19        Do you remember those questions?
20    A   I do.
21    Q   And I believe your answer was that Granite had
22  not performed due diligence in connection with this
23  estoppel; correct?
24    A   Yes.
25    Q   Is it the buyer's duty to perform due diligence

Page 148

1  in connection with estoppel certificates?
2        MR. BENNETT:  Object to the form, calls for
3  legal conclusion.
4        THE DEPONENT:  No, it is not typically the
5  buyer's responsibility, it is on the seller to do the
6  research and provide clean estoppels.
7    Q   BY MR. TRAHAN:  So the -- to be clear, the
8  buyer has no obligation to perform due diligence in
9  connection with estoppel certificates?
10    A   No.
11        MR. BENNETT:  Object; same grounds.
12    Q   BY MR. TRAHAN:  And I'll refer you to
13  Exhibit 3.
14        Exhibit 3 is the May 2009 -- I'm sorry, the
15  January 2009 estoppel certificate from Colorado Cinema;
16  correct?
17    A   Yes.
18    Q   There were a series of questions that
19  Mr. Bennett asked you earlier about objecting to
20  estoppel certificates and the various grounds for
21  objecting, and then he asked you questions relating to
22  reference to the lease, the underlying lease, in
23  connection with the estoppel certificate for a
24  particular tenant.
25        Do you remember that?

Page 149

1    A   Yes.
2    Q   Do you need to refer to the Colorado Cinema
3  lease to conclude that the estoppel certificate that is
4  Exhibit 3 represents a material and adverse deviation
5  from the estoppel certificate that is Form H to the
6  Forward Purchase and Sale Agreement?
7        MR. BENNETT:  Object to the form; calls for a
8  legal conclusion.
9        THE DEPONENT:  No.
10    Q   BY MR. TRAHAN:  Do you need to refer to the
11  lease in concluding that Exhibit 3 represents a material
12  and adverse modification from the estoppel certificate
13  that is Exhibit 2, which is the May 2008 estoppel
14  certificate for Colorado Cinema?
15        MR. BENNETT:  Same objection.
16        THE DEPONENT:  No.
17    Q   BY MR. TRAHAN:  Do you consider a reference in
18  an estoppel certificate to a cracked foundation a
19  serious issue?
20    A   Absolutely.
21    Q   Do you think that reports by a tenant of a
22  cracked foundation have a material adverse impact on
23  Granite's ability to market and potentially sell this
24  property?
25        MR. BENNETT:  Object to the form, lack of

38 (Pages 146 to 149)

Granite Southlands v. Alberta Town Center                ANGELA KRALOVEC                                1/15/2010

Page 150

1   foundation, irrelevant.
2         THE DEPONENT:  Absolutely.
3         MR. TRAHAN:  Pass the witness.
4
5              FURTHER EXAMINATION
6   BY MR. BENNETT:
7     Q   Do you think it's within industry standards, to
8   the extent you're familiar with them, for a purchaser to
9   reject a tenant estoppel based upon anything a tenant
10   says in the estoppel certificate no matter how
11   frivolous, lack of -- lacking in foundation or
12   truthfulness?
13         MR. TRAHAN:  Objection; calls for speculation.
14         THE DEPONENT:  Not anything.
15     Q   BY MR. BENNETT:  Okay.  So the -- the purchaser
16   has some obligation to at least determine whether there
17   is anything -- any basis for the statement of a tenant
18   in a tenant estoppel?
19     A   No.  I would say that the purchaser -- if --
20   when I say that you can't, as a purchaser, object to
21   anything frivolous, if the tenant stated that their
22   merchandise was -- is not as good as they want it to be
23   and it's clear that that's not anything having to do
24   with the landlord, that would be considered frivolous.
25   If it doesn't have anything to do with the lease and the

Page 151

1   landlord or is not a material -- an adverse change or a
2   default of the landlord, it doesn't -- it isn't
3   relevant.
4     Q   What if a tenant puts in a totally frivolous
5   claim that it's entitled to something that it's not
6   entitled to under the lease?
7     A   Then the seller has the obligation to prove
8   that.
9     Q   Okay.  Does the buyer have any obligation to
10   accept the seller's representation that the claim is
11   frivolous?
12         MR. TRAHAN:  Objection; calls for speculation,
13   hypothetical.
14         THE DEPONENT:  They -- can you repeat the
15   question?
16     Q   BY MR. BENNETT:  Does the buyer have any
17   obligation to either investigate whether the tenant's
18   claim is frivolous or to accept the seller's
19   representation that the seller's claim -- or the
20   tenant's claim is frivolous?
21         MR. TRAHAN:  Objection; calls for speculation.
22         THE DEPONENT:  The buyer only has the
23   obligations to investigate to the extent that the seller
24   provides the detail.  It is not the buyer's
25   responsibility to independently investigate whether

Page 152

1   there's any substantiation to the claim to the extent
2   that the seller's not cooperative and looking on their
3   own behalf.
4     Q   BY MR. BENNETT:  Well, does the buyer's
5   obligation to permit the -- or to conduct an
6   investigation extend at least to the extent of reading
7   the lease to determine whether the tenant's claim is
8   founded under the lease or not?
9         MR. TRAHAN:  Objection; calls for speculation,
10   lack of foundation.
11         THE DEPONENT:  To the extent that the lease is
12   the only document that is relevant, that there -- there
13   needs to be -- there's to be assurance that that is the
14   relevant document.
15     Q   BY MR. BENNETT:  Okay.  You were asked some
16   questions about VR2 and 3.  That relates to the Power
17   Center; right?
18     A   That's correct.
19     Q   And the Power Center is not part of the Alberta
20   Town Center; is that right?
21     A   That's correct.
22     Q   So any claims that exist between Alberta and
23   Granite relating to the Power Center are totally
24   unrelated to the Town Center?
25         MR. TRAHAN:  Object; calls for a legal

