# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-CV-00799-SJJ-KLM

GRANITE SOUTHLANDS TOWN CENTER LLC,

        Plaintiff,

v.

ALBERTA TOWN CENTER, LLC,
DONALD G. PROVOST
and PETER M. CUDLIP,

        Defendants.

---

## PLAINTIFF'S SECOND AMENDED COMPLAINT

---

Plaintiff Granite Southlands Town Center LLC ("Granite") files this Second Amended Complaint against Defendants Albert Town Center, LLC ("Alberta"), Donald G. Provost, and Peter M. Cudlip (collectively, the "Principals," and, together with Alberta, being referred to herein as the "Defendants"), as follows.

### SUMMARY OF COMPLAINT

This is a fraud and breach of contract lawsuit concerning a property known as the Southlands Town Center in Aurora, Colorado (the "Property"). The Principals committed fraud against Granite by failing to disclose a change in condition at the Property, a change that Plaintiff has learned involves material structural defects, which induced Granite to enter into a Release and Termination Agreement (the "Release") with the Principals. The Principals were aware of these defects prior to execution of the Release in December 2008, had a duty to disclose them,

but failed to do so.  Granite was not aware of these defects until after signing the Release and justifiably relied on the Principals' silence and misrepresentations by entering into and providing additional consideration for the Release which served, in part, to release the Principals from personal guarantees on a debt of approximately $160 million.  The Principals consequently had a significant financial incentive to conceal the defects from Granite.  Granite also seeks breach of contract damages for Alberta's failure to correctly report revenues and expenses and refusal to pay amounts owed as a result of post-closing reconciliation of revenues and expenses.[1]

## PARTIES

1.     Plaintiff Granite Southlands Town Center LLC is a Delaware limited liability company with its principal place of business in New York.

2.     Defendant Alberta Town Center, LLC is a Colorado limited liability company with its principal place of business in Denver, Colorado.  Defendant Alberta has appeared in this lawsuit and can be served through its counsel of record.

3.     Defendant Donald G. Provost is an individual residing in Colorado who can be served through his counsel of record.

4.     Defendant Peter M. Cudlip is an individual residing in Colorado who can be served through his counsel of record.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1332 by virtue of the diversity of citizenship of the parties.  The amount in controversy in this case, exclusive of interest and costs, exceeds $75,000.00.

---

[1]  Granite has eliminated claims relating to a dispute over escrowed funds that were submitted to the Court in February 2011 and have been reduced to a judgment; however, Granite expressly reserves all rights and does not waive any rights with respect to those claims by way of this amendment.

6.      This Court has personal jurisdiction over each of the Defendants because each is a resident of this state and has conducted business in this state.

7.      Pursuant to 28 U.S.C. § 1391, venue for this case is proper in this District because the claims affect property located in this District and all Defendants are subject to personal jurisdiction in this District.

## FACTS

8.      Granite purchased the Property from Alberta on December 12, 2008.  Alberta served as the developer for the Property and began construction following execution of a Forward Purchase and Sale Agreement ("FPSA") in September 2005.[2]  Alberta needed the FPSA in order to secure financing for construction of the Property in that the FPSA provided assurance to the lender that there would be a buyer to pay off the loan upon completion of the Property, provided certain conditions were met.  The FPSA also outlined Alberta's and Granite's rights and obligations with respect to the Property.

### Fraud Facts

9.      Also, on December 12, 2008, Granite and the Principals entered into the Release which was a separate agreement among Granite, the Principals, Alberta's construction lender, and various other parties which were not party to the FPSA and dealt, in part, with matters unrelated to the FPSA.  As consideration for the Release, Granite agreed to pay an additional $2,150,000 ("Additional Consideration") above the purchase price previously provided for in the FPSA.  Although the Principals were not the seller, they were parties to the Release.  Alberta's construction lender was also a party to the Release, and as part of the Release the lender released

---

[2]  The FPSA is dated September 29, 2005; however, the parties amended the FPSA numerous times, with the final amendment dated December 8, 2008.

the Principals from their obligations as guarantors on the underlying debt of approximately $160,000,000.  A true and correct copy of the Release is attached hereto as <u>Exhibit A</u>.

10.     Shortly after execution of the Release, a tenant provided Granite with Granite's first notice of what Granite would come to realize were material defects at the Property – defects that the Principals had known about for months before execution of the Release.  On January 28, 2009, Granite received a letter from legal counsel for DCC Architects, one of the tenants at the Property.  A true and correct copy of the letter from DCC Architects' attorneys is attached hereto as <u>Exhibit B</u>.  The correspondence enclosed a copy of a June 25, 2008, letter (the "DCC Letter") to Alberta whereby DCC Architects informed Alberta of defects at the Property, enclosing "photographs and verbal descriptions of damage due to building movement that is by no fault of the tenant or its occupants."  A true and correct copy of the June 25, 2008, letter is attached to the January 28, 2009, letter at <u>Exhibit B</u>.  Granite would learn the defects were severe enough for Alberta to have previously sought proposals from an engineering firm to investigate the source of the defects – all prior to execution of the Release and without notifying Granite.  Attached as <u>Exhibit C</u> (the "WJE Letter") is a true and correct copy of the November 2008 proposal from Wiss, Janney, Elstner Associates, Inc. "to provide engineering services related to the evaluation and remediation of slab and foundation movements affecting the buildings at the Southlands Mall located in Aurora, Colorado."  Granite later received evidence that, also prior to signing the Release, the Alberta's attorneys were in communications with attorneys for the Colorado Cinema, a tenant at the Property, regarding "foundation system movement."  A true and correct copy of the letter from Colorado Cinema's counsel, which references a letter from Alberta's counsel, Brownstein Hyatt Farber Schreck, LLP, dated December 8, 2008, is attached hereto as

Exhibit D.  These communications and events made it shockingly apparent to Granite that the Principals were aware of the defects almost six months before Granite signed the Release and were communicating with tenants about the defects just four days before execution of the Release.  Further, the Principals not only concealed the existence of these defects but made affirmative misrepresentations that no such defects existed in order to induce Granite to enter into the Release and to pay the Additional Consideration.

      11.     The Principals had a duty to disclose these defects to Granite prior to entering into the Release.  Not only are the defects of the kind that the Principals, in equity and good conscience, should have disclosed to Granite, but the FPSA clearly created a duty for the Principals to disclose these sorts of defects, including sections 7.2 and 11.2.[6]  There does not appear to be any real dispute that the Principals were aware of the defects prior to execution of the Release in December 2008.  When confronted with these issues in February 2009, Donald Provost acknowledged to Granite's representatives that he had been working to address the defects prior to execution of the Release.  Peter Cudlip was on-site regularly throughout construction and up through the date the Release was signed and was or should have been aware of the defects.  Not only did the Principals fail to disclose the defects, it appears they actively sought to conceal them.

      12.     For example, the Principals tried to convince Granite to accept the May 2008 estoppel certificates in December 2008.  The reason the Principals wanted Granite to accept the

---

[6] Section 7.2(f) of the FPSA required Alberta, and thereby the Principals, to promptly notify Granite "of any change in any condition with respect to the Property or any portion thereof."  Section 11.2(d) of the FPSA likewise required Alberta, and thereby the Principals, to promptly notify Granite of "any event or circumstance of which [Alberta] has knowledge subsequent to the date of [the FPSA] which (a) makes any representation or warranty of [Alberta] to [Granite] under [the FPSA] untrue or misleading."  Among the representations and warranties Alberta made to Granite under section 11.2(d) of the FPSA was, "As of the Closing Date, [Alberta], as landlord, is not in default or breach of any material terms, representations, covenants or conditions in any Qualifying Lease."