Page 153

1   conclusion.
2         THE DEPONENT:  I believe so at this time.
3     Q   BY MR. BENNETT:  Okay.  And Granite purchased
4   the Power Center from Alberta pursuant to an entirely
5   straightforward purchase and sale agreement?
6     A   Correct.
7         MR. BENNETT:  Okay.  Those are all the
8   questions I have.
9         MR. TRAHAN:  No further questions.  We'll
10   reserve our questions for trial.
11         Thank you, Ms. Kralovec.
12         THE REPORTER:  Do you need a copy?
13         MR. TRAHAN:  Yes.
14         (The deposition concluded at 5:04 p.m.)
15
16
17
18
19
20
21
22
23
24
25

39 (Pages 150 to 153)

Granite Southlands v. Alberta Town Center      ANGELA KRALOVEC      1/15/2010

Page 154

1      I, ANGELA KRALOVEC, do hereby certify that
2   I have read the above and foregoing deposition and
3   that the same is a true and accurate transcription of
4   my testimony, except for attached amendments, if any.
5      Amendments attached  ( ) Yes  ( ) No
6
7
8
9   _____
     ANGELA KRALOVEC
10
11
12
13      The signature above of ANGELA KRALOVEC was
14   subscribed and sworn to before me in the county of
15   _____, state of _____,
16   this _____ day of _____, 2010.
17
18
19
20   _____
     Notary Public
21      My Commission expires:
22
23
24
25   Granite Southlands Town Center, LLC 01/15/10 (tll)

Page 155

DEPOSITION OFFICER'S CERTIFICATE

1
2
3   STATE OF CALIFORNIA        )
                        ) ss.
4   COUNTY OF ORANGE       )
5
6
7      I, TAMI L. LE, hereby certify:
8      I am a duly qualified Certified Shorthand
9   Reporter in the State of California, holder of
10   Certificate Number CSR 8716 issued by the Court
11   Reporters Board of California and which is in full force
12   and effect. (Fed. R. Civ. P. 28(a)).
13      I am authorized to administer oaths or
14   affirmations pursuant to California Code of Civil
15   Procedure, Section 2093(b), and prior to being examined,
16   the deponent was first duly sworn by me. (Fed. R. Civ.
17   P. 28(a), 30(f)(1).
18      I am not a relative or employee or attorney
19   counsel of any of the parties, nor am I a relative or
20   employee of such attorney or counsel, nor am I
21   financially interested in this action. (Fed. R. Civ.
22   28).
23      I am the deposition officer that stenographically
24   recorded the testimony in the foregoing deposition and
25   the foregoing transcript is a true record of the

Page 156

1   testimony given by the witness. (Fed. R. Civ. P.
2   30(f)(1)).
3      Before completion of the deposition, a review of
4   the transcript  [x] was  [ ] was not requested.  If
5   requested, any changes made by the deponent (and
6   provided to the reporter) during the period allowed, are
7   appended hereto. (Fed. R. Civ. P. 30(e)).
8
9   Dated: January 21, 2010.
10
11
12   _____
     TAMI L. LE
13   Certified Shorthand Reporter No. 8716, RPR
14
15
16
17
18
19
20
21
22
23
24
25

1   STATE OF CALIFORNIA        )
                        ) ss.
2   COUNTY OF ORANGE       )
3
4
5
6      I, TAMI L. LE, Certified Shorthand Reporter,
7   Certificate No. 8716, RPR, hereby:
8      The foregoing deposition is a true and correct
9   copy of the original transcript of the proceeding taken
10   by me as thereon stated.
11
12   Dated: January 21, 2010.
13
14   _____
15      TAMI L. LE
     Certified Shorthand Reporter No. 8716, RPR
16
17
18
19
20
21
22
23
24
25

40 (Pages 154 to 157)

Granite Southlands v. Alberta Town Center          ANGELA KRALOVEC                    1/15/2010

January 27, 2010

Paul Trahan, Esq.
Fulbright & Jaworski L.L.P.
600 Congress Avenue
Suite 2400
Austin, Texas 78701

Re:  Granite Southlands Town Center, LLC, v. Alberta
      Town Center, LLC., et al.
Depositions of: Michael Krier & Angela Kralovec

Dear Mr. Trahan:

Enclosed are the original signature pages(s) of the
above-named deposition(s).  It was agreed that you would
arrange for signature of same by means of your copy
transcript(s) and the enclosed signature page(s).
Also enclosed are amendment sheets for changes if necessary.
Please return the signed and notarized signature page(s)
and amendment sheet(s), if any, to our office within
30 days from the date of this letter to comply with the
statute.
We will mail the original pages to the appropriate attorney
to be placed with the original sealed transcript and copies
to all other counsel.
If circumstances change and a copy transcript is not
available from your office for the witness to review, then
please notify the witness that he/she should contact our
office to make an appointment to read, sign, and make
corrections to a copy that we will make available at our office.
Thank you for your attention to this matter.
Sincerely,


Shaun Kandalec
HUNTER + GEIST, INC.
Registered Professional Reporters

c:  Stuart N. Bennett, Esq.