May 2008 certificates is because they did not contain evidence of the defects or other landlord defaults and, consequently, gave the mistaken impression that none existed.  However, the Principals knew at the time they offered the May 2008 certificates on November 21, 2008, that they were not accurate.  In contrast to the May 2008 certificates, the 2009 estoppel certificates reflect numerous and serious defects at the Property which existed prior to execution of the Release.  By offering these May 2008 certificates at or near the time the Release was signed, the Principals actively misrepresented the condition of the Property.  In addition, on information and belief, one or more of the Principals ordered that cosmetic repairs be made at the Property at times when Granite was scheduled to visit the Property for the purpose of concealing the defects and inducing Granite to enter into the Release.

13.      Granite relied on the Principals' silence in that Granite would never have entered into the Release or paid the Additional Consideration if Granite had known of the structural defects with the Property.  By withholding this information from Granite, the Principals induced Granite to enter into the Release and pay the Additional Consideration.  Given the Principals' duty to disclose any change in the condition, and even more importantly any defects, Granite was justified in relying on their silence.  Granite also relied on the affirmative representations made regarding the condition of the Property such as offering the May 2008 estoppel certificates three weeks before execution of the Release.  Offering the May 2008 certificates three weeks before the Release was signed amounted to an affirmative representation that the condition of the Property had not changed since May 2008, and Granite relied on this and other misrepresentations.

14.     The defects at the Property, though latent at the time the Release was signed, are serious.  Certain slabs at the Property were sinking into the ground, and the exterior walls, interior walls, and other components of some of the buildings at the Property were failing before Granite spent millions of dollars to repair the Property.  Although the cause of and responsibility for the defects remain unclear, there is no question these defects existed prior to execution of the Release and the Principals were aware of the defects at the time the Release was signed.  Despite having knowledge of the defects, the Principals failed to inform Granite of these defects prior to the December 12, 2008, execution of the Release.

**Breach of Contract Facts**

15.     In addition, the parties agreed to share revenues and expenses from the Property from December 14, 2007 through closing, which was December 12, 2008.  As part of this agreement, Alberta agreed to provide Granite with monthly reports certifying income and expenses, and Granite agreed to pay an equal share of any operating deficits based on Alberta's reports.  Granite's obligation was limited in that "[a]ny income or expenses that are properly accrued under generally accepted accounting principles and relate to a period prior the [December 14, 2007] shall not be included in the report"[7] and, therefore, not owed by Granite.  Over the course of 2008, based on Alberta's reports, Granite paid Alberta approximately $578,904 to cover the reported operating deficits.  The parties' agreements regarding reconciliation of revenues and expenses are covered in various amendments to the FPSA and were confirmed by the parties in various correspondence after closing.

---

[7] Paragraph 5 of the Eighth Amendment to the FPSA.

16.     The parties' agreements included an obligation to engage in a final post-closing reconciliation of revenues and expenses by March 31, 2009.  Between closing and March 31, 2009, the parties exchanged information and attempted to reach agreement on the amount of the "true-up" and regarding which party owed which party money.  The parties did not reach agreement.  Although Granite initially believed it would owe Alberta a modest amount of money as a result of the "true-up," it became apparent as Granite received more information that not only did Alberta owe Granite money – Alberta owed Granite a significant amount of money.  The discrepancy relates in large part to the fact that, in calculating operating deficits, Alberta included expenses from 2007 that should not have been charged to Granite for purposes of the reconciliation, namely 2007 property taxes and 2007 interest.  There also were numerous expenses, including Alberta's legal fees, that should not have been charged to the Property.

17.     As a result, Granite paid Alberta hundreds of thousands of dollars for operating deficits that it should not have paid, and the net "true-up" figure balances in Granite's favor by a considerable amount.  Alberta is obligated to pay, and repay, Granite these amounts pursuant to the parties' agreements, and Alberta's failure to do so is a breach of the parties' agreements.  Granite did not discover and could not, exercising reasonable diligence, have discovered the facts giving rise to this breach of contract claim until in or after July 2009.

### CAUSES OF ACTION

### BREACH OF CONTRACT
#### (Against Alberta)

18.     As alleged herein, Alberta breached its agreements with Granite by failing to provide accurate information in the monthly reports on revenues and expense.  This caused Granite to pay, or overpay, for operating deficits which either did not exist or were lower than

reported.  Alberta also has breached the parties' agreements regarding post-closing reconciliation of revenues and expenses by failing to pay Granite the final reconciled amount, which Granite estimates is upwards of $1.0 million, when you take the amounts Granite already has paid into account.

19.     Granite also seeks its attorneys' fees and costs against Alberta under the FPSA pursuant to Granite's breach of contract action.  Granite has been required to retain legal counsel to assist in resolving disputes over the reconciliation of the Property's income and expenses. Section 14.8 of the FPSA provides that the prevailing party in any dispute relating to the enforcement of the obligations of a party under the FPSA is entitled to recover reasonable attorneys' fees, expenses and costs actually incurred by such party.  Granite seeks to recover those attorneys' fees and expenses incurred in connection with the dispute over the reconciliation of the Property's income and expenses, as provided for in the FPSA

### FRAUDULENT INDUCEMENT AS TO THE RELEASE
#### (against Alberta, Donald Provost and Peter Cudlip)

20.     As alleged herein, Alberta and its Principals withheld material information from, and made material misrepresentations to, Granite so as to induce Granite to enter into the Release and pay the Additional Consideration – which Granite would not have done but for Defendants' fraudulent concealment and affirmative misrepresentations.  Granite reasonably relied on the Defendants' silence and affirmative misrepresentations, and Granite has suffered damages as a result of the Defendants' fraudulent conduct at least in the amount of the Additional Consideration.

## ACTUAL AND EXEMPLARY DAMAGES FOR FRAUD
### (against Alberta, Donald Provost and Peter Cudlip)

21.     Granite seeks the actual damages it has suffered as a result of the Defendants' fraudulently inducing Granite to enter into the Release, in particular the Additional Consideration paid in consideration for the Release of $2,150,000.  Granite also seeks exemplary damages against the Defendants for the fraud they committed to induce Granite to enter into the Release because the injury complained of by Granite is attended by circumstances of fraud, malice, or willful and wanton conduct on the part of the Defendants, as set out above.  The Defendants have continued to behave in a willful and wanton manner during the pendency of this lawsuit by refusing to be forthcoming with information relating to the defects, which the Defendants knew or should have known would aggravate Granite's damages, which it has.

WHEREFORE Plaintiff Granite Southlands Town Center LLC respectfully requests that the Court enter a judgment against Alberta and the Principals holding them jointly and severally liable for the Additional Consideration and exemplary damages, as well as holding Alberta liable for the damages for breach of contract, along with prejudgment and post-judgment interest and all other and further relief to which Granite is entitled.

Plaintiff renews its demand for a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

//s// Paul Trahan
Osborne J. Dykes, III
Benjamin M. Vetter
FULBRIGHT & JAWORSKI L.L.P.
370 Seventeenth Street, Suite 2150
Denver, CO  80202
(303) 801-2700 – Phone / (303) 801-2777 – Fax
jdykes@fulbright.com
bvetter@fulbright.com

Paul Trahan
FULBRIGHT & JAWORSKI L.L.P.
98 San Jacinto Blvd., Suite 1100
Austin, TX  78701
(512) 474-5201 – Phone / (512) 536-4598 – Fax
ptrahan@fulbright.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to attorneys for the remaining parties at the following e-mail addresses:

Stuart N. Bennett
Steven R. Kabler
JONES & KELLER, P.C.
1999 Broadway, Suite 3150
Denver, Colorado 80202
sbennett@joneskeller.com
skabler@joneskeller.com
*Attorneys for Alberta Town Center, LLC*
*Peter M. Cudlip and Donald G. Provost*

//s// Paul Trahan

# EXHIBIT A

## RELEASE AND TERMINATION AGREEMENT

This Release and Termination Agreement (this "**Agreement**") is made and entered into effective as of this /2 day of December, 2008, by and among ALBERTA TOWN CENTER, LLC, a Colorado limited liability company ("**Alberta**"), BLACKROCK GRANITE PROPERTY FUND, L.P., a Delaware limited partnership ("**Granite**"), GRANITE SOUTHLANDS TOWN CENTER LLC, a Delaware limited liability company ("**Granite Sub**"), SOUTHLANDS POWER CENTER, LLC, a Delaware limited liability company ("**Southlands Provost**"), SOUTHLANDS TOWER LLC, a Delaware limited liability company ("**Southlands Tower**"), BANK OF AMERICA, N.A., a national banking association, successor by merger to LaSalle Bank National Association, a national banking association, as agent ("**Agent**") for itself and the other banks party to the Loan Agreement (as hereinafter defined) (the Agent and the other banks being collectively referred to herein as "**Lender**"), DONALD G. PROVOST, an individual residing in the State of Colorado, ("**D. Provost**"), PETER M. CUDLIP, an individual residing in the State of Colorado ("**Cudlip**"), and ALLAN G. PROVOST, an individual residing in the State of Colorado ("**A. Provost**"). Alberta, Southlands Provost, D. Provost, Cudlip, and A. Provost are sometimes collectively referred to herein as the "**Alberta Parties**". Alberta, Granite, Granite Sub, Southlands Provost, Southlands Tower, Agent, Lender, D. Provost, Cudlip, and A. Provost are sometimes collectively referred to herein as the "**Parties**".

## RECITALS

A.    Alberta and Granite are parties to that certain Forward Purchase and Sale Agreement and Escrow Instructions dated as of September 29, 2005, as amended by that certain Amendment and Agreement dated as of April 30, 2007, and that certain First Amendment to Amendment and Agreement effective as of June 1, 2007, and that certain Second Amendment to Amendment and Agreement effective as of June 29, 2007, and that certain Third Amendment to Amendment and Agreement effective as of July 24, 2007, and that certain Fourth Amendment to Amendment and Agreement and Termination Agreement effective as of August 31, 2007, and that certain Fifth Amendment to Amendment and Agreement and Termination Agreement effective as of December 13, 2007, and that certain Sixth Amendment to Amendment and Agreement and Termination Agreement effective as of February 15, 2008, and that certain Seventh Amendment to Amendment and Agreement and Termination Agreement effective as of February 22, 2008, and that certain Eighth Amendment to Amendment and Agreement and Termination Agreement effective as of February 28, 2008, and that certain Ninth Amendment to Amendment and Agreement and Termination Agreement effective as of March 14, 2008, and that certain Tenth Amendment to Amendment and Agreement and Termination Agreement effective as of March 27, 2008, and that certain Eleventh Amendment to Amendment and Agreement and Termination Agreement effective as of April 9, 2008, and that certain Twelfth Amendment to Amendment and Agreement and Termination Agreement effective as of April 25, 2008, and that certain Thirteenth Amendment to Amendment and Agreement and Termination Agreement effective as of May 8, 2008, and that certain Fourteenth Amendment to Amendment and Agreement and Termination Agreement effective as of May 14, 2008, and that certain Fifteenth Amendment to Amendment and Agreement and Termination Agreement effective as of December 8, 2008 (collectively, the "**Town Center FPSA**"), wherein, among other things, Alberta agreed to construct and sell and Granite agreed to purchase the Project (as defined in the

Town Center FPSA) subject to the terms and conditions contained therein. Granite, pursuant to Granite's rights under the Town Center FPSA, has designated Granite Sub to take title to the Property (as defined in the Town Center FPSA) upon the closing of the Town Center FPSA.

B.   Southlands Provost and Granite were parties to that certain Forward Purchase and Sale Agreement and Escrow Instructions (VR-2 and VR-3) dated as of January 25, 2006, as amended by that certain Fourth Amendment to Amendment and Agreement and Termination Agreement effective as of August 31, 2007, as amended by that certain Amendment effective as of January 31, 2008 (collectively, the "**Terminated VR-2/3 FPSA**"), wherein, among other things, Southlands Provost agreed to construct and sell and Granite agreed to purchase the VR-2/3 Tracts subject to the terms and conditions contained therein. Granite terminated the Terminated VR-2/3 FPSA pursuant to Granite's rights in the Terminated VR-2/3 FPSA by letter dated September 26, 2008.

C.   Alberta, Granite, and Agent are parties to that certain Tri-Party Agreement dated September 29, 2005, as amended by that certain Amendment to Tri-Party Agreement dated May 14, 2008 (collectively, the "**Tri-Party Agreement**") wherein Granite consented to Alberta's collateral assignment of all of Alberta's right, title, and interest in and to the Town Center FPSA to Agent.

D.   Lender and Alberta are parties to a Construction Loan Agreement dated as of September 29, 2005, as amended by a First Loan Modification Agreement between Agent and Alberta dated as of October 31, 2007, and a Second Loan Modification Agreement between Agent and Alberta dated as of January 31, 2008, and a Third Loan Modification Agreement between Agent and Alberta dated as of May 14, 2008 (the Construction Loan Agreement, as so amended, is referred to herein as the "**Loan Agreement**"), pursuant to which Lender agreed to extend to Alberta a loan in the maximum principal amount of $158,807,879.00 (the "**Loan**"), upon the terms and conditions set forth in the Loan Agreement.

E.   On the date of this Agreement, (i) Alberta has transferred the Property (as defined in the Town Center FPSA) to Granite Sub pursuant to and in accordance with the Town Center FPSA, and (ii) Alberta has agreed to use all but $2,150,000.00 of the consideration received by Alberta at the closing of the Town Center FPSA to repay Lender for all sums due Lender under the Loan.

F.   In connection with the agreements of the Parties referenced in **Recital E** of this Agreement and the repayment to Lender of the full amount of the Loan, the Parties desire to evidence the termination of the Tri-Party Agreement and to evidence their respective agreements to release certain liabilities of the Parties on the terms set forth below.

NOW THEREFORE, for and in consideration of the foregoing recitals and the mutual agreements set forth herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.   **Incorporation**. The Recitals to this Agreement are incorporated herein by reference.

2. **Termination of Tri-Party Agreement**. Subject to Section 9, Alberta, Granite, and Agent agree that (i) the Tri-Party Agreement shall be terminated and of no further force or effect effective as of the closing of the Town Center FPSA, and (ii) effective as of the closing of the Town Center FPSA, none of the Parties shall have any further rights or obligations to any of the Parties or to any other person or entity pursuant to the Tri-Party Agreement.

3. **Release of Granite Parties**. Subject to Sections 5 and 9 of this Agreement, Agent, Lender, and the Alberta Parties (collectively, the "**Non-Granite Parties**") hereby RELEASE, ACQUIT, and FOREVER DISCHARGE Granite, Granite Sub, BlackRock Granite Property Fund, Inc., BlackRock Granite Property Fund, LLC, Southlands Tower, Metropolitan Life Insurance Company of New York, BlackRock Realty Advisors, Inc., and each of their respective direct or indirect owners, and all of their respective members, partners, shareholders, directors, officers, employees, agents, successors, assigns, attorneys and representatives (collectively, the "**Granite Parties**") from any and all Claims (defined below) that the Non-Granite Parties may have against the Granite Parties arising directly or indirectly, proximately or remotely, out of or relating to (collectively, "**Non-Granite Matters**"):

    (i) the Town Center FPSA;

    (ii) the Terminated VR-2/3 FPSA;

    (iii) the Tri-Party Agreement;

    (iv) the Loan;

    (v) any written or oral agreement between any of the Non-Granite Parties and any of the Granite Parties, including, but not limited to any alleged joint venture, partnership, or other similar agreement;

    (vi) any of the documents, instruments or other transactions, whether or not executed or entered into by any of the Parties, relating to any of the foregoing matters described in subclauses (i)-(v); and

    (vii) any costs and expenses relating to any of the matters described in subclauses (i)-(vi), including, without limitation, legal expenses.

Subject to Sections 5 and 9 of this Agreement, the Non-Granite Parties also RELEASE, ACQUIT, and FOREVER DISCHARGE the Property from any and all Claims of the Non-Granite Parties, at law or at equity, whether past or present, now or held, owned or possessed by any of the Non-Granite Parties, whether based upon contract, common law or statutory right, known or unknown with respect to the Non-Granite Matters. Subject to Sections 5 and 9 of this Agreement, the Non-Granite Parties understand and agree that the Non-Granite Parties are correctly described in this Agreement; that each signatory for the Non-Granite Parties is fully authorized and legally competent to execute this Agreement and is a duly authorized representative of the Non-Granite Parties; that the Agreement is fully and forever binding on the Non-Granite Parties and their successors, assigns and owners; that no promise or representation of any kind has been made to the Non-Granite Parties or by anyone acting for the Granite Parties, except as is expressly stated in this Agreement; that the Non-Granite Parties have not assigned,

pledged, or in any manner sold or transferred any right, title, interest or claim that arises out of or relates to the Non-Granite Matters; that the release in this Section 3 is a full, final, and complete release of the Granite Parties with respect to the Non-Granite Matters; that this release may be pleaded by any of the Granite Parties as an absolute and final bar to any or all Claims which may hereafter be filed or prosecuted by any of the Non-Granite Parties or anyone claiming by, through or under any of the Non-Granite Parties in respect of any of the Non-Granite Matters; that there are no Claims pending in any adjudicative proceedings by the Non-Granite Parties against the Granite Parties; that no recovery on account of the Non-Granite Matters may hereafter be had by anyone whom so ever claiming by, through or under the Non-Granite Parties; and that the consideration given for this release is no admission of liability and that none of the Non-Granite Parties nor those claiming by, through, or under any of them will ever claim that it is.

4.   **Release of Alberta Parties**.  Subject to Sections 5 and 9 of this Agreement, Granite, Granite Sub, and Southlands Tower hereby RELEASE, ACQUIT, and FOREVER DISCHARGE the Alberta Parties and each of their respective direct or indirect owners, and all of their respective members, partners, shareholders, directors, officers, employees, agents, successors, assigns, attorneys and representatives from any and all Claims against any of them arising directly or indirectly, proximately or remotely out of or relating to (collectively, "**Granite Matters**"):

  (i) the Town Center FPSA;

  (ii) the Terminated VR-2/3 FPSA;

  (iii) the Tri-Party Agreement;

  (iv) the Loan;

  (v) any written or oral agreement between any of the Alberta Parties and any of Granite, Granite Sub, and Southlands Tower, including, but not limited to any alleged joint venture, partnership, or other similar agreement between any of the Alberta Parties and any of the Granite Parties;

  (vi) any of the documents, instruments or other transactions, whether or not executed or entered into by any of the Parties, relating to any of the foregoing matters described in subclauses (i)-(v); and

  (vii) any costs and expenses relating to any of the matters described in subclauses (i)-(vi), including, without limitation, legal expenses.

Subject to Sections 5 and 9 of this Agreement, the Granite Parties also RELEASE, ACQUIT, and FOREVER DISCHARGE the Property from any and all Claims of the Granite Parties, at law or at equity, whether past or present, now or held, owned or possessed by any of the Granite Parties, whether based upon contract, common law or statutory right, known or unknown with respect to the Granite Matters.  Subject to Sections 5 and 9, the Granite Parties understand and agree that the Granite Parties are correctly described in this Agreement; that each signatory for the Granite Parties is fully authorized and legally competent to execute this Agreement and is a duly

authorized representative of the Granite Parties; that the Agreement is fully and forever binding on the Granite Parties and their successors, assigns and owners; that no promise or representation of any kind has been made to the Granite Parties or by anyone acting for the Alberta Parties, except as is expressly stated in this Agreement; that the Granite Parties have not assigned, pledged, or in any manner sold or transferred any right, title, interest or claim that arises out of or relates to the Granite Matters; that the release in this Section 4 is a full, final, and complete release of the Alberta Parties with respect to the Granite Matters; that this release may be pleaded by any of the Alberta Parties as an absolute and final bar to any or all Claims which may hereafter be filed or prosecuted by any of the Granite Parties or anyone claiming by, through or under any of the Granite Parties in respect of any of the Granite Matters; that there are no Claims pending in any adjudicative proceedings by the Granite Parties against the Alberta Parties; that no recovery on account of the Granite Matters may hereafter be had by anyone whom so ever claiming by, through or under the Granite Parties; and that the consideration given for this release is no admission of liability and that none of the Granite Parties nor those claiming by, through, or under any of them will ever claim that it is.

5.   **No Release of Certain Obligations**.  Notwithstanding anything to the contrary contained herein, any obligations of the Parties under the following agreements are expressly not released, cancelled, or waived:

(i) any terms or provisions of the Town Center FPSA which are expressly stated to survive the closing of the Town Center FPSA (including, without limitation, any obligation to "true-up" proration items);

(ii) the Special Warranty Deed made by Alberta, as grantor, conveying title to the Property (as defined in the Town Center FPSA) to Granite Sub, as grantee;

(iii) the Certification of Non-Foreign Status made by Alberta in connection with the closing of the Town Center FPSA;

(iv) the Bill of Sale and Assignment by and between Alberta and Granite Sub executed in connection with the closing of the Town Center FPSA;

(v) the Assignment and Assumption of Lease by and between Alberta and Granite Sub executed in connection with the closing of the Town Center FPSA;

(vi) the Assignment and Assumption of Contracts executed in connection with the closing of the Town Center FPSA;

(vii) the landlord estoppel certificates, if any, executed by Alberta pursuant to Section 8.1(k) of the Town Center FPSA and delivered to Granite Sub at or after the closing of the Town Center FPSA;

(viii) the Assignment and Assumption of Declarant by and between Alberta and Granite Sub executed in connection with the closing of the Town Center FPSA; [OPEN]

(ix) the Assignment and Assumption of Declarant by and between Southlands Colorado, LLC, and Granite Sub executed in connection with the closing of the Town Center FPSA; and [OPEN]

(x) that certain Management Agreement dated as of an undated date in 2007 by and between Southlands Shopping Center Management, LLC, and Granite Sub (as successor-in-interest to Alberta), as amended.

6.  **Release of Agent and Lender**.  Subject to Section 9 of this Agreement, Granite, Granite Sub, and Southlands Tower (on behalf of themselves and the other Granite Parties) and the Alberta Parties (collectively, the "**Non-Lender Parties**") hereby RELEASE, ACQUIT, and FOREVER DISCHARGE Agent and Lender and each of their respective direct or indirect owners, and all of their respective members, partners, shareholders, directors, officers, employees, agents, successors, assigns, attorneys and representatives (collectively, the "**Lender Parties**") from any and all Claims against any of them arising directly or indirectly, proximately or remotely out of or relating to (collectively, "**Loan Matters**"):

(i) the Town Center FPSA;

(ii) the Terminated VR-2/3 FPSA;

(iii) the Tri-Party Agreement;

(iv) the Loan;

(v) any alleged joint venture, partnership, or other similar agreement among any of the Non-Granite Parties, any of the Granite Parties, and Agent and Lender;

(vi) any of the documents, instruments or other transactions, whether or not executed or entered into by any of the Parties, relating to any of the foregoing matters described in subclauses (i)-(v); and

(vii) any costs and expenses relating to any of the matters described in subclauses (i)-(vi), including, without limitation, legal expenses.

Subject to Section 9, the Non-Lender Parties understand and agree that the Non-Lender Parties are correctly described in this Agreement; that each signatory for the Non-Lender Parties is fully authorized and legally competent to execute this Agreement and is a duly authorized representative of the Non-Lender Parties; that the Agreement is fully and forever binding on the Non-Lender Parties and their successors, assigns and owners; that no promise or representation of any kind has been made to the Non-Lender Parties or by anyone acting for Agent or Lender, except as is expressly stated in this Agreement; that the Non-Lender Parties have not assigned, pledged, or in any manner sold or transferred any right, title, interest or claim that arises out of or relates to the Loan Matters; that the release in this Section 6 is a full, final, and complete release of the Loan Matters; that this release may be pleaded by Agent or Lender Parties as an absolute and final bar to any or all Claims which may hereafter be filed or prosecuted by any of the Non-Lender Parties or anyone claiming by, through or under any of the Non-Lender Parties in respect of any of the Loan Matters; that there are no pending Claims by the Non-Lender Parties against

60134876.7
Release & Termination Agreement

- 6 -

the Lender Parties; that no recovery on account of the Loan Matters may hereafter be had by anyone whom so ever claiming by, through or under the Non-Lender Parties; and that the consideration given for this release is no admission of liability and that none of the Non-Lender Parties nor those claiming by, through, or under any of them will ever claim that it is.

7.      **Definition of Claims**.  The term "**Claims**" as used herein means all existing future, known, and unknown claims, demands and causes of action for all existing, future, known and unknown damages and remedies that arise out of or relate to the Non-Granite Matters, the Granite Matters, or the Loan Matters (as applicable) or that have been brought or could have been brought by the Parties in any court, tribunal or forum, in this or any other jurisdiction, in these United States or anywhere else.  Under this definition, "**Claims**" includes, but is not limited to, all claims, demands, and causes of action of any nature, whether in contract or in tort, or arising under or by virtue of any statute or regulation, for past, present, future, known, and unknown injuries, property damage, and all other losses and damages of any kind, including, but not limited to, the following:  all actual damages, property or economic damage, all penalties of any kind, any tax liabilities or other penalties, damage to business reputation, lost profits or good will, consequential damages, damages ensuing from loss of credit, prejudgment and postjudgment interest, and costs and attorneys' fees.  This definition further includes, but is not limited to, all elements of damages, all remedies, and all claims, demands, and causes of action that are now recognized by law or that may be created or recognized in the future by any manner, including, without limitation, by statute, regulation, or judicial decision.

8.      **No Joint Venture**.  The Alberta Parties acknowledge and agree that no agreement exists amongst any of them with any of the Granite Parties that would cause the Alberta Parties to be construed for any purpose to be a partner, joint venturer, agent, or associate of any of the Granite Parties.  The Alberta Parties hereby waive any claim as against any of the Granite Parties that any of the Granite Parties is a partner, joint venturer, agent, or associate of any of the Alberta Parties or any other party affiliated with or owned or controlled directly or indirectly by any of the Alberta Parties pursuant to any agreement, whether written or oral, in existence as of the date hereof or claimed or alleged to be in existence as of the date hereof by any of the Alberta Parties or any other party affiliated with or owned or controlled directly or indirectly by any of the Alberta Parties.  Granite, Granite Sub, and Southlands Tower acknowledge and agree that no agreement exists amongst any of them with any of the Alberta Parties that would cause Granite, Granite Sub, or Southlands Tower to be construed for any purpose to be a partner, joint venturer, agent, or associate of any of the Alberta Parties.  Granite, Granite Sub, and Southlands Tower hereby waive any claim as against any of the Alberta Parties that Granite, Granite Sub, or Southlands Tower is a partner, joint venturer, agent, or associate of any of the Alberta Parties or any other party affiliated with or owned or controlled directly or indirectly by any of the Alberta Parties pursuant to any agreement, whether written or oral, in existence as of the date hereof or claimed or alleged to be in existence as of the date hereof by Granite, Granite Sub, or Southlands Tower or any of the other Granite Parties.

9.      **Conditions to Agent's Consent**.  Notwithstanding anything to the contrary contained herein, the consent and agreement of Agent to the matters set forth in this Agreement (and accordingly the effectiveness of this Agreement) are expressly conditioned upon:  (a) the repayment in full of all principal and interest due under the Loan and all other sums owed by Alberta under the Loan (which repayment in full shall be conclusively deemed to have occurred

upon Lender's release of the lien on the Property securing repayment of the Loan); and (b) the Granite Parties' and the Alberta Parties' release of Agent and Lender as set forth in Section 6 of this Agreement.

10.     **Governing Law**.   This Agreement shall be governed by the laws of the State of Colorado, exclusive of choice of law rules.

11.     **Successors and Assigns**.     The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

12.     **Counterparts**.  This Agreement shall be fully executed when each party has signed and delivered to the other (by mail, overnight delivery, facsimile or e-mail) at least one counterpart, even though no one counterpart contains the signatures of all the parties to this Agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Granite has executed this Agreement as of the date first set forth above.

**GRANITE:**

BlackRock Granite Property Fund, L.P.,
a Delaware limited partnership

By:   BlackRock Granite Property Fund, LLC
      a Delaware limited liability company,
      its General Partner

     By:   BlackRock Granite Property Fund, Inc.
          a Maryland corporation,
          its Sole Member

          By:   BlackRock Realty Advisors, Inc.,
              a Delaware corporation,
              its Investment Manager

              By: _____
              Name: Christopher Silva
              Title: Director

[Signatures Continue on Next Page]

60134876.7
Release & Termination Agreement

IN WITNESS WHEREOF, Southlands Tower has executed this Agreement as of the date first set forth above.

**Southlands Tower:**

Southlands Tower LLC,
a Delaware limited liability company

By:    BlackRock Granite Property Fund, L.P.,
         a Delaware limited partnership,
         its Sole Member

         By:    BlackRock Granite Property Fund, LLC
                  a Delaware limited liability company,
                  its General Partner

                  By:    BlackRock Granite Property Fund, Inc.
                           a Maryland corporation,
                           its Sole Member

                        By:    BlackRock Realty Advisors, Inc.,
                                a Delaware corporation,
                                its Investment Manager

                                By: _____
                                Name: Christopher Silva
                                  Title: Director

[Signatures Continue on Next Page]

IN WITNESS WHEREOF, Alberta has executed this Agreement as of the date first set forth above.

**ALBERTA**:

Alberta Town Center, LLC,
a Colorado limited liability company

By: _____
Donald C. Provost, Manager

[Signatures Continue on Next Page]

IN WITNESS WHEREOF, Granite Sub has executed this Agreement as of the date first set forth above.

**GRANITE SUB:**

Granite Southlands Town Center LLC,
a Delaware limited liability company

By:    BlackRock Granite Property Fund, L.P.,
       a Delaware limited partnership,
       its Sole Member

     By:    BlackRock Granite Property Fund, LLC
           a Delaware limited liability company,
           its General Partner

          By:    BlackRock Granite Property Fund, Inc.
              a Maryland corporation,
              its Sole Member

              By:    BlackRock Realty Advisors, Inc.,
                  a Delaware corporation,
                  its Investment Manager

                  By: _____
                  Name: _Christopher Silva_
                  Title: _Director_

[Signatures Continue on Next Page]

IN WITNESS WHEREOF, Southlands Provost has executed this Agreement as of the date first set forth above.

**Southlands Provost:**

Southlands Power Center, LLC,
a Delaware limited liability company

By:    Southlands Colorado, LLC
       a Delaware limited liability company

       By:_____
       Name:_____
       Title:_____

[Signatures Continue on Next Page]

IN WITNESS WHEREOF, Agent has executed this Agreement as of the date first set forth above, in its capacity as Agent for Lender.

**AGENT:**

Bank of America, N.A., a national banking association, successor by merger to LaSalle Bank National Association, a national banking association, as Agent

By: _____
Name: _____
Title: Senior Vice President

[Signatures Continue on Next Page]

IN WITNESS WHEREOF, Donald G. Provost has executed this Agreement as of the date set forth above.

_____

Donald G. Provost

[Signatures Continue on Next Page]

IN WITNESS WHEREOF, Peter M. Cudlip has executed this Agreement as of the date set forth above.

_____
Peter M. Cudlip

[Signatures Continue on Next Page]

IN WITNESS WHEREOF, Allan G. Provost has executed this Agreement as of the date first set forth above.

_____
Allan G. Provost

[End of Signatures]

EXHIBIT B



**A**NEST &
**B**ROWN, P.C.
ATTORNEYS AT LAW

JAMES T. ANEST ♦
STEPHEN L. BROWN
KARA N. NOACK

♦ Also Member of Wyoming Bar

19590 East Mainstreet, Suite 107
Parker, CO 80138

Phone: (303)-841-9525
Fax:    (303)-841-0881

E-Mail Kara@parkerlawyers.com
http:www.parkerlawyers.com

January 28, 2009

Mr. Andrew Piekarski
Granite Southlands Town Center, LLC
c/o BlackRock Realty Advisors, Inc.
300 Campus Drive, Third Floor
Florham Park, NJ 07932
*Via US Mail, Certified, Return-Receipt*

RE: *Form of Estoppel Certificate, DCC Architects, LLC, Lease of premises Suite 235*

Dear Mr. Piekarski:

This letter is written in regard to misstatements in the Form of Estoppel Certificate recently provided to DCC Architects, LLC for its review and execution. Please find an executed copy of a Form of Estoppel Certificate containing most of the requested provisions, omitting incorrect provisions regarding the fact that all repairs required have been made and including a simple statement regarding the fact that the Tenant has requested repairs enclosed.

Unless you provide notice otherwise, DCC Architects, LLC will assume that the provided Form of Estoppel Certificate is acceptable. Please contact me to discuss any questions or concerns.

Sincerely,

ANEST & BROWN, P.C.

Kara N. Noack

Cc: BlackRock Realty Advisors
    Southlands Shopping Center Management, LLC
    DCC Architects, LLC

Enclosure



**A**NEST &
**B**ROWN, P.C.

ATTORNEYS AT LAW

**JAMES T. ANEST** ♦
**STEPHEN L. BROWN**
**KARA N. NOACK**

♦ Also Member of Wyoming Bar

19590 East Mainstreet, Suite 107
Parker, CO 80138

Phone: (303)-841-9525
Fax:     (303)-841-0881

E-Mail Kara@parkerlawyers.com
http:www.parkerlawyers.com

January 28, 2009

Mr. Andrew Piekarski
Granite Southlands Town Center, LLC
c/o BlackRock Realty Advisors, Inc.
300 Campus Drive, Third Floor
Florham Park, NJ 07932
*Via US Mail, Certified, Return-Receipt*

> *RE: DCC Architects, LLC, Lease of premises Suite 235, damage to property/requested repairs
> and requested revisions to the Form of Estoppel Certificate*

Dear Mr. Piekarski:

This letter is written in regard to the premises located 6155 South Main Street, Suite 235, Aurora, Colorado, 80016. As the previous owner likely informed you, there are several reported defects in this space and the surrounding area. A copy of my client's letter sent to Alberta Town Center, LLC on June 25, 2008 wherein DCC Architects, LLC detailed the emerging problems and requested the damages be repaired is enclosed for your notice and convenience. Please consider this letter and the enclosed letter notice pursuant to Article 10.1 of the Lease. The damages documented in the June 25, 2008 letter have yet to be satisfactorily repaired and conditions continue to deteriorate.

Additionally, further cracks and additional structural defects have emerged. There are several health and safety concerns within and around the demised premises in need of immediate attention such as:

- the increasing gap at the base of the glass wall around the conference room that could cause a failure of the glass
- the expanding cracks around the one hour rated egress stairwell, which is likely a violation of current building codes
- expanding joints and areas of sealant giving way which could result in moisture penetration and potential mold growth,
- movement from the built-in counters has the potential consequence of instability or collapse
- the unexplained floor bowing between the structural members has caused a large gap  at the base of the demising walls and places additional stress on surrounding structural members

In addition, the uneven building settlement poses a potential issue since the ground level entrances likely no longer meet ADA accessibility requirements. This could present a potential hardship to clients or

visitors to DCC Architects, LLC. There are also security concerns regarding the continual sag of the tenant entry door (repaired on numerous occasions), which results in the inability to lock and secure the premises (Article 9.5 Tenant must…keep the Demised Premises secure…). This item is in part related to the unexplained building movement that is also ongoing.

As a design-based business, image is important to DCC Architects, LLC. The defects visible in the main lobby and throughout the common area, secondary to the structural and safety concerns indicated above, create a negative perception regarding the quality of service associated with the firm. This affects the potential for attracting new clientele.

Pursuant to Article 3 of the Lease, the Landlord "represents and warrants that the foundation, structural portion of the exterior walls, floors, and roof of the Demised Premises as well as Landlord's Work, if, described in (as applicable) Exhibit "C-1" or Exhibit "C-2" to this lease were constructed (or if not yet constructed, will be constructed) in a good and workmanlike manner …" Pursuant to Article 10.1 of the Lease the Landlord must keep the foundation, the exterior walls, and roof in good repair. Many of the aforementioned conditions seem to suggest that the foundation and structural portions of the walls, floor and roof of the building were not constructed in a good and workmanlike manner. Your prompt attention in repairing the aforementioned problems is expected and appreciated.

This letter is also written to request revisions to and clarifications of the recent Form of Estoppel Certificate sent by the New Owners to my client. Please clarify how the amount of square footage was calculated and provide a certification of the square footage for the premises. Also, please describe how the additional rent expenses for common area operating costs are calculated for each tenant and provide evidence of the calculations regarding the additional rent expenses for Suite 235. In addition, please clarify the date of the Lease. The Lease began in March of 2007, yet the Estoppel Certificate listed the DATE OF LEASE as 11/13/2008. Importantly, as mentioned above, my client cannot state that the Landlord has performed all of its obligations under the Lease because of the safety concerns and detailed outstanding areas in need of repair.

Sincerely,

ANEST & BROWN, P.C.

*Kara Noack*

Kara N. Noack

Cc: BlackRock Realty Advisors
Southlands Shopping Center Management, LLC
DCC Architects, LLC

# FORM OF ESTOPPEL CERTIFICATE

Re: Southlands Town Center, Aurora, Colorado ("Property")

TENANT: DCC Architects, LLC
DATE OF ORIGINAL LEASE COMMENCED: 3/10/2007
DATE NEW OWNER ASSUMED THE LEASE: 11/13/2008
EXPIRATION DATE OF LEASE: 8/31/2012
PREMISES: Space No. Suite 235

To:     Granite Southlands Town Center LLC ("GSTCLLC"), BlackRock Granite
        Property Fund, L.P. ("Granite"), and BlackRock Realty Advisors, Inc.
        ("BlackRock") (GSTCLLC, Granite and BlackRock and their successors and
        assigns, collectively, "Buyer").

To Whom It May Concern:

        The undersigned hereby certifies to Buyer as follows:

        1.      The undersigned is the "Tenant" under the above-referenced Lease
("Lease") covering the above-referenced Premises ("Premises").

        2.      The Lease is in full force and effect and constitutes the entire agreement
between the landlord under the Lease ("Landlord") and Tenant with respect to the
Premises and the Lease has not been modified or amended in any respect as set forth
above. A true, correct and complete copy of each Lease is attached hereto as Schedule 1.

        3.      The term of the Lease commenced on 3/10/2007 and, including any
presently exercised option or renewal term, will expire on 8/31/2012. Tenant has
accepted possession of the Premises and is the actual occupant in possession. All
improvement required to have been constructed on the Premises as of the date hereof by
Landlord have been completed and accepted by Tenant and any tenant improvement
allowances required as of the date hereof to have been paid by Landlord have been paid.
Tenant has not assigned the Lease or sublet all or any part of the Premises except as
permitted in accordance with the Lease.

        4.      Tenant is currently obligated to pay minimum guaranteed rent installments
of $3,851.75 per month and monthly minimum guaranteed rent has been paid through
1/31/2009. In addition, the Lease requires additional rent based on the Tenant's pro-rata
share of the building's common area operating costs and real estate taxes which is agreed
to 1.29%. No other rent has been paid more than 30 days in advance. Tenant paid a
security deposit of $4,218.58 pursuant to the Lease.

*MBR*

5.      Tenant has provided a request for repairs to landlord on 6/25/2008 and provided another request to complete the repairs requested 6/25/2008, in addition to repair further defects, to Landlord on 1/28/09.

6.      The undersigned has no renewal, extension or expansion option, no right of first offer or right of first refusal and no other similar right to renew or extend the terms of the Lease or expand the Premises except as may be expressly set forth in the Lease. Tenant has no option or preferential right to lease or occupy additional space within the Property. Tenant has no option or preferential right to purchase all or any part of the Premises or any part of the Property.

7.      Tenant has made no agreements with Landlord or its agents or employees at this time concerning free rent, partial rent, rebate of rental payments or any other type of rental or other concession except as expressly set forth in the Lease.

8.      There has not been filed by or against Tenant a petition in bankruptcy, voluntary or otherwise, any assignment for the benefit of creditors, any petition seeking reorganization or arrangement under the bankruptcy laws of the United States, or any state thereof, or any other action brought under said bankruptcy laws with respect to Tenant.

This Certificate is made to Buyer in connection with the transfer of the Property to Buyer knowing that Buyer will rely thereon. This Certificate may be relied on by Buyer, any of BlackRock's, or Granite direct and indirect owners, any current or future mortgagee of Buyer, and any of the respective successors and assigns of any of the foregoing.

Dated this 28 day of JANUARY, 2009.

CERTIFIER

DCC Architects, LLC

By: _____

Name: MELISSA BOW-RICHARDSON

Title: MANAGING MEMBER

MBR



**DCC ARCHITECTS, LLC**

June 25, 2008

Jose Inclan
General Manager
Alberta Town Center, LLC
6155 South Main St., Ste. 260
Aurora, CO 80016

Dear Mr. Inclan:

This letter is to officially inform Alberta Town Center, LLC that we are requesting that said company, as the Landlord, repair interior damage to the DCC Architects' tenant space at 6155 S. Main St., Suite 235, Aurora, CO 80016 at Landlord's expense. Several items require attention and some have been documented in this correspondence. Enclosed are photographs and verbal descriptions of damage due to building movement that is by no fault of the tenant or its occupants. Please consider this letter your notice pursuant to Article 10.1 of the lease.





1. There are numerous cracks in the drywall. There seems to be evidence that the exterior walls of the building are moving independently from the rest of the building. As a result of this movement there is cracking in the interior finish drywall at numerous locations in the office. Cracks have appeared at the junction of the interior framed-in walls and exterior walls throughout the space. There are also cracks in the drywall at the apex of the arch of two of the windows on the east and north sides of the office.





2. The previously-mentioned exterior wall separation/ movement is further evident at the perimeter floor of the space. There is a rotation/ uplift to the closure angle that was installed to cover the gap at the floor from the 2nd level to the 1st level tenants. This movement is causing the light gage metal angles to push up at the concrete slab and create lumps in the carpeting. This is especially noticeable in our conference room space where there are no countertops or desks to hide the bow from view.



3. There is a noticeable gap forming between the wall and the floor on the on the south and east side of our office. The demising wall adjacent to the Free World Foods tenant in suite 240 and the floor slab is moving. This is also causing a gap at the base of the glass wall around the conference room. The floor finishes are pulling away and down from the original finish wall location.









4. The gasket around the glass wall in the conference room is falling out. We reinstalled the gasket once already and it is falling out again. Due to the excessive building movement, the next step will be to adhere it in place but to do so means vacating the office for the afternoon and having the work be completed when the office is vacant due to the smell of the adhesive.





5. The front door is racking in the frame. We moved into the space in April of 2007 and have requested that maintenance remove the door twice to shave the bottom down to allow the door to swing freely. The latch side of the door has displaced to the degree that the tile floor is cracking. We have also requested that maintenance adjust the strike plate on latch so that the door can be closed and locked. It is once again beginning to rub on the tile floor when swinging closed and will soon require additional shaving and adjustment to the strike plate to be able to secure our space. This will remain a temporary correction to this problem.



6. The aluminum frame of the front door is coming apart: the door jamb on the latch side is separating from rest of system, and the top mullion above the glazing area is starting to fall out. There is also cracking around the fame at the corridor.





7. There is also considerable movement form our countertops and low walls from the original installation. The countertops are separating from the walls as the walls around them are moving with the floor.





8. Within the common areas of the building there are large cracks developing as well. As examples located in the hallway wall across from the office door of suite 240 as well as a large crack within the 1 hour rated egress stairwell in the building. This crack started on the north side of the stairwell, but has now expanded to going all the way around the exit enclosure.









As a high-end Architectural firm, there is a perceived image that our office should convey to prospective clients. The current damages to the space are damaging to the image of the firm and limits our ability to invite perspective clients to meetings in the office. The items mentioned above are directly related to the foundation which apparently has not been constructed in a good and workmanlike manner. These conditions may be unsafe. DCC is not responsible for any injuries or damages caused by these conditions. We would greatly appreciate your attention to this matter as soon as possible. Please do not hesitate to contact me with any questions at 303-805-7550 or at mbr@dccarchitects.us.

Sincerely,

Melissa Bow-Richardson, Managing Member
DCC Architects, LLC

Enclosure

MBR/bc

# EXHIBIT C



WJE | ENGINEERS
      ARCHITECTS
      MATERIALS SCIENTISTS

**Wiss, Janney, Elstner Associates, Inc.**
10881 West Asbury Avenue, Suite 110
Lakewood, Colorado 80227
720.962.8688 tel | 720.962.8488 fax
**www.wje.com**

November 19, 2008

Mr. Jose Inclan
Southlands Shopping Center
6155 South Main Street, Suite 260
Aurora, Colorado 80016

Re:     Proposal for Engineering Services
        The Shops at Southlands Mall
        Aurora, Colorado
        WJE No. 2008.5358.P

Dear Mr. Inclan:

At your request, Wiss, Janney, Elstner Associates, Inc. (WJE) is submitting this proposal to provide engineering services related to the evaluation and remediation of slab and foundation movements affecting the buildings at the Southlands Mall located in Aurora, Colorado.

## BACKGROUND

The Southlands complex consists of 14, one- or two-story buildings, including a movie theater, located on a large site with extensive plaza areas, landscaping and surface parking.

It is our understanding that the complex was constructed between 2004 and 2006. Soon after the construction of the project was completed, the property began to exhibit problems as a result of slab and foundation movements. These movements appear to have accelerated within the last year and continue to worsen.

The most pronounced distress appears to have developed within Building E and the movie theater. Signs of expansive soils and settlement of backfill material, and a combination of both, were evident during our brief site visit on November 17, 2008. It was apparent that differential foundation movements are causing damage in the second and ground levels, and backfill settlement is causing damage at the ground level.

## PROPOSED SCOPE OF SERVICES

*Phase I - Initial Evaluation*

During our November 17 visit, we discussed performing an initial evaluation of two buildings in an effort to provide you and the owners with an initial assessment of the problems affecting the Southlands complex. At your request, the movie theater will be evaluated separately. We envision the following scope of services.

- Review the original design and construction documents and geotechnical report. These original documents are often useful in determining the cause of problems that develop. This review is intended to allow us to become more familiar with the type and details of construction, and the construction materials used, in order to better understand the problems encountered. At this time,

 ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

Mr. Jose Inclan
Southlands Shopping Center
November 19, 2008
Page 2

we do not propose to perform a complete or in-depth review of the documents, or judge the competence of the original design. If design checks are made, they will be limited to those portions of the structure where problems have been encountered.

- Conduct a detailed examination of the existing conditions within the buildings and their facades. This examination will be concerned with locating and documenting cracks, signs of movement and distress, poor drainage, construction deficiencies, and items that are not in conformance with good industry practice. We will include potential problems that affect safety, durability, maintenance, or performance of the buildings. The surrounding site work will also be documented.

- Supervise or perform elevation surveys at selected points at specific time intervals. The first elevation survey would be used to determine the relative position of selected points, and as a baseline for future surveys. Subsequent surveys would be performed to monitor ongoing movements. A second survey would be performed 3 to 4 months after the first survey. Subsequent surveys would be performed on 6-month to 1-year intervals, depending on conditions that develop.

- Provide an initial list of defective or deficient conditions that may have contributed to the problems at the site.

- Provide general remedial recommendations for any conditions that we have identified that should be promptly addressed in order to mitigate damages.

- Provide general recommendations for long-term monitoring and further investigative efforts that might be prompted by the initial phase of our work, as described below.

### *Phase II - In-Depth Evaluations*

Depending upon the findings from our Phase I efforts there may be a need for WJE to provide additional services. More specifically, the following services may be warranted:

- Extend the evaluation to the remaining buildings in the Southlands complex.

- Perform additional investigations of existing conditions. For example, discoveries made during our investigation may lead us to recommend exploratory excavations to determine the presence of voids under grade beams, expose underground drainage systems, or to recommend running a remotely operated camera down the length of buried sewer lines.

- Recommend an independent soils investigation. A geotechnical consultant would be retained by Southlands or WJE to retrieve soil borings and analyze the supporting soils.

- Provide general or detailed remedial recommendations to address existing problems and long term concerns.



ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

Mr. Jose Inclan
Southlands Shopping Center
November 19, 2008
Page 3

- Attend meetings with various parties to discuss our findings and to work toward a resolution of these problems.

- Continue to monitor the condition of the property with elevation surveys and periodic condition assessments.

- Provide litigation support, if needed.

## WJE PERSONNEL and CAPABILITIES

Professional qualifications of personnel likely to be involved with this project are attached. John Reins, Lee Farrell and Luis Estenssoro each have over 25 years of experience with building damage and distress caused by the local expansive soils and settlement of fill materials since the Denver office of WJE opened in 1982. The attached project files are examples of previous projects with similar problems.

WJE is uniquely qualified to assist you in this matter. While the primary experience of most structural engineering consulting firms is the design of new structures, we specialize in the evaluation and repair of existing structures, particularly with buildings of similar construction to Southlands'. We are in a good position to assist you and Southlands in selecting cost-effective options. I have also attached our company brochure for additional information.

## FEES and TERMS AND CONDITIONS

We estimate that the scope of services outlined above under Phase I for Buildings E and F can be provided within a budget of $15,000 to $19,000. For the movie theater, we estimate an additional budget of $5,000 to $7,000.

At this point in time, budgets have not yet been developed for any of the Phase II services, which will become better defined after the completion of Phase I services. WJE's actual charges will be based upon our standard hourly rates:

| Professional Staff | | Professional Support Staff | |
|---|---|---|---|
| Principal | $225.00 | Senior Construction Specialist | $160.00 |
| Associate Principal | 185.00 | Senior Specialist | 105.00 |
| Senior Associate | 160.00 | Specialist | 95.00 |
| Associate III | 145.00 | Senior Technician | 85.00 |
| Associate II | 120.00 | Technician II | 70.00 |
| Associate I | 100.00 | Technician | 55.00 |

Our Standard Terms and Conditions, dated October 8, 2007, are part of this proposal and are attached for your review.

We are a certainly available to discuss this proposal in greater detail. If you concur with this proposal, please sign on the space provided below and return one copy, which will serve as our authorization to proceed.



Very truly yours,

**WISS, JANNEY, ELSTNER ASSOCIATES, INC.**

Luis F. Estenssoro, P.E.
Principal

**Authorization to Proceed with Work**

**WJE No. 2008.5358**

**For:** _____
                              (Company)

_____          _____
        (Signature)                          (Printed Signature)

_____          _____
          (Title)                                    (Date)

Case 1:09-cv-00799-ZLW-KLM Document 29-5 Filed 09/04/2009 USDC Colorado Page 1 of 3

# EXHIBIT D



DLA Piper LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1293
www.dlapiper.com

Kenneth L. Schmetterer
kenneth.schmetterer@dlapiper.com
T 312.368.2176
F 312.630.6350

December 18, 2008

**Via email and UPS Next Day Delivery**

Benjamin A. Kahn
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432

Re:     **Colorado Cinema, 23955 E. Plaza Ave., Aurora, CO 80016**

Dear Mr. Kahn:

I am writing in response to your letter dated December 8, 2008. At the outset, the letter appears to reflect our miscommunication following our discussion and initial exchange of letters. It was my understanding that while we were gathering information I was also awaiting any construction contracts or related documentation that you may have access to that would help me understand both nature and extent of the issue you complained of as well as its underlying cause, something necessary to assess responsibility under the lease. As you know, Kerasotes Showplace Theatres LLC was not involved in the construction of the Colorado theatre, or in the hiring or supervision of any contractors. That complicating factor requires us to go back in time to secure information that, if Kerasotes does not possess, may be in the possession or control of Alberta Development Partners and Alberta Town Center, LLC ("Southlands"), the contractors retained by Colorado Cinema Group, LLC or others. I had asked if you had the underlying construction contract agreement and it was my understanding that you were going to see whether you had a copy of that agreement available (though I have since obtained a copy, which I have enclosed with this letter).

In the meantime, Kerasotes' Director of Construction has reached out to representatives of Colorado Cinema's former contractor, Murray and Stafford, to assist in the evaluation of conditions and to determine whether or not there is any ongoing foundation system movement. The step cracks occurring in the exterior walls might be directly related to foundation movement. If this is the case, we could determine whether any further foundation movement is occurring by marking either side of the step crack and observing results over a period of time. Without this information it will be far more difficult to determine what steps are required in order to rectify this problem. If the evidence compiled from the evaluations reveal no further foundation movement then Kerasotes could simply complete the caulking of the exterior wall at its own cost, setting aside any potential dispute over which party may bear the legal responsibility for these repairs. After securing additional information from Murray and Stafford, we anticipate that Kerasotes will retain a company independent of the original firm to perform these tests.

None of this is to suggest that we have determined the repairs necessitated by any foundation system movement to be the responsibility of Kerasotes. As an example, while the information you provided asserts that the problems may be associated with the failure of the contractor to drill and install piers to appropriate depths during construction, other records raise a question of whether Southland's engineering consultants, retained in connection with the overlot grading of the site and related Southlands development activities, made geotechnical recommendations based on its subsurface exploration in which it recommended to Murray and Stafford the very pier depths that are now alleged to have caused foundation movement. While we will proceed to provide you with our findings and recommendations once we determine whether or not foundation movement has stopped, I am also trying to gather information that will help explain Ground Engineering's work with Alberta and any relationship between Ground



**DLA PIPER**

Benjamin A. Kahn
December 18, 2008
Page Two

Engineering's work and the construction activity now complained of. To the extent you have access to that documentation (Southland's contract with Ground Engineering and communications between Ground Engineering and Murray and Stafford representatives or subcontractors, for example), I would appreciate it if you could send me copies. Conversely, at your request, I am providing with this letter copies of documents I have obtained in connection with my inquiries, and I will continue to provide you with additional documents as I receive them.

Again, I anticipate following up with you with additional information and a proposed timetable once Kerasotes' Construction Director obtains information from an independent testing company and additional information from Murray and Stafford. Thank you for your anticipated cooperation in this matter. It remains my hope that this issue can be resolved fairly and professionally. As indicated, Kerasotes intends to comply with any obligations it may have under its lease agreement.

Very truly yours,

**DLA Piper LLP (US)**

Kenneth L. Stylmetterer

cc:     Michael Policicchio (w/out enclosures)
        Richard F. Klawiter, Esq. (w/out enclosures)

encl

CENTRAL\31169983.1